**UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
CONNECTICUT**

| | |
|---|---|
| STEFON MORANT,<br><br>　　　Plaintiff,<br><br>v.<br><br>The CITY OF NEW HAVEN;<br>Chief of Police NICHOLAS PASTORE, in his<br>individual and official capacities; and<br>Officers VINCENT RAUCCI, ROBERT<br>LAWLOR, VAUGHN MAHER, JOSEPH<br>PETTOLA, and MICHAEL SWEENEY, in<br>their individual capacities;<br><br>　　　Defendants. | Case No. _____<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Stefon Morant by and through his attorney, states as follows:

**INTRODUCTION**

1.　　　Beginning in 1991, and continuing for more than two decades thereafter, Plaintiff Stefon Morant was wrongfully imprisoned for a heinous double murder that he did not commit.  At the same time, Scott Lewis, another resident of New Haven and long-time acquaintance of Mr. Morant, was likewise wrongfully charged and imprisoned for the same crimes.  Although no physical or forensic evidence ever connected either of them to the case, both of them were arrested, convicted and imprisoned on the basis of testimony that was coerced, fabricated and covered up by detectives and supervisors of the New Haven Police Department ("NHPD"), and as a further result of the City of New Haven, the NHPD and other Defendants' deliberately indifferent and/or negligent failure to disclose exculpatory and impeachment evidence, on an ongoing basis for years, in violation of Plaintiff's civil rights under the U.S. and Connecticut constitutions,  Conn. Gen. Stat. § 54-86c(c) and the common law.  As further set forth below, the

1

wrongful acts of the NHPD, and its investigative and supervisory personnel, proximately caused Mr. Morant to suffer severe and continuing personal injury, pain, suffering, physical and emotional distress, and restrictions on all forms of personal freedom on a daily basis for more than two decades, specifically including 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014 and 2015, and further including the ongoing effects thereof to this day.

2.      Throughout that period Mr. Morant steadfastly maintained his innocence.

3.      Subsequent to Mr. Morant's conviction, his innocence, and the Defendants' misconduct, was substantiated by testimony at a 2013 federal court hearing demonstrating that NHPD Detective Vincent Raucci had improperly coached and coerced witnesses into providing false statements implicating Mr. Morant and Lewis, and that the City's police department, and other Defendants herein, failed to intervene, disclose or rectify the foregoing -- wrongful acts and omissions that continued during the above-listed years from 1991 to 2015, in violation of Mr. Morant's civil rights.

4.      As a result of the 2013 federal court proceedings, and findings that exculpatory information had been withheld in violation of Mr. Morant and Lewis's civil rights, Mr. Morant was finally released from prison, but not until June 2015, after serving more than 21 years.

5.      The innocence of Mr. Morant and Mr. Lewis, and the NHPD misconduct that had caused their wrongful convictions and imprisonment, became so clear that in 2015 the State's Attorney for the Judicial District of New Haven stated in open court "that the key witness [against Morant and Lewis]. . . was not honest in his testimony with respect to both trials, and it's public information that a certain police officer involved in this [Raucci] had put him up to contriving a story."

6.      On July 7, 2021, the felony murder charges, on which Mr. Morant had been convicted and incarcerated, were expunged by the Connecticut Board of Pardon and Paroles, "forever acquit[ting], releas[ing] and discharg[ing]" him from said convictions.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Mr. Morant's civil rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8.      This Court has supplemental jurisdiction over Mr. Morant's state civil rights and other state law claims pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

10.      Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

11.      Plaintiff **STEFON MORANT** is a resident of the State of Connecticut, and, as relevant to this Complaint, was a resident of the Fair Haven section of New Haven, Connecticut, where he had resided since grade school.

12.      Defendant **CITY OF NEW HAVEN** is, and at all times relevant to this Complaint was, a municipality located in the State of Connecticut. The City of New Haven was officially responsible for the policies, practices, and customs of the NHPD, and was the employer of the individual NHPD Defendants in this matter. During all times relevant to this Complaint, the City of New Haven delegated policy-making authority regarding the NHPD to the NHPD Chief of

Police, for whose actions the City itself was directly liable.

13.     Defendant **NICHOLAS PASTORE**, as relevant to this Complaint, was an employee of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Pastore served as the NHPD's Chief of Police from approximately February 1990 to early 1997, when he resigned. The Chief of Police is responsible for setting the policies and practices of the NHPD, and is the final policymaker for police actions on behalf of the City of New Haven. Pastore is named in both his individual capacity and his official capacity.

14.     Defendant **VINCENT RAUCCI**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Raucci is named in his individual capacity.

15.     Defendant **ROBERT LAWLOR**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Lawlor was a member of the NHPD for 26 years. He began as an NHPD patrolman in 1970 and retired as a Lieutenant in 1995 (after Mr. Morant's conviction), at which time he was a supervisor of the NHPD's investigative services division. By January 1991, Lawlor was a detective-sergeant with supervisory responsibilities over NHPD detectives -- including, for example, Detective Raucci -- who were involved with the investigation, arrest, and prosecution of Mr. Morant.  Defendant Lawlor is named in his individual capacity.

16.     Defendant **VAUGHN MAHER**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes,

4

ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Maher, a detective within the NHPD's homicide division, and ultimately a sergeant, participated in the investigation that resulted in Mr. Morant's arrest, prosecution, and conviction. Defendant Maher is named in his individual capacity.

17.     Defendant **JOSEPH PETTOLA**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. In 1990 and 1991, he was a detective with the NHPD. He participated in the investigation that resulted in Mr. Morant's arrest, prosecution, and conviction. Defendant Pettola is named in his individual capacity.

18.     Defendant **MICHAEL SWEENEY**, as relevant to this Complaint, was an officer of the NHPD acting under color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New Haven and the NHPD. Sweeney began his employment with the NHPD in September 1968 and retired in December 1998. In early 1991, He was a detective-sergeant with supervisory responsibilities over homicide detectives, and participated in the investigation that resulted in Mr. Morant's arrest, prosecution, and conviction. Defendant Sweeney is named in his individual capacity.

## FACTUAL ALLEGATIONS

### The Unsolved Turner-Fields Homicide

19.     At around 4:30 a.m. on October 11, 1990, Ricardo Turner and Lamont Fields were murdered inside their second-floor apartment on Howard Avenue, in the Hill/City Point section of New Haven, Connecticut.

20.     Responding to a 911 call, NHPD officers found the victims in the apartment bedroom, shot multiple times in the head and torso.

21.     These murders attracted significant public attention in the following weeks and months, in part because Mr. Turner was a former alderman of the City of New Haven. The Governor authorized a $20,000 reward for information leading to an arrest and conviction.

22.     Plaintiff Stefon Morant had absolutely no involvement with the Turner-Fields murders.

23.     Defendant Detective Vaughn Maher led the NHPD's initial investigation into the murders, conducting or assigning the majority of the investigative tasks. Defendant Robert Lawlor was also involved in the NHPD's initial investigation in a supervisory capacity, including by assigning detectives to conduct various investigative steps. For example, Defendant Lawlor assigned Defendant Raucci to take a statement from a witness who lived in the building where the murder occurred.

24.     The initial investigation developed substantial information that the victims had been involved in drug trafficking and were associated with various gangs in the Hill and City Point areas of New Haven.  It also revealed that Turner and Fields had numerous potential enemies related to their involvement in selling narcotics in those areas.

25.     In the course of that investigation, the police developed several potential suspects, and continued to follow up on those leads.  Nevertheless, after more than two and half months of intensive work, during which 34 police reports were filed, more than twenty-five witnesses were interviewed, and physical and forensic evidence recovered from the scene was examined and tested, the case remained unsolved.

26.     None of the foregoing evidence implicated Mr. Morant or Mr. Lewis in any respect. Their names had never come up in a single one of the numerous police reports or witness interviews. There was no information to suggest they had any connection with the victims, or even knew them.  There was no indication that they were among the people with whom Turner had a

falling out in the weeks preceding the murders, or with whom he was involved in drug transactions. And, as later developed, Morant and Lewis were both excluded through DNA from any of the blood samples taken by the police at the scene -- tested, first at Lewis's request and expense, during post-conviction proceedings, and thereafter through the efforts of the Connecticut Innocence Project on Mr. Morant's behalf.

**Defendants utilize the NHPD "pre-interview" process to fabricate and coerce witness statements falsely implicating Lewis and Morant in the Turner-Fields murders**

27.     In early January, with the crimes still unsolved, and the original detective in charge of the investigation (Maher) transferred to another position, Detective Vincent Raucci took over. As set forth below, without the filing of a single additional report or any further street work, the investigation thereupon took an abrupt turn. Within three days, the NHPD had "solved" a high-profile murder case that had eluded solution in nearly three months of previous investigation.

28.     When Raucci took the helm of the Turner-Fields investigation, there were remaining leads to be investigated with respect to several suspects. Instead of pursuing any of that evidence, Raucci, with the knowledge and acquiescence of his fellow NHPD officers and supervisors, immediately pulled together a very different theory of the case – one that contradicted the actual events in a number of respects.

29.     The "solving" of the Turner-Fields case was accomplished through use of an NHPD policy and practice of conducting lengthy, unrecorded, undocumented "pre- interviews" with witnesses. After the "pre-interview" coaching session, the officer or detective conducting the interview would turn on an audio tape recorder and record a formal interview with the witness, in which the witness would be required to repeat back the statement the detectives had coached and/or coerced the witness to provide. As part of that practice, the NHPD also had a policy of not maintaining or disclosing any notes from the "pre-interviews," and of losing or destroying

the notes and audio recording of the witness statements if they were unhelpful.

30.      Connecticut courts have exhaustively documented this practice. *See* ¶¶ 94-112, *infra*.

31.      In the case of the Turner-Fields investigation, that pre-interview process was used over the course of three consecutive nights in early January 1991 to produce police-created statements from three witnesses who knew nothing about the murders -- Ovil Ruiz (a/k/a Augustin Castro), Jose Roque, and Mr. Morant -- and thereafter with additional witnesses (Hector Ortiz and Millie Martinez) to further support the case against Mr. Morant and Mr. Lewis.

32.      Thereafter, Raucci and the NHPD disclosed transcriptions of the taped statements to prosecutors, but affirmatively misrepresented to prosecutors that all the facts in those statements were volunteered by the witnesses themselves without coercion or suggestion. Raucci and his fellow officers withheld exculpatory information regarding the witnesses' off-tape denials and the officers' coercive tactics, failing for years, notwithstanding their continuing disclosure obligations, to report what actually occurred.

33.      In addition to the then-lead detective, Raucci, other Defendants – Sweeney, Pettola, and Maher -- were present for at least parts of these witness interviews. These Defendants knew about Raucci's misconduct and knew about the witnesses' exculpatory statements and yet failed to document or disclose any of it, failed to prevent Raucci from engaging in misconduct, and/or affirmatively misrepresented to prosecutors that no misconduct had occurred.

**Fabricated Statement of Ovil Ruiz**

34.      Raucci obtained his first fabricated statement on the evening of January 13-14, 1991, within days of taking over the case, from Ovil Ruiz, a frightened and mentally unstable teenager with whom Raucci was acquainted and who faced serious charges for another shooting on which Raucci had him under arrest at the time.

**35.**     Although Raucci had no reason to believe that Ruiz had any information about the Turner-Fields murders, Raucci used Ruiz's arrest on that other shooting as leverage against Ruiz. Raucci threatened Ruiz with life imprisonment if he did not implicate Lewis and Morant in the murders.

**36.**     In the face of the fact that Ruiz repeatedly stated that he did not know anything about the murders, Raucci provided Ruiz with details about the murders -- including the victims' names, the location, and the fact that they had been shot -- and told Ruiz what to say to implicate Lewis and Morant. Raucci even drove Ruiz around New Haven to show him the key locations that Raucci would incorporate into Ruiz's statement.

**37.**     After denying multiple times that he knew anything about the crime, Ruiz eventually gave a taped statement falsely claiming a connection between Lewis, Morant and the victims, and stating that after the murders he overheard a conversation in which Lewis and Morant were supposedly discussing the murders. Ruiz also falsely claimed that in the weeks following the crime he witnessed Lewis throw a gun off of a bridge and into the Mill River.

**38.**     As Raucci and Ruiz both knew, this statement was a complete fabrication. In other words, although the transcription of the taped statement made it appear that Ruiz voluntarily provided information that he knew about the crime without suggestion or coercion, all of the information was either provided by Raucci or manufactured out of thin air to be consistent with the story Raucci wanted Ruiz to tell.

**39.**     In fact, Ruiz never had any truthful information tying Morant or Lewis to the murders, and Ruiz never witnessed any of the inculpatory events described in his statement.

**40.**     Raucci subsequently misrepresented to prosecutors that Ruiz had volunteered the information on the taped statement based on his personal knowledge and without suggestion or

coercion. Raucci never informed prosecutors that Ruiz repeatedly denied having any knowledge of the crime, and that Raucci coerced Ruiz and fed him the information he recited on tape.

41.    Instead, it was the police-contrived narrative that found its way into Ruiz's supposedly unprompted police statements and furnished the foundation for Ruiz's testimony as the State's key witness at the trials of both Mr. Morant and Mr. Lewis, absent which, as the State itself later conceded, neither Lewis nor Morant would have been convicted in the first place.

**Defendants Michael Sweeney, Joseph Pettola, and Robert Lawlor are aware of Raucci's misconduct with Ruiz, but suppress all evidence of that misconduct**

42.    Much of Raucci's misconduct with Ruiz occurred in open view of Raucci's supervisors and other senior detectives within the NHPD.

43.    For example, Defendant Sergeant Michael Sweeney witnessed Raucci using unlawful tactics to obtain Ruiz's false statement, including coercing Ruiz and feeding Ruiz information. Sweeney never documented and failed to disclose to prosecutors either Ruiz's statements denying any knowledge or Raucci's misconduct.

44.    When Raucci first brought Ruiz to the police station, claiming that Ruiz had information regarding the Turner-Fields murders, Sweeney interviewed Ruiz alone. During this un-taped interview, Ruiz truthfully insisted that he knew nothing about the murders. Sweeney never documented or reported to prosecutors that Ruiz denied any knowledge of the Turner- Fields murders before falsely implicating Mr. Lewis and Mr. Morant.

45.    When Raucci thereafter joined the interview, after Ruiz again stated that he knew nothing about the murders, Sweeney witnessed Raucci deliberately provide Ruiz specific details about the murders for Ruiz to parrot back. Sweeney also witnessed Raucci falsely promise Ruiz that he would be released if he stated that he had been the driver on the night of the murders. Again, Sweeney never documented Raucci's misconduct and failed to report it to prosecutors.

**46.**     As a Sergeant, Sweeney understood that Raucci's conduct was blatantly inappropriate—that it was impermissible to feed Ruiz information or suggest that Ruiz would be released in exchange for a statement implicating Lewis and Morant, particularly when Ruiz had repeatedly denied any personal knowledge.

**47.**     As the interrogation of Ruiz on the evening of January 13-14 wore on, Defendant Detective Joseph Pettola arrived at the police station to begin his shift. Pettola was familiar with Raucci's corrupt practices because in a previous, unrelated case, Pettola had witnessed Raucci attempt to fabricate evidence by planting drugs on a suspect. Pettola had also personally witnessed Raucci meeting with known drug dealers on what clearly was not NHPD business.

**48.**     Sweeney brought Pettola up to speed regarding the interrogation and asked Pettola to join Raucci in the interview room. Sweeney then left the interview for good, but, as noted above, never documented or reported Raucci's misconduct or Ruiz's many exculpatory statements to prosecutors.

**49.**     Raucci, with Pettola present, continued the interrogation, coercing Ruiz until he agreed to give a false statement on tape. Like Sweeney, Pettola never documented or reported Raucci's misconduct or Ruiz's statements that he knew nothing about the murders.

**50.**     Although Sweeney did not disclose the exculpatory information regarding Ruiz and Raucci to prosecutors prior to Mr. Morant's criminal trial, during post-conviction proceedings brought by Mr. Morant, Sweeney testified that in 1991 he did advise his fellow detective-sergeant, Robert Lawlor.

**51.**     Sweeney testified that when he learned that the NHPD had made an arrest, he spoke with Lawlor and asked him if the arrest was based on Ruiz's statement. When Lawlor responded that it was, Sweeney told Lawlor that Ruiz's statement was a lie and fed to him by Raucci.

11

**52.**     In direct contrast to Sweeney's sworn testimony, Lawlor has testified that no such conversations with Sweeney ever took place.

**53.**     Either Sweeney never reported the exculpatory information about Ruiz to Lawlor, or Sweeney did report this information and Lawlor suppressed it. In any event, prosecutors never learned this exculpatory information and were instead mistakenly led to believe that Ruiz's statement was true and voluntary.

**Additional Police-Fabricated Statements and Suppression of Exculpatory Evidence**

**54.**     On January 15, 1991, the day after coercing and fabricating Ruiz's false statement, Raucci, this time with Defendant Detective Maher, coerced a second witness, Jose Roque, into providing another false statement implicating Lewis and Morant.

**55.**     Roque was a sixteen-year-old who knew Lewis, Ruiz and Morant from the Fair Haven neighborhood of New Haven.

**56.**     Like Ruiz, Roque told the detectives that he did not know anything about the murders and did not have any information implicating Mr. Lewis or Mr. Morant. Knowing that Roque had no relevant information, Raucci and Maher coerced Roque by threatening to arrest him for the Turner-Fields murders if he did not provide a false statement implicating Lewis and Morant.

**57.**     As with Ruiz, Raucci and Maher provided Roque with information off tape, and then had Roque repeat back that information during a taped statement. The detectives subsequently misrepresented to prosecutors that they had not fed any information to Roque, and that he voluntarily provided all the information on the tape.

**58.**     In the false taped statement, Roque claimed to have heard the same conversation as Ruiz -- a conversation involving Lewis and Morant supposedly discussing the murders, and also claimed, like Ruiz, to have witnessed Lewis throw a gun from a bridge into a river.

12

**59.**     Maher and Raucci were both present for Roque's taped statement. Maher even signed Roque's statement as a witness.

**60.**     Of course, Roque did not actually witness any of the events discussed in his statement because they never happened. Roque's police statement was consistent with Ruiz's police statement from a day earlier because Raucci told both Roque and Ruiz what to say.

**61.**     Neither Raucci nor Maher ever reported the misconduct with regard to Roque's interrogation—they never reported that Roque stated he knew nothing about the crimes, they misrepresented that the inculpatory information in Roque's statement was voluntarily supplied by Roque without suggestion or coercion, and they misrepresented that they had not stopped and started the tape in order to provide Roque with additional information.

**62.**     After he was released, Roque retracted his false statement. At Mr. Morant's trial, Roque testified under oath that his taped statement was false and that he had simply repeated what Raucci told him to say.

**63.**     In fact, Roque testified that Raucci repeatedly stopped the tape, told him what to say, and then restarted the tape. Raucci, by contrast, denied committing any misconduct during Roque's interview and specifically denied ever stopping-and-starting the tape during Roque's statement. Years later, the FBI's forensic lab conclusively established that Roque's tape had been stopped at least 11 times during Roque's twenty-two-minute statement, as Roque had testified and Raucci had falsely denied.

**64.**     The day after interrogating Roque, Raucci contacted Mr. Morant and arranged to meet him at a Fair Haven gas station. When Morant arrived, Raucci placed him in the back seat of his police vehicle, with no indication of what they would be discussing.  Only on the highway, with Morant locked in the back seat, did he indicate Morant would be interrogated about a homicide.

13

65.     At the NHPD Detective Bureau, Mr. Morant truthfully told the detectives that he knew nothing about the murders. Once again, as with Roque and Ruiz, Detective Raucci, joined by Maher, coerced a false statement nevertheless, implicating their primary target (Scott Lewis), by feeding Mr. Morant information over the course of a "pre-interview" that lasted for hours and of which no record was made or disclosed, showing him newspaper articles and reading him portions of the Roque and Ruiz statements, threatening that he himself would be arrested for the murders if he did not provide the statement against Lewis they were seeking (Raucci told Morant he would likely get the death penalty if convicted), and refusing to allow him to leave until he did so.

66.     Subjected to that blatant police misconduct, Mr. Morant ultimately provided the statement fed to him by the detectives, describing events matching Ruiz's and Roque's false police statements only because Raucci told all three witnesses what to say.

67.     Within days of that statement, which Mr. Morant refused to sign, he returned to the Detective Bureau to recant his statement. When the NHPD refused to allow this, Morant persisted in indicating the statement was false, even when threatened with conspiracy charges.

68.     As with the Roque interrogation, neither Raucci nor Maher ever reported their misconduct with regard to Morant's interrogation -- they never reported that Morant had repeatedly indicated the knew nothing about the case, and they misrepresented that the inculpatory information in Morant's statement was voluntarily supplied by Mr. Morant without suggestion or coercion.

69.     Subsequent forensic testing in February 2017 of the NHPD's tape of Mr. Morant's statement has confirmed, as with Roque, that the tape was stopped, started and over-recorded repeatedly – testing performed by the same examiner who had performed the FBI lab analysis of

14

the Roque tape, Bruce Koenig, then-retired from a 21-year career as FBI Supervisory Special Agent tasked with forensic analysis of audio and visual recordings and a nationally prominent expert in the field.

70.     In order to strengthen his fabricated case, Raucci attempted to coerce and/or fabricate additional statements from witnesses who Raucci knew had no knowledge of the crimes. Although he succeeded in obtaining additional statements, purporting to implicate both Morant and Lewis, these witnesses also later recanted, independently confirming the pattern of police fabrication and coercion used with every one of those witnesses.

**Defendants Raucci and Maher attempt to solidify their case against Lewis and Morant**

71.     Raucci and Maher also engaged in misconduct designed to ensure that Lewis and Morant could not present a viable third-party defense at trial.

72.     Before Raucci became involved in the investigation, Maher, as lead investigator, developed substantial evidence implicating Michael Cardwell as the NHPD's prime suspect.

73.     Maher discovered that Cardwell's name, his girlfriend's name, and several phone numbers associated with both Cardwell and his girlfriend were found throughout Mr. Turner's personal datebook and agenda. Seven individuals, including the victim's ex-wife and Cardwell's own brother, confirmed Cardwell was an associate of both victims.

74.     About one month after the murders, a formally-registered confidential informant— whom the NHPD deemed "known and reliable" because he had previously provided officers with information relative to homicides and/or serious felonies that had proven to be true and accurate and resulted in numerous arrests and convictions—told the NHPD that Cardwell *admitted* to the informant that *he* had committed the murders.

75.     Maher knew this information and met with the informant at least twice during

November 1990. The informant provided Maher with numerous important details that were consistent with the physical evidence and Maher's working theory of the crime, including: (1) that the informant had known Cardwell for years; (2) that Cardwell had previously run a narcotics organization with one of the victims, but the two were currently at odds; (3) that Cardwell admitted that his brother was supposed to whistle from the street when there was no activity as a sign to carry out the murders; (4) that Cardwell had admitted that he shot five times, killing Turner first and then Fields, who was lying in bed; and (5) that Cardwell had stashed the murder weapon at his girlfriend's house in New Britain, Connecticut.

76.     These details were largely corroborated by independent evidence, including non-public information about the crime scene and a statement from a witness who heard a man whistling on the street shortly before the murders.

77.     Maher even received information from an NHPD officer that a second informant implicated Cardwell in the murders.

78.     By January 1991, once Raucci became involved in the Turner-Fields investigation, all of this information regarding Cardwell was known to Maher and Raucci, and documented in the NHPD's file.

79.     Despite all of this evidence implicating Cardwell, neither Maher nor Raucci made any attempt to interview Cardwell's girlfriend or search her house, even though Cardwell had admitted to the informant that the murder weapon was in his girlfriend's house (for which Maher had an address and phone number). Nor did Maher or Raucci conduct an identification procedure with the witness who saw a man whistling on the street just prior to the murder.

80.     Once Raucci became involved in the investigation, rather than follow up on the important Cardwell lead, Raucci and Maher used the fabricated witness statements to close the

16

case. Maher also wrote a report downplaying the evidence pointing to Cardwell and incorrectly reported that the informant was unable to support the allegations against Cardwell "with any evidence or information," thereby closing the investigation into Mr. Cardwell and clearing the way for Mr. Morant and Lewis's prosecutions.

81.    In 2005, years after Morant and Lewis's convictions, the State's Attorney's Office agreed to conduct a photographic identification procedure with the witness who was known to, and ignored by, Maher and Raucci. At that photographic identification procedure, the witness identified Cardwell from two eight-person arrays as the person she saw across the street from the Howard Avenue building just minutes before the murders.

## The arrests, prosecutions and wrongful convictions of Lewis and Morant

82.    On April 12, 1991, based on the foregoing police-fabricated witness statements, Raucci obtained an arrest warrant for Lewis charging him with the Turner-Fields double murders.

83.    When Mr. Morant was subpoenaed to testify at the requisite probable cause hearing in Mr. Lewis's case, he refused to do so, requiring the State to reduce the murder charges against Lewis to manslaughter and temporarily halt the prosecution of Lewis.

84.    Thereafter, just as the police had threatened when Mr. Morant had renounced the coerced statement within days of its original procurement in January 1991, Mr. Morant was himself arrested and charged with murder. The NHPD's February 1992 arrest warrant for Mr. Morant repeated the police-fabricated statements set forth above, and completely omitted any mention of the exculpatory information of Ruiz and the others' repeated denials of any knowledge of the crime, or of the misconduct employed to obtain those police-contrived statements.  In the course of Mr. Morant's arrest, Raucci told Morant once again that it was Lewis he was after, and that Morant should cooperate. He refused.

17

85.     Although Lewis had been arrested long before and remained the primary target, Mr.

Morant was selected as the first defendant to stand trial, which commenced in May 1994.

86.     Ruiz was the State's key witness, without whom, as the prosecution itself later

conceded, it would not have been able to obtain a conviction. Despite written motions for

disclosure, and the mandatory disclosure obligations of Connecticut and federal law, the State

failed to disclose (because the prosecutors did not know) the exculpatory evidence discussed

above, including Ruiz's oral statements to Raucci, Sweeney, and Pettola denying any knowledge

of the murders, as well as evidence that Raucci inappropriately coached and coerced several

witnesses (including Ruiz and Roque) into making inculpatory statements against Lewis and

Morant.

87.     By the time of Mr. Morant's trial, as set forth in ¶¶ 62-63 above, Roque had completely

renounced his taped statement and testified that he had no information implicating Morant or

Lewis, and that the police statement was false. Roque truthfully testified that the detectives had

threatened to charge him with the murders if he did not tell them what they wanted to hear. and

that Raucci had coached him during the statement by stopping the tape and telling Roque what to

say.

88.     Despite this testimony, the transcription of Roque's coerced and police-fabricated

statement was entered into evidence against Mr. Morant.

89.     On June 8, 1994, Mr. Morant was found guilty on two counts of felony murder, and

thereafter sentenced to a 70-year term.

90.     Following Mr. Morant's conviction, Mr. Lewis was again charged with murder, and a

new probable cause hearing was scheduled. Morant, who had been immediately taken into

custody following his conviction, was brought from prison to the State's Attorney's Office in

18

New Haven, for a confrontation that the State had arranged to include his 4-year-old twins, and told that if he ever wanted to be with those children again, he needed to become a State's witness against Lewis. Again he refused.

91.     Yet again, several years later, in the course of post-conviction proceedings, when Mr. Morant's lawyer, Michael Fitzpatrick, was approached by the prosecution with an offer to reduce his sentence in return for testimony against Lewis, he likewise declined.

92.     Never once, from the date of his renunciation of the initial statement to Raucci, the day after it had been coerced, until his release from prison more than 24 years later, did Mr. Morant ever submit to the considerable pressures to falsely implicate Lewis in a crime with which neither of them had any involvement.

93.     As with Mr. Morant, at the trial of Mr. Lewis, the police-fabricated account of Ovil Ruiz was the primary evidence presented to the jury, resulting in Lewis's conviction, and an even lengthier (120 year) prison term.

**The NHPD's unconstitutional pattern, practice, and custom of coercing and fabricating witness and suspect statements, and suppressing exculpatory evidence**

94.     At the time of the Turner-Fields investigation, the City of New Haven, by and through its final policymakers at the NHPD, had in force and effect a policy and practice of unconstitutional misconduct with respect to witness statements. It likewise had in force and effect a policy and practice of suppressing exculpatory information related to such misconduct, in contravention of clearly established constitutional requirements, and the express provisions of Connecticut law.

95.     The City of New Haven, by and through its final policymakers at the NHPD, also had in force and effect during the Turner-Fields investigation and for years before and after, a policy and practice of failing to adequately supervise and discipline NHPD officers and detectives in the

19

exercise of their constitutional obligations, including their obligations not to fabricate evidence, and their obligations to disclose exculpatory evidence.

96.     The NHPD and Chief Pastore's failure to supervise and discipline Raucci, and instead to promote and empower him, is just one example of the NHPD's unconstitutional conduct. In fact, Raucci was just one of many NHPD officers and detectives engaged in such unconstitutional conduct, none of whom were adequately supervised or disciplined.

97.     In 1982, a federal jury found NHPD officer Mel Cartoceti liable for using excessive force in the arrest of 33-year-old postal employee Donald Dinkins. The jury also concluded that Cartoceti "knowingly and deliberately filed a false report" under penalty of perjury. Although Internal Affairs nominally investigated this incident, it cleared Cartoceti of any wrongdoing. Rather than disciplining Cartoceti, the NHPD promoted him to detective. NHPD Chief of Police William Farrell publicly commented that he was satisfied with Internal Affairs' response.

98.     In July 1984, Detective Anthony DiLullo was named as a defendant in a malicious prosecution lawsuit. At trial, DiLullo admitted to misquoting statements people gave him for an arrest warrant application and to leaving out the fact that one witness, the parking garage attendant, identified someone completely different as the killer. As reported by the Second Circuit, in a decision published at the very time of the Turner-Fields investigation, DiLullo, the NHPD detective with "primary operational responsibility for the investigation,"  had also testified at deposition "that it was his general practice to omit exculpatory information from affidavits submitted in support of applications for warrants." *Golino v. City of New Haven*, 950 F.2d 864, 871-72 (2d Cir. 1991).

99.     In September 1984, police arrested Leroy Harris for stealing a car and sexually assaulting two women. Though neither the robbery victim nor sexual assault victims identified

Harris's photograph as one of three perpetrators, and despite the lack of any other evidence implicating him in the crime, police arrested Harris based on the uncorroborated statement of a 17-year-old cooperating codefendant and admitted rapist, Jerome Downing. Downing's recorded statement, which was taken by Detectives John Dattilo and Vaughan Maher, was preceded by an unrecorded "pre-interview." As summarized in a memorandum that the State's Attorney's Office invited the Innocence Project to file in support of a sentence modification application, "police only taped Downing's final statement (which was later transcribed). It is apparent from the recording that Downing was reading answers that had already been written out. . . . At key points in the statement, such as before asking Downing to identify Harris, the interrogating officers repeatedly stop and start the tape. Comparing the noted beginning and end time of the statement and the length of actually recorded content, it appears that there is upwards of thirty minutes of commentary that went unrecorded." At trial, Downing recanted, and testified that he had only identified Harris, who he did not know, because the police had told him "this is the individual placing you there at the time," and that he had "made an agreement" with the police in order to "get out to this with as less time as possible."

100.    On May 8, 1990, Terrance Gamble was shot and killed. His murder was investigated by the NHPD, including by Detectives Anthony DiLullo and Joseph Greene. Two days after the murder, Detectives DiLullo and Greene obtained a tape-recorded statement from a witness implicating Maceo Streater. The witness later testified that DiLullo and Greene coerced her into providing the statement. She also testified that the detectives had stopped the tape several times during her statement to tell her what to say, and that the statement was not true. The Court did not allow Mr. Streater's counsel to question DiLullo regarding the fact that he was a defendant in three pending federal civil rights actions that included allegations of coercion and intimidation.

101.    In August, 1991, Eric Ham brought a federal civil rights action against NHPD Detectives

Joseph Greene and Michael Sweeney claiming false arrest and malicious prosecution. Mr. Ham, who had been arrested on February 13, 1991 for a January 20, 1991 murder, alleged that Greene and Sweeney knowingly made misleading statements and omitted material information from their affidavit in order to obtain the arrest warrant. In particular, Greene and Sweeney failed to disclose that a key witness mentioned throughout the affidavit made two prior statements in which he did not identify Mr. Ham as the assailant. A jury returned a verdict in favor of Mr. Ham for nearly $1,000,000 in damages. *See Ham v. Greene*, 248 Conn. 508, 729 A.2d 740 (1999).

102.    On September 21, 1991, two individuals were murdered outside of a New Haven diner. In 1994, Daryl Valentine was convicted of those murders based on the investigation of NHPD Detectives Joseph Greene and Anthony DiLullo. Mr. Valentine has consistently maintained his innocence. At trial, two witnesses testified that they were coerced and bribed by Detective Greene into making written and tape-recorded statements against Mr. Valentine. One witness testified that she had lied in the tape-recorded statement, that Detective Greene had threatened her with jail time in order to elicit her statement, and that after she provided the recorded statement, Detective Greene bought her alcohol and cigarettes and gave her money to buy cocaine. *See State v. Valentine*, 255 Conn. 61, 762 A.2d 1278 (2000). Another witness also testified that she told Detective Greene that she was not present at the diner during the shooting and that she fabricated her statement under pressure and bribes from Detective Greene.

103.    In the early 1980s, NHPD Officer Billy White, who already had a long history of alleged and proven misconduct, received a reprimand for "conduct unbecoming of an officer" and "failing to satisfactorily perform the tasks of an officer." The NHPD had already concluded in previous cases that White had fabricated evidence by planting drugs on victims and then arresting them. In this case, Officer White pointed a gun at the heads of several schoolchildren

22

who were not under arrest and yelled: "The first n***** who moves will get his fucking head blown off." During the investigation of this incident, the NHPD concluded that White had lied in his reports and subsequent testimony. Yet, NHPD Chief of Police Farrell chose to take no action beyond the basic reprimand.

104.    In April 1990, NHPD Chief Pastore decided to again promote then-Sergeant Billy White. Within a year thereafter, White participated in the threats and intimidation of a key New Haven-based alibi witness in connection with Derreck Hamilton's wrongful arrest and prosecution for a January 1991 Brooklyn, New York murder for which Hamilton was later exonerated.  Hamilton thereafter brought a civil rights action against White and the City of New Haven, inter, alia, which was settled by the City's payment of $375,000 to Hamilton. White remained active in the NHPD until approximately 2007, when he was arrested by the FBI in connection with illegal activities while the head of the NHPD's Narcotics Enforcement Unit. White eventually pled guilty to corruption-related charges.

105.    From approximately 1986 through his resignation in 1993, NHPD Officer Vincent Riccio had 14 complaints filed against him. None of these 14 complaints resulted in any official disciplinary action. In fact, in just seven years, Riccio was promoted to Sergeant and was even the second officer that Chief Pastore selected to pioneer his community-based policing program.

106.    In 1993, NHPD detectives arrested and charged George Gould and Ronald Taylor for the murder of a convenience store owner, based on a statement obtained from Doreen Stiles after six or seven hours of interrogation. Stiles, a heroin-addicted prostitute, later recanted, indicating that her identification of Gould and Taylor, following repeated denials of any knowledge of the perpetrators, came only after the detectives plied her with promises of assistance in obtaining heroin, and after the detectives showed her

23

photographs with "not so subtle hints" of who to pick out. *Gould v. Cms'r. of Corrections,* No. CV 054000409, 2010 WL 1544667, at * 21 (Super. Ct., Tolland J.D. Mar. 17, 2010). In May 2021, after a meeting between the Chief State's Attorney and lawyers for Gould concerning new exculpating evidence, Gould (who was serving an 80-year sentence), had is sentence modified to time served and was released from prison.

**107.**    In February1994, Adam Carmon was arrested by the NHPD for the killing of a seven-month-old child and paralyzing her grandmother as a result of a gunman firing 15 shots into a ground floor apartment at 810 Orchard Street in New Haven. Although an alternative suspect with a motive for the shooting confessed to his involvement in the crime on two separate occasions, and although no motive or physical evidence connected Carmon to the crime, he was convicted of murder and sentenced to 85 years in prison.  Subsequent to that conviction, evidence was uncovered of exculpatory information in the possession of NHPD detectives, that had not been disclosed prior to trial, including the following:

- the alternative suspect, Arthur Brantley, who had been involved in a fight with the victim's family only hours before the shooting, was "hysterical" after the fight and had told his purported accomplice, Anthony Little, that he was "ready to hurt someone" and "needed a gun" so he could "shoot the whole house up."
- the named accomplice (Little), when questioned by police, falsely denied ever speaking with Brantley the night of the homicide and offered an inconsistent and unverified alibi.
- NHPD detectives received information that the shooter was observed running into an apartment at 36 Beers Street, an address connected to an associate of Brantley's and with no connection to Carmon – exculpatory information in police field notes that, pursuant to long-standing NHPD policy and practice, were never disclosed.
- the State's primary eyewitness, Jaime Stanley, had (1) selected the photograph of a different person as a "look-alike" to the shooter who, unlike Carmon, had a beard, (2) viewed multiple photographs of Carmon without being able to identify him, before first identifying him three weeks after the crime in a highly suggestive arraignment proceeding that lacked any appropriate fillers, (3) stated that the location of the shooting "[was] not very well lit," and "the lighting conditions [were] in fact poor."

Carmon remains incarcerated, and is presently pursuing a habeas corpus petition based on the failure to disclose the foregoing and other items of exculpatory evidence.

108.    In 1996, Philip Cusick was shot to death in the Fair Haven section of New Haven, allegedly by a drug dealer. The NHPD reported that they had no reason to believe Cusick was involved in a drug transaction. In 1998, NHPD detectives taped an interview of a Fair Haven gang member who said that he witnessed the murder and identified a fellow drug dealer as the murderer. An NHPD supervisor kept a transcript of the interview in his desk drawer and the tape disappeared. The NHPD never interviewed or pursued the killer. Thereafter, the NHPD's chief of detectives, who indicated that then-Chief Melvin Wearing told him to stop the investigation, was arrested on charges related to his suppression of the statement and hindering the investigation. The NHPD's Internal Affairs report also noted that Chief Wearing overruled his own internal affairs investigators in their efforts to obtain "untainted testimony."

109.    On January 24, 1999, three armed individuals committed a robbery-murder at an all-night convenience store in the Newhallville section of New Haven. New Haven Detectives Leroy Dease and Daryle Breland quickly focused on Vernon Horn and Marquis Jackson, and proceeded to utilize the NHPD's "pre-interview" procedure to fabricate multiple witness statements purporting to link Horn and Jackson to the crime. As a result, Horn and Jackson were convicted and sentenced to lengthy prison terms.  More than 19 years thereafter, those convictions were set aside and Horn and Jackson released from prison, when forensic evidence established the police-fabricated nature of the statements used to arrest, convict and imprison them. In the civil rights actions that followed, currently pending in this District, there was testimony from a number of witnesses, including a former NHPD Assistant Chief, that it was the long-standing policy of the NHPD to routinely employ "pre-interviews" in advance of formal statements in major felony investigations, and to neither maintain nor disclose contemporaneous records of such pre-interviews – a practice rife with the danger of unconstitutional police misconduct of precisely the

sort that transpired in the numerous other NHPD murder investigation identified herein (*see, e.g.*, ¶ 99 [*Harris*], ¶ 101 [*Ham*], ¶ 102 [*Valentine*], ¶ 110 [*Carvaughn Johnson*]).

**110.** In the NHPD investigation of the 2001 killing of Markeith Strong, Ralph Ford, a juvenile interrogated by NHPD Detectives Daryle Breland and Stephen Coppola, and the State's key witness against the defendant, Carvaughn Johnson, later testified that, contrary to his police-procured statement, Ford had not seen the defendant at the crime scene, and that he had only told that to the detectives after they threatened him in the pre-interview with 30 years in prison and coerced him to falsely name Johnson in his subsequent taped statement.

**111.** In the course of the investigation into the August 1, 2006 murder of Herbert Fields, in which the NHPD's homicide detectives had precipitously focused on 16 year-old Bobby Johnson as the supposed perpetrator, four separate witnesses testified in post-conviction proceedings concerning the pre-interview misconduct engaged in by NHPD Detectives Michael Quinn and Clarence Willoughby, using off-record physical intimidation, falsehoods and threats to extract false taped statements from Michael Holmes (16 years old), Kwame Wells-Jordan (14 years old) and Johnson himself, resulting in Johnson's 38-year sentence for a murder he did not commit. During an unrecorded pre-interview with Johnson, the detectives threatened that if Johnson did not provide them the statement they were seeking (inculpatory information fed to him by the detectives themselves) he would get the death penalty and never see his family again. In addition, Holmes, Wells-Jordan, and the latter's guardian, Julia Sykes, all attested to similar such pre-interview sessions, involving similar threats and scripting of fabricated statements to implicate Johnson, followed by sanitized, end-of-session, supposedly unprompted taped statements. In each instance, no record was preserved of the pre-interviews leading up to the false inculpatory statements and there was no disclosure of the police misconduct that had

produced them. Johnson was freed in 2015, after having served 9 years on his 38-year sentence, and awarded compensation under the State 's wrongful conviction statute. He also filed a federal civil rights lawsuit against Quinn, Willoughby, New Haven Police Chief Ortiz, other high-ranking officers, and the City of New Haven – a case in which the District Court found a sufficient evidentiary basis, grounded on many of the same cases cited above, to reject the City of New Haven's summary judgment challenge to Johnson's *Monell* claim.

112.    In addition to the misconduct discussed above, prior to and during the pendency of the Turner-Fields case, the Connecticut courts had repeatedly documented and criticized the NHPD's long-standing pattern of concealing exculpatory information in connection with witness interviews, including by engaging in misconduct prior to taking a taped witness statement or by destroying a taped statement instead of disclosing the tape to the defense:

> **a.** In 1984, in *State v. Myers*, 193 Conn. 457, 467–68, 479 A.2d 199 (1984), the Connecticut Supreme Court determined that "a [tape-recorded] statement of the state's principal witness was deliberately destroyed according to a long-standing policy of the [NHPD], notwithstanding the pendency of serious criminal charges."
>
> **b.**  In *State v. Mullings*, 202 Conn. 1, 6, 519 A.2d 58 (1987), NHPD Detective Donna Amato erased the victim's tape-recorded statement and "misplaced" the transcript.
>
> **c.**  *State v. Williamson*, 212 Conn. 6, 7, 562 A.2d 470 (1989), presented the Connecticut Supreme Court "with no less than [its] sixth occasion since 1981 to consider whether the New Haven police department's destruction or loss of a witness' statements requires the striking of the witness' testimony in an ensuing criminal trial."
>
> **d.**  In *State v. Johnson*, 214 Conn. 161, 164, 571 A.2d 79, 81 (1990), the state Supreme Court again noted that the NHPD had destroyed tape recordings of multiple

witnesses.

**e.** Similarly, in *State v. Belle*, 215 Conn. 257, 263-64, 576 A.2d 139 (1990), overruled on other grounds, *State v. Person,* 236 Conn. 342, 352-53, 673, A.2d 463 (1996), the Court found that the NHPD had again destroyed taped statements given by witnesses to Detective Robert Coffey.

**f.** In *State v. Jones*, 29 Conn. App. 304 (1992), where the state Appellate Court set aside a felony conviction after the NHPD's tape of a police report had been destroyed, the Court noted that the case "necessitate[d] its return, yet again, to the New Haven police department's policy of destruction of taped statements," *Id*. at 310, with one of the Justices pointing out there had been 14 such New Haven cases reaching Connecticut's appellate courts within little more than a decade, and describing the NHPD as one that was "rapidly becoming the bete noire of Connecticut police departments." *Id*. at 335 n.9 (Norcott, J., dissenting in part, concurring in the result). Significantly, the trial judge himself, former New Haven prosecutor Thomas O'Keefe, had taken note of the "apparent . . . temptation" for after-the-fact manipulation of the police record to conform to an officer's subsequent conclusions where, as in *Jones* (as here), the NHPD's pre-existing contemporaneous record (an officer's field notes of a key witness interview) had been destroyed. *Id*. at 310, n.10.

**NHPD officials, including Chief of Police Pastore, are aware of Raucci's history of criminal and official misconduct, but do nothing to stop the prosecutions of Lewis or Morant**

113. In addition to the serious misconduct of the numerous other NHPD officers and detectives discussed above, NHPD Chief of Police Pastore and other NHPD high ranking officials and supervisors were also on notice of Defendant Raucci's own pattern of

unconstitutional and illegal behavior.

114.    Nevertheless, Chief Pastore and other NHPD supervisors failed to take any action to adequately supervise Raucci in the course of his investigations, to review the investigations he had completed, or to discipline him for his misconduct. Instead, Raucci was promoted and permitted to lead high-profile investigations.

115.    Upon information and belief, Chief Pastore in particular knew, or had reason to know, of Raucci's lead role in the Turner-Fields investigation both because the crimes themselves were particularly high profile -- Turner was a former alderman of the City of New Haven, and the NHPD sought and obtained the Governor's authorization for a $20,000 reward for information -- and because Raucci had a particularly close relationship with Chief Pastore.

116.    Raucci's reputation for engaging in criminal and/or official misconduct was well known through the NHPD. In the late 1980's, for example, Raucci openly asked Defendant Pettola to join him in planting drugs on an individual during a traffic stop. After failing to find a weapon he was informed would be in the car, Raucci suggested to Pettola they plant cocaine in order to make an arrest. Based on the incident, Pettola thought of Raucci as a "dirty cop."

117.    At the time, Raucci and Pettola were members of the NHPD's Street Crimes Unit. Soon after, Raucci was promoted to Homicide.

118.    Around this same time, Pettola also repeatedly witnessed Raucci interacting with Frank. Parise, whom Pettola knew to be a New Haven drug dealer. It was clear to Pettola that these interactions had no legitimate police purpose. Similarly, another former NHPD officer also witnessed Raucci interacting with Parise on several occasions in Fair Haven prior to 1993. These meetings were clearly unrelated to NHPD business. Pettola and the NHPD officer either reported Raucci's interactions with Mr. Parise to their superiors, who suppressed it, or Pettola and the

29

officer suppressed the information themselves.

119.    Chief Pastore was specifically informed on more than one occasion by Hector Ortiz, a civilian, that Mr. Ortiz knew Raucci to be a corrupt officer. Mr. Ortiz knew about Raucci's illicit associations with Parise. Pastore dismissed Mr. Ortiz's concerns.

120.    Moreover, on several occasions prior to Mr. Morant and/or Lewis's trials and convictions, Raucci engaged in misconduct with witnesses that was similar to his tactics with Ruiz, Roque, and Morant. This misconduct was known to high level NHPD supervisors, including Chief Pastore.

121.    Thus, on or around May 10, 1991, Raucci coerced a witness into providing a taped statement implicating Raucci's suspect in the high-profile murder of Yale University student Christian Prince. Like Jose Roque in this case, the witness recanted and testified at trial that, after being arrested on unrelated drug charges, he was coerced by Raucci into making the taped statement that incorporated details provided to the witness by Raucci. Given the high-profile nature of the Prince murder, supervisors up to and including Chief Pastore, knew or should have known about the allegations of misconduct made against Raucci. Similarly, Detective Raucci was assigned as the lead investigator regarding the August 1995 stabbing murder of Kevin "Goober" Brahan. In that investigation, just as he had done with Ruiz in the present case, Raucci first interviewed a witness off tape, and then later obtained a taped statement that contradicted the witness's prior statements. Upon information and belief, Raucci's supervisors at the time included Defendants Pastore and Lawlor.

122.    In December 1995, NHPD internal affairs investigators informed Chief Pastore that they had determined that Raucci had struck a suspect in the face with the butt of a large weapon during the course of an arrest, and that Raucci had lied about the incident to NHPD investigators.

123.    Finally, Raucci's misconduct, including his work with drug dealers like Parise, led to him developing a drug problem, which NHPD supervisors also knew about.

124.    The FBI's investigation into Raucci uncovered evidence that Raucci used drugs beginning in the late 1980s, while a member of the NHPD Street Crimes Unit, until well after the trials of Morant and Lewis. FBI surveillance witnessed Raucci frequenting drug locations with no legitimate police reason for doing so. The FBI's investigation also confirmed that NHPD supervisors, including Chief Pastore, were aware of Raucci's drug habit.

125.    Upon information and belief, in or around May 1995, Defendant Lawlor, by then a Lieutenant and head of detectives, instructed another officer to follow Raucci after Raucci failed to respond to repeated radio calls on several occasions. On two consecutive nights, the officer followed Raucci to a known drug location and observed him staying inside for several hours each night. When confronted later, Raucci said the house was occupied by drug dealers, prostitutes, and one of his confidential informants. Chief Pastore ordered Raucci to stay out of the area, but investigators and Chief Pastore soon learned that Raucci disregarded this direction and moved next door.

126.    Although the NHPD opened multiple Internal Affairs investigations into Raucci in early 1995, it was not until February 1996, following an Internal Affairs investigation into Raucci's acceptance of overtime pay for work he did not perform, that Raucci was suspended.

127.    The NHPD's eventual discipline of Raucci came too late for Mr. Morant, who had already been prosecuted, convicted, and incarcerated based on Raucci's fabricated evidence.

128.    In March 1996, the State's Attorney charged Raucci with second-degree larceny in connection with the overtime pay scheme. On April 11, 1996, Raucci resigned from the NHPD, with at least partial benefits.

**An independent FBI investigation reveals some of Defendants' misconduct**

129.    In 1995, following his own conviction, Mr. Lewis contacted the FBI to report that Raucci had framed him for the murders.

130.    The very next day, the FBI interviewed Lewis at a correctional center. He informed the FBI that Raucci was a corrupt police officer, was a partner of Frank Parise, and had framed Mr. Lewis for the double-homicide.

131.    Based on Lewis's information, the FBI opened a two-pronged investigation into: (1) whether "Raucci was a corrupt police officer," and (2) whether Raucci had "'set up' Lewis and Morant for the double homicide of Turner and Fields."

132.    Upon information and belief, the FBI would not have promptly initiated such an investigation if it did not intersect with an ongoing FBI investigation into Parise and/or corruption within the NHPD.

133.    Over the course of its investigation, of some 18 months, the FBI interviewed dozens of witnesses, conducted polygraphs, performed video surveillance, and undertook forensic and handwriting analyses.

134.    The FBI investigation largely corroborated Lewis's allegations -- the FBI uncovered evidence that Raucci had illicit ties to Parise, that Raucci had a drug problem for a number of years, that his drug problem led him to associate with drug dealers, which likely influenced his police-work (including on the Turner-Fields investigation), and that officers and detectives in the NHPD had repeatedly witnessed him engage in misconduct. The FBI administered a polygraph examination to Mr. Lewis and determined he was truthful in his denial of any involvement with the murders. The FBI also administered a polygraph examination to Mr. Parise and determined he was untruthful when he denied setting someone up for a double murder.

135.    The FBI also took statements from a number of witnesses who stated that Raucci had coerced them and fed them information in order to make false statements implicating Lewis and Morant, including Ruiz, Roque, Millie Martinez and Hector Ortiz.

136.    Despite knowledge of the FBI investigation, both at the time it was occurring between 1995-1997, and upon its conclusion, Chief Pastore and the NHPD did nothing to investigate or rectify the egregious police misconduct it had identified, or to change the NHPD's policies and practices with respect to detectives' conduct and documentation of witness interviews and "pre-interviews," the NHPD's preservation and disclosure of exculpatory information, or the NHPD's training, supervision and discipline of investigatory personnel with respect thereto.

137.    In response to the evidence gathered by the FBI, Connecticut Congresswoman Rosa DeLauro and New Haven Mayor John DeStefano, Jr. made inquiries concerning the NHPD investigation in the Turner-Fields case.

138.    Upon information and belief, Mayor DeStefano directed the Corporation Counsel to review a range of materials relating to the case, and the Corporation Counsel advised the mayor that "the evidence unearthed by the FBI raise[d] substantial doubt as to whether the New Haven Police investigation [wa]s untainted." The Corporation Counsel advised the Mayor that "it would be prudent to re-open the investigation with the evidence unearthed by the FBI in mind to determine whether the Police Department is persuaded that Detective Raucci's role in the Turner/Fields investigation did or did not create a situation in which an individual is inappropriately incarcerated for murder."

139.    In May 1999, the Mayor formally requested that the NHPD reopen the investigation into the Turner-Fields murders.  The NHPD failed to do so

**After more than two decades of incarceration, Mr. Morant is released and all charges are subsequently expunged**

140.    In or around 1999, Defendant Sweeney came forward and admitted what actually occurred the night of Ruiz's first statement implicating Lewis and Morant.

141.    Sweeney eventually testified at Mr. Morant's state court post-conviction proceedings in 1999, that Ruiz had repeatedly denied any personal knowledge of the murders. Sweeney also testified that Raucci had engaged in inappropriate interrogation techniques, including coaching Ruiz and promising leniency on the unrelated gang shooting if he made a statement against Lewis and Morant. This information was not disclosed to Mr. Morant prior to or as of the time of trial or for years thereafter.

142.    Moreover, even after the foregoing post-conviction testimony, the NHPD continued to withhold materially exculpatory information of which it was and should have been aware concerning the coaching and coercion of numerous other witnesses in the Turner-Fields investigation, and the NHPD's policy and practice of employing the undocumented pre-interview process to manufacture false inculpatory evidence in numerous other NHPD murder investigations as set forth above. Thus, notwithstanding the post-conviction Sweeney testimony, Mr. Morant remained in prison for another 16 years, all as the result of the NHPD's failure to comply with its ongoing duty to disclose such information – wrongful acts in breach of its continuing duty extending from 1991 through the date of Mr. Morant's ultimate release from prison in June 2015, in continuing violation of Mr. Morant's federal and state civil rights.

143.    On June 17, 2015, following a previous ruling by U.S. District Judge Charles S. Haight, Jr. granting Lewis's federal habeas petition, and the affirmance of that ruling by the Second Circuit Court of Appeals, *see Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109 (2d Cir. 2015), Mr. Morant was granted a sentence modification, at a proceeding in which New Haven

34

State's Attorney Dearington acknowledged that the State's key witness (Ruiz) had been put up to presenting a false ("contrived") account at the behest of the NHPD detective (Raucci) in charge of the investigation.   After more than 21 years of imprisonment for a crime he did not commit, and to which he would not have been subjected but for the continuing civil rights violations of the defendants set forth above, Mr. Morant was released from prison at long last.

144.    On July 7, 2021, following submission of the foregoing record of police misconduct, and Mr. Morant's resulting wrongful conviction and imprisonment, Mr. Morant was granted a full and unconditional pardon by the Connecticut Board of Pardons and Parole, expunging and erasing the two felony murder convictions that had been the result of that ongoing police misconduct, and to which he had been subject for more than 27 years.

## DAMAGES

145.    The unlawful, intentional, deliberately indifferent, reckless, and/or negligent acts and omissions of the Individual Defendants and the City of New Haven caused Stefon Morant to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve more than 21 years in prison, to and including June 2015, for a brutal crime he did not commit.

146.    As a direct result of Defendants' intentional, deliberately indifferent, reckless, and/or negligent acts and omissions, Mr. Morant sustained personal injuries, bodily injuries and damages, including loss of his freedom for more than twenty-one years, loss of his youth, pain and suffering, physical injury, severe mental anguish, emotional distress, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, travel, enjoyment, and freedom of speech and expression.

35

**147.**    As a further result of Defendants' misconduct, Mr. Morant sustained economic injuries and damages, including loss of income and loss of career opportunities

**148.**    Further, Mr. Morant was deprived of his familial relationships, including relationships with his four children, the three stepchildren he shares with his wife Kim, his siblings, his maternal and paternal grandparents, his mother Linda Morant, and his wife Kimberly Morant, as well as an extended family and network of friends from whom he was cut off for more than two decades.

**149.**    Equally tragic, when Stefon's youngest brother, Julian Morant -- whom he had helped raise from childhood and with whom he was particularly close -- contracted Lupus and passed away while Stefon was incarcerated, Stefon was robbed of the opportunity to say goodbye and spend time with him in his final days, as he likewise was on the occasions of the death of a number of other close family members during the lengthy period of his incarceration.

## FEDERAL CLAIMS

### COUNT I
### 42 U.S.C. § 1983 – *Brady* – Failing to Disclose Exculpatory Evidence
*Against Defendants Raucci, Maher, Sweeney, Pettola and Lawlor*

**150.**    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**151.**    Defendants Raucci, Maher, Sweeney, Pettola and Lawlor, acting individually and in concert, deprived Mr. Morant of his clearly established constitutional right to due process of law.

**152.**    These Defendants deprived Mr. Morant of his right to due process by withholding, on a continuing basis, exculpatory and impeachment information from prosecutors and defense, including information regarding Ruiz, Roque and other witnesses' exculpatory indications (prior to Defendants' coaching, coercion and fabrication of their false statements) that these witnesses knew nothing about the murders and had no information implicating Mr. Morant, and by failing to disclose the police misconduct through which the ultimately inculpatory statements of these

36

witnesses had been procured and fabricated by the NHPD itself.

**153.**    These Defendants performed the above-described acts within the scope of their employment with the NHPD.

**154.**    Defendants performed the above-described acts under color of state law, intentionally and with deliberate indifference to Mr. Morant's clearly established constitutional rights.

**155.**    No reasonable officer would have believed this conduct was lawful.

**156.**    Defendants' continuing acts and omissions in failing to make such disclosure were the direct and proximate cause of Mr. Morant's damages as described above.

**<u>COUNT II</u>**
**42 U.S.C. § 1983 – Denial of Due Process – Fabrication of Evidence**
*Against Defendants Raucci, Maher and Pettola*

**157.**    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

**158.**    Defendants Raucci, Maher and Pettola, acting individually and in concert, further deprived Mr. Morant of his clearly established constitutional right to due process of law and a fair trial in connection with the interrogations of Ruiz, Roque and other witnesses, by fabricating inculpatory evidence, and by failing to intervene to prevent and/or rectify the fabrication of evidence against Plaintiff despite having knowledge of the fabrication and a reasonable opportunity to intervene and/or rectify the same.  The Defendants forwarded this fabricated evidence to prosecutors -- evidence that they knew, intended and was foreseeably likely to influence a jury's verdict against Mr. Morant notwithstanding his innocence, and would corrupt the truth-seeking function of trial.

**159.**    These Defendants performed the above-described acts within the scope of their employment with the NHPD.

**160.**    The Defendants performed the above-described acts under color of state law,

intentionally and with deliberate indifference to Mr. Morant's clearly established constitutional rights.

161.    No reasonable officer would have believed this conduct was lawful.

162.    Defendants' conduct as aforesaid was the direct and proximate cause of Mr. Morant's damages as described above.

## COUNT III
### 42 USC § 1983 - Coerced Statement in Violation of Fifth and Fourteenth Amendments
*Against Defendants Raucci and Maher*

163.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

164.    Defendants Raucci and Maher, acting individually and in concert, wrongfully and unconstitutionally coerced a false statement and purported confession from Plaintiff, as set forth above, and thereby deprived him of his clearly established constitutional right not to be compelled to be a witness against himself.

165.    These Defendants performed the above-described acts within the scope of their employment with the NHPD.

166.    These Defendants performed the above-described acts under color of state law, intentionally and with deliberate indifference to Plaintiff's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

167.    The foregoing coerced statement was utilized in Plaintiff's prosecution.

168.    The acts and omissions by these Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Morant's damages as described above.

## COUNT IV
### 42 U.S.C. § 1983 - Failure to Intercede
*Against Defendants Maher, Sweeney, Pettola and Lawlor*

169.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

170.    By their conduct and under color of state law, Defendants Maher, Sweeney, Pettola and Lawlor, acting within the scope of their employment with the NHPD, had opportunities to intercede on behalf of Mr. Morant to prevent and/or rectify the deprivation of his liberty without due process of law, but, due to their intentional conduct and/or deliberate indifference, failed to do so.

171.    These Defendants' failures to intercede violated Mr. Morant's clearly established constitutional right to be free from police-fabricated evidence and compelled self-incrimination, and not to be deprived of exculpatory information. No reasonable police officer in would have believed that failing to intercede to prevent and/or rectify the aforesaid coercion and fabrication of inculpatory evidence, and the withholding of exculpatory and impeachment evidence, was lawful.

172.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Morant's damages as described above. Defendants knew, should have known, and/or were deliberately indifferent to the fact that their conduct would result in Mr. Morant's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT V
### 42 U.S.C. § 1983 - Supervisory Liability Claim
*Against Defendants Sweeney, Maher, Lawlor and Pastore*

173.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

174.    Defendant Raucci acted with impunity in an environment in which he was not adequately trained, supervised, or disciplined by Defendants Sweeney, Maher, Lawlor, and Pastore, in this

39

case and as a matter of practice.

175.    Defendants Sweeney, Maher, Lawlor, and Pastore acted with deliberate indifference to Mr. Morant's constitutional rights by failing to adequately train, supervise, and discipline Raucci, and thereby allowing him to deprive Mr. Morant of his clearly established constitutional rights, including his rights to disclosure of exculpatory evidence, to be free from fabrication of false inculpatory evidence, and to due process of law.

176.    Had Defendants Sweeney, Maher, Lawlor, and Pastore not provided inadequate training, supervision, and discipline of Raucci, he would not have been able to coerce and fabricate witness statements against Mr. Morant, fabricate other inculpatory evidence, commit perjury, withhold exculpatory and impeachment evidence, and undermine Mr. Morant's due process rights.

177.    Defendants Sweeney, Maher, Lawlor, and Pastore were directly involved in and aware of the Turner-Fields investigation and supervised the investigative acts of Raucci, and the subsequent actions and omissions of the NHPD in failing to rectify the same for years thereafter.

178.    The deliberately indifferent conduct of said Defendants violated their clearly established duty to supervise and discipline Raucci, and no reasonable police supervisor would have believed that deliberately indifferent supervision and lack of discipline in the face of actual or constructive notice of his misconduct was lawful.

179.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Morant's damages as described above.

## COUNT VI
## 42 U.S.C. § 1983 Municipal Liability Claim
*Against Defendant Pastore, in his official capacity, and Defendant City of New Haven*

180.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

40

**Municipal liability based on Chief Pastore's ratification of and/or deliberate indifference to Raucci's misconduct.**

181.    Defendant Pastore served as the Chief of Police of the NHPD from before the Turner-Fields murders, until well after Mr. Morant's wrongful conviction, sentencing and incarceration.

182.    As Chief of Police, Pastore had ultimate decision-making authority with respect to the NHPD's personnel decisions (such as which officers and detectives were assigned to which unit and which cases), disciplinary issues (such as when to initiate an internal investigation into an allegation of misconduct), investigative steps (such as whether to open or close particular investigations), and NHPD policies and practices.

183.    Although Chief Pastore was aware of Raucci's misconduct—including both investigative misconduct and his illicit association with known criminal -- prior to Mr. Morant's wrongful conviction and thereafter, Pastore chose not to investigate information that Pastore received indicating that Raucci had framed Mr. Morant and Lewis. In fact, Pastore did absolutely nothing to question Raucci's investigation into the Turner-Fields murders and did not even discipline Raucci until *after* Mr. Morant and Mr. Lewis were wrongfully convicted.

**Municipal liability based on the NHPD's custom, pattern, or practice of unconstitutional investigative techniques.**

184.    Prior to and at the time of this unlawful investigation, prosecution, and conviction, NHPD officers and detectives, including Defendant Raucci, maintained a custom, pattern, or practice of unconstitutional investigative techniques, including but not limited to the following:

    a.    the use of coercive and suggestive techniques in interviews and interrogations to
          obtain witness statements that law enforcement knew or should have known
          were false;

    b.    the use of lengthy "pre-interviews," of which no record was made, to prompt and

coerce witnesses;

c. the fabrication of inculpatory evidence, including witness statements;

d. the ongoing suppression of exculpatory and impeachment evidence; and

e. engaging in the affirmative suppression of such misconduct.

185. The ongoing policy, custom, pattern, or practice of unconstitutional investigative misconduct by NHPD officers is reflected in the multiple acts of misconduct and illegality committed by Defendant Raucci and other NHPD personnel in relation to numerous witnesses, both in Mr. Morant and Lewis's case and other cases as detailed above.

**Municipal Liability based on the NHPD's failure to supervise, discipline, and train its officers and detectives with respect to unconstitutional investigative conduct**

186. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Mr. Morant, the NHPD, by and through its final policymakers, maintained a policy, custom, pattern and practice of failing to adequately supervise, discipline and train NHPD officers and detectives, including Detective Raucci, with respect to their use of unconstitutional investigative techniques, including but not limited to conducting custodial interrogations and witness interviews and "pre-interviews," documenting and disclosing exculpatory and impeachment evidence to prosecutors, and the affirmative ongoing obligation to come forward with exculpatory and impeachment evidence.

187. The NHPD's policy, custom, pattern, or practice of failing to adequately supervise, discipline and train NHPD officers and detectives with regard to their use of unconstitutional investigative techniques is reflected in the numerous acts of misconduct and illegality committed by Defendant Raucci and other NHPD detectives and supervisors, both in Mr. Morant and Lewis's case and other cases, and the fact that these officers and detectives were permitted to continue to engage in such misconduct with impunity.

188.    The Defendant City of New Haven's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Morant's damages as described above.

## STATE LAW CLAIMS

### COUNT VII
### Negligence, in Violation of Plaintiff's Civil Rights under Connecticut Law
*Against Defendants Raucci, Maher, Sweeney, Pettola, Lawlor, and Pastore*

189.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

190.    Defendants Raucci, Maher, Sweeney, Pettola, Lawlor, and Pastore were police personnel acting within the scope of their employment and under color of law, who had a duty to Mr. Morant to exercise reasonable care in the investigation and arrest of Mr. Morant for the Turner-Fields murders and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful and negligent conduct of other NHPD personnel, to prevent and/or rectify the fabrication of evidence, and to fulfill their ongoing duty to disclose all exculpatory and impeachment evidence pursuant to Plaintiff's civil rights entitlements under the federal and Connecticut constitutions, Conn. Gen. Stat. § 54-86c(c), and Connecticut common law.

191.    Defendants negligently failed to fulfill those duties by their conduct set forth above.

192.    It was and should have been apparent to Defendants that said negligent conduct was likely to violate Plaintiff's civil rights, and to subject him, a specifically identifiable victim of their negligent misconduct, to severe and imminent harm on a continuing basis.

193.    As a direct and proximate result of the negligence and breach of duty of the Defendants as aforesaid, Plaintiff suffered severe and ongoing damages as described above.

### COUNT VIII
### Indemnification under Conn. Gen. Stat. §7-465
*Against the City of New Haven*

194.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

195.    As described in the preceding paragraphs and Counts, the Individual Defendants Raucci,

43

Maher, Sweeney, Pettola, Lawlor, and Pastore were police personnel acting within the scope of their employment and under color of law.

196.    As set forth above, said Defendants infringed Plaintiff's federal and state civil rights and Connecticut statutory and common law rights and caused him personal injuries and damages while performing their duties and acting within the scope of their employment.

197.    As a direct and proximate result of this conduct, Plaintiff suffered severe and ongoing damages as hereinbefore alleged.

198.    Within six months after the foregoing causes of action accrued, pursuant to Conn. Gen. Stat. § 7-465, Plaintiff filed with the clerk of the City of New Haven written notice of his intention to commence this action and of the time when and the place where the damages were incurred or sustained.

199.    To the extent the Individual Defendants are determined to be liable to Mr. Morant and are obligated to pay damages, under any of Counts I, II, III, IV, V and/or VII,  Defendant City of New Haven is liable to pay any such damages on behalf of the Individual Defendants pursuant to the City of New Haven's statutory liability imposed by Conn. Gen. Stat. §7-465.

**COUNT IX**
**Direct Action under Conn. Gen. Stat. § 52-557n**
*Against the City of New Haven*

200.    Plaintiff incorporates by reference all of the foregoing paragraphs and further alleges:

201.    The City of New Haven, its police department, and the individual Defendants  -- all acting under color of law -- had a duty to Mr. Morant to exercise reasonable care in the investigation and arrest of Plaintiff for the Turner-Fields murders and in the investigation, reporting and disclosure of evidence related thereto, to protect him from the unlawful and/or negligent conduct of NHPD personnel, and to prevent and/or rectify the violation of his civil

rights, including the suppression of exculpatory and impeachment evidence.

202.   As discussed above, the City, the NHPD and the other Defendants breached these duties in a number of ways, thereby directly and proximately causing Mr. Morant's wrongful arrest, prosecution, conviction, and incarceration.

203.   In addition, the City of New Haven and its police department failed to exercise reasonable care in preventing and/or rectifying the fabrication of inculpatory evidence, in the misuse of the pre-interview procedure and the failure to document, preserve and disclose any record thereof, in the failure to supervise or discipline or thereafter rectify the misconduct of Defendant Raucci notwithstanding  its knowledge of his illegal action, and in its ongoing failure to establish adequate procedures and oversight for preservation and disclosure of exculpatory evidence and for compliance with the mandatory provisions of Conn. Gen. Stat. § 54-86c(c), and thereby itself proximately causing Mr. Morant's wrongful arrest, prosecution, conviction, and continued incarceration.

204.   Even to the extent the City, its police department and the other defendants were performing discretionary functions in some of the foregoing respects, they disregarded the risk of imminent harm to Plaintiff, an identifiable person.

205.   Pursuant to the statutory liability imposed by Conn. Gen. Stat. § 52-557n, the City of New Haven is liable for the damages caused by the acts and omissions of the other Defendants and by its own acts and omissions as alleged herein.

45

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.      Compensatory damages against all Defendants in an amount to be determined at trial;

b.      Punitive damages against Individual Defendants, in an amount to be determined at trial;

c.      Pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

d.      Such other and further relief as this Court may deem just and proper.

Dated: New Haven, Connecticut
May 5, 2022

THE PLAINTIFF: STEFON MORANT

By:      /s/ *Kenneth Rosenthal*
         Kenneth Rosenthal (ct05944)
         Law Office of Kenneth Rosenthal
         One Audubon Street, 3d Fl.
         New Haven, CT 06511
         (203) 915-4235
         krosenthal@gs-lawfirm.com