UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STEFON MORANT,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF NEW HAVEN; Chief of Police NICHOLAS PASTORE, in his individual and official capacities; officers VINCNET RAUCCI, ROBERT LAWLOR, VAUGHN MAHER, JOSPEH PETTOLA, and MICHAEL SWEENEY, in their individual capacities.<br><br>    Defendants. | **Case No. 3:22-cv-00630-CSH** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT MICHAEL SWEENEY**

I.   Introduction

Plaintiff Stefon Morant spent more than two decades wrongly incarcerated for a double-murder he did not commit. In this § 1983 suit Morant seeks to hold accountable the City of New Haven and multiple New Haven Police Department officers and supervisors for the widespread misconduct and systemic failures that led to his wrongful conviction. Though discovery is ongoing, there is already sufficient evidence to entitle Plaintiff to partial summary judgment.

Many of Plaintiff's claims—including some claims against Defendant NHPD Detective Michael Sweeney—involve facts which are genuinely disputed. But this claim does not. Sweeney's own testimony establishes he was aware of exculpatory evidence he understood would be "devastating" to the prosecution of Plaintiff Stefon Morant and his co-defendant Scott

1

Lewis, but that he intentionally did not report this information because, as everyone at the NHPD understood, you don't put that kind of information in reports: "I don't know any detective that would put down information for the defense attorney to attack." Plaintiff's Statement of Undisputed Material Facts, ¶ 41. As the prosecution has conceded, the witness testimony that the withheld evidence undermines was "the key" to Morant's conviction, without which they "had no case" against him. *Id.*, ¶ 51. In other words, the facts establishing Sweeney caused a *Brady* violation are undisputed. This is one of the rare cases where summary judgment as to liability against a § 1983 defendant is warranted. *See, e.g., Birch v. Town of New Milford*, No. 3:20-CV-1790 (VAB), 2023 WL 4684720, at *15–19 (D. Conn. July 21, 2023) (granting plaintiff's motion for summary judgment as to liability on one theory where there were no genuine disputes of fact).

Although discovery continues regarding additional claims, success on any one of these many theories of liability is sufficient to entitle Plaintiff to the full measure of damages he suffered. Plaintiff respectfully submits that an early determination of Sweeney's liability on this theory—which the undisputed evidence already demonstrates—may help streamline the rest of the litigation (including theories of liability for other defendants who permitted or enabled this *Brady* violation) or prompt a global resolution.

## II. Facts

On January 14, 1991, Sweeney conducted an interview, alone, with Ovil Ruiz regarding the October 1990 New Haven double-homicide of Ricardo Turner and Lamont Fields that the NHPD had been investigating. Pl's Facts Stmt., ¶¶ 1, 4. Ruiz credibly reported to Sweeney, an experienced NHPD detective, that he had no information about the crime. *Id.*, ¶ 2–3.

Immediately following this interview, Sweeney and Defendant NHPD Detective Vincent Raucci interviewed Ruiz together. *Id.*, ¶ 5. During this interview, Sweeney observed Raucci using illegal threats and feeding nonpublic information about the crime to Ruiz to get him to parrot it back. *Id.*, ¶¶ 6–9. Raucci threatened Ruiz that he would "take the whole weight for the crime" if he didn't agree to implicate Plaintiff Stefon Morant and Scott Lewis. *Id.*, ¶ 7. Sweeney was aware that Raucci's behavior was illegal, and he stopped the interview and took Raucci into the hallway and told him to stop. *Id.*, ¶¶ 7–10.

When they returned to the interview room, Raucci nevertheless continued feeding Ruiz information about the crime. *Id.* ¶, 11. Ruiz began to adopt a story that he was the driver of the car involved in the shooting. *Id.*, ¶ 12. Ruiz did not volunteer a single piece of information about the crime that wasn't first fed to him by Raucci. *Id.*, ¶ 13. Sweeney was aware that Ruiz knew nothing about the crime but that he would say anything Raucci wanted him to say in order to go home. *Id.*, ¶¶ 14–16. Sweeney again stopped the interview, took Raucci into the hall, and told him to stop threatening Ruiz and feeding him information. *Id.*, ¶ 17.

Raucci then returned to the interview room without Sweeney and took a taped statement from Ruiz, during which Ruiz offered a third version of events, no longer claiming to be the driver of the car, but instead claiming that Morant and Lewis made admissions to him about committing the crime and that Ruiz observed Lewis discarding what might well be the murder weapon. *Id.*, ¶¶ 19–20, 23. Sweeney notarized the 20-page transcript of the taped statement from Ruiz the following day, in the presence of Ruiz and Raucci. *Id.*, ¶ 25.

Sweeney understood the information he had about Ruiz and Raucci was highly exculpatory, including the information that Ruiz provided three different accounts of the same events, with massive contradictions, on the same night, and Raucci's behavior in threatening

3

Ruiz and feeding him information. *Id.*, ¶¶ 26–28, 31–34. Sweeney nevertheless deliberately did not record this exculpatory information pursuant to his regular practice of not giving defense attorneys anything that could help them. *Id.*, ¶¶ 35–43. Sweeney admitted that in 1990 and 1991, he would "absolutely not" document a witness's initial version of events if he believed it wasn't true, even if the witness gave four or five different versions and the witness admitted lying. *Id.*, ¶ 42.

Raucci procured all evidence directly implicating Morant that was introduced at trial, which consisted of three witness statements: 1) Ruiz's live testimony, detailing the story Raucci initially fed to him that he drove Morant and Lewis to the crime scene; 2) a taped statement from Jose Roque claiming he heard Morant and Lewis admit to the murders and that he had seen Lewis discarding what likely was the murder weapon; and 3) Morant's own taped statement that he was present at the scene. *Id.*, ¶ 44. At trial, Roque disavowed his taped statement and explained that Raucci had fed him all the information and used threats to get him to adopt it. *Id.* at ¶ 45. Roque's description of his interview with Raucci, repeated to FBI agents investigating Raucci's misconduct years later, detailed "precisely the same misconduct [Sweeney] observed with Raucci and Ruiz." *Id.* Morant did not testify but put on alibi evidence that contradicted the statement taken from him by Raucci. *Id.* The information about Raucci threatening and feeding information to Ruiz and Ruiz providing multiple different false versions of his knowledge about the crime—just as Roque described his own interview with Raucci—was not disclosed to the prosecutor or defense at the time of trial. *Id.*, ¶ 46. All documentation provided to the prosecutor about the January 14-15, 1991 Ruiz interview withheld these details and affirmatively misrepresented what had occurred. *Id.*, ¶ 47. In the absence of this exculpatory information at

4

trial, Morant was convicted. *Id.*, ⁋ 50. He was incarcerated for more than 21 years before being released in 2015 and pardoned in 2021. *Id.*

**III.     Legal Standard**

Summary judgment is appropriate "if the record, viewed in the light most favorable to the nonmovant, shows no genuine dispute of material fact and demonstrates the movant's entitlement to judgment as a matter of law." *Donohue v. Hochul*, 32 F.4th 200, 206 (2d Cir. 2022) (cleaned up); Fed. R. Civ. P. 56(a). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "To survive summary judgment, defendants cannot simply raise some metaphysical doubt as to the material facts, or present evidence that is merely colorable. Instead, defendants must designate specific facts showing that there is a genuine issue for trial." *Picard Tr. for SIPA Liquidation of Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP*, 49 F.4th 170, 185 (2d Cir. 2022) (cleaned up). "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Fischer v. Forrest*, 968 F.3d 216, 221 (2d Cir. 2020) (cleaned up).

**IV.     Argument**

The law in this area is well settled. "When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83 (1963)." *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019); *see also Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). Plaintiff is prejudiced by the suppression if there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been

5

different." *Bellamy*, 914 F.3d at 751 (cleaned up). "The question is not whether the [criminal] defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, each of these elements is established based on undisputed evidence, including principally Sweeney's own testimony.

### A. There is no dispute Sweeney was aware of both exculpatory and impeachment evidence.

First, there is no dispute Sweeney was aware of exculpatory and impeachment evidence. Sweeney personally heard directly from Ruiz—in a conversation in which Sweeney was the only witness—that Ruiz did not know anything about the Turner-Fields homicides. Pl's Facts Stmt., ¶¶ 1–4. Based on his own interview of Ruiz (and his extensive experience) Sweeney believed that was the truth: that Ruiz did not have any information about the homicide whatsoever. *Id.* at ¶ 2.

Sweeney then observed Raucci using what Sweeney knew to be improperly coercive tactics—including promising that Ruiz could go home if he just told Raucci that Morant and Lewis were guilty, but threatening if Ruiz did not give that statement Raucci would make Ruiz "take the whole weight for the crime." *Id.* at ¶¶ 6–7. And Raucci improperly told Ruiz what to say, feeding him nonpublic specific details about the crime. *Id.* at ¶¶ 8–9, 11, 13. Although Ruiz then gave a statement implicating Morant and Lewis—in which Ruiz claimed to have been the driver of the car involved in the shooting—Ruiz subsequently admitted to Sweeney that this was false, reaffirming he did not actually know anything about the crime but that he was merely saying whatever Raucci wanted him to say so he could go home. *Id.* at ¶¶ 12, 14.

Sweeney believed what Ruiz reported to him in this private conversation was true: that Ruiz did not know anything about the crime but was prepared to give a false statement due to Raucci's illegal threats and other improper conduct. *Id.* at ¶¶ 16, 18, 22. And Sweeney confirmed that understanding through follow-up questioning of Ruiz. Sweeney recognized Ruiz had not volunteered a single piece of information about the crime that wasn't first fed to him by Raucci. *Id.* at ¶ 13. And when Sweeney asked Ruiz questions about areas where Raucci hadn't already fed him details, Ruiz couldn't provide any information, confirming Sweeney's suspicion that he was only parroting back the information Raucci had fed him. *Id.* at ¶ 15.

Although Ruiz had repeatedly told Sweeney he did not know anything whatsoever about the homicide, and Sweeney believed him, Sweeney knew Raucci then took a taped statement from Ruiz which was different from the one Raucci had attempted to take earlier that night, but still implicated Morant and Lewis in the crime. *Id.* at ¶¶ 19- 20; 23–24. In particular, in this version Ruiz no longer claimed to have been the driver of the car but otherwise implicated Morant and Lewis, including falsely claiming Morant and Lewis made admissions about committing the crime in front of Ruiz and that Ruiz had observed them discarding what might well be the murder weapon. *Id.* at ¶¶ 20, 23. On its face (and taken as true) this statement was a powerful piece of evidence implicating Morant and Lewis in the crime. *Id.* at ¶ 23. But based on his interactions with Ruiz and Raucci, Sweeney was suspicious of this new account; he had every reason based on what he had observed to question the reliability of this information. *Id.* at ¶¶ 21–22. Sweeney personally notarized the 20-page transcript of this taped interview the next day, for which he had to be physically present with both Ruiz and Raucci. *Id.* at ¶ 25.

Sweeney recognized that what he had observed that night was powerful impeachment of Ruiz. *Id.* at ¶¶ 26–28, 31–34. Even though he's not a lawyer, Sweeney recognized that one of

7

the most effective ways to cross-examine a witness is to confront them with contradictions in statements they have made or admissions that they have made statements which aren't true. *Id.* at ¶ 31. Here, Ruiz had given at least four separate versions of his knowledge of and involvement in the Turner-Fields homicides, all during the same night, and there were massive contradictions between all of Ruiz's versions of events. *Id.* at ¶¶ 27–28. Ruiz had also admitted, on multiple occasions, that he did not actually know anything about the Turner-Fields homicides, and that he had only said he did because Raucci had threatened him, promised him he could go home if he gave this statement, and told him what to say. *Id.* at ¶¶ 1–11. Sweeney understood if a defense lawyer had that information, he "would have had a very easy time impeaching Mr. Ruiz," that the effect would "absolutely" "devastate the case" and "make it impossible to call Mr. Ruiz as a witness, because it would make him completely incredible." *Id.* at ¶¶ 32–33. *See Lewis v. Connecticut Com'r of Correction*, 790 F.3d 109, 123–24 (2d Cir. 2015) ("If defense counsel had known this information [from Sweeney] at trial, he could have cross-examined Ruiz regarding his prior inconsistent statements and the extent to which Raucci coached him and induced him to testify falsely. As the district court concluded, Sweeney's testimony was clearly exculpatory under *Brady* or impeachment material under *Giglio*, if not both."); *see also Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (describing how the *Brady* obligation extends to "evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness") (cleaned up).

Sweeney also recognized this evidence was impeaching of another prosecution witness, Raucci, as well as the investigation he conducted. Sweeney believed what he observed Raucci doing was "absolutely wrong": Raucci was "making an effort to cause [Ruiz] to give a false statement." Pl's Facts Stmt., ¶ 9. He observed Raucci make "illegal threats" and feed "hold-

8

back" facts to Ruiz, in violation of "about as basic a concept in interviewing witnesses as you can have." *Id.* at ¶¶ 7–8. Even after Sweeney had directly and forcefully told Raucci to stop using these improper tactics, Raucci continued to improperly feed Ruiz information in front of Sweeney. *Id.* at ¶¶ 10–11. Based on what he had observed, Sweeney understood he had to be suspicious of evidence Raucci gathered outside his presence; he had every reason to question the reliability of that evidence. *Id.* at ¶ 18. Sweeney thus realized that what he had observed of Raucci's conduct was exculpatory evidence. *Id.* at ¶ 34. *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (holding evidence may be favorable under *Brady* where it provides a basis "to attack…the thoroughness and even the good faith of the investigation"). Significantly, Raucci procured all evidence directly implicating Morant that was introduced at trial: Ruiz's live testimony, and Roque and Morant's taped statements. *Id.* at ¶ 44.

    **B.  There is no dispute this *Brady* material was withheld from the prosecution.**

There is also no dispute this evidence was withheld from the prosecution. Pl's Facts Stmt., ¶ 46. Sweeney admits he did not create any police report recording any of the exculpatory information he observed that night. *Id.* at ¶ 35. All documentation of Sweeney and Raucci's interviews of Ruiz on January 14-15, 1991, provided to the prosecutor at Morant's trial fails to disclose this exculpatory and impeachment information and affirmatively misrepresents the circumstances of the ultimate taped statement Ruiz gave that night. *Id.* at ¶ 47.

As a matter of course—and pursuant to a general practice observed at the NHPD at the time—Sweeney would only record in police reports or a probable cause affidavit evidence that helped prove the case, not evidence that suggested someone might be innocent or that he thought a defense attorney would be looking for. *Id.* at ¶¶ 36–42. He would not even record such exculpatory or impeachment evidence in his notes. *Id.* at ¶ 36. Specifically, Sweeney would

9

never want to provide a defense attorney with information that would "devastate the case" or make a key witness "completely incredible"—such as the evidence about Ruiz's exculpatory statements. *Id.* at ¶ 39. As a result, he would not record such information in a police report. *Id.* Sweeney also understood that Raucci would not have recorded such exculpatory information, either, because "of course" a detective wouldn't want to report information that would hurt a case. *Id.* at ¶ 40. Sweeney "do[esn't] know any detective that would put down information for the defense attorney to attack" explaining "I'm totally not concerned about defense lawyers. That's not my obligation or job." *Id.* at ¶¶ 39, 41.

### C. There is no dispute this suppression was prejudicial.

Finally, there is no dispute suppression of this evidence was prejudicial. Sweeney himself admitted that any defense lawyer "would have had a very easy time impeaching Mr. Ruiz with that evidence at trial"; that it would "absolutely" "devastate the case" and even "make it impossible to call Mr. Ruiz as a witness, because it would make him completely incredible." Pl's Facts Stmt., at ¶¶ 32–33. Indeed, at Morant's 2015 release hearing, the New Haven State's Attorney described Ruiz as "the key witness in this case." *Id.*, ¶ 51. The prosecution had prior conceded to the Connecticut Appellate Court in Morant's 2009 state habeas proceedings that it "had no case [against Morant] without the testimony of Ovil Ruiz," and at the 2015 release hearing the State's Attorney explained that the very reason the State was finally agreeing to Morant's release was its recognition, by that time, that this outcome-determinative witness "was not honest in his [criminal trial] testimony," and that the responsible police officer, Detective Vincent Raucci, "had put him up to contriving a story." *Id.*, ¶ 51. Given the significance of Ruiz's testimony, this alone is sufficient to prove the suppression was prejudicial. *See Lewis*, 790 F.3d at 124 ("Sweeney provided credible evidence that Ruiz simply parroted information

10

supplied by an unscrupulous police officer. Sweeney's testimony thoroughly undermines Ruiz's credibility and thus any reasonable confidence in the outcome of the trial."); *see also Mellen v. Winn*, 900 F.3d 1085, 1097–1101 (9th Cir. 2018) (holding suppressed impeachment evidence from law enforcement officer that critical witness was not credible was "material *Brady* evidence as a matter of law").

But the withheld evidence did much more than impeach Ruiz. Raucci developed all the directly incriminating evidence introduced against Morant at trial, which consisted of live testimony from Ruiz and taped witness statements Raucci took from Roque and Morant. Pl's Facts Stmt., ¶ 44. At trial, Roque explained that after initially telling Raucci he had no information implicating Morant, Raucci had fed him all the information in his taped statement and used threats to get him to parrot it back—exactly as Sweeney had observed Raucci do with Ruiz. *Id.* at ¶ 45. Certainly if the jury had heard that Raucci engaged in "precisely the same misconduct" with Ruiz that Roque described from his interaction with Raucci, they would have believed Roque. This would have provided overwhelming evidence in Morant's favor—indeed, a central theme of the prosecutor's summation was that Ruiz was telling the truth and Roque's repudiation of his statement was not to be believed. *Id.* at ¶ 49. Morant did not testify at his trial but put on alibi evidence that contradicted the statement taken from him by Raucci. *Id.* at ¶ 45. In subsequent proceedings Morant has explained how Raucci also used these exact same tactics to obtain his taped statement. *Id.* at ¶ 49. In other words, the withheld evidence critically tarnished lead investigator Raucci and all other evidence he obtained—which included the only incriminatory evidence introduced at trial, Ruiz's testimony and Roque and Morant's taped statements—including by robbing Morant of the opportunity to corroborate Roque's account of Raucci using the same illegal conduct with him.

Given that all evidence incriminating Morant was obtained by Raucci, that Raucci's testimony vouched for all direct evidence incriminating Morant, and that another witness described identical efforts by Raucci to falsify evidence implicating Morant to what was suppressed, there can be no question of prejudice here. *See Kyles v. Whitley*, 514 U.S. 419, 435, 445–49 (1995) (holding *Brady* suppression is prejudicial where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" and describing how evidence which could cause the jury to doubt "the integrity of the investigation and…reliability of" the lead investigator could meet that standard); *see also Leka v. Portuondo*, 257 F.3d 89, 106 (2d Cir. 2001) (holding evidence that not only contradicted key witness testimony but would also have provided "promising lines…for the cross-examination" would "have had seismic impact" at trial).

## V. Conclusion

For the foregoing reasons Plaintiff respectfully requests that the Court grant his Motion for Partial Summary Judgment against Sweeney.

Dated: October 2, 2023            Respectfully Submitted,

/s/ Nick Brustin
Nick Brustin, phv08609
Emma Freudenberger, phv08602
Christina Matthias, phv206729
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 965-9081
Fax: (212) 965-9084
nick@nsbcivilrights.com
emma@nsbcivilrights.com
cmatthias@nsbcivilrights.com

/s/ Kenneth Rosenthal
Kenneth Rosenthal, ct05944
Law Office of Kenneth Rosenthal

                                                                     One Audubon Street, 3d Fl.
New Haven, CT 06511
(203) 915-4235
krosenthal@gs-lawfirm.com

*Attorneys for Plaintiff Stefon Morant*

## **CERTIFICATE OF SERVICE**

  I hereby certify that a true and accurate copy of Plaintiff's Response to Defendants' Request for Leave to Amend Affirmative Defenses was served via ECF on October 2, 2023, on all parties of record.

/s/ Samiha Abd-Elazem  
Samiha Abd-Elazem
