UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - -

STEFON MORANT,                           No.:  3:22-cv-00630-SVN

             Plaintiff

         v.

CITY OF NEW HAVEN; Chief of
Police NICHOLAS PASTORE, in his
individual and official
capacities; officers VINCENT
RAUCCI, ROBERT LAWLOR, VAUGHN
MAHER, JOSEPH PETTOLA, and
MICHAEL SWEENEY, in their
individual capacities,
                                         Hartford, Connecticut
                     Defendants          AUGUST 22, 2025

- - - - - - - - - - - - - - - -



MOTION HEARING



B E F O R E:

        THE HONORABLE SARALA V. NAGALA, U.S.D.J.




                                    Alicia A. Cayode Kyles, RMR
                                    Official Court Reporter

A P P E A R A N C E S:

FOR THE PLAINTIFF:

        NEUFELD SCHECK BRUSTIN HOFFMANN
        & FREUDENBERGER, LLP
        200 Varick Street, Suite 800
        New York, NY  10014
        BY:  ANNA BENVENUTTI HOFFMANN, ESQUIRE
             CHRISTINA CRANE MATTHIAS, ESQUIRE
             ELSA MOTA, ESQUIRE (Zoom)

        LAW OFFICE OF KENNETH ROSENTHAL
        One Audubon Street, Third Floor
        New Haven, CT  06511
        BY:  KENNETH ROSENTHAL, ESQUIRE

FOR THE DEFENDANT CITY OF NEW HAVEN:

        HOWD & LUDORF, LLC
        100 Great Meadow Road, Suite 201
        Wethersfield, CT  06109
        BY:  THOMAS R. GERARDE, ESQUIRE
             LIDIA MICHOLS, ESQUIRE

FOR THE DEFENDANT ESTATE OF NICHOLAS PASTORE, Chief
of Police, in his individual and official capacities:

        WILLIAMS WALSH & O'CONNOR, LLC
        37 Broadway, First Floor
        North Haven, CT  06473
        BY:  SCOTT ROLAND OUELLETTE, ESQUIRE

FOR THE DEFENDANT VINCENT RAUCCI, Officer, in his
individual capacity:

        KARSTEN & TALLBERG, LLC
        500 Enterprise Drive, Suite 4B
        Rocky Hill, CT  06067
        BY:  JAMES NEWHALL TALLBERG, ESQUIRE
             KIMBERLY A. BOSSE, ESQUIRE

FOR THE DEFENDANTS ROBERT LAWLOR and JOSEPH MAHER,
Officers, in their individual capacities:

        LAW OFFICES OF WILLIAM J. MELLEY III
        250 Hudson Street
        Hartford, CT  06106
        BY:  WILLIAM J. MELLEY, III, ESQUIRE

FOR THE DEFENDANT MICHAEL SWEENEY, Officer, in his
individual capacity:

    COHEN AND ACAMPORA
    8 Frontage Road
    East Haven, CT  06512
    BY:  THOMAS E. KATON, ESQUIRE


Also present:  Sam Fiske (Zoom)

```
 1                    (The Court entered at 10:33 a.m.)

 2                    THE COURT:  Give me one moment.

 3                    (Pause)

 4                    THE COURT:  All right.  I'm up and running.

 5            Good morning and I apologize for that brief

 6       delay.

 7            We're here in Case Number 22-civil-630 Morant and

 8       City of New Haven and other defendants.

 9            For those of you that I've have not met, I'm

10       Judge Nagala.

11            Let's begin with an appearance of counsel for

12       plaintiffs [sic], please.

13            MS. BENVENUTTI HOFFMANN:  Good morning, Your

14       Honor, Anna Benvenutti Hoffman for the plaintiff Stefon

15       Morant who is also here in the courtroom and I'll let my

16       co-counsel introduce themselves.

17            MS. MATTHIAS:  Good morning, Your Honor.

18       Christina Matthias on behalf of Plaintiff Stefon Morant.

19            MR. ROSENTHAL:  And Kenneth Rosenthal also on

20       behalf of the plaintiff.

21            THE COURT:  All right.  Good morning to all of

22       you.  How will you be splitting be the argument, if at

23       all?

24            MS. BENEVENUTTI HOFFMANN:  I'm just arguing.

25            THE COURT:  All right.  Thank you.
```

1              MS. BENEVENUTTI HOFFMANN:  Thank you.

2              THE COURT:  All right.  And let's begin with an

3    appearance for counsel for the City of New Haven, please.

4              MR. GERARDE:  Good morning, Your Honor.  Tom

5    Gerarde.  I represent the City of New Haven.  I have

6    Attorney Lidia Michols with me.

7              MS. MICHOLS:  Good morning, Your Honor.

8              THE COURT:  All right.  Good morning to both of

9    you.

10             And then counsel for Defendant Sweeney, please.

11             MR. KATON:  Good morning, Your Honor.  Thomas

12   Katon for the Defendant Sweeney.

13             THE COURT:  Good morning to you.

14             MR. KATON:  Good morning.

15             THE COURT:  Next counsel for Defendant Pastore.

16             MR. OUELLETTE:  Good morning, Your Honor.  Scott

17   Ouellette for the Estate of Nicholas Pastore.

18             THE COURT:  Good morning.

19             And then for Defendants -- is it pronounced Maher

20   or Maher?

21             MR. MELLEY:  Maher.

22             THE COURT:  Maher and Lawlor, please.

23             MR. MELLEY:  Good morning, Your Honor.  William

24   J. Melley for both.  Thank you.

25             THE COURT:  And finally for Defendant Raucci.

1          MR. TALLBERG:  Yes, good morning, Your Honor.

2   Jim Tallberg for Detective Vincent Raucci and I'm joined

3   by my colleague Attorney Kimberly Bosse.

4          MS. BOSSE:  Good morning, Your Honor.

5          THE COURT:  All right.  Good morning to all of

6   you.

7          So, as I believe my Courtroom Deputy indicated to

8   you this morning, the way that I intend to proceed with

9   this argument, since there are so many motions, is to have

10  basically mini arguments as to each motion and go through

11  them starting with the first filed which was plaintiff's

12  motion for partial summary judgment against Defendant

13  Sweeney.

14         To the extent defense counsel wishes to

15  incorporate arguments made by other counsel earlier on or

16  with respect to another motion, you're free to do that.

17         I have a lot of very specific questions for

18  counsel as to these motions, so I'll ask those questions

19  first, and then after I get through my questions I'll turn

20  to counsel and you can add anything additional that you

21  believe you want to present to the Court today.

22         As I said, I'm not setting time limits for the

23  argument, but we do have a lot of material to get through

24  so I hope that counsel will be concise in their

25  presentations.

1                So, let's begin with plaintiff's partial motion

2    for summary judgment against Defendant Sweeney as to the

3    *Brady* claim.

4                Attorney Benvenutti Hoffman, let me start with my

5    understanding of the bases for that *Brady* claim.  It seems

6    to be that there are two.  First, that Sweeney failed to

7    disclose really -- actually, it's that Sweeney failed to

8    disclose two different things.

9                First, he failed to disclose his -- Ruiz's

10   initial denial of knowledge of the homicide, and I'll say

11   that that bucket also includes just, generally, Ruiz's --

12   the fact that Ruiz gave inconsistent statements about his

13   knowledge of the homicide.

14               And then, secondly, there's this other bucket

15   about Detective Raucci's alleged misconduct during the

16   interview of Ruiz.

17               So, I'm interpreting plaintiff's *Brady* claim and

18   the way that it was laid out in your briefing to really

19   encompass those two buckets.

20               Do I have that generally correct?

21               MS. BENVENUTTI HOFFMANN:  Yes, Your Honor.

22               THE COURT:  Okay.  So, then with respect to the

23   inconsistent statements made by Ruiz, is there any

24   evidence in the record that Sweeney told Lawlor about the

25   potential inconsistent statements as opposed to telling

1    Lawlor, allegedly, about Raucci's alleged misbehavior

2    during the interviews?

3              MS. BENVENUTTI HOFFMANN:  I don't believe so.

4              THE COURT:  Okay.  So, at what point does it come

5    to light and how does it come to light that Ruiz had made

6    inconsistent statements and that Sweeney had had that

7    first interview with him where he denied knowledge of the

8    homicides?

9              MS. BENVENUTTI HOFFMANN:  Comes to light -- you

10   mean to people outside the police department?

11             THE COURT:  To any relevant person to whom this

12   information should have been reported.

13             MS. BENVENUTTI HOFFMANN:  So, I believe the first

14   time and my colleagues, I'm sure, who know the record

15   better than me will correct me if I get this wrong.

16             But I believe the first time that any of the

17   detailed, this detailed account of everything that

18   happened with Sweeney and Raucci and Ruiz that night came

19   to light is when Sweeney -- outside of the police

20   department -- is when Sweeney raised it postconviction

21   when -- you know, well after the conviction and the -- I'm

22   sorry.  I don't mean to interrupt the -- but there's

23   consistent testimony from Sweeney himself and from other

24   officers that it was the general practice you never report

25   these prior inconsistent statements.

```
 1              And so while Sweeney testifies that he raised to
 2    Lawlor his general concern, you know, the more significant
 3    concern perhaps that Raucci is, you know, basically
 4    fabricating evidence, the part that's focused on the prior
 5    inconsistent statements, I don't believe there's any
 6    evidence that he raised that or that he would of raised
 7    that because that was the general practice that you, you
 8    never report the prior inconsistent statements and that's
 9    what Sweeney specifically says, you know, I don't know
10    anybody who would do that, you're just helping the defense
11    lawyer, you don't give them this information.
12              THE COURT:  Okay.  So the first time that Sweeney
13    tells anyone that what defense counsel calls a
14    pre-interview occurred is after Mr. Morant's conviction
15    and when Sweeney starts his efforts to disturb the
16    prosecution?
17              MS. BENVENUTTI HOFFMANN:  That's my
18    understanding, yes.
19              THE COURT:  Okay.  All right.  And it's
20    plaintiff's position then that that is a *Brady* violation
21    because Detective Sweeney would have had an obligation
22    under *Brady* to forward to the prosecutor the inconsistent
23    statements?
24              MS. BENVENUTTI HOFFMANN:  Exactly.  So *Brady*
25    applies to both exculpatory and impeachment material.
```

1    Sweeney himself admits, obviously these are impeaching

2    statements and he gives colorful, you know, testimony

3    about how it would devastate the prosecution which is why

4    you don't provide it to the defense if it, you know,

5    because of the effect that it would have -- yes, so

6    that's -- and, yes.

7            THE COURT:  Okay.  Now, there is a factual

8    dispute between Sweeney and Lawlor about whether Sweeney

9    reported Raucci's behavior during the interview to Lawlor

10   the day after it occurred.

11           MS. BENVENUTTI HOFFMANN:  Right.

12           THE COURT:  Does that factual dispute have any

13   bearing on whether plaintiff is entitled to summary

14   judgment on the *Brady* claim against Sweeney?

15           MS. BENVENUTTI HOFFMANN:  So that's a good

16   question and our position is it does not because for this

17   motion we're only looking at the disputes between Sweeney

18   and the plaintiff and so we're taking Sweeney's version of

19   the evidence.  And Sweeney's version is he reported it

20   but, again, as we discussed, he only reported a different

21   portion and not the part about the inconsistent statements

22   even under his version of events.

23           THE COURT:  Okay.  And even -- is there sort of a

24   follow-on argument that even if he reported to Lawlor it

25   didn't satisfy his *Brady* obligations which are -- which

1    require reporting to the prosecutor?

2              MS. BENVENUTTI HOFFMANN:  Exactly.

3              THE COURT:  Okay.  There are two main arguments

4    that Detective Sweeney makes in his opposition to your

5    motion.

6              First is that there's no evidence he acted

7    intentionally to withhold exculpatory information.  And

8    the second is that even had that information been

9    disclosed, meaning, the prior inconsistent statements and

10   Raucci's behavior during the interview, had that been

11   disclosed it would of been cumulative and thus not

12   prejudicial because there were other things that impeached

13   Ruiz's credibility at trial.

14             So, I'd like your response to both of those.

15             So, first as to intentionality, why aren't there

16   genuine disputes of fact about whether Sweeney

17   intentionally withheld exculpatory information especially

18   in light of the efforts he took post-prosecution to undue

19   what had been done?

20             MS. BENVENUTTI HOFFMANN:  So I think on the *Brady*

21   portion of it I would submit that there is, just based on,

22   again, on his own testimony, he admits that he intended

23   for this evidence not to make it to the prosecutor or the

24   defense.  But also --

25             THE COURT:  And do we need to be precise there

1    about when you say "this evidence"?  Does that mean the

2    prior inconsistent statements?

3            MS. BENVENUTTI HOFFMANN:  The prior inconsistent

4    statements.

5            THE COURT:  Okay.

6            MS. BENVENUTTI HOFFMANN:  But also the Second

7    Circuit has not addressed specifically what the intent

8    requirement is for a civil *Brady* claim and district courts

9    have, some have said that it requires intentional

10   misconduct but others have said deliberate indifference is

11   sufficient, so we would submit that even a deliberately

12   indifferent failure to, you know, to disclose this

13   evidence would suffice.  Yes, so --

14           THE COURT:  *Poventud* does use the word

15   "intentional" right, the Second Circuit case?

16           MS. BENVENUTTI HOFFMANN:  Yes, but I believe

17   *Bellamy* which is after *Poventud* says, you know, that we

18   have not specifically addressed this, you know, we don't

19   have to address it here because we can assume, you know,

20   we would meet the standard anyway.  But, yes, so I think

21   since then and there have been district courts in this

22   district and around the circuits since then that have held

23   that it only requires a deliberately indifferent failure.

24           THE COURT:  Okay.  So that's intentionality as to

25   the prior inconsistent statements.  What about

1    intentionality as to Raucci's behavior during the

2    interview --

3            MS. BENVENUTTI HOFFMANN:  So I think that's --

4            THE COURT:  -- when under his version of the

5    facts he reported that up to Lawlor?

6            MS. BENVENUTTI HOFFMANN:  Exactly.  So I think

7    that, I admit that is trickier, but I would say that at

8    least with respect to deliberate indifference I think we

9    would meet that standard because he -- I mean, even under

10   his version he doesn't say that, sorry, that Lawlor said

11   he was going to do anything specific with this

12   information.  Certainly didn't say that he was going to

13   provide the -- and there are two separate interactions

14   that Sweeney described.

15           So there's the first one immediately that says

16   you got to take Raucci off this case and then there's a

17   second one when he comes back and learns, you know, the

18   case is going forward based on Ruiz's statement.

19           And, so, Sweeney's account is Lawlor tells him,

20   oh, there's reason to credit it, you know, Ruiz passed a

21   polygraph which there's no evidence that actually

22   happened, but that's Sweeney's account, that's what Lawlor

23   tells him.  But even if that's the case --

24           THE COURT:  When does that conversation occur?

25   Is that --

```
 1              MS. BENVENUTTI HOFFMANN:  After --
 2              THE COURT:  -- is that pre Sweeney leaving for
 3    Bosnia or --
 4              MS. BENVENUTTI HOFFMANN:  Yes.  Yes.  Before the
 5    trial, it's after -- I believe after Mr. -- certainly
 6    after charges are brought.
 7              It's at the time of either Mr. Lewis' or
 8    Mr. Morant's arrest warrant, so it's at a time when and
 9    I'm not sure that he describes exactly when it was because
10    I think what -- I think what he describes is he had
11    learned about one of them being arrested and he learned
12    the basis was this Ruiz statement and that's what
13    triggered him to go back to Lawlor and say, What's going
14    on?  I told you to take Raucci off, you know, in sum and
15    substance, I told you to take Raucci off the case.  And
16    what Sweeney claims is that Lawlor says, No, there's other
17    evidence, he passed a polygraph and then Sweeney just
18    let's it go.
19              But he still -- you know, and particularly with
20    respect to the prior inconsistent statements, Sweeney
21    knows he's the only person who's a witness to this, so if
22    he doesn't report it nobody else is reporting it, this
23    isn't going anywhere and he doesn't do anything at that
24    point.
25              And I want to go back to, I know you had another
```

```
 1    question about make materiality.  So --
 2              THE COURT:  Yeah, we'll get there.
 3              MS. BENVENUTTI HOFFMANN:  Okay.
 4              THE COURT:  Let's stay on intentionality --
 5              MS. BENVENUTTI HOFFMANN:  Sure.
 6              THE COURT:  -- just so I can keep things
 7    organized in my head.
 8              What should I make of the fact that despite these
 9    apparent misgivings about how the interview was conducted,
10    Sweeney notarizes Ruiz's statement after Raucci obtains
11    it?
12              MS. BENVENUTTI HOFFMANN:  So I think that that
13    is, what that demonstrates is he clearly knows -- there's
14    no dispute that he knows that there is a statement going
15    forward, you know, that's being used because he's present
16    and he sees that Raucci is taking a statement and, you
17    know, Sweeney is notarizing it.
18              And, again, he says that he didn't read it but
19    whether he read it or not he's certainly -- that's
20    irrelevant and that, you know, that may be a disputed
21    fact.
22              There's many disputed facts when we get to the
23    other motions, but just taking the facts in the light most
24    favorable to Sweeney, he at least knows that this
25    statement is happening, which means he knows that the
```

1   prior inconsistent statements, including, I know nothing

2   about this case, need to be reported and he does not

3   report them.

4            THE COURT:  Okay.

5            MS. BENVENUTTI HOFFMANN:  Should I go to

6   materiality?

7            THE COURT:  Let's go to make materiality.

8            MS. BENVENUTTI HOFFMANN:  Okay.  So there's no --

9   I don't think there is any question that the evidence that

10  would undermine, critically undermine Ruiz's testimony is

11  material in this context.

12           There was very little evidence, period, offered

13  against Mr. Morant.  There is this, the Roque statement

14  which he testified was false and he was coerced into

15  making and that testimony was disputed based on evidence

16  from the police, but it was later verified and proven

17  through the FBI investigation.

18           There is the statement attributed to Mr. Morant

19  which, and -- but both of those statements also are much

20  less inculpatory.

21           And then there's the Ruiz statement and there's

22  basically two versions of the Ruiz statement.  So

23  there's -- what happens is originally what Raucci tries to

24  get is a statement saying that Ruiz is the driver and

25  that's what Sweeney says he hears, you know, he overhears

1    trying to -- Raucci trying to get Ruiz to say he knows

2    that this is false.  He tells Raucci specifically, you

3    cannot take this statement, that he's the driver, he's

4    physically present at the crime because I know this is

5    false.  I can tell this is false.

6         So the statement that Raucci originally takes

7    from Ruiz just says I heard, you know, Mr. Lewis

8    confessing to this and then this other thing about

9    throwing a gun into the river which is like preposterous.

10        What happens down the line is when Roque says

11   his -- won't cooperate and won't testify against Mr. Lewis

12   because he says his statement is coerced and fabricated.

13   Mr. Morant, same thing, says, This is not true, I'm not

14   going to cooperate.

15        They don't have enough evidence to go against

16   Mr. Lewis who is the main target, so Raucci goes back and

17   gets Ruiz to give the exact same statement that Sweeney

18   said is, I know is false.  So he switches his statement

19   from, I just overheard a confession or a statement against

20   interest for Mr. Lewis to, I'm physically present, I'm a

21   driver.

22        And so if Sweeney had provided the prior

23   inconsistent statements including that he didn't know

24   anything, that ended up -- the Ruiz statement is the key

25   evidence.  So if Sweeney had provided those prior

1    inconsistent statements, there is no question that that

2    would have -- there's a reasonable likelihood of a

3    different outcome.

4         And I would direct to the Court, it's in our

5    papers, but a decision from the Ninth Circuit called

6    *Mellen v. Winn* which is in exactly the same context which

7    is a civil *Brady* claim.  And it found there materiality

8    was established as a matter of law given the context,

9    given the significance of the witness and the significance

10   of the impeaching evidence in that case.

11        And here, specifically, if you look at the

12   post-conviction proceedings, the reason that they

13   ultimately conceded that there was a problem with

14   Mr. Morant's conviction originally was because of this

15   exact same evidence.  We now know that there's a problem

16   with Ruiz's testimony and, therefore, you know, we can't

17   stand behind this conviction.  So, I don't think that

18   there is any reasonable dispute that this, these

19   particular statements would of been material evidence in

20   this case.

21        THE COURT:  Okay.  Let me ask you a couple of

22   targeted questions there.  When was what you're calling

23   Ruiz Statement No. 2 that he, in fact, was the getaway

24   driver, when was that obtained?

25        MS. BENVENUTTI HOFFMANN:  It's later.  So what

1    happens and you can correct me on the exact date, but the

2    basic chronology is they, in three successive days they

3    get the original statement from Ruiz, the statement from

4    Roque and the statement from Mr. Morant, and all of those

5    statements are targeting Mr. Lewis who is actually the,

6    you know, the one that Raucci has a motive to go after.

7    And -- but once Mr. Roque says he won't cooperate

8    and, you know, because it's not true and Mr. Morant says

9    the same thing, nothing happens for a long period of time.

10    And it's not for months later that Raucci goes back, so I

11    believe it's January 14th to 16th are the first three

12    statements, 1991.

13    And then May 28th is the second Ruiz statement

14    which is what they use to -- you know, and there's even

15    testimony that, you know, Ruiz, I believe from Ruiz that

16    he's told, you know, what you had originally isn't enough.

17    We need something more to be able to go forward and so

18    then they go back and have him admit to being -- fabricate

19    a statement that he is actually, was present, which, by

20    the way, does not match with any of the -- the first three

21    sets of statements are all fabricated to be consistent,

22    right.  So, they're all fabricated to have just Mr. Lewis

23    and Mr. Morant there for the crime and everything else is

24    overheard.

25    When they go back to fabricating the new Ruiz

1     statement, all of the sudden there's three people there

2     because Ruiz -- which is inconsistent with the other

3     statements because this is now a new makeup that's done

4     several months later to try to fix the fact that both

5     Roque and Mr. Morant are saying we're not going to

6     testify, this is false.

7            THE COURT:  Okay.  Clarify for me who Millie

8     Martinez is and what her statement is, sort of how it fits

9     into this picture of the evidence against Mr. Morant.

10           MS. BENVENUTTI HOFFMANN:  So Millie Martinez is a

11    friend or former girlfriend of Mr. Ruiz who was -- there

12    was an additional fabricated statement.

13           So, after the second fabricated statement from

14    Ruiz which now says he's present at the crime and he's,

15    you know, the driver, Raucci tells Mr. Ruiz, you know, we

16    need more corroboration.  And he tells him there was

17    evidence that there was a young woman I think, I believe

18    on the scene who was observed.  So he tells him we need to

19    have -- you know, go get this statement or we need to have

20    this statement to say she saw you there.

21           So Raucci goes to see Martinez and --

22           THE COURT:  Who says "go get this statement"?

23           MS. BENVENUTTI HOFFMANN:  Raucci.  I'm sorry.

24    Raucci tells Ruiz that they need corroboration and I

25    believe asks for, you know, a person who would corroborate

1    it.  Then Raucci goes to Martinez and pressures her to

2    give the statement.  She tells him it's false, she wasn't

3    there.  She wasn't there.  And -- but he pressures her to

4    give a statement and --

5              Is this one taped or is this one written?  I know

6    she doesn't sign anything, right?

7              (Off-the-record discussion among plaintiff's

8    counsel.)

9              MS. BENVENUTTI HOFFMANN:  I'll confirm the

10    details.

11             But essentially she gives testimony that this is

12   not true, she was pressured to give the statement.  She

13   was not there.  She explains how it couldn't of been true,

14   talking about something that had happened after the curfew

15   and she wouldn't have been out on the scene.  It's a taped

16   statement, so it's another taped statement where he

17   pressures her, tells her what to say, takes the statement

18   and she now said, you know, disclaims it and says the

19   whole thing is false and she was pressured by Raucci to

20   give this statement.

21             But I don't believe she ever testifies.  I think

22   this is just a statement that's in the record.  I could be

23   wrong about that -- yeah, she doesn't testify.

24             THE COURT:  Okay.  So it wasn't part of the

25   evidence introduced at the trial?

1          MS. BENVENUTTI HOFFMANN:  Not at the trial, but I

2     think in the record that's used to justify the

3     prosecution.

4          THE COURT:  Understood.  Okay.

5          In the Second Circuit's decision affirming Judge

6     Haight's grant of habeas relief to Mr. Lewis --

7          MS. BENVENUTTI HOFFMANN:  Okay.

8          THE COURT:  -- there's a line that said -- that

9     deals with the materiality of the alleged misbehavior by

10    Raucci during Ruiz's interview and the Second Circuit

11    seems pretty clear that that evidence was prejudicial and

12    material in the prosecution of Mr. Lewis.

13         So this is somewhat of a softball, but I'm not

14    saying that that decision has preclusive effect here, I

15    probably need to look at it myself, but if the Second

16    Circuit has already determined that the interrogation

17    tactics disclosure would have been material to Lewis,

18    wouldn't it also be material to Mr. Morant?

19         MS. BENVENUTTI HOFFMANN:  Yes.

20         THE COURT:  Okay.  All right.  So that covers the

21    questions that I have for you on your motion.  Before we

22    leave you, is there anything further that you want to

23    highlight to the Court before I turn to counsel for

24    Attorney [sic] Sweeney?

25         MS. BENVENUTTI HOFFMANN:  I don't think anything

1    further on this motion.

2        THE COURT:  Okay.

3        MS. BENVENUTTI HOFFMANN:  Thank you.

4        THE COURT:  All right.  Attorney Katon, so I'll

5    start sort of in the same place that I started with

6    Attorney Benvenutti Hoffman which was that there are two

7    buckets of allegedly withheld information.

8        Bucket No. 1 is Ruiz's prior inconsistent

9    statements given only to Sweeney, so he's the only one in

10   possession of that information.

11       Bucket No. 2 is Raucci's alleged misconduct

12   during the interview with Ruiz.

13       So, with respect to Bucket No. 2, even taking as

14   true that Sweeney reported that behavior to Lawlor, it's

15   undisputed it was never reported to the prosecutor,

16   correct?

17       MR. KATON:  It was not.

18       THE COURT:  And *Brady* requires reporting to the

19   prosecutor.  So why isn't that basically an admission of a

20   *Brady* violation?

21       MR. KATON:  Because it was reported to the

22   supervising detective on that job and that was Lawlor, and

23   Lawlor may deny it or not recall it, but reporting

24   obligation, as I understand it, is to go to the

25   supervising detective on the job and that was not Sweeney.

1          THE COURT:  But *Brady* says the exculpatory

2     information has to be given to the prosecutor and I think

3     for good reason because it's the prosecutor who can really

4     determine whether it is exculpatory and whether it needs

5     to be disclosed.  So when Sweeney just reports it one step

6     up to his supervisor, how is he discharging his

7     obligations under *Brady*?

8          MR. KATON:  It's important to realize he does two

9     things.  Not only does he report it to the supervising

10    detective but he also says, hey, let's get another

11    detective in there to overwatch, if you will, what

12    Raucci's doing and that's Detective Pettola.

13          So in terms of intentionality, I don't see how

14    there can be anything but an issue of fact regarding that

15    question given those two actions.

16          So Pettola comes out of the interview and says,

17    Dah [sic] no misconduct whatsoever, nothing was going on.

18    So -- and so there's no evidence that ever got back to

19    Sweeney.

20          THE COURT:  Meaning -- what do you mean "that

21    ever got back to Sweeney"?

22          MR. KATON:  That there was any report of

23    continued misconduct by Raucci in the interview.

24          THE COURT:  So Sweeney's relying on Pettola's

25    statement that everything was kosher --

1          MR. KATON:  Sure.

2          THE COURT:  -- from that point forward?

3          Okay.  And Sweeney notarizes the statement of

4    Ruiz which makes no mention of the information only

5    Sweeney knows about lack of complete knowledge regarding

6    this homicide.

7          MR. KATON:  Because Ruiz comes back in and claims

8    that's true and accurate in his statement, so --

9          THE COURT:  But Sweeney knows that -- truth of

10   the statement aside, Sweeney knows that Ruiz had said

11   something different earlier, right, so that's what I'm

12   contemplating in calling Bucket 1 of alleged wrongfully

13   withheld information.

14         So Sweeney knows Ruiz said something different

15   before and he says I would never disclose that to the

16   defense for a couple of reasons.  I think you argue it's

17   preliminary, it's a pre-interview, it wasn't an official

18   statement and also that it -- he says he would never

19   disclose that because it would be helpful to the defense.

20         So why isn't that an intentionally withholding

21   Bucket No. 1?

22         MR. KATON:  Well, we have an issue of fact

23   regarding whose obligation this would be.  I think it

24   primarily is the obligation of Detective Raucci.  He's the

25   one that was the investigating detective.

1          THE COURT:  But Sweeney's the only one who knows

2     that Ruiz made a prior inconsistent statement, right?

3          MR. KATON:  But Sweeney reported it.

4          THE COURT:  Okay.  So when did he report and what

5     did he report?

6          MR. KATON:  He walked out of -- my understanding

7     of the record is that he walked out of the pre-interview

8     and went to Lawlor and said, Hey, you know, you got to do

9     something about this.

10         THE COURT:  Wait.  I guess I'm misunderstanding

11    because my understanding was what we're calling the

12    pre-interview was between Sweeney and Ruiz alone and that

13    Raucci was not in that interview.  Do I have that right?

14         MR. KATON:  Raucci was in it for part of it.

15         THE COURT:  I thought the record was fairly

16    undisputed that there was a conversation between Sweeney

17    and Ruiz alone first.

18         MR. KATON:  First.

19         THE COURT:  Yes.  So that's what I'm calling the

20    pre-interview.

21         MR. KATON:  Okay.

22         THE COURT:  So, if we can settle on that

23    terminology.

24         MR. KATON:  Okay.

25         THE COURT:  There's a pre-interview between

1      Sweeney and Ruiz alone, and in that pre-interview Ruiz

2      disclaims any knowledge of the homicide; is that correct?

3              MR. KATON:  That's correct.

4              THE COURT:  So does Sweeney tell anyone about

5      that pre-interview and what Ruiz said during it?

6              MR. KATON:  What Sweeney did was report what he

7      saw occur with Raucci.

8              THE COURT:  So he did not report the contents of

9      the pre-interview with Ruiz, correct?

10             MR. KATON:  I believe that's correct.

11             THE COURT:  All right.  Okay.  Let's discuss

12     plaintiff's argument that the standard is not clear

13     regarding intentionality or deliberate indifference for a

14     *Brady* violation.

15             Do you believe that intentionality is required or

16     is deliberate indifference sufficient?

17             MR. KATON:  Deliberate indifference is not

18     sufficient.  It's intentionality in this circuit and

19     there's just simply no factual predicate that we can

20     derive intentionality from this set of facts.

21             THE COURT:  So let me press you on that.  As --

22     we've established that Sweeney was the only one to know

23     about the contents of the pre-interview and we've

24     established that Sweeney did not report the contents of

25     the pre-interview at any point and he testified that he

1    didn't memorialize the contents of the pre-interview

2    because a defense attorney would have a field day with it

3    effectively.

4          MR. KATON:  The best we can do is infer

5    negligence from this and that's simply not sufficient.  I

6    mean, you know, there's no evidence on the record to

7    establish that Sweeney intended to do anything to

8    Mr. Morant.  You know, he reported to his -- the

9    supervising detective and, you know, that -- and we can't

10   go any further than saying maybe he was negligent, maybe

11   he should of done better, but that's not the test.

12         THE COURT:  Okay.  I think it's worth saying on

13   the record that even plaintiff acknowledges that Detective

14   Sweeney's efforts to undo what he saw later as a

15   miscarriage of justice are commendable.  So let me go on

16   the record as saying that, plaintiff acknowledges that.

17         But as to what Sweeney did in the moment, it

18   doesn't -- it doesn't seem like he complied with *Brady*

19   because he never told anybody about the prior inconsistent

20   statements.

21         MR. KATON:  But, once again, I think that's a

22   question of fact for the trier of fact as to what his

23   mindset was at the time.

24         THE COURT:  Why doesn't the statement that he

25   made in his deposition that he routinely would not

1    document that kind of pre-interview statement because it

2    would be valuable to the defense.  Why isn't that enough

3    to show intentionality?

4             MR. KATON:  Because there's no evidence that he

5    was operating under that mindset at the time this occurred

6    with Mr. Morant.

7             THE COURT:  I think that's the exact reason he

8    was doing that.  That's how he justifies why he didn't

9    record it at the time, memorialize it in some fashion.

10            So, let's -- let me ask you what I posed as the

11   softball question to plaintiff's counsel.

12            In the Second Circuit appeal for Lewis' habeas,

13   federal habeas decision, the Second Circuit said that

14   Ruiz's testimony was critical to obtaining the conviction

15   against Lewis and thus withholding of the statements

16   related to Raucci's interview tactics with Ruiz was

17   prejudicial under *Brady*.  So how is it that you can still

18   argue that withholding that information was not

19   prejudicial?

20            MR. KATON:  Because there were other people in

21   the chain of command that were involved with this.  There

22   was Raucci who was the investigating detective who didn't

23   report and arguably Lawlor didn't report either.

24            THE COURT:  But I guess that's in part the reason

25   why I wanted to argue these motions separately as separate

1   motions because regardless of what Raucci did or Lawlor

2   did, this motion focuses on your client's actions and it

3   was your client who knew about this information and failed

4   to disclose it to the prosecutor as required under *Brady*.

5   So tell me why that interpretation is wrong.

6           MR. KATON:  Because it was, for lack of a better

7   term, sent up the chain of command.  It wasn't his case.

8           THE COURT:  And is there any case law that you're

9   aware of suggesting that reporting it to a supervisor

10  within the police department is sufficient to discharge

11  obligations under *Brady*?

12          MR. KATON:  I don't know of any off the top of my

13  head.

14          THE COURT:  Okay.  If there was such, it would of

15  been in your brief?

16          MR. KATON:  It would of been.

17          THE COURT:  Okay.  All right.  So that's all the

18  questions that I have for you, Attorney Katon, on this

19  motion.

20          Does plaintiff wish to have any rebuttal on its

21  motion?

22          MS. BENVENUTTI HOFFMANN:  I think most of it is

23  covered from what I said before.  The only thing I would

24  say is I don't think the obligation is a question of fact.

25  I think that that would be a question of law, so I don't

1    think, like, whose obligation it is to disclose, I don't

2    think that's a dispute of fact.  I think that would be a

3    legal issue that the Court could decide.

4         THE COURT:  Meaning that Sweeney had an

5    obligation to disclose because he was a member of the

6    prosecution team?

7         MS. BENVENUTTI HOFFMANN:  Exactly.

8         THE COURT:  Okay.  Now, one thing that I picked

9    up on through the helpful work of my staff and actually a

10   summer intern who's watching this proceeding remotely, is

11   that in the *Lewis* Second Circuit habeas decision there was

12   a revised opinion issued and from our review, I don't know

13   if much changed but at least one thing changed and that

14   was the addition of a footnote about Sweeney being --

15   Sweeney and others being members of the prosecution team.

16        I don't know why, I can't divine why the Second

17   Circuit needed to issue a revised ruling to cover that

18   point.  Do you have any insight into that issue and is

19   there any question that Sweeney was on the prosecution

20   team here given his involvement in the initial interview

21   of Ruiz?

22        MS. BENVENUTTI HOFFMANN:  I don't have any

23   insight.  I don't know whether -- no, I don't have any

24   insight as to that issue why there was the revised

25   opinion.  I would say, yes, he's absolutely a member of

1    the team.  I mean he was interviewing Ruiz related to this

2    case initially and then involved with Raucci in the

3    interviews on this case, so he's absolutely a part of --

4    whatever his formal assignment is, he's part of the team

5    that's investigating this case and absolutely a part of

6    the prosecution team.

7           THE COURT:  Okay.  All right.  Okay.  So that

8    covers all my questions related to plaintiff's motion,

9    partial motion against Sweeney.

10          Let's move to the next filed motion which is the

11   City's motion for summary judgment.

12          So, Attorney Gerarde.

13          MR. GERARDE:  Your Honor, would it be all right

14   if I went to the podium?

15          THE COURT:  Absolutely.  Sure.

16          That applies to all counsel.  If you'd rather

17   argue at the podium that's fine.  There's a little bit

18   less space for papers there though.

19          Okay.  So let me jump into my questions first.

20          MR. GERARDE:  Sure.  Thank you.

21          THE COURT:  Let's start with municipal liability.

22          MR. GERARDE:  Right.

23          THE COURT:  So there are three potential ways in

24   which plaintiff can allege municipal liability against the

25   City.

1           First -- and your briefing helpfully explains

2      these.  First, there's Chief Pastore's alleged

3      ratification or deliberate indifference to Raucci's

4      misconduct.

5           Second, there's the custom, pattern or practice

6      of unconstitutional investigative techniques including

7      withholding exculpatory information.

8           MR. GERARDE:  Right.

9           THE COURT:  And, third, there's failure to

10     supervisor, discipline and train with respect to

11     unconstitutional investigative conduct.

12          MR. GERARDE:  That's as alleged by plaintiff.  I

13     think it's just a failure to train, the third one.

14     Failure to supervise is an individual liability basis only

15     under the *Tangreti* line of cases.  So we look at that as

16     the *City of Canton v. Harris* failure to train *Monell* case.

17          THE COURT:  Okay.  All right.  I'll dig into that

18     a little bit with plaintiff.

19          So as to the first of the theories that Chief

20     Pastore ratified Raucci's improper behavior or at least

21     was deliberately indifferent to it, plaintiff largely

22     relies on a few things.  They say Pastore was a hands-on

23     chief and this was an investigation of prominence because

24     of who the victims were, so he would of, you know, been

25     involved or at least kept tabs on it.

 1          And then, secondly, that Lawlor testifies that if

 2    he was told about any misconduct by Sweeney he would of,

 3    and I think the wording is would of alerted his

 4    supervisors up the chain of command.

 5          Now, plaintiff also then spends a lot of time in

 6    his briefing talking about actions that Pastore took when,

 7    after Mr. Lewis reported that something was awry with his

 8    interview.

 9          So those though, that latter category all

10    postdates the alleged wrongful conduct here.  So let me

11    start there.  What relevance, if any, does the post-dated

12    conduct, what Pastore did after he learned about the

13    alleged misconduct, how should I be looking at that for

14    the ratification theory?

15          MR. GERARDE:  I submit to Your Honor that it has

16    no relevance.  All right.  In order to prove a *Monell*

17    violation you have to prove that this is a single act by a

18    final policymaker that was a moving force behind the

19    individual's violation of civil rights.

20          So it starts with you need an individual

21    violation of civil rights.  That's -- in our argument

22    that's Raucci violating Mr. Morant's civil rights.

23          That occurred when we know what the timeline is,

24    January '91 Ruiz, et cetera, arrest in '92.  Not much more

25    after the arrest in '92.

1          So, we should be looking at what did -- what

2     evidence is there that Pastore had knowledge of wrongdoing

3     and condoned it and Raucci saw that and was motivated by

4     it, and there's nothing there.

5          They talk about the fact that in the 1980s

6     Detective Pettola saw Raucci with some white powder that

7     might of been cocaine that he was going to plant, maybe it

8     wasn't.  He didn't know what it was.  He never reported

9     that to anyone.

10          THE COURT:  And you highlight, your brief says

11     that's an undisputed fact that Chief Pastore never learned

12     about this alleged white powder.

13          MR. GERARDE:  Right.  Right.  No one -- that's

14     undisputed.

15          And so what we have is what we just heard a

16     little bit about.  Sweeney told Lawlor that Raucci was

17     misbehaving with Ruiz, all right, and Lawlor denies it.

18     All right.  So, now in order to defeat summary judgment

19     we're looking for what evidence would be admissible at

20     trial.

21          Lawlor said, Well, Pastore was a hands-on chief

22     and he was the kind of guy, and if I knew that, if Sweeney

23     had told me that, I would not keep that to myself.  I

24     would report it up the chain of command.  And Chief's the

25     kind of guy that wouldn't ignore it and would let it --

1   you know, we're into speculation at that point.  That's my

2   argument.

3          You've gone from issue of fact for trial that

4   you're now in the realm of speculation beyond that, so you

5   never reach the point where there's a single act by your

6   final policymaker that is a moving force behind Raucci's

7   misbehavior with Ruiz.

8          THE COURT:  Okay.  All right.  That's all I had

9   for questions on ratification.

10         So possibility number two, custom, pattern or

11  practice.

12         There plaintiff cites to a lot of different cases

13  that in the City of New Haven where there were, in their

14  view -- in his view problematic actions by police officers

15  with respect to withholding exculpatory information.  And

16  the reply brief that you submitted doesn't quite address

17  all of those.  There's a lot to address and there are page

18  limitations so I understand that.

19         But plaintiff also cites to the testimony of

20  Sweeney, Pettola, Sullivan and the City's 30(b)(6)

21  witnesses.

22         So why, at the very least, wouldn't there be a

23  custom -- a jury question about whether there was a

24  custom, pattern or practice by the City to withhold

25  exculpatory information?

1          MR. GERARDE:  Right.  The answer lies in

2    reminding ourselves of what this theory of *Monell*

3    liability is.  Remember, when 1983 first became a

4    potential civil rights claim it was against individuals

5    only.  There was no such thing as a claim against a

6    municipality in the 1960s when 1983 claims were first

7    actionable.

8          Then in 1970s the *Monell* case was decided and it

9    was decided with the theory of, well, wait a minute I know

10   we're starting with individual liability but what if the

11   reason why this individual violated civil rights is

12   because it was the policy to do that and he's just

13   following what his department's policy is, so that's what

14   *Monell* says.  Okay.  And then in that case there should be

15   municipal liability.

16         And then it went a step further and said, well,

17   no one's, you know, crazy enough to say on a formal policy

18   you can violate civil rights.  What if they're doing it so

19   much it's got the fundamental effect of policy?  That

20   should be municipal liability also and that's where we

21   are.

22         The important case to remember about that is *Jet

23   v. Dallas Independent School District*, it's a Supreme

24   Court case and it says "when you have a longstanding

25   practice to violate constitutional rights that has become

1    the standard operating procedure of this municipality"

2    well, then you should have, it's the functional equivalent

3    of policy.  You should be able to get municipal liability.

4         So, the plaintiffs [sic] write these briefs like

5    we're dealing with a negligent supervision case and we

6    aren't.  We have to remember that we have to follow the

7    *Jet* paradigm.

8         So we'll accept, for purposes of summary

9    judgment, that what these allegations are we have to, that

10   they're true.

11        But you look at it, you look at, like, in the

12   *Dinkins* case in 1982, a police officer named Mel Cartoceti

13   makes a false police report.  That's one event.

14        I mean, we did have policies that forbade

15   falsification, forbade withholding evidence of any kind.

16   There's no -- they don't claim the first basis for Monell

17   a policy because we have constitutional policies.

18        In the *Golino v. New Haven* case it's Detective

19   DiLullo alleging -- is alleged to have done something

20   wrong, okay, but in the Second Circuit decision in *Golino*

21   in 1991 the Second Circuit found the City's policies and

22   practices were constitutional.  It was an individual piece

23   of Detective DiLullo that was a problem.

24        Leroy Harris was arrested in 1994.  Conviction

25   upheld by the appellate court in 1990.  His habeas was

1    denied and that was upheld by the appellate court.  So

2    somewhere in there, there's ground for habeases, the New

3    Haven Police were crooked and they forced things and that,

4    but there's no decisions.

5         You know, so I don't -- and I just want to

6    mention one more, Maceo Streater.  He was arrested in

7    1990, convicted in 1993.  He lost every single appeal and

8    habeas he attempted and served his full sentence, but

9    because he's claiming along the way problem, problem,

10   problem this is becoming the basis of their custom and

11   practice.

12        The point I want to make that's most important is

13   if we're going to give *Jet* its due regard, we have

14   evidence there's 1500 cases in that detective division a

15   year, 30 to 40 detectives in the department.  So even if

16   there was something wrong about all five or six or seven

17   or nine or whatever that number is, that has not become

18   the standard operating procedure of this department.

19        There's 15,000 cases in a 10-year period with 30

20   or 40 detectives and there's nine bad incidents in a city

21   police department.  That should not be the basis for

22   tantamount to policy *Monell* liability and that's the point

23   of our summary judgment motion.

24        So -- and so, you know, they can cite as many as

25   they want.  And there's -- the issue is there's a dispute

1   about that, but even at summary judgment this is a handful

2   of cases over a 10-year period in a 30 to 40 detective

3   department, 15,000 cases.  Is it bad?  Yeah.  Is it nine

4   too many?  Of course it is, but that doesn't make

5   municipal liability under *Monell*.  It's individual

6   liability under those detectives?  Yes, and that's the way

7   *Monell* is set up.

8           So, remembering how it started and what the whole

9   point is of policy and practice is not that it happened

10  once and once is once too many because it's a very, very

11  bad thing even once.

12          THE COURT:  All right.  I've read so many cases

13  in relation to this case that I can't remember where this

14  line comes from, if it was Judge Chatigny or maybe Judge

15  Bolden, but I believe one of them criticized this sort of

16  statistical approach in saying that having a few bad

17  apples or few instances of it over the course of 15,000

18  cases does not actually defeat a -- does not suggest there

19  isn't a question of fact about whether there was such a

20  custom or practice.

21          Tell me why you disagree with that line of

22  argument.

23          MR. GERARDE:  Yeah, I think the argument was that

24  they used a plane crash analogy.  It only has to happen

25  once and it's a disaster, it's is a major thing.  It's

1    never minor.  And I'll concede that, that every single

2    time, you know, if Detective Cartoceti made up what he

3    allegedly made up against Mr. Dinkins that's -- that's

4    unforgivable.  That's wrong.  It's not our policy.  It's

5    not how we train, et cetera.

6          But the answer lies in no one starts from what

7    *Monell* actually is, what its genesis is.  This was an

8    individual liability basis of a cause of action that a

9    municipality got added as a possibility only because what

10   if that individual event happened because it was the

11   policy to do it that way and this guy was just following

12   policy.  Well, let's hit the city for that.  That made

13   sense.

14         Then, like I say, if you embrace the fact that

15   that *Jet* says, "Has it become the standard operating

16   procedure of this department"?  That's what *Jet* asks and

17   so to answer that question, you don't look to, oh, my God

18   one is too much, of course one's too much.

19         You look at, is this the standard operating

20   procedure of the department, and in order to do that you

21   can't just look at the one or the horror of the one.  You

22   have to look at the whole department and if you look at

23   the whole department, in our case there's a 10-year swath

24   of 15,000 cases and they can come up with nine, you know,

25   maybes that we accept as true.  That is not standard

1    operating procedure of the department that has training

2    every year, everyone is certified by the State of

3    Connecticut to be a police officer and we have policies

4    that strictly forbid falsification, withholding of

5    evidence, et cetera.

6         So, the only way you should say yes, or a jury

7    could say yes is if they find standard operating

8    procedure.  But this is almost like one of those causation

9    cases where we say usually causation is an issue of fact

10   but there's some cases where it's so plain it's a matter

11   of law and I say that under our facts, with these numbers,

12   it's a matter of law.

13        THE COURT:  And remind me, were you counsel for

14   the City in *Horn* and *Jackson*?

15        MR. GERARDE:  Yes, I was.

16        THE COURT:  And Judge Chatigny found a question

17   of fact as to the policy of tape recording essentially or

18   starting and stopping tape recording I think was at issue

19   there.

20        MR. GERARDE:  What I'll respond to that -- well,

21   we lost *on Monell* summary judgment.

22        THE COURT:  Yeah.

23        MR. GERARDE:  There -- I dispute that we -- that

24   there is a constitutional right to have anything recorded.

25   So I don't think, I mean it has to be a policy or practice

1    that, violating constitutional rights.  Having an

2    interview recorded or pre-interviewing, et cetera, does

3    not violate constitutional rights.

4         Learning something that's exculpatory in the

5    pre-interview and not reporting it, that violates

6    constitutional rights, but the mere fact that it's not

7    being recorded is not of constitutional dimension and we

8    had evidence from the FBI.  They just fill out the 302s.

9    I mean, they don't even have witnesses sign statements.

10   The FBI agent -- it's all paper.

11        THE COURT:  I understand.

12        MR. GERARDE:  They don't record anything.

13        THE COURT:  Judge Chatigny though found that,

14   what I'll call a handful, I don't remember the exact

15   number of instances in which this had occurred, created a

16   question of fact about whether it was a standard custom

17   and practice of the department.  So, setting aside whether

18   there, you know, the substance of the constitutional claim

19   in *Horn* and *Jackson*, he seemed to reject the idea that,

20   you know, nine cases wouldn't be sufficient to create a

21   question of fact.

22        MR. GERARDE:  I was unsuccessful in convincing

23   Judge Chatigny that *Jet* is the standard.

24        THE COURT:  Okay.

25        MR. GERARDE:  It became more of a -- lawyers --

1    my opponents present this as negligence supervision, this

2    is just too much, you know, if this was a negligent

3    supervision case and you had nine instances, well, yeah,

4    you know, and so...

5           If you look at it as negligent supervision, nine

6    is going to be enough to create an issue of fact.

7           I say if you're looking at the *Jet* standard which

8    is the Supreme Court standard, which is standard operating

9    procedure of the department, you have to look at well, is

10   this the standard operating procedure of the department

11   that has 15,000 over 10 years and all these detectives and

12   you came up with nine, you know, maybes.

13          THE COURT:  Okay.  All right.  I understand the

14   argument.

15          MR. GERARDE:  Okay.

16          THE COURT:  I think that's a good place then to

17   transition to the third theory for *Monell* liability.

18          Now explain to me how you characterize

19   plaintiff's third theory which typically would be, fall

20   under the heading of failure to supervise and train.  I

21   think they throw in failure to discipline as well.

22          MR. GERARDE:  Right.

23          THE COURT:  So walk me through.

24          MR. GERARDE:  So, look, negligent supervision is

25   a lot easier to prove than *Monell*.  It was just the point

1    I just made.  This splashes over to this area.

2         *City of Canton v. Harris* is the foundation of

3    this method of *Monell* liability.  It's failure to train

4    and failure to train only.  It applies to situations where

5    the training is so inadequate that it's likely to result

6    in like a constitutional violation.  That can become

7    municipal liability, all right.

8         Supervision has crept into these claims and they

9    shouldn't be there.  This is only a training claim.  It's

10   not supervision, unless you're talking about Chief

11   Pastore, a final policymaker condoning bad conduct, that's

12   -- so that's kind of mishmashes over to that single act

13   *Monell* claim we were talking about in the first instance.

14        But the *Tangreti* case is the seminal case in the

15   Second Circuit.  You need to have individual involvement

16   for supervisory liability.  So supervisory liability

17   should not be anywhere in this *City of Canton* training

18   argument.

19        THE COURT:  Okay.  Plaintiff's opposition brief

20   is pretty devoid of argument as to failure to train

21   whereas your brief explains the training that officers

22   went through.  Do you see plaintiff as abandoning the

23   failure to train dimension of this third aspect and they

24   are focusing, it seems, on what you say is crept in which

25   is failure to supervise and discipline?

1          MR. GERARDE:  Yes, and for good reason because

2     there isn't any basis to criticize our training.  There's

3     no training that was lacking that would, that was so

4     likely to result in constitutional violation that it

5     needed to be provided.

6          We have undisputed evidence and we had a policy

7     that said you can't fabricate, you can't falsify, you

8     can't withhold evidence.  We had training on that policy.

9     We had training by a well-known Connecticut trainer Elliot

10    Spector, you probably know him, he's an attorney, who

11    swore an affidavit, he trained on the duty on *Brady* and

12    the duty to provide exculpatory evidence.

13         And everyone is state certified.  There's like,

14    as Your Honor knows, every three years the police get 60

15    hours of retraining to keep their certifications.

16         So these -- this aspect of *Monell* was always kind

17    of a throw in/throw out in these motions, that they would

18    get put in the complaint but they would easily be summary

19    judgment if there was training and you were certified or

20    whatever and so we have that.  Plaintiffs [sic] can't

21    defeat that and I don't think they offered anything to do

22    it.

23         THE COURT:  Okay.  So then walk me through then

24    your argument why the failure to supervise or discipline

25    theory fails.

 1              MR. GERARDE:  Why the failure to discipline or

 2    supervise fails?

 3              THE COURT:  Yes.  So, you're saying that fails

 4    because Chief -- under *Tangreti*, Chief Pastore had to have

 5    been personally involved in something, the constitutional

 6    violation?

 7              MR. GERARDE:  No.  Failure to supervise is --

 8    under *Tangreti*, requires an individual person and it's

 9    individual liability.  It's not municipal liability.  So

10    you could have a failure to supervise by one of these

11    other names we're talking about, but that's individual to

12    them, failure to supervise and it's -- it doesn't hit the

13    municipality unless you're talking about a police chief

14    condoning or ratifying bad behavior, et cetera and we've

15    been through Pastore.  We don't have that in our case.

16              THE COURT:  I see.  Okay.  So really that

17    collapses into the first theory?

18              MR. GERARDE:  Yes.

19              THE COURT:  Okay.  All right.  Before we leave

20    municipal liability do you want to offer any other

21    arguments on that topic?

22              MR. GERARDE:  No, that hit every point I made.

23    That's the 1983 piece.

24              THE COURT:  Okay.

25              MR. GERARDE:  Yeah.

```
 1             THE COURT:  So then I'd like to move to a
 2   question about governmental immunity under, for the state
 3   law claims.  Now, the City makes the same arguments that
 4   some of the individual defendants do on discretionary
 5   versus ministerial.  I'll say I tend to agree with the
 6   defendants that the question of disclosing exculpatory
 7   information is not a ministerial duty, there's judgment
 8   involved in determining whether something is
 9   exculpatory --
10             MR. GERARDE:  Right.
11             THE COURT:  -- even if there is a policy in place
12   to say you must disclose exculpatory information.
13             So, I think I'm at the point of trying to
14   determine whether the imminent harm to an identifiable to
15   an identifiable person exception to discretionary immunity
16   applies.  And we have an identifiable person, obviously
17   Mr. Morant, so it really boils down to what is imminent
18   harm in this scenario.
19             MR. GERARDE:  All right.  So the hallmark of this
20   exception is the concept of apparentness.  All right.  So
21   it has to be -- you need an imminent harm, an identifiable
22   person and then some municipal actor to whom it's apparent
23   that if he or she doesn't do something, that person will
24   befall that harm.
25             So, and there's no one in the command level staff
```

1    that it was apparent that Stefon Morant was at risk of

2    imminent harm.  I mean, at the Chief Pastore level, if he

3    just looked at it, he saw that someone was arrested, they

4    were convicted, done proved beyond a reasonable doubt,

5    their appeal failed, their habeas failed, their petition

6    for new trial failed, all the way up until a sentence was

7    modified and he got up, so that's kind of an easy one for

8    everyone above there.

9         But even if you look at the people, let's look at

10   Detective Raucci.  All right.  He sat in this interview,

11   with Joseph Pettola with him, Pettola said nothing bad

12   happened and Ruiz told him that, you know, what he told

13   him.  He told him in Interview 1 something that was left

14   out in the earlier argument about Interview 2 of Ruiz.

15   There was an issue of now, you know, the witnesses are

16   retracting, it's getting a little squirrely.

17        They had Ruiz with his lawyer go into the State's

18   Attorney's Office and in the presence of the State's

19   Attorney, with his lawyer sitting next to him, give a

20   statement.  That's the May 1991 statement and that's when

21   he said, What I told Raucci was the truth.  So Raucci's

22   sitting there, he's told -- there's no question what he

23   was told when he sat in that interview with Pettola and

24   Pettola has testified nothing bad happened in that

25   interview.

1          He was in sitting in the interview at the State's

2     Attorney's Office with this witness and his lawyer sitting

3     next to him and he said, What I told you in January Raucci

4     is true.

5          And then he testifies, Ruiz testifies to the same

6     thing at trial, there's a conviction and Raucci's out of

7     it after that.  I mean, as far as Raucci knows the

8     witnesses said what they said, they testified at trial, he

9     testified at trial, conviction, affirmed by the

10    Connecticut Appellate Court, et cetera, et cetera.

11         So, it's never apparent to Detective Raucci who

12    would be the closest one, that if he doesn't do something

13    some imminent harm is going to fall to Mr. Morant.  Raucci

14    interviewed Morant, Mr. Morant as well.  And he told him,

15    I was there, I was there at the murder scene.  I didn't

16    commit the murder but I was there in the car, Scott Lewis

17    did it, and he told him that.

18         So if he's heard that out of Mr. Morant's mouth

19    and Mr. Morant didn't testify at trial, it was his right

20    not to, but he heard that, how is it going to be apparent

21    to him that if he doesn't do something that there's an

22    imminent harm that's going to befall Mr. Morant and even

23    if he paid attention later on, the petition for new trial

24    is the -- they advance the Sweeney, you know what I will

25    call the Sweeney offense.  That Sweeney's now recanted,

1  Mr. Morant said I was in South Carolina bailing out a

2  friend.  I had an alibi and I was drunk when I gave the

3  statement, you know, words to that effect.

4       That all -- that was all heard by Judge Blue in a

5  full evidentiary hearing that went a long time and got a

6  long decision and he said it was rejected.

7       So even if anyone in New Haven is paying

8  attention, all right, these other theories, you know, that

9  came up they were rejected.

10       Even the *Brady* argument that we're hearing today

11  was raised in a habeas before Judge DeMayo in like 2009 or

12  so.  That was heard and that was found not to be material

13  and that was rejected.

14       So, if we're paying attention, I mean it never at

15  any point says we have someone who's at risk of an

16  imminent harm and I need to do something.

17       There was a time when the FBI investigation was

18  leaked to the New Haven Advocate and it was kind of, it

19  was like an exposé or whatever.  Well, our Police Chief

20  Mel Wearing heard from the State's Attorney Michael

21  Dearington and he wrote, he said, Should I open this?  And

22  Dearington said, No, there's a full-blown hearing for new

23  trial going on before Judge Blue.  Let's see how that

24  comes out, you know, and then if it gets opened, it gets

25  opened.

1          So, at no point is anyone in the City of New

2     Haven is it apparent that if he or she doesn't do

3     something, this specific person is going to suffer this

4     specific harm, and I really don't know what this specific

5     harm is.  I guess the harm is wrongful conviction, we'll

6     call it that, but there's no -- nothing on the ground is

7     showing wrongful conviction all the way up to the point

8     when there's a sentence modification in 2015.

9          THE COURT:  Okay.  I follow the argument.

10          MR. GERARDE:  All right.

11          THE COURT:  I know you probably -- I don't have

12     specific questions as to timeliness or favorable

13     termination, but I presume those are issues you'd like to

14     offer thoughts on.  You're welcome to at this moment.

15          MR. GERARDE:  You have no more questions on

16     anything else?

17          THE COURT:  Correct.

18          MR. GERARDE:  Okay.  Let me just run through a

19     couple of things.  Count IX is the 7-465 assumption of

20     liability claim against the municipality basically saying

21     you owe for the negligence or the conduct of the

22     employees, all right.

23          The 7-465 specifically excludes the conduct the

24     employees are alleged to have engaged in because there is

25     no willful, there's no assumption of liability in cases of

1    willful or malicious conduct.

2              THE COURT:  But isn't it the case that if this

3    were to go to the jury, the jury could be asked the

4    question about whether the individual defendants acted

5    negligently and also ask the question about whether they

6    acted willfully, and if the jury says yes, they acted

7    negligently, why wouldn't the City have to cover that?

8              MR. GERARDE:  Well, I don't think there is a

9    cause of action in our complaint that would allow a

10   negligence charge because --

11             THE COURT:  I thought Count VIII --

12             MR. GERARDE:  I know there's some -- Count VIII

13   is entitled negligence as is Count X.  But look at -- the

14   key to this is look at Paragraphs 157, 158 and 159 of the

15   complaint.  They are foundational paragraphs that are in

16   every single cause of action.

17             THE COURT:  Tell me those numbers again.

18             MR. GERARDE:  157, 158 and 159.  I thought I had

19   the complaint up here myself, but it talks about how, just

20   how -- it says acted maliciously.

21             THE COURT:  That's in the malicious prosecution

22   count?

23             MR. GERARDE:  Okay.  And that -- what you're

24   reading, those three paragraphs are incorporated into

25   every subsequent claim so that is -- those three

1   paragraphs are foundational to the negligence claim.  So

2   they're saying they call it negligence but they're saying

3   this person had an intent to harm, it was malicious, he

4   knew there was no probable cause, he made things up, he

5   coerced witnesses or whatever, and then they say and so

6   therefore they're negligent.  So, this --

7          THE COURT:  Can't a plaintiff advance alternative

8   theories of liability in a complaint?

9          MR. GERARDE:  Yes.  A plaintiff can advance

10  alternative theories of liability, but that's not this.

11         If there was a standalone case, the count that

12  had the defendants were careless and failed to meet the

13  standard of care and negligence type language and,

14  therefore, they were negligent.  It needs to be a

15  standalone count.  You can't have this intentional,

16  malicious, willful, wanton conduct as your foundation for

17  saying it was negligent.  It can't be in the same count.

18         THE COURT:  Do you have the complaint?  Are you

19  able to pull it up?

20         MR. GERARDE:  I should be able to, yeah.

21         Hang on.  It's Document 33.  Okay.

22         Yes, I got it.

23         THE COURT:  Okay.  So can you jump to 199 and

24  200, please.

25         MR. GERARDE:  Okay.

1          THE COURT:  So 199 does what you say it does.  It

2     incorporates, by reference all of the foregoing

3     paragraphs.

4          MR. GERARDE:  Right.

5          THE COURT:  And then 200 says that the individual

6     defendants had a duty to exercise reasonable care in the

7     course of the investigation and arrest.  So 200 does seem

8     to be that sort of standalone reasonable care language

9     that you're talking about.

10          MR. GERARDE:  Except that it's not standalone.  I

11     mean, if there was a count that was negligence that didn't

12     have any of that intentional, malicious, willful, wanton

13     in it and it said so and so had a duty of care, departed

14     from the standard, breached the duty, was negligent.

15     That's an alternative theory of negligence.

16          The way they have it, you can't plead alternative

17     theories in the same count.

18          THE COURT:  So why wouldn't that have been an

19     argument to have been made in a motion to dismiss years

20     ago when you're looking at the sufficiency of the

21     complaint?

22          MR. GERARDE:  Well, I mean the case is big enough

23     with all the hundreds of complaints and counts and

24     everything else to get involved in that, but it's a -- I

25     suppose it --

1          THE COURT:  I mean, isn't it effectively a

2     pleading deficiency and if the Court were to effectively

3     strike Paragraph 199 from the negligence claim then it is

4     a standalone negligence claim?

5          MR. GERARDE:  See, I think this is done

6     purposely.  I think that plaintiffs [sic] don't want to

7     say this person -- this happened by accident, this

8     happened because someone was careless.  All right.

9          THE COURT:  It's certainly their lead theory is

10    that it happened intentionally.

11         MR. GERARDE:  Absolutely and they won't take that

12    out.  I mean we've had -- I was just thinking, it was

13    Judge Dooley.  I thought it might have been Your Honor,

14    but we had this issue of whether 7-465 can apply in the

15    presence of malice and someone tried to amend their

16    complaint to take out, okay, we're taking out malicious

17    prosecution.  Yeah, but look at your foundational

18    paragraphs that say it was malicious, you intended to kill

19    that person, you this, you that, you that.

20         We have the same thing here.  I mean this is --

21    there's no way that I think Your Honor would want to

22    charge on negligence if the foundation for negligence was

23    this person acted with malice, and I'm just focusing on,

24    like, the 157, malice, knew the probable cause didn't

25    exist, arrested, charged him with murders violating

1    clearly established rights --

2          THE COURT:  Okay.

3          MR. GERARDE:  -- fabricated evidence,

4    intentionally withheld and misrepresented exculpatory

5    facts.  That's not negligence.

6          And so there are -- you don't get negligence and

7    intentional in the same count.  If they wanted to plead

8    alternative theories, there should be a standalone count

9    that says only this happened by accident.

10          THE COURT:  What was the name of the Judge Dooley

11    case if you remember and what was a the result?

12          MR. GERARDE:  Yes, that's Vega Colon v. the Town

13    of Wethersfield or *Vega Colon v. Eulizier*,

14    E-U-L-I-Z-I-E-R.  It's a fatal shooting case, but I won

15    summary judgment on the 7-465 piece of that --

16          THE COURT:  I see, so --

17          MR. GERARDE:  -- on this exact argument we're

18    making.

19          THE COURT:  -- Judge Dooley accepted the argument

20    that incorporation of intentionality paragraphs into a

21    negligence claim --

22          MR. GERARDE:  Yes.

23          THE COURT:  -- means you don't have a standalone

24    negligence?

25          MR. GERARDE:  Exactly.  It was all still in

1    there.  They tried to eliminate the malice claim and then

2    I said but look at these foundational paragraphs, you're

3    saying you intend- -- he intended -- he pointed his gun

4    and intended to kill the person and it was malicious and

5    wrong and et cetera and so that was the end.

6                THE COURT:  Okay.

7                MR. GERARDE:  All right.  So that's that point.

8                THE COURT:  All right.

9                MR. GERARDE:  I want to talk about the negligence

10   statute of limitations and statute of repose.

11           The negligence statute of limitations is a

12   two-year statute of limitations and the plaintiffs [sic]

13   say well, *Heck v. Humphrey* causes this tolling.  My

14   argument is *Heck* tolling does not apply to a state law

15   negligence claim.  The hallmark of *Heck* tolling is, is

16   that allowing the claim to go forward has to necessarily,

17   that's the important word, necessarily invalidate what the

18   conviction was.

19           All right.  And so the Courts have said you can

20   proceed with anything else as long as it doesn't

21   necessarily invalidate the conviction.  And they said

22   that -- so that you might have situations where you know

23   something that's going to really help you get some

24   post-conviction relief, but if it doesn't necessarily

25   invalidate the conviction, it's not tolled under *Heck* and

 1    you had to bring it back then.

 2            So my argument is, they had to bring negligence

 3    back then and you could say because of your negligence --

 4    if they ever properly said, you know, there was a duty and

 5    they did it -- because of your negligence I was convicted

 6    on proof beyond a reasonable doubt and I -- and whatever.

 7    If you would of done this, you would of done a better

 8    investigation or whatever, I don't think I would of been

 9    and I think I can establish proximate cause.

10            It's not invalidating the conviction, it's saying

11    this would of played out a lot differently if you did your

12    job, Mr. Police Officer, the way you should of done it.

13            So, point one, *Heck* tolling does not apply to

14    negligence.

15            The most important point I want to raise today

16    because no one addresses this and I think it's like a game

17    changer/end of story.  The three-year statute of repose

18    has nothing to do with *Heck*.  All right.  There's a

19    three-year statute of repose that says under no

20    circumstances do you get to bring a negligence claim more

21    than three years after the harmful act.  So the harmful

22    act to Mr. Morant is what happened in '91, '92, you know,

23    et cetera.

24            And the point is our Connecticut courts have

25    recognized that there are some people who will lose a

1   right to sue even before they've had, suffered an

2   actionable injury because it hasn't accrued yet or

3   whatever, but under no circumstances do we allow

4   negligence after three years and no one has addressed this

5   squared on.

6         Judge Chatigny denied without explanation in *Horn*

7   and *Jackson*.

8         Judge Bolden addressed the statute of limitations

9   piece, not the statute of repose piece.

10        I think if there's any question on this, this

11  would be a good question to certify to the Connecticut

12  Supreme Court.  Does your three-year statute of repose

13  apply no matter, you know, we can make our -- wordsmith

14  the question just the right way.

15        But states have the right to establish their own

16  negligence doctrines.  I'm going to use the word only in

17  quotes.  We're only talking about negligence.  We're not

18  talking about civil rights claims, intentional malicious,

19  etc.

20        So it makes sense that a state can say we're only

21  talking about negligence.  If someone has been negligent

22  to you, you have three years, and if it doesn't, if you

23  didn't learn about it, if it didn't accrue or whatever,

24  well, sorry but, you know, you don't get to sue for

25  negligence.  That part's over.

1            So, we're -- I mean, to think we are facing

2    negligence claims for conduct that occurred 30 something

3    years ago, you know, and so we're not only going to talk

4    about what someone, you know, maliciously doing things

5    that wound up with someone's wrongful conviction, oh, but

6    you departed from the standard of care and I'm going to

7    sue you for that and now we try to defend these cases.

8            THE COURT:  But plaintiff's response is that he

9    didn't -- the idea that they departed from the standard of

10   care did not come to fruition until the conviction was

11   later invalidated, so the three years should start from

12   that point and what's the response to that?

13           MR. GERARDE:  Thank you.  Then, I win.  That was

14   2015, that means they would of had to sue by 2018.

15           THE COURT:  I see.

16           MR. GERARDE:  I mean, I guess they -- this is a

17   pardon.  We have to get to pardon in a little bit.

18           THE COURT:  Right.  Right.

19           MR. GERARDE:  But the point is, in Mr. Morant's

20   case he knows he's been wronged the moment, you know, he

21   says, I was under the influence of alcohol and they took a

22   statement from me and they're now using it against me or,

23   Ovil Ruiz is lying.  He wasn't there and I knew it or, you

24   know, Sweeney just admitted he knew something and that's a

25   *Brady* violation.  That was known in 2009.  That was front

```
 1      and center before Judge DeMayo in that habeas.  I had

 2      alibi witnesses, I wasn't allowed to call him.  I had

 3      ineffective assistance of counsel.  All of that was tried

 4      and failed all the way along the line until a sentence

 5      modification happened in 2015.

 6              But, again, the hallmark of a statute of repose

 7      is sometimes the plaintiff doesn't even know he has a

 8      right.  Sometimes he doesn't -- the injury hasn't, you

 9      know, legally happened yet and, sorry, and that's it.

10      This is a negligence doctrine.  We are not going to let

11      negligence be brought all the way out to the future.

12              So I'm -- again, I think the Connecticut Supreme

13      Court would help.  This might be something where we submit

14      a certified question to the Supreme Court because this

15      issue about repose, that takes care of all the negligence

16      claims in Count VIII against the individuals.  It takes

17      care of the 7-465 claim because that's a derivative claim.

18      You have to have the underlying negligence before you get

19      the assumption of liability and it takes care of the

20      52-557n claim in Count X directly against the City because

21      that's based on negligence as well.

22              So, a couple other things, the Connecticut

23      Constitution claim --

24              THE COURT:  Let me just ask, I don't recall your

25      briefing raising the issue of certifying the question to
```

1    the Connecticut Supreme Court.

2         MR. GERARDE:  No, that's me on my feet suggesting

3    it to you.

4         THE COURT:  Okay.

5         MR. GERARDE:  All right.

6         THE COURT:  What would be the question?

7         MR. GERARDE:  Does the three-year statute of

8    repose on negligence claims bar a claim even in the

9    presence of *Heck v. Humphrey* tolling or something like

10   that.

11        THE COURT:  I see.  Now, there's a Connecticut,

12   either appellate or supreme court opinion that almost goes

13   as far as *Heck*, right, for state law claims, right.  I'm

14   forgetting the name of it, so it really wouldn't be *Heck.*

15   *Heck* applies to 1983 claims.

16        MR. GERARDE:  Right.

17        THE COURT:  We'd really be asking whether, in the

18   face of Connecticut law, advancing a similar theory like

19   *Heck* tolling --

20        MR. GERARDE:  Yeah, some kind of tolling based on

21   waiting for the validity of a conviction to be resolved or

22   something like that.  I mean, if Your Honor wants to ask,

23   you know, I could submit something in a week or something

24   if Your Honor wants a proposed question.

25             But speaking of which, the briefing, the

1    plaintiffs [sic] don't mention statute of repose in their

2    opposition brief.  I read it again.  It's not in there.

3    Literally there's no argument against it, so I think

4    that's -- we can call it conceded.  I'll call it conceded.

5    But there -- because there's no argument against it, there

6    literally is no argument against it.

7            And when summary judgment was rendered in the

8    *Horn* and *Jackson* case, statute of repose wasn't mentioned

9    at all in the decision and I've wrote, motion to

10   reconsider, I did write statute of repose, and the answer

11   was yes, you did.  The motion is granted.

12   Reconsideration.  And on reconsideration, I deny your

13   motion for summary judgment.

14           No words.  That was it.  That was my one-word

15   denial.  So that's -- no one has decided this.

16           And I think if you take it head on and you look

17   at the Connecticut decisions it sounds a little harsh, but

18   this is only negligence we're talking about and, you know,

19   there's certain doctrines that exist but they all say the

20   states have a right to establish their own and our

21   legislature, the Connecticut legislature decided if you

22   want to bring negligence you have to do it in three years

23   and if you've lost your claim, so what, but we can't have

24   these cases brought all, you know, forever.

25           THE COURT:  Okay.

1          MR. GERARDE:  Couple more points.  The

2     Connecticut Constitutional claim would be governed by the

3     52-577 three-year statute of repose.  That is -- that's

4     been identified in the cases in my brief.  That is a

5     statute of repose which means you don't have to have

6     accrual, you don't have to have an injury, you get past

7     three years of your constitutional rights being violated

8     under the state and you're out.

9          52-557n has another immunity, for lack of a

10    better term, that I've identified.  It's n(a)2(A) which

11    means there is no liability for the intentional,

12    malicious, willful acts of employees.

13         So, a(2)(B) is the discretionary act immunity

14    that we went through; a(2)(A) is no liability for the

15    intentional acts and it's the same argument that we made

16    about the 7-465, you know, malice not applying.  And

17    that's -- and so that's in their pleadings, you know, they

18    can't get away from that.

19         And I just -- I know that we had a few words on

20    the pardon issue, if I could just make a record on what I

21    think is the right way to analyze a pardon scenario now.

22         *Thompson v. Clark* is the controlling Supreme

23    Court decision.  All right.  So, the *Thompson* Court can be

24    presumed to know what the *Heck v. Humphrey* Court wrote in

25    19- whatever year that was.

1          Thompson presented, was presented with a case

2    from the Second Circuit actually where the -- our

3    circuit's approach was the prosecutor has to have a

4    thought that the person's innocent when he drops the

5    charges in order for you to have a favorable termination

6    to proceed.  And the *Thompson* Court said that's too much,

7    we don't need to go that far but here is the standard, the

8    prosecution must end without a conviction.

9          And that's where we are.  There's no mention of

10   pardons, there's no mention of anything like that.  So, to

11   the extent it's inconsistent with *Heck*, it's overruled

12   *Heck* is what my argument is.  And --

13         THE COURT:  Has any court accepted that line of

14   reasoning that you're aware of?

15         MR. GERARDE:  Has what?

16         THE COURT:  Has any court accepted this argument

17   and found in your favor?  Everything that I've read

18   suggests the opposite.

19         MR. GERARDE:  No, but I don't know if my argument

20   has actually been made.  Has anyone, has any court

21   analyzed what does prosecution end without a conviction

22   mean according to the *Thompson* Supreme Court decision?

23   It's only been a couple of years.

24         THE COURT:  Judge Haight did that in the context

25   of your motion to amend your answer and, again, I'm not

1   saying that that's law of the case.

2            MR. GERARDE:  Right.

3            THE COURT:  I'm saying I'll look at the issue

4   again but I think he did look at it.  I think also that

5   the Sixth Circuit has looked at this in a very helpful

6   opinion, *Carr v. Louisville* and I guess I'll leave it at

7   that.  I expressed my initial thoughts.  My initial

8   thoughts on this from the status conference haven't really

9   changed.

10           MR. GERARDE:  Okay.  So the logic of my argument

11  is this, prosecution is something that happens in the

12  judicial branch by prosecutors and judges and things like

13  that.  So, no question the last contact Mr. Morant had

14  with the judicial branch and a prosecutor and a judge was

15  his sentence was modified in 2015 so that he got

16  equivalent of time served.  He got out.  All right.  And

17  that's it.  Conviction intact, modified so that he got out

18  on time served.

19           Then, an executive pardon board, not judges, not

20  lawyers, you know, criminal justice majors, people

21  interested, willing to help the governor, they sit on a

22  board.  That is not ending the prosecution without a

23  conviction.  The prosecution has not ended without a

24  conviction.  Nothing that pardons board said changed the

25  fact that the prosecution did not end without a

1    conviction.

2          And I -- you know, I -- that statute is

3    essentially an act of clemency, mercy, et cetera.  It

4    allows someone -- the pardon statute allows someone to

5    say, I haven't been convicted of a crime.  I haven't --

6    they can go forward in their life and that's why those are

7    granted.

8          I mean, so -- I just -- I think Your Honor can

9    take judicial notice that that's not, not prosecution is

10    not judicial branch activity and so, therefore, that's the

11    argument I want to make and preserve.

12          THE COURT:  Preserve, sure.  Understood.

13          MR. GERARDE:  And that's everything and we'll

14    otherwise rely on the briefs.

15          THE COURT:  Okay.  Thank you, Attorney Gerarde.

16          Attorney Benvenutti Hoffman there's a lot of

17    ground to cover here.  I know we've reached 12:00 o'clock.

18    We'll see how long this takes.  We might take then a short

19    break for the court reporter and for everybody to grab a

20    bite to eat and reconvene.

21          MS. BENVENUTTI HOFFMANN:  Okay.

22          THE COURT:  I don't have anything else until

23    3:30.

24          MS. BENVENUTTI HOFFMANN:  Okay.

25          THE COURT:  So, let's start with municipal

1    liability, rewinding a bit.

2            On the ratification theory, my review again of

3    your evidence is that you're claiming Pastore was a

4    hands-on chief, that Lawlor says he -- if he knew about

5    this he would of reported it up the chain of command and

6    that's really all that you have that doesn't postdate the

7    alleged unconstitutional activity by several years.

8            So why is that enough to find that Chief Pastore

9    ratified the alleged unlawful conduct of Raucci?

10           MS. BENVENUTTI HOFFMANN:  Sure.  And let's just

11   start because I think this was a little, got a little

12   confused in counsel's opposition.  We are now out of the

13   realm of our affirmative motion for summary judgment.  We

14   are now in the real of responding to their motion.

15           THE COURT:  Of course.

16           MS. BENVENUTTI HOFFMANN:  Which means that all of

17   the facts have to be taken in the light most favorable to

18   us and all of our evidence credited and inferences drawn

19   in our favor.  And so, in that, you know, in that context,

20   first, I think that and the Second Circuit law is clear

21   that all of these questions that go to *Monell* liability

22   are questions of fact, the underlying questions which if

23   there is a reasonable dispute of fact have to be decided

24   by the jury.

25           And here there is both the evidence from Lawlor

1    which he does, you know, dispute that he got this warning,

2    but there's ample evidence that he did get the warning and

3    what he says he would have done if he got this warning is

4    run it up the chain of command.  So that is the evidence

5    that Pastore would have been alerted to this at the time.

6            Now, all of the --

7            THE COURT:  Now, chain of command though, there

8    are multiple layers of management and supervision within a

9    police department.  So, is it a reasonable inference to

10    say, when he says, I would run it up the chain of command

11    that it would actually reach Chief Pastore?

12            MS. BENVENUTTI HOFFMANN:  Yes, I think it is and

13    I also think that there's specific language from and I can

14    find the Second Circuit decisions talking about *Monell*,

15    circumstances in which you can infer even from a

16    high-level supervisor's knowledge of something that it

17    would of been raised to the policymaker, which is in our

18    briefing, but I can find the exact quote.

19            But, again, those are questions of fact as to

20    what would of been known and I think that we're not

21    saying -- to be clear, we're not saying that anything that

22    Pastore did that postdates this, the conviction in this

23    case is a cause or is the basis for our *Monell* claim, but

24    it is evidence that the jury can use to consider whether

25    he knew about the issues with -- that were raised at the

1    time and whether he would have reacted to them or did

2    react to them with deliberate indifference when they were

3    raised to him.

4         And there is ample evidence -- no -- from when

5    this was raised, from multiple people, that when warnings

6    were raised to him about Raucci in particular, his

7    response was damage control.  His response was, What are

8    you doing?  Why are you telling me about this?  When he

9    specifically got the same warning that the FBI got from

10   Mr. Lewis that they found incredibly -- credible and

11   launched this entire investigation, his response was to go

12   see Mr. Lewis in jail say, Why did you raise this to the

13   FBI and not me?  And, essentially, you know, it looks --

14   evidence that a jury could reasonably conclude that his

15   response was, again, damage control and trying to cover it

16   up.

17        There's his own admissions from, that he had

18   warned Raucci multiple times about, you know, that the

19   evidence that people had found him, you know, interacting

20   with drug dealers and other things that led ultimately to

21   his retirement but not a full investigation into the

22   extent of the corruption which was evident and which the

23   FBI was frankly warning directly about.

24        So there's a ton of evidence about what was

25   actually happening and what Pastore knew and understood

1    and you can conclude is what he understood at the time

2    that is relevant.

3              So, I think that all of this is --

4              THE COURT:  The earliest of those events though

5    is in 1995, right, is that --

6              MS. BENVENUTTI HOFFMANN:  The warning, the

7    specific warnings by outsiders are in 1995, yes, but there

8    is evidence, for example, when Raucci is about to -- when

9    things start to fall apart and he's about to have to

10    resign from or retire from the police department, Pastore

11    meets with his then wife and makes admissions about, you

12    know, we told him multiple times that he had to stay away

13    from -- like, there's admissions about having warned

14    Raucci multiples times.  This was something that was

15    happening over a period of time.

16              So I think there is evidence from which, in

17    conjunction with what Lawlor's saying is he would of

18    raised this up the chain of command that Pastore would

19    of -- and his own involvement.

20              Now, even just the bare facts of the

21    investigation, if you're aware of what's happening are

22    highly suspicious.  The investigation is going entirely

23    towards "Bullet" Cardwell.  And as soon as Mahar's taken

24    off the case and Raucci comes in, it switches 180 degrees

25    and goes to these two other people with no basis and then

1    a supervisor ultimately -- look, when they want to bring

2    the prosecution says, We have a problem.  We have all of

3    this evidence towards Cardwell, it's never been cleared

4    up, just go write a report saying he's been excluded when

5    there was no basis for it.

6         So there's a lot of evidence that supervisors,

7    even just based on what's happening in the case on its

8    face, that there was something very highly suspicious

9    going on.

10        And the specific test and this comes from *Amnesty*

11   *America v. The Town of West Hartford* from the Second

12   Circuit from 2004 about what it is you have to show for

13   this particular type of *Monell* liability is that a

14   policymaking official had notice of a potentially serious

15   problem of unconstitutional conduct, such that the need

16   for corrective action or supervision was obvious and the

17   policymaker's failure to investigate or rectify the

18   situation evidences deliberate indifference rather than

19   mere negligence or bureaucratic inaction.

20        So that's all that needs to be shown.  And I

21   think there is absolutely, at the very least, a question

22   of fact whether that test is met here with respect to

23   Pastore based on this record.

24        THE COURT:  So a lot of the evidence you're

25   describing though relates to Raucci's, what I'll term

1    extra-curricular activities, drug use, you know, other

2    things.

3         Does the evidence have to -- in the *Amnesty* case,

4    it's talking about knowledge of the constitutional

5    violation.  I assume the constitutional violation at issue

6    which is withholding exculpatory information, so how does

7    all of the other stuff you say Pastore knew about Raucci's

8    behavior, how does that bear on the alleged constitutional

9    violation here?

10        MS. BENVENUTTI HOFFMANN:  So the constitutional

11   violation here and the specific warning is literally about

12   fabricating evidence.  It's that Ruiz says he doesn't know

13   anything and Raucci is telling him what to say and taking

14   a statement that's false, right, so that he's creating

15   false evidence.  So this is slightly different spin than

16   when we're talking about the undisputed evidence and the

17   basis for the *Brady* claim for, against Sweeney.

18        And so the -- and Lawlor himself admits, oh, if I

19   got this warning, you know, this is a -- I understand this

20   is a huge deal.  This is a very important -- this is why I

21   would be, you know, sounding the alarm bells up and

22   raising it.

23        So, I think that there's -- if that message

24   reached Pastore, which I think is a jury question whether

25   it did, there's no question that that would satisfy the

1    amnesty test that you're aware of a -- you had notice of a

2    potentially serious problem of unconstitutional conduct,

3    that they're creating false evidence to be used in a

4    prosecution, there's no question, and that the need for

5    corrective action or supervision is obvious and they

6    didn't do anything, you know, didn't investigate or

7    rectify the situation and that arises -- that rises to the

8    level of deliberate indifference.

9         THE COURT:  Okay.  So I follow you with respect

10   to the evidence about Lawlor potentially reporting this up

11   the chain of command, but the question really was, the

12   post-dated information, how does that bear on Pastore's

13   knowledge of Raucci's fabrication of evidence?

14        MS. BENVENUTTI HOFFMANN:  So a lot of the

15   post-dated information is going exactly this same issue.

16   So, for example, when the FBI warns, they're warning of,

17   you know, you create the risk, the understanding because

18   this is coming from Scott Lewis.

19        Scott Lewis is saying, He framed me in this case,

20   right, which is a -- you know, same case as Mr. Morant.

21   And he's saying, This is all made up.  This is all false.

22   He created false evidence.  He has this motive against me.

23   And the FBI finds it credible and they're warning -- and

24   there's also evidence that Pastore, I think it's

25   undisputed, was fully informed about what's going on with

1    this FBI investigation.

2         So, what he's warned about from Mr. Lewis

3    directly, from the FBI, is exactly what happened in this

4    case.  And so I think a jury can infer if, both, that he

5    wasn't concerned about it at all because when he actually

6    gets the warning directly his reaction is damage control

7    and to cover up rather than to take minimally appropriate

8    action, but also that this is further evidence that just

9    like Lawlor when, you know, when the FBI person, the

10   investigator talked specifically to Lawlor and I believe

11   Sullivan who's another high-ranking NHPD official, they

12   say, before she even mentions Raucci, Oh, is this about

13   Raucci, Lawlor does, and then volunteer that this

14   investigation was troublesome at the time.  That's what

15   Lawlor says.

16        So there's evidence that people understood way

17   back when this exact same problem was happening, and I

18   think you can infer from their response when they're

19   warned about it, both that they were deliberately

20   indifferent to it and they would of been, you know, were

21   deliberately indifferent back then, but also that if this

22   was something you really didn't know about at the time and

23   then you get raised this issue which is exactly we know

24   happened, we know reaches Pastore, you know, two years

25   later, that wouldn't be your reaction.

 1          Your reaction wouldn't be cover up.  Your

 2    reaction would be oh, my goodness this is, you know, this

 3    is a horrible injustice.  We need to do something about

 4    it.

 5          THE COURT:  Horrible new situation I just learned

 6    about.

 7          MS. BENVENUTTI HOFFMANN:  Horrible new situation

 8    I just learned about.

 9          THE COURT:  Okay.  All right.  Then let's move to

10    this, the failure to -- well, let me ask you, do you have

11    any response on what I'll call Prong 2 the custom, pattern

12    or practice and the defense counsel's argument that under

13    *Jet* there has to be effectively standard operating

14    procedure of the department and when you have what he

15    calls nine maybes that that's not enough to show the

16    question of fact about whether there was a standard

17    practice to withhold evidence or fabricate statements?

18          MS. BENVENUTTI HOFFMANN:  So, I think that that

19    is a misstatement of the test but I also think even if

20    that were the test we would meet it on the evidence here

21    with the very least it is a fact question.

22          I mean the, we do have a number of examples and

23    that is a portion of our proof, but we also have testimony

24    which in its own is sufficient to create a fact question

25    about what the custom or standard operating procedure is

1    in the department and the testimony from a number of

2    different high-ranking NHPD officers is you do not

3    disclose exculpatory evidence, you do not write down these

4    original statements.

5        The 30(b)(6) witness even said, Yes, it was our

6    custom of these, you know, you talk to them for a long

7    time off tape and then you only create this tape at the

8    end once you've gotten to the version that you like.

9        That is a custom of failing to disclose, at the

10   very least, impeaching statements because the original

11   statements and that is, you know, the admissions from

12   Sweeney, from Pettola, from Sullivan who's another

13   high-ranking person.  He's not a defendant here, but he

14   describes in a different case, the *Gould Taylor* case, how

15   he took a witness who he knew was addicted to drugs and in

16   withdrawal and used, you know, coercive tactics basically

17   saying you can't leave until you tell us what we want to

18   hear.  If you tell us what we want to hear we will give

19   you money and drop you off where you can go get drugs.

20       And he says they understood absolutely that you

21   could be getting unreliable statements and didn't record

22   any of, either what she said initially, which she didn't

23   know anything, or any of the tactics that they had used to

24   obtain the ultimate statement.

25       And, again, this is consistent with what the

1    practice was in the department.

2            So there is ample evidence from which a jury can

3    conclude this is the actual custom or practice and that

4    it's well-known and, you know, that higher ups absolutely

5    know that this is what the practice is.

6            THE COURT:  And so the constitutional violations

7    at issue for the custom, pattern or practice prong are

8    both the withholding of exculpatory information and the

9    fabrication of evidence, that those were both customs and

10   practices of the department?

11           MS. BENVENUTTI HOFFMANN:  I would say our focus

12   for the custom prong is the withholding of exculpatory

13   evidence because I think that is the absolute clearest and

14   there really isn't any question under this that they had a

15   custom of failing to disclose the prior inconsistent

16   statements, the initial statements or the, you know,

17   tactics used to obtain those statements.  That they would

18   just get the version they wanted, put that on tape and

19   that was all that they would disclose even though they

20   knew that everything else would, at the very least, be

21   critically impeaching and they didn't disclose it.

22           THE COURT:  Okay.  So then let's move to the

23   third of the types of ways to establish a *Monell* violation

24   which is normally failure to train, but also in your view

25   encompasses failure to supervise and failure to

1    discipline.

2           So let's start with Attorney Gerarde's point that

3    this is really started with a failure to train and he's

4    put forward evidence of the training that the City

5    officers underwent and plaintiff doesn't really respond to

6    the training issue.

7           MS. BENVENUTTI HOFFMANN:  Yes, so that our claim

8    is not a failure to train claim.

9           THE COURT:  Okay.

10          MS. BENVENUTTI HOFFMANN:  So our claim is a

11   failure to supervise and discipline which is a very

12   well-recognized claim in the Second Circuit.  I have a

13   list of cases, if you go to Page 43 of our brief, a number

14   of cases from the Second Circuit.  Sometimes they describe

15   this as a failure to supervise, discipline.  Sometimes

16   they describe it as tolerating or acquiescing in

17   unconstitutional misconduct, but basically what this means

18   is if you have --

19          THE COURT:  I'm sorry.  I'm looking at Page 43.

20   I just want to make sure I'm keyed into the right page.

21          MS. BENVENUTTI HOFFMANN:  Yes, at the top there's

22   a list of cases at the top paragraph about where

23   "municipality may held be held liable for turning a blind

24   to misconduct."  So it's citing *Lucente*, *Cash*, *Amnesty* --

25   I'm sorry, American Amnesty or *Amnesty American* I'm not

1    sure which one it is, *Okin*, *Vann*, *Fiacco*.  I mean there's

2    a long list of cases.  And essentially, the --

3            THE COURT:  I'm sorry.  Is this 53?

4            MS. BENVENUTTI HOFFMANN:  43.

5            I'm sorry, 53 on the ECF.  I know, it's always

6    confusing.

7            THE COURT:  I tend to use the ECF.

8            MS. BENVENUTTI HOFFMANN:  Forty-three internal

9    pagination 53 on the ECF pagination.

10            THE COURT:  Got it.  Okay.

11            MS. BENVENUTTI HOFFMANN:  And taking a step back,

12    for *Monell* liability all you need to prove is an official

13    policy or custom that causes the denial of constitutional

14    rights and essentially what you're doing is you can't --

15    we absolutely agree you cannot hold a City liable just

16    because they employ someone who violates constitutional

17    rights, there's no respondeat superior.

18            But, if you have culpability by the municipality

19    which includes notice, which is an objective standard,

20    notice of a problem and failure to correct it, that

21    amounts to deliberate indifference.  That's enough to hold

22    the municipality liable.  That's the only standard that

23    you need to meet.

24            And so what happens in these, whether it's

25    described as a failure to supervise, discipline or a

1  tolerating unconstitutional misconduct is if you have

2  notice that what your current, you know, whether it's

3  training or supervision or whatever it is that you're

4  doing, is insufficient to prevent constitutional

5  violations and you don't take minimally appropriate

6  action, such that your inaction, your failure arises --

7  you know, rises to the level of deliberate indifference,

8  then you're responsible for the predictable constitutional

9  violations that occur in the future.

10        And so, and that is exactly what we're alleging

11  here and so we have many examples of warning to the

12  municipality and, again, this is for -- this has nothing

13  to do with *Tangreti* which is an individual liability case.

14  This is about municipal liability.  The Supreme Court is

15  clear in the context of municipal liability, it is an

16  objective not a subjective standard.  That's the key

17  difference.

18        So even if the policymaker didn't actually know

19  or they could establish that if they should of known, if

20  there was enough constructive notice of the issue, they

21  would still be liable if they fail to take the minimally

22  appropriate corrective action to prevent the future

23  constitutional violations.

24        And so we have a huge number of examples and

25  other types of ways that notice is provided apart from,

1    you know, I think a jury can conclude just from the

2    testimony about what's happening within the police

3    department, both the warnings about Raucci in this case in

4    particular, the knowledge about the failure overall to

5    disclose exculpatory evidence and also the abundant

6    evidence of the particularly strong "blue wall of silence"

7    in this police department.

8            And we are not saying -- we agree, it is

9    undisputed that the specific example Pettola gives of

10   seeing Raucci offering to plant drugs on a criminal

11   suspect was not reported, but the point of that is not

12   that that was a report that put that on notice.  There's

13   lots of other examples of the police department being put

14   on notice to the problem.

15           The point of that is this is an example of

16   exactly what is happening in this police department, which

17   is the culture which the officers say everybody

18   understood, which is even if you are well-intentioned,

19   even if you understand I'm not going to plant evidence and

20   I'm not going to tolerate someone else doing it in my

21   presence, you will not report it because the culture is

22   you do not bring forward officer misconduct.  And so when

23   you have that environment, it is a highly predictable

24   result that you are going to have serious misconduct like

25   what happened in this case.

1              And we have expert evidence supporting that that

2      is, you know, both below the standard of what is required

3      in police departments and also that this is the highly

4      predictable result and so the Pettola example with Raucci

5      is just an illuminating example of exactly how that

6      worked, but what they're saying is it was understood

7      throughout the department you do not rat out another

8      officer even if you see really obvious criminal misconduct

9      happening in front of you.

10             THE COURT:  Okay.  I had a question based on what

11     you were saying and I've now lost it.  Give me one moment

12     to try to recover it.

13             (Pause)

14             THE COURT:  Oh, I know what it was.  It was

15     Attorney Gerarde's characterization of some of the prior

16     cases as "maybes" in a sense that while arguments were

17     raised about fabrication of evidence or unlawful

18     withholding of exculpatory evidence, courts rejected those

19     arguments in some of those cases and so how could those

20     rejected arguments put the City on notice of the potential

21     problems?

22             MS. BENVENUTTI HOFFMANN:  So, I think first there

23     are a number of cases where that isn't the case.  For

24     example, there's cases where there was actually a civil

25     rights finding against, for example, Mr. Sweeney.  There's

1    a warning from one of the prosecutors about a problem, a

2    problem he'd seen I think in numerous cases about

3    withholding exculpatory evidence from arrest warrants that

4    was raised to the department.

5         So that's one response, but also all of this is a

6    fact question as to, you know, the characterization that

7    Mr. Gerarde was putting on is the best spin for the City,

8    you know, this is their version of events, but we're,

9    again, on our motion for summary judgment and it is a fact

10   question, what the --

11        THE COURT:  It's actually their motion for

12   summary judgment.

13        MS. BENVENUTTI HOFFMANN:  Their motion for

14   summary judgment, yes, so it is a fact question what

15   the -- what warnings reached the City, what they would of

16   reasonably understood from those warnings which includes

17   things that are raised internally and it includes the

18   knowledge of, you know, what we say or evidence shows are

19   practices throughout the department.

20        And one point I want to make is even though we

21   have these three separate theories, they're not unrelated,

22   so they're mutually reinforcing.  All of this evidence

23   comes together.  Eventually the jury has to find that

24   ultimately, you know, the City did something that meets

25   the level of culpability so that it caused the

1    constitutional violation.

2         But all of this evidence is interrelated and

3    helps a jury find ultimately they were aware, they did

4    realize it was a problem and that there were, you know, a

5    number of problems throughout the department and that

6    their response was we would rather cover up and do damage

7    control than actually address these issues and that that

8    was a cause of Mr. Morant's wrongful conviction.

9         THE COURT:  Now, I know your firm has litigated a

10   number of these cases.  Have any of them gone to trial and

11   this is just more for my curiosity and looking forward.

12   Are there specific jury interrogatories as to the

13   particular sub-prongs of *Monell* or is it simply one jury

14   question of whether the City meets the standards based on

15   the jury instructions provided for *Monell*?

16        MS. BENVENUTTI HOFFMANN:  So that is an

17   interesting question.  We actually do have a case that's

18   going to trial, not in the Second Circuit but in the Third

19   Circuit right now where there's a number of similar *Monell*

20   theories but one of them is this, you know, failure to

21   supervise, discipline based on basically "blue wall of

22   silence" sort of and then other *Monell* theories as well.

23        And I think -- I think that you could do it

24   either way.  I think in that case, at least with the

25   proposed instructions or what we've gotten from the judge

1    so far is likely the Third Circuit describes it slightly

2    differently in terms of two buckets.  It's the same idea

3    but that there's more a, you have a custom or policy that

4    causes the constitutional violation or there's what they

5    call a failure or inadequacy theory.

6            THE COURT:  Okay.

7            MS. BENVENUTTI HOFFMANN:  And so I think what is

8    proposed so far is a question on the, you know,

9    affirmative, like, you have a custom that causes one

10   question on that and then one question on did a failure or

11   inadequacy, that's key to the way that the Third Circuit

12   has described the test.  So, I think it --

13           THE COURT:  I won't commit you here to that.

14           MS. BENVENUTTI HOFFMANN:  Yeah, there are

15   advantages and disadvantages to more specificity because

16   it could arguably require the jury to agree on things that

17   they wouldn't necessarily have to -- like, if their

18   alternate theory is to same point they don't necessarily

19   have to agree on those so it's -- but then you have more

20   specificity about what they found, so I think there's

21   pluses and minuses.

22           THE COURT:  Okay.  Thank you.

23           All right.  Let's move to governmental immunity

24   for the state law claims.

25           I expressed my preliminary view that the, even

1      though there's a policy saying that they must disclose

2      exculpatory information, that the decision about whether

3      something is exculpatory does seem to be discretionary not

4      ministerial because it's not an easy question necessarily

5      as to whether something is exculpatory, so I'll let you

6      respond to that point.

7              MS. BENVENUTTI HOFFMANN:  I would say, I mean I

8      think that you, especially when you're talking about, in

9      particular, like prior impeaching statements, I think that

10     that -- and given that the obligation on the police

11     officer is not to disclose things to the defense.  The

12     obligation on the police officer is to provide it to the

13     prosecutor, and so they don't actually have to be making a

14     decision as to is this material in the context of the

15     prosecution.  What they have to do is provide the

16     information to the prosecutor so the prosecutor can make

17     that decision.

18             So I would say, especially if you're talking

19     about prior inconsistent statements, that really isn't

20     that discretionary.  It's just I'm writing down that they

21     said something different and I'm passing that along to the

22     prosecutor and that would be governed by the statute.

23             But addressing the other prong, which is the

24     imminent --

25             THE COURT:  The exception to discretionary.

1          MS. BENVENUTTI HOFFMANN:  The other exception,

2     right, which is the imminent harm to an identifiable

3     individual?

4          THE COURT:  Correct.

5          MS. BENVENUTTI HOFFMANN:  So I think that is

6     easily met here especially on the facts that are, that a

7     jury could find laid out here.

8          And to be clear we -- all of these, you know, a

9     lot of these things are questions of fact that the jury is

10    ultimately going to have to resolve so, yes, we having

11    alleged, you know, intentional misconduct against a number

12    of these individuals, although not all of them because

13    Pastore I believe we only have a negligence claim against

14    and we have not alleged that he was part of a malicious

15    prosecution or anything like that.

16         But those are ultimately fact questions.

17    Certainly, in their own defense, all of these officers are

18    saying at most what I did was negligence, right, or a

19    number of them are.  And so those are questions that the

20    jury ultimately has to decide, but I think that there's no

21    question here that there is ample evidence that there's an

22    identifiable individual that he's going to face incredibly

23    imminent harm.

24         I don't think that the cases require that it be

25    physical, but even if they did, it's a physical harm.

1  You're locked up for, in prison, that would qualify.

2  THE COURT:  Okay.  I'll just make one small point

3  on that.  You cite to the *Pines v. Bailey* case from Judge

4  Kravitz in your briefing on this issue.  That decision was

5  reversed on other grounds, so while the point that you use

6  it for stands, in the future, it would be better practice

7  to alert the Court if the district court's decision was

8  reversed in part on other grounds which it was in *Pines*.

9  MS. BENVENUTTI HOFFMANN:  I apologize for that.

10  I was not aware of that but that is an unfortunate error.

11  THE COURT:  No problem.

12  Okay.  Let's then turn to the arguments about the

13  negligence claim and the incorporation of the paragraphs

14  concerning intentional conduct into the negligence claim

15  and whether that, what effect that has on the complaint.

16  MS. BENVENUTTI HOFFMANN:  So, I don't think it

17  has an effect but if it -- again, we're allowed to allege

18  things in the alternative.  But if there was some issue

19  with that being, that one line being in the complaint, we

20  could just remove that and say that we're incorporating

21  the -- normally what we would do is incorporate the

22  factual allegations not the prior claims so, but it's

23  definitely not necessary to anything.

24  But, in any event, Pastore only has a negligence

25  claim brought against him and he's not included in the

1    malicious prosecution so it wouldn't affect the claims

2    against him in any event.

3        And I believe this exact same argument was raised

4    and rejected in *Horn, Jackson*.  Exact same argument about

5    incorporating the prior paragraphs from the complaint and,

6    again, the basic law is you're allowed to allege things in

7    the alternative.  We can allege things but ultimately the

8    jury is the ultimate arbiter of the facts.  Obviously,

9    many of these facts are disputed and so the jury is going

10   to have to ultimately decide.

11       So, the fact that we allege that there's enough

12   evidence to meet the standard of intentional or

13   deliberately indifferent conduct doesn't preclude the jury

14   from finding that it's merely negligent and that's a basis

15   for it to go forward.

16       THE COURT:  Okay.  Do agree that that issue of

17   alternative pleading should of been raised in a motion to

18   dismiss earlier in the case or is it something that can be

19   permissibly raised at this stage?

20       MS. BENVENUTTI HOFFMANN:  I think it should of

21   been raised earlier, but I think in any event if it's only

22   raised now and the remedy is for us to strike a paragraph

23   of our complaint, we can strike a paragraph of our

24   complaint.  I think this is easily fixable and complaints

25   can be amended to conform to the evidence in the

1    pleadings, you know, at any stage with the Court's

2    permission.

3              THE COURT:  And in your complaint, do the factual

4    allegations have words like "intentional" or "willful"

5    such that even if you were to only incorporate the factual

6    allegations and not the language of the counts of

7    malicious prosecution for instance, would you have the

8    same problem that Attorney Gerarde is highlighting?

9              MS. BENVENUTTI HOFFMANN:  I have to admit I was

10   not on the case when we filed the complaint so I have not

11   reviewed for that question, but I would assume that

12   anything we pled is in the alternative and especially,

13   again, for some of these less involved officers.

14             THE COURT:  And the factual allegations seem to

15   be factual allegations as opposed to full of adverbs

16   describing the import of the, or the mens rea of the

17   actions, based on my quick review while we're sitting

18   here.

19             MS. BENVENUTTI HOFFMANN:  Okay.

20             THE COURT:  Okay.  So then let's get to the

21   statute of repose argument for the state law claims and

22   the newly raised issue of certifying a question to the

23   Connecticut Supreme Court.

24             MS. BENVENUTTI HOFFMANN:  So, I don't think

25   there's any reason or need to certify a question.

1          There are a number of district courts -- so after

2     the, first, the *Taylor* decision which is at the appellate

3     court in Connecticut and then the *Cooke* decision which is

4     at the Connecticut Supreme Court which were both

5     addressing and essentially adopting a similar rule as *Heck*

6     *v. Humphrey* for state law claims.

7          And *Cooke* specifically said this is an element

8     that you have to prove is that the -- if your -- even if

9     it's a negligence claim, if your claim would require,

10    winning on it would necessarily show the invalidity of

11    a [sic] outstanding conviction you have to get that

12    conviction vacated in some manner first before you can

13    bring the claim and that is an element, and that is

14    exactly the same sort of reasoning as in the *Heck* decision

15    itself.

16         And so, I believe every -- certainly a number and

17    I believe maybe every district court in Connecticut that

18    has reached this question since then has held that, by

19    that reasoning.

20         And also under another Connecticut case, I think

21    it's *Fontanella* which talks about how when, if there's an

22    element that you can't prove yet then that tolls the

23    statute of limitations, has held that the claims like this

24    one based on wrongful convictions sounding in negligence,

25    are timely when brought within two years of the time that

1    the conviction was vacated or reversed.

2              And so, and in -- specifically in the *Birch v.*

3    *Town of New Milford* there are a number of decisions in

4    that case.  So this is the one from September 24, 2021,

5    and the cite is 2021 Westlaw 4932405.  This case

6    specifically addresses the statute of repose argument and

7    says specifically in this context that doesn't apply,

8    which is effectively what all these other courts are

9    finding as well but they may not have addressed it in

10   specific language, that only the two-year statute applies

11   because it, it's more directly on point given the nature

12   of the allegations of the type of personal injury you're

13   claiming, so that there's a different statute that

14   applies.

15             The only statute that applies from the statute of

16   limitations in Connecticut, even if you're bringing a

17   negligence claim is the two-year statute.  So, that's

18   in -- that's at Page 20 of this decision addresses and

19   rejects specifically the statute of repose argument.

20             And then all of these other cases, whether they

21   discuss it or not, are implicitly reaching the exact same

22   conclusion because they're saying these cases can go

23   forward.  And actually in this case --

24             It's *Birch*, right?

25             That there was recently a -- it went to trial,

1    there was a jury verdict on the negligence claim in

2    exactly this context, so they're finding that these claims

3    can go forward and they are timely.

4         THE COURT:  And what is the response to Attorney

5    Gerarde's argument that a negligence claim doesn't

6    necessarily require or implicate invalidation of the

7    criminal conviction because the negligence claim is

8    failure to use reasonable care which itself wouldn't

9    invalidate the criminal conviction in the way that a

10   coerced statement or a *Brady* violation would?

11        MS. BENVENUTTI HOFFMANN:  So that's specifically

12   rejected first by *Cooke* which says, I mean that is a claim

13   about -- what was at issue in *Cooke* was not a claim

14   against the police, but it was a claim against for, you

15   know, criminal malpractice and it is the same thing that

16   if you -- you cannot win that claim to show any damage

17   without showing that you wouldn't have been convicted and

18   so if you wouldn't have been -- that's why they held that

19   that claim couldn't go forward until the conviction was

20   already reversed in some way.

21        So it's the exact same thing here and, again,

22   that's what every single other court to look at this

23   question has held.

24        THE COURT:  Okay.  So in effect a negligence

25   claim does require invalidation of the conviction in the

1    same way that a 1983 claim would?

2         MS. BENVENUTTI HOFFMANN:  In this context and

3    what we're specifically claiming, yes, because -- and,

4    again, the negligence we're specifically talking about is

5    largely the failure to turn over and disclose exculpatory

6    evidence.

7         THE COURT:  Okay.  All right.  Is there anything

8    further you want to respond from the City's argument?

9         MS. BENVENUTTI HOFFMANN:  I don't know that I

10   need to say much about the favorable termination but one

11   thing other than I agree that I don't think any court has

12   adopted the interpretation they're offering, it does not

13   make any sense.

14        The *Thompson* case was talking -- it was a

15   circumstance where there was not a conviction, which is

16   why it's talking about ending without a conviction, but in

17   any -- and it was not overruling *Heck* and I don't think

18   anybody has held that across the country that *Thompson*

19   overrules *Heck*.  It's an, you know, an extension of *Heck*.

20   It is not overruling it.

21        But, beyond that, one thing that has happened in

22   the year while this has all been pending is Mr. Morant has

23   been granted state compensation on the basis of his

24   wrongful conviction and one of the statutory requirements

25   for that is that his conviction has been vacated and

1    reversed, another one is that he's actually innocent.  And

2    so there's no question the State of Connecticut views his

3    conviction as having been reversed, vacated.  It has no

4    legal effect on the basis of his -- and that he has

5    actually demonstrated his actual innocence.

6           So, I don't think there was any live question

7    before that but that is one important change in the record

8    that has happened in the meantime.

9           THE COURT:  Okay.  All right.  We've been going

10    for a little more than two hours.  I'm sure the court

11    reporter and counsel could use a short break.

12           Is everybody available to reconvene at about 1:10

13    if we take half an hour?

14           Let me ask it this way, is anyone unavailable?

15           MR. GERARDE:  No, I'm not unavailable.

16           I don't know if Your Honor wanted to wrap up the

17    City's motion?  I only had about five minutes of reply.

18           THE COURT:  Oh, sure, yes, let me take your

19    reply.

20           MR. GERARDE:  You want to do that?  And then we

21    can get --

22           THE COURT:  Let's do that, yes.

23           MR. GERARDE:  I just want to make a few points.

24           So, first, regarding the use of post-arrest

25    action, it's not allowed and it's not useful to a *Monell*

1     claim because of how *Monell* is set up.

2          The way the single act *Monell* claim against Chief

3     Pastore would have to work is that Chief Pastore actually

4     learned something or actually did something, reacted with

5     indifference, Raucci saw that and that emboldened him, it

6     showed him that I can do this and I will not have any --

7     not have any problems.

8          What counsel's doing by saying, well, look at

9     what happened in '95 and how he acted this in '96 and he

10    went and saw Scott Lewis and all that.  They're

11    essentially saying, well, if something came to Pastore's

12    attention he would of reacted with indifference and that

13    would of emboldened Raucci, but that's not the way a

14    *Monell* analysis works.

15         The issue about whether or not supervisory

16    liability applies, *Tangreti* does restrict this to

17    individuals.  The cases -- there are some cases out there

18    where policymakers, and it's very clear, the word is in

19    there.  The *Lucente* case, for example, in the Second

20    Circuit which is a seminal case on *Monell*, its

21    policymakers condoned the repeated evidence of et cetera,

22    et cetera, et cetera, but it has to reach.

23         So, we were talking about Pastore, individual

24    policymaker.  If it was a city council that had a chance

25    and they reacted, if it was a police commission or

1    something that's the City, but it has to be the City.  It

2    can't be individuals and they have to have more than

3    constructive notice.  I heard that in there.  That's the

4    sneak back to negligent supervision.  That would apply in

5    a negligent supervision claim.  We need actual notice and

6    deliberate indifference, knowledge and acquiescence in the

7    constitutional violation.

8         Third, and so, then, Sergeant Sweeney is not a

9    policymaker.  He's an outlier.  He's not -- he is not the

10   practice of what's happening in New Haven.  The 30(b)(6)

11   witness that we cited completely disavowed, If Sweeney

12   said that, If Sweeney did that, that's not New Haven

13   policy that's not what we do, that's not what we train.

14        Pettola and Sullivan both said, No one of my

15   superiors ever said in words or substance you can

16   fabricate, you can withhold exculpatory and nothing will

17   happen to you.  They're both on record saying that, so

18   that's undisputed.

19        I did want to mention one thing.  I told you

20   about the *Vega Colon* case with Judge Dooley.  As it turned

21   out in that case, that argument was in there because --

22   however, as it turned out in that case that plaintiff

23   never actually pled 7-465.  They put us on notice of

24   intent to sue.  We were arguing about it, but because they

25   didn't actually plead it as a separate count that's why we

 1   won summary judgment, so there's not a developed argument

 2   on because they left malice in.  I think there was a point

 3   where in one decision they said yes, I agree but it was

 4   because of this you have to at least plead it and you're

 5   out.  So I can't tell you that Judge Dooley found in my

 6   favor on that but that case -- that issue was in that

 7   case.

 8           THE COURT:  Understood.

 9           MR. GERARDE:  So thank you, Judge.

10           THE COURT:  Okay.  Thank you.

11           All right.  Let's talk a half an hour.

12           MS. BENVENUTTI HOFFMANN:  I have just one thing

13   quickly just on the constructive notice being sufficient.

14   It's in our brief, but the Supreme Court is very clear

15   that on *Monell* claims constructive notice is sufficient

16   and that goes to *Farmer v. Brennan*, *Board of Commissioners*

17   *v. Brown*.  There are a number of cases specifically

18   addressing that, so I just wanted to make that one point.

19           THE COURT:  All right.  All right.  The Court

20   will stand in recess and we'll come back at 1:15.

21           Thank you.

22           (The Court exited at 12:46 p.m.)

23           (* * * * *)

24           (The Court entered at 1:17 p.m.)

25           THE COURT:  All right.  Just give me a moment.

1          (Pause)

2          THE COURT:  Okay.  So let's pick up with

3     Defendant Pastore's summary judgment motion which is the

4     next filed one.  On that motion, because it raises some of

5     the issues that we've already discussed, I don't have any

6     specific questions but if you wanted to make a

7     presentation you're welcome to, Attorney Ouellette.

8          MR. OUELLETTE:  Your Honor, I'll be very brief

9     because, like you said, Attorney Gerarde already addressed

10    the majority of it.

11          I will just like to focus solely on, you know,

12    the claim against Pastore individually just relates to the

13    investigation of the homicides and in response to my local

14    rule statement where I said that he just, Pastore would

15    just receive updates, you know, in general, periodically

16    from his -- from the people under him regarding it.

17          Plaintiff denied that and cited to Paragraphs 28,

18    29, 30 and 31 of their local statement and in there it

19    only says that Chief Pastore was the addressee on the

20    autopsy report.

21          And I tried -- my client informed me that that

22    was the practice back then.  The medical examiner would

23    just mail it to the chiefs and it would eventually make

24    its way, whatever.  But even putting that, I tried to get

25    an affidavit but he became infirmed and passed away right

1  around this time period that this was filed.

2       But I say even if that's true, that's his only

3  involvement, that's, I think, the only time his name

4  appears in the police file with respect to the

5  investigation.

6       Governmental immunity applies to that.  It's

7  square law that the supervision of a police department,

8  the administration of it and the supervision of officers

9  is discretionary and there's no evidence of his

10 involvement in the act, in the investigation, thus the

11 apparentness exception is not satisfied and Attorney

12 Gerarde went over all that.

13      I'd also just like to touch on, we adopt the

14 statute of limitations and the statute of repose arguments

15 and actually join in on counsel's suggestion regarding a

16 certification of the question because, one, that is the

17 only claim against my client so it would be dispositive,

18 perhaps, putting aside the governmental immunity argument.

19 And, also, there are other several cases coming down the

20 pike that have this same exact issue, so one way to

21 address it.

22      But, other than that, I have no further and just

23 rely on previous arguments and -- oh, I will disagree with

24 Attorney Gerarde in one respect and agree with plaintiff's

25 counsel.  The only claim against the estate is a

1   negligence claim and there's no claims of any intentional

2   wrongdoings or maliciousness against my client.  So, other

3   than that I'd --

4           THE COURT:  In that claim, does it have the one

5   paragraph that incorporates all of the prior allegations

6   though, correct?

7           MR. OUELLETTE:  Yes, but I do believe I tried to

8   skim through it when this issue was raised.  I don't

9   believe there's any intentional -- with respect to the

10  investigation, there's no intentional conduct against

11  Pastore.

12          THE COURT:  Alleged.  Okay, understood.

13          MR. OUELLETTE:  Thank you.

14          THE COURT:  Thank you, Attorney Ouellette.

15          Attorney Benvenutti Hoffman, any response?

16          MS. BENVENUTTI HOFFMANN:  I'm just going to

17  address the thing that he raised which is different from

18  what we talked about already.  I'm not going to retread

19  any of that ground, but if you look specifically at those

20  paragraphs about the evidence that Pastore would of been

21  aware of what was going on in the investigation and that's

22  paragraphs I think he's at 29 or 28 through at least 31,

23  yeah, I think 31.

24          There's a lot of evidence which we think

25  certainly creates a fact question about what Pastore knew

1    including in particular Raucci says he has no doubt that

2    Pastore was in the loop on what was happening.  There's

3    evidence of the, at least weekly if not more meetings

4    among homicide sergeants and the chief concerning homicide

5    cases.  That comes from Sullivan.  And also Raucci he says

6    Pastore was in and out of the Homicide Unit having

7    meetings with supervisors.

8            So, there's abundant evidence that he would of

9    been aware.

10           And, again, just the basic facts of what happened

11   in the investigation, even apart from the evidence of the

12   warning reaching him, the evidence of what happened in the

13   investigation, which is everything's going towards

14   Cardwell and then all of a sudden it switches over, out of

15   the blue, to these people whose names have not come up at

16   all.  Then the supervisors instruct to create what, you

17   know, is a fabricated report that says Cardwell's been

18   ruled out when there's absolutely no evidence that went

19   into that.

20           All of that is information that the supervisors

21   and from those meetings would have known about, so there's

22   evidence he was personally involved.

23           I want to touch on two things that are not

24   related to this just coming up after this morning.

25           The first is Mr. Morant got called for a work

1    emergency so that's his apologies.  And I can't remember

2    whether I addressed my partner Mr. Brustin who very much

3    wanted to be here, but he's at that trial.  He was hoping

4    he could step away from the trial and listen, he couldn't

5    do that either, but he did not want to delay things

6    because this case has been going on for so long.

7         The last thing is I just want -- it was called to

8    my attention by my associate Ms. Mota, who is listening

9    remotely, that we do, actually, on Page 66 of our brief

10   for the first time we mention *Pines* say it's reversed in

11   part on other grounds, so we did have that in there.  I

12   think it was in error in the creation of the table

13   authorities that pulled up the Second Circuit decision

14   instead of the underlying district court as not mentioning

15   it and then the later times mentions, so I just, to give

16   her due, she was doing the citations, that she did include

17   that, so --

18        THE COURT:  All right.

19        MS. BENVENUTTI HOFFMANN:  -- I just want to make

20   that --

21        THE COURT:  Thank you for correcting that for me

22   as well.  I appreciate it.

23        Okay.  So, then, the next motion is the one filed

24   by Mr. Lawlor and Mr. Maher.

25        So, for the individual defendant's motions I have

1    questions that are specific to each count and so let's

2    start with Count II which is the conspiracy count alleged

3    against Lawlor and Maher as well as Raucci and Sweeney.

4        So, with respect to Maher, plaintiff argues that

5    Maher and Raucci worked together on the Roque interview

6    and then the Morant interview.  They say that the Roque

7    interview was fabricated and that that Morant statement

8    was coerced.

9        So, as to Maher first, why doesn't that create a

10   potential jury inference that there was a conspiracy?

11   Why, basically -- why shouldn't that question go to the

12   jury for Maher?

13       MR. MELLEY:  Well, we start off with Raucci

14   interviewing people alone and Sergeant Sweeney at the time

15   says, Pettola, get in there.  I don't want him alone.

16       When the other two interviews just referenced

17   occur, Maher is off doing his own thing.  He's not

18   involved in the day-to-day business of this particular

19   unit anymore.  He has been told he's going to be promoted

20   to sergeant.  He's been told to wrap up his affairs and to

21   move on.

22       So, initially, Maher had been the detective in

23   charge and he interviewed so many people and then it

24   stopped as he took this next stage.  Raucci came in and

25   developed what he developed.  And at the last moment, for

1    both those statements, Maher is told go in and observe.

2    So he has no knowledge, no background and there's nothing

3    to say that he did.

4            When the plaintiff was specifically asked about

5    the presence of Maher, he had no recollection at all.  His

6    involvement is mainly as an observer.

7            So, without more, there is no conspiracy.

8    There's no showing that Maher met with Raucci beforehand

9    anywhere.

10           THE COURT:  But if -- if Maher, when he was

11   investigating the case believed that all signs pointed

12   towards the Cardwells and then when he sits in, however

13   brief on the interviews of Roque and Morant, and the

14   investigation is obviously taking a 180-degree turn at

15   that point, couldn't a jury infer a tacit conspiracy when

16   Maher starts going along with the 180-degree turn instead

17   of the original hypothesis about who did this?

18           MR. MELLEY:  I would say no, that's really not in

19   the evidence because there's no evidence that Maher did

20   the turnaround.  What he testified to is that he spoke to

21   all these different persons, 24, whatever it was.  And

22   there's no claim anywhere that he had enough information

23   that would warrant applying for an arrest warrant or

24   anything like that.

25           Yeah, it led there, it led there, it led there

1    but then it failed.  And, to this date, we don't have that

2    smoking gun that says he should of at this stage or this

3    stage applied for an arrest warrant.  That didn't happen.

4         So, he -- again, he comes in and as he testified,

5    you know, he didn't know what had been developed and he

6    also testified cases do take turns and he was not part of

7    that.

8         THE COURT:  Am I remembering the fact correctly

9    that he actually writes the memo that says -- that closes

10    the loop on Cardwell and says, in fact, where, you know,

11    Cardwell is not the main suspect anymore?

12         MR. MELLEY:  Correct.  He did that after the

13    fact, later down the road.  And as he testified, he's not

14    sure how it came up, but somebody reviewing the file said,

15    Hey, you interviewed all these people, you got to close

16    the loop on this guy why isn't he involved.  And he says,

17    Well, it just ended up as a dead end.

18         So I mean, yeah, that happens.  I don't see --

19    and there's nothing to say otherwise.

20         THE COURT:  And didn't Maher also sign the

21    statements of Roque and Morant?  Am I right about that?

22         MR. MELLEY:  Did he sign both?

23         THE COURT:  Or at least Morant's, at least

24    Morant's?

25         MR. MELLEY:  Yes.

1          THE COURT:  Okay.  So, I guess the question I

2    have to decide is whether that's -- that involvement is

3    sufficient for a reasonable jury to find that Maher joined

4    the conspiracy however sort of implicitly.

5          MR. MELLEY:  I understand, but at the same time,

6    at that point in time, the plaintiff did not raise any

7    flags to say, hey, you know, not with Maher.  This isn't

8    my true statement, I don't -- wait a minute.

9          THE COURT:  That -- I'm not sure that that

10   necessarily goes to the conspiracy claim.  That might go

11   to the claim of fabrication of evidence, but I don't think

12   it -- well, let me put it this way, why would it be

13   necessary for the plaintiff to have raised concerns at

14   that point in order for there to be a jury question about

15   whether there was a conspiracy here?

16         MR. MELLEY:  There's two distinct events.  One is

17   the actual recording, the giving of the statement.  The

18   other is the affirmation.  I mean, the person giving the

19   statement has that option when he signs it, I can't sign

20   that, that's not the truth.

21         THE COURT:  I see.  So you're saying not -- not

22   Maher's signing but plaintiff's signing of the statement

23   is the relevant fact?

24         MR. MELLEY:  Correct.  He's just taking the oath.

25         THE COURT:  Okay.  Let's then focus on Lawlor and

1    Lawlor's involvement appears to be among the most minimal,

2    we'll set aside the chief, but among the most minimal of

3    the people who was actually on the ground.

4            Is there a dispute of fact about whether Lawlor

5    directed the creation of that memo to close the loop on

6    Cardwell?

7            MR. MELLEY:  I don't think there's any evidence

8    on that.

9            THE COURT:  Okay.  So the record just is

10   incomplete as to who directed --

11           MR. MELLEY:  That's my recollection.

12           THE COURT:  -- Maher to do that?

13           MR. MELLEY:  I can be corrected because -- but I

14   don't believe -- Maher testified he was not sure where it

15   came from.

16           THE COURT:  Okay.  And did Lawlor testify on this

17   subject?

18           MR. MELLEY:  You know, I read that over.  I don't

19   remember that coming up and I'm sure --

20           THE COURT:  Okay.  For some reason --

21           MR. MELLEY:  -- if I'm wrong --

22           THE COURT:  All right.  I will let plaintiff's

23   counsel correct me too if I'm wrong on that.

24           Aside -- so, if Lawlor had nothing to do with

25   directing Maher to write this memo ruling out Cardwell,

1    then am I correct that Lawlor's only involvement was

2    allegedly receiving information from Sweeney about

3    Raucci's alleged misconduct during the Ruiz interview?

4                THE COURT:  At best.

5                THE COURT:  At best.  And so --

6                MR. MELLEY:  There is one more.

7                THE COURT:  There's a dispute?

8                MR. MELLEY:  No, no, before we get to that there

9    is one more claim that Lawlor was a supervisor on this

10   file but there's no evidence of that.

11               And I don't know if Your Honor had the benefit of

12   going through what I filed in the past week after Lawlor

13   was re-deposed, but he kind of set out how it happens, you

14   know, the murders were at 4:00 in the morning, so the

15   person in charge is the sergeant at that time.  That's not

16   Lawlor.  Lawlor's working days.

17               So to the extent Lawlor had any further

18   involvement in the file, it would be in response to what,

19   the sergeant who had it originally was McCoy and he didn't

20   know who else it was would say, Hey, Bobby -- that's what

21   they call him -- can you have your guys do A, B and C, and

22   Lawlor explains that.

23               And he says I have no idea why or what or

24   whatever and he says but I'm doing that assignment.  And

25   he was very clear, I was not involved in the case.  So

1    he's extending his authority as a sergeant over the

2    detectives in his command but he's not actively involved

3    at all as a supervisor in the file.

4         THE COURT:  Okay.  All right.  I understand the

5    point.

6         Okay.  Let's move then to Count III which is the

7    *Brady* violation.

8         MR. MELLEY:  Can we --

9         THE COURT:  Oh, sure, sure.

10        MR. MELLEY:  -- just finish because you brought

11   up speaking to Sweeney?

12        THE COURT:  Sure.  Go ahead.

13        MR. MELLEY:  That whole bit.  And, you know, it's

14   kind of like the allegation against Lawlor is such that

15   he's being asked to prove a negative, you know, when did I

16   last beat my wife.  How do you prove it?  It's a negative.

17        Other than -- there's a couple things that I

18   would highlight to the Court.

19        The plaintiffs [sic] continually cite Lawlor for

20   being aware of what *Brady* is, the duty to inform, passing

21   it up, and every time -- and they say he's been consistent

22   throughout, you know, from the time he testified in '99,

23   2010 and then in this latest he's consistent.  And

24   likewise, he's consistent, I wasn't told, if I was told I

25   would of done something.

1          So, the statement by Sweeney kind of sits there

2     alone and then you saw, I'm sure Judge Haight's going back

3     and forth as to whether this or that.

4          One of the interesting things that I didn't put

5     in my brief, but it's in the record, as far as Sweeney's

6     motion, he says in Paragraph 36, that Lawlor told him that

7     Ruiz took a polygraph and I guess I figured that my

8     concerns were taken care of.

9          So that polygraph issue comes out of nowhere.

10    You know, I would submit it's manufactured.  And the

11    plaintiff responds and says, Yeah, he said that but

12    there's no evidence of a polygraph anywhere.

13         You know, so when the balancing occurs, you know,

14    in terms of having a claim against Lawlor, I think these

15    things have to be stacked up and like Judge Haight said,

16    if Sweeney did make a mention, the way I interpret Judge

17    Haight is, at best an off-hand comment and it's not

18    something of substance because he compliments Lawlor as

19    well.

20         So that brings up the issue of the qualified

21    immunity because if he -- if he supposedly even heard it,

22    he didn't appreciate its significance.

23              THE COURT:  Well --

24              MR. MELLEY:  If you accept.

25              THE COURT:  I see where you're trying to go with

1    this, but for purposes of an affirmative summary judgment

2    motion for Lawlor, there is a dispute of fact about

3    whether Lawlor was told by Sweeney about Raucci's alleged

4    misconduct during the interview.

5              MR. MELLEY:  I would submit the real question, is

6    there a genuine issue.

7              THE COURT:  Why wouldn't it be genuine?

8              MR. MELLEY:  Because everything the procedure

9    says is that you document, document, document and Sweeney

10   acknowledges he never documented and he's the one that has

11   the awareness.  He was the one what witnessed it.  He's

12   the one that is a sergeant and he never does anything.

13             THE COURT:  So, you're saying that his word alone

14   is not enough to create a genuine issue is what you --

15             MR. MELLEY:  Correct.  Correct.  It's not

16   supported anywhere else.  Nobody else backs that up.

17             And, you know, going back to that whole issue

18   Sweeney sent in Pettola to monitor Raucci.  So, I mean

19   there's knowledge, if there was a real problem why wasn't

20   that reported at that time?

21             THE COURT:  We're -- just so I understand sort of

22   the hierarchy, were Lawlor and Pettola both supervisor

23   level?

24             MR. MELLEY:  No.  Pettola is a detective.

25             THE COURT:  Okay.

1          MR. MELLEY:  Sweeney and Lawlor are both

2     sergeants, but in the hierarchy, because Sweeney has more

3     tenure, he is considered a higher ranking.

4          THE COURT:  Okay.  So that's why you're saying it

5     wouldn't of made sense for Sweeney to have reported this

6     to Lawlor because Sweeney was higher ranking anyway?

7          MR. MELLEY:  Right.  And that's pretty clear from

8     the record.

9          THE COURT:  Okay.

10          MR. MELLEY:  His perception later on is mistaken

11     but the record is clear that Sweeney had several years on

12     Lawlor.

13          THE COURT:  Okay.  All right.  So, I still think

14     that there's a genuine dispute of fact about whether this

15     conversation occurred and I don't think that there's a

16     requirement that the plaintiff put forth more than the

17     testimony of Sweeney contradicting Lawlor so, if there is

18     that genuine issue, I think it does raise the issue of

19     qualified immunity as you said.

20          But, doesn't that depend on what Sweeney, at

21     trial, would testify about what he told Lawlor because the

22     substance of what Lawlor knew is really what underlies

23     whether Lawlor acted objectively, reasonably in this

24     situation.

25          MR. MELLEY:  Then we get to what version is

1    Sweeney going to say about this particular episode.

2          THE COURT:  Yeah, and so questions of disputed

3    fact bear on the question of qualified immunity and so

4    summary judgment is inappropriate.

5          MR. MELLEY:  Well, I just hang on that word

6    genuine.

7          THE COURT:  Okay.

8          MR. MELLEY:  Yeah, I recognize there's a dispute.

9    I'm not -- I recognize that but, genuine, I mean really?

10   After -- I understand.

11         THE COURT:  Okay.  Now, on the *Brady* violation,

12   again, taking the facts in the light most favorable to the

13   plaintiff which is that Sweeney told Lawlor that Raucci

14   was feeding facts to the witness and engaging in improper

15   interview tactics.  Why wouldn't Lawlor's failure to

16   report that statement to, or that activity to a prosecutor

17   be a *Brady* violation?  Why couldn't a jury find that?

18         MR. MELLEY:  Well, it gets to the heart of the

19   issue did Sweeney tell him.  I mean --

20         THE COURT:  Which is why it's genuine and

21   material I think.

22         MR. MELLEY:  Well, as I said, the plaintiff cites

23   Lawlor again and again for the proposition that if that

24   occurred, that hypothetical that Lawlor is unwilling to

25   accept, yeah, there would of been a duty but he's -- I

1    mean --

2         THE COURT:  So you're saying plaintiff is

3    vouching for Lawlor's credibility in other respects but in

4    this respect saying Lawlor's not telling the truth?

5         MR. MELLEY:  Just on that one little part.

6         THE COURT:  I see.

7         MR. MELLEY:  But before we get there, in terms of

8    all of the times that Lawlor testified on that he's been

9    consistent.  That's in their most recent finding.

10        THE COURT:  I think that's a good argument for

11   closing argument.  I don't think it gets you over -- it

12   get you a summary judgment though.

13        All right.  Anything more on Count III before we

14   move on to Count IV?

15        MR. MELLEY:  Ah, no.

16        THE COURT:  All right.  So Count IV is largely

17   against -- it's only alleged against --

18        MR. MELLEY:  Maher.

19        THE COURT:  Yeah, not Lawlor and it's really two

20   pieces.  There's the fabrication of evidence with respect

21   to Morant's interview and then there's Roque's interview.

22        So, let's start with Roque's interview.  It

23   sounds like Maher doesn't remember being in that interview

24   but he did sign the interview statement.  So does -- this,

25   again, goes to, I guess, your original point that signing

1    the interview statement is a minimal involvement.

2           MR. MELLEY:  It's taking the oath of the person,

3    yes.

4           THE COURT:  And doesn't necessarily mean that he

5    was aware -- he -- that he knew the statement given was

6    false which is what is required for fabrication?

7           MR. MELLEY:  Correct.

8           THE COURT:  Okay.

9           MR. MELLEY:  Contrast to when Sweeney takes the

10   oath of the statement where he believes there was

11   malfeasance, he actually takes that oath.  This is

12   different.

13          THE COURT:  Okay.  So tell me.  Explain this.

14          MR. MELLEY:  Maher has no idea what Roque is

15   saying as it relates to anything.

16          THE COURT:  He doesn't know about the truth or

17   falsity of Roque statements?

18          MR. MELLEY:  Correct.  And he's not involved in

19   the pre-interview or anything like that.  He's just there

20   for the statement.

21          THE COURT:  He just comes in at the end and says,

22   administers the oath and takes it; is that what you're

23   saying?

24          MR. MELLEY:  No.  He was in on the interview.

25          THE COURT:  Okay.

1          MR. MELLEY:  But nothing untoward comes out of

2     that allegation itself.  The allegations deal with the

3     pre-interview.

4          THE COURT:  I see.  Okay.  So the question is

5     whether, for Maher, he was involved enough to have a

6     question of fact about whether he knew the statement of

7     Roque was false?

8          MR. MELLEY:  Correct.  And there's no evidence

9     that he had notice because, again, as he says, If I was

10    aware of anything like that I would of stopped the

11    interview.

12         THE COURT:  And --

13         MR. MELLEY:  Again, that's the appropriate

14    standard.

15         THE COURT:  Now, there seem to be some questions

16    of fact in this period between mid-January and the end of

17    January which is when his promotion takes place.

18         MR. MELLEY:  Right.

19         THE COURT:  So he had been the lead detective on

20    the investigation, he gets promoted and then he does do --

21    he has some involvement, right, because he sits in on the

22    Roque interview --

23         MR. MELLEY:  Right.

24         THE COURT:  -- and signs the statement.  So why

25    isn't -- why aren't there questions of fact about how

1    heavily he was involved in the prosecution in that

2    two-week period to send this to a jury?

3            MR. MELLEY:  Because those are the only

4    involvements that you have.  You have his testimony he

5    gets the letter in December, you're going to be a sergeant

6    as of -- I forget the date, it's that date in February or

7    whatever.  So he gets an oral order.  It's not in writing,

8    start cleaning up what you got, and he doesn't do anything

9    further because there's nothing with him initiating

10   anything on this particular case after that other than

11   these two statements where he comes in as a witness not as

12   the interviewer.

13           THE COURT:  Did he sit in on the entire

14   interview?

15           MR. MELLEY:  I believe so, yes.

16           THE COURT:  But you're saying he didn't ask any

17   questions?

18           MR. MELLEY:  There are a couple innocuous

19   questions, at best miniscule.  They're not probing.

20           He is in the car when they take him out to where

21   the gun was thrown.  I mean that's pointed out to him.  He

22   says he has no idea where they're going but he's directed

23   to that spot but, I mean, again, coming into the file he

24   had no knowledge of any of that.

25           THE COURT:  Okay.  As to both Roque and Morant's

1    statements, again, if Maher wrote the memo excluding

2    Cardwell, is that circumstantial evidence that he knew of

3    the falsity of those Roque's and Morant's statements

4    because he was leaning toward Cardwell all along?

5            MR. MELLEY:  No, I don't see how.  They're two

6    different things.

7            Again, the investigation of Cardwell does not end

8    up at a point were there's enough for an arrest warrant.

9    And if he doesn't get it after 24 interviews trying to pin

10   this down, okay, then the investigation takes another

11   turn.  Okay.  Well, he puts down that with regard to

12   Cardwell there are a couple of things that were told that

13   didn't pan out so therefore he felt it was a dead end.

14           THE COURT:  Okay.  All right.

15           Next, we've -- on the coerced statement from

16   Morant I've already asked you what Maher's role was during

17   that interview.  He was in -- correct, he was in the

18   entire interview and he asked a couple of questions?

19           MR. MELLEY:  Very few, yes.

20           THE COURT:  Okay.  You do make a statement in

21   your brief saying that plaintiff testified Maher was not

22   in the room when threats were made to the plaintiff.  I

23   think there was a threat of a death penalty, a threat of a

24   million dollar bond and some other threats.

25           When I went back to look at the deposition

1    testimony, plaintiff says he actually doesn't remember

2    whether Maher was in the room, not that affirmatively he

3    remembers Maher was not there.

4         MR. MELLEY:  Maybe I inartfully worded it, but he

5    doesn't say Maher was in the room.

6         THE COURT:  He says he doesn't remember whether

7    Maher was in the room.

8         MR. MELLEY:  Right.  Well, he doesn't say he's

9    there.

10         THE COURT:  Correct.  He says he doesn't recall

11    if he was.

12         MR. MELLEY:  You would think he would, if he's

13    being intimidated by multiple people as opposed to one.

14         THE COURT:  Okay.  Failure to intercede is the

15    next count.  The argument here is that if Maher was in the

16    room when Raucci is threatening and/or obtaining falsified

17    evidence from Roque that Maher had a duty to act in that

18    circumstance.

19         MR. MELLEY:  If he was aware of it.

20         THE COURT:  So it all goes back to what Maher

21    knew.

22         MR. MELLEY:  Right and, again, there's no other

23    evidence but that he's doing other things when he comes

24    back to sit in on these too.

25         THE COURT:  Okay.  All right.  As to negligence,

1    I think the, mostly the arguments you're making are

2    statute of limitations, statute of repose.  Would you like

3    to elaborate on those?

4            MR. MELLEY:  I think enough has been said, but

5    one of the points that I was thinking of, not briefed, you

6    know, in the State of Connecticut if a minor is injured

7    it's a two-year statute of limitations.  It doesn't extend

8    until they're 18 like Massachusetts extends until their

9    18, but Connecticut we don't have that.

10           And the exception is anything to do with sexual

11   assault where the legislature went out of their way to

12   pass a statute to say hey, because of the issues involved

13   here we're going to allow a minor and even others under

14   certain circumstances to bring a claim well after the

15   statute of limitations.

16           So, my point is that there, in response to a gap,

17   the legislature specifically passed a law.

18           THE COURT:  And here there's no such exception

19   for --

20           MR. MELLEY:  And here there's no such exception.

21           THE COURT:  -- cases involving wrongful

22   convictions.

23           MR. MELLEY:  Right.

24           THE COURT:  Okay.  I think that covers up the

25   questions I have for you, Attorney Melley.

1              Attorney Benvenutti Hoffman, let's hear

2     responses.

3              MS. BENVENUTTI HOFFMANN:  Sure.  Do you have

4     specific questions or --

5              THE COURT:  I think a question that underlies a

6     lot of the claims against Maher is what evidence there was

7     that he knew that the information from Roque was falsified

8     and/or did he know about the potential coercion in the

9     interview of Mr. Morant.  So let's start with his

10    knowledge and his role.

11             MS. BENVENUTTI HOFFMANN:  So there's abundant

12    evidence that he knew and even -- I mean, as I'm sure the

13    Court's aware, the record in this case is massive.

14             THE COURT:  The boxes in my chambers confirm your

15    impression.

16             MS. BENVENUTTI HOFFMANN:  I know that my

17    colleague was putting together for days.

18             So even in this detailed factual statement we

19    don't get into, you know, as minute detail as, for

20    example, if you were to look at the underlying deposition

21    and read it of -- I may pronounce it wrong because we've

22    been saying Maher this whole case, but Maher.

23             But just some highlights of some of the evidence,

24    so for both Roque and Mr. Morant they both say during

25    this -- during their own interviews which Maher -- I can't

1     get it right, I'm sorry -- which he said during the time

2     of the original prosecution he, now he says I wasn't there

3     I didn't know anything about it.  That's not what he said

4     to the prosecutor and it's not what he said at the

5     criminal trials and during the prior proceedings.

6           What he said before was I am present and I can

7     vouch that these are reliable statements.

8           And what both Roque, who said this at the time of

9     Mr. Morant's criminal prosecution and Mr. Morant say is

10    they said from the beginning they didn't know anything,

11    they were told what to say, they were threatened.  They

12    were -- you know, there's also a, in addition to that

13    overarching testimony which there's ample evidence that

14    Maher was present for -- Maher was present for -- there's

15    also specific misconduct in terms of the taping which is

16    what was corroborated by the FBI investigation and which

17    is addressed extensively in Maher's deposition.

18          So, Maher agrees it is not proper to start and

19    stop a tape without noting that you're starting and

20    stopping it.

21          What Roque testified to way back when at the --

22    in the criminal proceedings was they were telling me what

23    to say.  When I wouldn't get it right, they'd stop the

24    tape.  They'd, you know, rewind or go over and tell me

25    what to say again and then create this tape and both

1    Raucci and Maher denied it.

2         They said that's not what happened.  He just

3    volunteered all this information.  That's what they

4    represented to the prosecutor.

5         Lo and behold the FBI does analysis of the tape

6    and there are multiple stops and starts.  And at his

7    deposition in this case, Maher admitted it had to be

8    either him or Raucci who did that.  There's no

9    justification.  You can't do that without noting the

10   reason for it.

11        That's also, obviously, evidence that support --

12   not that you even need it because you have direct

13   testimony which has to be accredited, but that's also

14   evidence that corroborates and supports what Roque said at

15   the time, what Mr. Morant has said, and he didn't testify

16   at his criminal trial but, you know, he didn't come back

17   to sign the statement.

18        So they coerced him into giving the statement.

19   They took a tape.  They told him come back to sign it.  He

20   comes back with his mom and says, I'm not going to sign

21   it, it's false.

22        There's no dispute the statement's not signed.

23   There's no explanation.  There's nothing in the file that

24   indicates, you know, an explanation for that.  Of course

25   that's all consistent with what he said all along and with

1    his innocence, which is that he didn't know anything and

2    he was only succumbing to these threats which at the time,

3    frankly, were not even directed towards creating a case

4    against him.  It was trying to coerce him into falsely

5    implicating Mr. Lewis which was the target at that time of

6    the investigation.

7          So, there is ample evidence that Maher knew

8    exactly what was happening and that he made

9    misrepresentations both with respect to both of those

10   tapes and the representations to the prosecutor about the

11   reliability of this information suggesting that the

12   information came from the witnesses and that they were

13   independently providing these stories that all matched,

14   you know, Ruiz 1 and Roque and Morant, they're all

15   consistent.  They're consistent because the police were

16   feeding this information and telling the people what to

17   say.

18         But Maher vouched for it at the time and that

19   helped when Roque comes forward and says, This is false.

20   I don't know anything.

21         The reason that the prosecutor disbelieved him is

22   because the police are falsely saying, That's not true.

23   He just has cold feet.  He really came forward with this

24   information and he volunteered it.

25         So there is absolutely a dispute of fact.  I

1 mean, it's -- there is overwhelming evidence that Maher

2 knew exactly what was happening and he is responsible even

3 if he wasn't the person taking the lead in the

4 interrogations and creating these statements, that he is

5 also responsible for the fabrication of evidence, for the

6 *Brady* suppression of both the evidence of the misconduct

7 used to create these statements and the, you know,

8 inconsistent statements and other evidence that would

9 undermine them, that he's responsible for the coercion of

10 Mr. Morant to give this statement including the threats

11 and the, you know, promises that we'll let you go but only

12 if you give us this statement that we're telling you to

13 give.

14          So all of that he's directly involved.

15          THE COURT:  So, who actually makes the threats

16 that you might get the death penalty, you'll have a

17 million dollar bond, et cetera for Mr. Morant's interview?

18          MS. BENVENUTTI HOFFMANN:  I think it's mostly

19 Raucci but I think Mr. Morant doesn't remember whether

20 Maher said any of it as well.

21          THE COURT:  And the threats are part of the, not

22 part of the recording I presume?

23          MS. BENVENUTTI HOFFMANN:  Right.  They're not

24 part of the recording, but -- and the -- so the FBI at the

25 time analyzed the, or not at the time, postconviction but,

1    you know, in the '90s, analyzed the Roque tape and found

2    these stops and starts.

3         In this litigation we analyzed the Morant tape

4    and it's got the same issue and it's the same thing where

5    his tape, and he said that they did that at the time, but

6    he didn't testify for a variety of reasons and so that

7    wasn't looked into as part of that investigation back

8    then.

9         But the exact same, you know, people from the FBI

10   did the examination on Morant's tape and it's the same

11   thing, it's the stops and starts.  And Maher is clear in

12   his deposition there is no good explanation for that, it

13   would have to be either Raucci or him.

14        There's some really incredible statements he

15   gives.  He first says, when he's originally asked about it

16   he denies that there were any stops and starts.  Then

17   after there's the proof, and I think that was way back

18   when in the time of the criminal prosecution or

19   post-conviction proceedings, where he's originally asked.

20   Then when there is evidence and he's confronted with it,

21   he gives some other, you know, proveably false

22   explanations about oh, really, it was just one time.  He's

23   the one who says about stopping for a soda and then --

24        Is he the one who says -- which of them says that

25   there's silent --

1          MR. ROSENTHAL:  Maher.

2          MS. MATTHIAS:  Maher.

3          MS. BENVENUTTI HOFFMANN:  Maher says that there's

4    silent -- no, really what happened is maybe Raucci was

5    asking me something and we would just stop it, but he --

6    and to got out of the room to confer on something, but the

7    reason you can't tell that on the tape that's happening he

8    was making silent hand signals to me about why it is we

9    had to stop the tape, and there's absolutely no

10   explanation for why he would be making silent hand signals

11   as to why you had to the stop the tape instead of just

12   saying on the record, We're going to stop the tape.

13         So there is abundant evidence from which a jury

14   can conclude he knew exactly what was happening and he was

15   in the middle of it and he was a co-conspirator.  He's

16   part of the fabrication, he's part of the *Brady* violation

17   he's part of the coercion, he's part of all of it.

18         THE COURT:  Okay.  On the conspiracy claim as to

19   all the individual defendants, let's set aside Sweeney

20   because I think he's in a little bit of a different

21   category, but as to Raucci, Maher -- really, Raucci and

22   Maher, I think the two main players in this.  They each

23   did these actions under your set of facts, but does there

24   need to be something more suggesting that they had the

25   meeting of the minds to do it in order to falsely

1    implicate your client or do --

2         So the first question is, is there -- is there a

3    requirement that they have something more as opposed to

4    both of them kind of doing their own things and then if

5    there is such a requirement, is there evidence from which

6    a jury could conclude that they both were in this

7    together, they wanted to submit fabricated evidence for

8    the Roque statement and coerce a statement out of

9    Mr. Morant?

10        MS. BENVENUTTI HOFFMANN:  So all is required for

11   civil rights conspiracy is an agreement which can be tacit

12   and which can be proven by circumstantial evidence and

13   often is in conspiracy cases, to act in concert to inflict

14   an unconstitutional injury.  It does not have to be to

15   frame him.  It does not have to be that they know that

16   Mr. -- I mean, I think there is evidence from which you

17   can conclude, at least some of them understood that, but

18   they don't have to go that far.  They have to know that

19   they are depriving Mr. Morant of a fair trial.

20        So, for example, the agreement which all of them

21   are party to, to withhold the exculpatory and impeaching

22   prior statements, that alone is enough to show -- to prove

23   a civil rights conspiracy and that alone would prove an

24   unfair trial and be a path to full damages.

25        THE COURT:  So, on that point, if Sweeney's the

1       only one who knows about the prior inconsistent statements

2       until very late in the post-trial proceedings or even, you

3       know, this litigation, how is it that the others could be

4       involved in a conspiracy to withhold the prior

5       inconsistent statements?

6                   MS. BENVENUTTI HOFFMANN:  Well, they know

7       separate things.  So, Sweeney knows about the original

8       statements from Ruiz but he's not involved in the

9       subsequent interviews.  For example, Maher is the one

10      who's there and Roque and Morant and it's both the

11      inconsistent statements but it's also the evidence, you

12      know, suppressing and falsely representing to the

13      prosecutor about the evidence of the improper tactics that

14      were used.

15                  And I think for both Roque and Morant it's more

16      falsely representing than it is suppressing because Roque

17      does testify about it and Mr. Morant obviously knows what

18      happened.

19                  But -- and then there's the Cardwell they all

20      know about that, anybody who's been updated on the

21      investigation, so it may not -- I don't know whether

22      Sweeney did or not, but the other people involved in the

23      investigation all know, including the supervisors, and

24      there is, the evidence is -- this is another thing where

25      there -- you know, there are different accounts and

1    obviously on defendant's motion everything has to be

2    interpreted in the light most favorable to the plaintiff,

3    but what Sweeney says is that Lawlor was the supervisor on

4    this case.  He says that's why he went to Lawlor with this

5    warning because Lawlor was the one who could take Raucci

6    off of this case because Lawlor was the supervisor on this

7    case.

8            And so -- so, anyway, there's different pieces

9    that they would all know, but I think this also has echos

10   of the same evidence that goes to the *Monell* claim on the

11   "blue wall of silence" and on this understanding that you

12   don't, you know, don't give the defense attorney

13   information that's going to help them, and I think

14   there's -- there is this tacit understanding and

15   agreement.

16           You don't have to -- I mean that's more than we

17   have to prove here because all we have to prove is a tacit

18   understanding between the co-conspirators and I think this

19   is a general part of you can have different parts of a

20   conspiracy and they don't all have to know what each

21   other's doing, they just have to be linked together and

22   they have to be -- there has to be an overt act by

23   someone.

24           There's plenty of overt acts here and there has

25   to be, you know, acting in concert towards inflicting this

1      unconstitutional injury.  And, again, the unconstitutional

2      injury here could just be depriving of a fair trial.

3              So there's lots of things going on, but I think

4      there's ample evidence from which a jury can conclude each

5      of the -- I think we've had this on everybody -- Raucci,

6      Maher, Sweeney and Lawlor, were all acting, at least

7      reached a tacit agreement to deprive Mr. Morant of a fair

8      trial.

9              THE COURT:  Okay.  Please respond to defense

10     counsel's argument that Judge Haight found that if Sweeney

11     made the remark to Lawlor it was sort of an off-hand

12     remark and defense counsel argues then that's a basis for

13     qualified immunity on the *Brady* claim.

14             MS. BENVENUTTI HOFFMANN:  So, first, I don't

15     think that that's what Judge Haight found, but I also

16     think that at this stage the ultimate factual findings are

17     for the jury and so it's, again, everything has to be

18     interpreted in the light most favorable to the plaintiff

19     including all inferences and, frankly, have to be

20     interpreted motion by motion because we don't know what

21     the jury's going to ultimately decide and so, you know,

22     they could find that it was Lawlor who was the supervisor.

23     They could find as Lawlor claims it was actually Sweeney

24     who was the supervisor and, therefore, there -- you know,

25     who had an ultimate obligation to this, you know, take

1    action at some point.

2         So all of those things have to be interpreted in

3    our favor and it is crystal clear that the jury can choose

4    to believe some part of what someone says and disbelieve

5    another part and so the fact that, you know, Lawlor says,

6    I knew everything that I was supposed to do and it should

7    of been the end of the case if I received this warning.

8    The jury can believe, yes, that is true, he understood

9    that and, you know, he would of taken these actions and

10   brought it up the chain of command and all of these things

11   and also believed Sweeney when he says he actually made

12   the warning.

13        And I would point to -- we had a very similar

14   situation in another case against New Haven, right?

15        *Johnson*, *Bobby Johnson* case where it was

16   different, slightly different time period, different set

17   of actors, but it was the same sort of thing with a

18   supervisor where there was -- one supervisor said, I deny

19   I ever got this warning, but if I got the warning I would

20   of raised it to somebody else.  And so we said, you know,

21   the jury can credit that actually he did get it and then

22   this is what happened, he raised and we survived summary

23   judgment on that exact theory and then the case ultimately

24   resolved and did not go to trial.

25        But I think that that's crystal clear, the jury

1    has the right to do that so then the Court must take the

2    light -- the evidence in that light on summary judgment.

3            THE COURT:  Okay.  On the fabrication of evidence

4    claim, Judge Chatigny does a good job of helping me

5    understand what you need -- what a plaintiff needs to

6    prove.  The plaintiff needs to prove that the police

7    officer knew the statement was false when it was obtained.

8            So, what is the evidence that Maher knew Roque's

9    statement was false when it was obtained?

10           MS. BENVENUTTI HOFFMANN:  So, I would say the

11   elements of a fabrication claim and I would draw this from

12   *Kee v. City of New York* which is 12 F.4th 150 and the

13   pincite is 168, that's from the Second Circuit 2021 and

14   also *Ashley v. City of New York* and that's 992 F.3d 128,

15   pincite is 143, that's also from 2021, is essentially just

16   that you create -- you knowingly agree, create false

17   information, you forward it to a prosecutor, that

18   information is likely to influence a jury's decision and

19   the plaintiff suffers a, you know, deprivation of liberty

20   as a result.

21           So, first of all, I think there is evidence from

22   which the jury could find that Maher knew both that

23   Morant's statement and Roque's statement were completely

24   false because they both say, they said, This is false.

25   I'm only giving this in response to threats and you're

1   telling me what to say and I don't know anything.

2           THE COURT:  But they say that later, not at the

3   time of the statements.

4           MS. BENVENUTTI HOFFMANN:  No, this is their

5   description of what happened during the interrogation that

6   he was present for.  So their description of what actually

7   happens is, which is also corroborated again by Stefon

8   Morant and Scott Lewis' actual innocence.

9           What -- the statements that the police took are

10  completely false.  These witnesses did not have any of

11  this information.  They also match each other so -- and

12  the witnesses don't know each other.

13          THE COURT:  Right, but it's not about whether --

14  you know, I credit the argument that the statements were

15  false but here we're on to the question of whether the

16  defendants knew the statements were false.

17          MS. BENVENUTTI HOFFMANN:  Right.  What I'm saying

18  is what they've testified to now about what happened

19  during the interrogations is that they -- basically, the

20  same thing that happened with Ruiz, that Sweeney came out

21  of saying Raucci's trying to fabricate a statement, he

22  doesn't know this, I'm satisfied he doesn't actually know

23  anything, he's only repeating back the things that Raucci

24  is saying.

25          That exact same course of conduct happened again.

1    Raucci did the exact same thing.  He did it with Roque and

2    then he did it with Stefon Morant.

3            And so what they're describing about what

4    happened in the circumstances that Maher witnessed, is the

5    exact same thing that led Sweeney to say, I think this is

6    a false statement.  You're trying to create a false

7    statement.

8            But, beyond that -- so I think that there is

9    evidence that they knew the entire statement was false,

10   but beyond that it doesn't have to be that the whole

11   statement is false, is that they're making a

12   representation that it's false.

13           So the representation, in and of itself, but both

14   in terms of the representation to the prosecutor, you

15   know, vouching for not just that the statement was given

16   but that it was volunteered, without coercion, that it was

17   a tape that was complete without stops, there wasn't the

18   stops and starts.  All of that about how the statement was

19   created, which is evidence that goes to anyone assessing

20   the reliability of that statement, those are things that

21   there is no question that Maher had personal knowledge of

22   and they were false.

23           So he is making representations at the time that

24   these statements are reliable, that the tapes did not have

25   any stops in them, that the information came from the

1    witnesses, not wasn't fed to them by the police.  And

2    those are things, there's no question, you know, on the

3    evidence that we have presented that were false and he

4    knew were false.

5         THE COURT:  And where in the record can I find

6    the evidence that Maher forwarded this information to the

7    prosecution, because for the malicious prosecution claim

8    you cite to cases that say in order to initiate the

9    prosecution, the officer has to forward the information to

10   the prosecutor.

11        And so, given Maher's role on this case, did he

12   do that or where is there evidence that he did?

13        MS. BENVENUTTI HOFFMANN:  Well, it's also if you

14   make specific representations yourself to the prosecutor.

15   So that's part of what we're saying is representing that,

16   this evidence, you know, vouching for this evidence and

17   that it was created in a reliable manner and the

18   information was volunteered by the witnesses, all of those

19   things.

20        If you make false -- if you -- that is the

21   providing fabricated evidence to the prosecution and that

22   in and of itself is a basis also for finding initiation

23   under malicious prosecution is if you're providing

24   fabricated evidence.

25        And then there's separately there's no question

1    he's the one who wrote and the report falsely eliminating

2    Cardwell which was a separate, you know, glaring issue in

3    the investigation and was something that the prosecution

4    specifically relied on in saying, you know, here's a

5    reason to think that this, that this is a bona fide

6    prosecution because there are no other viable suspects.

7        THE COURT:  So where in the record can I find

8    what you're referencing about Maher making representations

9    to the prosecutor that this was all kosher and true?

10        MS. BENVENUTTI HOFFMANN:  So, I see that we have,

11   for example --

12        I'm sorry?

13        (Off-the-record discussion among plaintiff's

14   counsel.)

15        MS. BENVENUTTI HOFFMANN:  So there's both things

16   that are reported on the reports in the police file and

17   then there's also, I'm looking at Paragraph 206, which is

18   discussing testimony from the Prosecutor Gold about, you

19   know, what he understood, what was represented to him by

20   the police, and also a description of some of Maher's

21   testimony at the time which was, again, describing how

22   he's vouching for the process by which these statements

23   were created and falsely -- again, falsely vouching,

24   saying that it was, the claims that are being made, that

25   these statements were fabricated, they're told what to say

 1    or anything are not true.

 2            THE COURT:  Okay.  All right.  So, in your view,

 3    there's at least questions of fact about whether Maher

 4    played -- made representations such that he could be

 5    responsible for initiating the prosecution?

 6            MS. BENVENUTTI HOFFMANN:  Yes.

 7            THE COURT:  All right.

 8            MS. BENVENUTTI HOFFMANN:  And that's for the

 9    malicious prosecution.  That's separate from the

10    fabrication based on the same evidence, but that there's

11    no requirement for that on the fabrication.

12            THE COURT:  Yes, understood.

13            With respect to Count V, the coerced statement of

14    Mr. Morant.  The briefing sort of lumps Maher and Raucci's

15    actions together and a similar question of what I asked

16    defense counsel, but what did Maher do or say during the

17    Morant interview that makes a jury issue about Maher's

18    conduct specifically?

19            MS. BENVENUTTI HOFFMANN:  So, I don't think it is

20    clear honestly exactly what he said versus what Raucci

21    said.  At least, you know, Mr. Morant does not remember

22    specifically who said what.  Again, Maher says that he

23    was, at least at the time of the criminal prosecution, he

24    says he's present for the whole thing and he can, you

25    know, vouch for it being fine, kosher.

 1          So there's evidence that he's present and

 2    participating.  There's evidence that he's lying about

 3    what happened.  I think it is a -- it has to be one of the

 4    two of them making any of the statements and I think that

 5    it is a question of fact.  They will probably both deny

 6    that they made them, but I think it is a question of fact

 7    as to who said what.

 8          But even if Maher's present, and I think that

 9    there's a question as to if he's participating along with

10    Raucci and he's not doing anything to stop it.  I think

11    that that's -- I mean, it's certainly failure to

12    intervene, but I think that the jury could find that he's

13    cooperating and part of that and also responsible for the

14    coercion.

15          So, I think that you could have both, even if he

16    didn't speak the words when he's, you know, acting

17    together and cooperating with Raucci as part of that

18    interrogation.

19          THE COURT:  And there are at least factual

20    disputes about what happened in that room that can't be

21    resolved on summary judgment?

22          MS. BENVENUTTI HOFFMANN:  There are certainly

23    factual disputes.  It will be up to the jury to decide

24    exactly who made which threats or, you know, on the

25    defendant's side whether they were made, but...

 1          THE COURT:  Yeah, okay.

 2          On Maher and Lawlor's qualified immunity argument

 3    and really all the individual defendants qualified

 4    immunity arguments, they use a standard which they say is

 5    regarding witness interviews but seems to relate mostly to

 6    coerced statements of substantive due process and they

 7    say -- I'll point you to the place in the brief because I

 8    see your...

 9          MS. BENVENUTTI HOFFMANN:  Whose brief is this?

10    Is this --

11          THE COURT:  We're on Maher Lawlor, so it's ECF

12    134-1.

13          And look at the ECF header, Page 28 of 32, about

14    midway through the page.

15          This is the legal standard that every individual

16    defendant uses.  They say "with respect to qualified

17    immunity in the context of interviewing witnesses, the

18    methods used must be so shocking, brutal and inhumane that

19    every reasonable police officer would be compelled to

20    recognize that they violated substantive due process."

21          And in reading some of the cases on this, there

22    are two different types of claims a plaintiff can make

23    with respect to a coerced statement.  One is that it

24    violated the person's Fifth Amendment right against

25    self-incrimination and then separately that it violated

1    substantive due process.

2         It seems like the distinction occurs in those

3    cases where the statement is not actually introduced at

4    the trial and so it wouldn't be in violation of the

5    plaintiff's Fifth Amendment right against

6    self-incrimination.  So, then the plaintiff brings this

7    back up, substantive due process claim.

8         That's what happened in the *Mara* case that this

9    language is taken from, but I was confused by the

10   reference to a substantive due process standard here and I

11   wanted to understand if plaintiffs [sic] are pursuing a

12   substantive due process standard and if not, what is the

13   standard by which the qualified immunity question should

14   be judged for a coerced statement from Mr. Morant?

15        MS. BENVENUTTI HOFFMANN:  So I agree with the

16   Court that is definitely not the appropriate standard or

17   context.  I think the two cases that I would direct the

18   Court to, one of which is *Weaver v. Brenner* and it's

19   40 F.3d 527 and the discussion is around 533 to 37 of this

20   issue about both the coercion and the -- and actually

21   deny -- that's a case from 1994 and it denied qualified

22   immunity on a coerced confession claim that arose in --

23   the underlying conduct was from 1989.

24        And, so, it's the basic test about whether under

25   the totality of the circumstances the defendant's will was

1    overborne and then whether that -- so that's the coercion

2    test -- and then whether the defendants caused a coerced

3    statement to be used against the defendant in a criminal

4    proceeding.

5          And so you look at -- it's the same thing you

6    would do, generally, if you were looking to suppress a

7    statement in a criminal, criminal proceedings.  So, it's

8    looking at the totality of the circumstances, including

9    the circumstances of the defendant, the circumstances of

10   the interrogation, the coercive tactics used, you know,

11   whether there's threats, whether there's false promises of

12   leniency, things like that.

13         So that's one example, but then I would also

14   direct the Court to there's a very recent decision that

15   was issued by the Second Circuit since we did our briefing

16   and that's *Ortiz v. Stambach*, and that's, the cite for

17   that is 137 F.4th, 48 and that's from this year from the

18   Second Circuit and I believe the key portion of that

19   decision is at 67 and 68 and that's affirming a jury

20   verdict on a coerced confession claim.

21         In that case, the evidence of coercion was --

22   actually, it's a unique circumstance in that case because

23   the criminal defendant now plaintiff did not have any

24   memory of what happened during the interrogation and so

25   there was no direct evidence to contradict the officer's

1     testimony that it was all fine and nothing happened.

2          But there's evidence of innocence, there's

3     evidence of all sorts of other things that indicate that

4     the -- that what the officer claimed did not make any

5     sense and that the statement could only have been the

6     product of coercion and the jury found for the plaintiff

7     and the Second Circuit affirmed and said that there was

8     sufficient evidence.  It was a jury question, and there

9     was sufficient evidence despite the defendant's denial

10    that anything wrong had happened under the circumstances

11    to find that actually not only was with statement

12    fabricated, meaning the officer falsely represented what

13    happened and fed him information and everything else, but

14    also that it was coerced.

15          THE COURT:  Okay.  I appreciate that.  Thank you

16    for pointing me to those cases.

17          Generally speaking in your -- for your qualified

18    immunity arguments, the argument seems to be that the

19    questions of fact that you think exist on all the

20    substantive claims also preclude finding qualified

21    immunity at this stage, right?

22          Are there any instances in which you're saying

23    even -- that the facts are undisputed or the facts taken

24    in the light most favorable to the plaintiff still

25    wouldn't establish qualified immunity?

1          MS. BENVENUTTI HOFFMANN:  I think -- so, I will

2     say, I don't think there's any dispute -- I hope this

3     answer's the Court's question.

4          I don't think there's any dispute that each of

5     these -- on our version of the facts the, what we're

6     describing is a clearly established constitutional

7     violation.  So, I don't think there's been any argument by

8     anyone and there can't be under the Second Circuit law

9     that if the defendants, you know, knowingly fabricated

10    evidence, if they intentionally or, you know, even with

11    deliberate indifference suppressed exculpatory evidence,

12    if they coerced a statement, any of these things that

13    there's no qualified immunity.

14         The arguments that we're responding to from the

15    defendants are simply, I didn't do that.  That didn't

16    happen.

17         THE COURT:  Yeah.

18         MS. BENVENUTTI HOFFMANN:  Which, of course, are

19    not appropriate on summary judgment, but also -- so, to

20    that extent, I think the only disputes about qualified

21    immunity are about what actually happened.

22         I don't believe that there are any disputes about

23    what we allege and what we, you know, our evidence shows.

24    If that's the case, they would not be entitled to

25    qualified immunity.

1            I'm happy to, you know, point the Court to case

2      law.  We have some of it in our brief making clear that

3      all of these things have been clearly established

4      constitutional violations well before this case and there

5      are a number of cases from the Second Circuit, you know,

6      affirming jury verdicts again on this same sort of

7      misconduct that happened, you know, in the '80s before

8      this case.

9            THE COURT:  But for purposes of what I need to

10     decide on summary judgment, if there are factual disputes,

11     that's enough to say -- that's all I would have to say for

12     now, correct?

13           MS. BENVENUTTI HOFFMANN:  Yes.  Yes.

14           THE COURT:  And then the question of, you know,

15     what the jury eventually finds, because if the jury finds

16     all the facts in plaintiff's favor, then you would say no

17     qualified immunity because these rights were clearly

18     established?

19           MS. BENVENUTTI HOFFMANN:  Right.  And, again, my

20     understanding is that the defendants agreed to that.  They

21     dispute the facts, but I don't believe anybody has

22     disputed, and they certainly didn't in their papers, that

23     if you found what we're saying the facts established that

24     there would not be qualified immunity.

25           THE COURT:  I think Defendant Sweeney makes one

1    argument about that, but we'll get to that --

2            MS. BENVENUTTI HOFFMANN:  Okay.

3            THE COURT:  -- when we get to his motion about a

4    constitutional right to documentation basically.

5            MS. BENVENUTTI HOFFMANN:  Okay.

6            THE COURT:  So we can talk about that later

7    though.

8            For Lawlor on failure to intervene, is the

9    argument that if Sweeney told him about what was going on

10    with Raucci that he should of stepped in and prevented

11    Raucci from further interviewing Mr. Ruiz?

12           MS. BENVENUTTI HOFFMANN:  So, certainly, and

13    again, based on Lawlor's own admission, if Lawlor says, If

14    I was told this, this should of been the end of the case.

15           So there are disputes of fact as to whether he's

16    the supervisor, whether he's told this, but he himself

17    admits, yes, he should of taken -- if he was actually the

18    supervisor, if he was told this, he should of taken action

19    right then.  He just disputes that that happened.

20           I think that there's -- so that's one way.  I

21    think there's also other evidence.  Again, we talked about

22    before about Lawlor's knowledge of what's happening in as,

23    you know, if you credit that he's the supervisor and he's

24    involved and there's other evidence of his involvement

25    throughout the case in other ways.  I believe he

1    participated in the interview of Mr. Lewis, at one point

2    he signs on another.

3         So there's other evidence that he is actually the

4    person who's around and participating in this

5    investigation, but if you credit that he was otherwise

6    made aware through his supervision and through being in

7    the loop about what's happening in the investigation,

8    there could of been other opportunities to intercede as

9    well.

10        THE COURT:  Okay.  All right.  Anything more on

11   the Lawlor, Maher motion?

12        MS. BENVENUTTI HOFFMANN:  I don't think so.

13        THE COURT:  Okay.  Any rebuttal?  No.

14        Okay.  I know -- I know we're, we've been going

15   for a long time.  I understand, but I'm finding the

16   argument very helpful I will say.

17        So, next step is Raucci's motion.

18        MR. TALLBERG:  One more, yes, if I may?

19        Your Honor, before you ask a question, may I just

20   make one correction for the record with regard to the

21   *Horn, Jackson* ruling that Judge Chatigny issued?

22        In our motion for summary judgment, August 14,

23   last year, Docket No. 135 at Page 15 we cited to Judge

24   Chatigny's decision that we were very excited about, not

25   realizing that eight days prior he had made a docket

1    entry.  You wouldn't find that on Westlaw but on

2    reconsideration, which the local rules frown upon, he

3    granted one of those and so we failed to note that in the

4    record because we didn't know about it, but we can't rely

5    on that.

6              THE COURT:  Okay.  And what was the holding he

7    reconsidered?

8              MR. TALLBERG:  It was with regard to what he

9    reversed on is he had granted summary judgment on the

10   fabrication claims for certain individuals and I believe

11   plaintiffs' counsel persuaded him that upon a

12   reexamination of the record there was enough evidence in

13   that record for that to proceed.

14             THE COURT:  Okay.  Thanks for the clarification.

15             MR. TALLBERG:  And plaintiff cited that in their

16   reply.

17             THE COURT:  Got it.

18             MR. TALLBERG:  They got it right, we didn't.

19             THE COURT:  All right.  So let's start with

20   malicious prosecution.  The argument you make there is the

21   *Thompson, Heck* argument that we've heard from Attorney

22   Gerarde on.  Do you want to elaborate on that argument at

23   all?

24             MR. TALLBERG:  On that I think my learned

25   colleague Attorney Gerarde adequately addressed that

1    better than I probably could and so, I think I will leave

2    that to him.

3           The only thing I would say is there's not

4    unanimity in the circuits and Your Honor cited I think a

5    Sixth Circuit decision which I think that was an en banc

6    hearing.  At first they didn't have a rule in the Sixth

7    Circuit that a pardon might qualify as favorable

8    termination, so it's not been plain or squarely addressed

9    in the Second Circuit other than at the district court

10    level.  I think it's an open question how the Supreme

11    Court would address it and I think my colleague Gerarde

12    has laid the record.  Hopefully, we wouldn't have to get

13    to that point, but I think it's an open question in the

14    Second Circuit.

15           THE COURT:  Okay.  All right.

16           Count II conspiracy.  Couldn't a reasonable jury,

17    based on all that we've been talking about here, infer

18    that there was, at the very least, a conspiracy between

19    Raucci and Maher to coerce the statement from Mr. Morant

20    and fabricate the evidence from Mr. Roque?

21           MR. TALLBERG:  No.  My response to that, Your

22    Honor is, Your Honor had indicated an openness to consider

23    maybe at least some of the reasoning of Judge Haight's

24    decision in the *Lewis* case that was affirmed by the Second

25    Circuit.

1          I would instead implore you to start your

2    analysis and be guided by Judge Blue's decision in 1999

3    which is summary judgment Exhibit 26 in our briefing in

4    which Judge Blue, at an evidentiary hearing, a de novo

5    review in a habeas proceeding examined all the evidence,

6    heard all the witnesses and concluded that this conspiracy

7    theory, if you were to believe it, you would have to

8    assume that -- you'd have to conclude that Ruiz's Attorney

9    Moscowitz was a member of the conspiracy.

10          We've heard here, in response to Your Honor's

11    questions, that you could infer a tacit conspiracy.  You

12    don't have to infer anything.

13          Look at their allegations in addition to the

14    paragraphs that Attorney Gerarde cited about the

15    intentional nature of the alleged acts.  Paragraphs 42

16    through 47 in the complaint outline a conspiracy that's so

17    outlandish it's just patently absurd that Detective Raucci

18    was a member of a drug organization and that he concocted

19    this whole plan because he was upset that Mr. Lewis had

20    decided he was going to get out of the drug trade and so

21    they concocted this plan to conspire and frame him and

22    Mr. Morant for these murders.

23          Judge Blue went through that and in great detail

24    and described Ovil Ruiz's various recantations as, quote,

25    an undocumented work of fiction.

1          He described the likelihood that Raucci conspired

2     with Ruiz to implicate Morant for the murder, Judge Blue

3     said, quote, the likelihood of this hypothesis is

4     microscopic.

5          And, so, I think while that may not have

6     preclusive effect, Your Honor, it certainly should have

7     some persuasive authority in your analysis of the facts,

8     the allegations, as we try to piece together what happened

9     35 years ago.

10          Excuse me, my -- I'm a little hoarse today.

11          THE COURT:  All right.  So that I think brings me

12     to a question about your reliance on the habeas decisions

13     which were unfavorable to Mr. Morant and I read your brief

14     as arguing that he can't bring, for instance, a *Brady*

15     claim under Section 1983 because the habeas courts

16     previously rejected that claim.

17          But, as plaintiffs [sic] point out, there's no

18     legal authority in that section of your brief and I

19     wonder, are you trying -- what are you trying to make

20     that, what are you trying to say there and what legal

21     doctrine supports the idea that the habeas decisions have

22     effectively preclusive effect on his 1983 claim?

23          MR. TALLBERG:  Again, what I just said.  I don't

24     have authority.  I wish I did for the proposition that

25     those habeas decisions have preclusive effect.  They are

1    certainly, I think, persuasive authority that could help

2    guide your determination and conclude that based on the

3    facts Detective Raucci would be entitled to summary

4    judgment.

5          THE COURT:  Wouldn't I effectively, if I did

6    that, be sitting as a trier of fact crediting what Judge

7    Blue found over maybe what Judge Haight found and that's

8    not the Court's role on summary judgment, right?

9          MR. TALLBERG:  It is a complicated situation,

10   Your Honor, where we have credibility determinations that

11   were made by Judge Blue and you're not bound by those, but

12   I'd simply suggest there's something --

13         THE COURT:  Well, in fact I can't.  I can't do

14   anything on credibility at summary judgment.  That's

15   pretty fundamental.

16         MR. TALLBERG:  Well, when you look at the

17   totality of all of the circumstances and the facts, Your

18   Honor, that analysis by Judge Blue seemed quite cogent and

19   one that we'd urge your consideration.

20         THE COURT:  Okay.  I understand your -- the

21   limits of your proposition here.

22         You make an argument which I think Mr. Sweeney

23   does as well, that Raucci didn't have the requisite mental

24   state for a *Brady* violation.  I talked about this a little

25   bit with your colleague and plaintiff's counsel.

1          In your view, does the Second Circuit require an

2    intentional withholding or is deliberate indifference

3    sufficient for *Brady*?

4          MR. TALLBERG:  Yeah, I mean, I think as argued in

5    our brief that was my understanding.  I thought that's how

6    Judge Chatigny had looked at it, as you indicated as quite

7    helpful to you.

8          And the facts here are that Raucci didn't know

9    Morant, didn't know him at all.  I think that's

10   undisputed.  So, how could he possibly have some bias or

11   ill intent to frame him unless you believe this absolutely

12   fantastic tale that Detective Raucci was the devil

13   incarnate and he was acting on behalf of another drug

14   dealer.  And there's no evidence to support that rumor,

15   innuendo -- no credible or, excuse me, no admissible

16   direct evidence of that other than the character

17   assassination that Detective Raucci's had gone through.

18         I'd be remiss if I didn't note, Your Honor, that

19   the FBI investigated Detective Raucci for 18 months,

20   multiple interviews and didn't even bring a charge, didn't

21   seek an indictment.  He's never been convicted of

22   anything.

23         So while they, plaintiff seeks to impugn his

24   character and make these allegations, they're nothing more

25   than allegations.

1          THE COURT:  Okay.  With respect to the allegedly

2     coerced statement of Mr. Morant, you're citing in your

3     brief to cases involving deception by the interrogators or

4     psychological ploys, and what plaintiff's version of the

5     facts is, is that they were actual threats, you know,

6     beyond deception, threats about the death penalty and

7     otherwise.

8          Why wouldn't there be questions of fact at the

9     very least about what happened in that interview and

10    whether any threats were made and if so, what effect the

11    threats had on the statement Mr. Morant eventually gave?

12         MR. TALLBERG:  Yeah, I think it's undisputed that

13    he, Mr. Morant wasn't at the station long that night on

14    January --

15         THE COURT:  14th?

16         MR. TALLBERG:  Yes.  I think he was

17    January 16, 1991.  He had been picked up on the street.  I

18    think he acknowledged at his deposition there were no

19    physical threats, he was never assaulted, wasn't deprived

20    food, sleep, anything that shocking to the conscience.

21         And it's well recognized that law enforcement

22    officials can use some level of deception to try to elicit

23    information from people they suspect may have committed a

24    crime or a murder, and I don't think this one goes

25    anywhere beyond that.

1          I -- the most significant allegation is that he

2     may have been threatened that, and we dispute this, that

3     he might face the death penalty.  That might be a

4     statement of fact.

5          THE COURT:  But we're not in the land of

6     deception, we're in the land of whether that overtook his

7     will under the cases that plaintiff is citing.

8          So, why wouldn't that be a question for the jury

9     to determine whether the threat of the death penalty was

10    something that made Mr. Morant effectively collapse and

11    give the statement that he gave?

12         MR. TALLBERG:  Well, I think, you know, we --

13    unfortunately, the audio of that recording, which is

14    available, it's in the record for the parties.  I learned

15    this morning apparently it's not in the record before Your

16    Honor.  The transcript of the interview is submitted.

17         Judge Blue does describe listening to the audio

18    and his description, again, this is why I go back to it

19    because it's so insightful, that Mr. Morant seemed matter

20    of fact, didn't seem like he's prompted.  He's describing

21    things without -- he's correcting the detectives on

22    certain facts.

23         And so our argument is, quite frankly, as we've

24    laid out in the briefs, Your Honor, that it doesn't rise

25    to that level that it could give the jury the right to

 1    find a constitutional violation.

 2              THE COURT:  Okay.  Let me pose the same question

 3    that I had posed to plaintiff's counsel about the

 4    substantive due process standard that's cited in the brief

 5    as the prevailing standard for whether a statement is

 6    coerced.

 7              Tell me why that's the right standard to be

 8    applying here.

 9              MR. TALLBERG:  Yeah, I -- I'm sorry, Your Honor,

10    I don't really have more to add on that beyond the briefs.

11    I know this is, you know, an unsettled question as my

12    understanding and so you really got me there.  I don't

13    have much more to offer on that one.

14              THE COURT:  Okay.  Testimonial immunity.  Do you

15    agree that -- well, let me start here.  It doesn't appear

16    that any of plaintiff's claims are based on any testimony

17    given by Mr. Raucci, right?

18              MR. TALLBERG:  I'm not so sure about that.  I'd

19    love that stipulated if we get to a trial, that they're

20    not seeking to hold any of his testimony, hold him liable

21    for that.  It seemed to me that, especially when reading

22    the *Birch* decision where that was a big issue, it's not

23    something we wanted to waive.

24              You would think that if the allegation is he

25    engaged in misconduct and then reinforced that by

1    testifying at a habeas proceeding and at trial that it's a

2    defense we certainly don't want to waive and I think it's

3    going to be hard for the jury to understand that they

4    can't consider those issues, his testimony at trial and

5    the habeas proceeding, which really are inextricably

6    linked with the underlying conduct they're alleging.

7         And so, no, I simply didn't want to waive that

8    and, you know, it's not clear to me from the complaint.

9    They do reference, I think, his testimony or the trials.

10        THE COURT:  But insofar as they allege, for

11   instance, that Raucci fabricated evidence, that's based on

12   actions not on testimony, correct?

13        MR. TALLBERG:  Oh, I understand that won't

14   protect him for the pre-trial conduct.  I'm totally with

15   you on that.  I just wanted to protect the record that if

16   we get to trial and there are claims that his testimony is

17   actionable, he's protected by immunity.

18        THE COURT:  Okay.  Understood.

19        All right.  That covers my questions for you.

20   Thank you.  Anything further you wish to add on any other

21   points?

22        MR. TALLBERG:  Yeah, if I could add one thing

23   about the negligence.  And plaintiff, in their opposition

24   at Page 59, cited a handful of district court decisions

25   *Ramos v. East Hartford*, *Olschafskie v. Enfield, Ravalese*

1    for the proposition that a plaintiff pursuing a civil

2    rights violation could pursue the constitutional claim and

3    also a negligence claim and Judge Bolden I'll recognize

4    allowed that in the case that was tried earlier this year,

5    but I have familiarity with those cases and *Ramos*,

6    *Olschafskie* both involved tasers.

7         You could understand or at least I could

8    understand a district court judge allowing, you have a use

9    of force case and you have a scrum where officers are

10   grappling and a decision is to go to a taser versus hands

11   on and so the plaintiff might be allowed to pursue a

12   Fourth Amendment use of force claim and also negligence in

13   the alternative.  That's what those cases stand for, the

14   proposition for.

15        But here, again, it's not whether Detective

16   Raucci negligently did something.  Their allegation is he

17   was engaged in this absurd criminal conspiracy, and it

18   just seems to me that they ought not be allowed to proceed

19   on these two alternate theories setting aside even the

20   statute of limitations, statute of repose argument my

21   colleague has made.

22        And so I just simply wanted to distinguish those

23   cases that are relied on by plaintiff.  I don't think they

24   can have it both ways, Your Honor.  This is not a

25   run-of-the-mill garden variety use of force case like

1    *Ramos*, *Olschafskie*, *Ravalese*.

2          They're alleging this, you know, extended

3    conspiracy with fraudulent intentional misconduct.  How

4    could that in any universe be negligent?

5          THE COURT:  Okay.  I understand your point.  I

6    think it's a better argument for a jury.

7          MR. TALLBERG:  And with all that, Your Honor, we

8    respectfully request you grant summary judgment for

9    Detective Raucci.

10          THE COURT:  All right.  Thank you.

11          Plaintiff's counsel, okay, let me start with

12    malicious prosecution.

13          Mr. Raucci argues that he had an arrest warrant

14    and the arrest warrant at the very least gave him arguable

15    probable cause to proceed with this prosecution.  I don't

16    really see this argument addressed in your briefing.

17          Tell me if I missed it.

18          First of all, did I miss a responsive argument in

19    your briefing?

20          MS. BENVENUTTI HOFFMANN:  I honestly can't

21    remember if we specifically responded but I am happy to

22    respond to it now.

23          THE COURT:  Okay.  All right.  And he also -- he

24    sort of feeds you the *Franks v. Delaware* exception which

25    is that if the warrant affidavit itself contains false

1    statements then the Court goes through the exercise of

2    figuring out whether probable cause would still have

3    existed in the absence of the false statements but, again,

4    not an argument I see in your brief, so go ahead and

5    respond now.

6            MS. BENVENUTTI HOFFMANN:  So, I think -- so,

7    there is a *Franks* issue but I think actually there's --

8    it's related, but it's not exactly the same the way that

9    the Courts tend to deal with this in malicious

10   prosecution, which is the presumption, any presumption of

11   probable cause, either by the arrest warrant or by the,

12   you know, I can't remember whether -- is it a grand jury

13   or a preliminary -- but you know, whatever decision about

14   probable cause that initiated the proceedings here is not

15   a bar to a malicious prosecution claim so long as there's

16   evidence of either fabrication or withholding exculpatory

17   evidence from those decision makers or there's specific

18   language, other ways of misleading, basically the --

19           THE COURT:  The neutral magistrate judge.

20           MS. BENVENUTTI HOFFMANN:  Exactly.  Exactly.

21           THE COURT:  Right.

22           MS. BENVENUTTI HOFFMANN:  And so in this case, in

23   this case where there's evidence for Raucci, in

24   particular, that literally every piece of the evidence

25   offered against Mr. Morant is fabricated, the exculpatory

1    evidence is withheld, everything that may be why we

2    weren't specifically -- we were saying just literally

3    everything is a jury can find false and fabricated,

4    there's not anywhere close to probable cause.

5            This is not a case where you can --

6            THE COURT:  The whole arrest warrants goes

7    poof --

8            MS. BENVENUTTI HOFFMANN:  Exactly.

9            THE COURT:  -- in your view?

10           MS. BENVENUTTI HOFFMANN:  There's nothing left.

11           THE COURT:  Okay.  And that's the same for

12   arguable probable cause?

13           MS. BENVENUTTI HOFFMANN:  Right.  This is not a

14   close case.

15           On the version of the facts that the jury could

16   credit in our favor, this is -- and to be clear, we do --

17   no, I believe that we actually do have ample evidence of

18   everything that we lay out in terms of the corruption and

19   everything else, the connection to drug dealers, but that

20   said, we don't have to actually prove that.  We just have

21   to prove the specifics about the misconduct in this case.

22           The motivation, you know, helps explain things

23   but that's not an element, that other personal motivation

24   is not an element of any of our claims.

25           THE COURT:  Okay.  On this issue of the effect,

1    if any, of the unfavorable habeas decisions, you cite to

2    *Henning* and you cite to *Rosario*.  Both of those cases

3    involved situations where the state habeas decisions or

4    the underlying state decisions in the criminal proceedings

5    were reversed on appeal and so both of the judges in those

6    cases said, of course they get no preclusive effect

7    because they don't stand anymore, the unfavorable

8    decisions.

9         Now, it sounds a little bit like Attorney

10   Tallberg is not withdrawing, but he's backing away from

11   the idea that the habeas decisions have any preclusive

12   effect here.  He's simply saying they should have some

13   persuasive effect on how the Court views the facts, but

14   let me have you elaborate on this issue of the import of

15   the unfavorable habeas decisions on plaintiff's 1983

16   claims in this litigation.

17        MS. BENVENUTTI HOFFMANN:  Sure.  And I believe,

18   if I remember correctly, *Rosario* actually is talking about

19   a situation where the conviction was vacated and they're

20   talking about other prior decisions that were made in the

21   course of those proceedings and therefore that those no

22   longer have any effect because the conviction has been

23   vacated not that the particular decision has been vacated.

24        THE COURT:  Okay.  So, in this sense, that would

25   be similar to what we have here.

1          MS. BENVENUTTI HOFFMANN:  Similar, yes.

2          I will say, as you pointed out, there was no law

3     cited in this section, so it was not clear to me exactly

4     what argument they were making.

5          If it is a collateral estoppel sort of argument,

6     which it sounds like it isn't, there are many reasons why,

7     I mean, why those decisions would not be binding including

8     the conviction has now been vacated.  It's also a, you

9     know, other changes in the circumstances.  There are

10    equitable doctrines, and so under the circumstances where

11    they're all based on an assumption that, as they have to

12    be in postconviction that, you know, a presumption

13    essentially in favor of the jury verdict against

14    Mr. Morant which has now been shown to be, he's now been

15    shown to be completely innocent as recognized by the

16    State.  There's all sorts of reasons why they don't have

17    any preclusive effect.

18          And I will say, as you noted, we do those cases,

19    you know, this is what we do.  We do these wrongful

20    conviction cases.  It is always the case, when somebody's

21    been in prison for 20 years for something they didn't do,

22    there are prior decisions by courts saying you're not

23    entitled to relief, a number of them, before you

24    ultimately get to whatever new evidence or whatever new

25    circumstance leads to the ultimate vacatur, so this comes

1    up all the time.

2            It is not a bar and even the defendants seem to

3    acknowledge that it's not a bar, they're just saying it

4    should have persuasive effect which obviously, as the

5    Court noted, it can't.  These are factual questions and

6    it's not even admissible in front of the jury.  In

7    general, prior judicial opinions are hearsay.  They're

8    not -- there's no exception under the rule, so it's not

9    even something the jury would learn about or that could be

10   used.

11           THE COURT:  Okay.  Is there any evidence in the

12   record that Raucci would of known about Ruiz's prior

13   inconsistent statements given to Sweeney?

14           MS. BENVENUTTI HOFFMANN:  Yes.  I mean,

15   they're -- at least he would of known about some of it,

16   maybe not all of them because there are some things that

17   Sweeney -- there are conversations that Sweeney has with

18   Ruiz outside of Raucci's presence, but there are other

19   conversations that they all have together and then there's

20   also separate conversations that Raucci has with Ruiz and

21   so there's -- there is lots of other evidence that Raucci

22   would have about the problems with, you know, Ruiz's

23   statements apart from what Sweeney is the only witness to.

24           THE COURT:  Okay.  And certainly there's

25   evidence, according to Sweeney, that he told Raucci to

1    knock it off.

2            MS. BENVENUTTI HOFFMANN:  Yes, and, specifically,

3    yes, you can't take the statement, I know this is not

4    true, he was not the driver, right, that this is not true.

5    I'm not going to let you take this statement.  And Raucci

6    complied for that night and took a different false

7    statement, but then he came back and said the exact -- you

8    know, took a statement three months later, four months

9    later, however many months later, that was exactly the

10   same thing as Sweeney had specifically warned him this is

11   not true, this is a false statement.  And Raucci took that

12   again.

13           THE COURT:  So, when Sweeney effectively tells

14   Raucci you can't take the statement because it's not true,

15   could the jury infer then that the reason -- that Raucci

16   would of known the statement was not true because Ruiz

17   told Sweeney that he knew nothing about it?

18           MS. BENVENUTTI HOFFMANN:  Yes, but I think also

19   the jury can find based on, you know, Ruiz's account of

20   what happened that there's lots of ways that Raucci knew

21   this wasn't true.

22           I mean separately there's other statements and I

23   can't remember is this from Ortiz, one of the other

24   witnesses that testifies about a fabricated statement,

25   that Raucci specifically said, admitted to him, I'm trying

1       to prosecute somebody for something he didn't do.  I need

2       your help with this prosecution.  I mean, so there's all

3       sorts of evidence --

4               It was Ortiz, right?

5               (Off-the-record discussion among plaintiff's

6       counsel.)

7               MS. BENVENUTTI HOFFMANN:  And same with Ruiz.

8               There's all sorts of evidence that Raucci knew

9       exactly that there was no basis for this, that everything

10      he was doing was false from the beginning.

11              And, again, just the course of conduct, if you

12      look at it, you know, especially in light of the fact that

13      we now know and the jury can certainly find and credit, as

14      the State of Connecticut has, that Stefon Morant and Scott

15      Lewis are completely innocent, this is not what happened.

16              You have three statements that match each other

17      completely on successive days, exactly the same false

18      statements, and they're statements that Scott Lewis made

19      this admission of guilt to these separate people and that

20      they supposedly saw -- oh, we haven't even talked about

21      this -- that they supposedly saw Scott Lewis throwing a

22      gun into the river from a basketball --

23              From a basketball court, right?

24              MR. ROSENTHAL:  Yes.

25              MS. BENVENUTTI HOFFMANN:  From a bridge that you

1    could see from a basketball court that the police all

2    frequent, which is, like -- and that he could tell the

3    caliber of the gun from seeing it from however many feet

4    away.

5         That is completely preposterous and not only is

6    it preposterous, all of the officers knew the location and

7    we have testimony about this and would of recognized

8    that's not possible, you couldn't of seen this.  And

9    there's more, you know, specific testimony in their

10   depositions going through how ridiculous this is.

11        So there is lots and lots of evidence from which

12   the jury can conclude many of the officers understood this

13   evidence was false but certainly Raucci, no question about

14   Raucci.

15        THE COURT:  Okay.  Raucci says that the interview

16   of Mr. Morant lasted less than an hour and your papers say

17   that he was at -- he was held for hours.  Is that a

18   distinction between the amount of time he was at the

19   police station versus the amount of time he was actually

20   on tape for this interview?

21        MS. BENVENUTTI HOFFMANN:  Well, the tape doesn't

22   cover the entire interview.

23        But do you know how long specifically that Stefon

24   was being interviewed?

25        I think -- I think --

1           (Off-the-record discussion among plaintiff's

2    counsel.)

3           THE COURT:  It bears on the question of coercion,

4    right, if somebody is there for an hour or if they're

5    there for many hours?

6           MS. BENVENUTTI HOFFMANN:  It does although it's

7    not -- it's not necessary and I think that the *Ortiz v.*

8    *Stambach* case, again, is -- specifically addresses,

9    because in that circumstance was a short interview and I

10   believe the Second Circuit specifically says that in and

11   of itself is not, does not mean that the statement's not

12   coerced.

13          I would say on coercion here, if you look at the

14   circumstances, again, the test is, you know, under the

15   totality of the circumstances would a person's [sic] of

16   reasonable firmness, would their will be overborne or

17   something like that.

18          And here what Mr. Morant's evidence presents is

19   that he was innocent.  He did not know anything about this

20   case.  He told them, I don't know anything about it.  He

21   was being held.  They said well, you have to give this

22   statement which matches this false statement they had

23   already gotten from these two other people, Ruiz and

24   Roque.  And he says, I don't know anything about it.  He

25   says, If you don't give the statement, we're going to

1    charge you with the crime, we're going -- it's going to be

2    a capital offense and we're going to hold you on a million

3    dollars bail, but if you give this statement against Scott

4    Lewis we'll let you go.

5         And, so -- and he's held for some number of

6    hours.  I think it's -- we can find it in the record, but

7    he wasn't clear on exactly how long.  There's no question

8    that the ultimately taped statement, although it stops and

9    starts, is not as long as that, but there is a dispute as

10   to how long he's actually been -- being questioned.

11        But I think any reasonable person under those

12   circumstances would say, I just got to get out of here,

13   which is basically what he said, I have to give this

14   statement to get out of here.

15        They told him you have to come back and sign it.

16   He came back and said, I'm not signing it.  This is false,

17   and he didn't sign it.

18        And so I think that that is absolutely something

19   that a reasonable person, under those circumstances, you

20   know, would capitulate just to get out of there, which is

21   what he was trying to do, and that's ample evidence to

22   prove a coercion claim.

23        THE COURT:  Okay.  I want to make sure I

24   understand the basis of your fabrication of evidence

25   claim.  Obviously you're saying that the statements of

1    Ruiz and Roque were fabricated.

2         Do you -- are you also advancing a claim that

3    Mr. Morant's statement was fabricated or is Morant's

4    statement falling in the bucket of coercion as opposed to

5    fabrication?

6         MS. BENVENUTTI HOFFMANN:  It's both and those are

7    separate claims.

8         So, one, as you discussed, focused on the threats

9    and false promises and everything made to overbear the

10   will.

11        The other is about, you know, either knowingly

12   creating evidence that's false, whether it's the statement

13   itself which, again, this is another one where there's the

14   stops and starts on the tape, so they're telling him what

15   to say, they're feeding the information, they're creating

16   a false record of this in the tape which makes it seems

17   like he just knows everything and he's volunteering it

18   when that's not actually what's happened.

19        THE COURT:  For Morant as well as the other two?

20        MS. BENVENUTTI HOFFMANN:  For Morant as well as

21   Roque, yes.

22        THE COURT:  Okay.

23        MS. BENVENUTTI HOFFMANN:  Both of them had

24   evidence of the stops and starts in the tape.

25        And then there's also false representations,

1    again, that he volunteered this information, that he just

2    came in and gave this.  And this is important because the

3    three separate statements that line up look more reliable

4    if they're all independently volunteered, right.

5            If you've got three separate people and they call

6    come in and tell the same story and it wasn't told to them

7    by the police, that makes it seem like it's reliable

8    evidence.

9            When what you actually know what happened is the

10   police told everybody what to say, well, of course they're

11   the same.  That doesn't -- you know, that doesn't make

12   them reliable evidence.

13           So the misrepresentations about how the evidence

14   was obtained and who was the source are also critical

15   fabrications.

16           THE COURT:  Okay.  All right.  Anything further

17   on that motion?

18           MS. BENVENUTTI HOFFMANN:  I don't think so.  I

19   think that's enough.

20           MR. TALLBERG:  May I rebut one point there, Your

21   Honor?

22           THE COURT:  Yes, you may.

23           MR. TALLBERG:  I just have an obligation, for

24   record, I'm not -- I want to be clear.  I'm not waiving

25   anything, withdrawing any arguments.  We argued in our

1  brief strenuously about Judge Blue's decision and the

2  direct appeals and so I, you know, I stand by those

3  arguments.

4       We -- you know, we can't rewrite history.  As

5  Attorney Gerarde noted, there was a conviction and he

6  served his sentence and was released on a sentence

7  modification, not some other method, and so those rulings

8  are out there and quite frankly, as we think about Your

9  Honor's mentioned if the case survives summary judgment

10  and trial, what's the import of those decisions.  I

11  respectfully disagree with plaintiff's counsel.

12       I had it happen in a case where Judge Underhill

13  had made a credibility determination about a witness in

14  another proceeding and when that witness then came before

15  the court in a civil rights trial, there was an

16  instruction to the jury that a court has previously

17  determined that witness is not credible.  So, I wouldn't

18  so easily discount the holdings of Judge Blue and the

19  direct appeals and that's all I had to say, Your Honor.

20       THE COURT:  Okay.  Thank you.

21       MR. TALLBERG:  Thank you.

22       THE COURT:  All right.  We're on to the last one,

23  Sweeney's affirmative summary judgment motion.

24       As I said, I have another proceeding at 3:30 so

25  we're going to be wrapping this up in the next 25 minutes

1    or so, so I can get to that one.

2         All right.  So with respect to conspiracy, we've

3    heard a lot about what Sweeney's role was and it's

4    undisputed at a certain point he started to try to disturb

5    the prosecution, but before that, why isn't there enough

6    to create a jury question about Sweeney joining the

7    conspiracy to violate Mr. Morant's constitutional rights

8    by withholding the prior inconsistent statement for

9    instance?

10         MR. KATON:  There's no evidence of a

11   collaboration between Mr. Raucci and Mr. Sweeney who had

12   serious animus against each other, which is documented, so

13   there's simply no meeting of the minds with respect to

14   this so-called outcome to deprive Mr. Morant of his civil

15   rights.

16         THE COURT:  So, you know, Sweeney, knows that

17   when Ruiz initially came in, he was denying knowledge of

18   the homicide and somewhere between that and the

19   notarization of Ruiz's statement Sweeney gets himself

20   comfortable with what Ruiz says, right, on plaintiff's

21   version of the facts?

22         MR. KATON:  On plaintiff's version of the facts,

23   but I think Sweeney's reasoning was that Pettola would be

24   in there with Detective Raucci and that if a product came

25   out of that interview with Detective Pettola, who's

1    testified there was no misconduct, that it would be

2    sufficient.

3         THE COURT:  So why isn't that sufficient to have

4    a jury question as to conspiracy then on, again,

5    plaintiff's version of the facts that there was, in fact,

6    misconduct during the interview even if Pettola says

7    otherwise?

8         MR. KATON:  I would acknowledge that there'd be a

9    factual issue for the jury.

10         THE COURT:  Okay.  On the *Brady* claim we've kind

11    of already covered this.  It was a question about

12    reporting to the prosecutor versus reporting to the

13    supervisor and you believe that reporting to the

14    supervisor discharged his obligations?

15         MR. KATON:  Yes.

16         THE COURT:  I'd like to ask just a question about

17    your brief.  There is, there's -- on Page 8 of your brief

18    there's what looks like a block quote.  It's got cases

19    cited from Louisiana, Massachusetts you might remember on

20    this issue of --

21         MR. KATON:  Whether or not there's an obligation

22    to write a report?

23         THE COURT:  Exactly.

24         MR. KATON:  Yes.

25         THE COURT:  Normally, when I see a block quote, I

1    think that it's quoting another case, but I don't see a

2    case that has this language, so was this just your version

3    of putting all those cases together into one?

4            MR. KATON:  It was.

5            THE COURT:  Okay.  All right.  So, I can look at

6    each case individually and find the propositions you cite

7    them for?

8            MR. KATON:  Please.

9            THE COURT:  Okay.  On qualified immunity, I'll

10   have -- I have the same question to you because all the

11   defendants, as I said, used the legal standard for

12   substantive due process.

13           MR. KATON:  Yes.

14           THE COURT:  And it's talking about coercion of a

15   statement, so I wasn't sure exactly how that fits with

16   Mr. Sweeney because Sweeney's not named in the count

17   relating to a coerced statement and egregious conduct that

18   would overcome someone's will.

19           So, really, we're talking about for the counts

20   that Sweeney is named in, which is failure to intercede,

21   conspiracy and *Brady*.  Is that even a legal standard I

22   need to be considering?

23           MR. KATON:  To the extent that there is some

24   implication about Sweeney's conduct in the pre-interview

25   phase, then I think that's an appropriate standard.

1          THE COURT:  Okay.  I'm not aware that plaintiff

2    is making any allegation about Sweeney's conduct in the

3    pre-interview, but you're saying that if there was such an

4    allegation that would be the standard?

5          MR. KATON:  Yes.

6          THE COURT:  All right.  So let's get to that

7    question about whether there's a constitutional right, as

8    you put it, to documentation in a police report about a

9    prior inconsistent statement.

10         So, you cite to these cases that say there's no

11   right to having the police write a report.  Many of them

12   involve accidents or not necessarily in the context of a

13   criminal investigation, but why isn't the appropriate

14   right at issue here, the right to be free from the failure

15   to disclose exculpatory information?

16         MR. GERARDE:  Well, the heart of the matter is

17   the fact there is no New Haven general order or regulation

18   that requires a written report and, in fact, I believe it

19   was the City's 30(6)(b) -- (b)(6), excuse me, witness that

20   testified there's no obligation to do a written report and

21   there's no general order that requires one.  All it

22   requires is that you report it to a supervisor and that

23   can be orally.

24         So, it's essentially the consummate discretionary

25   obligation to do a written report.

1          THE COURT:  But you acknowledge that the *Brady*

2    right is a right to disclosure of the information, whether

3    it's written or oral doesn't really matter.  Well, the

4    plaintiff is entitled to have exculpatory information or

5    impeaching information, correct?

6          MR. KATON:  Correct and it was reported to the

7    supervising detective.

8          THE COURT:  Okay.  And I don't want to beat a

9    dead horse on that issue because we've talked about it

10   already.

11         Okay.  Anything further that you wish to add on?

12         MR. KATON:  Nothing further.

13         THE COURT:  Thank you.

14         MR. KATON:  Thank you.

15         THE COURT:  All right.  Attorney Benvenutti

16   Hoffman, so as to Sweeney, he certainly, later on in the

17   time frame, takes efforts to undue this prosecution

18   against Mr. Morant.  Is there sufficient evidence from

19   which a jury can conclude that earlier on he did, in fact,

20   join a conspiracy to implicate Mr. Morant when he then

21   later on took these actions to effectively -- assuming

22   there was a conspiracy -- withdraw from it?

23         MS. BENVENUTTI HOFFMANN:  So, again, the

24   conspiracy doesn't have to be to wrongly implicate

25   Mr. Morant.  It has to be to deprive him -- to cause a

1    constitutional injury including depriving him of a fair

2    trial, so I think the easiest evidence for Mr. Sweeney

3    joining the conspiracy is the agreement not to provide the

4    impeaching statements or other evidence impeaching the

5    Ruiz evidence which, again, we've talked about the

6    evidence that he intentionally, you know, withheld that

7    from the criminal defense because you never provide that

8    information to the defense.

9          THE COURT:  But I think we settled on the fact,

10    earlier in this hearing, that he didn't tell anybody about

11    those prior inconsistent statements, so how could there be

12    an agreement about it?

13          MS. BENVENUTTI HOFFMANN:  So, that's about the --

14    remember there's two different, at least two different

15    things that are exculpatory or impeaching information that

16    he knows that he doesn't disclose.  So, he may not tell

17    specifically about the prior inconsistent statements but

18    he certainly tells and also Raucci's aware of the coercive

19    misconduct that's used to try to get the false statement

20    which, again, he says, you know, if anybody knew about

21    this it totally discredits Ruiz as a witness, it also

22    discredits Raucci.

23          So, if you look at, for example, *Kyles v. Whitley*

24    it talks about -- Supreme Court case -- it talks about how

25    evidence that undermines the integrity of an investigation

1    is also, can fall under exculpatory or impeaching evidence

2    that has to be disclosed under *Brady*.  This is exactly

3    that, as we've gone through ad nauseam, every piece of

4    evidence in this case that implicates Mr. Morant comes --

5    has Raucci's hands all over it.

6        So, if, as ultimately came out, you learn that,

7    you know, of his misconduct in obtaining this evidence

8    that undermines any, you know, thought of reliability to

9    any of the evidence and, again, that's also what Lawlor

10   says, he denies hearing the warning but he says if I had

11   known that, that should of been the end of the case right

12   there.

13       So there's lots of evidence that -- there is

14   evidence that Sweeney participated, at least tacitly

15   agreed to withhold evidence that -- to join in with others

16   in depriving Mr. Morant of a fair trial which is all that

17   is necessary for a conspiracy claim.

18       THE COURT:  Okay.  The *Brady* claim, Mr. Sweeney

19   cites to the *Amiel* case, A-M-I-E-L, which says, "The

20   Government has no *Brady* obligation to communicate

21   preliminary, challenged or speculative information."

22       And what was going on there was that the

23   Government had received some information that a witness

24   had been heavily involved in mob activities and several

25   murders.  The Government then investigated those

1      allegations and found them to not be credible and thus did

2      not turn over to the defendant at issue here those

3      potentially impeaching statements or information about

4      that witness.

5              So would the pre-interview that Sweeney conducted

6      here be considered preliminary information that Mr. Morant

7      wouldn't have been entitled to under *Brady*?

8              MS. BENVENUTTI HOFFMANN:  So absolutely not.

9      And, you know, even Mr. Sweeney himself says, he admits

10     this is, you know, highly important impeaching evidence.

11     It would devastate the case.  He admits that he understood

12     that this was both impeaching and also material and that

13     the defense attorney would want to devastate a prosecution

14     and he did not disclose it.

15             THE COURT:  And he argues that, you know, when

16     it's not considered an official statement, when it's sort

17     an interview that it would be really onerous to require

18     police officers to document every single conversation with

19     a witness because the statements may evolve over time and

20     it could be a lot.

21             What is the response to that practical

22     implication of a ruling that says every statement that a

23     witness -- everything that comes out of a witness's mouth,

24     to the extent it's inconsistent with something they later

25     say, needs to be forwarded to the prosecutor?

1           MS. BENVENUTTI HOFFMANN:  So, yes, it's not that

2    every statement needs to be documented.  It's that

3    inconsistent, you know, exculpatory or impeaching

4    statements need to be documented.

5           To be clear here, again, you know, we have to

6    look at -- I mean, here there isn't actually much dispute

7    between at least Sweeney and us in terms of the account of

8    events, but this is not a minor inconsistency.  This is

9    literally Ruiz telling him, I don't know anything and

10   giving a statement.  Sweeney coming back and saying, Why

11   are you giving the statement, you don't seem to know

12   anything.  And he admits to him, I'm only giving the

13   statement because Raucci told me I can go home if I give

14   the statement, but it's not true.  None of this is true.

15          So these are the types of statements that we're

16   talking about in -- on top of the things that Sweeney

17   personally observed in terms of seeing Raucci feeding him

18   information, questioning Ruiz and noting that anything

19   that Sweeney had not seen Raucci feed him Ruiz did not

20   have, could not volunteer.  He did not have any

21   independent knowledge about what happened.

22          So, the example in this case is really

23   extraordinary.  This is nowhere close to the line.  This

24   is absolutely both exculpatory and impeaching as Sweeney

25   himself admits and so -- and it is squarely covered under

1    Second Circuit case law in terms of the obligation.

2            And to extent that they're arguing, because it's

3    not written down it doesn't have to be disclosed, so, for

4    example, the *Bellamy* case from the Second Circuit deals

5    with a situation that's on all fours where there's a

6    report of an oral statement that's given to the police,

7    which the police dispute, they say it didn't happen.

8    Witness says it he did.  And then they create a report

9    that says the opposite.

10           And the Second Circuit held that that

11   substantiates both a fabrication claim -- so, for creating

12   a report that says the opposite of what the witness told

13   them -- and a *Brady* claim, because they did not report the

14   oral statement that the witness gave, which was

15   inconsistent and which was also, I believe in that case it

16   was that she could -- either that she could say

17   definitively that somebody was not the perpetrator or that

18   she couldn't make any identification which was

19   inconsistent with what they later suggested which was that

20   she may be able to make an identification or something

21   like that.

22           So, but the point was, the fact that it's an oral

23   statement in no way excuses the obligation to provide the

24   information to the prosecutor.  It doesn't have to be in

25   writing.  It's -- the obligation is not about writing.

1    The obligation is about informing the prosecutor of

2    exculpatory and impeaching information.

3         And then ultimately to prevail, it has to be

4    material.  So if it was just something that was de minimis

5    there wouldn't be a claim.

6         THE COURT:  Yeah.  Okay.  Given that Sweeney

7    talked to -- interrupted the interview, pulled Raucci out,

8    said stop doing this, and then also at a later point sent

9    Detective Pettola in to supervise Raucci, is there a jury

10   question about whether Sweeney failed to intervene?

11        MS. BENVENUTTI HOFFMANN:  Yes.  I mean, I think

12   that is -- I agree that that is trickier because he did

13   intervene at least in the first Ruiz statement, but I

14   think he knows that there are issues going forward after

15   that point.  So I think what he did at that point, before

16   he knew that the prosecution was nevertheless going

17   forward, I think it would be hard to lay out a failure to

18   intervene based solely on that, because he is doing what

19   you should be doing.

20        But I think the problem becomes later when he

21   knows that there's this issue, he says something to

22   Lawlor.  There's a dispute as to what Sweeney would of

23   understood or expected Lawlor to do based on what he says

24   and then he doesn't do anything else.  So, he doesn't tell

25   the prosecutor, he doesn't provide any of this

1   information.  It doesn't go anywhere else.

2         And so there is a very large opportunity, based

3   on his personal knowledge, to prevent -- I mean, usually

4   what happens in failure to intervene cases, the focus is,

5   is there a reasonable opportunity to intervene and so

6   this, and there are a number of district court cases that

7   are addressing it in the context of a wrongful prosecution

8   as opposed to, like, a false arrest or --

9         THE COURT:  Excessive force.

10        MS. BENVENUTTI HOFFMANN:  -- you know, excessive

11  force.

12        But, in this context, there's a lot more

13  opportunity to intervene than there is -- I mean, often in

14  those cases in excessive force they're talking about

15  seconds, you know, did you really have an opportunity to

16  do something.  And here there's no question there is an

17  opportunity, because of the --

18        THE COURT:  Tell me exactly when, like, when

19  should Sweeney have done more?

20        MS. BENVENUTTI HOFFMANN:  So, when he has that

21  second conversation -- I will give you one example.

22        When he has that second conversation with Lawlor,

23  after he learns that the case is going forward based on a

24  release statement -- I mean, first, you know, you can say

25  even more because he actually notarizes a statement for

 1    Ruiz immediately after this happens and he says he didn't

 2    read it.  I think that's a jury question whether he did

 3    know more about it, but he claims he didn't pay any

 4    attention.

 5            But putting that to the side, when he's -- learns

 6    that the case is going forward, he says he goes to Lawlor

 7    again, he says, What do you mean this is going forward?

 8    You got to pull Raucci off this case, you know, he's

 9    fabricating the statement.  Then he doesn't do anything

10    after that.  He gets a -- you know, hears something from

11    Lawlor, I think it's a question as to exactly what that

12    interaction is and what he learns, but he doesn't record

13    the things -- either his own observations about what

14    happened with Ruiz and Raucci and make sure that that's in

15    a report that goes to the prosecutor either orally or in

16    writing.

17            He doesn't alert the prosecutor.  He doesn't talk

18    to anybody else.  He doesn't followup in any other way.

19    Basically he says, you know, at that point I just stepped

20    out of it.  I didn't do anything.

21            Now, again --

22            THE COURT:  And that's all before he leaves the

23    country?

24            MS. BENVENUTTI HOFFMANN:  Yes.  And I think he

25    even says -- I can confirm -- but I think he even says

1    he's vaguely aware of the prosecution but he isn't paying

2    much attention to it.

3              THE COURT:  And --

4              MS. BENVENUTTI HOFFMANN:  The prosecution going

5    forward.

6              THE COURT:  Well, there's a question of fact

7    about whether he's told that Ruiz passed a polygraph and

8    whether that would of given him the comfort to not

9    intervene, right?

10             MS. BENVENUTTI HOFFMANN:  Even if that was the

11   case, that would be about -- that would go to whether,

12   ultimately, there's any evidence that what Ruiz is saying

13   is true, not whether he observed Raucci engage in this

14   misconduct in this investigation, whether there's prior

15   inconsistent statement, whether there's exculpatory

16   information, any of those other things.

17             So, he is -- what he's learning, you know, again,

18   I think there's a dispute of fact, would go to whether he

19   knows that the statement is, like, there's no basis to it

20   at all, you know, whether there's no basis to believe in

21   Mr. Morant's guilt; but he's still aware of all of this

22   other information and he doesn't don't do anything with it

23   beyond telling Lawlor and then, I mean, I'm sure they're

24   in the same -- they're all in the same police department.

25   He would know that nothing had happened, right, that

1    Raucci's still there, he's not pulled off cases, there's

2    no, you know, consequence.

3              THE COURT:  So what is the obligation on

4    Sweeney's part?  Obviously for a *Brady* claim he would need

5    to have forwarded the information he knew to the

6    prosecutor; but for failure to intervene, wouldn't his

7    reporting it to Lawlor, who may be the supervisor on this

8    investigation, isn't -- would that be intervention enough

9    as a matter of law?

10             MS. BENVENUTTI HOFFMANN:  I don't think as a

11   matter of law, I think that those are factual questions as

12   to whether -- under the circumstances and what's reported

13   to him, whether he actually understood something was

14   happening to prevent it.

15             I mean, there's no reason that he shouldn't have

16   had to report to the prosecutor as well for this claim.

17   Like the way that you know that the prosecutor is aware of

18   any problems is you report it to the prosecutor, right,

19   like that's the way that you make sure --

20             THE COURT:  But is that what failure to intervene

21   requires?  Does it require going to the prosecutor or --

22             MS. BENVENUTTI HOFFMANN:  I mean it requires --

23   the standard is just that you failed to intervene to

24   prevent the violation of constitutional rights.  Then, if

25   that's -- if you don't take the, you know, actions that

1    you have a reasonable opportunity to take then you're

2    liable for the preventable harm.

3          So, I mean, I would argue, yes, he has an

4    obligation to do something to make sure that -- he could

5    of also told Mr. Morant about what he'd seen.

6          He could of gone to the defense lawyer.  There

7    are other things he could of done.  I don't think it has

8    to be going to the prosecutor, but there's things he could

9    of done to make sure that this information was out there

10   and there wasn't going to be a, you know, to take more

11   reasonable steps to prevent a prosecution based on, you

12   know, what he had seen and he believed to be fabricated

13   evidence, but he did not take at that time.

14         Now, I agree he did later, after the conviction,

15   but he didn't at the time.

16         THE COURT:  Okay.  He argues that there's no

17   clearly established right to documentation.  Is that the

18   right, is that the correct constitutional right to be

19   looking at, for purposes of qualified immunity, or is it,

20   is the constitutional right the right ultimately to a fair

21   trial?

22         MS. BENVENUTTI HOFFMANN:  Yeah, it's the

23   constitutional right and the qualified immunity is all in

24   the context of suppressing *Brady* information, so as we

25   were discussing earlier it's about withholding from the

 1    prosecutor exculpatory or impeaching information that is

 2    material.

 3            THE COURT:  Okay.  I think that concludes my

 4    questions.

 5            Any rebuttal?

 6            MR. KATON:  No, thank you, Your Honor.

 7            THE COURT:  I saw big smiles on everyone's faces

 8    when I said I was done with my questions.

 9            I really appreciate counsels' arguments.

10            As can you tell there's a lot to digest in this

11    case.  I'm working my way through it.  I think I did a lot

12    to prepare for this argument but there's still some ways

13    to go, so a decision is not imminent.  Although, I hope to

14    get one to you as expediently as I can given how long

15    you've been waiting for decisions on these motions.

16            Two logistical things.

17            The first is, the argument has been quite helpful

18    to me to understanding the parties' positions.  I'll ask

19    that you correspond with the court reporter about ordering

20    the transcript on an expedited basis so that I can refer

21    to it as I'm preparing the ruling here.

22            Given that are there seven parties, you can split

23    the cost seven ways and Ms. Cayode will be able to tell

24    you what your cost will be once the transcript is prepared

25    and if I could have it within seven days that would be

 1  helpful to the Court.

 2        The second issue is, obviously, the parties have

 3  a right to wait for the ruling and to see what it says

 4  about how the case will move forward, but I wanted to

 5  broach the question of whether the parties would be

 6  interested in a referral to a U.S. Magistrate Judge for

 7  purposes of a settlement conference on the basis of this

 8  argument now that you know the types of questions I've

 9  been asking and what your thoughts are on that.

10        So let me hear plaintiff's view on that first.

11        MS. BENVENUTTI HOFFMANN:  I mean, I think the

12  question is for the defendants more than it is for us.  I

13  mean, we're always open if they're going to be fruitful,

14  but, you know, it's -- we think this case is exceptionally

15  strong and so that colors our view going into any

16  negotiations.

17        THE COURT:  Attorney Gerarde, I'll take your

18  position first.

19        MR. GERARDE:  Judge, I think it's something that

20  I'd like to report back on --

21        THE COURT:  Yeah.

22        MR. GERARDE:  -- since we have new information

23  today since we've all been through the arguments.  It

24  hasn't been a case that we've had an interest in going to

25  a magistrate judge, but I think I owe the City the

1    obligation to let them know what happened today and to

2    relate what Your Honor's question was and so maybe we can

3    report back in seven days?

4              THE COURT:  Sure.  So by next Friday, if the

5    parties believe that request -- referral to a magistrate

6    judge would be fruitful -- actually, file a notice either

7    way just so I know that you've had that discussion with

8    your clients and thought about it.

9              MR. GERARDE:  Would you want that filed on the

10   docket versus call your clerk?

11             THE COURT:  Sure, on the docket.

12             MR. GERARDE:  File it on the docket?

13             THE COURT:  Yes.

14             MR. GERARDE:  We don't make a request or we do

15   make a request?

16             THE COURT:  File a notice that you've conferred

17   with your clients and you do or do not make a request for

18   a referral.

19             MR. GERARDE:  Speaking of the seven days, could

20   we have seven days to ask Your Honor to consider a

21   referral to the Connecticut Supreme Court on 52-584?  That

22   has not been done by anyone yet.

23             THE COURT:  I want to take some time to look back

24   at the arguments on that first before opening the door to

25   more paper --

1          MR. GERARDE:  Okay.

2          THE COURT:  -- and more new argument to consider.

3          As I'm getting -- what I'll do is I'll prioritize

4     my review of the negligence claims and the state law

5     claims --

6          MR. GERARDE:  Okay.

7          THE COURT:  -- to provide guidance to you about

8     whether it would be helpful to the Court for further

9     briefing on that topic.

10         MR. GERARDE:  Sure.  Thank you.

11         THE COURT:  With respect to a settlement

12    conference, if there is one, I saw that Judge Garfinkel

13    had negotiated the settlement in the *Lewis* case which did

14    not get very far.  It didn't get to summary judgment.  I

15    don't know if Judge Garfinkel is taking mediations, given

16    his retirement status, but -- and I don't think any of the

17    defense counsel were also counsel in the *Lewis* case.

18         MR. TALLBERG:  My deceased partner Karsten

19    represented Vincent Raucci.

20         THE COURT:  Okay.  So, if the parties believe

21    that Judge Garfinkel's knowledge of the case and, again,

22    the settlement conference was, I think, in 2017 or

23    something, so it was many years ago, but if the parties

24    believe that Judge Garfinkel's prior knowledge of the

25    *Lewis* case would be helpful, I could certainly ask him,

1    without making any guarantee that he would come out of

2    retirement to do the mediation, if that would be something

3    the parties would be interested in.

4            MR. GERARDE:  Okay.

5            THE COURT:  Otherwise, it would go on the wheel

6    to a magistrate judge and you would know it would not be

7    Judge Garcia because she's handled substantive motions in

8    the case.

9            MR. GERARDE:  Okay.

10           THE COURT:  Is there anything further I should

11   take up from plaintiff's perspective?

12           MS. BENVENUTTI HOFFMANN:  The one thing I would

13   raise and I understand, obviously, and we appreciate that

14   it will take, you know, at least some time to issue a

15   decision but especially given how old this case is, how

16   long we've been waiting and also the number of parties and

17   schedules, I would raise the idea of trying to set a trial

18   date especially when we talked about your calendar.

19           I can't do it today because my partner

20   Mr. Brustin would definitely have to be consulted, but I

21   would suggest if we could set something, obviously could

22   always move it for whatever reason there isn't a decision

23   or things in time, but I think looking how far ahead it is

24   and how long this case has been waiting already, we would

25   suggest it would make sense to get something on the

1    calendar for next year and, you know, try to coordinate

2    among all these different parties.

3         THE COURT:  So when you're conferring about

4    referral for a settlement conference also confer about

5    trial schedules in the event that summary judgment,

6    defendants' summary judgment motions are not granted in

7    full.

8         My inclination is that they won't be, frankly,

9    and that there's going to be a trial on some issues in

10   this case.

11        At this point, with my trial calendar, I think

12   the earliest that I would be able to guarantee

13   availability and I think plaintiff's counsel had said

14   probably a month would be necessary, would probably be

15   April at this point of 2026 --

16        MS. BENVENUTTI HOFFMANN:  Okay.

17        THE COURT:  -- given what else is on my docket.

18        MR. GERARDE:  If I could just speak up, Judge?

19        I think that's a -- this is a particularly bad

20   idea.  There's way too many moving parts to have us be

21   backed into a trial date.  We don't know when we're going

22   to get Your Honor's decision.  We don't know if any of the

23   individual defendants are going to take an interlocutory

24   appeal, which they may or may not have the right to.  They

25   might -- they can at least try.

1          And we would need a -- this -- the trial memo

2     that would generate with a case like this would be beyond

3     enormous.  All right.  So we need to meet with Your Honor,

4     see what's left, get a date for trial memo and then a date

5     for jury selection, a real honest estimate as to how long

6     it's going to take.  There's -- so --

7          THE COURT:  That's fair enough.  There are a lot

8     of moving pieces here.

9          I will tell you my sort of internal target for a

10     decision is September 30th.  That's the date by which

11     motions that have been pending for a certain amount of

12     time get reported to the Administrative Office of The

13     Court and although I have not been sitting with this case

14     for too long, those motions are now on my September list

15     and so my target is September 30th.

16          So, it won't be forever that you're waiting but I

17     do think -- I do, on reflection, think that there are

18     probably too many moving pieces to have counsel

19     meaningfully confer about the trial date, but you won't be

20     waiting forever.

21          MR. GERARDE:  I would also add the *Horn* and

22     *Jackson* cases Judge Dooley is about to set a trial date, I

23     think after the first of year sometime, spring maybe.  I

24     do know Attorney Rosenthal is in that case as well as many

25     of us here.

```
 1              THE COURT:  Are those post-summary judgment?

 2              MR. GERARDE:  They are post-summary judgment.  We

 3   are deciding now whether we are going to have a joint

 4   trial or bifurcated trial et cetera and we're going to get

 5   a date --

 6              THE COURT:  Okay.

 7              MR. GERARDE:  -- once that's decided, so I think

 8   it's going to be after the first of the year but not too

 9   much further.

10              THE COURT:  All right.  Okay.  So you have a

11   sense of my timing, we'll take up the issue of a trial

12   date after the ruling is issued.

13              MR. GERARDE:  Okay.  Thank you.

14              THE COURT:  And -- but in the meantime, talk to

15   your clients about a referral for settlement.

16              MR. GERARDE:  Understood.

17              THE COURT:  All right.  Okay.  Thank you to all

18   counsel for your helpful arguments and for devoting a

19   large portion of your Friday to being in my courtroom.

20              ALL COUNSEL:  Thank you, Judge.

21              THE COURT:  The Court will stand in recess.

22              (The Court exited at 3:28 p.m.)

23              (* * * * *)

24

25
```

1                           C E R T I F I C A T E

2

3

4

5          I, Alicia A. Cayode Kyles, RMR, Official Court

6    Reporter for the United States District Court for the

7    District of Connecticut, do hereby certify that the

8    foregoing pages are a true and accurate transcription of

9    my shorthand notes taken in the aforementioned matter to

10   the best of my skill and ability.

11

12

13

14

15

16

17

18   /s/ _____

19   ALICIA A. CAYODE KYLES, RMR
     Official Court Reporter
20   United States District Court
     450 Main Street, Room 320
21   Hartford, Connecticut 06103
     (860) 509-8743
22

23   Dated:  8/28/25

24

25