## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEFON MORANT,<br>　　　*Plaintiff*, | ) | 3:22-CV-00630 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| The CITY OF NEW HAVEN; Chief of<br>Police NICHOLAS PASTORE, in his<br>individual and official capacities; and<br>Officers VINCENT RAUCCI, ROBERT<br>LAWLOR, VAUGHN MAHER, JOSEPH<br>PETTOLA, and MICHAEL SWEENEY, in<br>their individual capacities,<br>　　　*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | October 3, 2025 |

## RULING AND ORDER ON PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

Plaintiff Stefon Morant commenced this action against the City of New Haven (the "City") and six New Haven Police Department ("NHPD") officers: former Chief of Police Nicholas Pastore,[1] Vincent Raucci, Robert Lawlor, Vaughn Maher, Joseph Pettola,[2] and Michael Sweeney, alleging civil rights violations. Plaintiff seeks damages for alleged misconduct that led to his wrongful conviction for a double homicide he did not commit, resulting in more than twenty-one years' wrongful incarceration.

The amended complaint alleges seven counts of federal claims arising under 42 U.S.C. § 1983, including malicious prosecution in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution (Count One), civil rights conspiracy (Count Two), failure to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Count Three), denial

---

[1] A Suggestion of Death as to Pastore was filed on October 18, 2024. *See* ECF No. 152. Carolyn Pastore, as Administratrix of the Estate of Pastore, was subsequently substituted as a party for this Defendant. *See* ECF No. 160.
[2] Pettola is no longer a party to this action. *See* Stipulation of Dismissal, ECF No. 130.

of due process based on fabrication of evidence (Count Four), coercion of statements in violation of the Fifth and Fourteenth Amendments (Count Five), failure to intercede (Count Six), and municipal liability against the City pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) (Count Seven).  Plaintiff also brings three state claims: negligence (Count Eight), indemnification under Conn. Gen. Stat. § 7-465 (Count Nine), and direct action under Conn. Gen. Stat. § 52-557n (Count Ten).[3]

Plaintiff seeks partial summary judgment on Count Three against Sweeney.  Sweeney opposes this motion and in turn cross-moves for summary judgment on all counts alleged against him.  All remaining Defendants also seek summary judgment on all Counts asserted against them. Plaintiff opposes these motions.  For the reasons set forth herein, Plaintiff's partial motion for summary judgment against Defendant Sweeney on Count Three is **GRANTED**; Pastore's motion for summary judgment on Count Eight is **GRANTED**; and Defendants' remaining motions for summary judgment are **DENIED**.

## I.    FACTUAL BACKGROUND

The following facts, drawn from the parties' Local Rule 56 statements, are undisputed except as otherwise noted.  The Court notes that Lawlor, Maher, and Pastore have adopted and incorporated by reference the City's Local Rule 56(a)1 Statement.

### A.    The Murders and the Relevant Police Officers

On October 11, 1990, Ricardo Turner and Lamont Fields were shot and killed at Turner's apartment in New Haven.  Pl.'s L.R. 56(a)2 St. re: the City's Mot. for Summ. J., ECF No. 145-2 ¶

---

[3]Counts One, Two, and Three are pleaded against Defendants Raucci, Maher, Sweeney and Lawlor.  Counts Four and Five are pleaded against Raucci and Maher.  Count Six is pleaded against Maher, Sweeney, and Lawlor.  Count Seven is pleaded against Pastore, in his official capacity, and the City.  Count Eight is pleaded against Raucci, Maher, Sweeney, Lawlor and Pastore.  Counts Nine and Ten are pleaded against the City.

1.  According to Plaintiff, Turner was a former President *pro tempore* of the New Haven Board of Aldermen, and Fields was Turner's boyfriend.  Pl.'s Add'l Mat. Facts, ECF No. 145-1 ¶ 1.

At the time of the murder, Defendant Pastore was New Haven's Chief of Police.  ECF No. 145-2 ¶ 3.  Plaintiff contends that Pastore was regularly briefed on cases of significance, including homicides.  ECF No. 145-1 ¶ 30.  But Pastore denies having personal involvement with the day-to-day happenings in homicide investigations—including the Turner-Fields homicide—and claims he only received updates from detectives on such investigations on an intermittent basis.  Pastore L.R. 56(a)1 St., ECF No. 131-2 ¶ 5.

It is undisputed that Defendants Raucci, Maher, and Sweeney participated in the Turner-Fields homicide investigation, and Plaintiff contends that Defendant Lawlor also participated.  ECF No. 145-2 ¶ 2.  The investigation was initially led by Maher until his promotion to sergeant, but the parties dispute how long Maher stayed on the case and whether his promotion took effect on December 30, 1990, or January 28, 1991.  Pl.'s L.R. 56(a)2 St. re: Lawlor and Maher's Mot. for Summ. J., ECF No. 145-3 ¶¶ 75–77; ECF No. 145-1 ¶ 39.  After Maher's promotion, Raucci took over as lead detective.  ECF No. 145-1 ¶ 39.  Sweeney and Lawlor were sergeants during the investigation, ECF No. 145-3 ¶¶ 62–63, and Plaintiff contends Lawlor served as the primary supervisor for the investigation.  ECF No. 145-1 ¶ 31.

B.  Maher's Initial Investigation

According to Plaintiff, Maher conducted an extensive initial investigation into the murders, including interviewing several witnesses.  *Id.* ¶ 32.  Plaintiff contends that the initial investigation pointed to a major cocaine dealer, Michael Cardwell (also known as "Bullet") and his brother Vincent Cardwell, as the perpetrators of the murders.  *Id.* ¶ 33.  Plaintiff states that, after having a close business and sexual relationship for years, Cardwell's relationship with Turner had soured

in the months leading up to the murders for two reasons:  Turner had cut Cardwell out of their drug operation, and Turner began a sexual relationship with Fields, making Cardwell jealous.  *Id.* ¶ 34. Plaintiff recounts information provided by police informants suggesting that Cardwell had murdered Turner and Fields, *id.* ¶¶ 36–38, and other information he believes pointed to Cardwell as the killer, *id.* ¶ 35.  Plaintiff contends that, when Maher left the case and Raucci took over as lead detective, Cardwell was Maher's "number one suspect" and there was nothing to rule him out.  *Id.* ¶ 40.  Plaintiff further alleges that Maher never identified Plaintiff or the other individual charged with the murders, Scott Lewis, as associates of Turner.  *Id.* ¶ 42.

       C.  <u>Interview of Ovil Ruiz</u>

According to Plaintiff, the first time that Plaintiff and Lewis were implicated in the Turner-Fields murders was through a mid-January 1991 interview of a then sixteen-year-old whom the police called Ovil Ruiz.[4]  *Id.* ¶ 44.  Plaintiff contends that, on January 14, 1991, Ruiz was arrested in connection with a shooting unrelated to the Turner-Fields murders.  *Id.* ¶ 48.  Plaintiff states that Raucci brought Ruiz to the station for questioning about the Turner-Fields murders.  *Id.* ¶ 49.

Sweeney admits to the following facts concerning Ruiz's interview.  On January 14, 1991, Sweeney conducted a one-on-one interview of Ruiz in connection with the Turner-Fields homicides, which Plaintiff labels the "first interview" in his Statement of Additional Material Facts.  ECF No. 103 ¶ 1; ECF No. 145-1 ¶ 50.  No one else was present during this interview.  ECF No. 103 ¶ 4.  Based on the interview, Sweeney believed that Ruiz had no information about the Turner-Fields homicides, as Ruiz "made clear in 12 different ways that he had no information whatsoever about the crime."  *Id.* ¶¶ 2–3.

---

[4] Ruiz's real name is Augustin Castro.  *See* ECF No. 145-1 at 21 n.4; Sweeney L.R. 56(a)2 re: Pl.'s Mot. for Summ. J., ECF No. 103 at 1, n.1.  As he was referred to by NHPD during the investigation by the name Ovil Ruiz and the parties use that name, the Court will do so as well.

After Sweeney's one-on-one interview with Ruiz, Raucci interviewed Ruiz in Sweeney's presence, which Plaintiff labels the "second interview." *Id.* ¶ 5; ECF No. 145-1 ¶ 52. During this interview, Sweeney observed Rucci engage in improper tactics to get Ruiz to implicate Plaintiff and Lewis in the killings. ECF No. 103 ¶ 6. Specifically, Sweeney allegedly observed Raucci tell Ruiz, "just tell us that these two men did it because I know they did it," and promised that, if Ruiz did so, he could go home. *Id.* Raucci also threatened Ruiz that, if he didn't give him the information he wanted, Ruiz would "take the whole weight for the crime." *Id.* ¶ 7. According to Sweeney, Raucci fed Ruiz vital details about the shootings and encouraged him to parrot those details back to him. *Id.* ¶ 9.

Upon observing Raucci's behavior, Sweeney stopped the interview and took Raucci into the hallway, where he told Raucci to stop threatening Ruiz and feeding him information about the crime. *Id.* ¶ 10. After the interview resumed, Raucci nonetheless continued to feed details of the crime to Ruiz, in what Plaintiff labels the "third interview." *Id.* ¶ 11; ECF No. 145-1 ¶ 60. As a result of Raucci's alleged behavior, Ruiz attempted to tell a story that he was the driver of the car that was involved in the shooting. ECF No. 103 ¶ 12.

At some point, Sweeney pulled Raucci into the hallway and confronted him a second time about the fact that Ruiz was "just parroting back what Raucci was telling him." *Id.* ¶ 17. Plaintiff contends that this second admonishment took place after they resumed the third interview. ECF No. 145-1 ¶ 64. While Sweeney admits he admonished Raucci a second time in the hallway, he is not specific about when that occurred. ECF No. 103 ¶ 17. Plaintiff further contends that Sweeney nonetheless let Raucci go back to interview Ruiz alone after the second admonishment, despite his concerns—which Plaintiff labels the fourth interview. ECF No. 145-1 ¶ 65.

Sweeney then interviewed Ruiz again, without Raucci, in what Plaintiff labels the fifth interview. ECF No. 103 ¶ 14; ECF No. 145-1 ¶ 66. During this interview, Ruiz allegedly admitted to Sweeney again that he knew nothing about the murders, but would make a false statement if Raucci wanted him to, because he wanted to go home. ECF No. 103 ¶ 14; Pl.'s L.R. 56(a)2 St. re: Sweeney Mot. for Summ. J., ECF No. 145-5 ¶ 11.

Sweeney testified at his deposition that Raucci then told him that Ruiz possessed information implicating Plaintiff and Lewis in the Turner-Fields homicides, and that he "wanted to continue a conversation" with Ruiz, in what Plaintiff labels the sixth interview. *Id.* ¶ 13; ECF No. 145-1 ¶ 70. Sweeney contends that he then enlisted the aid of former Defendant and then-NHPD Detective Pettola to participate in the Ruiz interview with Raucci; while Plaintiff admits that Sweeney asked Pettola to attend the interview, Plaintiff avers that Pettola left the room repeatedly and that Raucci made clear he did not want Pettola present. ECF No. 145-5 ¶¶ 17–18. Plaintiff contends that, as part of this sixth interview, Ruiz allegedly stated that he was not the driver of the vehicle and was not present at the crime, but he (a) overheard a conversation between Plaintiff and Lewis in which Lewis allegedly confessed to the murders and explained they were motivated by a dispute over drug dealing; and (b) later, while playing basketball, saw Lewis throw a gun into a river. ECF No. 145-1 ¶¶ 70, 76.

For his part, Raucci admits that he interviewed Ruiz on January 14, 1991, that Sweeney and Pettola were present for at least portions of the interview, and Raucci obtained a statement from Ruiz about the homicides. Pl.'s L.R. 56(a)2 St. re: Raucci Mot. for Summ. J., ECF No. 145-4 ¶¶ 5–6. Raucci contends that Ruiz's sworn statement incriminated Plaintiff and Lewis in the homicides and included specific information about conversations he observed between Plaintiff

and Lewis prior to and immediately following the homicide. *Id.* ¶ 8. Plaintiff contends that Ruiz's statement was coerced and fabricated by Raucci. *Id.* ¶¶ 5, 7.

Plaintiff contends that the sixth interview led to a taped statement and typewritten transcription memorializing Ruiz's statements about overhearing the conversation between Plaintiff and Lewis and observing Lewis throw a gun into the river, but that none of the previous five interviews with Ruiz were documented in any way. ECF No. 145-1 ¶ 71. The parties agree that the next day (January 15, 1991), Sweeney notarized the 20-page transcript of Ruiz's taped statement, and he would have done so in the presence of Ruiz and Raucci. ECF No. 103 ¶ 25; ECF No. 145-1 ¶ 79. Sweeney contends that he notarized the statement without reading it. ECF No. 145-1 ¶ 79; ECF No. 136-2 ¶ 27.

Plaintiff and Sweeney state that, on the same day that Sweeney notarized Ruiz's statement, he reported Raucci's misconduct with Ruiz to Lawlor and advised that Raucci should be removed from the Turner-Fields investigation. ECF No. 145-1 ¶ 83; ECF No. 145-5 ¶ 30. Lawlor and the City deny that this conversation occurred. ECF No. 128-2 ¶ 28; ECF No. 134-2 ¶ 70. Sweeney contends that he did not know whether action was taken to remove Raucci from the case, as he had no further interest in the Turner-Fields case and had his own cases to work on. ECF No. 145-5 ¶ 31.

Sweeney represents that he later learned from coworkers that an arrest was made in the Turner-Fields investigation and that the case was deemed "solved." *Id.* ¶ 33. Sweeney says he asked Lawlor if any additional witnesses had come forward or if someone had confessed to the crime, and again raised concerns about Raucci's conduct, stating Ruiz "was lying, absolutely lying that night, and [Raucci] was telling him what to say." *Id.* ¶¶ 34–35. Sweeney also allegedly told Lawlor to report Raucci's conduct to the State's Attorney. *Id.* ¶ 35. Sweeney contends that, in

response, Lawlor told him that Ruiz passed a polygraph test, which eased Sweeney's concerns—though Plaintiff contends that there is no evidence a polygraph was administered to Ruiz. *Id.* ¶ 36. According to Plaintiff, Lawlor testified that he did not know anything about Ruiz submitting to a polygraph at any relevant time. ECF No. 145-1 ¶ 161.

Plaintiff further contends that, after Plaintiff and Jose Roque recanted the statements they had given to Raucci (as discussed below), Raucci obtained *another* statement from Ruiz on May 28, 1991, in which Ruiz returned to the version of the story in which Ruiz was the driver and was actually present at the crime scene. *Id.* ¶ 169. According to Plaintiff, Ruiz also allegedly stated in this statement that he gave the murder weapons to Ruiz and Morant. *Id.* Plaintiff and Raucci agree that Ruiz's attorney was present for the May 28, 1991, statement. ECF No. 145-4 ¶ 20.

### D. Interview of Jose Roque

On January 15, 1991, the day after Ruiz's interrogation and the same day that Sweeney allegedly reported Raucci's conduct to Lawlor, Raucci interviewed sixteen-year-old Jose Roque, who Raucci contends was an acquaintance of Plaintiff and Lewis. ECF No. 145-1 ¶ 90; ECF No. 135-2 ¶ 10. The parties dispute whether Maher attended Roque's interview. ECF No. 145-1 ¶ 90; ECF No. 145-3 ¶ 82. While Plaintiff alleges that Maher was present during Roque's interview—citing his alleged prior testimony to this effect and the fact that his name and signature appear on Roque's written statement—Maher has no recollection of attending Roque's interview. ECF No. 134-2 ¶ 82; ECF No. 145-3 ¶ 82.

Plaintiff represents that, on the same day of his interview, Roque provided Raucci and Maher a signed statement indicating that he: (i) overheard a conversation between Lewis and Morant in which Lewis confessed to the murders and explained they were motivated by a dispute over drug dealing, and (ii) later, while playing basketball, saw Lewis throw a gun into a river. ECF

No. 145-1 ¶¶ 91, 95. This statement was consistent with Ruiz's statement from the day before. *Id.* ¶ 94; ECF No. 135-2 ¶ 10.

According to Plaintiff, however, Roque knew nothing about the Turner-Fields homicides and was "forced by threats to give an untrue statement" falsely implicating Plaintiff and Lewis, ECF No. 145-1 ¶ 92, and to regurgitate information fed to him by Raucci, so that his statement would match Ruiz's statement. *Id.* ¶ 94. Plaintiff states that Sweeney notarized Roque's written statement, which Roque signed the day of his interview. *Id.* ¶ 95.

Roque's interview was also tape-recorded, at least in part. *See id.* ¶ 94. Plaintiff alleges that throughout the interview, Raucci fed Roque information both before tape recording the conversation and during the taped session, and Raucci continued to stop, rewind and restart the tape to concoct his version of events. *Id.* The parties dispute whether these alleged improper tape recordings occurred. Maher contends that he neither stopped the tape to feed Roque information nor saw Raucci do so. ECF No. 134-2 ¶¶ 100–02. Maher further contends that if he had witnessed anything inappropriate, he would have stopped the interview. *Id.* ¶ 83. Raucci testified that he did not stop the tape during Roque's interview. ECF No. 145-1 ¶ 100; Raucci Dep. Tr., ECF No. 145-21 at 159. Meanwhile, Plaintiff asserts that Roque testified at Plaintiff's trial that the tape was repeatedly stopped and started during his recorded statement, and that a forensic analysis of Roque's taped session performed by the Federal Bureau of Investigation ("FBI") later revealed that the tape was stopped and restarted at least eleven times, and that there were four instances of "over-recordings" to erase prior information. ECF No. 145-1 ¶ 101.

E. Plaintiff's Interview

On January 16, 1991, the day after Roque's interrogation, Raucci and Maher interviewed Plaintiff. *Id.* ¶ 105. The record demonstrates that Plaintiff signed a waiver of his rights. ECF No.

145-4 ¶ 15; City's Ex. 11, ECF No. 128-14.  Plaintiff indicated in the transcription of his written statement that he completed high school through the twelfth grade and that he could read, write and understand English.  City's Ex. 10, ECF No. 128-13 at 2.

Plaintiff alleges that he consumed alcohol and marijuana earlier that day and consequently, his judgment was impaired.  ECF No. 145-1 ¶ 108.  Plaintiff and Maher agree that Raucci asked Plaintiff most of the questions during the interview, while Maher asked questions occasionally. ECF No. 145-3 ¶ 104.  After several hours of interrogation, accompanied by Raucci's alleged promise that Plaintiff would be permitted to leave if he gave a statement incriminating Lewis, Plaintiff succumbed and gave a statement in order to leave the police station.  ECF No. 145-1 ¶ 109.  Similar to Ruiz's and Roque's statements, Plaintiff stated that he: (i) heard Lewis make an incriminating statement; and (ii) later, while playing basketball, saw Lewis throw a gun into a river.  ECF No. 145-1 ¶ 106; ECF No. 135-2 ¶ 15; *see also* ECF No. 134-2 ¶ 96–97.

According to Plaintiff, these statements were not true, and were coerced and fabricated by Raucci and Maher.  ECF No. 145-4 ¶ 15.  He attests he was not even in the state of Connecticut when the murders occurred.  ECF No. 145-1 ¶ 111.  However, according to Plaintiff, Raucci threatened to arrest Plaintiff for the homicides "if he did not provide the statement he was seeking, told him he would get a million dollar bond put on him, told him that he would get the electric chair, and fed him information that he wanted [Plaintiff] to parrot (including by reading portions of the statements that he had procured from Ruiz and Roque)."  ECF No. 145-1 ¶ 107. Additionally, Plaintiff contends that although he repeatedly told Defendants that he lacked knowledge regarding the Turner-Fields homicides, Defendants refused to allow him to leave and, as was done with Roque, interrogated him for several hours before beginning to tape record the statement.  *Id.* ¶ 108.  Plaintiff alleges that, during this preliminary interrogation, Defendants

repeatedly told him details about the murders, *see id.*, and then, during the taped portion, Raucci (and possibly Maher) repeatedly stopped, re-winded and restarted the tape recorder. *Id.* ¶¶ 113, 116. Plaintiff further alleges that as with Roque, Defendants did not state, on the tape, the time that the Plaintiff's interview began and ended. *Id.* ¶ 114. Plaintiff alleges that although Raucci denies stopping the tape, an FBI forensic analysis later revealed that this was false—the tape recorder was stopped, restarted and over-recorded at least nine times during Plaintiff's interrogation. *Id.* ¶¶ 115, 117.

It is unclear which Defendants participated in this alleged preliminary interrogation. Plaintiff alleges that this session was conducted by Raucci, Maher and Sweeney. *Id.* ¶ 108. Plaintiff also contends that Maher was present throughout the entirety of Plaintiff's interrogation, *see id.*, though Maher references Plaintiff's testimony that Plaintiff could not remember whether Maher was in the interview room during these moments of alleged misconduct. ECF No. 145-3 ¶ 103; ECF No. 134-2 ¶ 103. Maher also contends that he did not coerce or tell Plaintiff what to say, stop the tape recorder to feed Plaintiff information, or witness Raucci stop the tape recorder to feed Plaintiff information. ECF No. 134-2 ¶¶ 90–94. Raucci does not address this allegation, but he avers in his brief that the tape recorder was stopped for "innocuous" reasons and that he engaged witnesses in "pre-interviews," which he states was a routine practice among NHPD officers at the time. ECF No. 135-1 at 12 & 23.[5]

It is undisputed that, ultimately, Plaintiff did not sign the written transcript of his taped interview. ECF No. 145-1 ¶ 124; ECF No. 145-4 ¶ 16. Plaintiff contends that, on the day of his interrogation, Plaintiff told Defendants he would return to sign the statement when it was typed

---

[5] The document Raucci cites to for the proposition that the tape was stopped for "innocuous" reasons is the state habeas court's June 12, 2007, ruling. *See* City's Ex 29, ECF No. 128-39 at 8. But in that ruling, the state habeas court is referring to *Pettola*'s statement that the tape of *Ruiz*'s interview was stopped for "innocuous" reasons—not that *Raucci* stopped the tape of *Plaintiff's* interview for innocuous reasons.

"so [he] could get out of [the police station]." ECF No. 145-1 ¶ 122. He states that, the next day, on January 17, 1991, he returned to the police station with his mother, and refused to sign the typed witness statement, stating "No, because it's a lie," and "a bunch of crap." *Id.* ¶¶ 122, 123. Plaintiff alleges that despite his disavowing the truth of the statement and reporting the police misconduct, "Defendants" did not document these events. *Id.* ¶ 123.

F. <u>Other Witnesses and Reports</u>

On February 2, 1991, Raucci took a statement from another witness, Hector Ortiz. *Id.* ¶ 126; ECF No. 135-2 ¶ 13. Plaintiff alleges that Ortiz and Raucci were friends and business partners, and they allegedly often did drugs together. ECF No. 145-1 ¶ 130. Raucci alleges that Ortiz provided testimony that corroborated statements provided by Ruiz. ECF No. 135-2 ¶ 14. According to Plaintiff, Ortiz's statements were false (and he later testified to this effect), and Raucci allegedly told Ortiz that he "needed some help" "putting a man in jail for something he didn't do." ECF No. 145-1 ¶¶ 128–29.

Two days later, on February 4, 1991, Raucci took a statement from another witness, Milly Martinez, who was a childhood acquaintance of Ruiz; Raucci contends that Martinez's statement also corroborated information provided by Ruiz. ECF No. 135-2 ¶ 22. According to Plaintiff, like the statements of the other witnesses in Plaintiff's case, Martinez's statement was false and fabricated by Raucci. ECF No. 145-1 ¶¶ 177–78. He contends that, because one of the false details included in Ruiz's fabricated statements was that Martinez had also been at the crime scene and had observed Ruiz there, Raucci obtained an alleged false statement from Martinez to substantiate Ruiz's version of events. *Id.* ¶¶ 176–81.

In late March of 1991, Maher wrote a report, allegedly at the direction of either Lawlor or Sweeney, to discredit the informant information that had pointed to Cardwell as a suspect, and

generally rule out Cardwell as a suspect.  *Id.* ¶ 144; ECF No. 145-3 ¶ 88; *see* Maher 3/27/1991 Police Rep., City's Ex. 12, ECF No. 128-15.

      G.  Plaintiff's Arrest, Prosecution, and Conviction

In April of 1991, Lewis was arrested for murder and felony murder of Turner and Fields. ECF No. 145-1 ¶ 184; *see also Lewis v. Comm'r of Corr.*, 975 F. Supp. 2d 169, 171 (D. Conn. 2013).  On February 26, 1992, Raucci applied for a warrant for Plaintiff's arrest.  ECF No. 145-4 ¶ 24; ECF No. 145-1 ¶ 182; Arrest Warrant App., City's Ex. 2, ECF No. 128-5.  While Raucci avers that the warrant application was based on the "information provided to him by Ruiz and as substantially corroborated by the additional witnesses whom [he] interviewed during the investigation," Plaintiff contends that the information upon which the arrest warrant was based was coerced and fabricated by Raucci.  ECF No. 145-4 ¶ 24; ECF No. 145-1 ¶ 182.  Plaintiff was arrested that same day and charged with two counts of "Aiding Murder."  ECF No. 145-4 ¶ 25.

Thereafter, in May and June 1994, Plaintiff was tried—before Lewis—for the Turner-Fields homicides.  ECF No. 145-1 ¶ 184.  Plaintiff contends that no physical or forensic evidence implicated Plaintiff in the Turner-Fields homicides.  *Id.* ¶ 205.  Rather, according to Plaintiff, the evidence presented at trial directly implicating him was all fabricated by Raucci and Maher: (1) evidence from Ruiz, (2) the taped statement from Roque, and (3) Plaintiff's taped statement.  *Id.* According to Plaintiff, the prosecuting attorney did not know this evidence was coerced or fabricated.  *Id.* ¶ 206.

Plaintiff presented an alibi defense at his trial, but he did not testify.  ECF No. 145-2 ¶ 14; ECF No. 145-4 ¶ 26.  Both Ruiz and Roque testified at Plaintiff's trial.  Ruiz, later described by an Assistant State's Attorney as a "key witness" in Plaintiff's case, ECF No. 145-1 ¶ 210, repeated at trial the version of events he provided to Raucci in May of 1991, in which Ruiz was the driver

and was actually present at the crime scene. *Id.* ¶ 207; *see also* Ruiz Dep. Tr., ECF No. 146-18 at 92 (noting Ruiz testified at trial consistent with his May 1991 statement). Meanwhile, according to Plaintiff, Roque recanted his taped statement during his trial testimony, explaining that Maher and Raucci stopped and started the tape, Raucci fed him information, and Raucci coerced him to repeat the statements fed to him. ECF No. 145-1 ¶ 212. Plaintiff alleges that the prosecutor— assuming Roque's new statements were false and that his original statement was voluntary— argued to the jury that Roque's repudiation of his statement should not be credited. *Id.* ¶ 213.

On June 8, 1994, Plaintiff was convicted of two counts of felony murder. ECF No. 145-2 ¶ 15. He was acquitted of two counts of murder. *State v. Morant*, 242 Conn. 666, 667 n.1 (1997).

### H. Post-Conviction Events

#### 1. Plaintiff's and Lewis's Requests for Post-Conviction Relief

Plaintiff sought various forms of post-conviction relief, including an appeal of his convictions and petitions for a new trial and habeas relief, but these requests were denied. *Id.*; *Morant v. State*, 68 Conn. App. 137 (2002); *Morant v. Comm'r of Corr.*, 117 Conn. App. 279 (2009).

In 2013, Lewis—who was also tried and convicted for the Turner-Fields homicides based on similar evidence presented at Plaintiff's trial—was granted habeas relief by the United States District Court for the District of Connecticut (Haight, J.), and this decision was affirmed by the Second Circuit. *See Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 124–25 (2d Cir. 2015) (amended op.). Sweeney testified during Lewis's habeas proceedings, recounting his observations of Raucci's interview misconduct with Ruiz and Ruiz's statements to Sweeney that he knew nothing about the murders. *See Lewis*, 975 F. Supp. 2d at 194–99.

2.    *FBI Investigation of Raucci*

In May of 1995, the FBI commenced an investigation into possible corruption within the NHPD, with a particular focus on Raucci, among other things.  ECF No. 128-2 ¶ 16.  The FBI initiated this investigation based on a report from Lewis, who had recently been convicted and alleged that Raucci had "set [him] up" for the murders.  FBI Reports, ECF No. 128-24 at 8.  Plaintiff states that, in July of 1995, Pastore went—unsolicited—to visit Lewis in jail alone.  ECF No. 145-1 ¶ 235.  According to Plaintiff, Lewis told Pastore "basically the same thing he had told the FBI:  that he was innocent and Raucci was a dirty cop and had framed him."  *Id.*  Plaintiff contends Pastore did not document this conversation, and made a determination that the information provided by Lewis was insufficient to open an Internal Affairs investigation into Raucci.  *Id.*  Plaintiff states that, while Pastore eventually initiated formal charges against Raucci in February of 1996 for unrelated actions of fraudulently collecting overtime pay and assaulting a man while off-duty, *id.* ¶ 244, there was never an Internal Affairs investigation into Raucci's investigative misconduct in the Turner-Fields murder, *id.* ¶ 245.  The FBI investigation did not result in charges against Raucci.  *See id*. ¶ 240; 145-4 ¶ 34.

3.    *Plaintiff's Release and Pardon*

After more than twenty-one years of wrongful incarceration, Plaintiff's sentence was modified and he was released from prison in 2015, following Lewis's successful habeas petition.  ECF No. 145-1 ¶ 265; *see also* Sentence Modification Hearing Tr., ECF No. 145-17 at 5 (State's Attorney recounting that "at some point in time it was determined that the key witness in this case was not honest in his testimony with respect to both [Lewis's and Plaintiff's] trials, and it's public information that a certain police officer involved in [Plaintiff's investigation] had put him up to contriving a story").  On July 7, 2021, Plaintiff was granted a full and unconditional pardon by the

Connecticut Board of Pardons and Paroles and his convictions were expunged.  ECF No. 145-1¶

266; Pl.'s Ex. 2, ECF No. 145-15.  The cover letter accompanying the pardon certificate stated that

Plaintiff was "legally able to truthfully state [he] ha[d] never been arrested or convicted of a crime

in the state of Connecticut as it relates to any of the convictions pardoned."  ECF No. 145-15 at 2.

Additional factual allegations regarding the City's policies and practices are set forth below

in the Court's discussion of Plaintiff's *Monell* claim.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the

determination of the fact might "affect the outcome of the [law]suit."  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if

the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of

proof at trial, the movant's burden of establishing there is no genuine issue of material fact in

dispute will be satisfied if the movant can point to an absence of evidence to support an essential

element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears an initial burden of "informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative

when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It

need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-

movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## III.    SUMMARY OF RULING

As discussed above, several motions for summary judgment are currently pending before the Court. First, Plaintiff has moved for partial summary judgment against Sweeney on Count Three, ECF No. 73, which Sweeney opposes. The City has moved for summary judgment against Plaintiff on all claims asserted against it, ECF No. 128-1. Likewise, the individual Defendants have also moved for summary judgment on all of Plaintiff's claims against them. ECF No. 131 (Pastore); 134-1 (Lawlor and Maher); ECF No. 135-1 (Raucci); ECF No. 136-1 (Sweeney). Plaintiff opposes all of Defendants' motions.

For the reasons explained below, the Court holds that Plaintiff is entitled to partial summary judgment against Sweeney on Count Three and Pastore is entitled to summary judgment as to

Plaintiff's negligence claim against him in his individual capacity in Count Eight.  In all other respects, Defendants' motions for summary judgment are denied.

The Court proceeds by first examining Defendants' arguments concerning the timeliness of Plaintiff's federal claims and state claim for negligence, concluding that they were all timely filed.  The Court then analyzes the claims against the individual Defendants, addressing Plaintiff's malicious prosecution claim in Count One; his *Brady* claim in Count Three, his fabrication of evidence claim in Count Four; his coerced statement claim in Count Five; and then his conspiracy, failure to intercede, and negligence claims against various individual Defendants in Counts Two, Six, and Eight, respectively.  Following those discussions, the Court considers Plaintiff's municipal liability claim against the City and Pastore in his official capacity (Count Seven) and his claims for indemnification and direction action against the City (Counts Nine and Ten).

## IV.    TIMELINESS OF CLAIMS

As a preliminary matter, the Court finds that neither Plaintiff's Section 1983 claims nor his state-law claim for negligence are time-barred.

### A.    Timeliness of Federal Claims

To start, Raucci, in an argument adopted by Lawlor and Maher, argues that Plaintiff's federal § 1983 claims in Counts Two, Three, Four, and Five are untimely because they were not brought within three years of, at the latest, Plaintiff's release from incarceration in 2015.  ECF No. 135-1 at 37.  The Court rejects this argument, as these claims did not accrue until Plaintiff's conviction was invalidated in the summer of 2021.

As Section 1983 does not contain its own statute of limitations, courts apply the statute of limitations for personal injury actions under state law.  *Lounsbury v. Jeffries*, 25 F.3d 131, 133 (2d Cir. 1994).  In Connecticut, the applicable statute of limitations, which is drawn from Conn. Gen.

Stat. § 52-577, is three years.  *Id.* at 134.  The accrual date for a § 1983 cause of action is a question of federal law, rather than state law.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

In *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), the U.S. Supreme Court held that, to recover damages under Section 1983 for an unconstitutional conviction or imprisonment, or "for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a plaintiff must prove that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  If a plaintiff brings § 1983 claims that "necessarily imply the invalidity of his conviction or sentence" before any of those events occur, the complaint must be dismissed, because allowing it to proceed could risk undermining the criminal conviction.  *Id.* at 487.  As a corollary to this holding, the Supreme Court noted that, "[j]ust as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor . . . so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence *does not accrue until the conviction or sentence has been invalidated*."  *Id.* at 489–90 (emphasis added) (internal citations omitted).

In this case, Plaintiff's § 1983 claims asserting *Brady* violations, fabricated statements, coerced statements, and conspiracy, implicate the validity of his conviction because they go to the heart of whether he received a fair trial.[6]  Under *Heck*, these claims did not accrue until Plaintiff was granted a full and unconditional pardon from the Connecticut Board of Pardons and Paroles on July 7, 2021.  It was only as of that date that Plaintiff's murder convictions were expunged,

---

[6] To the extent the City argues that these claims do not necessarily imply the invalidity of Plaintiff's conviction, the Court disagrees.  *See* ECF No. 128-1 at 23–24.  Indeed, at least two of the claims Plaintiff advances in this litigation are not far afield from those dismissed in *Heck* itself, on grounds that they challenged the legality of the plaintiff's conviction: claims that the defendants engaged in an unlawful and unreasonable investigation and knowingly destroyed evidence that was exculpatory in nature.  *Heck*, 512 U.S. at 479.  The claims Plaintiff is pursuing are more like these claims than unreasonable search claims, which *Heck* held would *not* necessarily imply that a conviction was unlawful.  *Id.* at 487 n.7.

which paved the way for his asserting § 1983 claims that, if brought before that date, would otherwise have been dismissed under *Heck* because they risked calling into question the validity of his conviction. Plaintiff brought the present suit within three years of July 7, 2021, on May 5, 2022. Thus, the Court holds that Plaintiff's § 1983 claims are timely.

B.    Timeliness of State Negligence Claim

Likewise, Plaintiff's state law negligence claim is timely.

The relevant statute of limitations is Conn. Gen. Stat. § 52-584, which provides that any action for injury caused by negligence shall be brought "within two years of the date the injury is first sustained, discovered, or should have been discovered," but in no case shall it be "brought more than three years" after the complained of conduct took place. *Pourkavoos v. Town of Avon*, No. 3:17-CV-00073 (SVN), 2023 WL 2456644, at *20 (D. Conn. Mar. 10, 2023).

The Connecticut Supreme Court has made clear that Conn. Gen. Stat. § 52-584 contains two separate provisions limiting the time in which a negligence claim can be brought. First, "the limitation period for actions in negligence begins to run on the date when the injury is first discovered or in the exercise of reasonable care should have been discovered." *Lagassey v. State*, 846 A.2d 831, 846 (Conn. 2004). For purposes of this provision, which is referred to as the discovery portion of the statute of limitations, *Rosato v. Mascardo*, 844 A.2d 893, 899 (Conn. App. 2004), injury has been interpreted to mean "legal injury" or "actionable harm." *Lagassey*, 846 A.2d at 846. This occurs when "the plaintiff discovers, or in the exercise of reasonable care, should have discovered the essential elements of a cause of action." *Id.* at 846–47. Once this happens, a party generally has two years to bring a negligence claim.

The second provision of the statute provides that "no action may be brought more than three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52-584. This

section categorically "bars the bringing of suit more than three years after the alleged negligent conduct of a defendant regardless of when a plaintiff discovers the proximate cause of his harm or any other essential element of a negligence cause of action." *Barrett v. Montesano*, 269 Conn. 787, 793 (2004). This second clause is often referred to as the repose section of the statute of limitations. *Id.*

The individual Defendants and the City contend that Plaintiff's negligence claim was filed decades after their allegedly negligent actions, and thus should be barred under both the discovery and repose portions of the state statute of limitations. Defendants point to different dates on which they claim the statute of limitations on this claim began to run, ranging from the date he was allegedly coerced into making false statements (January 16, 1991) to the date of his arrest (February 26, 1992), to the date of his conviction (June 8, 1994), to the date his sentence was modified and he was released from prison (in 2015). *See* Pastore Br., ECF No. 131-1 at 14; Sweeney Br., ECF No. 136-1 at 24, 27; City Br., ECF No. 128-1 at 22, 25; Lawlor & Maher Br., ECF No. 134-1 at 25, Raucci Br., ECF No. 135-1 at 34. Yet they all contend that Plaintiff's negligence claim, first brought in this action on May 5, 2022, was untimely under both provisions of § 52-584, and therefore barred.

Defendants are wrong. Under Connecticut law, the statute of limitations does not begin to run until the plaintiff can maintain an action—that is, until "all elements are present, including damages." *Rosenfield v. I. David Marder & Assoc., LLC*, 110 Conn. App. 679, 686 (2008) (citation omitted). Moreover, if a prior action prevents enforcement of a remedy sought in a later action, "then the pendency of the prior action can toll the pertinent statute of limitations applicable to the later action." *Fontanella v. Martucci*, 89 Conn. App. 690, 700 (2005). Along these lines, Connecticut courts have held—in line with *Heck*—that, if success in a tort action "would

necessarily imply the invalidity of a conviction," the tort action must be dismissed unless the underlying conviction is invalidated. *Taylor v. Wallace*, 184 Conn. App. 43, 51 (2018) (citing *Heck*); *see also Cooke v. Williams*, 349 Conn. 451, 464, 67–68 (2024) (disapproving of *Taylor*'s framing of the issue as one of justiciability, but affirming its holding and noting that a "criminal defendant turned civil plaintiff must prove that he or she has obtained either postconviction or appellate relief" from the conviction before pursuing a malpractice claim against counsel in his or her criminal case). Although *Taylor* and *Cooke* did not address the precise statute of limitations issue presented in this case, it follows from their reasoning that, because a "criminal defendant turned civil plaintiff" in these circumstances does not have a ripe claim—in *Taylor* and *Cooke*, for malpractice, and in this case, for negligence—unless and until his conviction is invalidated, the statute of limitations cannot begin to run on such a claim until that invalidation occurs. *See also Fontanella*, 89 Conn. App. at 700.

For Plaintiff here, that means the statute of limitations clock did not start until July 7, 2021, the day he was granted a full and unconditional pardon. This conclusion is supported by three other decisions in this District, each of which rejected the same argument Defendants make here. *See Esposito v. Aldarondo*, No. 3:22-CV-00621 (MPS), 2023 WL 2228412, at *6–7 (D. Conn. Feb 24, 2023); *Birch v. Town of New Milford,* No. 3:20-CV-1790 (VAB), 2021 WL 4932405, at *19–21 (D. Conn. Sep. 24, 2021); *Horn v. City of New Haven,* No. 3:18-CV-1502(RNC), 2024 WL 1342762, at *3 (D. Conn. Mar. 29, 2024). The same reasoning also applies to defeat Sweeney's argument that Connecticut's three-year general tort statute of limitations, Conn. Gen. Stat. § 52-577, bars Plaintiff's negligence claim.

For these reasons, the Court rejects Defendants' contention that Plaintiff's § 1983 and negligence claims are time-barred.

## V.    PLAINTIFF'S CLAIMS AGAINST INDIVIDUAL DEFENDANTS

### A.    Count One:  Malicious Prosecution

In Count One, Plaintiff brings a claim for malicious prosecution under § 1983 against Maher and Raucci, both of whom move for summary judgment on it.[7]  Because genuine disputes of material fact exist with respect to this claim, Maher and Raucci's motions for summary judgment are DENIED.

To prevail on a malicious prosecution claim under § 1983, "a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law."  *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (quoting *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002)).  To prevail on a malicious prosecution claim under Connecticut law, the plaintiff must show "(1) the defendant initiated or continued criminal proceedings against the plaintiff"; (2) "the criminal proceeding terminated in favor of the plaintiff"; (3) "the defendant acted without probable cause"; and (4) "the defendant acted with malice."  *Id.* at 420.  Additionally, to demonstrate the requisite Fourth Amendment violation, the plaintiff must show "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  *Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000).

### 1.    *Favorable Termination Requirement*

The Court first rejects the argument made by Raucci, Maher, and the City that Plaintiff's malicious prosecution claim fails because his criminal proceedings did not terminate in his favor. The Defendants who advance this argument draw it from the U.S. Supreme Court's 2022 decision in *Thompson v. Clark*, 596 U.S. 36, 49 (2022), which they read as requiring that a plaintiff

---

[7] In his summary judgment opposition brief, Plaintiff withdrew this claim against Sweeney and Lawlor.  ECF No. 145 at 24.

attempting to state a § 1983 claim for malicious prosecution must show that his criminal prosecution ended without a conviction.  This argument fails for two reasons.

First, in this very litigation, Judge Haight previously ruled that Plaintiff "has established that his conviction and sentence were invalidated" for the purposes of the favorable termination requirement of a §1983 malicious prosecution claim.  *Morant v. City of New Haven*, 731 F. Supp. 3d 358, 365 (D. Conn. Apr. 13, 2024).  The Court follows that ruling here, under the law of the case doctrine.  The law of the case doctrine, although not binding, "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons," including the need to "correct a clear error or prevent manifest injustice."  *In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (internal citation and quotations omitted).  This rule of practice promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues."  *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816 (1988).  As the Court sees no clear error in Judge Haight's ruling on this issue, and Defendants have not demonstrated that continuing to abide by his ruling would work a manifest injustice, the Court declines to revisit Judge Haight's prior holding.

Second, even if the law of the case doctrine did not suggest the Court should decline to disturb Judge Haight's ruling, this Court would independently adopt his reasoning.  The narrow holding of the Supreme Court in *Thompson* was that "a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence."  *Thompson*, 596 U.S. at 49.  Instead, "[a]plaintiff need only show that the criminal prosecution ended without a conviction."  *Id.*.  Defendants take this holding to *require* that Plaintiff's prosecution have ended "without a conviction" for his malicious prosecution claim to be viable.  Because, in Defendants' view, Plaintiff's prosecution

ended with a conviction—in spite of the pardon granted by the Connecticut Board of Pardons and Paroles—they contend he does cannot demonstrate the favorable termination element of a malicious prosecution claim.

But as Judge Haight explained, latching solely onto the Supreme Court's use of the phrase "without a conviction" in *Thompson* ignores the holding of *Heck*. *Morant*, 731 F. Supp. 3d at 366. In *Heck*, the Supreme Court held, as explained above, that a plaintiff may proceed with a malicious prosecution claim if he can prove his conviction or sentence has been, among other methods, "expunged by executive order [or] declared invalid by a state tribunal authorized to make such determination." *Heck*, 512 U.S. at 487. Plaintiff has demonstrated as much here. "In Connecticut, the pardoning power is vested in the legislature, which has delegated its exercise to the board of pardons." *Morant*, 731 F. Supp. 3d at 366. And the Connecticut Board of Pardons and Paroles has the "jurisdiction and authority to grant conditional or absolute commutations." *McLaughlin v. Bronson*, 206 Conn. 267, 270 (1988). No party contests that Plaintiff received "a full, complete, absolute and unconditional pardon for [his relevant] crime." *Morant*, 731 F. Supp. 3d at 367. The pardon itself "'forever acquit[ted], release[d], and discharge[d]' Plaintiff from said conviction." *Id.* Thus, under *Heck*, Plaintiff's pardon "plainly gave rise to the right to proceed with a Section 1983 claim for a wrongful conviction and imprisonment." *Id.* at 368; *see also Carr v. Louisville-Jefferson Cnty.*, 37 F.4th 389, 394 (6th Cir. 2022) (holding, after *Thompson*, that even though "executive pardons and judicial expungement orders are not specifically listed in *Heck*," a "full pardon, even one that does not indicate an individual is innocent, fulfills the purposes of *Heck*'s invalidation requirement").[8]

---

[8] It also bears noting that the cover letter accompanying Plaintiff's certificate of pardon stated that he could truthfully answer that he had "never been arrested *or convicted* of a crime in the state of Connecticut as it relates to any of the convictions pardoned." ECF No. 145-15 at 2 (emphasis added).

For these reasons, the Court rejects Defendants' argument that Plaintiff has failed to show favorable termination of his prosecution, for purposes of his malicious prosecution claim. Likewise, the Court rejects Raucci's argument that, because Plaintiff did not achieve a favorable termination, the statute of limitations on his malicious prosecution never started running. *See* ECF No. 135-1 at 38–39.

           2.      *Maher*

Next, the Court concludes that Maher is not entitled to summary judgment on Plaintiff's malicious prosecution claim. Maher contends that the record is insufficient to establish that he initiated the criminal proceedings against Plaintiff. "To initiate a prosecution, a defendant must do more than report the crime or give testimony." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010). Rather, he must "play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Id.* (quoting *Rohman*, 215 F.3d at 217). A jury may infer that a defendant initiated a prosecution where he filed the charges or prepared and forwarded false evidence to prosecutors. *Id.*; *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

Here, there are genuine issues of fact concerning Maher's degree of involvement in the Turner-Fields investigation, such that a reasonable jury could conclude he did initiate the prosecution, for purposes of the malicious prosecution claim. While it is undisputed that Maher initially led the Turner-Fields investigation until his promotion to sergeant, the parties disagree about how long Maher stayed on the case and when his promotion took effect. ECF No. 145-3 ¶¶ 75–77. In addition, although Maher does not recall being present for Roque's interview, Plaintiff proffers evidence that Maher has testified to being present at this interview and that his name and

signature appear on Roque's witness statement.  *Id.* ¶ 82.  Roque's witness statement (which was allegedly fabricated) was later forwarded to the prosecution.

Based on this record, a reasonable jury could find that Maher played an active role in initiating the prosecution, including by preparing the false witness statement and forwarding such false evidence to the prosecution.  *See Ricciuti*, 124 F.3d at 130.  Thus, the Court concludes that Maher is not entitled to summary judgment on this claim.

### 3.  *Raucci*

Likewise, Raucci is not entitled to summary judgment on Plaintiff's malicious prosecution claim.

Raucci first contends that there was adequate probable cause to arrest Plaintiff, as supported by the fact that a judge authorized a warrant for Plaintiff's arrest.  Although the existence of probable cause ordinarily serves as a defense to a malicious prosecution claim—and the issuance of an arrest warrant by a judge carries a presumption of reasonableness, *see Stonick v. Delvecchio*, 438 F. Supp. 3d 154, 162 (D. Conn. 2020)—a defendant may not benefit from such defense where there is evidence that the warrant was obtained by fraud or misconduct.  *See Manganiello*, 612 F.3d at 163 (describing that presumption of probable cause attaching to an indictment issued by a grand jury may be rebutted by evidence the indictment was "procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith") (citation omitted).  A jury can find that a warrant was secured through bad faith if "there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied."  *Id.*  (internal quotations and citation omitted).  Such evidence "works an unacceptable

27

'corruption of the truth-seeking function of the trial process.'" *Ricciuti*, 124 F.3d at 130 (quoting *United States v. Agurs*, 427 U.S. 94, 104 (1976)).[9]

Here, there is substantial evidence in the record from which a reasonable jury could conclude that Raucci engaged in misconduct, including by withholding and fabricating evidence and coercing statements—and that he submitted information obtained through that misconduct as part of the arrest warrant application.   For instance, the warrant application includes Ruiz's allegedly fabricated statement that Ruiz overheard Lewis and Plaintiff discussing Lewis's "shooting two guys," including Turner, and Roque's allegedly fabricated and coerced statement that he likewise was present for a conversation between Lewis and Plaintiff where they discussed shooting two homosexual people who owed Lewis money.   Arrest Warrant App., Pl.'s Ex. 1, ECF No. 145-14 at 84–85.   The arrest warrant affidavit also includes a statement from Plaintiff—again allegedly coerced—that, on a night in October of 1990, Lewis gave Morant a ride home, stopped at a location on the street where the murders occurred, and returned five to ten minutes later sweating profusely.   *Id.* at 85.   Raucci's arguments that the facts in the warrant affidavit were not proven false in the underlying proceedings and that the warrant application was supported by statements given under oath are immaterial, particularly where Plaintiff proffers evidence demonstrating that the statements themselves were procured through fabrication, coercion or other misconduct.   As the Court finds that there is sufficient evidence in the record from which a reasonable jury could conclude that Raucci engaged in misconduct that infected the warrant

---

[9] Although *Manganiello* discusses the issuance of an indictment based on police misconduct, its rationale is equally applicable to issuance of an arrest warrant.   Additionally, Raucci is correct that it is an open question in the Second Circuit whether the holding in *Franks v. Delaware*, 438 U.S. 154 (1978) applies to arrest warrants.   *See United States v. Powell*, 634 F. Supp. 3d 48, 53 (E.D.N.Y. 2022).   *Franks* creates an exception to the presumption of probable cause that attaches to a facially valid search warrant, when an affiant knowingly and intentionally, or with reckless disregard for the truth, includes a false statement in a search warrant application.   The Court need not reach the question of whether a *Franks* exception is available here, as *Manganiello* and *Ricciuti* provide a legal basis for Plaintiff's assertion that a reasonable jury could find the arrest warrant issued against him is not entitled to presumption of probable cause and therefore does not defeat his malicious prosecution claim.

application, Raucci's assertion of a probable cause defense does not defeat Plaintiff's malicious prosecution claim.

### 4.    *Qualified Immunity*

Finally, the factual disputes discussed above render qualified immunity inappropriate for both Maher and Raucci.

"Even in the absence of probable cause, a police officer is entitled to qualified immunity where (1) [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for [him] to believe that [his] actions were lawful at the time of the challenged act." *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007)). A police officer has qualified immunity from a malicious prosecution claim if the officer had arguable probable cause to charge the plaintiff with the crimes at issue. *Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011); *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007). Importantly, however, where the facts are disputed, a finding of qualified immunity is inappropriate. *Eaton v. Estabrook*, 144 F.4th 80, 89–90 (2d Cir. 2025) ("pre-trial resolution of the defense of qualified immunity may be thwarted by a factual dispute") (cleaned up) (quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990)); *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[S]ummary judgment based either on the merits or on qualified immunity requires that no dispute about material factual issues remain.").

Here, because a reasonable jury could find that Maher initiated the prosecution against Plaintiff, and that Raucci lacked probable cause to prosecute him, qualified immunity is inappropriate. Specifically, there are disputes of fact about Maher's role in the investigation after his promotion to sergeant and, as discussed further below, disputes about whether Raucci engaged

in any misconduct in his interviews of Ruiz, Roque, and Plaintiff.  These material factual disputes preclude a finding of summary judgment in Maher's or Raucci's favor on the basis of qualified immunity.

      B.    <u>Count Three:  Failure to Disclose Exculpatory Evidence</u>

In Count Three, Plaintiff alleges that Raucci, Maher, Sweeney, and Lawlor violated his constitutional rights under *Brady* by withholding exculpatory and impeaching information from him—specifically, that Ruiz and Roque had initially told police they knew nothing about the murders and had no information implicating Plaintiff in them, and that the inculpatory statements from these witnesses were obtained through police misconduct.  *See* ECF No. 33, ¶¶ 167–173. Plaintiff moves for partial summary judgment on this claim against Sweeney only, contending that he failed to (1) memorialize and disclose Ruiz's statements that he knew nothing about the murders and (2) disclose to prosecutors Raucci's alleged misconduct during the interview of Ruiz. Sweeney contests Plaintiff's motion and himself moves for summary judgment on this claim. Raucci, Maher, and Lawlor likewise move for summary judgment on this claim.

For the reasons explained below, the Court concludes that Plaintiff's partial motion for summary judgment on this claim against Sweeney is GRANTED, and all of the individual Defendants' motions for summary judgment on this claim are DENIED.

      *1.*    *Legal Standard*

The U.S. Supreme Court's 1963 decision in *Brady* "established the affirmative duty of the prosecution to turn over exculpatory evidence to the defense."  *Horn v. Stephenson*, 11 F.4th 163, 170 (2d Cir. 2021).  The Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  *Id.* (quoting *Brady*, 373 U.S. at 87).  The Supreme Court extended the

duty to cover evidence that could be used to impeach a government witness in *Giglio v. United States*, 405 U.S. 150 (1972). *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018). The duty to disclose extends to police officers, who "satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors." *Walker v. City of N.Y.*, 974 F.2d 293, 299 (2d Cir. 1992).

To establish a *Brady* or *Giglio* violation, "[the accused] must show that: (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the [accused]; and (3) the failure to disclose this evidence resulted in prejudice." *Kirk Tang Yuk*, 885 F.3d at 86 (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)). As to the first element, the Second Circuit has "suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional." *Bellamy v. City of New York*, 914 F.3d 727, 751 n.23 (2d Cir. 2019). Additionally, "[e]vidence that is not disclosed is suppressed for *Brady* purposes even when it is 'known only to the police investigators and not to the prosecutor.'" *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 161 (2d Cir. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). With respect to the second element, evidence is "favorable if it is either exculpatory or impeaching." *Id.* Finally, evidence is "material" if "there is a 'reasonable probability' that disclosure would have changed the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Kirk Tang Yuk*, 885 F.3d at 86 (quoting *Kyles*, 514 U.S. at 434–35).

### 2.    *Sweeney*

First, the Court concludes that Plaintiff is entitled to partial summary judgment on the *Brady* claim asserted against Sweeney.

Taking the second element of a *Brady* claim first, it is clear Sweeney possessed information that was favorable to Plaintiff concerning the interviews of Ruiz. Sweeney admits he conducted an interview of Ruiz alone on January 14, 1991, in which Ruiz "made clear in 12 different ways that he had no information whatsoever about the crime," and that Sweeney believed, from this interview, that Ruiz "did not have any information whatsoever about the Turner-Fields homicide." ECF No. 103 ¶¶ 1–4. Second, Sweeney admits that, after he interviewed Ruiz, Raucci interviewed Ruiz in Sweeney's presence and used improper tactics to get Ruiz to implicate Plaintiff and Lewis in the murders, including threatening Ruiz, promising him he could go home if he implicated Plaintiff and Lewis, and feeding Ruiz information to cause him to make a false statement. *Id.* ¶¶ 5–9, 11–12. After Sweeney sent Raucci out of the room, Ruiz again told Sweeney he did not know anything about the murders, but would say that he did if Raucci wanted him to do, so that he could home. *Id.* ¶ 14. Raucci eventually took a taped statement from Ruiz, in which Ruiz stated that he had information that Plaintiff and Lewis were involved in the crime. *Id.* ¶ 20.[10] Undoubtedly, the evidence of Raucci's alleged improper behavior and the discrepancies between the statements Ruiz gave to Sweeney and those he ultimately gave to Raucci in the taped statement are pieces of information that are favorable to Plaintiff.

---

[10] Sweeney denies this statement, and several others alleged in Plaintiff's L.R. 56(a)1 Statement, without citing to any evidence to support the denials. *See, e.g.*, ECF No. 103 ¶¶ 13, 15, 18–20, 22–23, 29, 47. Under Local Rule 56(a)3, each denial in a non-movant's Local Rule 56(a)2 Statement "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." The "[f]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1" or the Court imposing other sanctions. Thus, the Court deems those facts that are denied without any citation to any evidence admissible, as they are supported by the evidentiary record provided by Plaintiff. In other instances, Sweeney objects to facts on grounds of relevancy or that the fact calls for a legal conclusion, but neither admits nor denies them. *Id.* ¶¶ 31–43, 51. And in yet other places, Sweeney states that there is "insufficient evidence" for him to either admit or deny the statement. *Id.* ¶¶ 44–46, 48–49. Where necessary, the Court addresses these "insufficient evidence" responses individually.

Likewise, the evidence was material.  Ruiz was the prosecution's "key witness" at Plaintiff's trial.  ECF No. 145-1 ¶ 210.  Information that he had twice denied knowing anything about the murders; that Raucci had engaged in misconduct during the interviews to obtain Ruiz's statements implicating Plaintiff in the murders; and that Ruiz stated he would implicate Plaintiff at Raucci's request, so that he could go home, tends to show that Plaintiff was not guilty and impeaches Ruiz as a prosecution witness.  *See Boyette v. Lefevre*, 246 F.3d 76, 90 (2d Cir. 2001).  Indeed, the Second Circuit has already held as much, in affirming Judge Haight's decision granting Lewis habeas relief.  *Lewis*, 790 F.3d at 124 ("Ruiz—the State's key witness at trial—repeatedly denied to the police that he was at the murder site and that he knew anything about the murders. His statement changed only after Raucci provided critical details about the case, told Ruiz 'that it was in his best interest to tell what happened [and] give a detailed statement as to his participation and also the other two,' and promised to 'let [Ruiz] go' if he did so. . .  That evidence was 'of a kind that would suggest to any prosecutor that the defense would want to know about it.'") (quoting *Leka v. Portuondo*, 257 F.3d 89, 99 (2d Cir. 2001)) (other internal citations omitted).  Thus, the Court rejects Sweeney's arguments that the information was merely cumulative and hence immaterial.

Finally, there is no genuine dispute of fact about whether Sweeney suppressed the evidence:  he did.  Plaintiff attests that Sweeney never wrote down what he saw occur with Raucci and Ruiz, and that he would not typically put exculpatory or impeachment evidence like Ruiz's inconsistent statements into his notes or police reports, because such information would be helpful to the defense.  ECF No. 73-2 ¶¶ 35–42.  Rather than admitting or denying these facts, Sweeney curiously objects to them as irrelevant, even though they are critical to assessment of Plaintiff's *Brady* claim.  ECF No. 103 ¶¶ 35–42.  As Sweeney's own deposition testimony supports Plaintiff's

assertions, the Court credits them.  It is therefore undisputed, based on the record before the Court, that Sweeney did not disclose any of the favorable evidence of which he was aware concerning Ruiz's inconsistent statements or Raucci's alleged interview misconduct to Plaintiff's prosecutors. Although Sweeney contends he did not *intentionally* suppress the information because he had a fluctuating level of confidence in Ruiz's knowledge, because he reported Raucci's conduct to Lawlor the next day, and because he advocated for Plaintiff post-conviction, his own deposition testimony demonstrates that he intentionally failed to memorialize the statements Ruiz gave to him about knowing nothing about the murder because doing so would have been helpful to the defense. Likewise, even assuming that Sweeney reported Raucci's alleged interview misconduct to Lawlor during the series of interviews, it is undisputed that Sweeney never reported that information to any prosecutor, which is what is required to satisfy a police officer's *Brady* obligation.  *See Walker*, 974 F.2d at 299.  Thus, even assuming that intentionality is required, *see Bellamy*, 914 F.3d at 751 n.23, no reasonable jury could conclude he acted unintentionally to withhold the evidence from the prosecution and thus, in turn, from Plaintiff.[11]

In opposition to Plaintiff's motion, Sweeney does not argue other defenses, such as qualified immunity.  Thus, the Court holds that Plaintiff is entitled to partial summary judgment against Sweeney on Count Three.  In so holding, the Court acknowledges that Sweeney's testimony in Lewis's habeas proceeding was likely significant to Plaintiff's ultimate release.  But those efforts do not help Sweeney escape the undisputed evidence that he violated Plaintiff's *Brady* rights through his earlier conduct during the investigation.

---

[11] Sweeney's policy-based argument that a finding of liability would "establish an unworkable precedent" requiring police officers to record or otherwise report every potentially inconsistent statement or impeaching remark by a potential witness does not carry the day.  *See* ECF No. 102 at 10.  *Brady* itself sets boundaries on what must be disclosed:  only *favorable* information that is *material* to guilt or punishment must be disclosed.

Insofar as Sweeney raises a qualified immunity defense to Count Three in his own affirmative motion for summary judgment, the Court holds that he is not entitled to qualified immunity. With respect to Sweeney's affirmative motion asserting a qualified immunity defense, the Court must view the facts in the light most favorable to Plaintiff, as he is the party asserting the injury. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Taking that view, for the same reasons the Court has found Sweeney liable for a *Brady* violation in its discussion above, Sweeney would not be entitled to qualified immunity. Although Sweeney argues that there is "no known constitutional right to documentation in a police report," ECF No. 136-1 at 7, that is not the relevant right at issue. Instead, the relevant right is Plaintiff's constitutional right to a fair trial, which encompasses his right to disclosure of all favorable, material evidence. On the facts viewed in the light most favorable to Plaintiff, Sweeney violated Plaintiff's clearly-established right to a fair trial, by intentionally suppressing favorable, material evidence from Plaintiff.

The Court therefore grants Plaintiff's motion for summary judgment against Sweeney on Count Three.

### 3. Other Defendants

The Court also concludes that Defendants Lawlor, Maher, and Raucci are not entitled to summary judgment against Plaintiff on this claim, because there are disputed issues of fact precluding entry of judgment as a matter of law as to each of them.

First, as to Lawlor, there is a disputed issue of fact as to whether Sweeney reported Raucci's alleged interview misconduct with Ruiz to Lawlor.[12] While Lawlor claims Sweeney did not make

---

[12] As there is no evidence to support that any Defendant other than Sweeney knew about Ruiz's denial of knowledge concerning the murders, the Court construes the *Brady* claim against Lawlor, Maher, and Raucci to focus on the evidence of Raucci's alleged interview misconduct with various witnesses, including Plaintiff.

this report—or at least that he has no memory of it—Sweeney claims he did so report.  *See* ECF No. 145-3 ¶ 70.  If Lawlor indeed knew about the alleged interview misconduct, he would have had an obligation under *Brady* to report it to the prosecutor, as a police officer involved in the investigation, for the reasons discussed above.  Although Lawlor claims to have had a *de minimis* role in the investigation of Plaintiff, that, too, is disputed.  *See id.* ¶ 69; ECF No. 145-1 ¶ 31.  And even if it were not disputed, Lawlor points to no authority suggesting that playing a minimal role in an investigation absolves a police officer of his constitutional obligations under *Brady*.  Thus, Lawlor is not entitled to summary judgment on Plaintiff's *Brady* claim.

Maher also is not entitled to summary judgment on this claim.  While the parties agree Maher was the lead investigatory detective for a few months, ECF No. 145-3 ¶ 75; ECF No. 145-1 ¶ 27, they dispute whether he participated in the interview of Roque with Raucci, with Maher having no recollection of doing so, but Plaintiff providing evidence that he did so participate.  ECF No. 145-3 ¶¶ 76, 82.  There is also a genuine dispute about whether, during the interview, Roque was coerced into giving a statement that implicated Plaintiff and Lewis in the murders.  *See* ECF No. 145-1 ¶¶ 91–104; ECF No. 145-3 ¶¶ 98–102.  Additionally, with respect to the interview of Plaintiff, Maher's role is disputed, as is whether the statement Plaintiff gave at the interview— which represented that Plaintiff heard Lewis make an incriminating statement and had later witnessed Lewis throwing a gun into the river—was coerced.  ECF No. 145-3 ¶¶ 90–97; *see also* ECF No. 145-1 ¶¶ 105–120.  Plaintiff, for his part, refused to sign the statement from the interview when he returned to the police station later with his mother, claiming that it was not true.  ECF No. 145-1 ¶ 122.  If the jury were to conclude that misconduct did occur during the interviews of Roque and Plaintiff and that Maher knew about this misconduct, it could find in Plaintiff's favor on his *Brady* claim, as it is undisputed Maher never reported the information to the prosecutor, and the

jury could reasonably find that the information about the alleged coercion of Roque's and Plaintiff's statements was both favorable to Plaintiff and material for *Brady* purposes. Thus, genuine disputes of material fact preclude entry of summary judgment for Maher.

The same factual disputes also preclude entry of summary judgment for Raucci, as the principal alleged actor in the interview misconduct. Viewing the record in the light most favorable to Plaintiff, Raucci not only knew of his alleged misconduct in the interviews of Ruiz, Roque, and Plaintiff, but intentionally failed to disclose this favorable, material information to a prosecutor. Since a reasonable jury could find in Plaintiff's favor on his *Brady* claim against Raucci, summary judgment is inappropriate.[13]

The only qualified immunity argument made by Lawlor and Maher with respect to the *Brady* claim is that any alleged interview misconduct did not rise to the level of a substantive due process violation. *See* ECF No. 134-1 at 28–29 (arguing that "[i]nterrogation methods egregious enough to sustain a due process violation have been described as those 'so brutal and so offensive to human dignity' that they 'shock the conscience'") (citations omitted). But Plaintiff is not alleging a substantive due process claim in Count Three, so this argument is entirely inapposite.

As for Raucci's qualified immunity argument—that his actions were objectively reasonable, *see* ECF No. 135-1 at 14—the numerous disputes of fact discussed above preclude such a finding at this juncture. Indeed, viewing the evidence in the light most favorable to Plaintiff, Raucci would not be entitled to qualified immunity, as, on Plaintiff's view of the facts, he

---

[13] Raucci's brief relies heavily on Connecticut Superior Court Judge DeMayo's decision on Plaintiff's state habeas petition, which found that there was no suppression of material to establish a *Brady* claim. *See* ECF No. 135-1 at 12–13. When pressed at oral argument about what legal doctrine would allow the Court to give weight to the prior state habeas opinion, Raucci's counsel conceded that he had no authority to support the proposition that the prior habeas decision should be given any preclusive effect, and simply wished for the Court to consider the opinion as "persuasive authority." Tr., ECF No. 199 at 154–55. But the record before the Court is different than that presented in the state habeas proceedings, and so the Court has examined the relevant issues anew.

intentionally suppressed a significant amount of evidence that was favorable to Plaintiff and material to his prosecution.

For these reasons, when the record is viewed in the light most favorable to Plaintiff, Defendants Lawlor, Maher, and Raucci are not entitled to summary judgment on Count Three.

C.    Count Four:  Fabrication of Evidence

In Count Four, Plaintiff alleges that Maher and Raucci fabricated evidence through the interrogations of Roque and Ruiz, and other witnesses, in violation of his right to due process. ECF No. 33 ¶ 175.  Because there are disputed issues of fact regarding this claim, summary judgment is inappropriate as to these Defendants.

"When a police officer creates false information likely to influence a jury's decision and forward that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable act is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee.").  "To succeed on a fabricated-evidence claim, a plaintiff must establish that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Horn v. City of New Haven*, No. 3:18-CV-1502 (RNC), 2024 WL 1261421, at *10 (D. Conn. Mar. 19, 2024) (cleaned up) (quoting *Ashley v. City of New York*, 992 F.3d 128, 139 (2d Cir. 2021)).  A fabrication claim differs from a claim alleging that an officer used improper methods to obtain evidence. *Id.*  Simply put, "it is one thing for a detective to use improper tactics to pressure a witness to provide a statement that may be true and the witness believes to be true.  It is another to use such tactics to force a witness

38

to provide a statement that is false and known to be false by both the detective and the witness." *Id.* at \*11.

### 1.    Maher

The Court holds that Maher is not entitled to summary judgment on Count Four.

Maher contends that the record is insufficient to establish that he participated in Roque's and Plaintiff's interrogations.[14]   With respect to Plaintiff's interrogation, Maher contends that Raucci primarily questioned Plaintiff.  *See* ECF No. 145-3 ¶ 104.  As to Roque, Maher claims he never told Roque what to say, did not stop the tape to tell him what to say, did not see Raucci stop the tape and tell Roque what to say, did not coerce Roque, and did not see Raucci coerce Roque. *Id.* ¶¶ 98–102.  However, like with Plaintiff's malicious prosecution claims, genuine issues of fact exist as to Maher's involvement.  Plaintiff proffers evidence that Maher fabricated statements from both Roque and Plaintiff, fed witnesses information, stopped and rewound the tape to feed witnesses information and create a misleading record of the interview, and falsely stated that the tape was never stopped—though forensic evidence later uncovered that it was.  Moreover, Plaintiff points to evidence that Maher's early investigation into the Turner-Fields homicides pointed strongly to a different suspect, Cardwell, and yielded no evidence suggesting a connection to Lewis or Plaintiff.  Notwithstanding, Plaintiff contends that Maher falsely represented that Cardwell was cleared as a suspect so that he and Raucci could pursue claims against Lewis and Plaintiff, despite having no legitimate basis to do so.  Based on this record, a reasonable jury could credit Plaintiff's version of events and find that Maher fabricated evidence in this case.  Thus, summary judgment

---

[14] Maher's brief states that "his primary involvement appears to be as a witness when the plaintiff Stefon Morant and Ruiz gave their statements on January 15 and 16, 1991."  ECF No. 134-1 at 19.  However, there does not appear to be any evidence in the record to suggest that Maher was involved in the interviews of Ruiz.  The Court therefore assumes that Maher's reference to Ruiz is a typographical error, and that he instead meant to reference the interview of Roque.

is not appropriate for Maher on the merits of this claim, and his argument for qualified immunity fails at this juncture because of the existence of material factual disputes.

2.  *Raucci*

Likewise, there are issues of fact precluding summary judgment for Raucci. Relying primarily on events in Plaintiff's post-conviction proceedings, including Plaintiff's petitions for habeas corpus and for a new trial, Raucci argues that no court has deemed the evidence submitted in Plaintiff's criminal trial as false or otherwise fabricated, and one court found Ruiz's testimony at Plaintiff's trial credible because it was corroborated by other credible evidence presented in the case. As the record before the Court is different than that presented in these underlying proceedings, the Court finds these arguments unavailing. Moreover, as described above, there is sufficient evidence in the record from which a jury could conclude that Raucci violated Plaintiff's constitutional right to a fair trial by fabricating evidence and forwarding such information to the prosecution. In support of this claim, Plaintiff points to evidence documenting the purportedly untrue nature of the statements Raucci obtained through interviews of Ruiz, Roque, Martinez, and Plaintiff himself, and evidence of Raucci's comment to Ortiz that he was trying to "get" someone for a crime he did not commit. Additionally, Sweeney testified that he observed Raucci attempt to fabricate evidence from Ruiz and warned him about his conduct twice. Construing the record in Plaintiff's favor, as the Court must, summary judgment is inappropriate.

In light of this finding, and the significant issues of fact concerning this claim, the Court also concludes that Raucci is not entitled to qualified immunity.[15]

D.  Count Five:  Coerced Statements

---

[15] The Court also rejects as irrelevant Raucci's argument that he is entitled to absolute testimonial immunity for Raucci's own testimony at Plaintiff's criminal trial. As Plaintiff aptly notes, he is not seeking to hold Raucci liable for his *own* trial testimony, but rather for his actions throughout the course of the investigation. *See* ECF No. 145 at 39, n.15.

In Count Five, Plaintiff alleges that Maher and Raucci coerced him to make a false confession and statement, in violation of his Fifth Amendment right not to be compelled to be a witness against himself.  ECF No. 33 ¶ 181.  As there are likewise disputed issues of fact regarding this claim, Maher and Raucci are not entitled to summary judgment on this claim.

### 1.    Legal Standard

The Fifth Amendment to the U.S. Constitution provides that no person shall be compelled in any criminal case to be a witness against himself.  *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988).  A confession is not voluntary when it is "brought about by circumstances that caused the petitioner's will to be overborne at the time he confessed."  *Id.*  In determining whether a confession is voluntary, courts look at the totality of the circumstances, including the following factors: (i) the characteristics of the accused, such as his age, education and intelligence; (ii) the conditions of his interrogation, such as the location, the duration of the detention, and the presence or absence of counsel; and, most critically, (iii) the officers' conduct, including the "repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights."  *Id.* at 900–02 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  These factors should not be weighed against each other; rather, the "situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect."  *Id.* at 902.  Applying these factors here, the Court finds that there is sufficient evidence from which a reasonable jury may conclude that Plaintiff's confession was involuntary.

### 2.    Raucci

Raucci is not entitled to summary judgment on this claim, as there are genuine issues of fact concerning the voluntariness of Plaintiff's confession.  With respect to the first factor— Plaintiff's disposition—the record reflects that Plaintiff signed a waiver statement, wherein he

indicated that he had a twelfth-grade education level and that he could read, write and understand English. ECF No. 128-13 at 2. But Plaintiff proffers evidence that he was under the influence of alcohol and marijuana during his interrogation and that these drugs impaired his judgment. Raucci, in turn, points to Maher's testimony in Plaintiff's post-conviction proceedings that Plaintiff did not appear to be under the influence of drugs or alcohol and that he otherwise appeared lucid. *See* ECF No. 135-1 at 21. Thus, there is a factual dispute about Plaintiff's disposition at the time of the interview.

There are also issues of fact concerning the second factor, the conditions of Plaintiff's interrogation. Raucci relies on Plaintiff's taped witness statement to argue that the interrogation lasted one hour. Plaintiff, however, contends that he was held for several hours, and proffers evidence that Raucci and Maher did not state, on the tape, when Plaintiff's interview began or ended. Nor, according to Plaintiff, is Raucci counting the preliminary interrogation that occurred before the tape recorder was turned on. Construing the evidence in Plaintiff's favor, a rational jury could find that length of the interview cited by Raucci is inaccurate and credit Plaintiff's version of events that the interrogation actually lasted much longer.

And, significantly, with respect to the third factor, Raucci and Maher's conduct, the Court finds that there is ample evidence suggesting that Plaintiff's free will was overborne. Plaintiff adduces evidence that "Maher and Raucci: (1) refused to accept [Plaintiff's] truthful statement that he was innocent and did not have any information about the murders; (2) although they knew there was no actual reliable evidence implicating [Plaintiff], threatened [him] that they would arrest him, put a million dollar bond on him, and he would get the electric chair if he did not give the statement they wanted implicating Lewis; (3) fed him the information they wanted him to repeat, which they knew was false and which mirrored the other statements they had already fabricated; (4) held him

for hours, including refusing his repeated requests to leave, and refused to let him leave until he gave the statement they wanted; [and] (5) promised he would be released only if he did so."  ECF No. 145 at 33.  Courts have denied summary judgment for officers accused of misconduct arguably less egregious than that alleged here.  *See, e.g., Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 457–58 (S.D.N.Y. 2012); *Weaver v. Brenner*, 40 F.3d 527, 536–37 (2d Cir. 1994).

Additionally, the Court finds unpersuasive Raucci's arguments that the record is devoid of evidence that he engaged in tactics beyond "mere deception" or other commonly used and accepted practices.  The Second Circuit has acknowledged that "mere deception by an interrogator, *ipso facto*, does not invalidate a confession absent other compelling circumstances," *U.S. ex rel. Lathan v. Deegan*, 450 F.2d 181, 185 (2d Cir. 1971).  Similarly, police conduct that is "'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).  But Plaintiff's allegations of coercion here involve compelling circumstances and rank far above mere deception.  A reasonable jury could conclude, based on the evidence, that the alleged threats of a million-dollar bond and the electric chair, coupled with the other coercive tactics, overbore Plaintiff's will, thereby rendering his statements involuntary.  Accordingly, Raucci is not entitled to summary judgment on this claim.

### 3.    *Maher*

The Court likewise concludes that Maher is not entitled to summary judgment.  Maher does not meaningfully analyze the *Scully* factors.  Instead, Maher shifts blame onto Raucci, arguing that Raucci made the decision to interview Plaintiff and that Maher did not participate in pressuring Plaintiff or in any other coercive tactics.  Maher also cites Plaintiff's deposition transcript to argue that Plaintiff himself testified that Maher was not in the interrogation room when Raucci threatened

43

Plaintiff; the Court's review of the cited pages, however, reveals a different proposition—that Plaintiff stated he *did not remember* Maher being present (not that Maher definitively was not present).  Pl.'s Dep. Tr., ECF No. 134-15 at 5.  Moreover, as discussed above, Plaintiff proffers testimony implicating Maher in the coercive tactics.  Construing the evidence in Plaintiff's favor, a rational jury could conclude that Maher participated in the alleged events.

4.    *Qualified Immunity*

Given the well-established right of a criminal suspect to be free from the use of compelled statements guaranteed by the Fifth Amendment, and the numerous issues of fact outlined above, the Court finds that neither Raucci nor Maher is not entitled to qualified immunity on this claim. *See Weaver*, 40 F.3d at 536–37 (recognizing that it was "clearly established [as early as] 1989 that police could not lawfully coerce incriminating statements from an in-person criminal suspect" and denying qualified immunity on claim that officer coerced statement); *Ricciuti,* 124 F.3d at 130 (officers not entitled to qualified immunity where a reasonable jury could find, based on the evidence, that they violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forwarding to prosecutors a known false confession).

E.    Count Six:  Failure to Intercede/Intervene

In Count Six, Plaintiff alleges that Sweeney, Lawlor, and Maher all failed to intercede in Raucci's alleged interview misconduct with Ruiz, Roque, and Plaintiff.  ECF No. 33 ¶ 187.  Again, because genuine disputes of fact exist with respect to this claim as to each of the Defendants, summary judgment is inappropriate.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014).  In order to establish a failure

to intervene, the plaintiff must show that the officer "observes or has reason to know" of the constitutional violation and had a "realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Whether an officer was "capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.*

Here, there are disputed material facts concerning all three relevant Defendants' alleged knowledge of a constitutional violation and their opportunity to intervene. As to Sweeney, Plaintiff and Sweeney contend that Sweeney observed Raucci's improper interrogation tactics, but Raucci denies that he engaged in any improper tactics. While Plaintiff and Sweeney attest that Sweeney twice took Raucci to the hallway to admonish him about his tactics, a reasonable jury could conclude that Sweeney failed to properly intervene to stop the alleged constitutional violation because he allowed Raucci to continue the interview of Ruiz despite having previously witnessed Raucci's alleged misconduct (and even though he allegedly assigned Pettola to monitor Raucci, since Plaintiff disputes whether Pettola attended the entire resulting interview). Moreover, a jury could find that Sweeney's alleged reporting to Lawlor the next day was insufficient intervention, since Sweeney had also notarized the statement from Ruiz implicating Plaintiff, despite having firsthand knowledge that Ruiz had denied knowing anything about the murders.

As to Lawlor, there is a dispute about whether Sweeney told Lawlor about Raucci's alleged interview misconduct. If the jury credits Sweeney's testimony, it could also conclude that Lawlor, as a supervisor, had an opportunity (and perhaps a supervisory duty) to intervene to prevent further misconduct by Raucci—especially since Sweeney apparently told Lawlor that Raucci should be removed from the investigation.

And finally, as to Maher, there is evidence from which a jury could conclude that he participated in the interviews of Roque and Plaintiff, which allegedly resulted in fabricated and coerced statements. The level of his participation is disputed; if a jury were to find that he, indeed, participated in those interviews and that misconduct occurred while he was present, it could also reasonably conclude that Maher had a realistic opportunity to intervene to prevent the harm.

For these reasons, Sweeney, Maher, and Raucci are not entitled to summary judgment on Count Six.

### F.     Count Two:  Conspiracy

Next, the Court holds that Defendants Raucci, Maher, Sweeney, and Lawlor are not entitled to summary judgment on Count Two, alleging that they engaged in a conspiracy to deprive Plaintiff of his civil rights.

A § 1983 conspiracy requires: "(1) an agreement between two or more state actors. . .; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). Conspiracies, "by their very nature," are "secretive operations that can hardly ever be proven by direct evidence." *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994). Thus, "both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and intent may be established through circumstantial evidence." *In re Dana Corp.*, 574 F.3d 129, 153 (2d Cir. 2009) (internal punctuation omitted) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)). An agreement between conspirators may be tacit: "[t]here need not be any written statement or even a speaking of words which expressly communicates agreement." *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996).

The Court has recounted above the various genuine disputes of fact concerning whether Sweeney, Maher, Lawlor, and Raucci participated in the suppression of evidence and the coercion and fabrication of witness statements.  There is sufficient evidence from which a reasonable jury could conclude that more than one of the individual Defendants was involved in most of the relevant actions.  For instance, the jury could conclude that Sweeney witnessed Raucci's alleged interview misconduct with Ruiz, and both failed to disclose it to a prosecutor;  that Sweeney told Lawlor about Raucci's alleged misconduct with Ruiz, but Lawlor also failed to disclose it; and that Maher and Raucci jointly participated in the interviews of Roque and Plaintiff, which allegedly resulted in fabricated and coerced statements (the exculpatory and impeaching nature of which were not properly disclosed).  Additionally, there is evidence in the record that, as Raucci's investigation moved toward implicating Plaintiff and Lewis, Maher wrote a memorandum to exclude his original suspect, Cardwell, from consideration.  Further, Plaintiff has put forth evidence regarding the New Haven Police Department's alleged routine practice of failing to disclose exculpatory and impeachment material.  ECF No. 145-1 ¶¶ 186–87, 192, 197.

Based on the evidence in the record, a reasonable jury could conclude that Sweeney, Lawlor, Maher, and Raucci all came to a tacit agreement to take certain actions that ultimately deprived Plaintiff of his constitutional right to a fair trial.  Thus, summary judgment is not appropriate.  The material factual disputes that remain as to what actually happened in the course of the investigation also preclude a finding of qualified immunity on the conspiracy claim.  *See Tolon*, 572 U.S. at 655–56.

While certain Defendants may have arguments suggesting there was no conspiracy—for instance, Sweeney contends that his reporting of Raucci's alleged interview misconduct to Lawlor demonstrates he did not conspire to cover up that behavior, and Lawlor and Maher assert that their

involvement in the relevant portions of the investigation was so minimal that they could not have joined a conspiracy—they are free to advance those arguments at trial, and they may or may not prevail. But because summary judgment is appropriate only if no reasonable jury could find in Plaintiff's favor, the Court cannot conclude that Sweeney, Lawlor, Maher, and Raucci are entitled to summary judgment with respect to Plaintiff' conspiracy claim.

G.    Count Eight:  Negligence

In Count Eight, Plaintiff alleges that Defendants Raucci, Maher, Sweeney, Lawlor, and Pastore were negligent during the investigation and prosecution of Plaintiff, through the same conduct that Plaintiff alleges as the basis for his § 1983 claims. Each of these Defendants contends that Plaintiff's negligence claim is barred by the applicable state statutes of limitation and repose, and Sweeney, Raucci, and Pastore further argue that they are entitled to governmental immunity for their allegedly negligent conduct. As discussed above, the Court rejects Defendants' timeliness arguments. It further holds that there are triable questions of material fact as to the application of governmental immunity to Sweeney, Lawlor, Maher, and Raucci, but not as to Pastore.

1.    *Governmental Immunity*

Sweeney, Pastore, and Raucci contend that they are entitled to governmental immunity as to Plaintiff's negligence claim under Connecticut General Statutes § 4-165. For the reasons explained below, the Court concludes that Defendants' actions were discretionary, and thus covered by governmental immunity unless an exception applies. There are genuine issues of material fact precluding entry of summary judgment as to Sweeney, Raucci, Lawlor, and Maher concerning whether the "identifiable victim, imminent harm" exception to immunity applies. But because no reasonable jury could conclude, on the present record, that Defendant Pastore could

have known that his failure to act would subject Plaintiff to imminent harm, he is entitled to summary judgment on Plaintiff's negligence claim.

a)    *Discretionary and Ministerial Acts*

Under Connecticut law, "a municipal employee . . . has a qualified immunity in the performance of governmental acts" that are "performed wholly for the direct benefit of the public and are supervisory or discretionary in nature." *Violano v. Fernandez*, 280 Conn. 310, 318 (2006); *see* Conn. Gen. Stat. § 52-557n(a)(2)(B).   The "hallmark of a discretionary act is that it requires the exercise of judgment." *Violano*, 280 Conn. at 318.   Discretionary act immunity "reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury." *Doe v. Petersen*, 279 Conn. 607, 615 (2006). "[A]s a general rule, police officers are protected by discretionary act immunity when they perform the typical functions of a police officer." *Borelli v. Renaldi*, 336 Conn. 1, 13 (2020) (cleaned up; quoting *Ventura v. Town of E. Haven*, 330 Conn. 613, 631 (2019)).

Municipal officials and municipalities can be liable, however, for the negligent performance of ministerial acts, defined as acts "to be performed in a prescribed manner without the exercise of judgment or discretion." *Id.* at 11; *see also Violano*, 280 Conn. at 318.   "[T]o demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, by its clear language, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." *Doe v. Town of Madison*, 340 Conn. 1, 31–32 (2021).   The question of whether governmental immunity applies "is ordinarily a

49

question of law for the court," unless there are "unresolved factual issues material to the applicability of the defense." *Haynes v. City of Middletown*, 314 Conn. 303, 313 (2014).

Here, the individual Defendants are correct that their actions in investigating the Turner-Fields murders were discretionary acts, and thus protected by governmental immunity unless an exception applies. Investigating a crime, evaluating evidence, and arresting suspects are quintessential police functions that fall under discretionary act immunity. *See Borelli*, 336 Conn. at 13. Although Plaintiff suggests that the officers' duties were ministerial by operation of Conn. Gen. Stat. § 54-86c(c)—a 2024 statute requiring prosecutors to "disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor"—this argument ignores that there is still significant discretion and judgment involved in deciding whether and to what extent information is exculpatory. As an initial matter, it is not clear that that statute, which was enacted decades after the alleged police misconduct here, would apply retroactively to the officers' conduct in the early 1990s. But in any event, inherent in the determination of what is exculpatory is an exercise of judgment, and the decision about what is exculpatory is undertaken in the context of the typical police function of investigating criminal activity. Thus, the Court concludes discretionary act immunity would bar Plaintiff's negligence claim against the individual Defendants unless an exception to that immunity applies.

<blockquote>
b)      "Identifiable Person, Imminent Harm" Exception
</blockquote>

Next, the Court concludes that there are genuine disputes of material fact precluding entry of summary judgment for Defendants Sweeney, Maher, Lawlor, and Raucci concerning whether the "identifiable person, imminent harm" exception to discretionary act immunity applies. Defendant Pastore, however, is entitled to summary judgment because no reasonable jury could

conclude, on the evidence before the Court, that he should have known, at the time, that his failure to act would have subjected Plaintiff to imminent harm.

If an official performed a discretionary act, he may still be liable for negligence if one of three exceptions to discretionary act immunity applies. Each of these exceptions "represents a situation in which the public official's duty to act is so clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force." *Petersen*, 279 Conn. at 615 (cleaned up). The parties agree that only the third of the three exceptions is applicable here: a municipal officer may not claim immunity if the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm. *Id.* at 615–16. There are three requirements for this exception to apply: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Edgerton v. Town of Clinton*, 311 Conn. 217, 230 (2014) (quoting *Peterson*, 279 Conn. at 616). All three requirements "must be proven in order for the exception to apply." *Id.* at 231.

With respect to the first element, a harm is imminent if it was apparent to the defendant "that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act to immediately prevent the harm." *Haynes*, 314 Conn. at 323. The harm at issue need not be physical harm. *See Pines v. Bailey*, No. 10-CV-866, 2012 WL 2958213, at *5–6 (D. Conn. July 12, 2012), *rev'd in part on other grounds*, 563 F. App'x 814 (2d Cir. 2014) (citing *Petersen*, 279 Conn. at 618 n.10, 611). Concerning the second element, a victim is identifiable if he is in the class of persons as to whom the risk at issue is foreseeable. *See id.* at 311; *Evon v. Andrews*, 211 Conn. 501, 508 (1989). Finally, the apparentness requirement is an "objective test" that considers "the information available to the government agent at the time of

her discretionary act or omission." *Edgerton*, 311 Conn. at 231. What the government agent "could have discovered after engaging in additional inquiry" is not considered, as "expos[ing] a public official to liability for his or her failure to respond adequately to a harm that was not apparent to him or her" would "run counter to the policy goal underlying all discretionary act immunity." *Id.* at 231–32 (citations omitted).

Here, there are genuine disputes of fact concerning whether each of the police officer defendants who were personally involved in the investigation—Sweeney, Lawlor, Maher, and Raucci—can avail themselves of the "imminent harm, identifiable person" exception to discretionary act immunity.

To start, it is clear that Plaintiff would be considered an identifiable person, within the meaning of the exception. To the extent the officers engaged in unconstitutional conduct that resulted in Plaintiff's arrest, prosecution, and conviction, he is certainly within the class of persons who could foreseeably suffer a risk of harm.

With respect to whether the harm was imminent, the inquiry is whether it was apparent to the defendant "that the dangerous condition was so likely to cause harm" that he had a "clear and unequivocal duty to act to immediately prevent the harm." *Haynes*, 314 Conn. at 323. As to Sweeney and Lawlor, a reasonable jury could infer, based on the fact that Sweeney claims to have reported Raucci's alleged interview misconduct with Ruiz to Lawlor, that both officers knew Raucci's conduct was inappropriate and could result in procuring an untruthful statement from Ruiz, causing harm to Plaintiff. Although Lawlor denies that Sweeney made this report, that critical factual question turns on Sweeney's and Lawlor's credibility, and thus must be left to the jury to resolve. As to Maher and Raucci, there is a factual dispute about whether they were involved in procuring a fabricated statement from Roque and from Plaintiff himself. If the jury

were to credit Plaintiff's evidence, it could reasonably conclude that Maher and Raucci had an unequivocal duty to act to immediately prevent the harm of a wrongful prosecution that was based on fabricated and coerced statements from Roque and Plaintiff. Thus, Sweeney, Lawlor, Maher, and Raucci are not entitled to summary judgment on Plaintiff's negligence claim by virtue of discretionary act immunity. *See Henning v. Town of New Milford*, No. 20-CV-1790 (VAB), 2021 WL 4940970, at *23 (D. Conn. Sept. 24, 2021) (finding, on a motion to dismiss, that the plaintiff had sufficiently alleged that failure to disclose exculpatory evidence was so likely to subject the plaintiff to imminent harm that the defendant had a clear and unequivocal duty to disclose the information).

Pastore, on the other hand, is differently situated, since he was not personally involved in the investigation that led to Plaintiff's arrest. Pastore was Chief of the New Haven Police Department during the investigation. *See* ECF No. 145-6, ¶¶ 2–3. While Plaintiff has adduced evidence suggesting that Pastore was "hands-on chief" and was regularly briefed on "what was going on in major homicide[]" investigations, ECF No. 145-1 ¶¶ 29–30, there is little, if any, evidence in the record to suggest that it would have been apparent to Pastore, based on what he knew during the investigation and through the date of Plaintiff's conviction, that he would have had an unequivocal duty to act to prevent harm. Although Raucci testified that he had "'no doubt' Pastore was in the loop on what was happening" in the investigation, *id.* ¶ 30, that statement is vague, and there is nothing in the record to suggest that Pastore knew about the alleged police misconduct that Plaintiff claims led to the withholding of exculpatory evidence and fabrication and coercion of witness statements at the time that these events occurred, such that he would have had a clear and unequivocal duty to act.

Pastore's actions after Plaintiff's conviction cannot be considered in this analysis. According to Plaintiff's evidence, Pastore is alleged to have visited Lewis alone in July of 1995, after the FBI began to investigate Raucci, and to thereafter cover up Raucci's alleged misconduct. *Id.* ¶ 235. But, for purposes of the exception to discretionary act immunity, the Court must examine "the information available to the government agent at the time of her discretionary act or omission." *Edgerton*, 311 Conn. at 231. As the omissions and acts at the heart of Plaintiff's case relate to the information obtained in 1991 from witness interviews undertaken in the course of the investigation into the murders, Pastore's actions beginning in 1995 are not relevant to the inquiry. The high-level assertions of Pastore's hands-on role as Chief and general knowledge of the progress of high-profile investigations while the Turner-Fields investigation was ongoing do not create a genuine dispute of fact about whether the risk of harm to Plaintiff was objectively apparent to him at the pertinent time. Thus, the Court concludes that no reasonable jury could find in Plaintiff's favor with respect to whether Pastore is entitled to discretionary act immunity, and thus he, unlike the other individual Defendants, is entitled to summary judgment as to Plaintiff's negligence claim.

## VI.    PLAINTIFF'S CLAIMS AGAINST THE CITY

Plaintiff asserts claims for municipal liability under *Monell* against the City and Pastore in his official capacity, and claims of indemnification and direct action against the City. The City has, in turn, moved for summary judgment as to all counts against it. The Court denies the City's motion.

### A.    Applicable Facts

In relevant part, Plaintiff asserts the following non-exhaustive allegations concerning the NHPD's policies and practices:

(i) The practice within the NHPD was for officers to not include exculpatory or impeachment material in their police reports, nor disclose to the prosecution exculpatory information *not* included in their police reports;

(i) NHPD officers routinely interviewed witnesses for long periods of time, obtained multiple versions of events, and only documented and disclosed one version, despite knowing that the other statements would constitute impeachment evidence; and

(iii) NHPD officers engaged in a practice of tape-recording only the statements from witnesses the detectives wanted—without creating any record of the improper tactics used to obtain them or the witnesses' prior inconsistent statements—and only turned the tape recorder on at the end of such unrecorded interrogations, among other practices.

*See* ECF No. 145-1 ¶¶ 186–97.  Additionally, Plaintiff alleges that in 1991—the year that Plaintiff was interrogated for the Turner-Fields homicides—the NHPD lacked an express policy addressing officers' *Brady* and related obligations.  *Id.* ¶ 198.  Moreover, Plaintiff contends that during the 1980s and 1990s, NHPD officers operated under a "great deal of pressure," emanating "all the way from the top," not to report other officers' misconduct.  *Id.* ¶ 16.  This was described as "the blue wall of silence" and was "particularly strong" within the NHPD.  *Id.* ¶ 16.  Finally, Plaintiff describes in painstaking detail numerous instances of NHPD officer misconduct (similar to the misconduct alleged in this case) throughout the late 1980s through the early 2000s, resulting in fourteen lawsuits alleging the wrongful prosecution, arrest and/or conviction of innocent persons.  *Id.* ¶¶ 278–353.

The City, for its part, represents that since the 1970s, the NHPD has had a Code of Conduct, providing that officers should not make false reports or fabricate, withhold or destroy evidence of any kind, among other things, and that the failure to follow this code would result in reprimand, punishment, suspension, reduction in rank, discipline and/or investigation, among other consequences.  ECF No. 128-2 ¶¶ 43–44.  The City also describes the NHPD's numerous training

programs during the subject time period, *id.* ¶ 45–59, but since Plaintiff does not advance a municipal liability theory based on failure to train, the Court declines to address them.[16]

B.    Count Seven:  Municipal Liability Under *Monell*

*Monell* established that local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (quoting *Monell*, 436 U.S. at 690).  "Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by municipal employees."  *Id.* at 125.

A *Monell* claim may be based on a policy or custom of the municipality; a policymaker's ratification of a subordinate's unconstitutional actions or acquiescence in those actions; or a failure to train or supervise.  *See id.* at 124–31.  Here, Plaintiff asserts three theories of municipal liability.  First, Plaintiff contends that the City is liable based on Pastore's ratification of unconstitutional conduct.  *See* ECF No. 145 at 41–48.  Second, Plaintiff argues that the City is liable for acquiescing in the NHPD's practice of suppressing exculpatory and impeachment evidence from the prosecution.  *Id.* at 48–52.  Third, Plaintiff maintains that the City failed to provide minimally adequate supervision and discipline to police officers, despite notice that its existing program permitted constitutional violations—which Plaintiff asserts amounts to a custom and practice of

---

[16] Although Plaintiff's amended complaint asserts a claim of municipal liability based, in part, on a failure-to-train theory, *see* ECF No. 33 at 44 ("Municipal Liability based on the NHPD's failure to discipline, train and supervise its officers and detectives with respect to unconstitutional investigative conduct"), Plaintiff clarified at oral argument that he is not pursuing this theory of liability.  ECF No. 199 at 80.  The Court therefore treats this portion of Plaintiff's *Monell* claim as withdrawn and does not address the City's arguments or evidence concerning the adequacy of its training protocol.

tolerating unconstitutional conduct. *Id.* at 52–59. In evaluating the record as a whole, the Court concludes that the evidence provided in support of these theories is sufficient to support liability against the City under *Monell*, so the City's motion for summary judgment must be denied as to Count Seven.

### 1.    Ratification

Plaintiff alleges that the City is liable because Pastore, as a final policymaker, violated his constitutional rights by ratifying Raucci's alleged misconduct. To prevail on a theory of ratification, a plaintiff must demonstrate that an official with final policymaking authority ordered, ratified, or "was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty Am.*, 361 F.3d at 126. A plaintiff need only identify one such decision to bring a *Monell* claim, for "even a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered may deprive the plaintiff of his or her constitutional rights." *Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018) (internal quotation marks and alterations omitted).

Here, the parties do not dispute that Pastore was a final policymaker for purposes of a *Monell* claim. With respect to Pastore's purported actions of ratification, Plaintiff points to testimony of officers describing Pastore as a "hands-on chief," ECF No. 145-1 ¶ 29, and Raucci's testimony that he had "no doubt" that Pastore was "in the loop" on the Turner-Fields investigation, *id.* ¶¶ 28–30. Plaintiff also cites testimony that Sweeney reported to Lawlor that he observed Raucci attempting to coerce and fabricate evidence, ECF No. 145-1 ¶¶ 82–89, 155–66, though it is disputed whether Lawlor received this admonition. Plaintiff further cites to Lawlor's testimony

that if he had received the warning Sweeney described, he would have alerted his supervisors up the chain of command.[17]  *Id.* ¶ 160.

This evidence, however, is too speculative and ambiguous, standing alone, to support an inference that Pastore was aware of Raucci's alleged unconstitutional conduct.  The Court acknowledges that whether Sweeney warned Lawlor about Rauccci's misconduct involves issues of fact and credibility that are best resolved by a jury.  But even if a reasonable jury concludes that Sweeney did in fact warn Lawlor of Raucci's misconduct, the evidence is still insufficient to permit a jury to then make the inferences that: (i) Lawlor told *Pastore*, as opposed to other supervisors up the "chain of command" about the misconduct, as his mere reference to the "chain of command" is ambiguous; and, consequently, (ii) Pastore actually knew about Raucci's purported misconduct. At most, the current record is speculative as to what Lawlor might have done, which is insufficient to support municipal liability based on a ratification theory, particularly as it pertains to the conduct and/or awareness of another officer.

However, the Court finds that Plaintiff's remaining evidence concerning Pastore's conduct *after* Plaintiff's conviction is sufficient to support his theory of ratification.  Plaintiff adduces evidence that when the FBI launched an investigation into Raucci's misconduct, Pastore visited Lewis alone in jail, declined to open an Internal Affairs investigation into Raucci based on Lewis's

---

[17] In support of his ratification theory, Plaintiff also proffers evidence that Raucci was involved in drug dealing and that Pastore scuttled any internal investigation into this conduct by warning Raucci that he was observed at drug locations and that he should avoid those locations.  The Court need not address these allegations, however, as Plaintiff's *Monell* claim is premised on Pastore's alleged ratification of Raucci's investigatory misconduct in Plaintiff's case, not claims of drug dealing.  While this evidence may raise issues of credibility if presented at trial, it is immaterial for purposes of the Court's analysis of Plaintiff's *Monell* claims here.

Likewise, the Court declines to address the City's arguments and supportive evidence that Pastore was not aware of Raucci's purported erratic conduct with his ex-wife because she never reported it to Pastore.  That issue is not before the Court.  Additionally, the Court finds unavailing the City's contentions in relation to this argument that there is no evidence that Pastore "emboldened" Raucci to allegedly coerce testimony from Ruiz and Plaintiff in the Turner-Fields investigation.  ECF No. 128-1 at 8.  The City does not cite to any authority suggesting that municipal liability under a ratification theory depends on whether a policymaker emboldened a subordinate's misconduct.

allegations, and failed to discipline Raucci after the FBI's investigation revealed potential criminal

activity. Plaintiff argues that this circumstantial evidence shows that Pastore already knew about

Raucci's misconduct and that his response was to bury it, rather than take appropriate action.

The Second Circuit has not addressed whether post-event conduct sheds light on the prior

disposition of a policymaker, in a manner that could support *Monell* liability. At least one court

in this circuit has found that it may, at least for purposes of a motion to dismiss. In *Collins v. City

of New York*, 923 F. Supp. 2d 462 (E.D.N.Y. Feb. 15, 2013), the court allowed a *Monell* claim

based on a ratification theory to proceed where the plaintiff alleged that that the policymaker, the

District Attorney, took no disciplinary action against a prosecutor who had withheld numerous

documents from the plaintiff during his prosecution, and continued to praise the prosecutor even

after a court granted habeas relief for the plaintiff in a scathing ruling. *See id.* at 477–78. Relying

on cases from the Fifth, First, and Ninth Circuits, the *Collins* court found that the District

Attorney's "lack of corrective action" once he learned of the problem "might also reflect a tacit

policy on [the policymaker's] part to condone whatever his subordinates deemed necessary to

secure a conviction." *Id.*; *see Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985)

("Following this incompetent and catastrophic performance [by police officers], there were no

reprimands, no discharges, and no admissions of error. The officers testified at the trial that no

changes had been made in their policies. If that episode of such dangerous recklessness obtained

so little attention and action by the City policymaker, the jury was entitled to conclude that it was

accepted as the way things are done and have been done in the City of Borger. If prior policy had

been violated, we would expect to see a different reaction. If what the officers did and failed to

do . . . was not acceptable to the police chief, changes would have been made."); *Bordanaro v.

McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what

policies existed in the city on the date of the alleged deprivation of constitutional right."); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").  Although the court in *Collins* recognized that the subsequent events could also merely reflect the policymaker's support for a subordinate accused of wrongdoing, it held that the plaintiff was entitled to an inference of ratification.  923 F. Supp. 2d 462 at 477.

Although the posture of *Collins* was a motion to dismiss, the evidence Plaintiff has put forth here concerning Pastore's allegedly tepid reactions to learning about Raucci's alleged misconduct could support a jury finding that Pastore, and by extension the City, had a policy of tolerating or overlooking misconduct like that alleged here, such that the City could be liable.  Like in *Grandstaff*, the jury could conclude that a policy of condoning unconstitutional police conduct preexisted because Pastore failed to act more affirmatively to revise policy, to sanction Raucci, or to require closer supervision of officers when the allegation of Raucci's misconduct came to light.

### 2.    Acquiescence and/or Failure to Supervise or Discipline

Plaintiff's next theory of municipal liability is that the City failed to provide appropriate supervision and discipline despite notice that its existing program permitted constitutional violations, which Plaintiff contends amounts to a custom and practice of tolerating unconstitutional conduct.  *See Amnesty Am.*, 361 F.3d at 126 ("[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983.") (internal citation and quotations omitted).  In this context, a plaintiff must demonstrate that the City's conduct was tantamount to deliberate indifference.

60

Specifically, a plaintiff must show that "the need for more or better supervision to protect against constitutional violations was 'obvious,'" but that the City made no meaningful attempt to investigate, forestall or prevent the unconstitutional conduct. *Amnesty Am.*, 361 F.3d at 127 (quoting *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995)). "The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing." *Amnesty Am.*, 361 F.3d at 128.

The Court finds that the record here is replete with evidence illustrating the City's alleged deliberate indifference to unconstitutional conduct. Plaintiff points to fourteen lawsuits between 1984 and 2007, wherein NHPD detectives allegedly fabricated evidence, coerced witness statements, withheld exculpatory evidence or otherwise engaged in misconduct, resulting in the wrongful prosecution or conviction of innocent persons. ECF No. 145-1 ¶¶ 345–48. The City correctly observes that many of these referenced lawsuits postdate Plaintiff's 1992 arrest and that their timing might therefore diminish their probative value. *See Collins*, 923 F. Supp. 2d at 479; *Burwell v. Peyton,* 131 F. Supp. 3d 268, 304 (D. Vt. 2015) ("Post-event incidents of excessive force thus do not provide a basis for Plaintiff's *Monell* claims."). However, at least seven of the cited events occurred prior to or nearly contemporaneously with Plaintiff's investigation and arrest. *See* ECF No. 145-1 ¶¶ 278–288, 295–312, 349–53 (describing wrongful arrests that occurred between 1984 and 1993). While there is no brightline number of lawsuits required to establish a failure to supervise or discipline theory, the Court finds that these seven demonstrative examples provide ample fodder for a reasonable jury to conclude that that there was an obvious need for better supervision within the NHPD related to officers' *Brady* obligations. *See Vann*, 72 F.3d at 1049 ("An obvious need [for more or better supervision] may be demonstrated through proof of repeated complaints of civil rights violations.").

Additionally, the Court rejects the City's attempts to undermine the probative value of these lawsuits by noting that in some of them, courts ultimately upheld the challenged policies, found no misconduct, or denied habeas relief, among other arguments.[18]  "[T]here is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise."  *Felix v. City of New York*, 344 F. Supp. 3d 644, 662 (citing *Manigault v. City of New York*, No. 11-CV-4307 (AJN), 2012 WL 13049173, at *8–9 (S.D.N.Y. Apr. 19, 2012)); *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986) ("The fact that none of the claims had yet been adjudicated in favor of the claimant was not material; if the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims.").  Moreover, the purpose of these referenced lawsuits is not to establish that misconduct actually occurred, but rather to support an inference that the City was aware of the possibility of *Brady* violations and related misconduct by its officers prior to Plaintiff's arrest—yet disregarded it.  *See Edwards v. City of New York*, No. 14-CV-10058 KBF, 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015) (noting that "the point [of police misconduct lawsuits] is one of notice").

Additionally, Plaintiff points to testimony of NHPD officers describing the "particularly strong" "blue wall of silence" within the NHPD—that is, a "great deal of pressure," coming "all the way from the top," to not report other officers who engaged in misconduct.  ECF No. 145-1 ¶¶

---

[18] The City also argues that given the number of NHPD detectives and the number of cases they handled during the subject time period, the incidents cited by Plaintiff represent such a small percentage of misconduct that they cannot constitute a pervasive practice.  *See* ECF No. 128-1 at 14.  But this reasoning has been rejected by courts in this district.  *See, e.g.,* Tr., *Jackson v. City of New Haven*, No. 3:19-CV-0388 (RNC) (D. Conn. Feb. 27, 2024), ECF No. 267 at 13 ("the way to assess the *Monell* claim is not to look at it statistically as the City suggests, [but]…to look at this as an airplane crash. I don't think *Monell* permitted the City to wait for more wrongful convictions in homicide cases brought about through due process violations caused by its own policy and practice before it was obliged by law to act to avoid liability under *Monell*.").

15–26.  Plaintiff further cites to evidence that NHPD officers themselves engaged in criminal misconduct, but they were not disciplined for such activities, *see id.* ¶¶ 15–26, 221–54, 267–72, among other examples.  Courts have recognized that municipalities can be held liable under *Monell* based on acts of deliberate indifference regarding officer misconduct.  *See Fiacco*, 783 F.2d at 328–32 (relating to a number of prior incidents of excessive force); *Vann*, 72 F.3d at 1049–51 (relating to a lack of monitoring of new civilian complaints about a particular officer, who had been identified as violent-prone and had been involved in prior physical confrontations).

Taken together, and considering the scope and severity of the misconduct alleged in this case, the Court finds that the evidence could permit a reasonable jury to conclude that the City had notice of the need of greater supervision and discipline related to its officers' *Brady* obligations and interview tactics, yet failed to take meaningful steps to investigate, remedy or prevent the unconstitutional conduct.

### 3.    Unconstitutional Practice or Custom

Finally, the Court similarly concludes that Plaintiff's third theory of municipal liability, based on the City's acquiescence in the NHPD's practice of suppressing exculpatory and impeachment evidence from the prosecution, is well-supported by the record.  While isolated acts of police misconduct by officers are generally not sufficient to demonstrate a municipal custom or policy that would justify municipal liability, such acts can justify liability of the municipality if "they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware."  *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012); *see also Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992) (A practice can generate municipal liability under *Monell* if it is "persistent and widespread," or "permanent and

well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials.").

In support of this theory, Plaintiff again points to the NHPD's "blue wall of silence" and the fourteen lawsuits referenced above. Additionally, Plaintiff proffers evidence that the NHPD conducted off-the-record pre-interviews of witnesses, used threats and other coercive tactics to mold witnesses' statements, tape recorded and reported to the prosecutor only those statements that it coerced, and failed to record or report to the prosecutor exculpatory and impeachment evidence. ECF No. 145-1 ¶¶ 185–204, 190–97. Plaintiff also cites to testimony by the City's own witness that the NHPD had a longstanding practice of conducting unrecorded interviews. *Id.* ¶ 194. Construing the record most favorably to Plaintiff, the Court finds that a rational jury could conclude that this conduct was not isolated, but rather severe, persistent and pervasive such that it constituted an unconstitutional custom.

For these reasons, the Court denies the City's motion for summary judgment as to Plaintiff's *Monell* claim in Count Seven.

C.  Counts Nine and Ten:  Indemnification under Conn. Gen. Stat. § 7-465 and Direct Action under Conn. Gen. Stat. § 52-577n

In Count Nine, Plaintiff alleges that, to the extent the individual Defendants are determined to be liable to Plaintiff on Counts Three, Four, Five, Six, and Eight, the City must pay any damages awarded under the indemnification provisions of Conn. Gen. Stat. § 7-465. ECF No. 33 ¶¶ 204–09. In Count Ten, Plaintiff alleges that the City is directly liable under Conn. Gen. Stat. § 52-577n for the negligent actions of its employees, the individual Defendants. *Id.* ¶¶ 210–15. With respect to both claims, the City's potential liability is derivative of the liability of the individual Defendants. Thus, the City advances many of the same arguments advanced by the individual

Defendants, concerning timeliness of the underlying claims and the applicability of governmental immunity. For the reasons stated below, the Court rejects the City's arguments.

> 1. *Timeliness Arguments*

The Court has addressed the timeliness arguments related to Plaintiff's claim for negligence above. To briefly summarize, it has held that, under Connecticut case law, the statute of limitations on Plaintiff's negligence claim did not begin to run until his conviction was invalidated in June of 2021. *See Fontanella*, 89 Conn. App. at 700. Thus, neither the discovery portion nor the repose portion of Conn. Gen. Stat. § 52-584, nor the statute of limitations set forth in Conn. Gen. Stat. § 52-577, bar Plaintiff's negligence claim or his other state law claims, to the extent they are alleged under the Connecticut Constitution.[19]

Nor is the City's argument that Count Nine, brought under Conn. Gen. Stat. § 7-465, is untimely well-taken. The relevant portion of Section 7-465 states that "[n]o action for personal physical injuries . . . shall be maintained against such municipality and employee jointly unless such action is commenced within two years after the cause of action therefor arose and written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued." Although the City claims that it was not served with notice of Plaintiff's intent to file suit until May 10, 2022, Plaintiff has provided a copy of a letter dated December 23, 2021, addressed to the New Haven City Clerk providing exactly such notice, with proof of delivery. Pl.'s Ex. 35, ECF No. 146-5. As the Court has held Plaintiff's

---

[19] At oral argument, the City's counsel suggested, for the first time, that the Court certify a question to the Connecticut Supreme Court concerning § 52-584's application to cases like this one, in which alleged police misconduct occurred decades ago but the suit was not brought until after the plaintiff's conviction was invalidated. The Court need not entertain arguments raised for the first time at oral argument. *See Kosachuk v. Selective Advisors Grp., LLC*, 827 F. App'x 58, 62 (2d Cir. 2020) (summary order). Moreover, for the reasons explained above, the Court believes that the Connecticut appellate courts have answered this question—albeit indirectly—through their decisions in *Cooke* and *Taylor*.

cause of action accrued on July 7, 2021, when his conviction was expunged, he properly presented

his intent to sue to the City within six months of the claim's accrual, as required by § 7-465.

Additionally, for the same reasons the Court has held that Plaintiff's claims do not violate the

statute of repose portion of § 52-584, they likewise do not violate the two-year statute of repose

set forth in § 7-465.

### 2.    Liability under § 7-465

Section 7-465 provides that a municipality "shall pay on behalf of any employee of such

municipality . . . all sums which such employee becomes obligated to pay by reason of [liability]

. . . if the employee, at the time of the occurrence, accident, physical injury or damages complained

of, was acting in the performance of his duties and within the scope of his employment, and if such

occurrence, accident, physical injury or damage *was not the result of any wilful or wanton act of

such employee in the discharge of such duty*."  Conn. Gen. Stat. § 7-465 (emphasis added).  Thus,

to maintain a claim against a municipality under § 7-465, the plaintiff must "affirmatively plead

and eventually prove that her injuries were not the result of the municipal employee's wilful or

wanton act."  *City of Hartford v. Edwards*, 946 F.3d 631, 634 (2d Cir. 2020).

While Plaintiff certainly alleges that the individual Defendants acted with malice,

intentionality, and deliberate indifference—language that sounds in willfulness and wantonness—

he has also alleged that the individual Defendants acted negligently, and he can properly submit

his case to the jury on alternative theories.  *See, e.g.*, *Riverwoods Chappaqua Corp. v. Marine

Midland Bank, N.A.*, 30 F.3d 339, 343 (2d Cir. 1994); *Bussolari v. City of Hartford*, No. 3:14-CV-

149 (JAM), 2016 WL 4272419, at *3-4 (D. Conn. Aug. 12, 2016) (noting that "[i]t is well

established that a plaintiff may plead alternative theories of liability," explaining that Connecticut

law permits recovery for both negligent and intentional acts of police officers, and holding that a

66

"properly instructed jury" should decide whether the evidence supports a finding of intentional or negligent conduct, provided that the plaintiff cannot obtain "double recovery on alternative theories that are based on the same conduct and harm"); *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *20-21 (citing *Bussolari* and holding that "the Court will allow the jury to decide whether [the plaintiff] can prove intentional or negligent conduct"); *Ravalese v. Town of E. Hartford*, No. 16-CV-1642 (VAB), 2019 WL 2491657, at *19 (D. Conn. June 14, 2019) ("[W]here negligence claims [against police officers]. . . proceed to trial, derivative § 7-465 claims may also proceed to trial.").

Plaintiff concedes that, under Connecticut law, the jury cannot ultimately find the same conduct to be both "intentionally and negligently tortious." *See DaCruz v. State Farm Fire and Cas. Co.*, 268 Conn. 675, 693 (2004). But with careful jury instructions, this issue can be avoided.[20] Of course, were the jury to find that the individual Defendants' actions were wilful or wanton, the City would not be liable for such actions under § 7-465.[21]

### 3. Direct Action Claim Under Conn. Gen. Stat. § 52-577n

The City next mirrors the individual Defendants' arguments that the officers are entitled to governmental immunity for their discretionary acts, and thus the City cannot be derivatively liable for their acts. Because, as the Court explained above, genuine disputes of fact remain with respect

---

[20] To the extent the City also suggests that Plaintiff's amended complaint is facially deficient because it incorporates into its negligence allegations all prior paragraphs—including those alleging intentional and willful conduct, *see* ECF No. 33 ¶ 199—the Court construes the amended complaint as alleging the negligence claim in the alternative, which appears to be Plaintiff's clear intent, based on its summary judgment briefing. The Court further notes that the City did not move to dismiss the amended complaint, on this basis or any other.

[21] The City also advances an argument that negligent conduct cannot form the basis of a constitutional tort, under *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986). The City's argument on this point is not well-developed. In any event, *Daniels* is inapposite here. It merely stands for the well-established proposition that, in any given § 1983 suit, "the plaintiff must still prove a violation of the underlying constitutional right; and depending on the right, merely negligent conduct may not be enough to state a claim." *Id.* at 330.

to the "identifiable person, imminent harm" exception to governmental immunity as to Defendants Sweeney, Lawlor, Maher, and Raucci, the City is not entitled to summary judgment on this ground.

Connecticut has replaced its common law, court-articulated rules of municipal liability with Connecticut General Statute § 52-577n. *See Considine v. City of Waterbury*, 279 Conn. 830, 836 (2006). This statute expressly abrogates the common-law doctrine that municipalities are immune from suit for torts committed by their employees. *Ravalese*, 2019 WL 4791657, at *17. The statute subjects municipalities to liability for negligent acts or omissions of their employees arising within the scope of employment, except that municipalities are not liable for damages for acts of an employee that "constitute criminal conduct, fraud, actual malice or wilful misconduct," or "negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." Conn. Gen. Stat. § 52-577n(a)(2).

As the Court has held above, the investigatory actions engaged in by Sweeney, Lawlor, Maher, and Raucci are discretionary acts. But the "identifiable victim, immediate harm" exception to governmental immunity for discretionary acts turns on disputed facts that must be submitted to the jury for resolution, for the reasons explained above. The City also contends that *it* had no independent duty to act to prevent such harm, apart from any duty that may have been owed by the individual Defendants. The City cites no authority to suggest that § 52-577n and § 7-465 are to be read in a manner that requires a municipality to have an independent duty to act; rather, § 52-577n appears to impose derivative liability on the City for the acts of its employees. And, as the Court has held, genuine disputes of material fact exist as to whether the individual Defendants, as City employees, were required to act to prevent imminent harm from befalling Plaintiff. Thus, the Court denies the City's motion for summary judgment on this ground.

In sum, the City's motion for summary judgment is denied in full.

**VII.    CONCLUSION**

For these reasons, the Court grants Plaintiff's motion for summary judgment on Count Three against Sweeney, and grants Pastore's motion for summary judgment on Count Eight. Defendants' motions for summary judgment are denied in all other respects.

The Court will convene a status conference to set a date for trial and pretrial deadlines.

**SO ORDERED** at Hartford, Connecticut, this 3rd day of October, 2025.

      */s/ Sarala V. Nagala*
      SARALA V. NAGALA
      UNITED STATES DISTRICT JUDGE