# Exhibit 30

Charles Drago
Report

**In the matter re:**

**Stefon Morant**
**V.**
**The City of New Haven, et al.,**

**Case No: 3:22-CV-00630 (CSH)**
**United States District Court**
**District of Connecticut**

---

# Report

**of**


**CHARLES W. DRAGO**
**DRAGO PROFESSIONAL CONSULTANTS, LLC**


---

April 15, 2024

**Table of Contents**

Table of Contents………………………………………………… 2

Introduction………………………………………………………. 3

Qualifications…………………………………………………….. 4

Opinions…………………………………………………………… 5

Materials Relied Upon………………………………………… 48

Past Expert Witness Testimony…………………………….. 50

Publications………………………………………………………. 56

Compensation……………………………………………………. 56

Appendix 1 – Curriculum Vitae of Charles W. Drago

Ms. Christina Matthias
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, NY 10013

Dear Attorney Christina Matthias,

I have been retained as a consultant and expert in the matter known to me as Stefon Morant V. The City of New Haven; et al., Case No: 3:22-CV-00630 (CSH), United States District Court, District of Connecticut.

I was asked to review documents relevant to this matter and render expert opinions about the police actions of the defendants involved in this matter.

After evaluation of all the facts and circumstances that are known to the witnesses at the time of this incident, I employed comparative methodology in determining my opinions and in evaluating the officers' actions. This method of comparing the actions of the officers with accepted practice and training in the law enforcement profession is a common and consistently applied method when evaluating an officer's actions. Therefore, I formed a number of opinions to a reasonable degree of professional certainty, as to suspect and witness interrogation/interview, criminal investigation procedures, production of exculpatory evidence, supervision, training, and general police procedures used by the Defendants in this matter and whether or not certain actions of the defendant police officers were consistent with accepted police practices.

Note: The material reveals that there is conflicting information between witnesses. Resolving such conflicts involves assessing witness credibility and assigning weight to the given testimony and is the responsibility of the trier of fact. Accordingly, I make no credibility determinations. The opinions offered in this case related to facts in dispute are based on the available evidence, including assumptions that are identified in the basis for my opinion, and the totality of my knowledge, training and experience.

Evidence in this case—including admissions from the defendants themselves and other law enforcement officers, and forensic evidence from the FBI, and witness testimony, all assumed to be true/accurate—demonstrates the defendants seriously deviated from minimally accepted police practices in their investigation into the homicides of Ricardo Turner and Lamont Fields by feeding false information to interviewees, using coercive tactics to get them to repeat it back, and misrepresenting to the prosecution that the statements originated with the interviewees and the circumstances under which they were given, and that these deviations were systemic and were at play in other homicide investigations around the same time. Further, the defendants admit, and other evidence (taking it as accurate/true) further demonstrates, that the New Haven Police Department chain of command failed to impose necessary policies and failed to remediate or in any way address the evidence of misconduct in this case, evidence of similar misconduct in other homicide investigations from the time period, and evidence of Defendant Raucci's illegal behavior across the board.

My opinions are based not only on the facts presented by all parties, but my experience and training concerning proper policies and police practices in criminal investigation, witness interviews/interrogations, witness identification, police supervision, and training. Pursuant to the requirements of Rule 26 of the Federal Rules of Civil Procedure, I have studied the reports and other material provided to me regarding this case. Please be

advised that if there are any additional depositions, policies, or other materials produced in this case, a supplemental report may be necessary; thus I reserve the right to supplement my opinions and/or this report.

**Qualifications**

I am a 30-year career law enforcement officer who advanced through the ranks of the police department with an exemplary record. Recognized for integrity and leadership, I was appointed as assistant police chief, police chief as well as deputy chief of staff and senior law enforcement advisor to the Governor of Florida.

I have approximately 13 years' experience as a criminal investigator, including service in the Organized Crime Division, Vice, Narcotics, fraud and Homicide. I was involved in these criminal investigations at various levels to include detective, homicide sergeant and Commander of the Criminal Investigations Division. I conducted long term, complex organized crime investigations which in some cases involved the highest levels of organized crime syndicates. In three years as the homicide supervisor, I was responsible for overseeing hundreds of death investigations including homicide, officer involved shootings, suicide, and accidental deaths.

As a senior leader of major law enforcement agencies and a member of the department's review boards; I have investigated hundreds of police misconduct allegations in all areas including use of force/Taser/pepper spray, deadly force, k-9, and police pursuits. I have broad-based experience in high liability areas including the management and development of policies and procedures in those areas.

During my career, I have attained a significant amount of experience in police officer involved shootings as a police officer in the field as well as a line supervisor and homicide detective supervisor who investigated police officer involved shootings. As a police executive, I have also developed use of force policies and evaluated trends and individualized cases. In addition, I served as a union representative on many officer involved shootings. I received training in criminal investigations, homicide investigations, police officer bill of rights and internal police investigations.

As an experienced frontline law enforcement officer who was directly or indirectly involved in thousands of arrests, my experience includes service in various capacities with direct hands-on involvement and/or supervision in areas such as patrol, street narcotics, SWAT, k-9, street crimes, criminal investigations, training and homicide. I have advanced through the ranks and served as a police officer, field training officer, detective, sergeant, detective sergeant, captain, major, and assistant chief with 18 of those years as a commanding officer. My career includes significant experience with the investigation of police officer use of force, as an officer, immediate supervisor and senior administrator.

My education includes an associate degree in criminal justice, a bachelor's degree in criminal justice, and graduation from the Southern Police Institute Command Officer's School at The University of Louisville. In addition, I have had numerous hours of training in the use of force, Tasers, arrests, firearms, supervision, patrol procedures and the management of those.

As a certified police instructor, I trained thousands of police officers in the use of force, criminal investigations, search warrant procedures, narcotics investigations, and patrol procedures.

**Professional Homicide Investigation Practices**

Homicide cases and investigations in police agencies across the United States are given priority and resources not normally provided to other types of investigations. More experienced, trained and knowledgeable detectives are assigned. Their investigations result in detailed documentation, commonly referred to as "investigation files" or "murder book" in some jurisdictions. These investigative records provide a step-by-step record of all evidence gathered, all witnesses interviewed, statements taken, leads followed (whether productive or not), medical records, autopsy photographs and reports, photographs of the crime scene, wound descriptions, weapon (gun, bullet, shell, knife, vehicle, objects, etc.) analysis, chain of custody and evidence logs, vehicle impounds, search warrant applications and returns. It is not uncommon for a typical murder investigation to contain many hundreds (and often times thousands) of pages – even if there is thought to be a "known" suspect. There are well-established criteria and a broad range of literature for these practices.

Professional investigation and documentation are critically important for a number of reasons, some of which include but are not limited to:

- Case integrity
- Continuity of investigation
- Supervisory oversight
- Facilitation of case management
- Inclusion of investigative notes and investigators actions
- Ensuring thoroughness of the investigation
- Allowing other investigators to assist or replace initial investigators
- Providing a "paper trail" of what steps were taken (or not taken)
- Focusing on important aspects of the case
- Identifying what remains to be done and what has already been done and by whom
- Eliminating suspicion from some possible initial suspects
- Providing sufficient information to identify and arrest a suspect
- Providing insight for prosecutor considering charges
- Providing an objective basis for charging and trying the suspect
- Providing an objective basis for the court to determine challenges
- To have a single document for discovery and disclosure (Brady rule)

These standards were in place by 1990. Additional professional standards for minimally accepted practices during homicide investigations that were in place by 1990 (including regarding witness and suspect interviews, disclosure of exculpatory evidence, avoiding tunnel vision and ensuring an unbiased and comprehensive investigation, and supervision) are discussed in the following sections.

**Individual, Supervisory, and Institutional Failures in the Investigation Into the death of Ricardo Turner and Lamont Fields.**

The "investigation" of Stefon Morant by the City of New Haven Police Department, including the named defendants employed by this agency was conducted in such an improper manner that it targeted and resulted in the wrongful arrest and charging of Stefon Morant.

**<u>Opinion A: Defendants Vincent Raucci, Vaughn Maher, Robert Lawlor and Michael Sweeney failed to act in accordance with accepted police practices when conducting interviews of witnesses and suspects in the underlying criminal investigation.</u>**

1. There is evidence (including witness testimony that is assumed to be true) that over three days in January 1991 Defendant Raucci, along with the participation and/or consent of Defendants Maher, Sweeney, and Lawlor, coerced false statements from two teenagers and from Stefon Morant himself to support an invented narrative incriminating Mr. Morant and his friend Scott Lewis as Turner and Fields' killers.

2. These three statements, obtained on January 14, 15, and 16, 1991, were the first evidence of any kind implicating Mr. Morant and Mr. Lewis; their names never came up in any of the police reports or witness interviews from the first three months of the investigations led by Detective Maher, nor had the names of the individuals who implicated them, Ruiz and Roque.

3. There is evidence of improper misconduct by Raucci in these interviews; specifically, if the witnesses, including Sweeney, are believed, Raucci interrogated each witness prior to turning on the tape recorder and used various improper tactics to get them to repeat back false information he provided to them, including repeatedly threatening them with prosecution for the murders and telling them they could not leave unless they gave the statement Raucci wanted, and offering to help them out in exchange for a false statement. The witnesses' testimony (accepting it as true), Sweeney's admissions, and the forensic analysis of the Roque, Morant, and Ortiz tapes (accepting it as accurate) further suggests Raucci then took tape-recorded statements from each of them and arranged the recorded interviews in such a way as to make it seem like the witnesses were offering the information voluntarily, including by stopping and starting the tape recorder to coach them on what to say. Accepting the witnesses' testimony as true, Raucci provided Ruiz, Roque, and Morant with the false information included in their statements, failed to document that he did this, and misrepresented to the prosecution that these witnesses' statements had originated with them to make the statements seem reliable when in fact they were false and provided. If true, Raucci's representations to the prosecution that the information in the statements originated with the witnesses were fabricated and highly improper.

4. According to the information reviewed, Sweeney and Maher each participated in some portion of these interviews; Lawlor was responsible for supervising the investigation and received frequent updates. There is no evidence Maher ever documented or disclosed that Raucci engaged in misconduct with these witnesses or that the witnesses gave inconsistent statements by first disclaiming any knowledge of the murders and then adopting the false information Raucci fed them. Sweeney testified that the day after he observed Raucci engaging in misconduct with Ruiz he reported it to Lawlor, and that he reported it to Lawlor again some months later; Sweeney also testified that in 1999 he reported Raucci's misconduct to one of the officers then in charge of the Investigative Services Unit, Lt. Sullivan, by calling and leaving messages with his office. Lawlor has in the past denied Sweeney reported Raucci's misconduct to him; I understand Lawlor's deposition in this case is pending and may or may not occur; Sullivan has denied receiving Lawlor's messages. For the purposes of this report, I assume Sweeney's testimony regarding reporting Raucci's misconduct to be true. Sweeney admits he never documented Raucci's misconduct in a report. There is no evidence Lawlor ever documented or disclosed Sweeney's report of Raucci's misconduct, and no evidence Lawlor ever took any action to initiate an investigation into or remediate Raucci's misconduct.

5. If witnesses Hector Ortiz and Millie Martinez are believed, the evidence also indicates that Detective Raucci used coercive tactics to obtain a false, statement from Ortiz, who was facing criminal charges, and from sixteen-year-old Martinez, through the use of the same improper tactics he used with Ruiz, Roque and Morant. A forensic analysis of Ortiz's taped statement to Raucci (assuming it is accurate) demonstrates the tape was stopped and started repeatedly. Raucci also failed to disclose or document the use of those tactics with these witnesses, that their statements were false. or their inconsistent statements, in violation of his basic obligations.

6. In spite of the strong evidence to implicate Michael Cardwell in the Turner-Fields murders, Raucci only did one follow up interview of Cardwell which lasted 11 minutes. Raucci conducted a superficial interview where he neglected to ask some of the most elementary interview questions concerning his sexual relationship with Turner, his drug business, and why other witnesses had identified him. Raucci also appears to have suppressed an interview he did with a witness named Bobby Wilson that directly implicated Cardwell as the killer.

7. Raucci dismissed Cardwell as a suspect in a summary report on March 23, 1991. Raucci justified his dismissal by stating that the informant who had relayed Cardwell's confession had done so for financial gain. The motivation for a witness giving a statement is important and should be considered when accessing a witness's credibility but should not be cause to eliminate the witness. The information reviewed, including the deposition testimony of the witnesses, assuming it is true, exposed specific evidence that the defendants falsified evidence implicating Morant and Lewis while quickly dismissing the evidence of Cardwell's involvement. There is no evidence that Cardwell was ever ruled out as a viable suspect to this day, and there is objective evidence supporting witness statements implicating Cardwell, including mention of nonpublic facts from the murder scene allegedly volunteered by Cardwell. Mr. Morant's separately tried co-defendant Scott Lewis has alleged that Raucci framed Mr. Morant and Mr. Lewis for the Turner-Fields homicides because Raucci partnered in the illegal drug trade with a dealer, Frank Parise, who Mr. Lewis owed a drug debt to. I do not make credibility determinations about Mr. Lewis's claim, however the utter failure to properly investigate Cardwell as a viable suspect in the Turner-Fields homicides is a red flag regarding Raucci's motive.

8. The evidence suggests Raucci assumed the position of lead detective in the Turner/Fields investigation in January/1991. The defendants participated in interviews and interrogations of witnesses and suspects which were later recanted.

9. Based on my review of the records in this case, and assuming the testimony of witnesses interviewed by Raucci to be true, the interview techniques used by the aforementioned Defendants in these interviews/interrogations are contrary to police training and accepted police practices. In each case described below, the person being questioned later testified that they provided a false incriminating statement after Detective Raucci and/or other police officers threatened or made promises in exchange for them repeating back false statements that were provided to them. Defendant Sweeney also admits that he observed Raucci engage in these improper tactics with witness Ruiz.

10. By 1990, police officers were generally trained in interview/interrogation techniques that are designed to get truthful answers from the subject and greatly limit the possibility of false statements. The training and subsequent policies instruct police officers that all confessions/incriminating statements must be voluntary. The voluntariness of a statement will come in question when a police officer threatens or makes promises in exchange for that statement. Based on my experience and training, these types of statements are considered to be coerced statements and would not be acceptable for a police investigator and certainly not accepted as evidence in a criminal court:

11. International Association of Chiefs of Police Training Key #500: *Interrogation techniques: Guarding against False Confessions, P.3: Types of False Confessions: 1. Coerced Compliant Confessions. Perhaps the most frequent of these are false confessions resulting from the suspect's belief that there will be some instrumental gain from the confession. Possible gains include being allowed to go home, bringing the interrogation to an end (duress) or escaping the inherent psychological or physical pressures of the interrogation (coerced). Some studies suggest that nearly half of all false confessions are of this type.*

12. Psychological Coercion*: causing a suspect to believe that he or she has no choice but to comply with the wishes of the interrogator, is not specific to any one technique but may be the cumulative result of the interrogation methods as a whole. When suspects perceive there is no choice but to comply, their resulting compliance and confession are, by definition, involuntary and the product of coercion.* (Police Interrogations and False Confessions by G. Daniel Lassiter and Christian A. Mesisner, Ofshe & Leo, 1997: p.18)

13. IACP Interrogations and Confessions Concepts and Issue Paper p.1: The Concept of Voluntariness: *This point is essential, for one of the key concepts in the law of interrogations and confessions is voluntariness. To be admissible, the confession must be voluntary; that is to say, it must have been made freely, without any coercion or intimidation on the part of the police or their agents.*

14. Taking the testimony of the witnesses Raucci interviewed as true, considering the forensic evidence showing the tape recorder was stopped and started repeatedly during the interviews of three witnesses (taking it as accurate), and considering Sweeney's admissions about Raucci's interrogation of Ruiz, the evidence suggests Detective Raucci used a pattern of improper interrogation techniques where subjects were threatened with arrest unless they said what the officers wanted to hear in the statement and were otherwise intimidated to provide false statements that the officers provided to them. Raucci did not document that he provided the witnesses with their false statements; instead, he arranged the tape-recorded statements so it appeared the information originated with the witnesses and misrepresented in his reports that the information originated with the witnesses, in serious violation of his basic obligations to accurately document the investigation and to disclose exculpatory information. The witnesses also testified that Raucci offered promises of consideration to subjects in exchange for the incriminating evidence being sought against select individuals, namely Mr. Morant and Mr. Lewis. A basic requirement of police investigations is that any offers of consideration must be documented and disclosed; there is no documentation of any offers of consideration in the police file in this case.

15. All the while, the record reveals that on certain occasions (such as with Ovil Ruiz) Sweeney and Maher respectively were present while, according to Sweeney and the interviewees, the misconduct discussed above and below occurred (the witness testimony about the misconduct and Sweeney's testimony about his reporting of the misconduct is assumed true throughout this paragraph). Other than Sweeney's telling Raucci not to engage in these tactics, there is no evidence either of them took steps to stop this misconduct or to ensure that fabricated and/or false evidence was not used in court in this case and others. Even after the interviews took place, Sweeney reported Raucci's misconduct to Lawlor but took no other action, while Maher remained silent. None of Sweeney, Maher, or Lawlor ever documented the misconduct, informed the prosecutors or defense attorneys that such tactics were used to obtain false statements, or took steps to initiate internal investigation into the misconduct. The pattern of improper conduct that Sweeney, Roque, Ruiz, and Morant describe would cause a reasonable police officer to suspect that these statements were fabricated and/or coerced and not voluntary. Further, witnessing such misconduct would cause a reasonable police officer to take steps to stop the misconduct from taking place and to report such misconduct thereafter to ensure that investigations and prosecutions did not go forward on false information; non-intervention in the face of such misconduct and failure to report it after the fact amount to failures to comply with basic obligations of any police officer.

16. Any reasonably trained investigator knows that testimony from witnesses who are under arrest, incarcerated or with pending cases should be viewed with skepticism. Incarcerated witnesses, those charged with pending cases, and those under arrest are known to use their cooperation in a criminal investigation as a means to curry favor with those who wield (or are perceived to wield) some control over their criminal charges; their housing; their visiting privileges; and their ability to earn money. Investigators should be very careful when interacting with such witnesses to ensure that those witnesses do not have a misperception about any *quid pro quo* for information.

17. The easiest and safest course when dealing with witnesses in these situations is to never provide any benefits to the witness and to ensure that the witness is promised nothing in exchange. With this approach, law enforcement officers must take a firm line on anything that could be perceived as a benefit.

18. Likewise, any leniency for a witness's own criminal charges or sentence, beneficial changes in house (such as to a less- restrictive prison or to a prison closer to an inmate's family), or consideration in visits (providing additional visits, contact visits, phone calls, conjugal visits), can have a powerful influence over a witness who often cannot obtain any of these benefits absent intervention by a law enforcement officer or prosecutor.

19. Minimally trained investigators are aware that bold threats of arrest, punishment, longer prison sentences, the death penalty or any harm to the witness increases the likelihood of a coerced statement. Additionally, any obvious offer or promises to release the witness, or let him/her go home in exchange for the statement is also likely to result in a coerced statement. In these instances, the witness will feel they have no alternative but to provide whatever information the investigator is seeking even if it isn't true.

20. Accordingly, reasonably trained law enforcement investigators are aware that any benefit of any kind provided to a witness must be disclosed to the prosecution and thereby to the criminal defendant as well. It would violate commonly accepted law enforcement practices to either promise or provide a benefit to a witness and not disclose the promise or benefit.

21. Ruiz, Roque, and Martinez were juveniles when Raucci interviewed them. Many of the same protocols associated with adults pertain to juveniles as well, but investigators must be more careful with juveniles as they are more susceptible to making false statements in response to police pressure. Investigators should not threaten harm to the witness, arrest, longer sentences nor should he/she makes any promises of leniency, to release the witness or let him/her go as long as the witness provided the information sought by the investigator whether it was true or not. The investigators should not use tactics that might be used with adults such as downplaying the charge, suggesting the crime was an accident or refusing to accept the suspect/witnesses' denials. Investigators know that children are different from adults and have reduced comprehension skills. Juveniles may also display body language that, in adults, may indicate deception, such as lack of eye contact and slouching. Juveniles will be more likely to submit to pressure filled interrogations.

22. IACP Training key #665, Wrongful Convictions: *Juvenile Interrogations. Youth are between two and three times more likely than adults to falsely confess during a law enforcement interrogation. One recent study of proven wrongful convictions of youth found that a child's false statement contributed to 55 percent of the convictions. Regardless of whether the child being questioned is a victim, an innocent witness, or even a seemingly guilty suspect, he or she is first and fundamentally still a child. This means that, regardless of how clever or defiant a pose he or she strikes, the brain development and emotional maturity are still different from that of an adult.*

23. Finally, because witnesses who are under arrest, incarcerated, or facing pending charges may be seeking a benefit in exchange for their testimony, law enforcement officers must be careful to ensure that any facts provided by the witness originate from the witness, rather than being leaked to the witness from the investigator. While preventing non-public facts from being provided to suspects or witnesses is a commonly accepted practice with any witness, it is crucially important with witnesses who have a motive to fabricate false testimony in a separate criminal investigation and with juveniles, given they are especially vulnerable to providing false statements in the face of police pressure. Below is a discussion of some of the troubling circumstances where, if the evidence is accurate the Defendants ignored commonly accepted police practices.

**<u>Ovil Ruiz</u>**

24. On January 10, 1991, Defendant Raucci obtained an arrest warrant for 16-year-old Ovil Ruiz, a.k.a. Augustin Castro, on an unrelated December 1990 shooting. On January 13, Ruiz was arrested on this warrant and Raucci brought him to the NHPD Headquarters for questioning. Sergeant Michael Sweeney, who was not involved in the Turner-Fields homicides investigation at that point, was the sergeant on duty in the ISU that evening and participated with Raucci in questioning Ruiz.

25. It is clear that Ruiz was a problematic witness with mental health issues at the time. If Ruiz's deposition testimony is believed, as supported by Sweeney, he knew nothing about the Turner-Fields homicides. Sweeney conducted an interview of Ruiz that could have lasted as much as an hour and felt confident that Ruiz had no information regarding the Turner-Fields homicides.

26. More importantly, Sweeney admits he witnessed Raucci conduct an improper interview of Ruiz by using coercive tactics which Sweeney knew to be contrary to established police procedures. Q. *"Ruiz told you he knew nothing. Raucci threatened him repeatedly in front of you. You stepped out of the room with Ruiz. Ruiz told you he didn't know anything, but he would say anything to go home, correct?" A. "Rephrase the question, please". Q. "He would say anything to get out of there?" A. "Oh, yes. Correct."* (Sweeney 116:5)

27. As Sweeney has admitted, he observed Raucci pressuring Ruiz to identify Mr. Morant and Mr. Lewis as Turner and Fields' killers; feeding him information about the crime; for example telling him the time of the murders and describing Turner's apartment building, where the murders took place; threatening Ruiz that he would go down for the murders if he didn't adopt the information; and offering to let him go home if he did.

28. Q. *"At that point in time, you understood that Ruiz still knew nothing about the crime, but as a result of illegal threats from Raucci, was prepared to say whatever Raucci wanted him to say so he could get out of there, correct?" A. "That's basically correct."* (Sweeney Dep. 116:16-23)

29. *Q. "Now -- and there were two specific things that Raucci utilized during -- in front of you to get him to give information. One was the threat that he could -- he could go home if he gave you information, correct?" A. "Correct." Q. "And another threat was that if he didn't give you information, he was going to take the whole weight for the crime, correct?" A. "That he could take the whole weight, yes." Q. "Okay. And you understood that that was illegal and that's why you stopped it, correct?" A. "Yes. Q. And why you later reported it?" A. "Yes."* (Sweeney Dep. 117:3-17)

30. On 2/22-23/96, Ruiz admitted to the FBI that he had *"lied under oath about Scott Lewis and Stefon Morant being involved in the aforementioned homicides and that Lewis and Morant were innocent of those murders."* (FBI Report 137)

31. Sweeney explained that after a few hours, Raucci informed Sweeney, who had stepped out of the interview room to attend to other matters he was responsible for as the sergeant on duty, that Ruiz was ready to make a statement. Sweeney explained that he returned to the interview room with Raucci and listened as Ruiz claimed to have driven Mr. Morant and Mr. Lewis to the crime scene with guns in tow and waited in the car while they went in (and heard shots fired). Sweeney testified that he had Raucci leave the room, and questioned Ruiz alone, and that Ruiz admitted the story was untrue and reaffirmed he knew nothing about the murders, explaining he was saying what Raucci told him to so he could go home.

32. *"And then after that happened, Raucci continued to feed details to Mr. Ruiz, correct?" Q. "Let me be more specific. Raucci described, as you testified to in 2013, the house, the car, the gun in the bag to Mr.*

*Ruiz, correct?" A. "Yes, he did." Q. "He described the color of the house, the type of the car, that it was a BMW, correct?" A. "Yes." Q. "He described the house on Clay Street, correct?" A. "Yes, he did." (Sweeney Dep. 117:18-118:5*)

33. Q. *"What had occurred after the threats is that he began feeding him information to educate -- in your view, educate Mr. Ruiz about what he should say, correct?" A. "Yes." Q. "And then you called him out again and you told him you cannot do that, correct, stop it?" A. "Yes".* (Sweeney Dep. 119:9-13)

34. Q. *"You understood at this point -- A. "Yes." Q. – "that this detective had broken the most basic rules of interrogation in front of you, correct?" A. "Yes."*
(Sweeney Dep. 120:25-121:4)

35. Q. *"And, more specifically, one of the things that Raucci told Ruiz in your presence was that he was driving the car that night, it would be in his best interest to tell what happened, to give a detailed statement about participation and the other two, that that would be good for him, he wouldn't have to testify, and that Raucci would let him go home?" A. "That Raucci said that to him?" Q. A. "Basically, yes."* (Sweeney Dep. 123:24-124:8)

36. Sweeney admits he then permitted Raucci to continue interviewing Ruiz alone. Thereafter, Raucci took a statement from Ruiz that does not mention his having driven them to the crime scene but claims he had overheard Mr. Morant and Mr. Lewis at 149 Clay Street admitting to the murders and later saw Mr. Lewis throw a gun into the river. Ruiz has recanted that statement.

37. According to Sweeney, Ruiz provided three different versions to the detectives that night. The first version given to Sergeant Sweeney, a skilled interrogator, stated that Ruiz knew nothing. Ruiz's second version in an oral interview, after Raucci fed information and coerced Ruiz said he was the driver. In the third version, Ruiz stated he wasn't in the car but had heard admissions from Lewis and Morant that they were involved. No information appears explaining Ruiz's prior denials of knowledge.

38. Any reasonably trained investigator would have recognized the likelihood that Ruiz was lying when he implicated Morant and Lewis in the homicides. According to Sweeney's own testimony, Ruiz had lied throughout the interrogation and made every effort to tell the investigators what they wanted to hear after Raucci provided Ruiz with significant details. In fact, Sergeant Sweeney was very much aware that Ruiz was lying throughout the interrogation.

39. As demonstrated by Sweeney's admissions and Ruiz's deposition testimony (assuming it is true) Detective Raucci's interactions that led to Ruiz giving a statement were likely to produce a false account. Put simply, the methods used to manufacture Mr. Ruiz's statement (as demonstrated by Sweeney's admissions and Ruiz's deposition testimony, assumed to be true) by Raucci were unlawful and inconsistent with accepted police practices for conducting witness interviews in a criminal investigation. According to the IACP, such practices are inconsistent with the accepted police practices at the time.

40. IACP Interrogations and Confessions Concepts and Issue Paper p.1: The Concept of Voluntariness: *This point is essential, for one of the key concepts in the law of interrogations and confessions is voluntariness.*

*To be admissible, the confession must be voluntary; that is to say, it must have been made freely, without any coercion or intimidation on the part of the police or their agents.*

41. Further, additional research supports that the methods used by Defendants Raucci (established by evidence as described above) were coercive in nature.

42. Psychological Coercion: *Causing a suspect to believe that he or she has no choice but to comply with the wishes of the interrogator, is not specific to any one technique but may be the cumulative result of the interrogation methods as a whole. When suspects perceive there is no choice but to comply, their resulting compliance and confession are, by definition, involuntary and the product of coercion. (Police Interrogations and False Confessions by G. Daniel Lassiter and Christian A. Mesisner, Ofshe & Leo, 1997:p.18*

43. International Association of Chiefs of Police Training Key #500: *Interrogation techniques: Guarding against False Confessions, P.3: Types of False Confessions: 1. Coerced Compliant Confessions. Perhaps the most frequent of these are false confessions resulting from the suspect's belief that there will be some instrumental gain from the confession. Possible gains include being allowed to go home, bringing the interrogation to an end (duress) or escaping the inherent psychological or physical pressures of the interrogation (coerced). Some studies suggest that nearly half of all false confessions are of this type.*

44. In addition to the coercive tactics utilized by Detective Raucci, as described by Sweeney, the defendants knew that Ruiz had been arrested and faced serious charges. Any reasonably trained investigator knows that testimony from witnesses who are under arrest, are incarcerated, or with pending cases should be viewed with skepticism. Witnesses who are under arrest, incarcerated witnesses and those charged with pending cases are known to use their cooperation in a criminal investigation as a means to gain favor with those who wield (or are perceived to wield) some control over their criminal charges; their housing; their visiting privileges; and their ability to earn money. Investigators should be very careful when interacting with incarcerated witnesses to ensure that those witnesses do not have a misperception about any quid pro quo for information.

45. The easiest and safest course when dealing with witnesses in these situations is to never provide any benefits to the witness and to ensure that the witness is promised nothing in exchange. With this approach, law enforcement officers must take a firm line on anything that could be perceived as a benefit.

46. Accordingly, reasonably trained law enforcement investigators are aware that any benefit of any kind provided to a witness must be disclosed to the prosecution and thereby to the criminal defendant as well. It would violate commonly accepted law enforcement practices to either promise or provide a benefit to a witness and not disclose the promise or benefit.

47. Finally, because witnesses in these circumstances may be seeking a benefit in exchange for their testimony, law enforcement officers must be careful to ensure that any facts provided by the witness originate from the witness, rather than being leaked to the witness from the investigator. While preventing non-public facts from being provided to suspects or witnesses is a commonly accepted

practice with any witness, it is crucially important with witnesses who have a motive to fabricate false testimony in a separate criminal investigation. Here the evidence from Sweeney and Ruiz (accepting their testimony as true) is that all the information in Ruiz's statements (both the statement he gave in January 1991 and a subsequent May 1991 statement) came from Raucci and none of the information originated with Ruiz himself, and worse, that Raucci misrepresented that the information came from Ruiz to make his statements appear reliable, including by arranging Ruiz's tape recorded statements to appear as if the information originated with Ruiz and misrepresenting his interactions with Ruiz in his reports. Taking a statement consisting entirely of fed evidence the witness has disavowed as false (as Sweeney and Ruiz have described occurred) and misrepresenting that statement as having come from the witness is an egregious misconduct that departs drastically from basic standards of police investigations and disclosure obligations in place by 1990.

48. There is also evidence from Melvin Wearing, NHPD Chief of Police from 1997 to 2003, that the NHPD took a statement from Ruiz about the homicide of Jaqueline Shaw, which occurred within days of the Turner-Fields homicides. The officers deemed the information could not be corroborated and this information was not disclosed to the prosecution in the Turner-Felds homicide according to the evidence reviewed. I understand Wearing was not able to complete his deposition and that additional information on this subject remains to be developed, but if officers made a determination that Ruiz was not a credible witness in another case at the same time they were relying on Ruiz as a witness in the Turner-Fields homicides prosecution, any minimally trained and experienced officer in that position would have understood they had an obligation to document and disclose it and the failure to do so would be a serious departure from minimally accepted police practices in place by 1990.

**Jose Roque**

49. On January 15, 1991, Raucci, along with Maher, interrogated 17-year-old Jose Roque about the Turner-Fields homicides at NHPD headquarters. If Roque's trial and deposition testimony and his statement to the FBI are believed, he insisted to the officers he had no information, and then Raucci fed Roque information, including the contents of the statement Ruiz had given the day prior, and pressured Roque to adopt the same story Ruiz had provided the day prior: that he had overheard Mr. Morant and Mr. Lewis at 149 Clary Street admit to killing Turner and Fields and that he had then seen Mr. Lewis discarding a gun in the river. If Roque is believed, Raucci, likely in the presence of Maher and/or with Maher's participation (the records demonstrate Maher was present for Roque's taped statement), threatened to charge Roque with the murders and put him on a million-dollar bond if he refused to repeat this information back. Roque ultimately gave a tape-recorded statement to this effect that night, which he recanted at trial. At trial, Roque explained the police kept stopping the tape recorder and telling him what to say and then turning the recorder back on, years before the tape of his statement was analyzed by the FBI and demonstrated to have been stopped and started numerous times (accepting the FBI analysis as accurate).

50. On March 3, 1996, Roque told the FBI that the taped statement that he provided to the New Haven Police Department in 1991 regarding the homicides of Ricardo Turner and Lamont Fields was not true. Roque stated that he was threatened by Detective Raucci prior to giving the false statement. According

to Roque, Raucci threatened to arrest Roque for the homicides, if he, Roque did not give the false statement implicating Scott Lewis and Stefon Morant. Roque further stated that Raucci provided all of the information in the signed statement, adding that Raucci would ask a question on tape and then provide the answer to Roque, who would then repeat the answer on tape. Roque denied that he ever heard Lewis or Morant discuss murdering Fields and Turner. Roque also denied ever seeing Lewis shoot a .357 caliber revolver into the Mill River from the Chapel Street Bridge or throw a weapon into the river.

51. On 2/10/18, Roque provided an affidavit where he admitted that he never heard Lewis or Morant discuss murdering Turner or Fields. Roque stated that Detective Raucci threatened him and forced him to give a false statement. Roque stated that Raucci threatened Roque that he would charge him with the murders and place a million-dollar bond on Roque.

52. Additionally, Roque stated in the affidavit that Raucci provided Roque with the answers and stopped and started the tape recording repeatedly in order to tell Roque what to say on the tape. Several NHPD officers deposed in this case, including Sweeney, agreed that the misconduct Roque described is the same type of misconduct as that described by Ruiz and Sweeney as having occurred with Ruiz.

53. Taking Roque's testimony as true, all the information in Roque's statement came from Raucci and Raucci misrepresented that the information came from Roque, including by arranging Roque's tape-recorded statement to appear as if the information originated with Roque and misrepresenting his interactions with Roque in his reports. If this occurred, it amounts to serious misconduct by Raucci and a failure to comply with his basic disclosure obligations. FBI Investigator Brian Donnelly, who led the FBI's investigation into Raucci's handling of the Turner-Fields homicide investigation, has testified that by the time he concluded his investigation, it appeared Jose Roque was coerced and fed information as he described and that amounted to criminal fabrication of evidence by Raucci.

**<u>Stefon Morant</u>**

54. On January 16, 1991, Raucci interrogated Stefon Morant about the Turner-Fields homicides. According to Morant, after a pre interview interrogation, Raucci took a tape-recorded statement from him. Morant has testified that Raucci threatened him with arrest for the murders and said he couldn't leave unless he would repeat back false information Raucci was feeding him, and that Raucci repeatedly stopped and started the tape recorder to coach him on what to say. Sweeney signed off on the advisement of Mr. Morant's rights. The records indicate Maher was present for Morant's tape-recorded statement. Maher was likely present for or participated in the misconduct Morant has described (assuming it to be true). In this statement Mr. Morant claimed he had driven with Mr. Lewis to the murder scene and waited for him in the car while Mr. Lewis went into the building and then ran out. Mr. Morant claimed that in the days following, Mr. Lewis implied he had murdered Turner and Fields, and that Mr. Morant and Mr. Lewis had a conversation at 149 Clay Street with Roque and others present in which Mr. Lewis said he "did what he had to do." Mr. Morant also claimed that he then observed Mr. Lewis throwing a gun in the river, with Roque also present. Morant's statement matches up with the statements Ruiz and Roque provided the two days prior.

55. A forensic review of the recording of the Morant statement indicated that the tape recorder had been manipulated during the interview. The tape analysis (assuming it is accurate) demonstrates the tape recording was stopped and started and /or over recorded several times. Maher's changing descriptions of why and how the tape was stopped raise red flags about his reliability.

56. It should be noted that Mr. Morant didn't sign his statement on the day he gave it or anytime thereafter.

57. Taking Morant's testimony as true, all the information in his statement came from Raucci and Raucci misrepresented that the information came from Morant, including by arranging Morant's tape-recorded statement to appear as if the information originated with Morant and by misrepresenting his interactions with Morant in his reports. If this occurred, it amounts to serious misconduct by Raucci and a failure to comply with his basic disclosure obligations.

**<u>Hector Ortiz</u>**

58. On February 2, 1991, Raucci took a taped statement from Hector Ortiz that associated Mr. Morant's separately tried co-defendant Scott Lewis with one of the murder victims. Ortiz told the FBI in 1996 that the statement was false, that Raucci asked him to say those things, and that he provided the statement because he had pending charges and thought it could help him. Ortiz told the FBI that Raucci stopped and started the tape recorder repeatedly throughout the statement to tell him what to say.

59. Forensic analysis (assuming its accuracy) has demonstrated that the tape of Ortiz's statement was stopped and started repeatedly.

**<u>Millie Martinez</u>**

60. Millie Martinez stated in a statement to the FBI and at her deposition that Raucci went to her home and intimidated and pressured her to provide a statement that she saw Ruiz sitting in a car while she was walking down the sidewalk around the time of the murders. Martinez stated Raucci told her Ruiz had given a statement that he had seen her there and pressured her to corroborate this claim, despite her insistence she was not there. She ultimately gave a tape-recorded statement repeating back this false story provided to her by Raucci.

61. On 9/19/96, Martinez told the FBI that the statement she gave to Detective Raucci on 2/4/92 regarding the homicides of Turner and Fields was false and that Raucci forced her to make the statement. Martinez further stated that she was pressured by Raucci to give the statement, he offered her money adding that Raucci started and stopped the tape recorder in order to tell her what to say on the tape.

62. Reliable confessions or witness statements contain information unknown to the police that can be independently corroborated. If the information cannot be corroborated then some investigators may question the subject about specific information that was known only to the police. When police investigators do that, they open themselves to the likelihood of false statements from the subject. Here there is evidence Raucci went much further than that. In this case, Ruiz, Morant, Ortiz, Roque and Martinez all recanted their statements and also claimed that Detective Raucci told them what he wanted them to say. If, as the witnesses (including Sweeney) have testified, Raucci fed the witnesses' statements

to them, Raucci's misrepresentation to the prosecution that the information in the statements originated with the witnesses is outright fabrication of evidence.

63. It is important to note that if the defendants repeatedly stopped and started the tape recorder during the witness statements for the purpose of providing information and coaching witnesses on what to say then their conduct was unlawful and in violation of accepted police practices. Such misconduct, if it occurred, ensured that the witnesses would provide false statements.

64. To avoid contamination, reasonable and experienced investigators identify and withhold certain information to ensure some details about the crime are known only by the investigators and those with personal knowledge. It is well-known in law enforcement that an investigator must avoid revealing the withheld details or other sensitive investigative information during an interview, such as by asking leading questions, describing the details to the witness, or sharing information provided by other witnesses. Failure to avoid contamination can destroy the reliability of a witness statement. Moreover, intentionally providing hold-back information or other sensitive investigative information to a witness is a serious deviation from minimally acceptable police practice and failing to report that the investigator provided that information, or actively reporting that the information originated with the witness when it did not, is even more egregious. Furthermore. reasonable investigators understand that engaging in coercive tactics with a witness and/or providing a witness with false information regarding the investigation is also an egregious violation of minimally acceptable police practice as such conduct can unduly influencing the witness and therefore taint the reliability of the witness statement. If an officer engages in such conduct and fails to document it, the violation is even worse and reflects dishonesty on the part of the officer. Finally, it is important that everything in the investigation, including all events and statements made during any key interviews, be recorded in full, preferably by audio or video tape. Most importantly, officers cannot misrepresent the source of information in a witness statement or the process by which witness statements are obtained nor can officers hide exculpatory evidence from witness interviews, including if witnesses make inconsistent statements or if information is provided to witnesses.

65. Minimally trained investigators know that the tactics utilized during the interviews of Ruiz, Roque, Morant, Ortiz, and Martinez were contrary to established accepted police practices by 1990. The investigators would be aware that by using threats of arrest and promises to be released and allowed to go home without any criminal charges as long as they provided false information was likely to cause the witnesses to proffer a false statement. This is especially true when interviewing juveniles who are more susceptible to these types of threats and promises as part of a pressured interview.

66. Further, Sergeant Sweeney admits he met with Ovil Ruiz for nearly one hour alone and failed to properly record the conversation. Police officers are trained to properly record witness statements which allegedly provide significant inculpatory or exculpatory evidence against a suspect in a murder case. The documentation can be accomplished through electronic recordings, witness police officers and contemporaneous notes which directly quotes the witness statements. This illustration with regard to Ruiz is emblematic of a widespread occurrence through the entire investigation into the Turner-Fields homicides (the witnesses' testimony and statements are assumed true throughout this paragraph).

Throughout the investigation, the Defendants failed to fully and properly document and/or record their investigation. Those failures included the following:

- Failure to fully and properly conduct, document, and/or record interviews.
- Starting, stopping tape recorder to feed information to witnesses
- Missing and merging of investigative facts often precludes ability to actually know which officer (who) did what, when, where, how and why
- Failure to accurately (if at all) identify dates, times, locations, and individuals present for significant events (statements, investigatory actions, etc.);
- Investigative "tunnel vision" by Raucci and others and refusal to investigate potential suspects other than the department's chosen suspect; No documentation of numerous "witnesses" statements, either audio, visual, or written; particularly where the information tended to exculpate the department's chosen suspect (including the pre-interviews with witnesses, witnesses' inconsistent statements--disclaiming knowledge of the murders before providing inculpatory statements, and misconduct used to coerce statements from witnesses, including feeding facts, threatening witnesses with arrest and refusing to let them leave unless they repeated the fed facts back, intimidating witnesses and pressuring them to repeat back fed facts, and offering witnesses consideration for charges they were facing in exchange for their repeating back fed facts);
- Police files should include comprehensive details about witness interviews; This failure to document the pre-interview process, witnesses' inconsistent statements, that information was fed to witnesses, and the use of egregious misconduct to coerce witness statements was an egregious violation of the defendants' obligation to document witness interviews and an egregious violation of minimally accepted practices in place by 1990 that Sweeney, Pettola, and Sullivan admit was a systemic problem; Police files should also include information about alternative theories and suspects or information about how certain theories or suspects were allegedly eliminated. That is particularly true in a case like this.

67. Taking the witnesses' statements as true and considering Sweeney's admissions and the forensic evidence (assuming its accuracy) demonstrating the tape recorder was stopped and started repeatedly during Roque, Morant, and Ortiz's statements, the evidence demonstrates Detective Raucci presented a case of probable cause through misinformation, unreliable and uncorroborated sources and innuendo.

68. The misconduct that any one of these witnesses describe would be cause for serious concern, but the similarities among witness accounts and allegations of misconduct between five different witnesses is even more troubling. If true, these accounts suggest a department where egregious violations of rules were widely tolerated, creating serious risk of prosecutions based on false evidence.

**Opinion B: There is evidence in this matter that the defendants failed to properly investigate a prime suspect and suppressed evidence suggesting he was responsible, in violation of minimally accepted investigative standards.**

69. Substantial evidence was developed within the first three months of the Turner-Fields homicide investigation identifying Michael Cardwell as the prime suspect. In fact, Cardwell's name was mentioned several times in Turner's personal effects.

70. The majority of Maher's incident reports referred to Cardwell. Cardwell was the primary focus while Maher was the primary detective on the case. Prior to Raucci's interview of Ruiz on January 13, 1991, there was no evidence whatsoever incriminating Scott Lewis or Stefon Morant.

71. In the datebook of one of the murder victim's, Ricardo Turner, there were numerous references to drug dealers including Michael Cardwell and even more references to Cardwell near the date of the murders. However, there weren't any references in the date book to Lewis or Morant. Maher admitted this is one reason why he had his doubts about Ruiz's statement regarding Lewis and Morant involved in a murder related to drugs as stated by Ruiz.

72. On 11/6/97, Lorenzo Gibbs mentioned Michael Cardwell as a possible suspect while being interviewed by Detective Vaughn Maher. *" Both Johnson and Michael were two individuals who could be considered Turner's associates while Turner and Fields were dealing narcotics in the Congress Ave. area. He stated that, to his knowledge, they both got along with Turner and Fields, although it was brought to his attention that Cardwell had a parting of ways with Turner and the two were at odds recently."* (Maher Incident Report NH245)

73. During the week of November 11, 1990, Detective Maher met with an NHPD confidential informant (CI) known to be reliable. The CI stated he was in a discussion with Michael Cardwell during the week of October 21, 1990 or October 28,1990. The CI has been an associate of Miachel Cardwell and knew his street name to be "bullet". According to the CI, Carwell told him that he killed Turner and Fields. Cardwell stated: "*he and his brother Vincent, went to Turner and Fields apartment together. Once outside of the apartment, Vincent stayed outside while Michael Cardwell went into the apartment. Vincent was supposed to whistle when there was no apparent activity on the street. This was the signal for Micheal Cardwell that he was clear to complete his intended task. Michael Cardwell told the informant that he was let into the apartment by ringing the doorbell and being buzzed in. Upon walking up to the second floor, Turner's door was already open and he and Cardwell walked in. According to the informant Cardwell found Turner awake in the bedroom with Lamont Fields asleep in the bed. Cardwell told the informant that he shot five times, killing Turner first and then Lamont Fields while he laid in bed. Cardwell then immediately fled meeting his brother Vincent outside*." (Maher Incident report 11/24/90)

74. During the week of November 18, 1990, Maher and Sergeant McCoy once again met with the reliable C.I. who stated he spoke with Cardwell again and Cardwell told the CI that he killed Turner because he did him wrong. The CI believed that Cardwell may have been involved physically with Turner. The CI further stated Cardwell told him the murder weapon was at his girlfriend's house in New Britain, Connecticut.

75. Doreen Murdock identified Cardwell as a drug dealer and associate of Turner's. Doreen Murdock stated that Turner became involved in dealing drugs with Cardwell and that they were good friends.

76. 10/24/90: Maher's interview with Doreen Murdock identified Cardwell as a drug associate of Turner's. She says Turner did not have a falling out with Cardwell that she knows of but notes that it was "kind of odd" that Cardwell didn't show grief after learning about Turner's death because they were best friends.

77. 10/29/90: Maher's narrative report notes that Mr. Murdock stated that Cardwell and Turner were close. Murdock also stated in an interview with Maher on 12/8/90 that Cardwell and Turner had a "falling out" around August 1990. The two parted ways and Cardwell started selling his own drugs. This created a "beef" between Cardwell and Turner. Murdock also believed that Cardwell was jealous over the relationship between Turner and Fields. According to Murdock, Cardwell and Turner had a casual sexual relationship at one time.

78. Maher admitted Cardwell had two motives for killing Turner and Fields. One motive involved the falling out over the drug dealing business. The second would be jealousy since Turner and Cardwell had been in a sexual relationship.

79. When gathering information in a homicide case, the investigator is required to constantly evaluate the credibility of the witnesses to safeguard against unreliable information. One way to do that is through consistency; an investigator should take note that the witnesses all provide the same information, especially information that wasn't known to the investigator before.

80. Numerous people described a "fall out" between Cardwell and Turner in the summer before the murders.

81. An NHPD reliable CI told Detective Maher that Cardwell had confessed to him that he had murdered Turner and Fields.

82. The NHPD reliable CI provided details of the murder as revealed by Cardwell. " *he and his brother Vincent went to Turner and Fields apartment together. Once outside of the apartment, Vincent stayed outside while Michael Cardwell went into the apartment. Vincent was supposed to whistle when there was no apparent activity on the street. This was the signal for Micheal Cardwell that he was clear to complete his intended task. Michael Cardwell told the informant that he was let into the apartment by ringing the doorbell and being buzzed in. Upon walking up to the second floor, Turner's door was already open and he and Cardwell walked in. According to the informant Cardwell found Turner awake in the bedroom with Lamont Fields asleep in the bed. Cardwell told the informant that he shot five times, killing Turner first and then Lamont Fields while he laid in bed. Cardwell then immediately fled meeting his brother Vincent outside*." (Maher Incident report 11/24/90)

83. NHPD Sergeant Ortiz told Detective Maher that the CI (Frank Graham), was a very reliable informant. Graham had provided Ortiz reliable information in a variety of serious crimes that led to arrests and successful prosecutions.

84. Graham provided two critical pieces of information that was not generally known and could be corroborated by the investigators, the precise number of gun shots and the fact that a person at the scene was whistling.

85. Maher had received multiple reports from witnesses who heard a whistle outside the building and saw someone standing outside the building near the time of the murders.

86. Maher also knew the information regarding the five shots was consistent with the autopsy report which said that Turner and Fields were shot a total of five times. Information that only the real perpetrator would know.

87. The following IACP key is relevant to my opinions here:

88. Key #597: Assessing Witness IACP Training Credibility: *There is an adage in conducting investigations that physical evidence does not lay, but people do. This adage is accepted as true because items of physical evidence lack the human characteristics of pride, greed, envy, anger, and lust that motivate people to be deceptive in their actions and words.*

89. The credibility of witnesses affects the believability and trustworthiness of their statements and provides the investigator with a basis to rely on witnesses' statements as factual or to assess conflicting stories, in order to determine the truth of the matter under investigation. A factor used to determine the credibility of a witness is to show the witness has the character to be a reliable witness. A witness credibility analysis in this case would indicate that the witnesses incriminating Cardwell provided information that was consistent and able to be corroborated. Sweeney and Maher's observations of Detective Raucci's misconduct with witnesses (considering Sweeney's admissions, accepting the forensic analysis of the tapes as accurate, and taking the witnesses testimony about Raucci's misconduct as true) demonstrate they were not credible. The only way an investigator could use their statements would be if he/she corroborated their information. Detective Raucci either wasn't able or didn't attempt to do that.

90. Raucci interviewed Cardwell by himself without any police witness two months after interviewing Ruiz, Roque and Morant. Detective Maher stated there was no more important interview in this investigation than that of Cardwell. The interview needed to be comprehensive, thorough, and well thought out beforehand. Maher also confirmed that an investigator should have a witness during the interview.

91. Raucci conducted this one and only interview of the most important witness without any police witness for a total of eleven minutes. The evidence shows Raucci also conducted a pre interview which was not recorded or documented in a police report. The evidence indicates that it was an extensive pre interview as Raucci mentions that he gave the name of Scott Lewis during the pre-interview and also conducted a photo array with Cardwell where Cardwell identified Lewis by name.

Raucci: Q. "*During the Earlier interview, I mentioned an individual by the name of Scott Lewis, do you know this individual? Cardwell: A. No Raucci: Q. You had an opportunity to view a New Haven Police Protoboard, did you in fact recognize one of these individuals? Cardwell: A. Yes."*

92. Detective Raucci acted in contravention of minimally accepted investigative practices when he conducted a pre interview with Cardwell and failed to document that interview in any way. The lack of documentation did not end there, though. Detective Raucci also conducted a photo array with Cardwell and didn't document that either.

93. Raucci did not document in a police report which photograph or how many photographs he presented to Cardwell. As is discussed above and below, the failure to document such information is inconsistent with the accepted police practices at the time.

94. U.S. DOJ: Eyewitness Evidence: A Guide For Law Enforcement: Section IV.B. Recording Show up Results: When conducting a show up, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness

95. A police investigator is obligated to document all his/her activities that are relevant to the case. All evidence must be carefully collected and properly documented in the proper police report. The investigator must document all evidence whether it is exculpatory or inculpatory. It is not up to the investigator to decide what evidence he will document and what evidence he will conceal. These standard police practices were in effect in 1991.

96. IACP Eyewitness Identification Model Policy: IV. 17. Document the time and location of the show up, the officers present, the result of the procedure, and any other relevant information.

97. Further, as these officers should have known, line ups and show ups are a highly scrutinized aspect of a criminal investigation. The investigator is trained to recognize that fact and therefore obligated to document all his/her actions when utilizing a show up or line up investigative technique. This includes a description of how the show up was conducted, what officers were present, maintain copies of the photographs used, and document exactly what the witness said about the photograph. The information must be documented on the proper police report regardless of whether the witness identified the photograph or not.

98. IACP Criminal Investigations Concepts and Issues Paper P5: *Completeness. The report should be complete in that must contain all the facts that were uncovered during the investigation and are relevant to the case. An incomplete report can hinder the validity of the investigation and prove to be inadmissible in court.*

99. Failing to document critical information in a police report during a criminal investigation is inconsistent with accepted police practices and police training in criminal investigation, established by 1990. Detective Raucci failed to document significant information relating to the photo Array and comments made therein.

100. Raucci failed to conduct a complete and thorough interview of Cardwell by failing to follow up on significant information that any minimally trained and experienced officer would have understood the need to follow up on. There were a number if inconsistencies between Cardwell and other witnesses and Raucci neglected to follow up on:

- No questions about inconsistencies (sex relationship) or what others said. Cardwell said there was no sexual relationship with Turner, contradicted by numerous witnesses.
- A minimally trained investigator would understand the evidence in the case and question around it.

- No questions about his relationship with other witnesses who say he had motive and opportunity to commit murders.
- No questions about girlfriend or her house, whether left town after murders, the trip to Virginia.
- Didn't take the time to clarify why Cardwell broke up his relationship with Turner.
- Didn't ask in depth questions regarding Turner's drug operation since witness information claimed that to be reason for murders.
- Never asked if Cardwell was in the drug business

101. Raucci should have recognized that Cardwell corroborated information provided by the reliable confidential informant, Frank Graham:

- Cardwell knew Turner, had a relationship
- Cardwell knew that Turner was in the drug business, Cardwell was in business with him
- Cardwell knew where Turner lived
- Cardwell knew Fields
- Cardwell had been to Turner's apartment many times
- Cardwell and Turner severed their relationship in the summer of 1990
- Cardwell had a brother

102. Cardwell told Raucci in his statement that he was at the Super 8 Hotel with his mother, father and niece. There is no evidence to show that Raucci ever followed up and investigated Cardwell's alibi. Any minimally trained and experienced officer in Raucci's position would have understood the importance of doing so.

103. Maher's final report, written on March 27, 1991-- over a month and a half after Maher left the unit and when Raucci was lead detective on the case -- indicated that confidential informant Frank Graham should not be relied upon. However, Maher later testified that nothing in his report suggested that Cardwell should be ruled out as a suspect. Maher also stated that it was information from Raucci and other supervisors about Lewis and Morant that led him to believe Cardwell was no longer a suspect. None of the defendants could provide a credible explanation as to what happened to rule out Cardwell as a suspect given all the information that had been developed linking him to the murders.

104. Scott Lewis told the FBI that Raucci had intentionally framed him and Morant for the Turner-Fields homicides because Raucci was involved in the drug business with a major dealer, Frank Parise, who Mr. Lewis owed a large drug debt to. Although the FBI ultimately deemed the evidence insufficient to support a prosecution against Raucci, the FBI did develop evidence connecting Parise and Raucci.

105. Raucci dismissed Cardwell as a suspect without articulating a solid basis for doing so. He failed to re-interview Cardwell or other witnesses who mentioned Cardwell. Raucci's unwarranted dismissal of Cardwell as a suspect led to an incomplete investigation. The fact that Raucci failed to conduct a complete and thorough investigation into Cardwell as a suspect would be a red flag that Raucci was operating under a preconceived theory.

**Tunnel Vision**

106. Tunnel vision is a catch-all term that encompasses several cognitive biases, including verification bias. A recognized psychological/psychosocial phenomenon, tunnel vision is often at play when an investigator focuses an investigation or interrogation on one particular outcome he or she believes to be true. Clouded by tunnel vision, the investigator then filters the evidence in the case to fit that outcome. Through verification bias, all information supporting the particular outcome takes on an elevated significance, while information that does not support it is ignored or dismissed as extraneous. The investigator ends up molding the evidence to fit his or her personal theory, rather than objectively following the evidence in an effort to obtain the truth. According to Police Chief Magazine: Chief's Council by Julie Risher: Although an extensive discussion of tunnel vision is beyond the scope of this column, supervisors and officers alike should be aware that this phenomenon might lead investigators to discard information that does not support a hypothesis and to focus on information that does. It is precisely the information that does not support a hypothesis that may prove to be exculpatory (or, at least, that a defense attorney may convincingly argue is exculpatory). Consequently, as agencies work to improve their officers' understanding of both Brady and the importance of compliance, helping officers understand their vulnerability to tunnel vision is key. At least in more serious cases such as rapes, kidnappings, robberies, and homicides, classifying anything as "irrelevant" early in the investigation is fraught with hazards.

107. The problem and risks associated with tunnel vision were well-known among police officers and law enforcement agencies in 1991. Reasonable investigators have long understood that, to prevent tunnel vision, it is crucial that investigations be conducted in an objective manner. Additionally, reasonable and experienced investigators understand they must be neutral and impartial throughout the course of any witness interview or interrogation because when an investigator is not neutral, the investigator risks contaminating the questions he or she asks and his or her interpretation of the witness' or defendant's responses with his or her own preconceived theory. Individual pieces of evidence should not become the focus of an investigation to the exclusion of other credible evidence or explanations. Investigators are trained to seek the truth, not a particular statement based on their personal theory of the crime or organizational pressures to solve the case. If, instead, an investigator begins to view a case with tunnel vision, he or she risks losing sight of the investigator's role as a truth-seeker and information gatherer. The investigator then often adopts an adversarial role of attempting to build a case against a particular person, rather than an investigative role of gathering facts to determine what actually occurred. It is in these cases where the investigator is more likely to make investigative mistakes or to use problematic interview techniques, and, either intentionally or unintentionally, contaminates the resulting statement evidence as described above and below.

108. Given these risks—which are well-known in the law enforcement community—reasonable and experienced detectives knew in 1990 and beyond that they had an obligation to guard against tunnel vision, to keep detailed and accurate records of their investigative steps, to follow eyewitness identification policies and procedures conscientiously, to truthfully report the way in which interviews and interrogations were conducted, to objectively evaluate new evidence as it came to their attention, and to thoroughly consider whether the evidence in the case corroborated or refuted the statement evidence they had obtained. Indeed, it is understood in the law enforcement community that failing to do so could risk prosecution of an innocent person for a crime.

109. There are allegations and substantial evidence in the record, if they are accurate, of outright corruption and supporting the conclusion that at a minimum the Turner-Fields homicide investigation suffered from tunnel vision and verification bias. Given the defendants' admissions, the forensic analysis of the tapes, and taking the witnesses' testimony and statements to the FBI as true, substantial evidence suggests Raucci focused on Lewis and Morant as the prime suspects and proceeded to engage in misconduct aimed at getting witnesses to testify accordingly. Raucci failed to investigate Cardwell even though he was considered to be the prime suspect according to Detective Maher.

**Opinion C: Defendants failed to follow accepted police practices when they failed to disclose exculpatory evidence to the prosecutor. The NHPD had no written policy or procedure regarding officer's obligations under Brady in the early 1990's and there is no evidence that any of the defendants ever received training on the Brady obligations.**

110. The following definitions are relevant to this opinion, and others:

111. Duty to Disclose: The landmark decision of *Brady v Maryland* (1963) places an affirmative constitutional duty on a prosecutor to disclose exculpatory evidence to a defendant. This duty has been extended to police agencies through case law, requiring law enforcement agencies to notify the prosecutor of any potential exculpatory information.

112. Exculpatory Evidence/Brady Material: Evidence in the government's possession that is favorable to the accused and that is material to either guilt or punishment, including evidence that may impact the credibility of a witness.

113. There is substantial evidence (taking the testimony and statements of witnesses' as true, given the defendants' admissions, and accepting the forensic evidence as accurate) Detective Raucci conducted this investigation with a pre-determined theory and discounted information/evidence which did not correspond with his theory, and that his fellow defendant officers Sweeney and Maher and his supervisor Lawlor permitted that course of action by Raucci. Therefore, Raucci and the other defendants often failed to document interviews, photo arrays, and other significant exculpatory evidence.

114. According to Police Chief Magazine: Chief's Council by Julie Risher: *Although an extensive discussion of tunnel vision is beyond the scope of this column, supervisors and officers alike should be aware that this phenomenon might lead investigators to discard information that does not support a hypothesis and to focus on information that does. It is precisely the information that does not support a hypothesis that*

*may prove to be exculpatory (or, at least, that a defense attorney may convincingly argue is exculpatory). Consequently, as agencies work to improve their officers' understanding of both Brady and the importance of compliance, helping officers understand their vulnerability to tunnel vision is key. At least in more serious cases such as rapes, kidnappings, robberies, and homicides, classifying anything as "irrelevant" early in the investigation is fraught with hazards.*

115. A police investigator is obligated to document all his/her activities that are relevant to the case. All evidence must be carefully collected and properly documented in the proper police report. The investigator must document all evidence whether it is exculpatory or inculpatory. It is not up to the investigator to decide what evidence he will document and what evidence he will conceal.

116. Detective Raucci mentioned in witness statements that he conducted photo arrays with the witnesses prior to taking their statements. Raucci did not document the process by which he conducted the photo arrays. There is no record or report describing the process, the date, who was present, what photos were included in the array, what questions were asked by Raucci etc. Investigators are trained to document the entire witness encounter and preferably video record the interaction. Raucci's failure to document the entire witness encounter and failure to document showing photo arrays to witnesses was an egregious violation of minimally accepted police practices. Officers also must document all interactions with witnesses, including any inconsistent statements from witnesses and any information provided to witnesses during interviews.

117. Cardwell Statement: Raucci: "*You had an opportunity to view a New Haven police photo board, did you in fact recognize one of these individuals." Morant.: "Yes*" *Raucci: "And this individual is photograph number what?" Morant: "Number 6 and I know number one too."*

118. FBI Report 122 Basilicato: *"Basilicato also indicated that she identified a photograph of an individual sometime after the initial statement. She stated that she thought the photograph may have been of Morant."*

119. IACP Eyewitness Identification Model Policy: IV. 17. *Document the time and location of the show up, the officers present, the result of the procedure, and any other relevant information.*

120. U.S. DOJ: Eyewitness Evidence: *A Guide For Law Enforcement: Section IV.B. Recording Show up Results: When conducting a show up, the investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness.*

121. Further, as these officers should have known, photo arrays, line ups and show ups are a highly scrutinized aspect of a criminal investigation. The investigator is trained to recognize that fact and therefore obligated to document all his/her actions when utilizing a show up or line up investigative technique. This includes a description of how the show up was conducted, what officers were present, maintain copies of the photographs used, and document exactly what the witness said about the photograph. The information must then be documented on the proper police report regardless of whether the witness identified the photograph or not.

122. **IACP Criminal Investigations Concepts and Issues Paper P5:** *Completeness. The report should be complete in that must contain all the facts that were uncovered during the investigation and are relevant to the case. An incomplete report can hinder the validity of the investigation and prove to be inadmissible in court.*

123. The NHPD apparently rejected these minimally accepted practices entirely. The Department had no written policy, rule, or regulation about officers' obligations to document and disclose exculpatory and impeachment information of any kind. The Department had no requirement that officers take notes during unrecorded interviews, and no requirement to turn over notes, if an officer chose to take them, to the State's Attorney's Office. The defendant officers' failure to document and to disclose the following information constituted an egregious violation of minimally accepted police practices in place by 1990:

- Detective Raucci interviewed Bobby Wilson but never transcribed the interview or submitted a report. Wilson identified Cardwell as "Bullet" as someone who knew something about the murders. Raucci could not explain why he never transcribed the interview or submitted a police report concerning the interview.
- Sweeney admits he witnessed Raucci conduct an improper interview of Ruiz by using coercive tactics which Sweeney knew to be contrary to established police procedures. *Q. "Ruiz told you he knew nothing. Raucci threatened him repeatedly in front of you. You stepped out of the room with Ruiz. Ruiz told you he didn't know anything, but he would say anything to go home, correct?" A. "Rephrase the question, please". Q. "He would say anything to get out of there?" A. "Oh, yes. Correct." (Sweeney 116:5)*
- As Sweeney has described in detail on multiple occasions under oath, he observed Raucci pressuring Ruiz to identify Mr. Morant and Mr. Lewis as Turner and Fields' killers; feeding him information about the crime; for example telling him the time of the murders and describing Turner's apartment building, where the murders took place; threatening Ruiz that he would go down for the murders if he didn't adopt the information; and offering to let him go home if he did. These tactics, and those described below, that Sweeney observed Raucci use with Ruiz constitute serious police misconduct. Sweeney and Raucci's failure to document the use of these tactics with Ruiz constituted an egregious violation of minimally accepted police practices in place by 1990.
- Q. "Now -- and there were two specific things that Raucci utilized during -- in front of you to get him to give information. One was the threat that he could -- he could go home if he gave you information, correct?" A. "Correct." Q. "And another threat was that if he didn't give you information, he was going to take the whole weight for the crime, correct?" A. "That he could take the whole weight, yes." Q. "Okay. And you understood that that was illegal and that's why you stopped it, correct?" A. "Yes. Q. And why you later reported it?" A. "Yes." (Sweeney Dep. 117:3-17)
- "And then after that happened, Raucci continued to feed details to Mr. Ruiz, correct?" Q. "Let me be more specific. Raucci described, as you testified to in 2013, the house, the car, the gun in the bag to Mr. Ruiz, correct?" A. "Yes, he did." Q. "He described the color of the house, the type

of the car, that it was a BMW, correct?" A. "Yes." Q. "He described the house on Clay Street, correct?" A. "Yes, he did." (Sweeney Dep. 117:18-118:5)

- Q. "What had occurred after the threats is that he began feeding him information to educate -- in your view, educate Mr. Ruiz about what he should say, correct?" A. "Yes." Q. "And then you called him out again and you told him you cannot do that, correct, stop it?" A. "Yes". (Sweeney Dep. 119:9-13)
- Q. "You understood at this point -- A. "Yes." Q. – "that this detective had broken the most basic rules of interrogation in front of you, correct?" A. "Yes." (Sweeney Dep. 120:25-121:4)
- Q. "And, more specifically, one of the things that Raucci told Ruiz in your presence was that he was driving the car that night, it would be in his best interest to tell what happened, to give a detailed statement about participation and the other two, that that would be good for him, he wouldn't have to testify, and that Raucci would let him go home?" A. "That Raucci said that to him?" Q. "Yes." A. "Basically, yes." (Sweeney Dep. 123:24-124:8)
- As Sweeney admits, Ruiz provided three different versions to the detectives that night. The first version given to Sergeant Sweeney, skilled interrogator, stated that Ruiz knew nothing. Ruiz's second version in an oral interview, after Raucci fed information and used improper tactics to get Ruiz to repeat it back, Ruiz said he was the driver. In the third version, Ruiz stated he wasn't in the car but had heard admissions from Lewis and Morant that they were involved. Sweeney and Raucci's failure to document these inconsistent statements by a witness constituted an egregious violation of minimally accepted police practices in place by 1990.

124. None of Raucci, Sweeney, or Maher ever documented any of the misconduct used to coerce these fabricated statements from Ruiz, Roque, Morant, Ortiz, or Martinez (assuming it occurred as witnesses describe and Sweeney admits) or that information was provided to witnesses (as witnesses describe and Sweeney admits). There is a single police report describing the NHPD's interactions with these witnesses, authored by Raucci, dated March 23, 1991. It does not mention that Ruiz was interrogated prior to giving a tape recorded statement; that Ruiz repeatedly disclaimed knowledge about the Turner-Fields homicides; that Raucci fed Ruiz substantial information about the crime; that Ruiz at one point in the evening provided a completely different version of events, claiming he drove to and was present at the scene of the murders; or that Raucci threatened Ruiz with taking the weight of the homicides if he refuse to identify Mr. Morant and Mr. Lewis as the shooters and adopt the other information Raucci was feeding him, and offered to let him go him if he did. It does not mention that Roque was interrogated prior to giving a tape recorded statement; that Roque repeatedly disclaimed knowledge about the Turner-Fields homicides; that Raucci fed Roque substantial information about the crime, including describing Ruiz's statement to him; or that Raucci threatened to charge Roque with the murders on a million dollar bond if he refused to identify Mr. Morant and Mr. Lewis as the shooters and adopt the other information Raucci was feeding him, and only let him go home after he did. It does not mention that Mr. Morant was interrogated prior to giving a tape-recorded statement; that Mr. Morant repeatedly disclaimed knowledge about the Turner-Fields homicides; that Raucci fed Mr. Morant substantial information, including describing Ruiz and Roque's statements to him. It does not mention any of the egregious illegal misconduct used to obtain the February 2, 1991, fabricated statement from Ortiz. It does not mention

that during the tape recording of the statements taken from each of these people, the tape was stopped and started and stopped and over-recorded repeatedly so Raucci and/or the other officers could coach them on what to say. The failure to document each of these things constituted an egregious violation of minimally accepted police practices in place by 1990.

125. Sweeney and Maher never prepared reports about their interactions with any of these witnesses or documented them in any other way.

126. There is no police report documenting either the May 1991 interview with Ruiz or the February 1992 interview with Martinez.

127. Failing to document critical information in a police report during a criminal investigation is inconsistent with accepted police practices and police training in criminal investigation. Detectives Raucci, Sweeney and Maher failed to document significant exculpatory information relating to the photo arrays and interviews and police misconduct used therein (assuming it occurred) and comments made there in by witnesses.

128. The Defendants have admitted it was the standard practice of the NHPD not to document or disclose exculpatory and impeachment information, including inconsistent witness statements. This constitutes a severe departure from minimally accepted practices and raises serious concerns about the department's commitment to integrity and regard for the reliability of their investigations, as well as the department's apparent disregard for the use of false and/or fabricated evidence in prosecutions and the risk of causing wrongful convictions.

129. Assuming it occurred, the Defendants' use of improper tactics used to obtain false fed statements from five witnesses as described above constituted a complete rejection of their obligations as police officers.

**Opinion D: The City of New Haven, including through Defendant Chief Pastore, failed to provide proper supervision of their law enforcement officers in criminal investigations, interrogations, and production of exculpatory evidence.**

130. The witness testimony, admissions from Sweeney, Pettola, and Sullivan, and forensic evidence (taking all as true/accurate, suggests there was an absence of appropriate policy and procedure and supervision for homicide investigations, and that these supervisory failures led to a routine practice of officers feeding false information and using improper tactics to get interviewees to repeat it back, and then misrepresenting that the interviewees had offered the statements themselves in a non-coercive setting. Any police administrator would know, including by 1990, that this absence of supervision and/or the practices it apparently led to would create a high risk of proceeding on fabricated information and causing wrongful convictions.

131. To have effective constitutional policing, every law enforcement agency must have the three critical pillars which link the operational standards of the department: policies, training, and supervision. First, the department must have current written policies, secondly the department has to have proper training on those policies and lastly the department must hold the police officers accountable to follow those policies.

132. Police departments must decide if it is reasonably foreseeable that department members will be required to complete a particular task. Is that task one that can result in injury or violations of protections provided to citizens through federal and state laws or constitution? As such, it would be reasonably foreseeable to expect a member of the New Haven Police Department might have to conduct a criminal investigation at some time and /or might have to interview witnesses to a crime or interrogate suspects in a crime. Nevertheless, the New Haven Police Department failed to have adequate training, policies and proper supervision regulating the proper procedures for criminal investigations, interrogations, or production of exculpatory evidence.

**Policies**

133. Sweeney, Pettola, and Sullivan, all confirmed in their depositions that the NHPD did not have adequate policies or procedures to guide police officers in criminal investigations or interrogations. Sweeney was not aware of any polices or procedures that gave instructions to document the times when the tape recorder is stopped and started in homicide investigations. Sweeney admitted that he made his own rules regarding stopping and starting the tape. Sometimes he would note the time and sometimes he wouldn't. It was left to the individual investigator's discretion.

134. The defendants could not point to any policies or procedures in place in 1991 for reporting and documenting exculpatory evidence, including investigator misconduct in witness interviews and inconsistent witness statements, documenting complete interviews, and procedures for starting and stopping the tape recorder during interviews. Any prudent law enforcement officer would believe that it is more than likely that a member of the NHPD would be tasked with conducting a criminal investigation or interview witnesses or suspects in criminal activity at some time. Therefore, it would be reasonable and expected for the NHPD to have policies, procedures, and training in these areas of policing. The failure to maintain and clearly communicate policies in these areas was a serious supervisory failure.

135. Sergeant Sweeney stated in his deposition that there was no rule, regulation or custom which required investigators to document the interview he had with Ruiz even though it was inconsistent with subsequent interviews.

136. Sweeney was not aware of any rule or requirement for an investigator to report the misconduct he observed when, as he admits, Raucci intimidated, coerced, and intentionally fabricated a statement from Ruiz. No regulation required him to report this misconduct even though it is exculpatory.

137. According to Sweeney NHPD did not have any regulation requiring investigators to document in a report the illegal behavior he observed during the Ruiz interview.

138. Sweeney admits NHPD had a custom and practice in 1990-1991 where investigators never put interview notes in their file and did not disclose their notes to the State Attorney's office. It was understood that investigators did not disclose any of their notes.

139. The defendants admit the NHPD had no written policy, rule, or regulation requiring investigators to document any impeachment evidence or exculpatory evidence in police reports in 1990-1991. Sweeney

admitted at the time NHPD investigators only documented evidence on police reports when it helped prove their case.

140. The NHPD failed to provide adequate and proper policies for investigators in 1990-1991. The defendants admit that the NHPD did not have polices or procedures for reporting and documenting exculpatory evidence, documenting investigator misconduct, documenting inconsistent witness statements during interviews, and procedures for starting and stopping the tape recorder during interviews. The lack of policies on these topics constituted a glaring failure of the NHPD to ensure their officers were instructed and required to comply with minimally accepted police practices in 1990-1991.

**Supervision**

141. An agency's disciplinary system is a critical reinforcement of its policies and rules. It is important that an agency's policies are followed and that an appropriate disciplinary scheme is established for violations. An important function of disciplinary action is the message that is sent to others when an officer is disciplined or when he or she is not disciplined for a policy violation. All officers must understand the importance of the rules and regulations and the consequences for violating them.

142. A first violation may result in a letter to the file, while a second violation may require some remedial training. A third violation may result in a change of duty so the individual does not have an opportunity to use force to control a suspect. At some point a department will have to take more drastic action and those steps must also be made known to the officers. A policy without a meaningful disciplinary system will not be taken as seriously as one which includes an effective system of discipline. Similarly, a disciplinary system that can be subverted or manipulated will not serve as a deterrent. There is no room for "winking" at a violation and excusing poor judgment or deliberate actions which result in a violation of policy.

143. Because of their refusal to implement policies, procedures, and training on such vitals areas, the NHPD has given tacit approval to the members of the agency to violate citizen’s constitutional rights as it relates to criminal investigations, interrogations, interviews, production of exculpatory evidence, preservations of evidence etc. It is common for a police department to develop de facto, unofficial policies to fill the void when there are no official policies. One such example involves the stopping and starting of the tape recorder during interviews. Sweeney admitted that he made his own rules regarding stopping and starting the tape. Sometimes he would note the time and sometimes he wouldn’t. It was left to the individual investigator’s discretion.

144. If the testimony is believed, the broad scope of Raucci’s misconduct in this case alone, repeatedly in front of other detectives and supervisors, either with their complicity or without correction, is evidence of systemic misconduct and failures of the NHPD supervisory apparatus.

145. There is evidence NHPD Chief Nicholas Pastore was engaged in illegal misconduct himself in the early 1990s. The defendants and other NHPD officers deposed in this case have admitted there was widespread knowledge throughout the NHPD that Pastore frequently had sexual relationships with

prostitutes' decades younger than him. Ultimately Pastore resigned when news of his fathering a child with a 20-year-old prostitute became public in 1996.

146. The Chief of Police is the highest-ranking police officer in the police department and his/her behavior can set the standard for members of the agency. This is why police agencies will typically list integrity as a must have quality in a police chief. The misconduct of a police chief sends the message to the agency that misconduct will be acceptable and permitted.

147. IACP Corruption Prevention Model Policy D. *Special Responsibilities: IV. 1. Managers. A. This agency acknowledges the fact that command and supervisory behavior sets an example to subordinates. Therefore, managers are responsible for being especially aware of the impression or image they present to subordinates by either word or deed. Corruption violations on the part of managers will be vigorously prosecuted*.

148. IACP Corruption Prevention Model Policy II.: *Policy It is the policy of this law enforcement agency to establish proactive procedures to prevent corruption, to investigate complaints or allegations of corruption, and to administer appropriate administrative punishment or criminal prosecution where corrupt acts are confirmed.*

149. Pettola testified the scandal involving Chief Pastore became very public and that Pastore had a reputation for frequenting prostitutes and Pettola had reasons to believe the rumors. Pettola testified the rumors were subsequently confirmed when Pettola learned Pastore had a child out of wedlock with a woman who worked as a prostitute in New Haven.

150. Pettola, who according to Rose Dell, the City's representative had a good reputation for honesty, stated that he believed there had been a "Code of Silence" in place in New Haven and Pastore modeled an environment of rule-breaking by his own conduct. Pettola described knowing that there was code of silence in other police departments but that it was worse at the NHPD. Pettola cited this as a reason why, he and his partner did not report their observations of Raucci attempting to plant drugs on a suspect in the 1980s. Pettola described that this culture of the code of silence continued through Pastore's tenure as chief.

151. It is not unusual to have some semblance of protectionism or a code of silence in many police departments across the country. The strains and stress of policing in some cases can cause individual police officers to believe in that they are working for the greater good; therefore "the ends justifies the means". The defendants have testified to and the record otherwise reflects numerous examples that would indicate that the code of silence in the 1990s went beyond individual police officers and took on a department wide culture.

152. The Code of Silence breeds and supports other forms of unethical and illegal actions. The code of silence among administrators, although better camouflaged and less well known, is more destructive than when non ranking personnel do the same thing. When a culture fosters the destructive features of the code of silence, it promotes loyalty to people over integrity. The New Haven Police Department has shown evidence of a culture which supports the code of silence through many different ways which are

designed to mislead the public and protect individual police officers. A code of silence raises questions regarding the integrity of the police investigation and the willingness by the NHPD to ignore policy violations and failures to follow proper police procedures. The department administration must develop a culture which supports transparency, truthfulness and integrity within the administration and rank and file to ensure officers comply with their duties and minimally accepted police practices.

153. Sullivan was also aware of Pastore's longstanding reputation of frequenting prostitutes and the fact that Pastore had father a child out of wedlock with a prostitute. Sullivan was aware that Pastore's frequenting prostitutes was criminal in nature.

154. Pettola believed that the leadership of NHPD, including patrol had an unwritten rule that one should not report police misconduct. Pettola believed that the NHPD was not interested in uncovering police misconduct but preferred to sweep it under the rug.

155. Pettola provided an example of the unwritten rule prohibiting officers from reporting misconduct. While interviewing robbery suspects, Officer DiLullo smacked a suspect in the interview room. It was unexpected, Pettola did not know DiLullo was going to do that. After that, they got the suspect on one robbery, and then the suspect confessed to all the other robberies. Neither Pettola nor DiLullo wrote down on the police report that DiLullo had smacked the suspect in the face before the suspect confessed. Pettola understood at time he had an obligation to write it down on the report. Pettola knew that if they documented that DiLullo had slapped the suspect before the suspect confessed, the admissions would have been stricken. Other defendants and officers deposed in this case provided other examples demonstrating that the code of silence caused officers not to report officer misconduct when they observed it.

156. In the case I reviewed, there is substantial evidence (including based on witness testimony assumed to be true) that police officers gave false testimony, failed to properly prepare and complete police reports, and coerced witnesses to provide false information while investigators who witnessed the misconduct remained silent and failed to disclose it during the investigation. These examples are all indicative of a department which has accepted the code of silence and failed to take steps to terminate the practice. Such a failure is giving tacit approval to the police officers to continue using excessive force and continue to enforce the code of silence.

157. There is substantial evidence, including admissions from the defendants themselves, of a supervisory breakdown with regard to officer misconduct during the 1990s – the failure to adequately supervise, investigate, and address/remediate officer misconduct.

158. The defendants have admitted that Lawlor took no action to investigate or respond to Sweeney's reports of Raucci's misconduct (assuming he did in fact report it twice to Lawlor as he testified). Lawlor told the FBI that he had concerns about Raucci's investigation into the Turner-Fields homicides at the time of the investigation; he had an obligation to follow up on those concerns by initiating an investigation. The defendants admit he took no such action. His failure to take action in response to his concerns was a gross departure from his obligations as a supervisor.

159. There is evidence that when NHPD supervisors, including Pastore, received reports of Raucci engaging in illegal conduct – including drug use and drug dealing – and in the midst of NHPD efforts to surveil Raucci while engaged in that illegal conduct, Pastore tipped Raucci off to the fact that supervisors and the top of the chain of command was aware of his frequenting specific drug areas. Any minimally trained and experienced police officer – and much more so the chief of police – would understand that tipping Raucci off in this way would sabotage efforts to properly investigate Raucci's illegal activity. The NHPD also intervened to prevent the FBI from initiating a sting operation to arrest Raucci after the FBI developed information he was involved in illegal drug use and drug dealing.

160. These actions by NHPD supervisors and Chief Pastore are egregious violations of minimally accepted police practices. A failure or reluctance by supervisors to immediately investigate any officers accused of committing criminal activity fosters an atmosphere for further abuse on the part of the police officers. In particular, it creates an atmosphere where "noble cause" corruption can take hold. When officers are not required to follow the law and the department's formal policies and understand that they are operating according to unwritten practices, officers may believe that following department policies and upholding constitutional safeguards are unnecessary obstacles to their goal of arresting criminals. These officers cite the "greater good" when attempting to justify their behavior. The defendants have admitted that after an FBI investigation revealed significant evidence of misconduct by Raucci, they took no action to reinvestigate the Turner-Fields homicides to determine if the wrong people had been convicted, took no action to reinvestigate any of Raucci's other cases, and took no action to respond in any other way. Pastore admitted that the FBI investigation concluded at the same time that his relationship and fathering a child with a woman who worked as a prostitute became public, leading to significant public controversy and Pastore's resignation from the NHPD, and admitted that his focus on his own personal issues related to that controversy and the impact it had on his family distracted him from his responsibility to respond to the evidence developed by the FBI about Raucci's illegal misconduct. Chief Pastore was duty bound as the Police Chief to ensure the integrity of the NHPD. His failure to fulfil his obligation was consistent with the unofficial policies and code of silence within the agency. His failure to do so encourages police officers to believe that they can violate criminal laws and NHPD police with impunity which can lead to biased criminal investigations and subsequent coerced and false statements. A proper Police Chief and supervisors would have recognized the need for investigations into the Raucci allegations earlier and thereby prevent further NHPD misconduct. As FBI Investigator Donnelly testified there were several leads left to be followed up on in the reinvestigation into the Turner-Fields homicides when the FBI concluded its investigation.

161. Sullivan, who became one of the officers in charge of the Investigative Services Unit in the late 1990s, had an obligation to investigate how Raucci's misconduct raised by the FBI investigation may have impacted the cases Raucci had worked on. Sullivan also had an obligation to investigate whether to prosecute Raucci criminally for illegal activity raised by the FBI investigation and by internal NHPD surveillance. Sullivan also admitted that the NHPD chain of command was all aware by the time of the FBI investigation that Raucci engaged in criminal activity and illegal, corrupt misconduct. Sullivan made clear that the fact that no federal prosecution followed the FBI investigation in no way eliminated the NHPD's obligation to internally address Raucci's misconduct in connection with the Turner-Fields

homicide and reinvestigate if the right people were convicted, and also potentially if Raucci engaged in similar misconduct in other cases.

162. Pastore admits that he personally went to visit Scott Lewis in prison after Mr. Lewis made allegations of Raucci's misconduct to the FBI. Pastore never documented that visit. Pastore could not explain why he did not document that visit. Any minimally trained and experienced police officer – and much more so the chief of police – would understand that it was critically important to document such a visit -- a convicted inmate who has alleged misconduct by the officer who investigated the case he was convicted for to the FBI where those allegations were in fact being actively investigated by the FBI. Pastore's actions improperly bypassed the NHPD internal affairs mechanism; Pastore's taking it upon himself to interview Mr. Lewis about his allegations of Raucci's misconduct in his case and Raucci framing him for the Turner-Fields homicides without documenting that interview amounted to a complete disregard of the proper policy and procedure at every step of the internal investigation process. By acting in this way Pastore communicates to the rest of the force that internal rules do not matter, or that there are no internal rules that must be followed with regard to responding to allegations of officer misconduct.

163. The defendants have admitted that the chief of police who succeeded Pastore, Melvin Wearing, likewise took no action to reinvestigate the Turner-Fields homicides to determine if the wrong people had been convicted, took no action to reinvestigate any of Raucci's other cases, and took no action to respond in any other way to the FBI investigation. As Captain Sullivan admits, Wearing had an obligation to investigate how Raucci's misconduct raised by the FBI investigation may have impacted the cases Raucci had worked on. Wearing also had an obligation to investigate whether to prosecute Raucci criminally for illegal activity raised by the FBI investigation.

164. The defendants have admitted that after Sweeney asserts that, years later (in 1999), again reported Raucci's misconduct with Ruiz by leaving messages for then-Captain Sullivan, the NHPD took no action to reinvestigate the Turner-Fields homicides to determine if the wrong people had been convicted, took no action to reinvestigate any of Raucci's other cases, and took no action to respond in any other way.

165. The defendants have admitted that after Sweeney testified in open court in 1999 about Raucci's misconduct with Ruiz the NHPD took no action to reinvestigate the Turner-Fields homicides to determine if the wrong people had been convicted, took no action to reinvestigate any of Raucci's other cases, and took no action to respond in any other way.

166. The defendants admit that after Scott Lewis's habeas petition was granted in 2013, the NHPD took no action to reinvestigate the Turner-Fields homicides to determine if the wrong people had been convicted, took no action to reinvestigate any of Raucci's other cases, and took no action to respond in any other way.

167. The evidence described above demonstrates that policymakers at the top of the chain of command at the NHPD in the 1990s failed to adequately supervise, investigate, and address/remediate officer misconduct, and that as a result injustice caused by officer misconduct went uncorrected, Raucci was permitted to continue engaging in misconduct and illegal activity, and this contributed to a culture of permitting misconduct. These supervisory failures and the failure to take any action in response to

reports of officer misconduct constituted a gross departure from minimally accepted practices in place by 1990.

168. The failure to investigate and remediate substantiated officer misconduct is an egregious departure from minimally accepted police practices that causes several problems within a department: Police administrators know that proper supervision of the police department, particularly, homicide investigations is necessary to prevent corruption including civil rights violations. The NHPD appears to have lacked proper supervision for many years. Failing to require police officers to follow procedures designed to prevent violations of law by police officers which will eventually lead to violations of law including the type witnesses have testified to in this case. If Raucci did what witnesses and forensic evidence in this case suggest, it was a predictable result of the NHPD's failure to have a properly supervised police agency and failure to investigate Detective Raucci's misconduct, which any police administrator would expect to result in Raucci feeling that they could commit misconduct right in front of other police officers and supervisors without any concerns of being disciplined.

169. In the late 1990s and into the early 2000s Chief Wearing and Lt. Sullivan were involved in a public scandal at the NHPD stemming from allegations that Wearing and/or Sullivan (and other officers) tampered with evidence and failed to properly investigate the homicide of Philip Cusick. There are even unsubstantiated allegations that the motive of the police corruption in this investigation was to protect a former police officer and/or his family from being connected to the crime. What is striking is that the two highest-level officers involved – Wearing, Chief of Police at the time, and Sullivan, head of the Investigative Services Unit at the time – claimed that the other lied under oath concerning their involvement in the misconduct that allegedly occurred in the investigation. Further, Wearing was accused of having interfered with an internal investigation process by at least one Internal Affairs officer, John Minardi. I understand Minardi will be deposed soon in this case. Even based on the current level of information, these allegations of the highest-level people within the NHPD engaging in misconduct in a homicide investigation similar to the allegations of misconduct in this case, and interfering with the internal investigation process, raises a major red flag regarding the integrity of the NHPD's supervision of homicide investigations and the integrity of the NHPD's Internal Affairs mechanism at the time.

**Opinion E: There is evidence that officer misconduct misrepresenting or not documenting exculpatory and impeachment material consisting of officer misconduct from witness interviews and inconsistent witness statements occurred repeatedly across homicide cases in the early 1990s**.

**Anthony Golino**

170. The charging of Anthony Golino arose out of an 11–year investigation by the City of New Haven Police Department into the 1973 murder of Concetta ("Penny") Serra. Lillis, a police sergeant, supervised the investigation. According to a court opinion, DiLullo and Leonard Pastore, police detectives, and Fish–MacDonald, a police officer, had primary operational responsibility for the investigation. in July 1984, Golino was arrested pursuant to an arrest warrant and charged with the murder.

171. In July 1984 Golino was arrested; according to a summary provided in a decision from the Second Circuit, the primary evidence inculpating Golino was statements from his estranged wife claiming he had

admitted to the crime; inconsistent statements from the wife, including her admissions that Golino never made the inculpatory statements, were excluded from the arrest warrant affidavit; the arrest warrant affidavit also stated that an informant (Neil Russo) stated Golino dated Serra, which Russo later testified (at a deposition in a subsequent civil case) he never said; a number of other exculpatory details were also omitted (descriptions of the killer as thin, whereas Golino was 215 pounds; identification by one witness of Serra's boyfriend as the killer).

172. Charges against Golino were dismissed when DNA evidence excluded him. Golino brought a civil claim against NHPD officers.

173. Russo stated in his deposition in a civil rights case: he never told police that Golino dated Serra and when they interviewed him he would "say one thing and they put down another thing."

174. DiLullo stated in his deposition in the civil rights case: it was his general practice to omit exculpatory info from affidavits in support of arrest warrant applications.

175. The above evidence (accepting the witnesses' statements as true and given NHPD officer admissions) suggests NHPD officers engaged in serious misconduct with witnesses in the Serra homicide investigation leading to Golino's arrest, including attributing statements to witnesses they never made, and that NHPD officers failed to document exculpatory information from witness interviews, including inconsistent witness statements (including that Golino never made inculpatory statements the witness later attributed to him) and misconduct used to obtain witness statements. This evidence (accepting it as true) demonstrates NHPD officers engaged in the same pattern of egregious misconduct in this investigation that officers engaged in in the Turner-Fields homicide investigation (considering defendants' admissions and taking the witnesses' testimony and statements as true): officers had improper tunnel vision with regard to the investigation, engaged in similar misconduct with witnesses, and failed to document or disclose that misconduct and other exculpatory evidence.

**<u>Eric Ham nolle prosses for 1991 Markiest Alexander homicide</u>**

176. In the investigation into the 1991 murder of Markiest Alexander, Lynwood Cypress gave his first statement to Detective Joe Green of the New Haven Police department on February 6, 1991. Cypress described the shooter as dark skinned, 5'5" to 5'7", stocky build (consistent with other witness accounts), and stated he believes his name is Joe. Cypress also stated he couldn't see the shooter's face because he was wearing a ski mask.

177. On February 11/1991 Lynwood Cypress gave a second statement to Detectives Green and Sweeney identifying Ham (6'5", light-skinned) as the shooter, now claiming Joe was the driver.

178. [undated] Joseph Timothy Davis gave a statement to Detective Greene, identifying Ham as the shooter and stating he shot from inside a car.

179. February 13, 1991: Ham arrest warrant, signed by Sweeney, is issued. February 13, 1991, Ham was arrested for the Alexander murder and held

180. February 18, 1991: Davis provided a written statement to Attorney Leaf detailing police interrogation, explaining he told police Ham was innocent multiple times, that police threatened him with 24 years and said they had his fingerprints, and that he finally provided a statement implicating Ham under this pressure.

181. Assistant State's Attorney David Gold wrote an undated memo detailing his intention to nolle pros the case because of exculpatory information withheld from the arrest warrant; Gold and Tim Reardon interviewed Cypress and Davis who both recanted their statements inculpating Ham; Cypress described to Gold and Reardon being told by police what to say, and Davis described Detective Green threatening to charge him with murder if he didn't name Ham as the shooter.

182. May 9, 1991: Gold nolle prosses case.

183. August/1991: Ham brings federal civil rights case against Green and Sweeney.

184. March/1996: Civil rights jury awards Ham $1.4M.

185. May 4, 1999: Civil rights verdict affirmed.

186. The evidence (accepting the witnesses' statements as true and considering Sweeney's admissions below) demonstrates NHPD officers engaged in serious misconduct with witnesses in the Alexander homicide investigation leading to Ham's arrest, including threatening to charge witnesses with murder and with decades of jail time unless they would inculpate Ham, and that NHPD officers failed to document exculpatory information from witness interviews, including that officers provided witnesses with information and used misconduct to get them to repeat it back, witnesses' inconsistent statements (including asserting that Ham was innocent before then naming him as the shooter); instead, like in the Turner-Fields homicide investigation (accepting witnesses' testimony and Sweeney's admissions as true) the officers misrepresented that the witnesses provided the information in their statements and provided their statements in a non-coercive setting.

**<u>Sergeant Sweeney's Involvement and Misconduct in Ham case</u>**

187. Sweeney remembered the Ham case and described it as "a horrific crime" which occurred only a week after the Ruiz interview. (Sweeney Dep. Vol 2 390-391. Sweeney was the supervisor in the Ham case responsible for ensuring that all officers investigating the case were doing it properly. Following up on all leads and documenting all the evidence that needed to be. Sweeney was not only the supervisor but also was present in all the interviews.

188. Sweeney agreed that Lynwood Cypress gave multiple statements to the police. Cypress originally said he couldn't identify the suspect and claimed that the shooter wore a ski mask. Sweeney acknowledged that the investigators didn't mention the multiple interviews in the arrest affidavit and agreed that the affidavit was consistent with the practice of detectives routinely taking multiple statements, either formal or informal from witnesses and determining based on their experience which statement was true and only including that statement in the final affidavit. No one in the NHPD told Sweeney that such a process was improper.

189. Sweeney reviewed the Ham arrest warrant and acknowledged that he signed every page of the document as the supervisor thereby approving the document. Sweeney agreed that the language in the affidavit indicates that the police only took one statement from Cypress even though they took multiple statements. According to Sweeney, the practice of only revealing one statement in the affidavit was consistent with the practice at NHPD at the time.

190. Mr. Gold stated in a memo that Cypress and Davis vehemently denied knowing who the shooter was. Cypress recanted his second statement stating that the police told him what to say. Davis described the pressure put on him by Detective Greene including threats that he, Davis, would be charged with the murder if he didn't name Ham as the shooter. Sweeney advised he wasn't present during this misconduct but confirmed that the threat was the same type of information as he witnessed by Raucci in the Ruiz statement a month earlier.

191. The evidence, including Sweeney's own admissions and a memo from then-Assistant State's Attorney Judge Gold (accepting the witness statements therein as true), demonstrates that NHPD officers, including Sweeney, had tunnel vision and engaged in serious misconduct with witnesses in the Alexander investigation that was very similar to the police misconduct that occurred in the Turner-Fields homicide investigation (considering defendants' admissions and taking the witnesses' testimony and statements as true), including providing witnesses with the information in their statements and using improper tactics to get them to repeat it back, failing to document or disclose that misconduct and other exculpatory evidence, and misrepresenting that the witnesses provided the information in their statements and provided their statements in a non-coercive setting.

192. The defendants have admitted the officers in charge at the NHPD took no action in response to the Gold Memo detailing misconduct by the NHPD in investigating the Alexander murder. This failure was a gross departure from the minimally accepted supervisory standards in place by 1990.

**Daryl Valentine prosecution for 1991 Paisley and Poole homicides**

193. September 21,1991: Andrew Paisley and Hury Poole were shot and killed at the Athenian Diner on Whalley Avenue in New Haven.

194. September 21,1991: Det Greene interviewed Regina Coleman who denies she was present at the shooting.

195. September 26,1991: Kristina Higgins provides a statement to the NHPD identifying Valentine as the shooter and picks him out from a photo array.

196. September 28,1991: Coleman statement to Detective Green identifying Valentine as the shooter and picking him out from a photo array, which she later refuses to sign; Green admits he stopped the tape to prompt Coleman to explain there was another person shooting at random (a fact which the CIU has discredited), which he claims she had offered in the pre-interview; Green later admits he could have given her that info.

197. At the first trial, Higgins recants and details how Greene threatened her with jail time to obtain her statement and then afterward bought her alcohol, cigarettes, and gave her $50 to buy cocaine. Also at the first trial Coleman recants and details how Greene pressured her and bribed her for her statement.

198. January 13,1991-January 14,1991: At the second trial Higgins recants statement and explains she lied because Detectives Green and DiLullo threatened to arrest her on an open warrant and bribed her with $50 to give the statement they wanted inculpating Valentine; afterward they dropped her off at the package store where she got beer and cigarettes and then went to buy cocaine. at the second trial Coleman states she didn't remember the shooting or giving a recorded statement.

199. April 1,2022: CIU interview with Higgins in which she states her statement to the NHPD was false and coerced by Detective Green. Higgins' statement to the CIU was consistent with her trial testimony.

200. September 16, 2022: CIU report published presenting "plausible and verifiable evidence that may cause a reasonable person to lose confidence in the conviction due to discredited eyewitness evidence."

201. The above evidence (accepting the witnesses' testimony and statements as true) demonstrates NHPD officers engaged in serious misconduct with witnesses in the Paisley and Poole homicide investigation leading to Valentine's arrest, including feeding witnesses information, threatening witnesses with arrest and offering them money, alcohol, and drugs in exchange for them repeating back the information the officers fed them; failed to document exculpatory information from witness interviews, including misconduct officers used to obtain witness statements and witnesses' inconsistent statements; and misrepresented that the witnesses' statements came from the witnesses and were given in a non-coercive setting. This evidence (accepting it as true) demonstrates NHPD officers engaged in the same pattern of egregious misconduct in the Paisley-Poole homicide investigation that officers engaged in in the Turner-Fields homicide investigation (considering defendants' admissions and taking the witnesses' testimony and statements as true): officers had improper tunnel vision, engaged in similar misconduct with witnesses, failed to document or disclose that misconduct and other exculpatory evidence, and misrepresented that witnesses' statements originated with them when in fact they were false and fed.

**<u>James Fleming prosecution for 1991 Christian Price homicide</u>**

202. February 17, 1991: Yale student Christian Prince is shot while walking home from a party and dies immediately; his body is found in front of St. Mary's church in the middle of campus, and his wallet is found on the ground some yards away from his body.

203. February 27, 1991: Randy Fleming (no relation), 17 years old at the time, provides a statement to Detectives DellaCamera and Burton. He states the day before the murder, James Fleming told him he was going to "take someone off at Yale" and the next day J. Fleming admitted to him he shot a Yale student with a .25 and dropped his wallet in flight.

204. March 5, 1991: the Prince autopsy report is sent to Chief Pastore.

205. May 10, 1991 R. Fleming statement to Raucci and Cartoceti: He states he drove with J. Fleming and two others in a white Nissan to Yale where James got out of the car and robbed and shot a Yale student.

206. May 16, 1991: Raucci signed J. Fleming arrest warrant.

207. June/1991: Probable cause hearing: R. Fleming recants his statement and the prosecutor charges him with conspiracy to commit robbery.

208. At the first trial in May, 1992, R. Fleming invoked his Fifth Amendment rights and the prosecutor granted him immunity, after which he testified he knows nothing and the cops pressured him to give his statement: "They forced me. What could I do?" "I didn't make it up. I was, like pushed into it" by the police; "They forced me, man. I didn't tell them nothing, man. They had the answers themselves." "I don't know nothing…I wasn't there." Police threatened he would "do time" if he didn't cooperate "I said it, but it ain't true" "I made it all up. It's all lies. They pressured me. They said, 'we're going to make you rot until you tell."

209. The jury convicts J. Fleming on conspiracy to commit robbery but acquits him on the murder charge; the jury hangs on attempted robbery and felony murder. J. Fleming is sentenced to a 9-year prison term. At the second trial in March/1993, J. Fleming is acquitted on felony murder and attempted robbery charges. J. Fleming maintains he did not commit the Prince shooting.

210. The above evidence (accepting R. Fleming's testimony at trial as true) demonstrates NHPD officers engaged in serious misconduct with the key witness in the Prince homicide investigation leading to J. Fleming's arrest and prosecution, including feeding this witness information and threatening him with jail time unless he repeated back the information the officers fed them, and that NHPD officers failed to document exculpatory information from witness interviews, including misconduct officers used to obtain witness statements and witnesses' inconsistent statements, and misrepresented that the information in the key witness's statement originated with him. This evidence (accepting it as true) demonstrates NHPD officers engaged in the same pattern of egregious misconduct in the Prince homicide investigation that officers engaged in in the Turner-Fields homicide investigation (considering defendants' admissions and taking the witnesses' testimony and statements as true): officers had tunnel vision, engaged in similar misconduct with the key witness, failed to document or disclose that misconduct and other exculpatory evidence, and misrepresented that the key witness's statement originated with him when it was in fact false.

**<u>George Gould and Ronald Taylor prosecution for the 1993 Eugenio Vega homicide</u>**

204. July 14,1993: Eugenio Vega killed in the cooler of his bodega.

205. July 29, 1993: Doreen Styles's prostitution arrest and statement to Gethers and Sullivan identifying Gould from a photo array. Sullivan admits that Styles was experiencing withdrawal from heroin addiction and was under arrest for a prostitution charge while she was interviewed, that it's possible he told her she could not leave until she gave a statement, and that after the interview he took her to a place where he knew she could buy heroin and gave her money. Sullivan admits this kind of thing was routine for him and other officers in interviewing witnesses. Sullivan admits he did not document any of those details and that that was his routine practice. Any minimally trained and experienced officer would understand the risks of obtaining a false statement under these circumstances: interviewing a heroin addict

experiencing withdrawal, while she is under arrest, and taking a statement from her before taking her to obtain more heroin. It is also another example of criminal activity by NHPD under the color of law. It illustrates the systemic criminal activity that occurred throughout the department and specifically with criminal investigators, as admitted to by Sullivan, who later became one of the officers in charge of the Investigative Services Unit. The corruption is routine, out in the open which shows the officers do not fear any discipline for that misconduct. Minimally trained and experienced officer would understand that it is critically important to include the circumstances of such an interview (the heroin addiction/withdrawal, the prostitution arrest, and taking the interviewee to obtain more drugs after the interview) in a report. Sullivan's decision to take a statement from Styles under the circumstances he encountered her in and his failure to document those circumstances were both gross departures from minimally accepted police practices in place by 1990.

206. August 2,1993: Doreen Styles signs her July 29, 1993, statement and gives a second statement to Detectives Gethers and Dease identifying Taylor from a photo array.

207. As Sullivan admits, Sullivan and Gleason picked up Stiles and her boyfriend the night before the probable cause hearing and took them out to dinner, took them to buy heroin then took them to Plaza Park Hotel where Stiles and her boyfriend did the heroin and slept with Sullivan present overnight. According to Stiles, she said she wanted to leave but they refused her request and Sullivan told her they would vacate the open warrants against her in exchange for her testimony.

208. January 19,1995: Doreen Styles trial deposition (used at trial because Stiles was in the hospital) at which time she maintains her statement inculpating Gould and Taylor.

209. August 3-August 4, 2009: Stiles testimony at Gould and Taylor's combined state habeas hearing: she testifies her trial testimony was completely false; she gave the statement to Detectives after being arrested in a prostitution sweep, after being held for hours and beginning to go into heroin withdrawal; the detectives told her what to say and refused to release her until she said what they wanted to hear, at which time they promised to buy her heroin.

210. The charges were dismissed in 2024.

211. Sullivan's admissions (and the testimony of Stiles, accepted to be true) demonstrates NHPD officers engaged in serious misconduct with the key witness in the prosecution and conviction of Gould and Taylor for the Vega homicide, including feeding her information, offering her money, alcohol, and drugs in exchange for her repeating back the information officers fed her, interrogating her while she was going through heroin withdrawal and refusing to let her leave until she repeated back the information they wanted to hear, and providing her with drugs the night before she testified at trial, refusing to let her leave the hotel where they had her stay the night before trial, and offering to clear warrants against her in exchange for her testimony; and that NHPD officers failed to document exculpatory information from these interactions with this witness, including misconduct officers used to obtain her statement, her inconsistent statements, and the fact that she was going through withdrawal and under arrest for a different charge while being interrogated. This evidence (accepting it as true) demonstrates NHPD officers engaged in the same pattern of egregious misconduct in the Vega homicide investigation that

officers engaged in in the Turner-Fields homicide investigation (considering defendants' admissions and taking the witnesses' testimony and statements as true): officers had improper tunnel vision, engaged in similar misconduct with the key witness, failed to document or disclose that misconduct and other exculpatory evidence, and misrepresented the circumstances of the witness's statement. Moreover, Sullivan's admissions that he and fellow officers routinely took statements under circumstances like those present in this case and that they had a practice of not documenting those circumstances demonstrates that this misconduct and non-compliance with disclosure obligations was widespread. Sullivan's admissions that this type of misconduct was customary are particularly important given that a few years later, Sullivan became one of the top people in charge of the Investigative Services Unit; this suggests this type of misconduct was standard and was tolerated from the top down.

**Adam Carmon prosecution for 1994 Danielle Taft murder**

212. February 3,1994: 7-month-old infant Danielle Taft is shot through the window of her home and killed; her grandmother Charlene Troutman is also shot and is paralyzed.

213. Sweeney was one of the supervisors of the investigation.

214. February 9,1994: According to a summary in a court decision, the NHPD recovered a gun from a 2/7 shooting and Detective Anthony Stephenson determined it was the gun used in the Troutman/Taft shooting, and that after the shooting someone must have obliterated the front by inserting a foreign object and moving it around inside the barrel.

215. February 10,1994: Detective Dease interviewed Anthony Stevenson, who was found shot at the scene of the 2/7 shooting with the relevant gun lying next to him, while he recovered in the hospital; officers informed Stevenson they had linked the gun to the Troutman/Taft shooting; Stevenson says Adam Carmon gave him the gun.

216. February 15, 1994: Anthony Stevenson provides a follow up statement to Dease, while still in the hospital; officers told him they wanted to know how the inside of the barrel of the gun had been marked up and Stevenson states he "forgot to tell" them that he had seen Carmon scraping the inside of the barrel of the gun; Stevenson is asked what kind of car Carmon was driving, and Stevenson can be heard on the tape whispering "what kind of car"; an audible response can be heard, and then Stevenson says "burgundy Buick."

217. March/1995 at trial an eyewitness, Jamie Stanley testified that she saw the shooter's face for several seconds and that she picked out Carmon's photo as a look-alike; Dets DiLullo and DiNello also testified she picked Carmon out of photos as a look-alike; photos that were shown to Stanely are produced at trial and include a notation on the back of a photo of a different person (not Carmon) that says "look a like."

218. On April 7, 1995 Carmon was convicted. In December 2022 Carmon had a habeas petition granted. In July/2023 Carmon filed a federal civil rights action.

219. The above evidence suggests NHPD officers may have engaged in serious misconduct with the witnesses in the Taft homicide investigation, including provided a witness with unknown information and misrepresenting that the information originated with him, and misrepresenting who Stanley a witness identified in a photo array, and failed to document this exculpatory information. This evidence suggests NHPD officers may have engaged in a similar pattern in the Taft homicide investigation that officers engaged in in the Turner-Fields homicide investigation (considering defendants' admissions and taking the witnesses' testimony and statements as true) of feeding witnesses information, misrepresenting witness interviews, and not documenting or disclosing exculpatory information.

220. The allegations of similar misconduct across cases raise serious concerns about the department's integrity. It is especially troubling to see this many similar allegations in the same short time period. What makes this case unique, in my experience, is the combination of admissions concerning misconduct with witnesses (including providing false information, using coercive tactics to get witnesses to adopt it, and misrepresenting that the information in witness statements originated with the witnesses) that was apparently customary and accepted by the highest-level supervisors, the absence of written policies or procedures prohibiting this type of misconduct, and the numerous examples of this custom in practice causing wrongful convictions or leading to prosecutions that were abandoned/did not result in conviction.

**Opinion F: The City of New Haven through Chief Pastore failed to properly supervise Detective Vincent Raucci.**

221. Based on the evidence reviewed, it appears that the Defendant City of New Haven failed in their duty to properly supervise Defendant Raucci for years, allowing him (if the witnesses are believed) to engage in extreme illegal misconduct, including drug dealing, regular drug use, fabricating evidence, assaulting civilians, and severe misconduct in investigations that led to innocent people being prosecuted and multiple convictions being overturned in cases he worked on. The City was on notice of all this and more, and failed to take any action to stop Raucci from engaging in rampant illegal behavior. This failure to investigate, and if reports were deemed credible, discipline Raucci, despite the evidence he engaged in multiple forms of misconduct was a massive departure from minimally accepted practices.

222. NHPD supervisors were put on notice of Raucci's misconduct with Ruiz in the Turner-Fields investigation in January 1991 when Sweeney reported it the very next day to Defendant Lawlor (assuming this in fact occurred as Sweeney reports). They were again put on notice when Sweeney reported it to Defendant Lawlor again either a few months or a year later, around the time that either Mr. Lewis or Mr. Morant was arrested (Sweeney cannot remember which) (assuming this in fact occurred as Sweeney reports). While Lawlor has denied that Sweeney reported Raucci's misconduct to him, Lawlor admitted to the FBI in 1995 that he was troubled at the time by Raucci's investigation into the Turner-Fields homicides. The NHPD did nothing at the time, or at any later time, to respond to these reports of extreme misconduct from a fellow officer.

223. In Spring 1992, a witness (Randy Fleming) at the Prince homicide trial claims on the stand that Raucci coerced a statement from him. Instead of investigating Raucci, the NHPD charged the witness with conspiracy to commit the crime and with perjury.

224. In 1994 at Mr. Morant's trial another witness (Jose Roque) testifies that Raucci fed and coerced his entire statement, corroborating Sweeney's two prior reports about this misconduct (assuming they occurred). Defendants admit nothing was done to investigate Raucci or reinvestigate the Turner-Fields murders.

225. Roque testified that most of what he said in his taped statement (including all inculpatory statements about Stefon's involvement in the murders) he was told to say by the police interviewing him; they would stop the tape and tell him what to say and then turn it back on and he would say it.

226. December 9, 1995, attorney Frank Cannatelli wrote a letter of complaint addressed to Chief Pastore alleging Raucci hit his client, Christopher Esposito, in the face with the butt of a rifle during his arrest on Dec 2, 1996. Raucci is interviewed and denies it. A fellow officer, Officer BTW Donnelly, is interviewed and confirms when he arrived on the scene Raucci was standing over Esposito holding a pistol; another witness claimed to have seen Raucci with a shot gun on December 2. These statements, if believed, suggest Raucci's explanation and denial was a lie.

227. March-April 1996 the FBI investigates and finds evidence corroborating earlier evidence of Raucci's misconduct in Turner-Fields case, including multiple witnesses recanting statements they made to Raucci and telling the FBI that Raucci coerced the statements from them.

228. In April 1996, a rape victim informs the State's Attorney's Office that she had sex with Raucci, who was the responding officer to the scene, within a couple weeks of an alleged rape in October 1995. The victim's upstairs neighbor reports details suggesting Raucci had sex with the victim the night he responded to the rape allegation. The NHPD does nothing to investigate / respond to this incident and there is a conviction in the rape case in 1997. In 2000, the rape conviction is overturned based on Raucci's sexual relationship with the victim not having been disclosed before trial.

229. The defendants and other officers deposed in this case have admitted that there were widespread rumors on the force about the FBI investigation into Raucci for corruption, for example Pettola testified it was "big news" in 1995-96, and there was a lot of talk about it. They have also admitted there were a lot of rumors, "hearsay," by 1995 that Raucci was using and dealing drugs and acting as an enforcer for drug dealers in the Fair Haven neighborhood of New Haven Pettola suspected, based on what he observed, that Raucci was carrying bag of cocaine in pocket to use in situations where he couldn't find drugs and wanted to plant them. In the mid-1980s, Officer Pettola was on a traffic stop with another officer present when Raucci arrived. After the officers searched the vehicle and failed to find any contraband, Raucci offered to plant cocaine in the car. With that, Raucci pulled a bag of cocaine from his pocket. Pettola refused the offer and allowed the suspect to leave the area. Pettola admitted his observation was consistent with the rumors of Raucci using drugs.

230. An undated memo from Sgt Lanza to Lt. Sullivan indicates a credible informant told Lanza that Raucci had a cocaine problem, that Raucci was protecting drug dealers in the Fair Haven section of New Haven, providing them with money to obtain drugs to sell.

231. May 9 and 10, 1995 Officer Badger memos to Lawlor detail surveillance of Raucci, including his observations of Raucci spending a lot of time at 123-125 and 127-129 Blatchley Avenue while on duty,

which, evidence demonstrates, was a known drug location in the Fair Haven area. Sullivan, then a high-ranking officer, admits that he was involved in surveillance of Raucci that demonstrated he was engaged in criminal drug activity that could have led to criminal charges.

232. On January 6, 1996, a woman named Michele Reidel made a complaint to the NHPD that Raucci was harassing her, had taken her out on multiple occasions while on duty including one time in which he bought and used cocaine, that she'd seen him use cocaine in his unmarked police car at one point, and that she wanted him to leave her alone; investigation was done that corroborated her claim that Raucci took her to a motel one night while on duty in May 1995.

233. Between May 1995 to May 1996 the FBI develops significant evidence of Raucci's drug dealing and drug use, including observing Raucci's car at known drug locations with no legitimate police purpose and interviewing many individuals who reported that Raucci used drugs and was involved in the drug trade.

234. Evidence suggests that in February 1996 Raucci went into a drug treatment program.

235. Raucci's wife, Donna testified she can't even remember how many times she called New Haven PD as result of physical abuse from Raucci because when she did call Vincent was immediately outside saying it's ok she's fine. She estimates it was 6 or 7 times that she called police about the abuse. She has a vague recollection of Detective Sweeney coming to house on one occasion. Sweeney himself admitted to being present on one occasion when a family member reported Raucci being violent. He remembers there were other officers on the scene who chose not to arrest him.

236. Despite widespread indicia of Raucci's rampant, illegal misconduct, both on the job and off, the NHPD looked the other way and permitted him to continue as a Detective for years and ultimately permitted him to take disability retirement with a full pension. The NHPD never investigated or remediated Raucci's misconduct until finally placing him on leave in January 1996. There is no record of IA issues in Raucci's file between 1990-1995.

237. Raucci admitted that prior to leaving, nobody questioned his conduct regarding his criminal investigations; nobody ever tried correcting his report writing, no one questioned the way he taped interviews/or conducted pre-interviews; nobody attempted to discipline him in any way for any conduct in connection with criminal investigations that he can recall; and nobody questioned the manner in which he handled witnesses. He testified no one ever mentioned him doing anything wrong in a case, at least not while he was investigating the case, prior to 1995.

238. At the time he retired because of disability, Raucci understood he was being investigated for using and dealing drugs on the job, and also accused of lying about overtime job. At the time he retired and took disability retirement, he understood all these allegations were still being investigated.

239. Defendants have admitted there was never any Internal Affairs or other investigation of Raucci as a result of the FBI report that was issued in 1996.

240. Following the May 9 and 10 1995 Badger memos to Lawlor describing surveillance of Raucci spending a lot of time at 123-125 and 127-129 Blatchley Avenue while on duty (a known drug location in Fair Haven

area), the matter was "brought to Chief Pastore's attention" and Pastore "told Raucci to stay out of the area" as Pastore admits.

241. In the fall of 1996 the FBI had authorization to arrest Raucci in a sting operation based on the information they had gathered to that point that he had been engaged in drug trafficking with Raul Luciano, Frank Parisi, and others, with the aim of arresting him prior to planned arrests of Luciano and Parisi, in order to "provoke testimony from either Parisi or Luciano at the time of their arrests on drug charges."

242. The sting was scrapped because of concerns from both FBI and from NHPD – the FBI concerns were just related to technology and weather and likely would have postponed the sting a matter of days – but the NHPD raised the concern that "the predicates for investigating Raucci on public corruption charges may be somewhat lacking and suggested further investigation prior to a sting" – because of these issues the sting was called off and ultimately couldn't be pursued.

243. In January 1996 Chief Pastore suspended Raucci.

244. In March 1996 Raucci was arrested for larceny in relation to allegations that he billed extra-shifts that he didn't work, when he was actually at a motel with a woman (Michelle Reidel) doing cocaine. He was offered a conditional discharge, which allowed for dismissal of the charges in exchange for community service hours and compliance with a few other requirements.

245. In June 13, 1996 Raucci was granted disability retirement retroactive to April 1996. The defendants admitted his retirement comes with a full pension. There is no evidence the NHPD ever investigated or initiated additional criminal charges against Raucci. Defendants have admitted that Raucci's cases were never reinvestigated after his retirement.

246. Based on the level of evidence developed indicating Raucci may have engaged in significant illegal activity for years while on the force there should have been a complete criminal investigation into him and most likely, based on the level of evidence I have seen, if proven true, he should have been prosecuted for his illegal activity. The failure to do so sent a message to the force that illegal activity is tolerated and will go unchecked. There is no reason why Raucci's retirement should have precluded a criminal investigation and prosecution of Raucci, as defendants have admitted. There is also no reason why the FBI's investigation and conclusions about Raucci should have precluded the NHPD from engaging in a criminal investigation and prosecution of Raucci, as defendants have admitted. To the contrary, the NHPD's failure to investigate and prosecute Raucci for his illegal misconduct was a gross failure of the top officials within the NHPD to carry out their obligations.

247. Because of the unwritten rule prohibiting police officers to turn in police officer violators and the fact the NHPD refused to investigate Raucci in spite of the information they had has given tacit approval to the members of the agency to violate citizen's constitutional rights as it relates to criminal investigations, interrogations, interviews, production of exculpatory evidence, preservations of evidence etc. It is common for a police department to develop de facto, unofficial policies to fill the void when there are no official policies.

248. If the allegations were proven, Raucci should not have been permitted to retire with a pension and should instead have been disciplined and terminated from the department for his illegal activity and police misconduct. Failure to investigate, and if allegations are true, to discipline Raucci through the internal NHPD disciplinary apparatus was a gross failure of the top officials within the NHPD to carry out their obligations and sent a message to the rest of the force that illegal misconduct would be tolerated. Pastore's decision to tip Raucci off while he was being investigated for his illegal drug-related activity was an egregious deviation from accepted police practices that undermined the NHPD's ability to investigate and (assuming it was demonstrated to have occurred) remediate Raucci's misconduct.

249. In light of the significant evidence (taking witness testimony as true, including Sweeney's) that Raucci engaged in misconduct with witnesses in the Turner-Fields homicide and other cases (including the Horrocks rape case and Prince homicide) there should have been a reinvestigation of Raucci's cases, including the Turner-Fields homicide investigation to determine if the wrong people had been convicted. Pastore and Wearing's failure to initiate these reinvestigation efforts constituted a failure of their obligations as chief of police.

**<u>Materials Relied Upon</u>**

Amended Complaint
FBI Report
Lynwood Cypress Statement
Jose Roque Trial Testimony
Davis statement
Davis written statement
Augustin Castro deposition
Rose Dell deposition
Joseph Pettola deposition
Brian Sullivan deposition
Michael Sweeney deposition
Vaughn Maher deposition
Millie Martinez deposition
Vincent Raucci deposition
Jose Roque deposition
Brian Donnely deposition
Stefon Morant deposition
Wearing deposition,Lewis v Earden
Minardi deposition Coppola v Wearing
Wearing Testimony : Lewis First State Habeas
End of Investigation SAO 01716
Plaintiff Deposition Exhibits 1-66:
Ruiz Exhibit 60 Nolle Pross
Ruiz Initial Assessment
NHPD Turner- Fields Investigative File
Scott Lewis Arrest Warrant

Maher Documents
Pettola Documents
Forensic report of Roque Tape recording
Koenig Repot
Bobby Wilson telephone Transcript
Bobby Wison Audio recording
Phot of Criscuolo park
Criminal Justice Case Prep
NHPD Training Bulletin
Millie Martinez Statement
Millie Martinez second Statement
Stiles Statement 1,2
Millie Martinez Trial testimony
Parese Notebook
Hartford Courant Article
Ham v Greene
Gold memo
Ham Arrest Warrant
Sweeney testimony/Ham
Augustin Castro testimony
Ruiz Letter
Lisa Bell Memo
Letter to Chief Wearing
Incident report: Doreen Stiles
Jose Roque Affidavit
Pettola Personnel File
Pastore Article
Fleming reports
R. Fleming trial testimony
Memo Re; Raucci Incidents
Anthony Stephenson Statement transcript and audio
Wearing testimony
Memo to Lt. Wearing
Audio recordings of statements:
Ovil Ruiz: Ex. A,B,D
Stefon Morant
Scott Lewis
Hector Ortiz
Jose Roque
Milly Martinez
Diane Basilacato
Golino v New Haven
Higgins testimony
Fleming Affidavit
Memo in support of Summary Judgement
Statement of Facts
IACP Interrogations and Confessions Concepts and Issue Paper

Carmen v State
Stiles prostitution arrest
Gould Habeus Transcript
Gould mem for Conviction Integrity Unit
State  v Valentine CIU Report
Police Interrogations and False Confessions by G. Daniel Lassiter and Christian A. Mesisner, Ofshe & Leo, 1997:p.18
International Association of Chiefs of Police Training Key #500: Interrogation techniques:Expert report of Bruce Koenig
IACP Eyewitness Identification Model Policy:
DOJ: Eyewitness Evidence: A Guide For Law Enforcement
IACP Criminal Investigations Concepts and Issues Paper

**Expert Witness Testimony for the Past Four Years:**

Amanda Hoskins v. Knox County et al. (plaintiff)
Case No.: 17-cv-84
United States District Court
District of East Kentucky
Criminal Investigation
Testified in deposition

Howard v. City of Durham (Plaintiff)
Case No.: 1:17-cv-477
United States District Court
Middle District of North Carolina
Criminal Investigation
Testified in deposition

Holmes v Hernandez et al (Plaintiff)
Case No.: 14CV8536
United States District Court
Northern District of Illinois
Eastern Division
Officer Involved Shooting
Testified in deposition

Ann Tracy DeLeo v Ryan Houk et al. (Plaintiff)
Case No.: 5:19CV00027-RH-MJF
United States District Court
Northern District of Florida
Use of Force
Testified in deposition

James B. Griffin as Personal representative of James Olvey, Deceased v.
Donald Hornsby Wright II et al. (Plaintiff)

Case No.: CV-2018-903480
Circuit Court of Jefferson County, Alabama
Birmingham Division
Vehicular Pursuit
Testified in deposition

Peralta v. State of Arizona (Plaintiff)
Case No.: CV-17-01868-PHX-DJH (BSB)
United States District Court
District of Arizona
Holding cell/police procedures
Testified in Trial

Beltran v. City of Tacoma (Plaintiff)
Case No.:15-2-11618-1
Superior Court of the State of Washington
County of Pierce
Officer Involved Shooting
Testified in deposition

DeGraw v. Pinellas County Sheriff's Office (Plaintiff)
Case No.: 8:18-cv-02116-WFJ-SPF
United States District Court
Middle District of Florida
Use of Force, Taser
Testified in deposition

William Anderson v. Knox County et Al. (Plaintiff)
Case No.: 17-cv-133
United States District Court
Eastern District of Kentucky
Criminal Investigation
Testified in deposition

Johnnie Williams v. Strickland (Plaintiff)
Case No.: 9:15-cv-01118-DCN
United States District Court
District of South Carolina
Officer Involved Shooting
Testified in deposition

Miller v Montgomery County (plaintiff)
Case No.: 18-CV-619
United States District Court
Eastern District of Kentucky
Criminal Investigation
Testified in deposition

Hall v. City of Atlanta (defense)
Case No.: 1:18-cv-04710-ELR
United States District Court
Northern District of Georgia
Atlanta Division
Admin/IA investigation
Testified in deposition

Howard v. City of Durham (plaintiff)
Case No.: 1:17-cv-477
United States District Court
Middle District of North Carolina
Criminal Investigation
Testified in trial

Howard v. Kirksey (plaintiff)
Case No.: CV-19-904908
Circuit Court of Jefferson County, Alabama
911 Operator procedures
Testified in deposition

Canney, Bestenlener v. Phoenix et al. (plaintiff)
Case No.: CV2019-011516
Superior Court of the State of Arizona
County of Maricopa
Vehicular Pursuit
Testified in deposition

Renzullo v. Town of Wakefield (plaintiff)
Case No.: 1:20-cv-11961
United States District Court
District of Massachusetts
Use of Force/Traffic Stop
Testified in deposition

Skeen v. Sparks et al (plaintiff)
Case No: 1:200cv00017
United States District Court
Western District of Virginia
Arbingdon Division
OIS/Use of Force
Testified in deposition

Smith v. Chino Valley (plaintiff)
Case No.: 3:21-cv-0809-MTL-JZB
United States District Court

District of Arizona
Use of Force/Mental Illness
Testified in deposition

Amanda Hoskins v. Knox County et al (plaintiff)
Case No.: 17-cv-84
United States District Court
District of East Kentucky
Criminal Investigation/Wrongful Conviction
Testified in trial

USA v. Richard Palmer (criminal)
U.S. Department of Justice
United States District Court
Tampa, Florida
Officer involved shooting
Testified in trial

Lurry v City of Joliet (plaintiff)
Case No.: 20 CV 4545
United States District Court
Northern District of Illinois
Eastern Division
Fail to provide medical care/Narcotics Investigation
Testified in deposition

Thomas Mark Colatrella Sr. and Jane Ann Colatrella v. The Board of Commissioners of
Case No.: 2126-CV17520
Kansas City, MO (plaintiff)
Circuit Court of Jackson County, Missouri at Kansas City
Vehicular Pursuit
Testified in deposition

Tracey Morrissey v. Town of New Milford (plaintiff)
Case No.: LLI-CV-21-6027686-S
Milford, CT
State Of Connecticut Superior Court
Medical aid /Holding cell
Testified in deposition

Jones v. John W. Mina (plaintiff)
Case No.: 2018-CA-005828-0
Ninth Judicial Circuit, Orange County, Fl.
Vehicular Pursuit
Testified in deposition

Wooten v. East St. Louis PD (plaintiff)

Case No.: 1722-CC11777
City of St. Louis Circuit Court
State of Missouri
Vehicular Pursuit
Testified in deposition

Kye Allen v. Kyle T. McCann (plaintiff)
Case No.: 1:22-cv-187
United States District Court
Middle District of North Carolina
Greensboro Division
Use of Force
Testified in deposition

Brown v. Homestead (Labor)
Homestead. Florida
Case No : 2017-014137-CA-01
Labor Arbitration
Use of Force
Testified in arbitration hearing

Edouard v. Botta (Plaintiff)
Case No.: 2020-CA-008709-0
Ninth Judicial Circuit, Orange County, FL
Mentally Ill/Traffic stop/patrol procedures
Testified in deposition

Candace Sparks v. City of Seattle (plaintiff)
Case No.: 21-2-16367-6 SEA
King County Superior Court
Seattle, WA
Police misconduct Vice Investigations/Sex Battery
Testified in deposition

Swearingin v. Excelsior Springs (plaintiff)
Case No.: 20CY-CV03829
Circuit Court of Clay County, MO
Emergency Vehicle Operation
Testified in deposition

Harrell v. City of Chicago (plaintiff)
Case No.: 2018-L-006323
Circuit Court of Cook County, Illinois
Vehicular Pursuit
Testified in deposition

Harrell v. City of Chicago (plaintiff)

Case No.: 2018-L-006323
Circuit Court of Cook County, Illinois
Vehicular Pursuit
Testified in Trial

Wooten v. East St. Louis PD (plaintiff)
Case No.: 1722-CC11777
City of St. Louis Circuit Court
State of Missouri
Vehicle Pursuit
Testified in trial

Jones v. John W. Mina (Plaintiff)
Case No.: 2018-CA-005828-0
Circuit Court of 9th Judicial Circuit
Orange County, Florida
Vehicular Pursuit
Testified in deposition

Maros v Cure (Defense)
6:21-cv-03346-JD—JDA
United States District Court
District of South Carolina
Greenville Division
Use of Force/OIS
Testified in deposition

Handy v. St. Paul (Plaintiff)
Case No.: 0:17-cv-01145-NEB-KMM
United States District Court
The District of Minnesota
Use of Force/OIS
Testified in trial

Bishop v. Buckley (Plaintiff)
Case No.: 2:22-cv-05759-BHS
United States District Court
Western District of Washington at Tacoma
Testified in deposition

Creamer v. Chicago (Plaintiff)
Case No.: 3:17-cv-00834-PPS-MGG
Circuit Court of Cook Count
Criminal Investigation/wrongful Identification
Testified in deposition

**Publications:**

Dig Deeper To Address Officer Involved Shootings: Orlando Sentinel, 5/26/13
Police Leaders Must Walk the Walk, Pursuit Driving: Orlando Sentinel, 2/19/12
Save Community Policing: Orlando Sentinel, 5/25/11
State Cracks Down On Unlicensed Activity, Orlando Sentinel, 3/18/09
The Threat Abatement Group, Police and Security News, 11/95

**Compensation**:

My fees for this case are $250.00 per hour to review and analyze relevant material and $350.00 per hour to testify in depositions or trial in the State of Florida and $2,500.00 per day plus expenses to testify in deposition or trial out of the State of Florida.

Submitted by:

**Charles W. Drago**

**In the matter re:**

**Stefon Morant**
**V.**
**The City of New Haven, et al.,**

**Case No: 3:22-CV-00630 (CSH)**
**United States District Court**
**District of Connecticut**

---

# Addendum Report

**of**


**CHARLES W. DRAGO**
**DRAGO PROFESSIONAL CONSULTANTS, LLC**


---

August 28, 2024

I declare under penalty of perjury under the laws of the United States of America that the content of the foregoing report, dated April 15, 2024, is true and correct.

Submitted by:



**Charles W. Drago**