UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -

STEFON MORANT, No.: 3:22-cv-00630-SVN

Plaintiff

v.

CITY OF NEW HAVEN, et al,

Defendants

Hartford, Connecticut
APRIL 29, 2026

- - - - - - - - - - - - - - - -

JURY TRIAL - DAY 1

B E F O R E:

THE HONORABLE SARALA V. NAGALA, U.S.D.J.

and a JURY OF TEN

Alicia A. Cayode Kyles, RMR
Official Court Reporter

A P P E A R A N C E S:

**FOR THE PLAINTIFF:**
NEUFELD SCHECK BRUSTIN HOFFMANN & FREUDENBERGER, LLP
200 Varick Street, Suite 800
New York, NY 10014
BY: ANNA BENVENUTTI HOFFMANN, ESQUIRE
NICK BRUSTIN, ESQUIRE
KATHERINE CION, ESQUIRE
EMMA FREUDENBERGER, ESQUIRE
AMELIA GREEN, ESQUIRE
ELSA MOTA, ESQUIRE
GRACE PARAS, ESQUIRE
SYEDA ALI, ESQUIRE

LAW OFFICE OF KENNETH ROSENTHAL
One Audubon Street, Third Floor
New Haven, CT 06511
BY: KENNETH ROSENTHAL, ESQUIRE

**FOR THE DEFENDANT CITY OF NEW HAVEN:**
HOWD & LUDORF, LLC
100 Great Meadow Road, Suite 201
Wethersfield, CT 06109
BY: THOMAS R. GERARDE, ESQUIRE
LIDIA MICHOLS, ESQUIRE
AMANDA STONE, ESQUIRE
ABIGAIL R. WILLAUER, ESQUIRE

**FOR THE DEFENDANT VINCENT RAUCCI:**
KARSTEN & TALLBERG, LLC
500 Enterprise Drive, Suite 4B
Rocky Hill, CT 06067
BY: JAMES NEWHALL TALLBERG, ESQUIRE
KIMBERLY A. BOSSE, ESQUIRE

**FOR THE DEFENDANTS ROBERT LAWLOR and VAUGHN MAHER:**
LAW OFFICES OF WILLIAM J. MELLEY III
250 Hudson Street
Hartford, CT 06106
BY: WILLIAM J. MELLEY, III, ESQUIRE

**FOR THE DEFENDANT MICHAEL SWEENEY:**
RYAN RYAN DELUCA LLP
1000 Lafayette Boulevard, Suite 800
Bridgeport, CT 06604
BY: MICHAEL T. RYAN, ESQUIRE
JONATHAN ZELLNER, ESQUIRE

I N D E X

WITNESS PAGE

**OPENING STATEMENTS**

By Mr. Brustin....................................27

By Mr. Gerarde....................................58

By Mr. Tallberg...................................70

By Mr. Ryan.......................................77

By Mr. Melley.....................................82

**MICHAEL SWEENEY**

Direct Examination by Mr. Brustin.................93

* * * * *

(Call to Order of the Court, 12:18 p.m.)

THE COURT: All right. Anything we need to take up before we bring in the jury?

MR. BRUSTIN: No, Your Honor.

MR. GERARDE: No, Your Honor.

MR. TALLBERG: No.

MR. RYAN: No.

THE COURT: Okay. We can call the jury in.

(Pause)

THE COURT: Would counsel like me to read the stipulation of facts after the openings?

MR. BRUSTIN: Yes, please.

MR. GERARDE: That's fine.

THE COURT: Okay.

MR. MELLEY: Your Honor, on that note I still have to give you the final stip on Robert Lawlor.

THE COURT: Sure, we can do that.

MR. MELLEY: Later on.

THE COURT: Later?

MR. MELLEY: Yes.

THE COURT: Okay. These will just be the stipulations from the joint trial memorandum.

(Pause)

(Jury entered at 12:21 p.m.)

THE COURT: You all may be seated.

Members of the jury, now that you have been sworn I will give you some preliminary instructions to guide you in your important function as jurors. These instructions are not a substitute for the legal instructions I will provide at the conclusion of the case, but are designed to assist you as you prepare to hear the evidence that will be presented to you over the course of this trial.

First, statement of the case.

This is a civil lawsuit. The party who brings a civil lawsuit is called the plaintiff. In this case the plaintiff is Stefon Morant.

Mr. Morant, who I will at times refer to simply as "plaintiff" is a United States citizen residing in New Haven, Connecticut. As I mentioned at jury selection, Mr. Morant was arrested by the New Haven Police Department in February of 1992 and charged with the murders of Ricardo Turner and Lamont Fields.

On June 8th, 1994, he was convicted after a trial by jury. He spent more than 21 years incarcerated before he was released from prison in June of 2015. He was later granted a pardon, which has the legal effect of invalidating and erasing his conviction.

A pardon is not a finding made by a judge or a court of law; it is issued by the Connecticut Board of Pardons within the state executive branch. Under

Connecticut law, a pardon is not a finding of innocence. There is no statutory provision under Connecticut law to obtain a pardon that includes a finding of innocence.

Plaintiff claims that the defendants, the City of New Haven and former New Haven Police officers Vincent Raucci, Vaughn Maher, Robert Lawlor, who is deceased, so the administratrix of his estate, Gail Lawlor is the party, and Michael Sweeney violated his constitutional rights, were negligent, and caused him to be wrongfully prosecuted and convicted of a crime of which he claims he is innocent. Whether plaintiff's conviction was wrongful and whether he is entitled to any money damages is a matter for you to determine.

Mr. Morant asserts ten counts against the various defendants which are as follows:

Count One, malicious prosecution against Defendants Raucci and Maher.

Count Two, civil rights conspiracy against Defendants Raucci and Maher.

Count Three, failure to disclose exculpatory evidence against Defendants Sweeney, Raucci and Maher.

Count Four, fabrication of evidence against Defendants Raucci and Maher.

Count Five, coercion of statements against Defendants Raucci and Maher.

Count Six, failure to intercede against Defendant Maher.

Count Seven, liability pursuant to *Monell v. Department of Social Services of the City of New York* a United States Supreme Court case from 1978 against the City of New Haven.

Court Eight, negligence against Gail Lawlor as the Administratrix of the Estate of Robert Lawlor.

Count Nine, indemnification against the City of New Haven.

And Count Ten, direct action against the City of New Haven.

I will instruct you in more detail at the end of the case about the elements of each of Mr. Morant's claims, but, for now I will give you some preliminary instructions to keep in mind as you listen to the evidence. It is okay if you do not record or remember all of the claims and their elements as they will be repeated to you at the end of the trial and you will be given written copies of the final jury instructions. My summary now is merely meant to provide a brief overview of the basic claims at issue. To the extent that these preliminary instructions might conflict with any legal instructions provided to you at the end of the case, the instructions given at the end of the case will control.

Plaintiff brings a combination of federal and state law claims against the defendants. Plaintiff's federal law claims all arise under a federal statute called 42 United States Code Section 1983 which I will refer to as Section 1983.

Section 1983 requires a plaintiff to establish by a preponderance of the evidence that for each claim he brings pursuant to the statute:

First, the conduct complained of was committed by a person acting under color of state law. This element is not disputed by the parties for any of plaintiff's claims.

Second, that his conduct, that this conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States.

And third, that the defendants' acts were the proximate cause of the injuries and consequential damages sustained by the plaintiff.

I will instruct you more on what preponderance of the evidence means in a moment.

Plaintiff's federal claims are as follows. The claims I am about to describe pertain to the second element of a Section 1983 claim: That the conduct violated plaintiff's constitutional rights. If you find the elements of each of these claims have been proven, you will still need to decide the third element of a

Section 1983 claim for each of the following counts: Namely, whether plaintiff has proven that the defendants' actions were a proximate cause of his injuries -- a concept I will instruct you on at the end of the case -- and that plaintiff suffered damages.

I will describe the claims out of the order of their count numbers because you will need to decide certain claims before others.

Count One, malicious prosecution against Defendants Raucci and Maher.

To succeed on his malicious prosecution claim against Defendants Raucci and Maher, plaintiff must demonstrate, first, that the defendants initiated or continued the criminal proceeding against him; second, the criminal proceedings have terminated in his favor; third, the defendants acted without probable cause; fourth, the defendants acted maliciously, primarily for a purpose other than bringing the plaintiff to justice; and fifth, plaintiff suffered a post-arraignment deprivation of his liberty.

Next, Count Three, failure to disclose exculpatory evidence against Defendants Raucci, Maher and Sweeney.

To succeed on his failure to disclose exculpatory evidence claim against Defendants Raucci and Maher,

plaintiff must prove by a preponderance of the evidence: First, that the defendants were aware of information favorable to the plaintiff; second, defendants deliberately withheld favorable information from the prosecutor; third, the deliberately withheld information was material, meaning that if the evidence had been disclosed, there is a reasonable probability that the outcome of the trial would have been different; and fourth, plaintiff suffered a deprivation of liberty as a result.

Further instruction will be provided regarding Defendant Sweeney in the final instructions.

Count Four, fabrication of evidence against Defendants Raucci and Maher.

To succeed on his fabrication of evidence claim against Defendants Raucci and Maher, plaintiff must prove that: First, an investigating official; second, knowingly fabricated information; third, that was likely to influence a jury's verdict; fourth, the investigating official forwarded that information to the prosecutor; and fifth, plaintiff suffered a deprivation of liberty as a result.

Count 5, coercion of statements against Defendants Raucci and Maher.

To succeed on his coercion of statements claim

against Defendants Raucci and Maher plaintiff must show that his statement was involuntary, meaning it was given under circumstances that overbore plaintiff's will at the time he gave the statement. You should consider the totality of the circumstances in making this determination including plaintiff's characteristics at the relevant time, the conditions of the interrogation, and the conduct of the law enforcement officials.

Next, Count Two, civil rights conspiracy against Defendants Raucci and Maher.

If you find that one of the individual defendants committed the constitutional violations described in Counts One, Three, Four or Five, you may reach Count Two which alleges that Defendants Raucci and Maher joined a conspiracy to violate plaintiff's civil rights.

For plaintiff to succeed on this claim against Defendants Raucci and Maher, he must prove that: First, there was an agreement between two or more officers or between an officer and a private actor; second, to act in concert to inflict an unconstitutional injury; and third, there was an overt act done in furtherance of that goal.

Count Six, failure to intercede against Defendant Maher.

If you find that Defendant Raucci committed any of the constitutional violations described in Counts One,

Three, Four or Five, you may reach Count Six which alleges that Defendant Maher failed to intervene to stop Defendant Raucci's conduct.

For plaintiff to succeed on this claim, as to Defendant Maher, he must prove by a preponderance of the evidence: First, Defendant Maher observed or had reason to know of one or more of Defendant Raucci's constitutional violations; second, Defendant Maher had a realistic opportunity to intervene to prevent the harm from occurring; and third, Defendant Maher did not intervene to prevent the harm.

Count Seven, *Monell* liability against the City of New Haven.

In a U.S. Supreme Court case called *Monell v. Department of Social Services of City of New York*, the Supreme Court held that local government units, including cities, may be liable under Section 1983. These are called "*Monell* claims."

For the City of New Haven to be found liable under a *Monell* claim, you must first find that one of the individual defendants violated plaintiff's constitutional rights or rights under federal law.

If you make that finding, then plaintiff can establish his *Monell* claim in one of the following three ways: First, the City of New Haven tolerated a practice

or custom by the New Haven Police of suppressing evidence that was favorable to criminal suspects, and that custom caused the suppression of evidence in Mr. Morant's case; second, the City of New Haven made a deliberate choice not to provide appropriate supervision and discipline of the New Haven Police and the inadequate supervision and discipline caused the violation of Mr. Morant's constitutional rights.

Or, third, then Chief of Police Nicholas Pastore was alerted to the defendant's investigative misconduct in Mr. Morant's case and Pastore failed to take appropriate action which may be referred to as ratification.

Plaintiff needs only establish one of these three theories of *Monell* liability to successfully prove his claim.

Plaintiff also needs to prove that the actions of the City under at least one of these theories caused plaintiff harm. The evidence you consider for this claim will, at times, differ from and be applicable only to this claim and will not be admissible to prove any of plaintiff's other claims.

When this is the case, you will be instructed on the limited purposes for which you can consider the evidence.

Plaintiff has also brought state law claims.

These claims and their elements are as follows:

Count Eight, negligence against Defendant Lawlor. To succeed on his negligence claim against Defendant Lawlor, plaintiff must prove by a preponderance of the evidence that Defendant Lawlor, first, had a duty to use reasonable care; second, Defendant Lawlor was negligent, meaning he failed to use reasonable care under the circumstances; third, Defendant Lawlor's negligence harmed plaintiff; and, fourth, the harm caused was reasonably foreseeable.

Related to Count Nine for indemnification and Count Ten for direct action, I will provide you instructions on these claims as part of the final jury instructions.

As previously mentioned, defendants deny that they are liable on any of these claims. Defendants may also advance defenses that you will be instructed about in the final jury instructions.

Next, the duty of the jury.

As the jury, it is your duty to listen to and consider the evidence and to decide what the facts are based on the evidence. You and you alone decide the facts in this case. Then, you will apply those facts to the law as I will describe it to you at the end of the trial. You must follow the law whether you agree with it or not, but

you should not take anything that I may say or do during the trial, as indicating what your verdict should be.

You will make your judgment based solely on the evidence received in this courtroom which consists of the testimony of witnesses and any documents or other items received in evidence during the course of the trial.

Perform these duties fairly and impartially. You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases including unconscious biases. Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be expressed without conscious awareness, control or intention.

Like conscious bias, unconscious bias can affect how we evaluate information and make decisions.

Now, you may hear references to the words "counsel" or "attorneys" or "lawyers" during the course of this trial. All of these words mean the same thing. You may also hear references to "the Court." When someone refers to the Court they generally mean the judge presiding over this case, namely, me.

You will also hear the words "instruct" or "instruction." This is a direction or order from me to you, that you must follow.

Next, evidence. The evidence will consist of sworn witness testimony, both live and written, documents and other things admitted into the record as exhibits, and any facts that the parties agree to or that the Court instructs you to find.

You should give careful attention to the testimony and evidence presented throughout the trial, keep an open mind and not form or express any opinion about the case one way or the other until you have heard all of the evidence. As I mentioned earlier, some evidence you will be presented with may only be considered for certain purposes. I will instruct you what those purposes are. It is important that you rely on this evidence solely for the purposes I identify, and not for any others.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

The word "infer" and the expression "to draw an inference" mean to find that a fact exists even though it has not been proven directly. For example, assume, that

when you came into the courthouse this morning, the sun was shining and it was a nice day. Assume that our doors to the courtroom were closed and because there are no windows in this courtroom, you could not look outside.

While you're sitting here, imagine someone walks in with an umbrella that is dripping wet and then a few minutes later another person also enters with a wet umbrella.

Now, in this scenario you cannot look outside of the courtroom and you cannot see or hear that it is raining. So, you have no direct evidence of that fact. But on the combination of facts that I asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

An inference may be drawn only if it is reasonable and logical, not if it is speculative. You are allowed to draw logical inferences from facts that you find to have been proven, but you may not go outside of the evidence to find the facts, nor may you resort to guesswork or conjecture.

To aid you in better understanding this, consider, the rain example I used a moment ago. Although you could infer from evidence of the wet umbrellas that it had rained, you could not also infer that there was a thunderstorm or lightening without additional evidence.

In other words, you must avoid resorting to speculation, conjecture or guesswork to determine critical facts in this case.

I will give you further instructions on these issues at the end of the case, but keep in mind that you may consider circumstantial evidence as well as direct evidence, and it is for you to decide how much weight, if any, to give to either.

You, as the jury, also decide the credibility of witnesses and the weight to be given to their testimony

In considering the weight and value of the testimony of any witness, you may take into consideration the appearance, attitude, and behavior of the witness, the interest of the witness in the outcome of the case, if any; the inclination of the witness to speak truthfully or not; the probability or improbability of the witness's statements and all other facts and circumstances in evidence.

You should test the evidence a witness gives by your own knowledge of human nature and of the motives that influence and control human action.

In short, you are to assess a witness's testimony using the same considerations and the same sound judgments and common sense you apply to the questions of truth and veracity that present themselves in your daily lives. It

will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witnesses testimony to accept or reject.

I will give you further guidelines for determining the credibility of witnesses at the end of case.

Now, certain things are not evidence and must not be considered by you when determining what the facts are. I will list them for you now.

First, statements, arguments and questions by lawyers are not evidence. On the other hand, witnesses' answers are evidence.

Second, objections are not evidence. You may see the lawyers make objections when they believe that evidence is improper. In fact, it is their duty to object to testimony or other evidence that they believe is not admissible. You should not prefer or dislike an attorney because that individual does or does not make objections.

What a lawyer says while making an objection is not evidence and should not influence you. If I sustain an objection, ignore the question that was objected to, draw no inference from the question, and do not speculate about what the witness would have said.

If I overrule an objection, treat the witness's

answer to the question like any other. If I instruct you to disregard evidence that has been stricken, you must follow that instruction. If I instruct you that some item of evidence is admitted or should be considered for a limited purpose only, you must follow that instruction as well.

On occasion, when an attorney objects, I may ask you to leave the courtroom so they can give me the reasons for their objections out of your hearing. We will try to keep your departures to a minimum by taking up such objections during your breaks, but you should understand that they may be necessary.

Third, testimony or other evidence that the Court excludes or tells you to disregard is not evidence and must not be considered.

Finally, anything you may have seen or heard outside of the courtroom is not evidence and must be disregarded. You are to decide this case solely on the evidence presented here in the courtroom.

Burden of proof.

Plaintiff has the burden of proving his case by what is called the preponderance of the evidence, which means that, in order to prevail plaintiff must produce evidence that leads you to believe his claim is more likely true than not.

On this point, it helps to visualize a scale. Imagine that you place on one side of the scale the evidence that you find credible, relevant, and supportive of the plaintiff's position on a particular issue. And placed on the other side of the scale, the evidence that you find credible, relevant, and supportive of the defendant's position on that issue.

If the scales tip in favor of the plaintiff, even a little bit, then the plaintiff has carried his burden of proof. But if the scales are evenly balanced or if the scales tip in favor of the defendant or defendants, even a little bit, then the plaintiff has not carried his burden of proof.

This does not mean that the party who calls the most witnesses or offers the most exhibits wins. This is not a numbers game. Rather, it means that the party who offers the evidence that you find the most persuasive prevails.

Some of you may have heard a standard of proof called "beyond a reasonable doubt." That requirement does not apply in a civil case like this one, so you must put it out of your mind.

Conduct of jurors.

Now, a few words about you how you must conduct yourselves as jurors.

First, you must decide this case based solely on the evidence presented within the four walls of this courtroom.

I will share with you an instruction about not communicating with anyone in any way and not letting anyone else communicate with you in any way about the merits of this case or anything to do with it.

I'll give that instruction at the end of the day.

You may not conduct independent research about this case, the matters in the case, or the individuals involved in the case.  Put simply, do not read or listen to anything relating to this case in any way.

That includes internet content, including Google or other search engines, social media, television programs, newspaper articles, books, dictionaries or other reference materials.

Second, until you enter the deliberation room at the end of the trial, you may not discuss this case with anyone, including your family or employer, or your fellow jurors.

This prohibition extends to the use of technology and social networking.  In other words, do not post about this case or about your duty as a juror on websites such as Twitter/X, Facebook, Snapchat, LinkedIn, Instagram TikTok, or YouTube, or any other social media and do not

use your cell phone or any other communications device to communicate about any of your activities or opinions regarding this case.

If anyone should try to talk to you about this case outside of the courtroom, please bring it to my attention promptly.

Third, while serving on this jury, please do not speak with any of the parties or their attorneys or any witness, or with me or my law clerk -- Attorney Valle please identify yourself -- either about this case or about any other subject. In no other way can all of the parties be assured of the absolute impartiality they are entitled to expect from you as jurors.

I have instructed the attorneys and the parties to avoid contact with you.

Therefore, if you run into them in the hallway or elsewhere in the courthouse, please know that they have been instructed not to interact with you in any way. They're not being rude, they're following my instruction.

If at any point you have a question to pose to me or any other message, please write out the question, or message on a piece of paper and give it to the Courtroom Deputy, Ms. Denault, who will bring it to my attention. I will try to respond promptly.

Although you should not talk at all with me,

court staff or anyone involved in the case, you may certainly talk amongst yourselves during breaks. Just be sure your conversations are not about anything having to do with the case.

Finally, in fairness to the parties to this lawsuit, you should keep and open mind throughout the trial. Reaching your conclusion only during your final deliberations after all the evidence is in and you have heard my instructions to you on the law, and heard the attorneys closing arguments, even then, you should reach a conclusion only after an interchange of views with the other members of the jury during deliberations.

Final points, you may take notes during the course of the trial. These notes must be left in the jury room during all recesses and should not be taken home at night or at the conclusion of this case. Any notes that you take should be used only as memory aids. Do not rely on your notes if they conflict with your independent recollection of the evidence. If you do not take notes, you should rely on your own recollection of the proceedings and should not be unduly influenced by the notes of other jurors.

These preliminary instructions are, as I previously stated, intended simply to help orient you to hear the evidence. Later, before you begin deliberations,

I will instruct you again in greater detail. I am sure you will bear these principles in mind and will keep an open mind until you have heard all the evidence and my formal instructions.

In a moment we will hear opening statements for attorneys for each party. What the lawyers will say in their opening statements is not evidence; rather, it is a prediction or roadmap of what the lawyer expects the evidence will be.

You should not decide anything about the case on the basis of the opening statements, which, like these preliminary instructions, are intended merely to orient you to the case.

The trial will then proceed in the following order:

The plaintiff will introduce evidence in support of the claims he has made. While the defendants will elicit evidence to support their defenses through cross-examination.

Next, the defendants may introduce evidence to refute the plaintiff's claims and evidence in support of their positions, while the plaintiff elicits evidence to support his claims through cross examination.

The defendants will proceed generally in the following order: The City of New Haven, Defendant Raucci,

Defendant Sweeney, and then Defendants Maher and Lawlor.

Third, the plaintiff will have the opportunity to introduce rebuttal evidence in response to defendants' evidence, though he can opt not to introduce additional evidence at this point. Regardless of whether rebuttal evidence is introduced, the burden is always on the plaintiff to prove every element of his claims by a preponderance of the evidence.

In this case, some witnesses may be called by both the plaintiff and the defendants, so the attorneys may conduct both direct and cross examination of those witnesses in one sitting.

After all the evidence is in, I will instruct you on the applicable law. This is a more fulsome version of the preview I provided today. To the extent anything in the final instructions contradicts the summary I provided today, you should disregard whatever I have said today and consider only the final instructions I will provide.

Then, the parties, attorneys will make their closing arguments. Remember, what is said in closing arguments is not evidence. The arguments by the lawyers are designed to present you the contentions of the parties as to what the evidence has shown and what inferences may be drawn from the evidence.

Following closing arguments, I will give you some

final instructions and then you would retire to deliberate on your verdict.

We will start at 9:00 a.m. each day. Although you should report to the courthouse by 8:30 a.m. You will get a 15-minute break at 10:30 and a 45-minute lunch break at 12:15. We will start again at 1:00, take a 15-minute break at 2:15 and then end the day at 4:00.

This will be the schedule for all days that we are in session. I will do my very best to adhere to this timeline, but I do ask for your patience if any testimony runs slightly over.

Thank you for your attention.

We will now proceed with the opening statements of the parties. Each side will have one hour for it's opening statement. Defendants may divide their collective hour as they see fit.

Plaintiff.

MS. HOFFMAN: Thank you, Your Honor.

**OPENING STATEMENT BY MR. BRUSTIN**

MR. BRUSTIN: Good afternoon.

THE COURT: Go ahead.

MR. BRUSTIN: Almost exactly 32 years ago Stefon Morant was wrongfully convicted for a New Haven double homicide he had nothing to do with and knew nothing about.

He spent more than 21 years in jail, in prison

for this crime as an innocent man. Twenty-one years locked in a cage, torn away from his children, his family, his life, from age 26 to 47 when other people were figuring out careers and life partners and parenting.

How could this happen? Here's how. We will prove the New Haven Police Department, the NHPD, violated the most basic and important rules of policing. You can't fabricate or make up evidence; you can't coerce witnesses; you can't hide evidence of innocence -- rules that protect all of us, victims, suspects, citizens.

First, we will show that even though our Constitution requires officers to report all evidence that could help a suspect, the practice in the NHPD was the opposite. Officers would not report anything that could hurt the prosecution's case. And following that practice, powerful evidence of Mr. Morant's innocence was hidden.

And, second, we will show there was what's known a blue wall of silence, a rule to cover up misconduct of brother officers. That was uniquely strong in the NHPD. So, even when an officer committed the most egregious misconduct, fabricating evidence and coercing witnesses, the department would brush it under the rug rather than intervene to stop it.

Now, before I get into the story of what we intend to prove in this case, let me just say you are

going to hear a lot of details -- names, dates, all of which will be presented later as evidence. The intent now is just to give you a preview of some of what you will hear to make it easier to follow how it fits together when you hear the actual evidence.

The story of this case begins in the early morning of October 11th, 1990, when former New Haven Alderman Ricardo Turner and his boyfriend Lamont Fields are shot and killed in their New Haven apartment.

Stefon Morant has nothing to do with the crime and knows nothing about it. At the time Mr. Morant is in North Carolina, almost 1,000 miles away, visiting his large network of family and friends.

Defendant Maher, a homicide investigator with the NHPD, is assigned the case. And at first Maher conducts a standard homicide investigation. He quickly uncovers likely suspects, a man named Michael Cardwell also known as "Bullet" and his brother.

Maher learns that Cardwell had recently had a falling out with the victims over drugs and relationship issues, that Cardwell had suspiciously left town right after the murder and most significantly that he admitted to committing the crimes to others.

Three months later, after dozens of witness interviews Cardwell and his brother remain the primary

suspect. Stefon Morant has no connection to the crime. His name never comes up in Maher's investigation because he is completely innocent, but then another NHPD detective Vincent Raucci gets reassigned the case and that changes the course of Stefon Morant's life.

Raucci drops any investigation into Cardwell and instead he takes the opportunity to frame a man named Scott Lewis. Why? Well, Mr. Lewis, like Mr. Morant, has nothing to do with the crime, but Mr. Lewis has gotten in the way of Raucci's side job working with drug dealers.

You heard me correctly. In addition to being an NHPD homicide detective, you will hear evidence that Detective Raucci deals drugs, protects drug dealers, and uses drugs himself. And Raucci uses his position, as a homicide detective, to punish Mr. Lewis by framing him for murder.

The police believe the shooter was assisted by a second person. And so Mr. Morant, who is a friend of Mr. Lewis, becomes targeted as the second person. He is simply collateral damage.

And here is how Detective Raucci does it. Raucci brings in a 17 year old who is -- who goes by the name at the time of Ovil Ruiz. Ruiz, who suffers from mental illness and who also knows Raucci from the illegal drug trade in New Haven is brought in.

Ruiz knows nothing about the murders, but over the course of hours, Raucci threatens Ruiz to make him give a statement and tells him what to say. He feeds Ruiz details about the murders and a false story that Scott Lewis did it with the help of Stefon Morant. Raucci coerces and feeds this statement from Ruiz in front of his supervisor Defendant Sweeney.

Remember Sweeney's name as you'll see he's important.

Ruiz tells Sweeney he doesn't know anything about the murders and is just repeating what Raucci is telling him to say so he can go home.

Sweeney repeatedly tells Raucci to cut it out because the statement he is trying to get from Ruiz is clearly false. But then Sweeney gets busy and he leaves Raucci alone with Ruiz to continue interviewing him. Ultimately Raucci tape records a rehearsed-fabricated statement from Ruiz that includes multiple made-up details.

For example, in it Ruiz falsely claims that he overheard conversations between Lewis and Morant in which Lewis confessed to committing the murders and also states that later, while playing basketball, Ruiz saw Lewis throw a gun into the river. It is all made up.

Sweeney tells another supervisor, Defendant

Lawlor, what Raucci did. In other words, Sweeney tries to do the right thing, but neither Sweeney nor Lawlor actually stop Raucci. And consistent with the NHPD policy and practice, Sweeney does not write down or report to the prosecutor that Ruiz's statement is false, or that Sweeney witnessed Raucci coercing and fabricating the statement, or that Ruiz said that he was just repeating Raucci's false story so he could go home.

It will be many years until Mr. Sweeney fully admits this misconduct, but more on that a little later.

Left alone by his supervisors, Raucci continues on. The next day Raucci brings in a second vulnerable teenager, Jose Roque. Roque, like Ruiz, has no actual knowledge about the murder. Raucci threatens Roque that he will pin the murder on him if he doesn't say what Raucci wants him to say and then he feeds him the same story that he fed to Ruiz. Raucci does this in front of Defendant Maher who does nothing to stop the misconduct or report it.

And after a number of hours, Raucci and Maher take an audio-taped statement which matches the one that Raucci took from Ruiz, but Roque can't remember the made-up story that Raucci has fed to him. So Raucci and Maher repeatedly stop and start the tape to coach him.

The next day Raucci tracks down Lewis's friend

Stefon Morant and brings him in. And at that time Mr. Morant is 22 years old. And on that night, Mr. Morant has been drinking and smoking marijuana with friends and is under the influence.

Raucci and Maher interrogate Mr. Morant for hours, threatening him to implicate Mr. Lewis. They say he'll get the electric chair if he doesn't tell them what they want to hear. They tell him he can leave if he does. Mr. Morant has never been interrogated by the police before and after hours of threats and feeding him the same story they fed to Ruiz and to Roque, Mr. Morant succumbs and he falsely implicates Mr. Lewis, claiming he was in the car with Lewis and saw Mr. Lewis run up to the victim's apartment the night of the crime.

Raucci again, with Maher, repeatedly starts and stops and even rewinds and records over the tape to get a clean take from Mr. Morant. They let Mr. Morant go. As soon as he is freed, Mr. Morant tries to set the record straight. Within days he returns to the station with his mother to tell them his statement was fabricated and coerced, but the detectives and the supervisors refused to even see him. Then Raucci takes yet another false statement implicating Lewis, this time from an informant that Raucci uses cocaine with.

Raucci again starts and stops and rewinds and

over-records the tape to coach the witness. Raucci has now fabricated four matching statements falsely implicating Mr. Lewis and Mr. Morant, but there's still the problem of the overwhelming evidence that the crime was actually committed by the initial suspect Cardwell, not Lewis or Morant.

So Maher writes a police report that Cardwell was ruled out. He wasn't. That was a lie. And because Lewis and Morant are innocent, there is no physical evidence whatsoever tying them to the crimes. Nevertheless, based on the false statements, Lewis is arrested first and charged with murder. And then Defendant Sweeney, who had seen Raucci coercing 17-year-old Ovil Ruiz he reenters the picture.

When Sweeney learns that Lewis has been arrested based upon the fabricated statement he, again, confronts Lawlor about Raucci. Sweeney tells Lawlor again the statement is all lies, that Raucci simply fed it to Ruiz, but Lawlor, again, does nothing and Sweeney takes no steps to report this information to the prosecutor even after Lawlor's inaction becomes clear.

But the case against Lewis hits a speed bump. Almost immediately after their release from Raucci's control, both Morant and Roque report that their statements were coerced and fabricated, so they refuse to

testify against Lewis.

With the fabricated case falling apart, Raucci goes back to Ruiz and he coerces him to give a different false statement which now puts Ruiz at the scene of the crime directly implicating Morant and Lewis.

Raucci then arrests Mr. Morant. Raucci tells him again that it is Lewis he is after. But, again, Morant refuses to testify against Mr. Lewis, so Raucci's case against Mr. Morant goes forward.

The case is based upon the false taped statements. At trial, Mr. Ruiz lies and he gives Raucci's made-up story. Roque testifies truthfully that his statement had been coerced and fabricated. He describes how Raucci and Maher repeatedly stopped and started the tape to tell him what to say.

Raucci and Maher lie to the prosecutor and then to the jury saying the taped statements were volunteered without any coercion or feeding whatsoever and also saying they never stopped, started, or rewound and re-recorded the tapes to fix answers. And neither Lawlor, nor Sweeney, nor anybody in the NHPD do anything to fix these lies. They follow the widespread NHPD practice of not reporting evidence that suggests innocence or officer misconduct.

So, the prosecutor argues that Roque just got

cold feet and that his taped statement is the truth. And even after Mr. Morant puts on the evidence of his truthful alibi, corroborated by multiple witnesses, that he was in North Carolina at the time of the crime visiting family for weeks, the jury believes the detective. And, as a result, Mr. Morant is wrongly convicted of felony murder as an accomplice.

The jury's verdict shatters him. He is sentenced. He is offered another deal if he will testify against Lewis but, again, he refuses. He is sentenced to 70 years in prison, essentially a life sentence. And in May of 1995 Lewis too is wrongfully convicted.

Mr. Morant and Mr. Lewis both continue to fight to prove their innocence. Within days of his wrongful conviction Lewis reaches out to the FBI to report that he and Morant were framed by Raucci and that Raucci is a dirty cop. And after interviewing Lewis in jail, the FBI opens a formal investigation. The FBI interviews numerous witnesses who all describe Raucci's criminal involvement in drugs. They also interview the teenagers that Raucci coerced in this case and all of them describe how Raucci coerced them into offering false statements against Lewis and Morant. Even Ruiz, the 17-year-old who succumbed to Raucci's pressure and continued to lie at the trial, he too admitted to the FBI that it was all a lie that was fed

to him by Raucci.

Based upon the evidence gathered, the FBI gets permission for a high-level sting operation on Raucci to prove his corruption. They plan to catch him using his police authority to seize drugs and then steal it for himself. But the NHPD objects to the sting and soon thereafter Raucci is tipped off that he is being watched, ruining any possibility of catching him in the act. The only people who know about the sting operation are the FBI and the highest levels in the NHPD. And without the type of hard evidence the sting could provide, the FBI has to close the investigation.

The Chief of Police Nicholas Pastore was aware of the FBI investigation shortly after it began and he personally -- he personally visits Scott Lewis in jail. He interviews him alone to find out what information Lewis has against Raucci, but Chief Pastore buries the information Lewis provides about Raucci and he covers up his visit.

The NHPD takes no action to investigate Raucci's conduct or the murder investigation that put Mr. Morant and Mr. Lewis in prison and Raucci is allowed to retire with a full pension.

Still, Mr. Morant and Mr. Lewis continue to fight to prove their innocence the best they can from their

prison cells.

Now, remember Sweeney. I asked you to remember that name. He's the supervisor who was physically in the room with Ruiz when Raucci coerced and fabricated that very first statement.

Finally, Sweeney comes forward and he testifies publicly that the Ruiz statement, which started the case against Morant and Lewis and was the basis for the conviction, was coerced and fed by Raucci. But Raucci and Maher continue to lie and the department let them.

So, Sweeney's testimony isn't enough to win Mr. Morant his release at that time. For Mr. Morant these defeats are almost incomprehensible, but Mr. Morant is a man of great faith and he never loses hope and he never stops fighting. He wills himself to remain strong, to be a strong presence in the life of his family, the best he possibly can and finally his prayer are answered.

Scott Lewis is successful in getting a Yale law professor to take on his case. She and her students work tirelessly. Eventually they uncover that the FBI had sent the Roque tape to the FBI crime lab for analysis. That analysis showed that the Roque tape had been stopped and started at least 11 times, corroborating Roque's trial testimony that Raucci and Maher stopped the tape to feed him information and contradicting Raucci and Maher's claim

that they did not.

Mr. Lewis' conviction is overturned by a federal judge in this District and in Mr. Morant's case, the prosecutor candidly informs the judge that Ruiz testified falsely and that Raucci put him up to contriving the story.

Mr. Morant's sentence is modified and he is immediately released after more than 21 years in prison.

His kids who were six and under now are in their 20s. And after six more years, Mr. Morant is granted a full and unconditional pardon.

Now, as you know from jury selection, my name is Nick Brustin and together with my law partners Anna Benvenutti Hoffman and Amelia Green who will by here later in the trial, as well as Attorneys Grace Paras, Katie Cion, Elsa Mota, Ken Rosenthal, and our paralegals Jackie Ochoa Acevedo and Priya Anand and James Smith our trial consultant, it is our great honor to represent the plaintiff in this case, Stefon Morant.

And in this case, we are suing former NHPD Officers Vincent Raucci, Vaughn Maher, Michael Sweeney and the late Robert Lawlor. We are suing the City of New Haven itself and here's why.

First, we will prove that the defendant officers fabricated evidence. More specifically, they coerced

witnesses, fed them false stories, manipulated tape recordings until they got the statements they wanted and then lied and said the witnesses had volunteered all of the information on their own.

Second and relatedly, they hid the truth about how they got these statements from the prosecutor.

And third, and most important, the evidence will show that the NHPD knowingly allowed a culture that protected officers at all costs, even when they engaged in the most egregious misconduct.

We will prove that the breadth and scope of misconduct in this case could only occur in a police department that failed to hold its officers responsible and that all of these violations of the most basic rules of policing caused Mr. Morant's wrongful conviction.

So, let's start with the evidence that Raucci and Maher coerced and fabricated multiple witness statement and that Raucci, Maher, and their supervisor Defendant Sweeney, failed to document and disclose any of this evidence and provide it to the prosecutor.

So let me describe some of the examples of the evidence you are going to hear on this issue.

First, you will hear the testimony of Defendant Sweeney. He will be our first witness and here's why. Sweeney will admit that he was present with Raucci when

Raucci first interviewed Ruiz, that he repeatedly heard Ruiz say he knew nothing about the crime. That Raucci repeatedly threatened Ruiz and that the inculpatory information on the taped statements all came from Raucci who fed it to Ruiz. And that although Sweeney verbally reported it to Lawlor, his failure to stop Raucci, or to report any of the exculpatory evidence he saw and heard was entirely consistent with the practice of the NHPD in 1991.

And as you will see, there will be no evidence of any reason why Sweeney would make these damning statements about himself and his fellow officers if they weren't completely true.

And as you will also hear, the misconduct that Sweeney witnessed with Raucci and Ruiz shows that the entire case against Morant and Lewis was made up out of whole cloth.

Sweeney was only present for the Ruiz interview so he could only directly say that the Ruiz statement was made up and fed to Ruiz, but Ruiz went first and then the statements Raucci obtained from Roque and Morant matched the statement he made up and fed to Ruiz.

We will prove that Roque and Morant didn't just happen to volunteer the identical made-up story Raucci coerced and fed it to them. And, of course, that will

also be proved by the audiotapes, but we'll get to that in a minute.

So Sweeney, by his own admission, witnessed and enabled the fabrication of evidence and failed to document or disclose exculpatory evidence that would have proven Mr. Morant's innocence.

But as you will also see, Sweeney is the least culpable of all the defendants. Sweeney is the only defendant who admitted his misconduct, albeit too late. You will also hear the testimony of each of the witnesses from whom Raucci and Maher fabricated statements either live or through their prior sworn testimony.

You will hear each testify that they knew nothing about the murders and each will provide a consistent account of threats and feeding and stopping and starting the tape to create false statements.

You will hear that each of them was vulnerable as a result of age or other factors. They will describe how they are still afraid of the New Haven Police Department. For example, Mr. Ruiz who now uses his given name Castro. He suffered from and continues to suffer from schizophrenia, but at least by the time of his deposition he was medicated. He will describe the same misconduct by Ruiz, same misconduct by Raucci, that Sweeney describes as best he can.

You will also hear from Jose Roque, both from his sworn deposition in this case and even more importantly from his testimony in the 1994 criminal trial. During the 1994 trial, Mr. Roque testified that he didn't know anything about the crime, that he only gave the taped statements because Raucci and Maher threatened him and told him what to say, exactly tracking what Sweeney says happened with Ruiz.

And at the 1994 trial, Mr. Roque further describes Raucci and Maher starting and stopping the tape to coach him, but in 1994 the forensic analysis showing the stops and starts on the tape hadn't yet been done. And without Sweeney's testimony and without the forensic evidence, the jury believe Raucci and Maher who swear they never stopped the tape, which brings us to forensic scientist Bruce Koenig. As you will hear, Mr. Koenig is the nation's foremost expert on forensic audio analysis.

For many years Mr. Koenig led the FBI audio lab. He holds multiple science degrees. You will hear that the FBI lab was the gold standard for forensic analysis of tape recordings in the 1990s.

He was tasked with some of the most important audio investigation in our nation's history, including analyzing the Nixon Watergate tapes. And in 1996, FBI agents sent the Roque tape to the FBI crime lab for

analysis. Mr. Koenig's forensic analysis, on behalf of the federal government, revealed 11 instances in which the Roque tape was stopped and started just as Mr. Roque had always claimed.

And after Mr. Koenig retired from the FBI crime lab and went into private practice, Mr. Morant's legal team hired Mr. Koenig to evaluate additional tapes, including the tape of Mr. Morant's statement. In both Mr. Koenig found the tape recorder was stopped, rewound and over-recorded many times.

There is much more, but this is a preview of some of the evidence we will present that the defendants coerced and fabricated witness statements and hid it all from the prosecutor.

Admissions from Defendant Sweeney, combined with multiple witness statements, all describing the same misconduct and all bolstered by forensics.

And we still haven't talked about Defendants Raucci and Maher. We will be calling them in our case. We will be questioning them extensively and you will judge their credibility.

On the issue of taping, for example, you will hear Defendant Maher, his evolving attempts to explain why there are multiple starts and stops and over-recordings on the tape. As you will hear even Raucci admit, when police

have a legitimate reason to stop a recording, like a bathroom break, they announce what they're doing on the tape. They announce the time the tape is stopped and they announce the time the tape is restarted on the tape. As you will hear, that never happened here.

Prior to the forensic testing in 1994, Maher swore that they only stopped the Morant tape once when Mr. Morant allegedly asked for a soda.

Many years later, after the forensic analysis contradicted Maher's claim, Maher claimed to remember for the first time and new, as the evidence will show, implausible explanations for why they would have stopped the tape at least nine times without ever noting that they were doing so on the tape.

Which bring us to Defendant Raucci. Raucci will swear that the story Ruiz gave on tape was completely voluntary with no coercion or feeding whatsoever and that Ruiz gave the same story before the tape was turned on while Sweeney was still in the room. In other words, he will tell you that both Sweeney and Ruiz are lying.

In fact, you will hear Raucci testify that more than a dozen people lied about his conduct in this case and about his criminal conduct and his drug use including all of the taped witnesses, multiple detectives, other high-ranking police officials and many others. He will

deny ever using drugs, let alone dealing drugs or working with drug dealers.

In short, what we believe you will see, when he testifies, is a man that is completely untethered from truth and we will prove that a person so comfortable lying can only become a police officer investigating homicides in a department that is indifferent to truth and accountability.

Which brings us to the evidence of what we believe is the most important failure here, the failures by the City.

First, the evidence that the City allowed a custom and practice of suppressing evidence that was favorable to criminal defendants.

Second, the evidence that the City made a deliberate choice not to provide adequate supervision and discipline to its officers.

And, third, that the NHPD's policymaker Chief of Police Nicholas Pastore was on notice of defendants investigative misconduct in Mr. Morant's case and failed to take appropriate action.

So, what's the evidence you will hear on those claims?

Here is a preview of just some of it.

First and most importantly you will hear

admissions from officers at all different levels in the chain of command, that there was a custom and practice of hiding evidence that could help a suspect and that nothing was done about it.

All will admit that by 1991 NHPD officers were obligated, under the law, to document and disclose to the prosecutor evidence tending to show innocence or what's known as exculpatory evidence and any evidence that could be used to impeach or call into question the reliability of a prosecution witness called impeachment evidence.

But despite understanding these most basic obligations, you will hear detectives, sergeants and the eventual captain in charge of a unit investigating homicides all admit that the practice of an NHPD detectives was not to include this exculpatory evidence in their police reports.

Defendant Sweeney, for example, we'll admit that, in general, in the NHPD you only put in police reports evidence that helped you win. Not evidence that suggested somebody might be innocent, just as he admitted was done in this case.

Other officers will echo his admissions.

One officer who will testify is one former detective Joseph Pettola and he is not a defendant in this case. As others will testify, Pettola had a reputation for honesty

in the department. Detective Pettola will admit that during the 80s and 90s NHPD officers felt a great deal of pressure coming all the way from the top not to report officers who engaged in misconduct. He will describe that this blue wall of silence was particularly strong in the NHPD and that the pressure not to report a bad cop exceeded the instincts of a good cop to do the right thing.

That it was understood that even reporting criminal misconduct by another police officer could effectively end your own career. And he will describe how the blue wall of silence worked in this case. Pettola will testify that in the mid 80s, he observed Raucci attempt to plant cocaine on a criminal suspect. During a traffic stop of a suspected drug dealer that turned up empty, Raucci pulled a packet of white powder from his pocket, told Pettola and Pettola's partner it was cocaine and said they should plant it on the suspect and arrest him.

And although Pettola stopped Raucci from doing it and made him pour the cocaine in the gutter, he will tell you that he and his partner failed to report this misconduct to anybody, specifically because of the code of silence.

This incident remained buried for about a decade until the FBI investigation following Mr. Morant's trial.

In fact, we will prove that Raucci's misconduct, his criminal misconduct and drug use was an open secret in the NHPD and that the highest-ranking officers in the department covered it up rather than investigate and address it.

You will hear the testimony of former Chief Pastore and Defendant Lawlor who eventually led the unit, as well as another former head of the unit Brian Sullivan. Pastore and Lawlor are both deceased, but their prior under oath sworn testimony will be played for you during this trial. And although Chief Pastore is not an individual defendant, he is the key policymaker for the City's responsibility.

All will describe the NHPD's knowledge of Raucci's drug-related misconduct, including in this case and the NHPD's failure to address it.

Raucci was allowed to simply retire without repercussion, but as we will prove, the misconduct in the NHPD was not limited to Detective Raucci. In addition to testimony about the broad practices of suppressing exculpatory evidence and covering for officer misconduct you will hear examples of other homicide investigations where NHPD detectives did exactly the same thing that was done in this case, pressuring witnesses to give statements, doctoring tapes, feeding facts.

You will also hear evidence that the City was on notice of these unconstitutional practices before Mr. Morant's criminal trial and that they failed to take any action whatsoever to remedy it.

And you will hear evidence that when NHPD and in particular, the Chief of Police, were warned specifically about Raucci and the investigation into Lewis and Morant, their only priority was covering up the misconduct.

Again, you're going to hear more evidence of systemic failures but this is a preview of some of the evidence you will hear during this case.

So, what will the defendant officers say in response?

Well, we don't know for sure, but we have some ideas. One thing you may hear is that there was no written or official NHPD policy to fabricate evidence or withhold exculpatory evidence. And as you will hear, of course that is true. That is not how things work.

One of the witnesses you will hear on this point is a man named Chuck Drago. He is a police practices expert that we hired to evaluate the evidence in this case. Mr. Drago is an experienced supervisor of investigators. He was Assistant Chief of Police in the Ft. Lauderdale Police Department. He has supervised detectives at all levels and he is an expert in

investigating officer misconduct and internal affairs.

Mr. Drago will explain how a basic risk that police departments face is that officers will ignore their constitutional obligation such as not to hide exculpatory evidence because they are worried that obeying the Constitution will make it harder to prosecute the people they arrest. And Mr. Drago will explain how because of this risk, there are minimally accepted standard among departments about how to ensure all relevant evidence reaches the prosecutors. And you will hear that the evidence shows that the NHPD completely failed to follow these minimally accepted practices.

Mr. Drago will also explain how the code of silence is another well-known risk in policing where officers prioritize loyalty to fellow officers over integrity. And Mr. Drago will explain how allowing a code of silence culture protects corrupt officers and puts well-intentioned officers in impossible position.

Again, you will hear evidence that that is exactly what happened in the NHPD during this time.

What else will they say? Well, Defendant Raucci may try to show that there is insufficient evidence to prove that he conspired with a known drug dealer to frame Scott Lewis and by default Stefon Morant.

To be clear, you will hear, when the Judge

instructs you on the law, it doesn't matter what motivated Raucci's misconduct, only that the misconduct occurred and that it caused his wrongful conviction.

But you will hear evidence that Raucci was involved in the drug trade and in particular with a drug dealer named Frank Parise because it is part of the story of what happened in this case and we contend further evidence of systemic misconduct.

When Scott Lewis, who will testify in this case, reported to the FBI in 1995 that Raucci framed him, he also reported his suspicion that Raucci was motivated to do so because of Raucci's connection to Frank Parise.

Mr. Lewis will testify that in the 1990s, in late 1990, he had decided to stop dealing drugs but he still owed Mr. Parise a substantial amount of money. He also had reason to believe that Raucci was involved with Parise and that this could be Raucci's motivation for framing him.

And you will also hear that the FBI was trying to develop more such evidence including through surveillance and a sting that could catch him in the act stealing drugs but the NHPD objected and then Raucci was tipped off.

We will prove that if there was insufficient evidence to catch Raucci committing crimes and to connect him with Parise it was the fault of the NHPD.

One thing, we know that at least some of the defendants will say despite the mountains of evidence of Mr. Morant's innocence and all the evidence of misconduct is that the criminal jury in 1994 got it right. They will claim that Mr. Morant and Mr. Lewis actually committed this crime. One thing you won't hear is any actual evidence that they did this.

We ask you to consider how could these defendants and the City still be arguing that they are guilty as you hear the evidence. We will prove it's the same reason why Mr. Morant was arrested and prosecuted in the first place. To admit Mr. Morant's innocence is to admit the police engaged in misconduct and with the exception of Mr. Sweeney none of these men will ever do that.

You will see that the defendants and City did not value Mr. Morant as a human being in 1990 and they don't value him as a human being today, which brings us to Mr. Morant and the end of my opening statement.

Mr. Morant will testify in this trial. Mr. Morant will explain where he was and what he was doing at, down south at the time this horrible crime occurred. How he came to make the taped statement you will hear and most importantly how these events impacted his life.

Mr. Morant will candidly admit the shame and regret he still feels today for having succumbed to

defendants' coercion and threats and making the false statements on tape that were fed to him by Raucci and Maher and the shame and regret he feels that for a few years before his arrest he was dealing drugs to make extra money, including for a short period of time with Mr. Lewis.

This made Stefon an easy target for Raucci to frame as an accomplice, but even then Mr. Morant was always working one or more jobs and by the time of his wrongful conviction he had gone back to school, completed his high school degree and had gotten his life back on track.

What we will show you in this trial is that Mr. Morant is a big man in every sense of the word. Enormous strength of body and spirit, enormous resilience, enormous faith, enormous grace, enormous love for family and friends, and those less fortunate than himself, not perfect by any means, none of us are, but for all of those years stuck in a cage surrounded by violence and despair, he never lost hope. He never stopped fighting. In fact, in so many important ways, he was able to rise above all of it.

Under the most challenging circumstances he tried everything to find ways to be a committed father and husband and son. He became an informal counselor to other

prisoners and even prison guards. And since his release from prison in 2015 he has devoted all of himself to work and to family and to helping others.

He has counseled other men who were wrongfully convicted like himself, but also men who were guilty but needed counseling and help nonetheless. He has tried not to waste a second feeling sorry for himself. You're going to hear from a variety of people about who Mr. Morant is. For a man like Mr. Morant falsely labeled a murderer, the constant indignities of prison were intolerable.

But, as we will prove, all that was happening inside the prison walls paled in comparison to what Mr. Morant was missing on the outside. The loss of time with his family, the inability to be physically present, the actual loss of family, the loss of his brother in prison, and his son soon after he was released from prison. For Mr. Morant, the grief was magnified tenfold. And as you will hear, the pain and the anguish didn't end when he was released from prison.

Until his pardon in 2021 he had to live with his wrongful conviction and all the difficulties and indignities that it caused in his daily life.

He still lives with the pain and trauma and will for the rest of his life and it is still very difficult for him to process and talk about it. He would prefer to

just plow forward and to take care of business, to take care of family, to be a rock for so many.

One of the witnesses you will also hear from is a woman named Dr. Akinsulure-Smith. She is a forensic psychologist we retained to evaluate Mr. Morant's psychological trauma from his wrongful conviction. She will explain how despite his unique resilience he suffers from PTSD, depression, anxiety, and an overwhelming sense of loss.

Family and friends will describe the same. To be clear, you will hear about everything Mr. Morant endured, not because Mr. Morant is seeking sympathy. You will hear about everything Mr. Morant endured, everything he went through in prison and after his release because at the end of this trial, if you find liability against any of the defendants, you will have the responsibility of awarding money damages for all that he endured.

We have to put on evidence of all that Mr. Morant went through because as the Judge will instruct you, it will be your job to put a money value on all of the harm and all of the losses Mr. Morant suffered. And to be frank, it is a daunting task because when you dispassionately follow the law, your common sense and the evidence will tell you that the value of what Mr. Morant went through is an astronomically high number, but that is

the only way our system has to balance the harm.

So, as you listen to the evidence in this case, I ask you to pay attention to everything that Mr. Morant went through for the last 35 years. Every second of every day that he lost locked in a cage, labeled a murderer, every second away from his family, every second away from his dreams and his hopes, every second he had to live with the stigma of his wrongful conviction between his release in 2015 and his pardon in 2021, every second that he has had to and will continue to live with the trauma and loss for the rest of his life every pain, every in dignity, every separation, every loss.

So that when it comes time to assess Mr. Morant's damages you can measure each and every one of these harms and fully and appropriately put a dollar value on all that he has endured, to fully value the man and his loss.

As you will see and hear, Mr. Morant is a proud man and he doesn't talk openly and easily about his feelings, but they're all there. You will feel them in the air around him when he speaks. Even as he continues to work every day to rebuild his life, he remains overwhelmed by loss. This trial will be an important step forward.

Thank you.

THE COURT: Thank you. We're just going to take

a very quick five-minute restroom break and then we'll come back for the defense opening statements.

Members of the jury, during the recess, do not speak about the case. I'll give you, again, a longer instruction about communications later on but I just wanted to give you that short instruction for this short break. We will be back in five minutes.

(Recess, 1:46 p.m. to 1:51 p.m.)

THE COURT: Attorney Gerarde, are we ready for the jury? Okay. We can get them.

(Pause)

(The jury entered at 1:53 p.m.)

THE COURT: Everyone may be seated.

Attorney Gerarde, you may proceed with the City of New Haven's opening statement.

MR. GERARDE: Thank you, Your Honor.

**OPENING STATEMENT BY MR. GERARDE**

MR. GIRARDE: I'm sure that no one will be surprised to learn that the lawyers on this side of the room have a very different view of what the evidence will show than what the lawyer next to me just told you. So, let's get right into it.

The evidence will show, ladies and gentlemen, that Stefon Morant was not in North Carolina on the date of the Turner-Fields homicide. He was not in South

Carolina on the date of the Turner-Fields homicide. He was in New Haven, Connecticut, in a car with Scott Lewis. They entered Rick Turner's apartment, who was being visited by Lamont Fields. The homicides occurred and it was over a controversy over the cocaine trade in the City of New Haven.

The evidence will show that Stefon Morant confessed his involvement to the New Haven Police Department. We have that on tape. It was 35 years ago. The tape has been preserved and you will have it. You will be able to listen to the words asked by the detectives and the responses given by Mr. Morant.

We have typed out versions. We are going to hand them to you and you will be able to read along while you listen, and you can determine for yourself whether or not this is coerced, because the evidence will show it wasn't.

The evidence will show he wasn't drunk when this happened. He wasn't out of it, high, whatever was suggested. He understood what was happening and he gave his statement. He admitted his responsibility.

The evidence will show he did not say during his confession to the New Haven Police Department, Excuse me, I was in North Carolina that day. I was in South Carolina. There's no evidence that I was somewhere else when he gave his statement. And the evidence will show

that he signed a piece of paper, a waiver form, acknowledging he understood his rights. You'll see his initials put on by his hand. You'll see his signature at the bottom of the paper that he signed this knowing what he was doing before he gave his confession to the New Haven Police Department, and that will be for you to decide.

Now, you will hear testimony that Stefon Morant and Scott Lewis were childhood friends. Scott Lewis has a few years on him, but they had a lot in common. They both dropped out of high school, they both got involved in the cocaine trade in the City of New Haven. Now, Stefon Morant was a smaller fish, to use the vernacular, in the cocaine trade at that time.

Scott Lewis was buying major quantities and he had a crew that worked for him and did the selling. Stefon Morant worked on his own selling small quantities, $10 worth at a time. But he also worked in conjunction, they covered the same territory. They were not rivals; they were allies.

The group of people that sold for Scott Lewis considered themselves soldiers. And the one soldier who you're going to hear a lot about, it has been raised in opening statement to you, is this person named Ovil Ruiz.

Ovil Ruiz is a person who has aliases. He goes

by, you'll hear in this trial, Ovil Ruiz, Agustin Castro. His street name is "Blockhead." All right. But you will hear testimony from Ovil Ruiz that he was in the car when they went to the Turner-Fields apartment that night. He was in the car with Lewis and Morant when they went to the Turner-Fields apartment that night.

And he will also say that the reason why they were there is that the Lewis operation was setup; so that they didn't have all the drugs and the cash in the houses where they sold from, because if that gets raided then you lose it all. So they had an ally in Rick Turner where they kept the stash. The big money and the big cocaine was kept in the Turner apartment. Only on this night, Lewis was concerned that Turner was ripping him off, that he was going to take something and then run with it. And he went over there to go deal with that. And Ruiz is in the car with them. They all three drive over.

You will hear his voice. He's answering questions about this. He gave a statement, two statements, one in January and one in May in 1991. You are going to hear his voice say that they went over in the car and that Lewis and Morant got out of the car. Ruiz gets up to be the getaway man, he moves to the driver's side. Then Lewis and Morant go into the apartment. Shots fired. Two men come running out, Lewis and Morant, with

bags. One has kilos of cocaine, one has cash. Into the car they go. Off they sped.

Now, Ruiz gives his first statement to Detective Raucci in the presence of Detective Pettola in January 1991. You're going to hear a lot of testimony about this, and this is what you will have to dissect. And, fortunately, you don't have to take lawyers' words for this. You don't have to hear lawyers spin of what got said. We have Ruiz's voice. We have Raucci's voice. Detective Raucci is asking the questions. Ruiz is giving the answers. And you can tell for yourself, is this person being coerced? Is this person spitting back something?

And I will tell you, that first statement there's 20 pages of typing when they typed up what he said, way more than a young kid could memorize and spit back, but you will have that.

Detective Pettola who has not been sued, who has credibility, will testify nothing improper happened during the Ruiz interview. He sat there for the entire interview. He listened to the questions. And he was asked, and he will testify, "Did you see Raucci feed him facts?" "No." "Did you see him stop the tape and say you better say it this way next time because you're saying it wrong?" "No." Nothing improper whatsoever.

That statement gets typed up. Ruiz comes back the next day, raises his hand that what you have typed here is the truth and he signs his name saying I swear what I said that you have typed out is the truth. Who takes his oath? Mike Sweeney. Sweeney was there. He took the oath, so he knows this has happened.

Now, once the word gets out that Blockhead has spoken to the police out on the street, once that word gets out, the pressure to get him to recant, to take it back, is enormous. And Scott Lewis gets arrested as a result of this first statement. And what the prosecutors decide to do is, they say, let's bring this guy Ruiz back, let's hear from him again. Let's say, and hear from him are you sure because there's a lot being said about here about what's going on, should you recant or is he recanting, et cetera. Come on in, Ruiz, we want to hear from you.

So he comes to the State's Attorney's Office, not the NHPD, not in an interview room. He's in the State's Attorney's Office with his lawyer. His lawyer is a guy named Mike Moscowitz and you'll hear from Mike Moscowitz because he was present.

So Ruiz, with his lawyer, go to the State's Attorney's Office and they say, let's do it again, let's hear from you, what is the truth -- and Ruiz says exactly

that I just laid out for you. He was in the car that night. They drove to the Turner apartment. Morant and Lewis get out. Ruiz goes to the driver's wheel. Morant and Lewis are in for a while. Shots fired. They run out with the kilos of cocaine and the cash. And that gets typed up and he signs it under oath with his own lawyer as a witness. And his own lawyer, Mike Moscowitz, will say nothing improper happened during that questioning period. Raucci didn't do anything other than normal questions and answers. No stopping the tape. No saying, you know, let's say it a little differently, let's rewind. Zero of that.

Now, it takes a while, as everybody knows, from the time someone's arrested until the time there's a trial. But years later, three years later in 1994 is the trial. And a prosecutor, and his name is David Gold and he will testify also, calls Ruiz as the main witness at the trial. And Ruiz walks into a courtroom, just like the one we're in here except in New Haven, raises his hand to swear to tell the truth, and he says exactly what he said in statement number two. "I was in the car. I worked for Lewis. I was a soldier in that group. I drove them over there. They came out with the kilos and cocaine after I heard the shots fired, and no one's made me any promises, no one has threatened me, I'm saying this because it's the

truth."

He didn't do that just once. He did that in the Stefon Morant trial in 1994, but also in the Scott Lewis trial in 1995. He raised his hand and said exactly that.

Now, the testimony will be that and the evidence will show that once Scott Lewis was convicted, so the second of the two trials has happened, then the pressure to try and secure a reversal, a recant and undermining of the conviction, doubled and tripled at the behest of Scott Lewis. He got behind every possible avenue he could to try and undermine this conviction.

So yes, you heard he picked up the phone and cold-called the FBI and convinced them to open an investigation saying you have cops dealing drugs, you have cops securing false convictions, there's corruption going on in the New Haven Police Department. And he sent them on a two-year wild goose chase that ended with nothing. They closed their file. No arrest. They didn't even try for an indictment.

It's not as if they indicted someone and he beat the charge. They didn't even try for an indictment of Raucci, of anyone else. And they referred, the state prosecutor, he could have if he wanted to, to try something on the state level. He didn't even try.

So it's the position, ladies and gentlemen, that

this is not a case of wrongful conviction. Remember Her Honor said, when you get a pardon that's not a finding of innocence. You are here to determine rightful conviction or wrongful conviction. And you'll have all the law you need to do that and we'll talk to you at the end of the case about that. But this is not a case of wrongful conviction. There is no basis for the award of any money damages.

Now, ladies and gentlemen, you'll hear testimony that the New Haven Police Department had policies, had comprehensive policies, and they were crystal clear, in black and white, that there is no fabricating evidence. You don't make up something false that's in a police report. You don't tell a witness what to say. You don't coach witnesses. You don't hold back evidence that tends to show someone is innocent. That's exculpatory evidence.

You don't withhold evidence of any kind, and those policies were trained on. Every police officer in the New Haven Police Department has a requirement that they go 60 hours every three years of training, recertifying, including what's the latest developments in the law, what are the latest requirements of the Supreme Court, all of that so that no one's civil rights are violated.

And there are also many layers of supervision

that you will hear about in the department. There's detectives, but the detectives answer to sergeants, who answer to lieutenants, who answer to captains, who answer to assistant chiefs, who answers to the chief of police.

And the testimony, it will be uniform, that no detective has ever been told by any of those superiors on that level that it is okay for you to fabricate evidence or withhold evidence of innocence and that that will be condoned by the chiefs; don't worry, nothing will happen, go ahead and do it. The evidence will be uniform. No one has ever been told that in words or in substance.

And the evidence will also show that the New Haven Police Department did have an active internal affairs department. Every police department needs one of these so you can have complaints, they can be investigated, and discipline can be meted out if warranted. And New Haven's was active. It wasn't as if the message was, don't worry, we don't discipline police officers. If it's warranted, someone will get something.

Not warranted in this case, that will be the undisputed evidence. And there was testimony about that an expert witness is going to come. You heard the reference to a man named Charles Drago from Ft Lauderdale. Well, we will have an expert witness who will talk to you about policies and practices by the New Haven Police

Department. His name is Jerry Rodriguez. He has a career in the Los Angeles Police Department, the Baltimore Police Department, the San Francisco Police Department, and the highest levels of command, including the highest levels of internal investigation and ensuring there is no corruption. And he will testify that all of the policies of the New Haven Police Department were sound and the practices of the police department involved in this case were sound.

Now, obviously, the plaintiffs make a claim that the tape recording of witness statements was done improperly. What they're saying is -- there's an accusation tape has stopped, someone is told, Hey, get it right because you just got it wrong, and then start it up again. That is not allowed. No one says that's allowed. The New Haven Police Department doesn't say that's allowed. But the point is, there is no evidence that that occurred.

There are instances when a tape needs to be stopped, and those are valid. A witness needs a bathroom break, the detectives need to gather their notes to see who they want to go next. Sometimes you need to go out in the hall and say, based on what this person just said, I think we should go here, here and here, and then they go back in. Stopping the tape is not a problem.

Stopping the tape and threatening a witness, now that's a problem. But there is no evidence that occurred. There is zero evidence that any, even one word, was over-recorded. Meaning, I haven't just stopped it, but I backed up the tape because I didn't like what you just said, I'm now going to get back far enough so I can start over with you saying it right this time or else, and then we go forward. There is no evidence even one word was over recorded.

Now, as you heard, our police chief was Nicholas Pastore, and he is deceased, but you will hear from him. We have a videotaped deposition before he passed. He was not a young man, but he will tell you all about the policies and practices and that the training was proper, and that he was not afraid to discipline police officers if that was warranted. And he certainly took an opportunity to do that.

And we also lost Sergeant Bobby Lawlor who's deceased. We have him on videotape, again, and you'll hear about his methods, policies and practice. And he wasn't negligent. He followed everything exactly the way he should. I will leave his lawyer to run forward with that.

And the final point I want to make is you will hear from a lot of people that want to try to help Stefon

Morant, family, friends, people who have had a beef with the New Haven Police Department love to get a chance to try and get back at them.

I will point out to you in my closing argument all of the reasons and the motives they had to provide that testimony, and that really is the next time I get to speak to you.

I want to give my brother counsel a chance to say their peace, so I'm going to stop now. But I want to tell you, I will speak to you at the end of the case about all of the reasons why this is not a case of wrongful conviction.

For now, I thank you very much for listening to me. I will be asking you to return a verdict for the defendant, the City of New Haven. Thank you.

THE COURT: Thank you, Attorney Gerarde. Attorney Tallberg next.

**OPENING STATEMENT BY MR. TALLBERG**

MR. TALLBERG: May it please the Court?

THE COURT: Sure.

MR. TALLBERG: Counsel, members of the jury, you may recall from yesterday, my name is Jim Tallberg, and I represent retired Detective Vincent "Vinny" Raucci who is seated behind me in the purple shirt there. He is flanked by my colleague, Attorney Kimberly Bosse, and our

paralegal, Anna Oliveira. And we will be with you for the duration of this trial.

The evidence you will hear is that almost every one lies to the police, especially in serious cases. That is the testimony you will hear, on repeated occasions, that almost everyone lies to the police, especially when it concerns drug dealing and murders.

And so this case is about how the police navigate through those lies and try to determine whether there is probable cause to present to a prosecutor. You will hear testimony and evidence from the prosecutor in this case himself, David Gold, that once the prosecutor has made that determination, it goes to a judge. And so you have a neutral, third-party magistrate, who makes a finding of probable cause for the charge.

It's not the police or the prosecutor, or even the judge who decides whether the person is guilty; it's the jury. And there is no dispute in this case that a jury in New Haven found Mr. Morant guilty of the crimes charged.

And then he served that sentence, as you have heard here this morning -- and you'll get additional details as imposed by the judge and was later released on a sentence modification for time served.

You will hear testimony in evidence that the

legal proceedings were complicated and traveled through various appeals, motions for new trials, habeas, in both state and federal court.

It will be your job all these decades later to decide a very narrow issue. What you hear may sound overwhelming, but there will be a very narrow issue at the end of the case for you to decide whether Detective Raucci violated the constitutional rights of Mr. Morant, which we deny. You will make that decision based on the evidence.

So you've heard about it a little bit, but let me fill in couple of additional blanks. Your job is to decide whether Detective Raucci violated the constitutional rights of Mr. Morant based on what he knew at the time, decades ago. Not years later, not with the benefit of hindsight, not with theories developed long after the fact.

The evidence you will hear is that Ovil Ruiz, also known as Agustin Castro or Blockhead didn't just come into Detective Raucci's orbit. He was charged with a felony assault charge by Detective Raucci. And Ovil Ruiz then offered the information about the double homicide of Ricardo Turner and Lamont Fields. The shooting was of an unrelated person, Javier Torres.

Ruiz also came up with the names and gave them to Detective Raucci of other witnesses who had information

about the murders, and that included Mr. Morant and Scott Lewis, and information about the drug dealing operation at 149 Clay Street. One of those people was Jose Roque who also gave a statement implicating Mr. Lewis and Mr. Morant.

As you've heard, Mr. Morant then came into the police department, signed a waiver of his rights, and he essentially gave a confession implicating Mr. Lewis as having committed the murders.

The next day Mr. Lewis came in and he gave a statement. And you will hear testimony from him and you will hear that he didn't have a single complaint about the manner in which Detective Raucci took his statement, which was recorded.

You will hear the heart of plaintiff's theory of this case, you heard a bit already, is that the witnesses were coerced to make these false statements because there was a grand conspiracy orchestrated by Detective Raucci who was upset that Scott Lewis had made a decision that he was going to get out of the drug trade rather than take over the drug operation of this person, Frank Parise, who allegedly was about to go off to prison. And so the plaintiff's theory of the case is that Detective Raucci framed these two men in retaliation for Mr. Lewis getting out of the drug trade.

You will hear that Mr. Lewis owed this drug debt to Mr. Parise because he had been fronted cocaine on consignment. And, again, the conspiracy theory is so farfetched that it practically doesn't pass the blush test that Detective Raucci would be upset that Mr. Lewis was getting out of the drug trade. But you'll hear this fantastic story and you will have to make credibility determinations based on all of the evidence presented before you.

Some of the statements are written and some of them it's just going to be oral, and so there will be disputed facts. But on some of the most key points you won't have to take our word for it because Detective Raucci himself recorded the statements. Those would include Ovil Ruiz, Jose Roque, Mr. Morant, Scott Lewis, Diane Basilicato, and possibly other witnesses.

The evidence will show the recordings are not the best quality. We didn't have digital back then decades ago. They are analogue. They are scratchy. You've already heard a little bit of plaintiff's theory that there were stops and starts and over-recordings.

But we trust that you will be able to see all of that and you will be able to decide by the tone, inflection, demeanor of the conversations that are captured on recordings, that it's kind of like we're

having this discussion here. And the evidence will show no witness was coerced by Detective Raucci, no witness was mistreated by Detective Raucci, no evidence was fabricated by Detective Raucci, no evidence was hidden by Detective Raucci, and there certainly was no grandiose conspiracy theory because he had a side job as a drug dealer. You will not hear any allegations that any witness was subjected to physical or mental abuse.

You'll hear these discussions in an interview room from the New Haven Police Department and you will understand that plaintiff's claims cannot be sustained.

As I wrap this up, because I have colleagues here who need to say their peace, there is obviously much more of the case. This is just the brief introduction. This case is not about whether a terrible crime occurred. It did. Two men were murdered in cold blood and Mr. Morant was convicted by a jury of his peers.

You will hear testimony in evidence from witnesses who became involved in this case years or decades later. You'll hear from people who reviewed these witness statements long after the fact, again years and decades later, and were not in the room when the recordings were made. And every one of those people almost that you will hear from had one mission in mind, and that was to reverse the conviction of Mr. Morant.

That is part of our adversary legal process. We don't begrudge that. But the evidence will show all these decades later, memories fade, stories shift. In particular, informants and snitches flip and recant their testimony for a variety of reasons.

Your job, again, will be to sift through all those stories, but you need to make your decision based on the information that was available to Detective Raucci at the time of the events, not decades later with 20/20 hindsight, and that evidence will show that Detective Raucci acted reasonably, lawfully, and did not violate Mr. Morant's constitutional rights.

And at the end of the case, after you've heard all of this evidence, and we appreciate your paying attention to this, I'll be back up here again. I won't have an opportunity to engage with you again until that time, but when I do I will ask you to please return a verdict in favor of Detective Raucci on all counts.

All I would ask at this point is that you please keep an open mind and wait until you've heard all of the evidence as Your Honor has instructed you before you reach any conclusions.

And with that, I thank you for your time.

THE COURT: Thank you, Attorney Tallberg.

Attorney Ryan.

MR. RYAN: Thank you.

**OPENING STATEMENT BY MR. RYAN**

MR. RYAN: May it please the Court.

Good afternoon, ladies and gentlemen. Thank you for your patience and your service in this case. My name is, as you know, Michael Ryan. And it is my privilege and it's been my honor to get to know Mr. Michael Sweeney and to represent him in this case.

Assisting me with the case, and Michael is sitting in the corner over there and you will hear from him in a very few minutes, but also assisting me is my partner, Jonathan Zellner, who is also seated at counsel's table.

You are going to meet Mr. Sweeney in a few minutes. He lives with his wife in Madison, Connecticut. He grew up in Waterbury and attended Crosby High School. Upon graduation he served in the Marine Corps. for four years and he was in combat, Vietnam, honorably discharged in 1968, and then joined the New Haven Police Department where he served for 30 years, from 1968 through 1998, retiring as a lieutenant.

After the Marine Corps. he started his education, and you will hear about all the degrees he received. During his time in Marine Corps., as well as the police department, he received many accommodations and letters of

recommendation which you will also hear about.

After his retirement Mike volunteered for an international peace keeping force in Bosnia for a year and later served in Iraq for four months.

I expect the evidence in this case is going to show that in 1991 Mr. Sweeney was a detective sergeant in the Investigative Services Unit at the New Haven Police Department and was only very briefly involved in the investigation of the Turner-Fields investigation.

And as you've heard, there's only one claim pending against him at this time. You will hear evidence that he was working on the night shift on the morning of January 14, 1991, when a young man named Ovil Ruiz was brought into the police station. Mr. Sweeney spoke to Ruiz for some time, and based on his discussions he did not think Ruiz had any information about the Turner-Fields homicide.

Mike sat in on several interviews of Mr. Ruiz conducted by Detective Vincent Raucci, who is originally one of the investigators as you've heard, and Sergeant Sweeney didn't think the interviews were being conducted properly. So he admonished Mr. Raucci twice to conduct the interviews properly.

He admonished him and he told him to knock it off. As the discussions with Mr. Ruiz continued that

night, Mr. Sweeney got pulled away from the case on a different matter, and his shift ended shortly after that. Before he left for the night, Sergeant Sweeney told another officer, Sergeant Pettola, who you've heard about, and who plaintiffs admit had a reputation for being an honest cop, a good cop. He called on Sergeant Pettola to come in and to take the statement, sit in, while Mr. Raucci rather took the statement from Mr. Ruiz. He did that because he wanted it to be done properly.

Pettola then came into the interview room and Mr. Ruiz gave a recorded statement to Detective Raucci. Mr. Sweeney was no longer there. He was not present at the time.

Mr. Morant's claims in this case arise out of Mr. Sweeney's discussion with Mr. Ruiz and his observations of Mr. Raucci's conduct during his interviews of Ruiz before that recorded statement was taken on January 14, 1991. And what Sergeant Sweeney did or not do with that information. Mr. Sweeney, as you've heard, will testify that he took the information and the very next day he followed the practice at the department and reported it to the sergeant who was in charge of the investigation, Robert Lawlor.

Mr. Sweeney will testify he reported Mr. Raucci's conduct to Sergeant Lawlor again when he learned an arrest

warrant had been issued later on in 1992.

The testimony will be that at that time Mr. Sweeney was told that Mr. Ruiz had passed a lie detector test. So Mr. Sweeney believed he might have been wrong about Mr. Ruiz.

Mr. Sweeney will testify that he took the information -- I'm sorry. Finally, you're going to hear evidence that after Sergeant Sweeney returned from Bosnia in 1999, he again tried to report the information to the police. But when he got no response, he made an unsolicited call to Mr. Morant's attorney and told him what he had witnessed during Detective Raucci's interviews of Ruiz on January 14, 1991.

Sergeant Sweeney was not compelled to do that. He wasn't forced to do it; he did it on his own volition. He wasn't following any code of silence or any code at all except for his own conscience.

Sergeant Sweeney then met with Mr. Morant's criminal defense attorney and cooperated with them, testified in court on behalf Mr. Morant at his petition for a new trial in 1999. He went to court without an attorney and told the court what he knew.

He again testified in court on behalf of Scott Lewis, who was also charged with the Turner-Fields homicide. That testimony was in federal court in 2013.

Mr. Sweeney, once again, went to court without an attorney and testified as to what he knew.

Sergeant Sweeney has testified about these events several times over the years, including in this case. On each occasion he has given the same story, which you will hear in a few minutes.

As I said earlier, the evidence will show that at this time the plaintiff is only making one claim against Sergeant Sweeney. That claim has four parts, one of which the Judge will tell you about this, is causation. In other words, the plaintiff must prove to you, by a preponderance of the evidence, that Sergeant Sweeney's conduct was a cause of Mr. Morant's deprivation of his liberty. And we believe that the evidence will show you that Sergeant Sweeney's conduct was not the cause of the plaintiff's deprivation of liberty in this case, and for that reason you should find in his favor. Thank you very much.

THE COURT: Thank you, Attorney Ryan.

And last but not least, Attorney Melley.

MR. MELLEY: Hopefully not least.

**OPENING STATEMENT BY MR. MELLEY**

MR. MELLEY: Good afternoon, ladies and gentlemen. Jay Melley. As Her Honor indicated, I'm an attorney, as are all these other people. Every one of us

are advocates. Every one of us have our point of view. We're trying to push onto you our thoughts, and it's going to come not only in our words but in our actions the way we approach witnesses, what we're trying to get, the phrasing.

I would ask that, as we start, that you keep in mind what the Judge had said, that the question or the manner of the question is not the evidence; it's what the witness is going to do with it. That's where the evidence comes from. And I'm sure you figured out by now there's a fair amount of evidence that you're going to have to go through.

I submit at the end of the case you should return a verdict on behalf of Robert Lawlor and on behalf of Vaughn Maher. And I'm going to take them individually, as I request you do that with every party here.

So in other words, the plaintiff is an individual. He is suing, he has his burden of proof, that's his role. Each of the defendants have their own role and should be treated separately and evaluated separately, which is going to be clarified by the Judge later on.

So, with regard to Robert Lawlor, I'm here through his widow, as he died in January. And he was a sergeant at the time of the Turner-Fields murder. And

you're going to hear that the sergeants in New Haven would work out of a room and there'd be a number of desks in there. And the sergeants would work together. There wasn't necessarily walls there, but there was a certain flow and they would all work together.

So, for example, if there was something that came up, as you're going to hear here, where one sergeant wants something done but there's not enough detectives on board at that time, there's going to be a note, hey, later on can you, sergeant whose replaced me, have a couple guys go out. And Robert Lawlor will talk about that in terms of giving assignments out.

He had no direct involvement with this case, okay. When the murders occurred there was a Sergeant McCoy who was directing a number of things that happened. He ends up finishing up in December of 1990.

So we have October, November, December. So Robert Lawlor is there. But one of the interesting things, and this is going to come out with Mr. Sweeney's testimony and I'm not going to speculate on his motivation for what he's saying or whatever, but at the time that this occurs Sergeant Sweeney is senior to Lawlor. He's a senior officer. He's been on longer, he's been a sergeant longer. And one of the things he says is that oh, he explained the problem that he saw to his supervisor,

Robert Lawlor. But Lawlor was not his supervisor.

What you are going to hear consistently in a number of different statements from Robert Lawlor over the years is that it was never said to him, anything, about anything improper at the time of this statement. And you're going to be able to see his testimony.

Last July Robert Lawlor was deposed. He had been dealing with Lewy Body Disease for a long time. He had a pretty good long-term memory. He was having a lot of issues. But he's emphatic, that if he was told there was a problem he would have done something about it because at the end of the day you document whatever it is. He's not shying away from anything. So you're going to have that benefit to you.

Later on there's a comment made by somebody to Robert Lawlor that the initial interview, there was a problem with it, and supposedly Lawlor says this to an FBI agent. And what's interesting, and you heard an allusion to it but it's going to become more clear, this Ovil Ruiz at the time, who is a prime witness in this case, is 16 or 17 years old, first of all. He has no connection to his parents. He's living by himself in New Haven. But he gives one statement, but then he agrees to go back and give another statement with his attorney and with the state prosecutor. That doesn't happen. That's very

unusual. Yeah, that might stand up.

Regardless, when he's deposed and several times before that, Lawlor says, I don't remember that at all. I don't remember making that comment. The FBI agent says I can't tell you anything other than what's written in the words, I can't give you any kind of insight at all. It goes nowhere.

And that's the essence of the negligence claim against him, that he breached a duty. And you'll figure it out as we go forward with the evidence.

I also represent Vaughn Maher. And he's going to testify and I expect he will be on for a while. I was going to memorize what he did, but it was too much so I wrote it down, so if you bear with me.

So the murder, as indicated, was October 11. It's about 4:30 in the morning. Detective Maher gets the call within the hour. When he shows up at the scene, there's investigators already in the apartment. They're going through it, what they do. And he has nothing to do with that.

So he goes to 640 Howard Avenue and interviews three different people. He goes to 628 Howard Avenue, two more. 637 Howard Avenue, 639, 627, 634, Howard Avenue. Talking to all these different people, "what did you hear, what did you see?" Writing it all down, putting it in a

report.

The next day he goes back to 634, then to 460 Columbus Avenue. Talks to a Doreen Murdock, gets some information from her. He goes back to see her two days later. Then he goes to see an Arnold Little on Marlborough Street on October 15. October 23rd, he's back on Howard Avenue at 636. He interviews this Doreen Murdock at the police station on the 24th of October. 25th Shelton Avenue, a Keith Knox.

All these names will be spelled out a little more for you in their context in the matter as it develops. You know, I'm just throwing this out here because it goes on and on and on. And for practical purposes, his direct involvement is on December 19th. He's now talked to 30-odd people. And everything he's done, he puts in a report. It's typed out. He signs it, he puts it in a report.

And everything he did was provided to the legal team of the plaintiff here. It's not like anything is hidden. And in the course of this he encounters through another police officer an informant, this Frank Graham, who may have information as to who was the cause behind the shooting. And Frank Graham points a finger at this guy Michael Cardwell. And everything, oh, Cardwell, Cardwell, Cardwell.

And so then Detective Maher will tell you how he tried to set up with this Frank Graham, All right, let's meet, let's go through this, you say that Cardwell's going to be here. There's issues all the time and he runs into a stone wall. And Mr. Maher will testify that yeah, okay, there was a lot of stuff pointing to this Cardwell but there was not enough to get me to the point where I could put together an application for an arrest warrant, that I could go to the State's Attorney's Office and they can proceed, because that's the standard. Okay, you got to be there, you have to have enough to get there, and he's saying he doesn't have anything. That's where he is when this happens in December.

The other thing that happens in December is, he gets a letter, Detective Maher, that he's now being promoted to sergeant. And the second paragraph says, You're moving into a different department, start wrapping up your affairs now. Close those books and get ready. You're going into training at the end of January.

So things are shifting. And the way things happen on these cases, things develop. His next involvement is the day after this Ovil Ruiz has appeared at the police station and given a statement that ultimately implicates the plaintiff here. He has no involvement in the case at all in terms of that time in

December and when he is in the next day for an interview with this Jose Roque, and you heard Roque, R-O-Q-U-E, you heard that name several times.

All this has already been developed before he gets there.

He's going to tell you, he walks in cold; he has no idea what's going on. And he's going to tell you, yeah, he went one way with his investigation, sometimes an investigation goes another direction. He has very minimal involvement thereafter. He is involved the next day in another statement, but that's it.

So things are proceeding, he's onto his other job. He does write a report in March that says, you know, I was looking at this Cardwell, didn't work out. There were a number of leads, and that's it. And then he's done. He's done with the case.

His entire file is turned over to the plaintiff, so if there's misdirections or whatever that he could have or should have done in there, you're going to see more typed reports than you're going to care to read through but they don't go anywhere. There's a lot of suggestions, but it's not the hard proof that's going to bring about saying somebody else did this.

So he's not involved in the arrest warrant of the plaintiff here at all. He's not involved -- he does

testify with regard to the taking of the statement in a pretrial hearing, but that's it. He's never cross-examined at either trial about what he did or didn't do or whether it was actually another person. That is all ignored.

The case revolved around Ovil Ruiz who Detective Maher had nothing to do with in terms of bringing it in and his testimony was there.

There's a lot more information. Yeah, you're getting more details than you appreciate, but my point is you have to keep an open mind. And just because there's a lot of allegations and there's a lot of lawyers talking doesn't mean that you're going to find those facts, because the facts speak for themself.

Certainly, with regard to then Sergeant Lawlor, there's very little evidence that he had any role at all, especially when he denies everything. And as far as then Detective Maher, I would submit to you that there is no constitutional violations anywhere, certainly no hiding of anything, certainly no manipulation or coercion.

He's being asked questions about what happened in an interview. He's not running the tape recorder. He's there. He's not taking notes. He's not signing anything off. And you can ask somebody what happened on a day in January 1991, 5 years, 10, 20 years, now 35 years later,

and some details are going to be clear and some are not. And what his testimony is going to be clear, the things he's being accused of he would never do and that falls in line with his entire experience as a police officer.

Thank you for your attention.

THE COURT: Thank you, Attorney Melley.

So, we'll just take another quick five-minute break while we reconfigure the lectern and get ready for plaintiff to call their first witness.

(Jury exited, 2:51)

(Recess, 2:51 p.m. to 3:03 p.m.)

THE COURT: Are we ready to proceed?

MR. BRUSTIN: Yes, Your Honor. Thank you.

MR. GIRARDE: Yes, Your Honor.

THE COURT: All right. We will get the jury.

(The jury entered at 3:06 p.m.)

THE COURT: You may be seated.

Members of the jury, before plaintiff calls his first witness, I need to read to you some stipulations of fact.

Plaintiff Stefon Morant and all defendants, through their attorneys, hereby stipulate and agree that the following facts are true:

1. Ricardo Turner and Lamont Fields were shot and killed on October 11, 1990, at approximately 4:34 a.m.

in Ricardo Turner's apartment at 634 Howard Avenue in New Haven, Connecticut.

2. The shooter used a total of five bullets in the Turner-Fields homicide.

3. Ricardo Turner was shot while standing up confronting his attacker and Lamont Fields was shot while he lay in bed asleep.

4. On April 15, 1991, Scott Lewis was arrested for the Turner-Fields homicide.

5. On February 28, 1992, Stefon Morant was arrested for the Turner-Fields homicide.

6. On June 8, 1994, Stefon Morant was convicted of felony murder related to the Turner-Fields homicide.

7. On May 10, 1995, Scott Lewis was convicted of murder for the Turner-Fields homicide.

8. From the time of his arrest on February 28, 1992, to his release on bond on April 27, 1992, Stefon Morant spent 59 days in jail.

9. From the time of his conviction on June 8, 1994, to his release from prison on June 17 2015, Stefon Morant spent 21 years and 9 days incarcerated for the Turner-Fields homicide.

10. Former NHPD Sergeant William McCoy was not involved in the Turner-Fields homicide investigation after December 19, 1990.

Plaintiff can call their first witness.

MR. BRUSTIN: Thank you, Your Honor. Plaintiff calls Defendant Michael Sweeney.

THE COURT: All right. And we'll proceed until about --

MR. BRUSTIN: I apologize, Your Honor. Before we do that, we wanted to introduce some exhibits. It will be fine for him to go up.

MS. CION: Yes. Your Honor, at this time we would like to -- plaintiff would like to move into evidence Exhibits 1, 2, 11, and 17, none of which have any objections logged, and Exhibit 35 where defendants have withdrawn their objection.

THE COURT: Any new objections from any defense counsel? Just raise your hand if you have one.

No hands have been raised.

MR. GERARDE: None.

MR. TALLBERG: No.

THE COURT: All of those exhibits are admitted as full exhibits, 1, 2, 11, 17, and 35. Thank you.

We will go until 3:55 so I have time to give the jurors their warning about communications before they leave.

(Exhibit Nos. 1, 2, 11, 17 and 35, received in evidence)

MR. BRUSTIN: Thank you, Your Honor.

THE COURT: Mr. Sweeney, please direct your attention to the courtroom deputy and raise your right hand.

MICHAEL SWEENEY

called as a witness, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please be seated. Please state your name and spell your last name.

THE WITNESS: My name is Michael Sweeney, S-W-E-E-N-E-Y.

THE CLERK: Please state the city and state you reside in.

THE WITNESS: Pardon me?

THE COURT: City and State of your residence.

THE WITNESS: I live in Madison, Connecticut.

**DIRECT EXAMINATION BY MR. BRUSTIN**

Q. (By Mr. Brustin) Good afternoon, Mr. Sweeney.

A. Good afternoon.

Q. Mr. Sweeney, before we start, let me just let you know what's in front of you so that you can have easy access to it. I've left you a copy of your deposition from this case which is Binder Number 1. And Binder Number 2 is

your testimony from the various proceedings, post-conviction proceedings for Mr. Morant and Mr. Lewis which you're well familiar with, correct?
A. Yes, I am.
Q. And then I also have a copy up there I believe of Exhibit 1, which is the police file in this case which I either may refer you to or I may even put it on the screen for you, if that's easier, okay?
A. Okay.
Q. Mr. Sweeney, let me start with some background that was referenced by your attorney in his opening.
A. Yes.
Q. You were employed by the NHPD for 30 years starting in 1968?
A. That's correct.
Q. You retired in 1998 as a shift commander?
A. Yes, I did.
Q. You were a lieutenant?
A. Yes, I was.
Q. You were a detective sergeant in the investigative services unit in 1990 and 1991?
A. Yes, I was.
Q. And that's the unit in the New Haven Police Department that investigate homicides, correct?
A. That's correct.

Q. That's the unit that employed Detective Raucci and Detective Maher, correct?
A. That's correct.
Q. And you made detective sergeant somewhere around 1985?
A. Yes, I did.
Q. And your responsibilities as a detective sergeant at that time were you were supervising the night shift which was 4 to 12; is that right?
A. That's correct.
Q. You have a BA in criminal justice and a master's degree in elementary education?
A. Yes, I do.
Q. You're also a registered nurse?
A. Yes, I am.
Q. You were in the Marine Corps. for four years?
A. Yes, I was.
THE COURT: Attorney Brustin, if I could ask you to just slow down a little bit.
MR. BRUSTIN: I'm sorry.
THE COURT: Thank you.
MR. BRUSTIN: You may have to ask me again, but I'll really try.
THE COURT: Okay.
Q. (By Mr. Brustin) In fact, before your time with the NHPD, you were a platoon sergeant in Vietnam?

A. Yes, I was.
Q. And you were -- 15 years you were a detective beginning in 1970?
A. Yes, I was.
Q. And as a detective sergeant assigned to the investigative services unit you were responsible for crimes including homicides, sexual assaults, and other violent crimes?
A. That's correct.
Q. The ISU unit in the NHPD is what would be referred to in other departments sometimes as the homicide unit, correct?
A. Yes, it is.
Q. That was the top detective division in the department?
A. Yes.
Q. And Sergeant Lawlor was also another sergeant at ISU before he became a lieutenant, correct?
A. Yes, he was.
Q. And both you and Lawlor ultimately became lieutenants?
A. Yes, we did.
Q. Your recollection is that Lawlor became a lieutenant in charge of the detective division at some point during the life of this case; fair to say?
A. That's correct.
Q. And you believe in -- you believe he made detective

in -- lieutenant in 1994?
A. We both made lieutenant at that time.
Q. Okay. And when you retired, the war -- you -- when you retired, you went to Bosnia?
A. Yes, I did.
Q. In 1998?
A. Yes, I did.
Q. And you were -- at the time they were looking for lieutenants who could run police officer districts over there, correct?
A. Yes, that's correct.
Q. And you were there from 1988 to 1999, correct?
A. I was there for one year, yes.
Q. All right. And when you came back, you went into nursing?
A. No. No. I was already a registered nurse. I went to nursing I believe 1991, 1990. 1991 I graduated from nursing school.
Q. I apologize. Not only that, you were going to nursing school while you were a sergeant, correct?
A. That's correct.
Q. And then when you came back from Bosnia, you were working as a registered nurse?
A. Yes, I was.
Q. And my understanding is you still are?

A. I had to retire in January of this last year. I had a cardiac arrest en route to work, so I retired on that day.
Q. Sorry to hear.
Are you okay, are you better now?
A. Yes, I am.
Q. Good.
All right. I want to show you and put into evidence, if there's no objection, Exhibit 23, which is a letter of recommendation that you received from Chief Ortiz. Okay?
A. Okay.
MR. BRUSTIN: Any objection?
MR. GERARDE: None.
MR. TALLBERG: No objection, Your Honor.
THE COURT: All right. Exhibit 23 is admitted as a full exhibit.
(Exhibit No. 23, received in evidence)
MR. BRUSTIN: We would ask it be shown to the jury.
Make it a little bit bigger, James. Great.
Q. (By Mr. Brustin) And this is a letter of recommendation that you received from then Chief of Police Francisco Ortiz, correct?
A. Yes, it is.
Q. And is this letter, which describes your service, consistent with what you understood your standing to be in

the department at the time you left?
A. Yes.
Q. Consistent with how you understood you were being viewed by the chain of command in the police department?
A. Yes, it is.
Q. And would it be fair to say that during the entire time you served in the NHPD, nobody, nobody above you in the chain of command ever said anything to you contrary to what's in this letter?
A. That's correct.
Q. Okay. So in other words, your understanding was that this letter which was written by the chief was consistent with how you understood you were being viewed by the chain of command all the way through 2003?
A. Yes, it is.
Q. Okay. Now --
MR. BRUSTIN: Thank you, James.
Q. (By Mr. Brustin) I want to get right into your involvement in the Turner-Fields homicide investigation, okay?
A. Okay.
Q. Now, I want to show you, first of all, in Exhibit 1 -- and we can put this on the screen -- Page 340. You're familiar with this document, correct?
A. Yes, sir, I am.

Q. All right. Now, this is a transcript of the taped statement that was taken of Ovil Ruiz by Vinny Raucci in the early morning hours of January 15th, correct?
A. Yes, it is.
Q. And you participated in a number of interviews with Vincent Raucci and Ovil Ruiz prior to the taking of this statement, correct?
A. Yes, I did.
Q. This is -- this is the culmination of those interviews; fair to say?
A. No, it's not.
Q. Well, this is what happened after those interviews?
A. That's correct.
Q. And you were not present for this taped statement?
A. No, sir, I was not.
Q. And the jury's going to hear more about this later, but Detective Pettola was present for that taped statement, correct?
A. Yes, he was.
Q. But Detective Pettola was not present for any of the interviews that you were involved in with Vincent Raucci and Ovil Ruiz earlier that evening, correct?
A. No, sir, he was not.
Q. In other words, you agree with me?
A. Yes, I agree.

Q. Okay. Now, you've testified numerous times over the years about the interviews that you participated in that night, correct?
A. That's correct, sir.
Q. You've testified in connection with Mr. Morant's efforts to prove his innocence in a sworn depo -- withdrawn.
First, you testified extensively in this civil rights case, correct?
A. Yes, it is correct.
Q. You also testified in 1999 at a hearing where Mr. Morant was seeking a new trial?
A. That's correct, sir.
Q. You also testified in 2013 in a habeas proceeding for Scott Lewis where he was attempting to prove his innocence?
A. Yes, sir, I did.
Q. And you testified in other civil proceedings about the matters in this case?
A. Yes, sir, I did.
Q. And you've confirmed each time, including at your dep in this case, that your testimony in 1999, your testimony in 2013, your testimony in your deposition in this case was true and accurate to the best of your ability?
A. Yes, I did.

Q. Not necessarily perfect recall, but you've always done your very best to tell the truth about what you saw and heard with Ovil Ruiz and Vincent Raucci that night, correct?
A. Yes, sir, it is.
Q. Okay. Now, I'm going to be asking you questions about your memory of those events today, but I'm also going to be asking you questions and showing you previous testimony so that the jury can see your reporting of these events in context and over time, okay?
A. That's fine.
Q. All right. Now, you recall -- and I'm only going to -- I've tried very hard to have my questions track your testimony, but if necessary we can always go to your testimony, okay?
A. Yes, sir.
Q. Actually, before I do that, I assume that you've had an opportunity in preparation for today to review all of your prior testimony?
A. No, sir, I have not.
Q. Have you reviewed any of it?
A. Yes, I have. Yes, sir.
Q. Okay. All right. We'll take it a step at a time.
A. Okay.
Q. So first of all, you recall meeting with Ovil Ruiz at

the station the night of January 13th, and I think I gave the wrong dates and I apologize. The first --
A. Yes --
Q. The first was the night of January 13th into the 14th?
A. Exactly, sir.
Q. But you recall even today that meeting, correct?
A. That's correct.
Q. All right. And you were working that day the 4 to 12 shift?
A. Yes, I was.
Q. And you had looked -- before speaking to Mr. Ruiz, you had looked at the file to see if anything new had been written up in the previous week?
A. No, I did not.
Q. Are you sure?
A. I am positive.
Q. Okay. Well, let's take a look at your deposition. You know what? Let's take it a step -- let's move on.
So, first of all, you interviewed Ovil Ruiz in an interview room at the detective division by yourself?
A. Yes, sir, I did.
Q. And you spoke to Ovil Ruiz about information he might possess concerning the Turner-Fields homicide, correct?
A. Yes, it is.
Q. In fact, you were told, it was reported to you that he

might have information about the Turner-Fields homicide; that's why you were interviewing him, correct?
A. That's right.
Q. By Vincent Raucci, correct?
A. No, I never spoke to Mr. Raucci about, before I --
Q. Not before?
A. Not before.
Q. Okay. Okay. In any case, when you went to speak to him, Vincent Raucci was not there when you began questioning Mr. Ruiz, correct?
A. Yes, it is correct.
Q. And to your knowledge, at that time, you understood you were the first person questioning him about that homicide, correct?
A. To my -- yes, to my knowledge, I was the first one that day.
Q. Right. Back then that's what you thought?
A. Yes.
Q. All right. And you understood at the time that Mr. Ruiz was in custody for a separate serious assault?
A. Yes.
Q. And you spent approximately 30 minutes alone with Mr. Ruiz?
A. A period of time. I said 30 minutes, it could have been an hour, but it was a good amount of time.

Q. Okay. And at the time you were a very experienced detective, correct?
A. Yes, that's correct.
Q. You had done thousands of interviews?
A. Thousands, yes, sir.
Q. You were very good at determining whether a witness had reliable information?
A. I was very good, yes, sir.
Q. And during the initial interview with Mr. Ruiz, he said to you he knew absolutely nothing about the Turner-Fields homicide, correct?
A. Yes, it is correct.
Q. You asked many questions so he would be comfortable to get -- to give you the most reliable information possible, correct?
A. That's correct.
Q. And over and over he denied any knowledge whatsoever of the crime, correct?
A. That's correct.
Q. And based on your experience as a detective, you concluded that Mr. Ruiz knew nothing about the Turner-Fields homicide, you can never know for sure but that was your assessment at the time?
A. Yes, it was.
Q. But I think, as you told us in your deposition,

Mr. Ruiz made it clear to you in 12 different ways he had no idea about anything related to that crime, correct?
A. I don't know about 12 different ways, but in many ways, yeah.
Q. Okay. Then at some point during that 30 minutes to an hour interview, Vincent Raucci, Mr. Raucci, then Detective Raucci knocked on the door, right?
A. Um, yes, he did. I don't know if it was an hour, but I was in the room and he knocks on the door. I knew he was there. I knew he was en route to see me or see him.
Q. Okay. And what you did at that time, as was your duty, is you told Mr. Raucci that you had interviewed the witness and he seemed to know nothing, correct?
A. Yes, that's correct.
Q. And by the way, at that point you were Vincent Raucci's direct supervisor? Not in the case, but in general?
A. Yes, I was.
Q. Okay. He was subordinate to you?
A. Yes, he was.
Q. And Mr. Raucci said to you that he believed he did have information, that he did know something, correct?
A. Basically, yes.
Q. And at that time, as you've already told us, you had no idea whether or not he had any -- withdrawn.

At that time you had no reason to believe that Vincent Raucci had any contact with Ovil Ruiz about the homicide prior to him coming into the room; fair to say?
A. That's fair to say.
Q. And at that time you had no idea that Vincent Raucci had driven with Ovil Ruiz earlier that night to the Clay Street address where Mr. Lewis was allegedly selling cocaine, correct?
A. That's correct.
Q. Okay. Back to the interviews. At that time you didn't ask Mr. Raucci what the source of his information was as to why he believed Ovil Ruiz knew something about the murders, correct?
A. That's correct.
Q. Nevertheless, you allowed Mr. Raucci with you to go back in the room and reinterview Mr. Ruiz, correct?
A. Yes, I did.
Q. Okay. And when you did that, initially Mr. Ruiz said to both you and Mr. Raucci he knew absolutely nothing about these crimes, correct?
A. That's correct.
Q. The same thing he told you before?
A. That's correct.
Q. That he was not there, he had no knowledge what happened, correct?

A. Basically, yes.
Q. And then Detective Raucci in his questioning started to give Mr. Ruiz facts about the case?
A. That's correct.
Q. Mr. Raucci would ask a question. And Mr. Ruiz would say, What's the answer? I don't know. And Mr. Raucci would give it to him. Correct?
A. Basically.
Q. And Mr. Raucci during this interview, in front of you, also told Ovil Ruiz that he could go home if he gave information and that if Ovil Ruiz didn't give information he would take the whole weight for the crime, correct?
A. Basically in a conversation, he did.
Q. Well, that's not just a conversation; that's an illegal threat, right?
A. Yes.
Q. Mr. Ruiz said he had no knowledge, again, whatsoever. Vincent Raucci said there were two other people that were telling on him and if he didn't talk, again, he was going to take the full weight, correct?
A. I don't remember two men saying that, but he was definitely not acting properly. I don't have a recall of two men.
Q. Okay, that's very fair. So I want to show you -- and I should ask you and I don't want to ask any more than I

need to.
A. Okay.
Q. Did your health -- has your recent health episode, has that in any way affected your memory?
A. It has, but I'm getting better. Initially, the first two months it was affecting me, but I'm almost back to normal.
Q. Okay. If at any time you'd like to refer to your testimony, I'm happy to do that. And I'm going to do that for this.
A. Thank you.
Q. Let's take a look, if you would --
A. Yup.
Q. -- at Binder Number 2. And you tell me, Mr. Sweeney, would it be easier for you to use the binders or would you like me to put it on the screen for you?
A. The screen would be easier for me if you can do it.
Q. Let's do that. So let's go to Tab 3, Page 24 -- I'm sorry, Tab 3, Page 23. And I will represent to you, Mr. Sweeney, that this is your testimony from Mr. Lewis' habeas proceeding from 2013. Okay?
A. Okay.
Q. You recall reviewing this in your deposition as well?
A. Yes, I do.
Q. Okay. And if you take a look beginning at line 16.

MR. BRUSTIN: If we could go up a little bit, James.

THE WITNESS: Okay, I see it.

MR. BRUSTIN: No, this is the wrong page. I apologize.

Can you make it a little smaller? I apologize. No, it's actually 23 to 24, that's what I'm missing.

Q. (By Mr. Brustin) Okay. There we go. If you take a look on Page 24 it says, And what was Detective Raucci's response? Answer: He told me he was lying, that he knew he was involved --

THE COURT: Attorney Brustin, are you just refreshing his recollection?

MR. BRUSTIN: He's already told -- I'm actually doing past recollection recorded.

THE COURT: Okay.

Q. (By Mr. Brustin) Do you recall giving this testimony?

A. Yes, I do.

Q. And is this accurate?

A. Yes, it is.

Q. Okay. And Mr. Raucci continued interviewing Ovil Ruiz in your presence for approximately half an hour?

A. Well, yes, yes. I was there for at least a half hour with him, but it wasn't continuous. I stopped him a couple times.

Q. Well, that's what I'm asking you. That's what I'm getting to you.
    You stopped him?
A. Yes, I did.
Q. Because you didn't like what you were seeing?
A. Exactly.
Q. You took him out in the hall?
A. Yes, I did.
Q. You told him to knock it off, right?
A. Yes, I did.
Q. You told him to knock it off, correct?
A. That's correct.
Q. And you told him specifically that he was simply giving details of the case to Ruiz, correct?
A. Yes, I did.
Q. In fact, you said to him you're just detailing the whole case for him, that's not the way to do it. Correct?
A. Yes, it is.
Q. And Mr. Raucci told you at that time he was going -- and in addition, you also told him -- in addition to not feeding him information, you also told him it was not appropriate to threaten him, correct?
A. Yes.
Q. Both of those things are illegal for police detectives to do, correct?

A. It's improper.

Q. It's completely improper and it violates the Constitution, correct?

A. That's correct. 100 percent correct.

Q. That's what you observed happening between Raucci and Ovil Ruiz in front of your eyes, correct?

A. Yes.

Q. And so you brought him in the hall and you told him this is not the way to do it, you need to stop. You need to stop threatening him and you need to stop giving him information. Correct?

A. Yes, it is correct.

Q. And you additionally told him this person appears to know nothing, he is simply parroting back information that you are providing to him?

A. Yes, I did.

Q. And it was your view at that time that, based on what Raucci was saying to Ruiz in front of you, Mr. Ruiz was willing to say anything to get out of there?

A. Yes, he was.

Q. Okay. Now, I want to take a step back now because there's some more interviews. So that's the first two interactions with Ruiz with you. But I want to take a step back and I want to give the jury some context about where this is all taking place.

So the homicide division, or ISU, that was on the third floor, correct?
A. That's right.
Q. And it's the floor of the main police station on Union Avenue in New Haven, correct?
A. That's correct.
Q. And this wasn't the New York City Police Department, this is New Haven. There's approximately 500 officers total, right?
A. Yes.
Q. It's a relatively small municipal police department?
A. Yes.
Q. Small enough where you probably know everybody at least by face?
A. Yes.
Q. And at the main station were where you were interviewing Raucci -- you were interviewing Ruiz with Raucci, the police chief, his office is just down the hall, right?
A. Yes, it is.
Q. And so when you brought Raucci out into the hall, you're in the middle of the station, the ISU unit, just down the hall from where the police chief sits, correct?
A. Yes.
Q. Okay. Let's go back to the interview. So you went

back in. After you took him out in the hall to tell him to stop threatening and to stop feeding information, you went back in with Mr. Raucci and at that time, again, after you had told him to stop, you heard Vincent Raucci tell Ovil Ruiz that he knew he was the driver of the car, that it was best to tell them what happened with the other two, and if he did, he would be -- he wouldn't have to testify and he could go home, correct?
A. That is correct.
Q. And you've testified to that fact consistently under oath in 1999, in 2013, and in your deposition, correct?
A. That's correct.
Q. And in addition to telling him that he needed to say he was the driver, you also heard Vincent Raucci providing details to Ovil Ruiz about what allegedly happened, correct?
A. That's correct.
Q. And those details included where the crime occurred?
A. Yes.
Q. A description of the building where the crime occurred?
A. Yes.
Q. After Mr. Ruiz claimed he didn't know what kind of car -- withdrawn.
Vincent Raucci also told him about going to Clay

Street and allegedly getting guns from there to use in the crime, correct?
A. That's correct.
Q. In other words, those words first came from Raucci's mouth, never from Ruiz, correct?
A. Never. That's correct.
Q. And what would happen would be Raucci would tell him what to say, You went to Clay Street and you got the guns, and Ruiz would say, Okay, yes, that's what happened. In substance?
A. Basically, yes.
Q. And in regard to being accused of being the driver, another thing you recalled, at least back in 1999, was that Mr. Ruiz said not only was he not the driver, he didn't even drive very well and couldn't have been the driver, correct?
A. That's correct.
Q. All right. So after more minutes of more threats from Raucci and more feeding information about the crime, at that point it's still crystal clear to you that Mr. Ruiz has not said anything suggesting he knows anything about the crime, correct?
A. That's correct.
Q. Then you take Mr. Raucci out into the hall again?
A. That's correct.

Q. You told him again, you need to stop feeding information to this witness because he knows nothing, correct?
A. That's correct.
Q. And more specifically, you said to him, You are telling him the whole case. He has no information on his own. Correct?
A. Yes, that's correct.
Q. And you further told Mr. Raucci that, based on your assessment from your, by that point, more than an hour of interviewing Mr. Ruiz, it appeared that he knew absolutely nothing but would say whatever Raucci wanted him to say because he thought he was going home, correct?
A. That's absolutely correct.
Q. So you went back in the room a second time or maybe it's a third time now. It's the second time with Raucci. And this time -- I apologize. You went back a second time to interview him alone, correct?
A. I did, correct.
Q. Because you wanted to confirm your belief that in fact Ruiz didn't know anything and was just reacting to Raucci's threats and feeding, correct?
A. That's correct, sir.
Q. And when you went back in a second time Mr. Ruiz confirmed all he wanted to do was go home. Raucci said he

could go home, and that's why he was repeating what Raucci told him to say?
A. That's correct. We were alone in the room at that time.
Q. And again, you wanted to be certain of that fact and you were careful to question him in a way that would make him comfortable to tell you the truth; fair to say?
A. Fair to say.
Q. And, again, you confirmed Mr. Ruiz knew nothing, just parroting back information to Raucci, correct?
A. That's correct.
Q. Okay. Now, that's the point in the evening where things started heating up and you left, correct? Let me be more clear. I will withdraw the question.
A. Yeah. Okay.
Q. You had -- your sole responsibility that night wasn't babysitting Raucci, right?
A. That's correct.
Q. You had other responsibilities?
A. Yes, I did.
Q. And you left?
A. It wasn't an abrupt, no. I just didn't leave, no. I met another detective.
Q. You had other things that you had to do?
A. Yes, but I met another detective and I told him to --

Q. We're not there yet.
A. Oh, you're not there yet, okay.
Q. We're not there yet.
A. Yes, they continually called me when I was in the room. I went in and out a couple times.
Q. Okay. I'm still not at the point where you called in Pettola.
A. Okay.
Q. All right. So initially before you called Pettola -- and I could show you your testimony if I need to, but hopefully you recall -- you got busy temporarily with other things and you allowed Raucci to go back in and interview him alone, correct?
A. Yes, I did.
Q. Okay. And you did that despite all the things that you had seen Raucci do before that?
Let me ask you a clearer question.
A. Okay.
Q. After determining in your own mind that Raucci -- that Ruiz had no real information and was just parroting back information because of the threats, you still allowed Mr. Raucci to go back in the room and question him alone, correct?
A. Correct. I allowed him to go in one time. I pulled him out and then he went -- he went in a second time, he

started pulling the same stuff.
Q. Okay.
A. There was a third time, basically.
Q. That's what I'm asking you.
A. Okay.
Q. That third time. And that third he went in there, some point after Raucci came back, Raucci came out, and he said, Guess what? Mr. Ruiz wants to give the whole case up, correct?
A. I don't understand that. I don't recall him saying that. I took him out of there twice and --
Q. So let's take a look at your testimony.
A. Okay. Okay.
MR. RYAN: Excuse me. He's interrupting the witnesses answer, Your Honor.
MR. BRUSTIN: Oh, I don't mean to.
Q. (By Mr. Brustin) You go ahead.
A. What was the question?
Q. So after you had taken him out the second time --
A. Yes.
Q. -- and before you brought Pettola back --
A. Yes.
Q. -- you let Raucci go back in the room. And after he went in the room, he came out and said he wants to confess to being the driver, correct?

A. That's not the way I recall it.
Q. Okay.
A. I remember two times and then the third time I went to get the, Detective Pettola. And then he -- yeah, he came out, I guess that was the third time and said that, okay, he just wants to say that -- I think he wanted to say that he heard them talking about it or something like that. So I -- Joseph Pettola was standing there, and I told him that I was leaving and for Detective Pettola, don't leave the room, go in with Raucci and don't let him, quote, do his usual bullshit.
Q. Okay.
A. And he just wanted -- he told me -- when I left that night, Raucci told me that he was just going to talk to him further. They may have been talking about it. He may have overheard him talking. And that was my only -- when I left that night, that's the only thing I told him to do, that he can interview him further on what he heard, not what he -- the kid was in the car and all that, because I didn't believe that.
Q. Okay. And I think we skipped a step.
A. Okay.
Q. So what I'm going to do is I'm going to show you your testimony about what happened just before that from 1999. Would you agree your testimony about this would have been

much better in 1999?

A. Absolutely.

Q. Okay. So let's go to your testimony from 1999.

A. Okay.

Q. And I want to start on from the 1995 Mr. Morant's petition for a new trial at Page 17. We will put it on the screen for you.

MR. TALLBERG: 99 or 95?

MR. BRUSTIN: 99. Page 17, please.

Q. (By Mr. Brustin) Okay. Now, do you see where it says about four lines down, I was either called out?

A. Yes.

Q. Okay. And this is your testimony, correct?

A. That's correct.

Q. And I'm going to read it into the record.

"I was either called out, whatever, but I had gone to do something else, and Detective Raucci was in the room for a period of time. He come out and he put his hands up. He said that this person wants to give the whole case up."

"Question: What did you do at that point?

"Answer: So I told him let's go in and listen to it. So he and I went in to listen to the case and the person Mr. Ruiz -- you want the whole what he said? Mr. Ruiz said that he had been driving the car that night,

it was a BMW, that he had driven to Howard Avenue. Well, first they went to Clay Street. They obtained two guns in a gym bag, put it in the trunk of the car, and then went to Howard Avenue where this Stefon Morant and his partner took the bag and went up into the apartment. He heard shots. They came back to the car and drove off and they want back to Fair Haven."

So, Do you recall now -- I'll ask it this way. This is your testimony under oath in 1999, correct?

A. That's correct.

Q. And it was truthful testimony, correct?

A. Of course it was, yes.

Q. Do you recall that happening today or is that something you've forgotten?

A. No, I recall vividly. I misunderstood your question.

Q. Okay. That's fine.

So before Pettola came in, Raucci went back in --

A. That's correct.

Q. -- and somehow, because you weren't there, got Ruiz to admit to being the driver as we just saw in that testimony, correct?

A. That's correct.

Q. All right. And then you went back in again, you questioned Mr. Ruiz, you told him in no uncertain terms that regardless of what Raucci said he was not going to

being released that night, correct?
A. That's 100 percent correct, yes. That's correct.
Q. Okay. And when you said that, he told you again that all of that stuff about being the driver and going to Clay Street was not true, he just said it so he could go home, it was only information provided by Raucci, correct?
A. That's correct.
Q. He made clear that none of that information was actually in his knowledge, he was simply repeating what Raucci told him to say because Raucci told him to go home, correct?
A. Yes, he did.
Q. And when you told him no matter what he said he wasn't going home, he again said he knew nothing, and you believed it completely, correct?
A. Yes, that is correct.
Q. And, by the way, every piece of information that he repeated was information that you heard Raucci feed to him directly, correct?
A. That is correct.
Q. Again, you took Raucci in the hall, you told him he is absolutely not taking that statement, correct?
A. Yes, I did. Yes, that's correct.
Q. You got busy again, you allowed him to continue talking to Ruiz, correct?

A. Correct.
Q. And then Raucci came out and he told you, oh, now Ruiz is not saying he's the driver, he is simply saying that he overheard some admissions, correct?
A. Yes, that is correct.
Q. All right. Now, in the last few minutes that we have here today, fair to say at that point in time you had absolutely no reason in the world to believe a word of what Raucci was telling you about what happened in that interview room, correct?
A. That's correct.
Q. In fact, by that point in time you had repeatedly told your subordinate, Vincent Raucci, that he was not to threaten, he was not to feed, and he did it over and over in front of you?
A. I didn't allow it. He was doing it, and I stopped him from doing it.
Q. Okay. Fair enough.
A. More than once.
Q. And maybe that was the wrong way of asking it.
A. Okay.
Q. You observed him threaten and coerce and feed, you told him to stop, and he did it over and over, correct?
A. Yes, he did.
Q. All right. And so, when he came out and he told you

that Ruiz had made a different statement, even though you weren't in the room, you had absolutely no reason to believe that that interview was any different than the last, correct?
A. That's correct.
Q. And in fact, you would expect that if Raucci was willing to do that in front of you, it could have been far worse what was happening in the room when you weren't there, right?
A. That's correct.
Q. And at that point -- and I understand you had lots of responsibilities, but at that point you did not take the additional step of questioning Ruiz again, it was the end of your shift, and instead what you did is you called in Detective Pettola -- withdrawn.
You didn't go back in and ask Ruiz again whether or not that statement, the new statement was true. Instead, you allowed Detective Raucci to take a taped statement with that new version, correct?
A. That's not correct.
Q. Well, you called in Pettola, right?
A. I called in Pettola. Then he come out of the room and he said the other conversations were -- I wouldn't let him continue with those. And he said now he's talking about he heard them overhearing. So I told him, okay, well,

just stay here. And then I said -- Detective Pettola had just come in to work, and I told him to go in and sit with him and don't let him pull this stuff, don't leave the room, he wants to interview him further. That's basically, if you understand me.

Q. Okay. So I do understand you exactly and I agree with you completely. So what happened was, he comes out and he told you he's giving a new statement. You brought in Detective Pettola who had no involvement whatsoever in what had happened in those many interviews before, correct?

A. Many what, sir?

Q. Right? Detective Pettola was not involved in any --

A. He was not involved at all.

Q. Okay. You brought him in to sit with Raucci when he took a taped statement of Mr. Ruiz, correct?

A. That's not correct. The taped statement wasn't talked about. He was going to interview him further.

Q. Okay.

A. Because it was not my case and maybe this -- I investigated hundreds of homicides and sometimes we pick up bits and pieces of information when we are talking to suspects or concerned people, so I didn't want to just say stop because it wasn't my case. I said, well, interview him further.

Q. Okay.
A. But I told Joe that, what had occurred. And he said that he would obey my order to go in and don't leave him.
Q. Okay. And Detective Pettola has testified and will testify here --
A. Yes, sir.
Q. -- that the only involvement that he had with Raucci and Ovil Ruiz was when Mr. Raucci took that taped statement. Do you have any reason to dispute that?
A. Yes, I would.
Q. Okay. Well, did you tell Detective Pettola what had happened with Raucci beforehand?
A. In a way, I did, yeah.
Q. In what way? Because you've never said that before.
A. My words, as I recall.
Q. Okay.
A. I told him Vinny's doing his usual bullshit, I stopped him.
Q. Okay.
A. Okay.
Q. Fair enough. Let's do this. You understand --
THE COURT: Well, actually, you can finish up one question, but then we're going to end for the day.
MR. BRUSTIN: One question.
Q. (By Mr. Brustin) You understand that soon after you

left Detective Raucci took a taped statement of Ovil Ruiz?
A. When I come back the next day, I did, yes.
Q. You understood the next day that he had done that?
A. No. When I come back to work. I went home about one o'clock in the morning, somewhere around there.
Q. But my question is you understood -- you understand today that after you left, Mr. Raucci took in fact a taped statement from Ovil Ruiz which is the taped statement you just saw today, correct?
A. Yes, sir, I do.

MR. BRUSTIN: Okay. So we'll leave off there and we'll continue with that tomorrow.

THE COURT: All right. Thank you.

Members of the jury, I've been previewing for you that I would give you instructions on communications and your conduct during the course of this trial, so let me do so now before you're excused for the day.

Because you must base your verdict only on the evidence received in this case and on my instructions, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or until I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do

with it. This includes discussing the case in person, in writing, by phone, tablet, or computer, or any other electronic means, via email, text messaging, or any internet application including, but not limited to, Facebook, YouTube, Twitter/X, Instagram, LinkedIn, Snapchat, TikTok, or any other form of social media.

This also applies to communicating with your fellow jurors until I give you the case for deliberation. And it applies to communicating with everyone else, including your family members, your family, and your employer, though you may notify your family and your employer that you have been seated as a juror in this case and how long you expect the trial to last. It also applies to communicating with the media.

If you are asked or approached in any way about your jury service or anything to do with this case, you must respond that you have been ordered not to discuss the matter, and you must report the contact to the Court.

Because you will receive in this courtroom all the evidence and legal instruction that you may properly consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research such as consulting dictionaries, maps, searching the internet, or using other reference materials. And do not make any

investigation or in any other way try to learn about the case on your own. Do not try to visit or view any place that is discussed. And do not use the internet or any other resource to search for or view any place discussed during the trial.

Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses or the lawyers, until you have been excused as jurors.

If you happen to read or hear anything touching on this case in regular or social media, turn away, and report it to me as soon as possible.

These rules protect each parties right to have this case decided only on the evidence that is presented here in court.

All of the parties are entitled to a fair trial by an impartial jury. And if you were to decide the case based on information not presented in court, you would have denied the parties a fair trial.

I hope that you all have a pleasant evening and we'll see you tomorrow for the second day of trial.

Thank you. You are excused for the day.

(The jury exited at 4:00 p.m.)

THE COURT: You may be seated.

Before you step down, sir, now that you're in the

middle of your testimony, you are not to consult with your attorneys about the nature of your testimony, given that your testimony has begun. You can talk to them about anything else, but not the subject matter of your testimony.

THE WITNESS: Yes, ma'am.

THE COURT: You may step down now.

THE WITNESS: Thank you.

(The witness stepped down.)

THE COURT: All right. I want to preview for the parties one issue that I learned about at the break, which is that Juror Number 9 in the box, who was Juror Number 64 previously, apparently called her employer which is Monstream Law Group. This is the lady who works for a law firm. And her employer told her she only is paid for five days of jury service and otherwise she would need to use vacation time to cover the rest of her service.

I don't know why she didn't raise this at any point during our lengthy jury selection, but we have asked her to hang back after the other jurors leave so that we can call her into court and get this on the record because she just conveyed it informally to the courtroom deputy.

So my proposal is have her come in to get more information, and then to excuse her for the day and talk to counsel about how we should proceed. And I'll tell her

to report tomorrow. And then, you know, we can take it from there. So, hopefully she will be arriving at the back in just a moment.

(Pause)

THE COURT: All right.

MR. GERARDE: Judge, just while we are waiting, witnesses should be sequestered, I thought that was our agreement, and we are making exceptions, at least one exception and maybe others. I don't see any witnesses here, but I'm saying we didn't -- you didn't issue that order, so can we have that on the record?

THE COURT: Sure. I see Juror 9 there, so just remind me to take this up as soon as we finish with her.

Juror Number 9, could you please come in.

You can sit in the first seat of the jury box and we will hand you a microphone.

Thank you for staying. I understand that you had raised a concern with Ms. Denault about continued service in this matter. Can you tell me what your concern is?

THE JUROR: I talked to my boss. And they said that they only cover five days of jury duty and after that it won't be paid, I could use some vacation time and some sick time. I only have a couple of weeks of that. And they also said that I couldn't make up the time because I'm only allowed to work -- if I'm in the court for eight

hours, I can't work after that, more than that.

THE COURT: All right. Was there reason you didn't bring this to our attention earlier?

THE JUROR: I didn't know about it. I just found out about it at lunch time.

THE COURT: And you work for Monstream Law Group; is that correct?

THE JUROR: Yes.

THE COURT: Who is the managing partner at --

THE JUROR: Dominick Statile, Senior Partner.

THE COURT: Can you just wait until I finish my questions, please? What's the name of the managing partner there?

THE JUROR: Dominick Statile is the senior partner.

THE COURT: Is that the person you have been corresponding with?

THE JUROR: Yes.

THE COURT: Okay. I don't know that I will proceed in this way, but I want to ask if you feel comfortable with my contacting him about the fact that you've been seated and how long we expect the trial to last, just to gather more information about the situation. Would you feel comfortable with that?

THE JUROR: Yes.

THE COURT: Okay. Is there anything else that you think that the parties and I should know about this situation?

THE JUROR: No.

THE COURT: All right. So I'm going to have you report back tomorrow as scheduled, and we'll be able to share more information once we decide how to proceed.

THE JUROR: Okay.

THE COURT: Thank you very much. You're excused for the day.

(The juror exited.)

THE COURT: You may be seated.

So my inclination is I could contact this law partner and tell him the situation and that the juror only learned about this now and just see what his reaction is. I can't pressure anybody into anything, but I would hope that a law firm, of all places, would recognize the importance of jury service and would understand that once a juror is seated, it becomes very disruptive to the trial to lose a juror.

Let me hear the parties' views on this.

MR. BRUSTIN: That makes sense. And the other thing we might think about is treating her like an alternate juror and, you know, if --

THE COURT: There's no provision for alternates

in civil cases. So tell me what you mean.

MR. BRUSTIN: I just mean in a sense of if, after three weeks we still have 10 jurors, it's not a problem. If we lose more jurors, it becomes more of a problem. So if she at least stays for a couple of weeks. And if we're in a problem where we're at 6 jurors, she might have to stay the whole time. But, you know, we could at least -- it doesn't seem like we should be excusing her now.

THE COURT: All right. Defense counsel?

MR. GERARDE: I'll second that. I think it's outrageous for a law firm, of all people, to say that we're not going to pay our people for jury duty. And I think if Your Honor calls -- you know what your limits are, but I think you should strongly suggest that the Court would appreciate if she was not jeopardized because we have a lot invested.

THE COURT: I think that would be well within my limits to say.

Any other defense counsel want to weigh in on this question?

MR. RYAN: No, I agree, Your Honor.

MR. TALLBERG: No, I echo that completely, Judge.

THE COURT: All right. Attorney Melley?

MR. MELLEY: I'm debating. I mean, Monstream, I haven't dealt with them in a hundred years. I remember

Bob Monstream. Small office, all they do is comp. They have no understanding of our world at all. It's a different animal. And they're going to say the statute says five days, that's what we do, but good luck.

THE COURT: The other option is I could ask him to come and, you know, do this all on the record. Would the parties prefer to do it that way?

MR. BRUSTIN: I have more confidence that a call from you may result in a different outcome. I think, you know -- I think that's a good first step.

THE COURT: Defense counsel agrees?

MR. RYAN: Yes, Your Honor.

MR. TALLBERG: You always have Plan B, if necessary.

THE COURT: Good to have a backup plan. I will make that call this afternoon and see what headway I am able to make, and we'll have her tomorrow at the very least.

Okay. Issues that I need to take up today before we break?

MS. HOFFMAN: One question that was raised during Mr. Sweeney's testimony is I think there was some question as to what was or was not being displayed to the jury when we had exhibits. So we just --

MS. PARAS: My understanding from my colleague is

that exhibits were displayed in the gallery but weren't necessarily displayed on the jurors' screens, from what we could tell. So we just wanted to confirm.

THE COURT: So my general practice is that once lawyers are done questioning a witness about a document, it should come off the screen. So there was a point at which the transcript of Mr. Ruiz's statement was up for quite some time and there were no further questions about it, so I directed the courtroom deputy via Teams to just turn off the jurors screens. That may be what you're talking about.

MS. PARAS: Most likely. Thank you, Your Honor, for clarifying.

THE COURT: While the testimony from the deposition was being read, the jurors' screens were off because that has not been admitted into evidence. And the rule I think says it can be read and it can be offered by an adverse party, but it hadn't been offered yet. So the jury did not see, for instance, the red scrolling that was going on while it was being read.

MR. BRUSTIN: Thank you, Your Honor.

THE COURT: Does that clarify things?

MR. BRUSTIN: It does. And I will be more precise in how I do it.

THE COURT: No problem.

And then the issue of witness sequestration.

MR. GERARDE: Right. And then, just for future reference for us, so if we want to impeach someone with something they said at a sworn deposition, we can call that up and make it clear, Your Honor, that the jury shouldn't see it, but the witness should?

THE COURT: Yes.

MR. GERARDE: Is that what was happening when we got into what they called past recollection recorded?

THE COURT: That is what was happening at that time.

When you pull it up on your screen, it usually will say -- at least on mine, it says "jury is overridden." That's what it's saying right now, "jury and gallery are overridden."

MR. GERARDE: Very well.

THE COURT: So that will be a signal to you that the jury is not seeing it. The jury -- that's what it's saying right now, "Jury and gallery are overridden."

MR. GERARDE: Could we hear again about the witness order?

THE COURT: Sure. I want to make sure I don't forget your point about sequestration.

MR. GERARDE: Okay.

THE COURT: So I think where we had settled on

this was that Ms. Morant would be an exception to the general witness sequestration order. Otherwise, no other witnesses should be sitting in on testimony until after they testify.

MR. BRUSTIN: That was the agreement.

MR. GERARDE: That's fine.

THE COURT: And that's adopted as an order of the Court.

Okay. So then the next question was how the witnesses are going to proceed.

MR. GIRARDE: Four witnesses that are possible, I'm wondering what the order, like, tomorrow what the plan is?

MR. BRUSTIN: We gave you our witness order. Our witness order is what we said. The only issue is, with counsel's permission, which we appreciate, they are going to let us call our expert, Bruce Koenig, out of order. So sometime tomorrow we will be calling Bruce Koenig. Other than that, we're staying in the same order.

THE COURT: And will you be interrupting Mr. Sweeney's testimony or finishing with Mr. Sweeney and then --

MR. BRUSTIN: It depends how far it goes.

THE COURT: Okay.

MR. BRUSTIN: With the Court's permission, but

counsel has agreed to let us do it whenever it's convenient.

THE COURT: All right. I appreciate that.

MR. TALLBERG: So we have a rough idea of the lineup for the next two days, do we find out this evening about Monday?

THE COURT: Today is Wednesday. I think I said three days. Let's do that as three business days. So by tomorrow -- yes, it should be by tonight. Three business days would be tonight.

MR. BRUSTIN: That's fine.

THE COURT: So if you could let opposing counsel know your plan for next week in at least rough order.

MR. BRUSTIN: We have one additional issue, Your Honor. So we've been trying to negotiate and haven't been able to. We want the actual original homicide file in court so that we can show it to witnesses. We actually think how it actually looks is relevant. And we haven't been able to agree on that. So we would ask the Court to -- we're asking for the Court to direct that they bring the original homicide file here.

THE COURT: And what is it about the file's actual appearance that is different from the copies?

MR. BRUSTIN: For example, one of the issues with Defendant Raucci is that he claims he had no idea where

the file was. So I want to actually show him what the file looks like, how big it is. Something like that. Same with -- and with Detective Maher, he conducted lots of investigation into Mr. Cardwell, I'd like to show how big the file is, what it actually looked like. I think there's a benefit to the jury actually seeing what the original file looked like.

And in addition to that, we also wanted to actually review the original to see if maybe there is Post-Its or other things that didn't get copied. But the main reason is we want to actually have it as an exhibit in court to show to witnesses.

THE COURT: On your second point about reviewing it for Post-It notes and otherwise, was it ever asked in discovery to review it for that purpose?

MS. HOFFMAN: My understanding -- and I wasn't involved in the discovery. My understanding it has been reviewed. There are also -- defendants will say we just learned -- despite that review, we just learned in the lead-up to trial that there was actually a page in the file that wasn't copied in the version that we got, which I believe they're appending as an additional exhibit later. I mean -- so, despite whatever inspection was done at whatever point, there may have been things missed. There clearly was something missed in what was produced to

us because there's one page that was missing from the file.

THE COURT: What's the defense position?

MR. GERARDE: Well, just to address that point, the file was digitized. And apparently in the copying process, two pages went in as one. So there are Page 2 and 3 of a report and this is -- I don't even know how -- why it's there, but this is a 1991 investigation. A 1989 three-page report found its way into that investigation. So someone must have, you know, grabbed it from an earlier case. But as we -- we did 100 percent check to make sure this digitized copy we are using as Exhibit 1 is exactly what is in the police department, and we did find this one extra page. We took photographs of what it looks like, and we said if you want to come down here and turn pages, you can. But to come in and mark it as an exhibit, it's now attached to this trial for the life of the trial. How do we get it back? This is an original document in our records.

THE COURT: So, my memory from prosecuting criminal cases is that physical evidence like that can be introduced at the trial and then returned to the party that retains custody of it at the conclusion of trial. Frankly, I don't want it. I don't want to keep it with the Court. It belongs with the New Haven Police

Department. But it can be shown, used here as the original file. And even during trial it can be taken back, you know, with a chain of custody, if necessary, to the New Haven Police Department or it can stay in counsel's custody.

MR. GERARDE: I think what I would like since it is organized, I would like that if we can have the file here, it shouldn't now become like the -- it shouldn't be torn apart for trial when we have Exhibit 1 that is a duplicate until we find something else, and I don't think there is anything else. I mean, I don't want to have it torn apart and then handed back, and then it's a big problem.

MR. BRUSTIN: We have no interest in doing that.

THE COURT: So you will keep it in order? Well, let me ask you this. Will you be showing any witness documents from the original file, or will you be using the digitized copies and you simply want to have it here as sort of a physical exhibit?

MR. BRUSTIN: Exactly. Just a physical exhibit. We are not going to -- unless we find something in there that's different, we would only be showing the digital copy to the witnesses and the jury. We would like to have the actual physical copy of the original exhibit just to show how it looked.

THE COURT: So we could perhaps mark it as 1A. It could remain in the control of counsel for the City but be brought to trial for the days it's necessary. I'm sorry, I just want to --

MR. GERARDE: They're telling us for chain of custody purposes, we need an order from the Court to the chief that that be brought and then it will be brought, kept track of, and then we will return it.

THE COURT: Okay. And will you retain it in your custody at the end of each trial day, just so I can make sure the order --

MR. GERARDE: I think it should probably stay in the custody of the Court. That's the safest place I think for the chain's purposes.

MR. BRUSTIN: I can tell you we won't need it until early next week.

MR. GERARDE: If it's possible to make it a Court exhibit, maybe that would help. Then it's got some -- it can be referenced and --

MR. BRUSTIN: I think all we're going to need it for, to make this simpler, is for Defendant Raucci and possibly for closing.

THE COURT: Okay. So I'm told that we have a walk-in safe in the Clerk's Office where we could retain it. Generally, we are not in the practice of retaining

parties' exhibits, but since this is just a bunch of papers in a file, I'll make an exception.

So when does it -- when do you need it by?

And when can you obtain it, Attorney Gerarde?

MR. TALLBERG: I think it's -- once we have the order, we could have it here for Monday, I think.

(Pause)

MS. STONE: I could talk --

THE COURT: Name? Sorry.

MS. STONE: Hi. Amanda Stone. I could talk to the records lieutenant tonight and maybe get you an answer tomorrow morning.

THE COURT: Okay. So, would Monday be early enough?

MR. BRUSTIN: Yes, Your Honor.

THE COURT: Okay. So tentatively the plan will be for the City of New Haven to bring the original police file, we'll mark it as Plaintiff's Exhibit No. 1A. I don't want to mark it as Court Exhibit, but it will be 1A. For chain of custody purposes, the Court will maintain it in its safe for the duration of trial, and you'll just need to let us know when you need it so we can bring it out of the safe. And then we'll return it to the City of New Haven at the conclusion of the trial.

MR. GERARDE: All right. Thank you.

THE COURT: Okay. All right. With respect to other exhibits that you intend to introduce let's say this week, since I didn't rule on all the outstanding objections to every piece of evidence, I want to make sure that we sort of know what exhibit objections remain. And my thought was that we would kind of be doing this serially in advance of a witness's testimony, we would sort of know what exhibits you might want to show and then I could deal with any outstanding objections.

So beyond what you've already admitted through Defendant Sweeney, do you anticipate other nonconsent exhibits?

MR. BRUSTIN: We do. Would it be possible for us to gather our thoughts and then raise that in the morning?

THE COURT: Sure.

MR. GERARDE: And regarding procedure, my understanding, Judge, was that we did go through a process of some of the exhibits are not objected to. And I'm -- I'm -- I'm asking that the process not be for that universe that, all right, that was unobjected to, is there now a new objection you want to raise. If it's not objected to, that really should just be picked up and said, Judge, we are marking this.

THE COURT: I agree.

Today, because this was the first time we had

done it, I just wanted to make sure for the record there wasn't anything new and I didn't want you to be giving up some objection you might have previously made. For instance, I think -- so 23, which was the letter from Former Chief Ortiz regarding Mr. Sweeney's employment history, that had an objection.

MR. GERARDE: They asked me about that. That's fine. That was all right.

THE COURT: Okay. So, you know, I want to make sure that you're preserving any objection you previously had made and that was the reason I asked, but if you've reached agreement and something is a consent exhibit --

MR. GERARDE: They asked me ahead of time, so we figured that part out. But I was a little thrown when you asked, that wasn't objected to, is there any new objection. Because I want to be able to look at the chart where they haven't objected to one of my proposed exhibits and pick it up and not have to defend an objection when I'm not prepared to.

THE COURT: And that's how we'll do it going forward. I apologize if it threw anybody for a loop today, but --

MR. GERARDE: Okay.

THE COURT: It's just growing pains as we get through the first day.

MR. GERARDE: Getting through the other objections is important also.

MR. BRUSTIN: We will let the Court know and let -- first let counsel know what additional exhibits that are objected to we want to bring in. If we can't agree on it, we will raise it with Your Honor in the morning.

THE COURT: Let's do that. Let's have that be the plan for each day so that in the morning session before the jury, I can get you rulings on admissibility of anticipated exhibits for the day.

MR. BRUSTIN: With the caveat that there may be one or two exceptions, but generally we'll know what we're going to do.

THE COURT: Okay. Try to limit the number of exceptions.

Anything else we should take up?

MR. BRUSTIN: Not from plaintiffs' perspective, Your Honor. Thank you.

THE COURT: And from defendants?

MR. RYAN: No, Your Honor.

MR. GERARDE: No.

MR. TALLBERG: No, Your Honor.

THE COURT: Thank you very much. We'll see you tomorrow morning. You can report for 8:30.

MR. BRUSTIN: Thank you, Your Honor.

THE COURT: One more thing. We need to collect your lists from jury selection, so please give those all back and we will proceed with shredding them.

(Court adjourned 4:26 p.m.)

C E R T I F I C A T E

I, Alicia A. Cayode Kyles, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/s/ ______________________________

ALICIA A. CAYODE KYLES, RMR
Official Court Reporter
United States District Court
450 Main Street, Room 320
Hartford, Connecticut 06103
(860) 509-8743

Dated: 4/30/26