UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

---

| | |
|---|---|
| STEFON MORANT, | NO. 22-CV-630(SVN) |
| Plaintiff(s), | JURY TRIAL DAY 18 |
| v. | |
| CITY OF NEW HAVEN, et al., | HARTFORD, CONNECTICUT |
| Defendant(s). | May 26, 2026 |

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff(s):
Anna Benvenutti Hoffmann
Nick Brustin
Grace Paras
Katherine Cion
Neufeld Scheck Brustin Hoffmann & Freudenberger LLP
200 Varick Street, Ste. 800
New York, NY 10014

Kenneth Rosenthal
Law Office of Kenneth Rosenthal
One Audubon Street, Third Floor
New Haven, CT 06511

For the Defendant(s):
Thomas R. Gerarde
Amanda Stone
Howd & Ludorf LLC
100 Great Meadow Road, Ste. 201
Wethersfield, CT 06109
(Representing City of New Haven)

James Newhall Tallberg
Kimberly A. Bosse
Karsten & Tallberg LLC
500 Enterprise Drive, Ste. 4B
Rocky Hill, CT 06067
(Representing Vincent Raucci)

William J. Melley, III
Law Offices of William J. Melley, III
250 Hudson Street
Hartford, CT 06106
(Representing Gail Lawlor and Vaughn Maher)

Michael T. Ryan
Jonathan Zellner
Ryan Ryan Deluca LLP
1000 Lafayette Blvd., Ste. 800
Bridgeport, CT 06604
(Representing Michael Sweeney)

Reported by: Diana Huntington, RDR, CRR, CRC
Federal Court Reporter
860.463.3180
diana_huntington@ctd.uscourts.gov

TABLE OF CONTENTS

| | PAGE |
|---|---|
| JURY INSTRUCTIONS | 3372 |
| CLOSING ARGUMENT BY PLAINTIFF | 3432 |
| CLOSING ARGUMENT BY DEFENDANT CITY OF NEW HAVEN | 3475 |
| CLOSING ARGUMENT BY DEFENDANT RAUCCI | 3509 |
| CLOSING ARGUMENT BY DEFENDANT SWEENEY | 3531 |
| CLOSING ARGUMENT BY DEFENDANTS LAWLOR AND MAHER | 3549 |
| REBUTTAL ARGUMENT BY PLAINTIFF | 3568 |
| FINAL JURY INSTRUCTIONS | 3577 |

(8:44 a.m.)

THE COURT: Good morning. We're here in Case No. 22-CV-630, Morant v. City of New Haven and other defendants. Let's begin with appearances of counsel for plaintiff.

MR. BRUSTIN: I think Ms. Paras is here and also Elsa Mota will be coming as well.

THE COURT: And obviously Attorney Brustin, Attorney Hoffmann, Attorney Paras, and Attorney Cion -- yes, back there -- and Attorney Rosenthal.

And for the City?

MR. GERARDE: Good morning, Your Honor. Tom Gerarde for the City of New Haven. I have with me Attorneys Amanda Stone, Lidia Michols, and Abby Willauer.

THE COURT: Good morning to all of you.

MR. TALLBERG: Good morning, Your Honor. Attorney Tallberg for Mr. Raucci. And I have with me Attorney Bosse and Ms. Oliveira.

THE COURT: Good morning.

MR. RYAN: Good morning, Your Honor. Michael Ryan for Michael Sweeney. I have with me Attorney Jonathan Zellner.

THE COURT: Good morning. I notice your client is here as well.

MR. RYAN: Yes, Your Honor, correct.

MR. MELLEY: Good morning, Your Honor. Right now I'm here alone. I'm expecting Mr. Maher. He parked a little distance away. He plans to be here by 9:00. Good morning.

THE COURT: Good morning.

All right. First, is there anything that plaintiff's counsel wishes to put on the record regarding the change from yesterday to withdraw the punitive damages claim against Mr. Raucci?

MS. HOFFMANN: Just that we are withdrawing the punitive damages claim. I think that covers it.

THE COURT: Okay. And that change has been made to the jury instructions and to the verdict form. I hope there's no changes to either of those things, because they're fully printed, but let me hear from the parties if there are.

MR. GERARDE: No changes.

MR. TALLBERG: Nothing here, Your Honor. And no objection, obviously, to dropping the punitive damages.

MR. RYAN: No changes, Your Honor, thank you.

MR. MELLEY: No changes, Your Honor.

MS. HOFFMANN: No changes.

THE COURT: Anything I should take up from the parties?

MS. HOFFMANN: Not from the plaintiff.

MR. GERARDE: Nothing, Your Honor.

MR. TALLBERG: Nothing here, Judge.

MR. RYAN: No, Your Honor.

MR. MELLEY: No, Your Honor.

THE COURT: Okay. Our full jury is here, just so you know. They have already decided they wish to maintain the same schedule for deliberations that they have been maintaining, so checking in at 8:30 and ending by 4:00. So today if they go over, they are committed to doing that, but for any days of deliberation, that's when they'll be here.

Well, I guess we can get started a little bit early since they're here.

MR. GERARDE: Your Honor, I just want to make sure that we are not going to alter the schedule in terms of having a lunch break and then I begin. So I'm just thinking if we start early, if for some reason Attorney Brustin goes less than an hour 15, he only goes an hour, you're not going to say, all right, we have 15 minutes, Attorney Gerarde, get your first 15 in.

THE COURT: No, I won't break up your closings. We'll just take our lunch a little bit early if that's the situation.

MR. MELLEY: Your Honor, may I have a moment to see where my client is?

THE COURT: Oh, sure.

MR. MELLEY: I assume you're going to lock on the door?

THE COURT: I'm going to put a sign on the door that says "Jury Instructions in Progress - Please Enter Quietly," but I don't plan to lock it.

MR. MELLEY: Okay.

THE COURT: If you would like to wait until he gets here, we can hold the jury.

MR. MELLEY: He should be here.

THE COURT: I should note for the record, of course, Mr. Morant is present, given that I noted Mr. Sweeney was, and has been present throughout the trial.

MR. MELLEY: Your Honor, can I just step out?

THE COURT: Sure.

(Pause.)

MR. MELLEY: Thank you, Your Honor.

(Whereupon, the jury entered the courtroom.)

THE COURT: You may be seated. Good morning, members of the jury. I hope that you had a nice weekend.

Today we will proceed with jury instructions and then closing arguments of all of the parties in this case. You should have on your chair a copy of the final jury

instructions which I need to read word for word into the record. So that will take some time, but please feel free to follow along as I am reading. You will see on the first two pages there's a table of contents. That's for your reference if you want to easily jump to a specific section while you're deliberating. We'll begin on page 4, Introduction.

Members of the jury, you have now heard all of the evidence. At this point, I'm going to instruct you about the law that applies to this case. At the outset, I want to express my gratitude to you for the time and energy you have devoted to this trial. Jury service is rarely convenient, especially so in a multi-week trial such as this, but without you, justice could not be done in this case.

It will take some time for me to read these instructions to you, but it is important that you listen carefully. You have been provided with a copy of these instructions so that you can read along as we go. Please feel free to write on these copies. You will also be permitted to take them into the jury room with you during your deliberations.

My instructions will be in three parts. First, I will discuss general rules concerning the role of the Court, the duty of the jury, and the types of evidence and

inferences that you may rely on in reaching a verdict. Second, I will go over the counts in this case, identify the questions of fact that you must answer based on the evidence presented at trial, and discuss the applicable law of damages. Finally, after the parties have presented their closing arguments, I will give you some rules and guidelines for your deliberations.

Before we begin, I ask you to look over the other document that was placed on your seats, namely, the verdict form. After I have given these instructions and you hear the closing arguments of counsel, you will go back into the jury room to deliberate beginning tomorrow. You will have with you the following: the original of the verdict form, digital versions and hard copies of the original exhibits along with any limiting instructions applicable to each exhibit, your copies of these instructions, and any personal notes that you may have taken. At the conclusion of your deliberations, you will use the verdict form to report your verdict to the Court and the parties.

Section II. General Instructions. Part A. Role of the Court.

As Judge, I perform basically two functions during the trial. First, I decide what evidence you may consider. You have heard me doing that throughout the

trial. Second, I instruct you on the law that you are to apply to the facts. I gave you some preliminary instructions before the trial began and some during the course of the trial, but it is now, at the close of evidence, that most of the instructions are given, so please be patient and listen closely. If any of the lawyers state the law differently from the way I am explaining it to you, you are to follow my instructions. I believe that everything I am going to tell you is consistent with the preliminary instructions I delivered at the start of trial, but if you have any doubt, you should rely on these instructions and not anything different I may have said in the preliminary instructions.

Part B. Instructions to be Considered as a Whole.

These instructions are long, and I may repeat certain parts. That does not mean that those parts should be emphasized. You should not single out any one part of my instructions and ignore the rest. Instead, you should consider all of the instructions as a whole and consider each instruction in light of all of the others. The order in which I give these instructions does not indicate their relative importance. Do not read into these instructions, or into anything that I have said or done, any suggestion about what verdict you should return. That is a matter

for you alone to decide. During these instructions, I may, by the level of my voice or by my inflections, seem to emphasize certain matters. That is simply to help you understand the important principles of law. It is not intended to communicate any opinion about the facts.

I should also point out that, although you have been given a copy of the instructions to follow as I deliver them, if I say aloud anything at all different from what is written, you must follow what I say here in court.

Part C. Both Sides Entitled to a Full and Fair Hearing.

Regardless of your ultimate decision about the parties' claims and defenses, the parties in this case are entitled to a full and fair hearing. You must remember that one of the most important functions of our system is to give the parties to a dispute a full and fair hearing, regardless of the final outcome of the case. It is your duty, therefore, to give careful thought to every issue set forth by these instructions, regardless of any feeling that you may have about which party is right. Mr. Morant made the decision to bring this lawsuit, and the Defendants have the right to defend the lawsuit until a verdict is reached. You should draw no inference against any Defendant simply for their decision to defend against

Mr. Morant's claims.

You have been chosen and sworn as jurors in this case to decide the issues of fact and to apply the law to those facts as the Court gives the law to you in these instructions. You are to perform this duty without bias or prejudice as to any party. Nor may you permit sympathy or emotion to influence your verdict. Your decision must be based solely upon the evidence admitted at trial and the law as I instruct you. Your verdict must reflect your collective, reasoned judgment as to what the evidence proves and what the law requires.

Part D. Objections and Rulings.

It is the duty of an attorney to object to testimony or other evidence that the attorney believes is not properly admissible. These objections are not evidence you may consider in your deliberations. You should not prefer or dislike an attorney or a party because an attorney made objections, failed to make objections, or made his or her objections in a particular manner during the trial. The application of the rules of evidence is not always clear, and lawyers and parties often disagree about them. It has been my job as the judge to resolve these disputes during the course of the trial. You need not concern yourself with why a lawyer or party made an objection or why I ruled on it in the manner

that I did. If I have allowed testimony or evidence that an attorney objected to, you should not give that evidence any more or less weight than evidence that was not objected to. My rulings on objections have nothing to do with the credibility of the witnesses.

If I have sustained an objection to a question asked of a witness, you must disregard the question entirely, and may draw no inference from the question nor speculate about what the witness would have said if he or she had been permitted to answer the question. If a witness started to answer or answered before I had an opportunity to sustain the objection, you must disregard the answer and draw no inference from any answer that witness started to give or gave. You must also disregard any testimony that I have stricken, because it is not evidence.

During the course of a trial, one cannot help but recognize the various personalities and styles of the attorneys. Every attorney representing a party here has worked diligently over the course of this trial in support of their clients. Whatever you may think about the conduct of the individuals who presented the case during this trial, you must decide this case solely on the basis of the evidence.

Part E. Duties of the Jury.

The jury is the finder of fact in a trial. It is your duty to find the facts from all of the evidence in the case. In reaching a verdict you must carefully and impartially consider all of the evidence in the case and then apply the law to that evidence as I have explained it to you. Regardless of any opinion you may have about what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any understanding or interpretation of the law other than the one I give you. You must do your duty as jurors regardless of any personal likes, dislikes, opinions, prejudices, or sympathies that you may have. In other words, you must decide the case solely on the evidence before you, and you must do so fairly and impartially.

The verdict you reach must be unanimous; that is, agreed upon by each of you. You must each decide the case for yourself, but do so only after impartial consideration of the evidence in the case with your fellow jurors.

Part F. Prove, Find, and Establish.

Throughout the remainder of my instructions to you, I will use the word "prove" when talking about what Mr. Morant must do in order to win this case. My use of the word "prove" means "prove by the preponderance of the evidence," even if I do not always repeat those words.

Similarly, when I speak of your "finding" various facts or the parties' "establishing" various facts, you must determine whether those facts have been proven by the preponderance of the evidence, even if I simply use the word "find" or "establish."

Part G. Burden of Proof — Preponderance of the Evidence.

As you know, the plaintiff in this case is Mr. Morant. Because this is a civil case, Mr. Morant has the burden of proving every element of his claims by a preponderance of the evidence. The Defendants in this case, as you know, are the City of New Haven (which I will call the "City," for short); Vincent Raucci; Michael Sweeney; Vaughn Maher; and Gail Lawlor, as administratrix of the estate of Robert Lawlor.

To establish a fact by a preponderance of the evidence, Mr. Morant must prove that the fact is more likely true than not true. Picture in your head the scales of justice, as I discussed with you at the beginning of the case. If you find that the credible evidence on a given issue is evenly divided between Mr. Morant and any Defendant, or tips in favor of any Defendant, then you must decide that issue in favor of the relative Defendant or Defendants. However, if Mr. Morant proves that a fact is more likely true than not, even

slightly, then you are to find that Mr. Morant has proven that fact by a preponderance of the evidence.

In determining whether a claim has been proven by a preponderance of the evidence, you should consider the testimony of all witnesses, regardless of who may have called them, and all the exhibits received in evidence, regardless of who may have presented them. A preponderance of the evidence means the greater weight of the evidence; it refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents presented.

Some of you may have heard of proof beyond a reasonable doubt, which is a higher standard of proof that applies in a criminal trial. That standard of proof applied to Mr. Morant's underlying 1994 criminal trial. It does not apply to this civil case.

Part H. Forms of Evidence.

Next, I want to discuss with you generally what we mean by evidence and how you should consider it. The evidence from which you are to decide what the facts are comes in three forms:

First -- actually, four forms.

First, there is the sworn testimony of witnesses, both on direct examination and cross-examination, and regardless of who called the

witness.

Second, there is the sworn testimony of unavailable witnesses from previous proceedings, which was read to you by the parties over the course of the trial or played on video.

Third, there are the exhibits that have been received into the trial record. Exhibits were received into evidence when I said that an exhibit was admitted as a full exhibit. All of the exhibits that have been admitted into evidence will be with you in the jury room. If an exhibit has been admitted into evidence, it is evidence that can be considered by you regardless of whether any witness referred to the exhibit or testified about it during trial. If I instructed you to consider an item of evidence for a limited purpose only, you must follow that instruction. This instruction is called a "limiting instruction." Any limiting instructions that I have given with respect to an exhibit will be attached to that exhibit for your reference while you deliberate.

Fourth, there are facts to which all the lawyers have agreed or stipulated to or of which I have taken judicial notice, which I have read for you and of which you will have a copy during deliberations.

Part I. What is Not Evidence.

Questions are not evidence; answers are. At

times, a lawyer may have incorporated into a question a statement that assumed certain facts to be true and asked the witness if the statement was true. If the witness denied the truth of a statement, and if there is no evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

Testimony that has been stricken or excluded by the Court also is not evidence and may not be considered by you in rendering your verdict.

What the lawyers say in their opening statements, closing arguments, comments, objections, and questions is not evidence. What they say in their closing arguments is intended to help you understand the evidence and to reach your verdict. If your recollection of the facts differs from the lawyers' statements, however, you should rely on your memory.

Moreover, what I may have said during the trial or what I may say in these instructions is not evidence, and my rulings on the admissibility of evidence do not indicate any opinion about the weight or effect of such evidence.

It is for you alone to decide the weight, if any, to be given to the testimony you have heard and to the exhibits you have seen.

Part J. Direct and Circumstantial Evidence.

There are two types of evidence that you may properly consider in reaching your verdict.

One type of evidence is direct evidence. Direct evidence includes a witness's testimony about something the witness knows by virtue of his or her own senses — something he or she has seen, felt, touched, heard, or done.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts. For example, as I noted before trial, assume that when you came into the courthouse this morning the sun was shining and it was a nice day. Assume that, because there are no windows in this courtroom and if I were to close the back doors, you could not lookout side. As you were sitting here, someone walked in with an umbrella that was dripping wet. Then a few minutes later, another person also entered with a wet umbrella. Now, in this scenario you cannot look outside of the courtroom and you cannot see or hear whether it is raining. So, you have no direct evidence of that fact. But on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence. On the basis of your reason, experience, and common sense,

you infer from one established fact the existence or nonexistence of some other established fact. Circumstantial evidence is of no less value than direct evidence. It is a general rule that the law makes no distinction between direct and circumstantial evidence, but simply requires that your verdict must be based on a preponderance of all of the evidence presented. Circumstantial evidence, however, does not include guesswork or conjecture. Circumstantial evidence consists only of the reasonable and logical inferences that you draw from other evidence in the regard.

Part K. Definition of "Inference."

During the trial you may have heard the attorneys use the term "inference" and in their arguments they may ask you to infer, on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a reasoned, logical conclusion that a disputed fact exists because another fact has been shown to exist.

There are times when different inferences may be drawn from the same facts, whether proved by direct or circumstantial evidence. Mr. Morant may ask you to draw one set of inferences, while the City, Mr. Sweeney, Mr. Raucci, Mr. Maher, and Mr. Lawlor may ask you to draw

another. It is for you, and you alone, to decide what inferences you will draw.

The process of drawing inferences from facts in evidence is not a matter of guesswork for speculation. An inference is a conclusion that you are permitted, but not required, to draw from the facts that have been established by either direct or circumstantial evidence. In drawing inferences, you should exercise your common sense. Finally, you may not draw any inferences from the mere fact that this lawsuit was filed.

Part L. Witness Credibility — Generally.

You have had the opportunity to observe all of the witnesses. It is now your job to decide how believable each witness was in their testimony. You are the sole judges of the credibility of each witness and the importance of their testimony.

In making these judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.

How do you determine truthfulness? You base it on what you have seen and heard. You watched the witness testify. Everything a witness said or did on the witness stand counts in your determination. How did the witness

appear to you? Was the witness frank, forthright, and candid, or evasive and edgy as if hiding something? How did the witness appear? What was the witness's demeanor — that is, their behavior, manner and appearance — while testifying? Often it is not what a person says but how they say it that convinces us.

You should use all the tests for truthfulness that you would use in determining matters of credibility in your everyday lives. You should consider any bias or hostility the witness may have shown for or against any party as well as any interest the witness has in the outcome of the case. You should consider the opportunity the witness had to see, hear, and know the things about which they testified; the accuracy of the witness's memory; the witness's candor or lack of candor; the witness's intelligence; and the reasonableness and probability of the witness's testimony, its consistency or lack of consistency, and its corroboration or lack of corroboration with other credible testimony.

Always remember that in assessing a witness's testimony, you should use your common sense, your good judgment, and your own life experiences.

Part M. Impeachment of a Witness.

A witness may be discredited or impeached by contradictory evidence, by a showing that a witness

testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something inconsistent with the witness's present testimony. It is your exclusive province to give the testimony of each witness such credibility or weight, if any, as you think it deserves.

If you believe a witness testified untruthfully in some respect, you may consider that fact in deciding the weight you will give to that witness's testimony. Considering that fact and all other relevant evidence, you may accept or reject the testimony of each witness either in whole or in part.

Part N. Law Enforcement Witnesses.

You have heard the testimony of people who work or have worked in law enforcement. The testimony of a person who works in law enforcement should be considered by you just as any other evidence in this case, and in evaluating his or her credibility you should use the same guidelines that you apply to the testimony of any witness. You should not give either more or less weight to the testimony of a witness merely because he or she works or has worked in law enforcement.

Part O. Expert Testimony.

In this case, I have permitted certain witnesses to express their opinions about matters that are in issue.

A witness may be permitted to testify to an opinion on those matters about which he or she has special knowledge, skill, expertise, and training. Such expert testimony is presented to you on the theory that someone who is experienced and knowledgeable in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

In weighing this testimony, you may consider the witness's qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness's testimony. In weighing the expert's testimony, you should also consider any bias, motive, or interest in the outcome of this case you may find such expert may have. You may give the opinion testimony whatever weight, if any, you find it deserves, in light of all of the evidence in this case. You should not, however, accept expert testimony merely because I allowed the witness to testify concerning his or her opinion.

Nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you. As with the testimony of any other witness, you, the jury, may decide to accept all, some, or none of the testimony of any

expert witness. If you decide that an opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not convincing to you, or if you feel that the opinion is outweighed by other evidence, you may disregard the opinion entirely.

Part P. Uncontradicted Testimony.

You are not required to accept testimony simply because the testimony is uncontradicted and the witness is not discredited or impeached. You may decide, because of the witness's manner and demeanor, the improbability of his or her testimony, or other reasons, that such testimony is not worthy of belief.

On the other hand, the testimony of a single witness may be enough to convince you of a fact in dispute, if you believe that the witness has truthfully and accurately related what in fact occurred.

Part Q. Presence of a Party.

During trial, you have seen various parties come and go from day to day over the course of the trial. Mr. Morant, Mr. Sweeney, Mr. Raucci, and Mr. Maher each have had a right to be present for the duration of the trial, but they have had no legal obligation to be present each day of trial.

Part R. Multiple Defendants.

Although there are several Defendants in this action, it does not follow from that fact alone that if one is liable, all are liable. Each Defendant is entitled to a fair consideration of Mr. Morant's claims against him or it, and of each Defendant's own defenses to those claims, and is not to be prejudiced by any fact that you may find against another defendant. The fact -- remember, that the claims as to each of the Defendants must be considered separately by you. The fact that you may find one of the Defendants is or is not liable does not determine your verdict as to any other Defendant. This applies both when there are multiple Defendants in a claim, and across the various claims.

Part S. Effect of a Pardon and Other Definitions.

Mr. Morant was granted an absolute and unconditional pardon, which has the legal effect of invalidating and erasing his conviction. A pardon is not a finding made by a judge or a court of law. It is issued by the Connecticut Board of Pardons within the state executive branch. Under Connecticut law, a pardon is not a finding of innocence. There is no statutory provision under Connecticut law to obtain a pardon that includes a finding of innocence.

You have also heard evidence that Mr. Morant's

sentence was modified in 2015 before he received a pardon. A judge may reduce a sentence under Connecticut law. A sentence modification does not overturn a conviction or establish that a person is innocent.

Within the judicially noticed facts that I have read at trial, and of which you will have a copy during your deliberations, there has also been reference to the convictions of other people being vacated and their sentences being commuted. To vacate a conviction means to overturn a conviction. A conviction may be vacated due to a defect in the legal proceeding. A sentence commutation is an act of the Connecticut Board of Pardons to reduce or modify a criminal sentence. Like a sentence modification ordered by a judge, a commutation does not overturn a conviction or establish that a person is innocent.

Part T. Invocation of a Person's Fifth Amendment Right.

During the testimony presented at trial, both Mr. Raucci and José Roque chose to invoke their Fifth Amendment right against self-incrimination. I will now repeat the same instructions I previously gave you about a person's invocation of their Fifth Amendment right against self-incrimination.

Mr. Raucci has a right under the Fifth Amendment to the United States Constitution to decline to answer

questions on the ground that doing so may tend to incriminate him. He has chosen to invoke this right. You may, but are not required to, infer from such refusal that the answer would have been adverse to Mr. Raucci's interest. You should consider any inference you may or may not choose to draw from Mr. Raucci's refusal to testify on Fifth Amendment grounds together with all other evidence in the case.

Witness José Roque also has a right under the Fifth amendment to the United States Constitution to decline to answer questions on the ground that doing so may tend to incriminate him. You may, but are not required to, infer from Mr. Roque's refusal to answer that the answer would have been adverse to his own interests. But you may not infer from Mr. Roque's refusal to answer certain questions that the answers would have been adverse to Mr. Morant's interests. That is, you may not draw any adverse inference against Mr. Morant based on Mr. Roque's refusal to answer questions. You should consider any inference against Mr. Roque that you may or may not choose to draw from his refusal to testify on Fifth Amendment grounds together with all other evidence in the case.

Section III. Overview of Claims in this Case.

I am now going to discuss the issues in this case relating to liability and damages. Before I begin,

it is important to distinguish between liability and damages. When I use the word "liability," I mean the legal obligation that any particular Defendant has allegedly violated with respect to the specific claims Mr. Morant has made. This is different from damages which are an award of money to compensate Mr. Morant if you find any Defendant liable for the harm Mr. Morant alleges any such Defendant caused. Liability may be premised on the different claims or counts that Mr. Morant has brought. I will use the word "claims" and "counts" interchangeably, and they have the same meaning.

If you find by a preponderance of the evidence that Mr. Morant has proven a count against the applicable Defendant or Defendants, then that Defendant or those Defendants are liable as to that count. If one or more Defendant is liable on a count, you may then proceed to consider whether to award Mr. Morant damages as compensation for such liability. You may not consider the question of damages unless you first determine that one or more Defendants is liable on at least one count.

I will instruct you on damages later. For now, please focus your attention only on Mr. Morant's claims of liability, a list of which was provided to you over the course of the trial. Mr. Morant's claims are split into two broad categories: his federal claims that all arise

under Title 42 U.S.C. Section 1983, which I will call "Section 1983," and his state law claims. I will now read that list of claims that I provided to you during the trial to you again:

Mr. Morant's Federal Section 1983 Claims.

Count One: Malicious prosecution against Mr. Raucci and Mr. Maher.

Count Three: Failure to disclose exculpatory evidence against Mr. Raucci, Mr. Maher, and Mr. Sweeney.

Count Four: Fabrication of evidence against Mr. Raucci and Mr. Maher.

Count Five: Coercion of statements against Mr. Raucci and Mr. Maher.

Count Two: Civil rights conspiracy against Mr. Raucci and Mr. Maher. You may only reach this count if you find that one of the individual Defendants committed the constitutional violations described in Counts One, Three, Four, or Five.

Count Six: Failure to intercede against Mr. Maher. You may only reach this count if you find that one of the individual Defendants committed the constitutional violations described in Counts One, Three, Four, or Five.

And finally, Count Seven: Municipal liability against the City of New Haven.

Next, I will read Mr. Morant's State Law Claims.

Count Eight: Negligence against Gail Lawlor as the administratrix of the Estate of Robert Lawlor.

Count Nine: Assumption of liability against the City of New Haven.

Count Ten: Direct action against the City of New Haven.

As I mentioned in the preliminary instructions, Defendants have advanced defenses that you will be instructed about in these instructions.

I will now explain the law applicable to Section 1983. After that, I will proceed to explain the law applicable to each of Mr. Morant's individual state law claims.

Section IV. Mr. Morant's Federal Section 1983 Claims.

All of Mr. Morant's federal claims are brought pursuant to a federal civil rights statute, Section 1983. Section 1983 permits a plaintiff to seek monetary damages in a federal court if he has been deprived of rights protected by the Constitution or laws of the United States. Section 1983, by itself, does not establish or create any federally protected right. Rather, this statute allows Mr. Morant to enforce rights guaranteed to him by the United States Constitution or

other laws of the United States.

For each claim that he brings under Section 1983, Mr. Morant must prove, by a preponderance of the evidence, three elements.

First, he must prove that the Defendants were acting under color of law, meaning for the individual defendants that they were acting as New Haven Police officers and for the City that it was acting as a governmental body. This element is undisputed by the parties, so I instruct you to find that it has been met.

Second, Mr. Morant must prove that the relevant Defendant's conduct intentionally or recklessly deprived Mr. Morant of a right secured by the Constitution or laws of the United States. An act is intentional if it is done voluntarily and deliberately and not because of mistake, accident, negligence, or other innocent reason. An act is reckless if done in conscious disregard of its known probable consequences. In other words, even if a defendant did not intentionally seek to deprive Mr. Morant of his rights, if nevertheless he purposely disregarded the high probability that his actions would deprive Mr. Morant of his rights, then this element would be satisfied. Intent can be proved directly or it can be proved by reasonable inference from circumstantial evidence. Mr. Morant alleges several different

deprivations of his rights here which, I will explain to you further in a moment. You must find at least intentionality or recklessness for all of Mr. Morant's Section 1983 claims, though some of the claims below may require a finding of a specific higher level of intent. If so, follow the applicable instructions for that claim.

Third, Mr. Morant must prove that the applicable Defendant(s)' acts caused Mr. Morant's injury. To show Defendant(s)' acts caused Mr. Morant's injuries, Mr. Morant must establish "but for" and "proximate" causation. But for causation is established whenever a particular outcome would not have happened but for the purported cause. In other words, a but for test directs us to change one thing at a time and see if the outcome changes. If it does, there is a but for cause. Often events have multiple but for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but for cause of the collision. Here, so long as the relevant Defendant's violation was one but for cause of Mr. Morant's deprivation of liberty, that is enough.

An act is a proximate cause of an injury if it was a substantial factor in bringing about that injury, and if the injury was a reasonably foreseeable consequence

of the relevant Defendant's actions. To constitute a substantial factor, Mr. Morant must prove that the relevant Defendant's actions contributed materially and not just in a trivial or inconsequential manner to his injuries — specifically, his conviction. If you find that the relationship between the relevant defendant's actions and Mr. Morant's injuries is too remote, Mr. Morant will not have established proximate cause by a preponderance of the evidence as to that Defendant.

If you find that Mr. Morant has established each of these elements as to any of his federal counts, you may proceed with considering whether Mr. Morant is entitled to damages. I will now describe each of Mr. Morant's claims in more detail.

Before we do, we're going to take a quick stretch break. We've been going for about 45 minutes. So everybody stand up and stretch.

(Pause.)

THE COURT: Count One: Malicious prosecution against Mr. Raucci and Mr. Maher.

For his Section 1983 malicious prosecution claim against Mr. Raucci and Mr. Maher, the constitutionally secured right Mr. Morant alleges was violated is his Fourth Amendment right to be free from unreasonable or unwarranted restraints on his personal liberty.

To succeed on his malicious prosecution claim, Mr. Morant must prove by a preponderance of the evidence that: (1) the relevant Defendant(s) initiated or continued the criminal proceeding against him; (2) the criminal proceedings terminated in his favor; (3) the Defendant(s) acted without probable cause; (4) the Defendant(s) acted maliciously, or for a purpose other than bringing Mr. Morant to justice; (5) Mr. Morant suffered a post-arraignment deprivation of his liberty; and (6) Mr. Morant's deprivation of liberty occurred as a result of the malicious prosecution.

Element 1. Initiated or Continued the Criminal Proceeding.

As to the first element, Mr. Morant may prove that the relevant defendant initiated or continued a criminal proceeding against him by showing that the Defendant played an active role in the prosecution, such as giving advice and encouragement or prompting the prosecutor to act. This may include filing the charges, seeking the arrest of Mr. Morant, or forwarding false information to the prosecutor, which information is then instrumental in bringing about or continuing the charges.

Element 2. The Criminal Proceedings Terminated in Mr. Morant's Favor.

I instruct you that a pardon by the State of

Connecticut Board of Pardon and Paroles is a termination of criminal proceedings in Mr. Morant's favor as a matter of law. As the parties have stipulated that Mr. Morant received an absolute pardon, you must consider this element to have been met as to both Mr. Raucci and Mr. Maher.

Element 3. The Defendant(s) Acted Without Probable Cause.

As to the third element, Mr. Morant must prove that the relevant Defendant lacked probable cause to initiate or continue the criminal proceedings against him. Probable cause exists when a police officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person committed the crime charged.

The issuance of an arrest warrant by a judge typically carries with it a rebuttable presumption of probable cause. But that presumption goes away if Mr. Morant shows that the person who swore to the information contained in the affidavit that was presented to the judge knowingly and intentionally, or with reckless disregard for the truth, made a false statement or material omission in the affidavit that was necessary to the finding of probable cause.

The existence of probable cause is a complete defense to a malicious prosecution claim. If you find that the relevant Defendant had probable cause to initiate or continue the criminal proceedings against Mr. Morant, you must stop here and find that Mr. Morant has not established his malicious prosecution claim.

4th Element. The Defendants Acted With Malice.

If you find that Mr. Raucci and/or Mr. Maher did not have probable cause to initiate or continue the prosecution of Mr. Morant, then you may proceed to determine whether each Defendant acted with malice. Malice is not just hatred or ill will. You may find a Defendant acted out of malice if you find any of the following: the Defendant acted with reckless disregard for Mr. Morant's rights; the Defendant used the prosecution of Mr. Morant for an improper purpose; the Defendant did not actually believe Mr. Morant was guilty; or the Defendant intentionally misrepresented the facts to the prosecutor or intentionally withheld favorable information from the prosecutor that was helpful to Mr. Morant. You can also infer malice from the absence of probable cause to prosecute Mr. Morant. You do not need to find that all of these were the case; a single basis for finding malice is sufficient.

5th Element. Post-Arraignment Deprivation of

Liberty.

There is no dispute in this case that Mr. Morant suffered a post-arraignment deprivation of liberty through imprisonment. Therefore, I instruct you to find as a matter of law that Mr. Morant has proven this element.

6th Element. Causation.

As described above, Mr. Morant must show that his deprivation of liberty occurred as a result of his prosecution. That means but for and proximate cause, as I have already instructed you.

Part B. Count Three: Failure to Disclose Exculpatory Evidence Against Mr. Raucci, Mr. Maher, and Mr. Sweeney.

In Count Three, Mr. Morant alleges his Fourteenth Amendment right to due process and a fair trial was violated by Mr. Raucci, Mr. Maher, and Mr. Sweeney, because they withheld material information that was favorable to him. In describing this claim, I will use the terms "information" and "evidence" interchangeably.

A claim of withholding favorable evidence is also known as a *Brady* claim named after the 1963 Supreme Court case *Brady v. Maryland*. You have heard lawyers on both sides refer to this claim as Mr. Morant's *Brady* claim throughout the trial. I, too, will refer to this claim as a *Brady* claim or alleged *Brady* violation in these

instructions.

To prove a *Brady* claim, Mr. Morant must prove each of the following elements by a preponderance of the evidence: (1) the relevant Defendant was aware of information that was favorable to Mr. Morant; (2) the relevant Defendant deliberately withheld the favorable information from the prosecutor; (3) the withheld information, taken all together, was material to Mr. Morant's criminal trial; (4) Mr. Morant suffered a deprivation of liberty; and (5) Mr. Morant's deprivation of liberty was as a result of the withholding of the favorable information.

As to the first element, information can be favorable in many ways. First, information is favorable if it is exculpatory, which minutes is tends to show that the accused did not commit the crime. Second, information is favorable if it could be used to undermine the credibility of a witness who provides information against the accused (known as impeachment evidence). Another type of favorable information is information that calls into question the integrity of the police investigation.

As to the second element, Mr. Morant must prove that the relevant Defendant intentionally did not disclose the favorable information to the prosecutor.

As to the third element, the favorable

information is material if there is a reasonable probability that, had the information been disclosed, the outcome of the trial would have been different. In other words, the information is material if its absence from the criminal trial undermines confidence in the trial's outcome. In assessing materiality, the suppressed information must be considered collectively, not item by item.

As to the fourth element, there is no dispute in this case that Mr. Morant suffered a deprivation of liberty through imprisonment. Therefore, I instruct you as a matter of law to find that Mr. Morant has proven this element.

As to the fifth element, you must determine whether Mr. Morant suffered a deprivation of liberty as a result of the relevant Defendant's withholding of the favorable information, which requires finding that the relevant Defendant's actions were a but-for and a proximate cause of Mr. Morant's deprivation of liberty, as I have previously instructed you.

You are to consider all elements of the *Brady* claim with respect to Mr. Raucci and Mr. Maher.

With respect to Mr. Sweeney, I instruct you that, as a matter of law, Mr. Morant has proven elements one through four of his *Brady* claim against Mr. Sweeney.

As a result, your only task as to Mr. Sweeney is to consider the fifth element of causation — that is, whether Mr. Morant has proven by a preponderance of the evidence that Mr. Sweeney's withholding of information that was favorable to Mr. Morant was a but-for and proximate cause of Mr. Morant's deprivation of liberty.

Part C. Count Four: Fabrication of Evidence against Mr. Raucci and Mr. Maher.

In Count Four, Mr. Morant alleges that his Fourteenth Amendment right to due process of law was violated by Mr. Raucci and Mr. Maher by their alleged fabrication of evidence. In describing this claim, I use the words "information" and "evidence" interchangeably.

To succeed on his fabrication of evidence claim, Mr. Morant must prove by a preponderance of the evidence each of the following elements against the relevant Defendant: (1) the Defendant was an investigating official; (2) the Defendant fabricated information, such as by knowingly making false statements or material omissions; (3) such fabricated information was likely to influence a jury's verdict; (4) the investigating official forwarded, or caused to be forwarded, the fabricated information to the prosecutor(s); (5) Mr. Morant suffered a deprivation of liberty; and (6) Mr. Morant's deprivation of liberty was as a result of the fabricated information.

I instruct you as a matter of law to find that Mr. Morant has established that both Mr. Raucci and Mr. Maher are investigating officers (element one) and that Mr. Morant has suffered a deprivation of liberty through his imprisonment (element five). Accordingly, you must decide only elements two, three, four, and six.

As to the sixth element, you must determine by a preponderance of the evidence whether the relevant Defendant's alleged fabrication of evidence was a but-for and proximate cause of Mr. Morant's deprivation of liberty.

Part D. Count Five: Coercion of Statements against Mr. Raucci and Mr. Maher.

In Count Five, Mr. Morant alleges that his Fifth Amendment right against self-incrimination and Fourteenth Amendment right to due process of law were violated by Mr. Raucci and Mr. Maher when they allegedly coerced his statement.

The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. Thus, the Constitution prohibits the use of an involuntary statement against a criminal suspect in a criminal proceeding. The use of an involuntary statement against a criminal suspect in a criminal proceeding also violates a

person's right to due process of law. A statement is voluntary when it is the product of the person's free choice. On the other hand, a statement is involuntary if it is obtained under circumstances that overbear the person's will at the time he gave it.

To succeed on this claim, Mr. Morant must prove by a preponderance of the evidence: (1) that the relevant Defendant caused Mr. Morant to give an involuntary statement; (2) that statement was used against Mr. Morant in a criminal proceeding; (3) Mr. Morant suffered a deprivation of liberty; and (4) the deprivation of liberty was as a result of the involuntary statement's use against him in a criminal proceeding.

There is no single criterion for you to use to determine whether Mr. Morant was caused to give an involuntary statement. Instead, in considering whether a statement was involuntary, you must consider the totality of the circumstances, including (1) the characteristics of Mr. Morant (such as experience, age, intelligence, education or lack thereof, and background); (2) the conditions of interrogation (such as its location, length, and the presence or absence of an attorney); and (3) the conduct of law enforcement officials (including whether there was repeated and prolonged questioning; a failure to inform Mr. Morant of his constitutional rights; clear

promises of leniency or benefits; use of psychologically coercive techniques; physical treatment such as physical abuse or long restraint in handcuffs; and any physical deprivations of food, water, sleep, or clothing for long periods of time).

As to the second element, I instruct you that Mr. Morant's statement was used against him in his criminal trial. Thus, you must find that this element has been met.

As to the third element, there is no dispute in this case that Mr. Morant suffered a deprivation of liberty through imprisonment. Therefore, I instruct you as a matter of law to find that Mr. Morant has proven this element.

As to the fourth element, you must find that the use of the involuntary statement in criminal proceedings was a but-for and proximate cause of Mr. Morant's deprivation of liberty.

Part E. Count Two: Conspiracy to Violate Mr. Morant's Constitutional Rights Against Mr. Raucci and Mr. Maher.

In Count Two, Mr. Morant alleges that Mr. Raucci and Mr. Maher conspired amongst themselves and with others to violate his civil rights. In order for you to consider whether these Defendants are liable for a conspiracy to

violate Mr. Morant's civil rights, you must first find that Mr. Morant was deprived of at least one other constitutional right by Mr. Raucci or Mr. Maher, as he alleges in Counts One (malicious prosecution), Three (*Brady* violation), Four (fabrication of evidence), and Five (coercion of statements).

To establish his conspiracy claim, Mr. Morant must demonstrate by a preponderance of the evidence: (1) there was an agreement between the relevant Defendant and one or more other Defendants, other officers, or private actors, such as Frank Parisi, Ovil Ruiz a/k/a Agustin Castro, or Hector Ortiz; (2) to act in concert to deprive Mr. Morant of his civil rights; (3) an overt act was taken to further the goal of depriving Mr. Morant of a constitutional right, which caused Mr. Morant harm; (4) Mr. Morant suffered a deprivation of liberty; and (5) the deprivation of liberty was as a result of actions taken in furtherance of the conspiracy, which means but-for and proximate cause.

As to the first element, you do not have to find that there was an express verbal or written agreement. An agreement between coconspirators can be tacit and reached without any written statement or express spoken words communicating the agreement. You may infer that there was an agreement and that a given Defendant or private actor

participated in it based on circumstantial evidence. Further, you do not need to reach unanimous agreement on the issue of with whom Mr. Raucci and/or Mr. Maher conspired in order to find either or both of them liable for conspiracy.

I instruct you to find as a matter of law that Mr. Morant suffered a deprivation of liberty, the fourth element. Thus, you must decide only elements one, two, three, and five.

Part F. Count six: Failure to Intercede against Mr. Maher.

In Count Six, Mr. Morant alleges that Mr. Maher failed to intercede in constitutional violations committed by Mr. Raucci. You should only reach this count if you have found that Mr. Raucci is liable as to at least one of the following four counts: Count One (malicious prosecution); Count Three *(Brady* violation); Count Four (fabrication of evidence); or Count Five (coercion of statements). If you have not found Mr. Raucci liable on one of these four counts, then you may not reach the failure to intercede count against Mr. Maher.

All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers. The constitutional

violation must be of sufficient duration to support a conclusion that an officer who stood by without trying to assist the citizen became a tacit collaborator.

In addition to finding that Mr. Raucci is liable on at least one of the four counts described above, Mr. Morant must also demonstrate, by a preponderance of the evidence, that: (1) Mr. Maher observed or had reason to know of one or more of Mr. Raucci's constitutional violations; (2) Mr. Maher had a realistic opportunity to intervene to prevent the harm from occurring; (3) Mr. Maher failed to intervene to prevent the harm; (4) Mr. Morant suffered a deprivation of liberty; and (5) the deprivation of liberty was as a result of Mr. Maher's failure to intervene.

As to the second element, if Mr. Maher had witnessed prior unconstitutional conduct by Mr. Raucci that would have alerted him to a likelihood of further unconstitutional conduct, this may be considered a realistic opportunity to intervene.

As to the fourth element, there is no dispute in this case that Mr. Morant suffered a deprivation of liberty through imprisonment.  Therefore, I instruct you to find as a matter of law that Mr. Morant has proven this element.

As to the fifth element, you must find that

Mr. Maher's failure was a but-for and proximate cause of Mr. Morant's deprivation of liberty.

Part G. Count Seven: Municipal Liability Against the City of New Haven.

In a U.S. Supreme Court case called *Monell v. Department of Social Services of the City of New York*, the Supreme Court held that local government units, including cities, may be liable under Section 1983 for unconstitutional actions taken by municipal employees under certain circumstances. The fact that an employee of a municipality deprived the plaintiff of a federal right is not alone a sufficient basis for holding the municipality liable to the plaintiff. Before you can hold the municipality liable, the plaintiff must establish by a preponderance of the evidence that the action of the employee that deprived him of his federal right was the result either of a municipal -- of an official policy of the municipality or a municipal custom that was in place even though such a custom had not necessarily received formal approval through the body's official decision making channels.

You have heard this claim referred to in this trial as Mr. Morant's *Monell* claim or, alternatively, Mr. Morant's claim for municipal liability against the City of New Haven. Through this claim, Mr. Morant alleges

that the City is responsible for the violations of his constitutional rights. As you have heard me say throughout the trial, there are particular pieces of evidence that you may only consider with respect to Mr. Morant's *Monell* claim.

You may only reach Mr. Morant's Section 1983 *Monell* claim if you have already found that at least one individual Defendant has violated at least one of Mr. Morant's constitutional rights in Counts One, Three, Four, Five, or Six. If you have not so found, you may not reach this count.

The elements of a *Monell* claim are: (1) the existence of a municipal policy or custom; and (2) the municipal policy or custom caused Mr. Morant to suffer the deprivation of a constitutional right.

To show a policy or custom justifying municipal liability, Mr. Morant need not identify an express rule or regulation. Rather, Mr. Morant may prove the existence of a municipal policy or custom in one of the following three ways: (1) a widespread practice or custom; (2) deliberate indifference to the need to supervise or discipline; or (3) ratification. I will explain each theory in more detail in a moment. Mr. Morant need only prove one of these theories by a preponderance of the evidence to establish the first element of his *Monell* claim.

In addition to proving a municipal policy or custom through one of these theories, Mr. Morant must also prove that the policy or custom caused the deprivation of his constitutional rights, meaning that the policy was the moving force behind what happened in Mr. Morant's case, which I will explain in a moment. To show that the policy was the moving force behind the alleged violations of Mr. Morant's constitutional rights, Mr. Morant must prove that the municipal policy or custom existed before his conviction. However, you may consider evidence of events that occurred after Mr. Morant's conviction as circumstantial evidence of what policies or customs existed before his conviction.

The first element, Municipal Policy or Custom.

I will now go through what is needed to prove each of the three options for a municipal policy or custom by a preponderance of the evidence.

Option One: Widespread Practice or Custom.

Mr. Morant alleges that at the time of his conviction, the New Haven Police Department had a widespread practice or custom of suppressing evidence that was favorable to criminal defendants.

To succeed on this theory of *Monell* liability, Mr. Morant does not have to establish that there was an express rule or regulation in place; it is enough that he

prove by a preponderance evidence that the practice or custom was so persistent and widespread, so as to effectively have had the force of law behind it. Isolated acts by lower-level employees are not enough to establish a practice or custom. Rather, the practice or custom must be so widespread as to imply the constructive acquiescence of Chief of Police Nicholas Pastore.

Option Two: Deliberate Indifference to the Need to Supervise and Discipline.

As a second option, Mr. Morant alleges that a municipal policy existed because the City, through its policymaker, Chief of Police Nicholas Pastore, made a deliberate choice not to provide appropriate supervision and discipline of the New Haven police.

To demonstrate a municipal policy through this deliberate indifference theory, Mr. Morant must prove by a preponderance of the evidence that: (1) Chief Pastore knew to a moral certainty that its officers would confront a given situation; (2) the situation presents an officer with a difficult choice of the sort that supervision or discipline would make less difficult, or there is a history of officers mishandling the situation; (3) the wrong choice by the officer will frequently cause the deprivation of a citizen's constitutional rights; and (4) Chief Pastore failed to make meaningful efforts to address

the risk of harm.

Deliberate indifference is a stringent standard of fault requiring that a municipal actor disregarded a known or obvious consequence of his action. Mr. Morant's evidence must establish that Chief Pastore had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and his failure to investigate or rectify the situation evinces deliberate indifference, rather than mere negligence or mere bureaucratic inaction. In other words, Mr. Morant must show that based on the facts available to Chief Pastore, he knew or should have known that the particular omission was substantially certain to result in a constitutional violation. Deliberate indifference requires more than mere negligence by the City; it requires a conscious choice not to act.

Deliberate indifference can be shown through expert testimony that a practice condoned by Chief Pastore was contrary to the practice of most police departments and was particularly dangerous because it presented an unusually high risk that constitutional rights would be violated. The means of proving deliberate indifference vary from case to case; you should consider Chief Pastore's conduct as a whole.

Option Three: Ratification.

As a final option, Mr. Morant alleges that a municipal policy existed because Chief Pastore ratified the individual Defendant(s)' alleged unconstitutional conduct. To succeed on his ratification theory, Mr. Morant must prove, by a preponderance of the evidence, that Chief Pastore was aware of, and consciously chose to ignore, one or more unconstitutional actions taken by one or more of the Defendants, effectively ratifying them. Chief Pastore's knowledge and intent may be proven by circumstantial evidence, and even a single decision to ignore an unconstitutional action in Mr. Morant's case is enough to demonstrate this theory.

Element 2. Causation.

If Mr. Morant proves the existence of a municipal policy or custom through at least one of the theories I have just discussed by a preponderance of the evidence, you may move on to considering whether he has demonstrated that the municipal policy or custom at issue caused the violation of his constitutional rights.

To show causation, Mr. Morant must prove, by a preponderance of the evidence, that the alleged City policy or custom was the moving force behind the constitutional violation. "Moving force" means but-for and proximate cause. Post-conviction events cannot be the moving force behind Mr. Morant's alleged constitutional

violations, because they occurred after those alleged violations.

Section V. Mr. Morant's State Law Claims.

Having completed the discussion of all of Mr. Morant's federal law counts, I will now turn to Mr. Morant's state law claims. As with Mr. Morant's federal law counts, he must prove each element of his state law counts by a preponderance of the evidence.

Part A. Count Eight: Negligence Against Gail Lawlor, as the Administratrix of the Estate of Robert Lawlor.

Mr. Morant alleges that Robert Lawlor was negligent under Connecticut state law. Because Mr. Lawlor is deceased, Gail Lawlor, as the administratrix of his estate, has been substituted for Robert Lawlor in this action. The substitution of Gail Lawlor as a party has no legal impact on your analysis of this claim. For simplicity, I will continue to refer to the Defendant who Mr. Morant alleges was negligent as "Mr. Lawlor."

Negligence is the violation of the legal duty which one person owes to another. To succeed on this claim, Mr. Morant must prove, by a preponderance of the evidence, that: (1) Mr. Lawlor owed Mr. Morant a duty of care; (2) Mr. Lawlor breached his duty to use reasonable care under the circumstances; (3) Mr. Lawlor's negligence

caused harm to Mr. Morant; and (4) Mr. Morant suffered damages.

As to the first element, a duty to use care exists when a reasonable person, knowing what Mr. Lawlor here either knew or should have known at the relevant time, would foresee that harm of the same general nature as that which occurred here was likely to result from that conduct. If harm of the same general nature as that which occurred here was foreseeable, it does not matter if the manner in which the harm that actually occurred was unusual, bizarre, or unforeseeable.

As to the second element, reasonable care is care that a reasonably prudent person would use in the same circumstances. In determining the care that a reasonably prudent person would use in the same circumstances, you should consider all of the circumstances which were known or should have been known to Mr. Lawlor at the time of the conduct in question. Whether the care is reasonable depends upon the dangers that a reasonable person would perceive in those circumstances. It is common sense that the more dangerous the circumstances, the greater the care that ought to be exercised. Mr. Morant need only prove that Mr. Lawlor failed to use reasonable care in one way.

As to the third element, Mr. Morant must prove

that he was harmed in some way by Mr. Lawlor's negligence — meaning there is some harm that would not have occurred if Mr. Lawlor had used reasonable care. Mr. Morant is not required to prove that Mr. Lawlor's negligence was the only cause of the harm, or even the most significant cause. Mr. Morant does have to prove, however, that Mr. Lawlor's negligence was a substantial factor in producing the harm, meaning that Mr. Lawlor's negligence contributed materially and not just in a trivial or inconsequential manner.

As to the fourth element, Mr. Morant is not required to prove that Mr. Lawlor actually foresaw or should have foreseen the extent of the harm suffered or the manner in which it occurred. Instead, Mr. Morant must prove that the harm he suffered was of the same general nature as that which a reasonably prudent person in Mr. Lawlor's position should have anticipated, in view of what Mr. Lawlor knew or should have known at the time of the negligent conduct.

Subsection 1. Defense to Mr. Morant's Negligence Claim: Governmental Immunity.

Mr. Lawlor was a municipal employee at the time of the events giving rise to his alleged liability for negligence. So, if you find the elements of Mr. Morant's negligence claim satisfied as to Mr. Lawlor, you must then

consider whether he would nevertheless be immune from negligence liability.

Ordinarily, a municipal employee has immunity from liability for negligence in connection with discretionary acts performed within the scope of his employment. However, a municipal employee is not immune from liability for such acts if his actions were likely to cause imminent harm to an identifiable person. I will call this the "identifiable person, imminent harm" exception.

I have determined as a matter of law that Mr. Lawlor's conduct in the investigation of Mr. Morant was a discretionary act within the scope of his employment, so he would be entitled to governmental immunity unless the "identifiable person, imminent harm" exception applies.

To invoke this exception to immunity, Mr. Morant must prove, by a preponderance of the evidence, that each of the following elements existed at the time of his alleged injury: (1) Mr. Morant was an identifiable person; (2) that the harm which Mr. Morant claims befell him was imminent when Mr. Lawlor acted or failed to act; and (3) that it would have been apparent to Mr. Lawlor that his conduct was likely to subject Mr. Morant to the particular harm alleged.

As to the first element (identifiable person), you must determine whether Mr. Morant was an identifiable person. Mr. Morant alleges that no later than at the time of his conviction, he was a readily identifiable person, such as a person in Mr. Lawlor's shoes could understand he may be subjected to imminent harm.

The second element of this exception (imminent harm) requires you to determine whether Mr. Morant has proven that the harm to which he was subjected, if any, was imminent. A harm is imminent if a dangerous condition existed and the dangerous condition was so likely to cause harm to Mr. Morant that Mr. Lawlor had a clear and unequivocal duty to act immediately to prevent the harm. A harm is not imminent if it could have occurred at any future time or not at all. For the harm to be deemed imminent, the potential for harm must be sufficiently immediate.

The third element (apparentness) is that the particular imminent danger to which Mr. Morant claims he was exposed would have been apparent to a reasonable person in Mr. Lawlor's position. The risk must have been sufficiently great so that it must have been apparent to Mr. Lawlor that there was a clear and unequivocal need to act promptly. "Apparent" means easily observed and understood.

You must refrain from resorting to the clarity of hindsight when evaluating the situation of Mr. Lawlor. Also, you must use only the information that was available to Mr. Lawlor at the time.

Although the components have been identified separately, they are interconnected. The criteria of identifiable person and imminent harm must be evaluated with reference to each other. An allegedly identifiable person must be identifiable as a potential victim of specific imminent harm. Likewise, the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person.

Unless you find that Mr. Morant has proved all of the elements of this exception as I have explained them to you, Mr. Lawlor retains immunity from Mr. Morant's negligence claim. If you find that Mr. Morant has not proven all of the elements of this exception, you must return a verdict for Mr. Lawlor on the negligence claim. If, however, you find that Mr. Morant has proven the elements of the "identifiable person, imminent harm" exception by a preponderance of the evidence, then Mr. Lawlor has no immunity, and you must return a verdict in favor of Mr. Morant on this claim, and proceed to considering the issue of damages.

Part B. Count Nine: Assumption of Liability.

I will decide this claim, if it is necessary to reach it. You need not make any findings as to this count.

Part C. Count Ten: Direct Action Against the City.

Finally, in Count Ten, Mr. Morant brings a claim of direct action negligence against the City of New Haven.

The City's liability on Count Ten flows from your finding in Count Eight as to Mr. Lawlor's negligence. If you found that Mr. Lawlor did not act negligently in Count Eight or that the "identifiable person, imminent harm" exception applies to Mr. Lawlor, you must, in turn, return a verdict for the City on Count Ten. If you found that Mr. Lawlor acted negligently in Count Eight and the "identifiable person, imminent harm" exception applies to Mr. Lawlor, then you must, in turn, return a verdict for Mr. Morant on Count Ten.

All right. We're almost there. Let's take one more stretch break before we reach damages and give the court reporter a moment.

(Pause.)

THE COURT: All right.

Section VI. Damages.

Part A. General Instructions.

If you find that any Defendants are liable to

Mr. Morant on any of his claims, then you must determine the amount of money to award to Mr. Morant as damages.

Before I instruct you on the issue of damages, a few words of caution are in order. The fact that I am telling you about the law of damages does not mean that I believe you will, or should, find damages for Mr. Morant. Rather, my instructions include both liability and damages because I must give you instructions on all the issues in the case. With respect to the damages claimed, as with every other matter before you, you can award only such damages as are justified by the proof and the law.

I will now explain the types of damages that apply here. Plaintiff seeks only compensatory damages.

Part B. Compensatory Damages.

If you find for Mr. Morant on any claim, then you must decide the amount of damages that will reasonably and fairly compensate him for any harm caused by any Defendant's unlawful actions. These damages are known as compensatory damages. Compensatory damages seek to make Mr. Morant whole — that is, to compensate for the losses or injuries suffered. Keep in mind, however, that compensatory damages are not allowed as a punishment and must not be imposed or increased to penalize any Defendant. Mr. Morant must prove his damages by a preponderance of the evidence.

The law places the burden on Mr. Morant to prove facts that will enable you to arrive at the amount of damages with reasonable certainty. This is not a requirement of mathematical precision, and you are permitted to determine the amount of damages by estimation or approximation, as long as Mr. Morant provides you with a reasonable basis for such estimation or approximation, such that you are not required to make a calculation by guessing or speculation. You should be guided by dispassionate common sense. Compensatory damages must not be based on speculation or sympathy. They must be based solely on evidence presented at trial. Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the issues in this case based on the evidence presented here in this courtroom.

You shall award damages only for those injuries that you find Mr. Morant has proven by a preponderance of the evidence. Moreover, you may not simply award damages for any injury suffered by Mr. Morant — you must award damages only for those injuries that are caused by any Defendant's conduct. However, for any and all injures you do find were caused by Defendants' conduct, you must fully assess damages as required by law.

The source of payment of any damages you may

award, if you find for Mr. Morant, is not an appropriate matter of concern for you. You are not to speculate about the source of payment of any damages you may find it appropriate to award.

Mr. Morant seeks non-economic damages. Non-economic damages are monies awarded as compensation for all non-monetary injuries that Mr. Morant has suffered, or is reasonably likely to suffer in the future, as a result of the Defendants' violation of his constitutional rights and/or negligence. They are awarded for such things as loss of liberty, physical pain and suffering, mental and emotional pain and suffering, and loss or diminution of the ability to enjoy life's pleasures.

In determining the measure of compensatory damages, you may consider the following:

First, the loss of liberty for the period Mr. Morant spent in wrongful confinement. You may consider the loss of time and the sense of loss of freedom, which is inherent in any wrongful confinement, separate and apart from any particular harms you may find Mr. Morant suffered as a result of Defendants' conduct. In other words, loss of liberty damages compensate Mr. Morant for the reasonable value of each day of freedom lost.

Second, Mr. Morant's emotional pain and suffering beginning with the constitutional violations and continuing through to today and into the future, including fear, humiliation, or mental anguish Mr. Morant has already experienced, and the fear, humiliation, or mental anguish he is reasonably certain to experience in the future.

Third, physical harm to Mr. Morant during and after the events at issue, including ill health, physical pain, disability, or discomfort, and any such physical harm Mr. Morant is reasonably certain to experience in the future.

And finally, Mr. Morant's loss of a normal life, including his loss of family connections and family interactions, loss of relationships, loss of companionship, and loss of enjoyment of life's activities.

No evidence of the dollar value of loss of liberty, physical or mental or emotional pain or suffering, or loss of a normal life has been or needs to be introduced. There's no exact standard for setting the damages to be awarded on account of these factors. You are to determine an amount that will fairly compensate Mr. Morant for the injury he has sustained. Any award you make should be fair and reasonable in light of all of the evidence presented at trial, and should be guided by

common sense, not bias, passion, sympathy, speculation, or guesswork. You must use your best judgment, remembering always that it is incumbent upon Mr. Morant to prove his damages by a preponderance of the evidence.

Counsel for the parties may suggest to you a dollar figure for compensatory damages. Any such suggestion is only a suggestion, or the attorney's comment on the evidence. It is not itself evidence. You should give any such comment or suggestion whatever weight you decide; you are not required to adopt it. Any award of damages should be based on the evidence and is within your discretion.

Section VII. Closing Arguments.

At this point, after taking our morning break of 15 minutes, we will interrupt the instructions to hear closing arguments of counsel. I will conclude the instructions after the summations. Remember, what the lawyers say in their closing arguments is not evidence, but it is merely argument about what the evidence shows.

So after our break, we'll begin with plaintiff's opening summation. And after that, we'll take our lunch break, to be followed by all of the defense summations, and then the plaintiff's rebuttal summation in the afternoon. That's your schedule for the day.

So at this time, thank you for your attention on

these long instructions. You may proceed back to your deliberation room for your break. As I have said throughout the trial, do not research or read anything about the case, and do not discuss it amongst yourselves until you have the case for deliberations either later this afternoon or tomorrow morning. Thank you.

(Whereupon the jury left the courtroom.)

THE COURT: You may be seated.

Counsel, I would like to just mark, if you use a closing argument of some kind, mark it for identification only just for purposes of the appellate record so it's clear. So once your slided are finalized, perhaps at the end of the day today or even tomorrow morning, we can mark those.

Is there anything we should take up before our break?

MR. BRUSTIN: No, Your Honor, not for the plaintiff.

MR. GERARDE: Nothing from us, Your Honor.

MR. TALLBERG: Nothing here, Judge.

MR. RYAN: No, Your Honor.

MR. MELLEY: No, Your Honor.

THE COURT: And the podium is positioned the way you would like it?

MR. BRUSTIN: I think so.

MR. GERARDE: That looks fine, sure.

THE COURT: All right. We'll come back at 10:45. Court will stand in recess.

(Whereupon, a recess followed.)

THE COURT: All right. I apologize for the delay. I wanted to let everyone know, since we have a large audience, we have an overflow courtroom set up in Courtroom 3 and closing arguments will be broadcast to that courtroom going forward.

Now, I understand the parties have caught one small error in the charge, that's at the top of page 38. The first line should read "the 'identifiable person, imminent harm' exception does not apply to Mr. Lawlor"; is that correct?

MS. HOFFMANN: That's correct.

MR. GERARDE: Agreed, Your Honor.

THE COURT: I will mention that to the jury and ask them to make that correction handwritten in their instructions.

Is there anything else before we call them in?

MS. HOFFMANN: No, Your Honor.

THE COURT: Okay. We can get the jury.

I'll ask counsel to speak slowly during your arguments.

(Whereupon, the jury entered the courtroom.)

THE COURT: You may be seated.

Members of the jury, we caught one substantive error in the jury instructions that I need you to hand correct on your versions.

On the top of page 38, the very first line, it currently reads "the 'identifiable person, imminent harm' exception applies to Mr. Lawlor." And you need to strike the words "applies to" and instead write "does not apply to." So that top line will read "the 'identifiable person, imminent harm' exception does not apply to Mr. Lawlor, you must, in turn, return a verdict for the City on Count Ten." I'm seeing nodding heads, so I see that you have all made that change.

We will now proceed to the first closing argument of plaintiff Mr. Morant.

MR. BRUSTIN: Thank you, Your Honor.

As you've seen in this courtroom, the evidence of Stefon Morant's innocence of the pervasive investigative misconduct --

MS. HOFFMANN: Sorry. We need the display to the jury.

THE COURT: All set now?

MR. BRUSTIN: Take two.

As you've seen in this courtroom, the evidence of Stefon Morant's innocence of the pervasive investigative misconduct at the New Haven Police Department of Raucci's corruption is absolutely overwhelming. Much of it is undisputed. The reason Mr. Morant was wrongly convicted, the reason he spent 21 years wrongly imprisoned, the reason 35 years later he is still fighting here is, despite all this evidence, the City has never acknowledged this undeniable truth, let alone accepted responsibility for it and attempted to stop it from happening in this case or in any other case.

And let's be clear. None of what you saw in this courtroom was a surprise to the defendants. Knowing everything you know now, including that Raucci had just engaged in criminal witness tampering in this very case, the City got up on the first day of this trial and they called Mr. Morant a murderer, not in North Carolina or South Carolina, he was in New Haven, Connecticut, in a car with Scott Lewis, they entered Rick Turner's apartment, the homicides occurred. They would rather align themselves with one of the least truthful and reliable witnesses imaginable than take any responsibility for what they have done.

We are here in this courtroom because truth matters. Accountability matters. And it's not up to the

City anymore whether or not truth is recognized or whether there's any accountability for the egregious misconduct you have been hearing about for the last weeks. In a few hours, it will be solely up to you.

You've heard a lot of evidence in this case. It's clear to all of us that you have been paying very careful attention. And we very much appreciate the care you are giving to this important task and the time that you have taken away from your own lives and responsibilities to do so. Mr. Morant very much appreciates it.

This morning I'm not going to go over everything. I'm going to try to focus on some key areas. And because the evidence of Raucci's misconduct is so extensive, I'm going to start with the other defendants and explain how the evidence overwhelmingly proves their liability as well.

Now, in this case we believe that we have proven every claim by any conceivable standard. But remember, all you have to find is that more likely than not we have proven our claims.

Let's start with Mr. Sweeney. You've just been instructed that Sweeney has been found liable for violating Mr. Morant's constitutional rights because he failed to report to the prosecutor that he observed Raucci

coercing Ruiz and feeding him his statement, and he failed to report that Ruiz admitted he knew nothing about the crime and was only repeating the story that Raucci had fed to him.

With respect to Mr. Sweeney, I instruct you that as a matter of law Mr. Morant as proven elements one through four of his *Brady* claim against Sweeney. And although his actions were common and accepted practice in the NHPD, which we will get to in a few minutes, as a matter of law he violated the Constitution.

And as you have all seen in this courtroom, Sweeney was an honest and decent man in a difficult situation doing exactly what the department expected of him. You have seen he is by far the least culpable defendant. The reason Sweeney is the only one found liable already is he is the only one to admit the part he played. And what he admitted to is in fact a constitutional violation. But, of course, what the other defendants did is far worse. You have heard and seen Sweeney is the only one in the whole department who had reached out to volunteer information about misconduct he observed. The only question you have to answer with respect to Mr. Sweeney is whether his failure to disclose this information at the time was a cause of Mr. Morant's wrongful conviction. And it's obvious that it was.

As Sweeney admitted, the entire statement that Ruiz gave on January 14th was fed to him by Raucci, all the words came from Raucci's imagination. And the second statement taken in May of 1991, the one you've heard so much about that was taken in the State's Attorney's Office with Attorney Moscowitz, by Sweeney's own account, all the incriminating information in his statement was fed by Raucci to Ruiz on that very first night. And as Maher and Lawlor admitted, there wouldn't have even been a basis to arrest Mr. Morant if the truth about Mr. Ruiz's statement had been disclosed. By all accounts, the entire case falls apart solely based upon what Sweeney knows and fails to document and to report to the prosecutor.

You saw an example of what would have happened in the Ham case where a prosecutor learned of similar exculpatory information at the time the charges were brought, and the whole case was nolle'd or dismissed before there was even a trial. And even if, for some reason, in this case it had gone forward to trial, Sweeney himself admits it would be devastating to the prosecution and you couldn't rely on Ruiz as a witness with the information that Sweeney had. There is no way that a jury that heard Sweeney's testimony about what he observed would have convicted Mr. Morant.

The sad truth is that, despite his honesty

today, Sweeney had an opportunity to stop this train wreck before it started, and he failed to do so. It's not even a close call on causation. And you must not let your very reasonable sympathy for him, which, by the way, Mr. Morant shares, cloud your view that he shared responsibility with the much more culpable defendants and the City defendant.

Which brings us to Mr. Maher. We're not saying that Maher set out to frame an innocent man. He's not Raucci. His initial investigation pointing to Michael Cardwell was a by-the-book investigation. But Maher is no Sweeney, either. It's very clear that, unlike Sweeney, he did not stand up to stop what was happening in his presence. And not only did he not stop it, he helped to cover it up. He lied about it to vouch for the validity of what Raucci said happen during the prosecution and then repeatedly, when Mr. Morant and Mr. Lewis were seeking to prove their innocence, he lied again and again. He said, "I was there and nothing wrong ever happened." And we know to a moral certainty that that was a lie.

You heard the interview tapes for Roque and Morant. You heard on those tapes that Maher was present with Raucci during those whole interviews in a small closed room.

And you heard the uncontroverted evidence from what all agree is the most qualified audio expert in the

world, Bruce Koenig, that there were at least nine overrecordings on the Morant tape and eleven stops and starts on the Roque tape. Koenig has never seen so many stops and starts and overrecordings as in this case.

And you also heard that Koenig can tell scientifically that those stops and starts and overrecordings were put there during the original recordings of the interviews. Undisputed scientific proof of exactly what Morant and Roque say, that they were coerced and told what to say and that the tapes were manipulated, testimony which is uniquely credible because it was given before scientific testing proved the same thing.

Maher himself told you that the best way to judge if someone is telling the truth is inconsistencies in their statements, circumstantial evidence, and common sense. And here, all three powerfully prove that Maher is lying.

First, his story changed dramatically starting with saying in 1994 no stops on the Roque tape, one stop for a soda break on the Morant tape.

(Video played.)

MR. BRUSTIN: After FBI testing on the Roque tape proving eleven stops and starts, he suddenly claims he and Raucci went out in the hall to talk as many as 20

times over the two short interviews. And the reason that none of it is mentioned on the tape is because they were making silent hand signals to go in the hall. Even Raucci says that explanation is ridiculous. Of course that didn't happen.

And because that was a lie, made up to account for the testing on the Roque tapes which showed stops and starts, it doesn't even account for what the testing showed on the Morant tape: at least nine overrecordings. Everybody, including Maher, agrees overrecordings -- stop, rewind, erase, record again -- are completely impermissible under any circumstance.

And Maher's account makes no common sense. First, Morant is innocent. So, of course, he didn't volunteer the statement like Maher claims. And Maher admits Raucci coerced and fed information to Ruiz in front of Sweeney, but then claims that Raucci wouldn't do it in front of Maher. Mr. Maher, who admits he's never reported any police misconduct in his life because he claims he never saw any in the New Haven Police Department. And of course, if Sweeney is telling the truth, as Maher admits he is, Roque and Morant didn't just happen to independently volunteer Raucci's imagined story. Rather, it was fed to them by Raucci while Maher was in the room just as Morant and Roque described. By Maher's own

metric, it's crystal clear he lied during the prosecution and he lied to you in this courtroom.

And Maher told another crucial lie. He lied that Cardwell had been eliminated as a suspect to help tie the investigation into Lewis and Morant with a bow.

At the end of his comprehensive investigation, all avenues pointed to Michael Cardwell. They still do. Several months later, Maher comes back to write a false report eliminating Cardwell and reports the same to the prosecutor with no new information simply to tie up loose ends. I gave him the opportunity in this courtroom to come clean, to admit the misconduct he observed and his failure to report it before. And he would not do it.

He did have one honest moment, though. Although he wouldn't clearly admit Raucci stopped, started, and overrecorded the tape, as the evidence proved, he did admit "I didn't think anything of it. It was the way we did things." And that's exactly right. That was the way they did things in the NHPD. And Maher wasn't about to stop it or admit it to anyone even when asked.

And this is completely consistent with the code of silence that you have seen was pervasive at the NHPD at this time. But while that helps demonstrate the City's liability, which we'll talk about in a few minutes, let's be clear: that is not a defense to a constitutional

violation by Mr. Maher. As Drago told you, he is just as responsible as Raucci.

And as you'll see when you look at the verdict sheet, he's involved in the coercion of Mr. Morant's statement, he's involved in the fabrication of the Morant and Roque statements, and the report falsely eliminating Cardwell. He's involved in the suppression of exculpatory evidence because he didn't report Raucci's misconduct. He failed to intervene when Raucci engaged in misconduct in his presence. And he agreed with him to cover it up. That's conspiracy.

And he's responsible for malicious prosecution as well because he knew from watching Raucci none of the evidence Raucci gathered in this investigation could be trusted, as well as that Cardwell had never been ruled out so there was no probable cause. But Maher lied to the prosecutor and said the opposite, which continued the prosecution.

Now let's talk about Lawlor, the supervisor. As you heard in the Court's instruction and see in the verdict form, our claim against Lawlor and, through him, the City of New Haven is based on negligence or the failure to exercise reasonable care.

The evidence demonstrates that Sweeney reported to him twice before Mr. Morant's wrongful conviction that

Raucci had fed statements to Ruiz and it was false and you couldn't base an arrest on it.

Lawlor was the assigned supervisor overseeing the Turner-Fields homicide investigation at all times when we claim misconduct occurred after December 1990. Sweeney, Lawlor was supervisor in charge. Raucci, Lawlor was the primary supervisor. Maher, more contact with Lawlor than anybody else. Sullivan, understood that Lawlor was the primary supervisor. And Lawlor later admitted. And so Lisa Bull wrote precisely, "Lieutenant Lawlor advised that the investigation Raucci conducted into Lewis had been troublesome at the time." Which is, of course, consistent with him receiving and understanding Sweeney's warnings when they were given before Mr. Morant's wrongful conviction. Given Sweeney's warnings, any reasonable prudent person in Lawlor's position would at the very least have taken a closer look at the investigation. And Lawlor admitted he would have understood if he received that warning that he absolutely could not base a prosecution on that evidence.

And there's much more apparent just from the homicide file itself. The final report lie that Cardwell was excluded despite the failure to follow up on any Cardwell lead. The Cardwell 11-minute cover-up interview. Or the absence of any start and stop times on all the key

interviews: Ruiz, Roque, Morant, Ortiz, Martinez. Lawlor's failure to take these steps was a substantial factor in causing Mr. Morant's wrongful conviction. And for that reason, Mr. Lawlor is liable. And the City is also directly liable based on the same evidence of Lawlor's negligence here. Which brings us to Raucci.

As you have seen, the evidence of Raucci's misconduct in this case is absolutely staggering. In addition to Mr. Koenig, who scientifically proves the misconduct with the taped interviews of Roque, Morant, and Ortiz, and in addition to Sweeney's description of the misconduct he observed with Ruiz, all five witnesses that Raucci interviewed described that Raucci pressured and coerced them into making false statements.

Ruiz: Raucci coerced me to lie.

Roque: Raucci threatened to making false statement.

Mr. Morant: Raucci threatened with electric chair, told him what to say.

Ortiz: Raucci stopped the tape, pointed to the picture, made me say names.

Martinez: Raucci fed and coerced her into making false statements.

Raucci himself told you the choice you, the jury, have is: Do you believe Koenig's scientific testing

and Mr. Sweeney, or Raucci's word? That's the choice you have.

And here is one example of a lie that Raucci told about who conducted the preinterview of Mr. Morant.

(Video played.)

MR. BRUSTIN: First, didn't ask a single question until the tape turned on, and then absolutely conducted the entire interview.

You heard Raucci's ridiculous explanations as to why he didn't investigate Cardwell at all, including that he couldn't find the homicide file.

You heard the Bobby Wilson and the Cardwell tapes that show this was really a cover-up for his plan to frame Scott Lewis.

Raucci claimed everybody in this case told terrible lies about him again and again. He claimed he was an honest, rule-following, by-the-book detective who never coerced or threatened anybody ever. And as much misconduct as we have shown you, we likely don't even know the full extent of it.

And you also saw how he coerced and threatened his ex-wife not to testify about his involvement in illegal narcotics just before opening statements in this very case.

And let's be clear. We're not saying Raucci was

a mastermind. Not by any means. I'm sure Raucci was a far more skilled liar when he was a younger man, just as you saw he was much more physically impressive 30 years ago at the time of these events than he is today. But you saw that there were obvious problems in the case even then.

For example, the statements from Ruiz, Morant, and Roque include the claim that they saw Scott Lewis throw a gun into the water from a basketball court when that's literally not possible to see, as any NHPD officer would know.

But, unfortunately for Mr. Morant and Mr. Lewis, it didn't need to be a masterful frame job. Based on the defendants' lies about how these statements came about and without any information about Raucci's corruption and general dishonesty, Prosecutor Gold took them at their word. And so did the jury that convicted them.

And as Professor Dignam explained in this courtroom, once there is a jury finding of guilt, it's extraordinarily difficult to get them overturned, certainly so long as the NHPD stands behind it.

Again, going through the verdict sheet, this overwhelming misconduct proves every one of our claims against Raucci: fabrication, suppression of exculpatory evidence, coercing Mr. Morant's statement, malicious

prosecution, conspiracy. None of it is even close.

And although you need not determine why Raucci did this, there is ample evidence he set out to frame Scott Lewis, as we will talk about a little bit later. Stefon Morant was just collateral damage.

Now let's talk about the claims directly against the City.

We have three separate *Monell* theories, or ways of proving that the City is directly responsible for Mr. Morant's wrongful conviction. We only need to prove one of them to hold the City accountable. But here, we have proved all three by any standard, certainly more likely than not.

The first is that the New Haven Police Department had a widespread custom or practice of suppressing evidence favorable to criminal defendants, also known as *Brady* material.

You heard clear, unambiguous admissions that this was the case. Sweeney described in 1990 and 1991 an expectation that exculpatory and impeachment evidence would not be documented in police reports. Don't put things in police reports that hurt the case. Don't know any detective that would put down information for the defense to attack.

(Video played.)

MR. BRUSTIN: And Petolla said the same thing. The practice was not to turn over exculpatory evidence from your notes. People didn't document that type of information. They didn't write down in police reports inconsistent statements.

And the same with Sullivan who you recently heard, as he described in the Gould-Taylor case, no duty to document when you told a heroin addict unless she told you what you wanted to hear, she couldn't get high. All the things relevant to reliability and credibility do not need to be in police reports in New Haven in 1993 or before, and Chief Pastore was fully on board with what he did.

You heard from Mr. Drago, who has been in policing for 40 years and an expert for many years, that he has never heard a description of such admissions of widespread practice across the department of not disclosing exculpatory or impeachment evidence as he heard in this case. Never.

And beyond those highly credible descriptions of the practice, there is independent evidence that what they are describing is, of course, true. There were the very public examples of NHPD failures to disclose this type of information in both the Golino case and the Ham case, both of which were raised in 1991. First, Golino,

December 1991 published opinion, general practice to omit exculpatory evidence. And the Ham case in the spring of 1991, Prosecutor Gold calls it a debacle, failing to report exculpatory evidence. And again in August of 1991, a civil rights lawsuit against Sweeney and Greene for precisely that misconduct.

It is undisputed, and the City's representative admitted, that the City took no action after the Gold memo or the Ham civil suit, none whatsoever. Not even after in the Ham case there was a finding of a constitutional violation against Sweeney and Detective Greene, and a $1.4 million award in 1996 for Ham's only three months of wrongful incarceration.

Sweeney told you that no one from the department ever questioned his conduct in the Ham case or suggested that he had done anything wrong. There cannot be a clearer indication that what Sweeney, Petolla, and Sullivan all described was in fact the widespread practice of the NHPD throughout the '90s and had the constructive acquiescence or approval of the chief of police.

And, of course, there is extraordinary evidence of that practice and the NHPD's failures over the life of this case alone. Five or more coerced and fed witness statements both in front of supervisors or other detectives, Sweeney and Maher, with a full knowledge of

another supervisor, Lawlor, never documented or disclosed, all from a detective that nobody trusted at the time. What could be better evidence of a systemic problem?

And it's also clear that this systemic problem caused Mr. Morant's wrongful conviction. Sweeney, in particular, is exactly the type of officer who would have followed appropriate training and policies and supervision, if they existed. It is only in a department where the culture is that detectives withhold this information from the prosecutor that an honest and well-intentioned officer like Mr. Sweeney does not report what he saw to the prosecutor.

The second theory of the City's liability is that the City, through Chief Pastore, deliberately failed to provide adequate supervision and discipline. This is where the code of silence comes in.

Petolla candidly described exactly what the unwritten rule was in the NHPD about reporting officer misconduct or disciplining for it: You don't do it. He described how there was a great deal of pressure not to report any misconduct by other officers, that this pressure was particularly strong as compared to other police departments, and that it came all the way from the top. He described how reporting even criminal misconduct by another officer would get you labeled a rat and would

effectively end your career.

Here is Petolla:

Unwritten rule not to report misconduct.

All police officers understood this code of silence.

Pastore did nothing to fix it.

And Mr. Sweeney agrees. Contacting Mr. Morant's defense attorney: Absolutely not an easy thing to do; wasn't going to be seen in a very good light. This tracks exactly the elements of deliberate indifference you just heard.

It was very clear in Mr. Petolla's testimony he was extremely reluctant, there is no way he would be saying what he was saying if it wasn't the truth. The City's own representative said he was uniquely trustworthy. And Petolla also provided a vivid example from when he observed Raucci's attempt to plant cocaine during a traffic stop in the 1980s of exactly how the code of silence operated in practice in the 1980s and 1990s in New Haven. And because of the extremely strong code of silence, he didn't report it. And Raucci remained on the force where he could become a homicide detective with the vast power that that entails.

And you saw plenty of examples, other examples of how the code of silence worked in practice in this very

case:

Maher covering up Raucci's misconduct during the Morant and Roque interviews, including falsely vouching for Raucci during Mr. Morant's criminal prosecution, that's the code of silence.

Lawlor falsely denying in 1999, in 2013, that he ever knew anything about misconduct at a time when no one had the Bull memo making clear he had admitted the investigation was troublesome at the time, that's the code of silence.

Sullivan, not even returning Sweeney's calls so as not to have to even address what he knew was coming about Raucci, code of silence.

And as we'll get to shortly, Pastore and the NHPD obstructing a federal investigation into Raucci's criminal misconduct is probably the most extreme example of the code of silence imaginable.

Now, the Court also instructed you another way to prove this deliberate indifference is through expert testimony. And you heard unrebutted testimony from our expert Chuck Drago. Drago testify about the known risk in policing, the risk of what's called noble cause corruption, that officers will think the ends justify the means and that they have to bend the rules to make arrests.

And you heard examples of how that's exactly what happened in the NHPD, such as Mr. Sullivan's description of how he extracted a statement from a heroin addict in withdrawal by telling her he would buy drugs for her if she just gave the statement he wanted, and then giving her money and taking her to buy heroin as promised. Sullivan said this was the kind of thing he and other detectives had to do from time to time. And he would be comfortable discussing it with Chief Pastore. This is Sullivan as a supervisor of the homicide unit, the exact opposite of how a minimally functioning homicide unit is supposed to run.

And you heard lots of other examples reinforcing this. First, Petolla admits officers would regularly start and stop tapes to fix testimony.

And here are examples of other cases with similar constitutional violations at the same time such as Ham and Carmon and Gould-Taylor. And more cases where specific credible allegations of the same misconduct were raised publicly, like Fleming and Valentine and Streater. All during the same time period. Involving many of the same detectives, including Raucci. And there was no follow-up investigation at all by the NHPD.

Drago told you if you have a minimally functioning system, you would have to investigate these

public reports of investigative misconduct. If you don't, you clearly send a message that that type of misconduct is condoned. And that's exactly what happened here with the deliberate failure to provide adequate supervision and discipline. In fact, each of the defendants told you they were never questioned by the NHPD about any misconduct. In this case no questions, no internal affairs investigation, no investigation after the FBI report, no additional training. Or in any other case. Not until this lawsuit.

And let's be clear. The examples we have identified are certainly only the tip of the iceberg. As Petolla told you, the only reason he even came clean about Raucci's attempted drug planting was because he had happened to mention it to another police officer and then was asked about it specifically in an FBI interview which was under penalty of perjury. He made clear that even now the code of silence is still so strong that he won't name names unless you already know the specific misconduct to ask about. It's still ingrained in him. How many other innocent victims are out there whose names we still don't know?

Now, in their opening statement, the City told you they would be bringing a police practices expert to testify. They said he would tell you that, quote, the

practices of the police department involved in this case were sound, unquote.

Here is what Mr. Rodriguez actually could say and why he never came to court. He is a similarly qualified expert as Mr. Drago and he doesn't disagree with anything Mr. Drago says. He specifically agrees proper supervision, proper reporting of violations, and proper discipline for violations are all critical to constitutional policing. But he never says a word about whether the NHPD actually had constitutionally adequate practices on the key issues in this case: supervision, reporting, discipline. He doesn't disagree with a single one of Drago's findings on the code of silence, or the pattern of *Brady* violations, or the ratification of the misconduct in this case by Pastore. The silence on these issues is deafening. And that's because no expert in policing could possibly disagree with this record. And Mr. Rodriguez did not. And that is why he was never brought to this courtroom. It wasn't to save him a trip from Florida.

The NHPD and Chief Pastore, in particular, have made clear time and time again they did not care about the damage they caused, the constitutional rights they violated, or the lives that they've destroyed. There could not be a clearer example of deliberate indifference.

And that brings us to the third element, the third theory, the ratification theory that Chief Pastore was aware of and consciously chose to ignore one or more of defendants' unconstitutional actions in this case.

First, let's discuss the widespread criminal conduct Raucci was engaging in by 1991 when he got involved in this investigation. You heard from Scott Lewis about how Raucci was working with Frank Parisi at this time, how when Lewis rejected Parisi's request to take over a drug operation Parisi told him Vinny wants his money. And then when Raucci arrested Mr. Lewis, he told him, You never should have stopped selling drugs in Fair Haven. And many, many other witnesses corroborate Raucci's criminal misconduct by this point. Castro, Ortiz, Desai, Roberts, Donnelly all describe Raucci's drug-related crimes, including Chief Pastore who admits he came to believe Raucci was involved in drug dealing and protecting drug dealers. And others describe Raucci's specific connection to Parisi and his drug operation. Roberts, Petolla, Ortiz, Desai, Donnelly all describe this specific connection. And Mr. Raucci denies ever meeting Parisi.

We know from Petolla's testimony Raucci was attempting to plant drugs years earlier. By 1991 Raucci already had a well-earned reputation as a dirty cop. And

Raucci also had a reputation of investigative misconduct as well.

Sweeney testified how by January of 1991, he already knew that he could not trust Raucci's police work or his ethics and that he would not have him work on any serious case. And that he also told us that Lawlor knew it, too. Sweeney told you he described the misconduct he saw with Ruiz at the time as Vinny doing his usual bullshit.

And you also heard that Chief Pastore had a personal relationship with Raucci. According to Desai, his ex-wife, Pastore did look out for Raucci probably more than he should have. Pastore had a personal relationship with his father and her father. And Sweeney described the unusually close relationship and that he would see them talking alone in Pastore's office.

And there's also specific evidence that Pastore would have been aware of the problems in the Turner-Fields investigation at the time in 1991. This was a very small police department with a relatively small number of homicides a year, and the Chief would remain in the loop on all of them. He was very hands-on. And this was a particularly high-profile case, the murder of a former alderman. And he would also be kept in the loop about any concerns with officers in the chain of command, including

through weekly meetings.

And as we've already discussed, based on Sweeney's repeated warnings to Lawlor about Raucci and Ruiz, Lawlor understood that this investigation was troublesome at the time. And Lawlor also described how closely he worked with Pastore. Very close. And how he absolutely, without a doubt, would have discussed any serious misconduct that he learned about detectives in his chain of command with Chief Pastore.

Now, you can't hold the City responsible for things that happened after Mr. Morant's wrongful conviction. But you can certainly consider what happened after the conviction as evidence of the conditions that existed before.

And it's hard to imagine more powerful evidence of the cancer that had existed for years at the NHPD with Pastore's full approval than what we have in this case.

So once Scott Lewis cold-called the FBI with his complaint about being framed by Raucci, the FBI quickly amassed overwhelming evidence of Raucci's corruption, including both involvement in elicit narcotics and misconduct in the Turner-Fields homicide investigation itself.

And you saw how the NHPD already had this information in their possession: the Lanza memo showing

Raucci's cocaine use and drug-related criminal activity; and the missing Badger memo describing NHPD surveillance; and Chief Pastore tipping Raucci off that he was being watched.

As soon as they had this information -- and we can't tell how early it was known because the NHPD did not keep records of it -- Drago told you Raucci should have been immediately taken off the streets and fully investigated.

Again, Drago has never seen so many allegations on one officer that was never investigated. Allegation after allegation after allegation: drug use, drug dealing. He told you I don't care whether he walked out the door today, he's getting investigated, and if he's found guilty he's going to jail.

Instead, Lawlor told Lisa Bull they didn't even have the resources to initiate an internal affairs investigation despite multiple NHPD officers confirming observations of Raucci's elicit activities. Instead, Pastore himself went to visit Scott Lewis alone at the jail allegedly to find out what information Lewis had with no tape recorder, no internal affairs investigator with him, not even a pen and paper. Pastore chastised Lewis for going to the FBI and then lied and claimed that the reason he didn't investigate Lewis was because Lewis never

told him anything about Raucci. The Scott Lewis that you saw in this courtroom who was screaming in every direction for justice was too shy to give any details to Pastore?

It's hard to imagine a stronger evidence of a cover-up, of damage control. Except there actually is in this case. Here, it gets worse. Much worse.

Lawlor told you candidly about Pastore's concern during the FBI investigation. Here's what he said. "My understanding would be that Nick wanted to do damage control if something is going to come back to haunt us should Vinny be formally charged or some substance would come of the FBI investigation."

And damage control was needed here. Given the overwhelming evidence of Raucci's criminal misconduct, the FBI got approval for a rare integrity sting operation. They were going to put out drugs for Raucci to seize and to watch him to see whether he turned them in to the police or he kept them. And there was no question that there was ample evidence to support going forward with this sting. Even Sullivan admits it. There is absolutely no reason to object to an integrity sting operation if you think the officer is honest. But the NHPD, through Pastore, objected.

Here is Donnelly's memo on the sting. "The NHPD raised an additional concern that the predicates for

investigating Raucci on public corruption charges may be somewhat lacking and suggested further investigation prior to a sting."

And then "Information was developed, however, that Raucci became aware of police investigation into his possible drug activity and, as such, changed his (Raucci's) routine."

And that someone who tipped off Raucci was almost certainly Pastore. He had just done it before, as admitted in the Badger memo. And he was always the one calling the shots.

As both Sullivan and Donnelly told you, tipping Raucci off at that point is outright criminal, it's obstruction of justice. That's the lengths Pastore would go to keep the massive misconduct at the NHPD from coming to light.

And then he let Raucci retire with no investigation of drug-related misconduct and no discipline whatsoever. And here Pastore may have had an additional reason to prevent another public scandal, because he was trying to keep under wraps his own scandal arising out of his years of illegally frequenting sex workers.

One of the most tragic things about this case is the many, many opportunities the NHPD had to stop it.

Raucci was engaged in criminal misconduct for

years. He could and should have been rooted out well before this and sent to prison instead of two innocent men. If the NHPD had appropriate supervision and discipline, Sweeney could have more effectively stopped Raucci when he observed the misconduct directly. It could have been stopped if the NHPD had a practice to report exculpatory evidence, which would have devastated the case. It could have been stopped if they listened to Sweeney when he warned Lawlor the next day or when he warned Lawlor again at the time Scott Lewis was arrested. And that's leaving aside all of the many, many times the NHPD could have taken appropriate action after the wrongful convictions and, instead, they doubled down again and again with lies and more cover-ups. As described in the charge, all of them but-for causes of Mr. Morant's wrongful conviction.

And let's be clear about the costs of the NHPD's pervasive and systemic misconduct. The NHPD failed Stefon Morant. The NHPD failed Scott Lewis. It failed the victims Turner and Fields and their families. It failed the public by leaving the real perpetrator on the street. But it also failed Sweeney and Petolla. In a properly functioning department, Sweeney is a good cop and Petolla is a good cop. The NHPD prioritized shielding the worst cops, outright criminal actors like Raucci, from

responsibility and the NHPD from any bad press or having to reopen cases. It enabled the worst, most base instincts.

And even today, despite the overwhelming evidence proving this, the City will still not accept any accountability.

Mr. Castro, you saw him take responsibility for the part that he played. He feels terrible about what he did even though he was a vulnerable kid coerced by Raucci.

Millie Martinez had to go to therapy because she understands the false statement she gave as a 16-year-old played a small part in sending two innocent men to prison.

Mr. Morant feels guilt and remorse for succumbing to coercion to giving a false statement against Mr. Lewis even though he was steadfast, he would never testify to it.

The only people who didn't take any accountability, never apologized, feel no remorse are the NHPD with a notable exception of Mr. Sweeney.

Think of the integrity it took for Mr. Morant to resist the urge to give in to pressure to testify falsely against Mr. Lewis knowing everything he was missing on the outside. And the defendants have the gall to suggest somehow that it is his fault because when Raucci was coercing a statement from him, completely uninterested in

the truth and telling him they only wanted Scott Lewis, that he didn't volunteer that he was in North Carolina at the time of this crime that he knew nothing about.

In their opening statement, the City said so it's the position of the City of New Haven that this is not a case of wrongful conviction.

Say it loud and clear with your verdict. This is a wrongful conviction of an innocent man. And this wrongful conviction was caused by defendants' misconduct, including the systemic failures of the NHPD. Say it loud enough and clearly enough that even the City of New Haven can finally hear it.

Now let's talk about damages.

As you've already talked about, liability has been proven overwhelmingly as to each defendant on each claim. As you heard in the Court's instructions, so long as you find that Mr. Morant has proven any one of his claims, that he has established that defendants violated his rights, you must award full damages.

The injuries Mr. Morant suffered are unimaginable and undeniable. You saw it in this courtroom. You could feel them. And the evidence was undisputed.

Defendants did not bring in any expert to challenge Dr. Akinsulure-Smith's diagnosis of chronic PTSD

or her conclusions about the extreme psychological harm 21 years of wrongful imprisonment did to Mr. Morant. They didn't try to dispute that he'll continue to suffer for the rest of his life. They did not ask Mr. Morant a single question about what it was like to be locked in a cage for 21 years or missing the entirety of his children's childhood, any parent's nightmare. Not a single question of the witnesses who came in and described all the ways this devastated Mr. Morant. And it wasn't out of respect. The City stood up at the beginning of this trial and they called Mr. Morant a murderer. It was because there is no way to challenge the enormity of the harm to Stefon Morant. And your verdict cannot undo the harm. What our legal system provides is money damages to balance the harm. That's what the law says Mr. Morant is owed.

So the important weighty task that you have in this trial is to assess a fair value for every one of those harms that Mr. Morant suffered. And the law does not provide any precise mathematical formula. The only thing you must do is you must measure it all without any regard to any other consideration.

So let's talk about a fair and just and reasonable way to measure all of the harms.

First, let's talk about some basic rules. The

worse the harm, the greater amount of money. Common sense. The longer it goes on and the more times it happens, the greater the amount of money. Again, common sense. And all of the damages that we are seeking here are non-economic damages.

Before we get to what this does include, let's be clear on what it doesn't include. Mr. Morant is not seeking damages for out-of-pocket expenses or lost wages here. So those things have no relationship whatsoever to the damages that you will be evaluating in this case. They are, of course, far, far worse.

Here are the damages the Court has instructed you to consider.

Let's start with loss of liberty, the most fundamental loss in this case. What is the value of the loss of time and freedom of each day of wrongful incarceration separate and apart from any other specific harms? What is the value of having to spend one day in prison as an innocent man, let alone one week, one year, 21 years? Let's start with just one day.

Mr. Jeter described what one day in prison was like. Prison is a horrible place for anybody, but particularly an innocent man like Mr. Morant. Up to 22 hours a day locked in a cage the size of a small bathroom. A metal toilet inches from your head. No privacy, just a

hand-held sheet to use the bathroom. Nothing soft to sit on. A world of steel. You're literally trapped stuck in a cell with someone you can't even ask what are they there for. Constant threat of violence. Constant threat of discipline just for breathing wrong. Constant risk of lockdown with no warning. No choices. No control. No ability to make decisions for yourself. Inedible, unhealthy food that you are afraid to chew too loudly. Referred to by a number, not even a name. And knowing the entire time that you shouldn't be there. It doesn't make any sense, but no one listens, no one comes to fix it. What is a fair and just value for one hour of that? What about one day? What about for one year? What about for 21 years of waking up day after day to the fear that you may die in prison for something you didn't do? What is the value of that?

And what about solitary confinement, even more supreme deprivation, 23 to 24 hours a day in the cell alone with no end date in sight. Almost no human contact at all, only the constant screaming from other cells. Shackles even when you get a shower. And an outdoor cage even in the yard. So trained into helplessness you spend months with the lights on all the time because you don't even realize you can turn it off. What is a fair and just value for one day of that torture for any person? What

about one month? What about 11 months?

But Stefon Morant is a real human being. And so his brand of suffering was unique to him. And his suffering is not limited to the pure loss of liberty. So you have to look at the other injuries that have been shown and how to value them.

So, first is the physical injuries, the pain and discomfort he experienced. You heard about chronic shoulder and back discomfort from living in a cell and sleeping on a thin mat on a metal slab barely as wide as his body for 21 years. You heard about losing half of his teeth on one side of his mouth.

And then there are the strip searches. What is the dollar value of having to endure one strip search? How about a thousand? What is the dollar value of having each strip search be the exclamation point of each family visit ruining one of the only things that brings you any joy?

Which brings us to the emotional pain and suffering. All the extraordinary emotional pain Mr. Morant has experienced for the past 35 years and the anxiety, fear, humiliation, or mental anguish that he is reasonably certain to experience in the future.

Dr. Akinsulure-Smith described how extreme the trauma and the anguish that Mr. Morant experiences. This

isn't like PTSD from a car accident. This is like experiencing a car accident every day for 21 years. And she described how, despite his efforts, he will never recover. He will live with this for the rest of his life. What is the value of that?

And what about humiliation? What is the value of the humiliation of being falsely labeled a murderer again and again? What about the humiliation of not being able to actually support your children financially, sending them the few dollars that you make from your job in prison? Or the loss of dignity of watching your mother spend all of her savings trying to fix your wrongful conviction instead of you easing her burden as you had always planned? Or not being able to be there for Brother D's passing after years of daily nurturing and caring for him?

And finally, you have to value Stefon's loss of a normal life. And as you heard, for Stefon, these damages tower above all others. That's because, for Stefon, all that he endured on the inside, all that he experienced paled in comparison to what he was missing on the outside. He would have given up the rest of his teeth and whatever small privileges he enjoyed for a few hours with his brother or his son.

What is the value of losing your baby brother

and best friend before you are ever able to pay back the sacrifices he made to you in helping to raise your children? What is the value of knowing that you lost so many years you could have spent with your child before he died? What is the value of living out your life thinking that if you had been there when he was growing up, you might have been able to save him? What is the value of not being able to say good-bye, not being able to mourn the death of your father and your brother with your family, not even being able to attend a funeral except alone and in shackles? What is the monetary value of that?

What is the dollar value of having to get married in prison with only four guests and waiting years for a real wedding? What is the value of having no privacy and no intimacy with your wife for the first six years of marriage?

What is the value of missing a first day of school or a graduation? How about all of them? How about 21 years of Christmases, Easters, Thanksgivings, family reunions?

What is the dollar value of missing one season on the sidelines of Christian and Julien's football games? How about their entire football careers, having to instead track their sports careers from Pee-wee to college on your

prison wall?

And beyond each of these big things, there are the small everyday moments. He missed those, too. He missed the school pick-ups and the family dinners and the game nights and Sunday church services with family. Twyla was barely old enough to have memories of her father before he went into prison. Stefon Jr. and Christian and Julien were not. Stefon missed their childhood. And he had to live with the thought of them on the outside missing him, fear over the growing distance year after year. The fear of being a father in name only. And for Stefon, his family and his children, along with his faith, were and are everything to him.

You can see how important it was to him to be present for his children in a way his father was not always present for him. Stefon spent eight weeks taking a dehumanizing class on parenting for an additional hour-long visit without restrictions for his four children.

Defendants took that away from him. And dispute all his best efforts, now there's no good way to make up for that. As Scott Lewis told you, there are some connections that you just can't get back.

So what is a fair and just way to value the enormity of those losses? How many millions of dollars

could possibly fairly compensate for the torture of losing out on the entire childhood of your four children?

And then there are the changes to Stefon and who he is, changes that have continued since his release and will continue into the future. You saw who he is. He's someone whose connection to the people he loves make his life full and rich. That's what he values most in the world.

And they not only took him away from everybody he loved and isolated him, they also changed him by making him live 21 years in a place where you can't ever let your guard down, you can't have any privacy or intimate connections, you can't have any physical touch because you are always worried about the threat of violence or being watched. And so the happy, easygoing, confident kid who tapped his future wife on the shoulder in fifth grade and told her she would be his girlfriend now can't even hold hands, he can't share a bed, he can't enjoy holidays or date nights because his time wrongly in prison has remade who he is.

You saw how hard Mr. Morant's wrongful conviction has been not just on him, but the people he loves most: his mother, his wife, his kids. Defendants' callousness destroyed an entire family. We aren't asking for damages for their suffering. The law does not provide

for that. But we are asking you to assess damages for Stefon's own emotional pain and suffering knowing what they are going through. He sees how much what he has been through and his struggles now impact the people he loves the most, and that kills him. The last thing in the world he wants to do is to hurt those people, to make life harder for them. You decide how to value each of these things and how to add it all up.

You could decide to value each of these harms separately and then add them. Or you could decide on a number per year that encompasses all these different harms Stefon suffered during his 21 years in prison and a number per year for all he has suffered since his release and will continue to suffer for the rest of his life. The way you calculate that is up to you. But you must consider fairly and fully, and value each harm you find he has suffered as a result of defendants' actions.

We will suggest some dollar values for Stefon's values but, as the Judge has instructed, you, and you alone, are responsible for making these calculations. You are free to award less and you are free to award more.

So how much money will justly compensate Stefon Morant for all that he has suffered and all he has lost?

Let's start with all he suffered and all that he lost for more than 21 years of wrongful incarceration. Is

$2 million a year for each of those 21 years enough for all that he endured and all that he lost? That would be $42 million. How about $3 million per year? Is that even enough? That would be $63 million.

And what about all that he endured and all that he lost since he was released from prison before the pardon, after the pardon, and all that he will endure until the day that he dies? Stefon was released at the age of 47. Assuming he lives for 30 or 35 or 40 years, what is the value of all that he has and will endure as a result of what these defendants did to him? Is $500,000 per year, is that the right number for each of the 35 years, is that enough? That would be an additional $17.5 million. Is $750,000 per year more appropriate? That would be an additional $26,250,000. Again, it's entirely up to you.

Now, the City is going to get up here and they're going to try to convince you to devalue Stefon Morant's life and all that he's been through just as they have for the past 35 years. They are hoping, because of who he is, where he came from, or any mistakes he may have made as a young man, they can convince you that the immense, almost unfathomable suffering you saw on display in this courtroom is worth less than the high number your common sense would otherwise dictate. They are hoping

they can walk away from this trial with a slap on the wrist, the cost of doing business, without true accountability. We ask you to do exactly the opposite. We ask you to measure every ounce of damage that Mr. Morant suffered in the past and until his death because that is what the law requires, that is what justice requires. If ever there was a case that screams out for full accountability, it is this one.

You have seen vividly what happens when rules don't matter and misconduct is allowed to go unchecked. We ask only that you follow the law on damages and dispassionately value the full measure of the harm they have caused, to not discount that value, not even one penny.

Thank you. I will have an opportunity to speak one more time by the end of the day.

THE COURT: Thank you, Attorney Brustin.

Members of the jury, we will take our lunch break at this time. We will come back at 1:00. During your lunch break, do not read about the case or research it, and do not discuss it amongst yourselves. Thank you.

(Whereupon the jury left the courtroom.)

THE COURT: You may be seated.

Plaintiff has 20 minutes remaining for rebuttal.

Anything I should take up before our lunch

break?

MS. HOFFMANN: Not from the plaintiff.

MR. GERARDE: Nothing, Your Honor.

MR. TALLBERG: Nothing here, Judge.

MR. RYAN: No, Your Honor.

MR. MELLEY: No, Your Honor.

THE COURT: We will reconvene at 1:00. The Court will stand in recess until then.

(Whereupon, a recess followed.)

THE COURT: Are we ready for the jury?

MR. GERARDE: Yes, Your Honor.

MR. BRUSTIN: Yes, Your Honor.

THE COURT: Okay.

(Whereupon, the jury entered the courtroom.)

THE COURT: You may be seated. We will now proceed with the closing argument of the City of New Haven.

MR. GERARDE: Good afternoon, ladies and gentlemen.

Everyone today is going to start off with a thank you, I'm sure, because what you've given us these last five weeks is a huge ask by us, and you've shown up and we really appreciate it. Everybody came to the jury selection on day one thinking here's my one day, and now

we're five weeks later. We really appreciate it. It's more than anyone could expect.

So we're here today because today is the day when you begin your verdict analysis. And "verdict" is a Latin word. I'm not sure if anyone knows this, it literally means to say the truth. That's your job here today. You're going to evaluate, talk to each other, and say the truth. You render a verdict. And everyone has a role in this process. The Judge is going to give you the law. You talk it out and you say the truth. And the lawyers have a job, too. We are supposed to get you information that you need so you can say the truth. And we do that by asking questions of witnesses and by submitting documents, et cetera.

There are many different ways you can ask questions. And I submit to you some are more helpful to your mission than others. One way you can ask a witness a question is ask a question that allows the witness to think about the question, give an answer, and then you can evaluate that. Open-ended questions. I tried with every witness to ask a question that allowed the witness to hear my question. You could answer me "yes," you could answer me "no," you could answer me "I don't know," you could say "let me tell you a story." It was always open-ended. The other side didn't do that. Almost exclusively, they put

the words in the witness's mouth and then pulled them back out. So technically you got an answer, but how helpful is that?

How many times did we hear an examination, mostly of the police officers, but an examination where the question, it sounded like this is what you were thinking; correct? This is what you did; correct? And this is what you said; correct? And this is what everyone else did; correct? And this is what everyone else was thinking when they did it. That, I submit to you, technically you got an answer out of those witnesses, that's not helpful, because it doesn't give the witness a chance to say yes, no, and here's my explanation. There's no dialogue there.

So, look. Not a fair fight. These old guys, these police officers who have been off the job for 30 years and they're trying to remember what happened. And they're not coming out of nursing homes, but they are no match for the kind of peppering they got. And so some of these guys were answering "yes," "correct," when it was demonstrably false what they were saying correct to. Attorney Melley pointed that out once. I hope everybody remembers that, that there was absolutely -- the answer was X, but following along, yes, correct, yes, correct, yes, correct, yes, yes. And all of a sudden we have

incorrect information because they're just no match for it. That was obvious. It was plain. But you are the ones who need to make the decision. And you need to rely on what is reliable information that I can now use to say the truth.

And I took very great pains to try and get you information based on open-ended questions that would be valuable, particularly on the point of what were the policies and practices going on in the New Haven Police Department.

We had some kind of global-type answers drawn out of the police officers by the other side on, oh, everybody was doing it and everybody knew it. And you saw me ask, Who is everybody? What do you mean everybody? How about a first name and a last name? We'll talk about human beings. So what I did in my examination with every one of the police witnesses -- Sweeney, Raucci, Maher, Petolla, Sullivan -- I gave them a chance to tell me anything they wanted. Tell me a story if you need to. Say I don't know, ask me a question back. Anything they wanted.

And we established what the policies, practices, and training was at the New Haven Police Department. Every one of them had not only their academy training but their recertification training all throughout their

careers. And I didn't tell them what they had. I said, Did you get all of your recertification training when you were a New Haven police officer? And they were able to answer me yes. I asked them, Was it allowed under the New Haven Police Department's code of conduct to coerce witness testimony, to fabricate witness testimony, to withhold exculpatory information? They could have said yes, no, I don't know, let me tell you a story. But that's kind of the easy one. It's does the policy allow that, was that question.

Then I got to -- it's being called code of silence, similar. I said, Did any supervisor ever communicate to you in words or substance -- so it's not just tell you; it's wink-wink, nod-nod -- you can break the rules of the New Haven Police Department and, don't worry, the bosses will look the other way? Did that ever get said to you, communicated to you somehow in words or substance? And every one of them answered no. Every single one. That was unanimous. They all got the same roughly 15 questions, and all five of them answered exactly the same way.

So we're in this scenario where everybody knew it. It went all the way up to the highest levels; correct? And they're getting, Correct. Well, that is not reliable information. What's reliable information is when

you give them a chance to calmly hear your question, reflect, put an organized thought in their head, and then tell you an answer. And those are the answers that I got. I actually emphasized this point by saying, Tell me the name of every single supervisor you remember all the way up, because I don't want to leave anyone out. And I got a very long list of names. And they were all the ranks. And I just want to run down that list. And it's worth spending some of my valuable time doing it just so you hear all the people who were asked did this person ever communicate to you in words or substance that you can break the rules at the New Haven Police Department and it will be looked the other way. Chief William Farrell. Chief Nicholas Pastore. Chief Melvin Wearing. Assistant Chief Tom Muller. Assistant Chief Doug Dortenzio. Captain John O'Connor. Lieutenant Louie Laukaitis. Lieutenant Danny McNulty. Lieutenant Peter Gill. Sergeant Tim Binkoski. Sergeant Tom Richitelli. Sergeant Francisco Ortiz, who became chief later in his career. Sergeant Jim O'Neill. Sergeant Lenny Gallo. And two other sergeants, Montanari and Cacace. As to every one of those high-ranking people, all the way up to the chief, including Pastore, because Pastore is getting a lot of attention in opening argument, not one person said to them, in words or substance, you can break the rules,

don't worry, you're not going to get in trouble, we'll look the other way.

And then I focused on the chiefs specifically with, all right, did you ever witness the chief ever condone anyone -- meaning it didn't have to just be you -- Did you ever witness the chief ever condone any New Haven police officer not following the rules with respect to fabrication, withholding of evidence, coercion? No one ever saw that. So there's zero evidence of that. And evidence is what we go by in court.

I then went beyond the chief to the police commission. As you saw, when Chief Pastore brought Detective Raucci up on charges, they went to the police commission as a disciplining body. Did you ever see the police commission ever condone a New Haven police officer's fabrication, coercion, withholding of evidence? And no one did. So we're talking about evidence here. And there is no evidence.

I then brought it into the internal affairs department of the New Haven Police Department, that's a disciplining body. Did you ever see the internal affairs department ever condone, fabricate, or coerce -- condone, fabrication, coercion or withholding of evidence? And the answers were no, no, no. By every single witness who testified. There's not one single witness who said yes.

I mean -- and these are all open-ended questions. Any one of them could have said, Let me tell you about one time because I do remember this one time when the police commission did this or when Chief Pastore said this to me, et cetera, et cetera. And it was unanimous. So when they say everybody is doing it, there is no everybody; all right? And what we say, we're in court. And in court where we are, that means you have not proved your point because you didn't establish evidence. There isn't one person that supports this contention that everybody was doing it, there's a code of silence, there's a blue wall, however they say it. Everybody needs to have a name. And there isn't one single person with a first and last name who answered one of those questions that they saw Pastore condone or that Pastore said something to them or one of the supervisors said something to them.

So I submit, ladies and gentlemen, just based on this alone, there's a failure of proof here on the policies, practice, and training. They are not entitled to damages from the City of New Haven.

Now, their own expert, Charles Drago, raised a point. And we had a dialogue, and that proves the point that I just made. Remember we were talking about what if you had a business where there's a boss and then there's staff, and someone says, hey, boss, everyone on our team

is using drugs. And he said you can't just fire everybody for using drugs based on that. You have to have proof. You would never do that. I said that's exactly my point, and that's how that ended. You couldn't do that. So they can talk about global everybody this and we all knew that and up to the highest levels. You have to have a name. And there are no names.

Now, a couple of more words on expert Drago, because that was mentioned and he was compared to the City's retained expert, Jerry Rodriguez. You do get to compare credentials when you're talking about experts. And Charles Drago, their expert, had a career in Ft. Lauderdale. Ft. Lauderdale, Florida, is a beautiful city, best spring break in the United States by reputation. And I'm sure he had a very busy and rewarding career. And then he moved on to be a small town police chief where he wore all the hats, including internal affairs. Compare that to the credentials of Jerry Rodriguez. Career with the Los Angeles Police Department where he achieved the rank of captain. Then he became the head of internal affairs in the Baltimore Police Department, he was a commander level and he did that for a few years. Then he went to San Francisco's District Attorney's Office where he was in charge of all investigations and all investigators. So those are some

pretty hefty credentials.

And he wasn't brought here because we were afraid of what he was going to say. We had a stipulation. Stipulations mean both sides agree and the Court reads it to you and you have it in writing now. We had stipulations as to what his testimony would be. And it's okay to have a witness in and to interview them before you start the tape recorder, see if they know anything, see if they have useful information, et cetera. What's not okay, it's not okay to coerce someone before you turn the tape recorder on. Everyone agrees to that. That's not an expert issue. It's not okay to threaten someone, to make them promises. So that's wrong, no question about it. But there's nothing wrong with having people in.

He also said the New Haven Police Department's code of conduct, which is our Rule 15, you have this as Exhibit 565. 565 is your exhibit. The New Haven code of conduct was within accepted practices for police departments in the 1990s. If you actually go look at 565, you're going to see that Rule 15 has the old mimeographed typeset to it. That's because if you have policies and you're enforcing policies from the 1970s all the way forward, that's what your policy is going to look like, and we grab it from way back then when we turn it into evidence.

Rodriguez also said that our Rule 16, which is part of 565 as well, also met the standards for Connecticut police departments in the 1990s. So that's like the precursor to internal affairs. It's the code that allows you to investigate and discipline police officers if there are complaints.

So we have the head of internal affairs for the Baltimore Police Department looking at the City of New Haven's code of conduct and police discipline rules and says those were within accepted practices.

Also within accepted practice, how we trained our men, by sending them -- and women, by sending them to training, by having people come in. It can happen a lot of different ways. You have as Exhibit 542, Detective Maher's training, a chunk of it, the years surrounding this event that we're talking about in 1991. And all officers testified they had their continuing training.

Lieutenant Sullivan recalled being trained on the duties related to exculpatory evidence by the State's Attorney. Michael Dearington came in and he trained them on the duty associated with exculpatory evidence.

Sergeant Sweeney testified he knew he was required to document exculpatory evidence in writing. He knew it. He didn't do it, and that's why you had the Court tell you that the first elements as to the *Brady*

violation are found by the Court.

There's no evidence of deficient policies or practices here.

So let's dig into a little bit the three theories of liability against the City of New Haven.

This first one that I want to talk to you about is the one they call the ratification theory. What that actually means is that the chief got involved in the investigation, the specific investigation involving Stefon Morant, and condoned misconduct. In other words, he got involved, he knew something bad was happening, and he gave his stamp of approval, he didn't stop it specifically in that.

Now, the fact that Sergeant Sweeney, Detective Maher, and Detective Raucci have all testified that no one ever communicated to them that they could break rules, they could violate constitutional rights and get away with it is dispositive of this. All right. So there is no evidence whatsoever that Pastore got involved with Sweeney, Raucci, or Maher and said don't worry, guys, keep going, I don't care about the flaws. They absolutely denied ever having any contact with Pastore or anyone that told them you can get away with this, go ahead. They denied that. Every one of them. And there's no proof contrary to that. So I submit that that's dispositive in

and of itself.

And remember, Chief started in 1990. That was his testimony. You can look back on them. We'll give him the whole year, January of 1990. He's only there a year by the time January 1991 rolls around, and that is when all this misconduct happened. The Ruiz interview, the Sweeney failure to disclose exculpatory evidence, the interview of Stefon Morant, that's all January of 1991. And so Chief is busy, there's no question.

I mean, there was reference on opening argument that this was a small department. Well, you heard his testimony. 450 sworn police officers. All right. I have statistics, and this is Exhibit 548, and you'll have this in evidence, but I've highlighted these. Just look at these years. Chief's first year, 1990, 21,000 offenses. These first four columns go to the detective division. So you can see the top. Murder, rape, robbery, aggravated assault. And we had the testimony that those would go to the detective division. Just in 1990 alone, there's probably 4,000 new cases in the detective division. 1991, probably similar. But the Chief is the chief of the whole department. All right. There's probably 40 detectives and there's 450 sworn police officers. And all the administrative staff that supports all of that operation, the Chief is the captain of that entire ship. He is not a

supervisor of the detectives. That was very clear. He has captains, lieutenants, and sergeants for that.

And there is no evidence that he had any involvement whatsoever in the Morant investigation. Certainly, there's no evidence that anyone came to him -- and this is what you see typically in a ratification case, no one came up to the chief, Chief, we've coerced a statement from Mr. Morant but we're going to run with it and seek an arrest anyway. If he says, yeah, go ahead, that's ratification. It sounds absurd, but that's what you need --

MR. BRUSTIN: Objection to what you typically see in a ratification case.

THE COURT: Overruled. You can address it on rebuttal.

MR. GERARDE: Imagine if someone said, Chief, the detectives fed information to witnesses who knew nothing about the case, but we're going to use him anyway, and he says go ahead. If there's evidence like that, yes, we lose. But there is no evidence whatsoever he even knew about that investigation or anyone spoke to him. And there isn't any reason why. But remember, once you have Sweeney, Raucci, and Maher all testifying I never saw the chief ever condone fabrication, withholding of evidence, or coercion of witnesses, this is case closed on a

ratification theory.

The next theory I want to talk to you about is this theory of deliberate indifference. Now, there are -- what this theory is, is that the chief demonstrates, through his own ignoring of problems, that he demonstrates to the staff I don't think these are that important, so you don't have to worry about following the rules. That's the theory behind that. And it has to be that the chief creating this scenario where he is condoning this and he's consciously ignoring problems, this is the moving force behind what the detectives did that becomes the civil rights violation.

So in order to really understand this, we need to remind ourselves of a couple of things that the Judge told you about in her charge.

This is from page 20 of the charge. It has to do with what but for causation is. And you'll see that but for causation is established when a particular outcome would not have happened but for the purported cause.

So on this theory against the chief and his deliberate indifference, it's whatever the detectives and Sergeant Sweeney did in January of 1991 would not have happened but for the chief reacting with deliberate indifference and them figuring it out and then acting accordingly. Hold that thought because there's another

element of causation, because that's not proved and neither is this one.

This is the moving force piece to it.

To show causation, Mr. Morant must prove that the alleged City policy or custom was the moving force behind the constitutional violation. Post-conviction events cannot be the moving force behind the alleged constitutional violations because they occurred after the alleged violations.

So just to keep the timeline in mind, all right, Chief Pastore arrives in 1990. In order for this theory to work, he would have had to in that first year had situations arise where he was consciously deliberately indifferent to problems going on in the department, and that became the moving force why bad things happened in January of 1991 in terms of coercing witnesses and statements, et cetera. There wasn't enough time for that to happen. There's no evidence that the chief did anything in 1990 except deal with this massive influx of cases in his first year that you're looking at right here. 21,000 cases to a brand new chief.

And what the plaintiffs sought to do is to have you take a look at this chart they created involving other events that happened as if to show there was a lot going on that the chief probably got to his desk and he

consciously ignored. This is a judicially noticed facts. You have this. You will have this. So you can read them all carefully. I just want to run through seven of the items here. These are the seven that they're pointing to.

Eric Ham is the 1991, he's charged with -- this is the one where you had the memo, the internal memo from one prosecutor to the head prosecutor and they said, well, that must have gone to the attention of the chief. Well, there's an internal memo saying I'm dropping these charges and we need to get the New Haven Police Department's full file when we start dealing with this -- I'm sorry, as we continue to deal with cases like this in the future. There's no evidence anyone saw this memo. It was internal to the State's Attorney's Office. There's no evidence the chief saw it, reacted with deliberate indifference, no evidence that Sweeney, Raucci, or Maher knew what the chief had done regarding Ham and said, oh, Chief doesn't care about this, we can just do anything we want. That's the point of moving force and but for causation. They have to prove that the chief's conduct was the moving force before they did, and that drove what they did when they did what they did in January of 1991. This happened after January 1991. If you look at that memo, the arrest happened in January, but the nolle happened three months later, that would have been April. So all of those things

that happened in January 1991 had already happened, plus the fact that Sweeney, Raucci, and Maher have all said that I never saw the chief do anything to condone and I never was told by the chief it's okay, we'll look the other way. Again, that's dispositive.

This James Fleming case -- read these carefully as you go through them. By the way, 1996 is when that federal jury came back. So a jury verdict in 1996 is not going to drive what detectives did in 1991.

James Fleming, arrested in May of '91, which is after January '91. And at his trial he was acquitted of murder, but he was found guilty of the robbery. So he was in on it, but they couldn't make him the person who pulled the trigger. This is a person who was guilty of conspiracy to commit robbery, and that was affirmed by the Connecticut Supreme Court in 1995.

The Golino case is one that I really hope you will dwell on because, yes, there is a reference in this decision that there was an officer who testified that it was his practice to omit exculpatory omission. But the Court of Appeals -- that's the Second Circuit here -- did not decide whether any officer acted unconstitutionally. If you're the chief, you're like, well, there's no finding of unconstitutional conduct, and the trial court, listen to this one, separately dismissed municipal liability

claim against the City finding the plaintiff had not put forward sufficient evidence of unconstitutional municipal policies or practices. So here is a court saying the plaintiff took a shot at the City saying you had unconstitutional municipal policies and practices, and the court threw it out. So that doesn't tell you I have got problems. That's not something to be ignored and you can tag a chief for saying, oh, you were consciously indifferent to that. The court threw out the municipal policies claim in that case, in Golino.

And then the remainder of these are things that don't add up to anything except one person claiming, ultimately, I got some type of relief.

So in the Maceo Streater case, 1993 he's convicted of murder. April 2022 he gets a full pardon. We know a pardon is not a finding of innocence. You saw that in the Judge's instruction.

A few more on the back. 1994, Daryl Valentine, convicted of murder. 1997, conviction reversed, he gets a new trial. 1998, he's retried and he's again convicted. The Supreme Court affirms that in 2000. Twenty-two years later he gets his sentence commuted by the Board of Pardons. Again, that's not a finding of innocence.

So what, for example -- now, remember, this is all offered in support of Chief Pastore's deliberate

indifference that drove what the detectives did in January 1991. How is something like this evidence that the chief was deliberately indifferent to and that drove what any detective did in 1991?

Two more here is all I have. Gould and Taylor, 1995 they're convicted. In 2010, a court vacates the convictions. In 2011, the Supreme Court reverses that and then the one man who was still alive is returned to jail. And then in 2024, he gets relief. So 2024 is not going to mean anything to Pastore in 1995 or '4 and certainly not in 1991 during his first year so that he could somehow be a moving force behind what happened with Sweeney, Raucci, Maher.

1995, Adam Carmon is convicted. 2023, convictions are vacated. Again, that can never be a moving force why detectives did what they did in 1991.

So there is this claim that there's a policy of indifference, and there isn't.

Again, the fact that the only people who actually committed the -- allegedly committed the misconduct, the three people charged with a civil rights violation in this case, Sweeney, Raucci, Maher, have all testified they never saw the chief even once condone misconduct and no supervisor, including the chief, ever said to them you can do what you want, we'll look the

other way. That's dispositive. And that's why the City cannot be found liable under item two or method two of deliberate indifference.

Let's talk about method three, which is that there is a widespread practice so widespread that it has the force of law. All right.

So they've identified -- if you believe the judicial notice here, they've identified seven events that happened. Seven events that maybe involved nine people because there are two persons arrested in the same one. But look what's going on here. I'm giving you the Pastore years of '90 through '95. If you wanted to look to see if there's a widespread practice as of 1991 in January and that's what motivated what Sweeney, Raucci, and Maher are accused of, it's not there.

First of all, they have all said I have never seen a chief condone it. And they were asked about Farrell. These are William Farrell's years as chief. They've never seen Farrell condone. They've never seen the police commission condone. They've never seen internal affairs condone. And this is the years before Pastore. So how could a widespread custom of accepting violation of civil rights be a moving force behind what they did in January 1991? When there's probably, I don't know, 15,000 cases, detective cases in this six-year

period leading up to January of 1991, and they've pulled about seven, eight, or nine maybes from the years after '91. That's called not proving the case. That's a failure of evidence. And that's why I want to emphasize where we are in the verdict form. Because your verdict should be for the City in these cases, as to all claims.

Here's the verdict form. You have this. Count Seven, the *Monell* claim.

Question 13. Have they proven by a preponderance of the evidence the City of New Haven had the widespread practice, as we just finished talking about? The answer to that is no.

Have they proved that the City, through its policymaker Chief Pastore, made a deliberate choice not to provide appropriate supervision and discipline? The answer is no.

Have they proved by a preponderance of the evidence that the chief ratified the unconstitutional conduct? The answer to that is no.

And then Question 16 is this moving force question. Even if you checked "yes" for any of those boxes that I just mentioned, 13, 14, or 15, you still have to find that any such policy or practice was the moving force behind what the detectives did. And the detectives -- I'm beating a dead horse, I realize that. I

can't say this enough times. They have all sworn. They testified consistently, never inconsistently, never changed, never waffled that there was no time that they saw the chief condone officer misconduct or internal affairs or the police commission. And no supervisor ever told them wink-wink, nod-nod. There's no way that any action by the City of New Haven would have been or could have been the moving force behind what they did allegedly in January 1991. Which means the City is not responsible. So that's how we ask you to fill out that verdict form.

Now, Chief Pastore got a lot of mention in opening argument and specifically what happened in 1995, 1996. And I want to explain to you why the actions that Chief Pastore took in 1995 when the FBI investigation began were reasonable. In 1995, the investigation by the FBI begins. And you saw it in opening argument, the New Haven Police Department was already looking at Raucci, all right. They had their own thing going on. When the FBI comes in, the local municipal police department has to step back. No one can do it as well as the FBI. So you let the FBI run their course. And that's what they did. They took from May 1995, went all the way to December of 1995, there was a lot of smoke there but they couldn't build a case. They said we don't have a case for arrest. And that's where you have -- this is 45F, as in Frank.

And this is at the end of the drug investigation phase. This is where they write on December 15, 1995, all right, they uncovered a great deal of potential and criminal activity, but we don't have enough for -- of solid information for a federal criminal indictment. We believe the information should be forwarded to the State's Attorney and the Chief of Police of New Haven for the potential criminal prosecution or administrative action. This is December 15, 1995.

Within the next month, Chief Pastore brings Raucci up on charges before the New Haven Police Commission. That is our Exhibit -- I'm sorry, Exhibit 564. I'll put it on the screen for you.

January 31, '96, this is the next month. Based on an ongoing internal investigation -- so it started and it's continuing -- we believe Raucci has violated several rules. I've suspended him without pay and he's not allowed to enter the police facility.

So in the next month Raucci was suspended without pay, not allowed in the building, and he never came back. And what they did was they had this information. We got criticized for why didn't you arrest him on the drug charge. The drug charge was not a ready-to-go made charge that the FBI just handed to the police department. They couldn't get enough for an

indictment. But there was a lot there. There was a lot of smoke. And so you heard what Brian Sullivan testified to. What he said was we had what we had on him, the seven charges that were brought to the police commission, and we said if you don't resign, we are going to make the rest of that drug charge, you know. If the FBI got 80 percent of the way, we're going to get to the last 20 percent, and then you're gone for good. And that's when he left.

Now, if we go to the last page -- so we didn't throw the drug charges out and we didn't throw these charges out. Raucci left. He had a union contract that allowed him to take his pension and so he took it.

And then here's from the police commission. This is the end of the same exhibit. It's the best interest of the department that the board suspend indefinitely any action on Pastore v. Raucci, but appends and makes a permanent part of his file to the charge sheet and related documents. So not thrown out, it was suspended. If he ever tried to come back, obviously this would be brought up and he would be prevented. That tells you that this is an appropriate reaction by Chief Pastore.

And where we are is there's no evidence that would justify making a Connecticut public entity, the City of New Haven, pay damages in this case. It just doesn't come up, it doesn't add up.

MR. BRUSTIN: Objection.

MR. GERARDE: These detectives -- I'm moving on, Judge. I don't know what that was --

THE COURT: To public entity?

MR. BRUSTIN: I'm sorry, Your Honor. Yes. Objection -- yes, on who is paying in a public entity.

THE COURT: Can you clarify that, Attorney Gerarde?

MR. GERARDE: Yes, I'll rephrase that.

You should not award damages as to the City of New Haven, Connecticut, as called for by the plaintiff in this case where detectives knew the rules, they were fully trained, and no supervisor ever suggested that that would be condoned.

So let me say a few words about Bobby Lawlor.

Bobby Lawlor, former sergeant, former lieutenant. He's not charged with a civil rights violation. He was not involved in any of these nefarious interviews that we're talking about here. He's charged with negligence only. He's not alive, as everyone knows, to defend himself. I know Attorney Melley behind me will be speaking for him, but I want to say a few words, too.

The theory of negligence is Sergeant Sweeney told him what he saw about Detective Raucci feeding facts to Ruiz. And so if we accept that as true -- and I know

that that was denied when we saw the video. Even if you accept that as true, this is not negligence by Lawlor. I will tell you the very first thing he gets to assume is that Sergeant Sweeney had an absolute obligation to memorialize in writing what he learned and witnessed regarding the Ruiz interview. He testified to that. So Lawlor has a right, at minimum, to know that, all right, Sergeant Sweeney is going to write up what he saw, now what do I do with it?

If he looked into it, what he would see is, well, all right, I have a situation where someone came in and they said I don't know anything, but a statement was taken and what do I do about that? All right. The fact that I don't know anything doesn't necessarily mean that they don't know anything. A lot of people come in and say to the stranger, like the strange sergeant, I don't know anything, and then it develops into something else. Does it mean you don't write it up? Of course not. You have to write it up so the prosecutor has it. That's what got Sergeant Sweeney in the trouble that he's in right now, he didn't write it up. But if you're Lawlor and you decide you're going to take a look at what's happened, the first thing you'd see is Detective Petolla, who sat in on the interview, said there were no improprieties, Raucci did a good job then. He would also see that Ruiz returned the

next day and signed.

Now, we have this. This is your Exhibit 501. He gave 20 pages of testimony, and he came back and signed it. And look at what we have on page 3 here. Page 3 is when the witness comes back -- and you'll have this in evidence -- the witness comes back to sign and so then there's a typo here, everyone has to initial. There's the initial of MS, that's Mike Sweeney's initial. And it's down at the bottom also.

So if Lawlor looks into this, he's going to say, all right, the witness came in and told Mike he didn't know anything, but he did sit in with Petolla in an interview that had no improprieties in it, he gave 20 pages of statement. And then he came back the next day and he signed it under oath. Sworn by Mike Sweeney. And if he keeps looking, he'll say, all right, and there was a second statement given by this same person with his lawyer in the prosecutor's office three months later.

So he's not seeing any impropriety as this goes along. He's not seeing any need to I need to jump in here. Of course, he assumes that the right thing got done when Sweeney had the obligation to do the right thing, he doesn't realize that, and there's no evidence he doesn't know that that hasn't happened. No one claims there's any impropriety in that second statement. Was it troublesome?

Yes, it's rare that anyone ever comes back and has to give a second statement, but what Ruiz said in that second statement was I'm being threatened to recant. So the prosecutor says let's get this in once and for all and have it done and see what it says.

And if he kept looking, kept looking all the way through trial, he would see that this same witness swore an oath and testified at trial -- that's the 150 pages of testimony you have -- and he testified at the trial of Mr. Lewis as well. And there was conviction with jury finding proof beyond a reasonable doubt. That doesn't trigger anything in Lawlor's mind that there's something wrong here.

Why is this important? There's two reasons. Because negligence requires failure to act as a reasonable person under the circumstances, and there's nothing for him to do other than know that one time I got told and then if he looked in at it, there was nothing to see there.

The second thing is, is there's this immunity doctrine. And I know this is the first time you're hearing about immunity and it's really hard to embrace, but you have it all written down for you. Bobby Lawlor has immunity for his police acts, in general. They're generally discretionary acts. There's an exception. If

it's apparent to him that if he doesn't do something immediately, some identifiable person is about to get hurt, then he doesn't have immunity, he has to act. But what this is telling you, this whole sequence of facts I just went through, is that moment never came. There's never a time in this sequence where Lawlor thinks if I don't do something right now, Stefon Morant is going to get hurt and hurt badly. It's just not there anywhere in this.

You can say question one -- and I'll see if I have the verdict form. But question one as to Mr. Lawlor -- well, I think I may not have it. But question one is: Have they proved the claim against Lawlor for negligence? The answer to that is no. But even if you say yes to that, you then have to say have they proved the exception to Lawlor's immunity. And the answer to that is definitely no. There is no moment where it was apparent to Lawlor that if he doesn't intervene right now, that this someone is about to get hurt imminently. "Imminently" is an important word in that paradigm.

So in the time I have remaining, I want to talk to you about sympathy and anger. All right.

Sympathy and anger are two very real human emotions. We all have them. They're supposed to play no

role in anything that you do. And we have to fight that because we have all these normal sympathy and anger feelings and they come up. And they come up in this case, there's all kinds of ways to trigger them, all right. Whether it's intentional or not, they just come up because we're all human beings. The Court has told you you have to put that aside. And that's the only way to decide this case, that's the only way you can say the truth and decide it on logic and common sense.

So I ask you to support each other in this regard. If you're in there and you're deliberating and someone senses that there's anger going on that's driving some of the conversation, raise your hand and say, hey, let's not let anger decide this, all right? Let's just stay cool, calm, and collected and get back to what we were talking about. If it starts to be grounded in sympathy, raise your hand and say let's not base this on sympathy. Let's be cool, calm, and collected, and let common sense and logic drive what we're doing. If one of the lawyers gets you riled up -- that happens, all right -- don't let each other make a decision based on sympathy or anger.

Now, I want to talk to you about the large number that you heard on opening argument. And, yes, there's a shock value to it. Let me tell you my thoughts

on that and tell you a scenario that illustrates how I think about something like that.

Let's say I'm a lawyer and I have a case, and I want to get a million dollars for the case. And I ask a whole bunch of people, as my test group, what do you think? I tell them the whole story. They all say $450,000 is the average. Then I go and get a different group, tell them the exact same story, but what I say to them is and I want $4 million for that. And then I get back the average at $1.7 million. Same exact case. I submit to you, the reason is because when I plant $4 million in their mind, I set the process in play in a way that's going to get me a lot more money. So someone could be thinking $4 million, that's outrageous for what he just described, I wouldn't even give him half, that's two. Well, a little less than half, 1.7, I think I can live with that. That is the process that I believe is in play here. You have this very large number thrown at you so that it just sets where we are so high that no matter what happens, you cut it in half, you cut it in fourths, you have a gigantic award.

So what I submit to you, that there's only one way to be fair, just, and reasonable about this, and that is you have to start at zero. Everybody walks into court having to prove their case under the law before they're

entitled to any money damages. So there's no ceiling. You are free to go as high as you want as long as you believe it's fair, just, and reasonable. But the starting point has to be zero.

And I submit that your foundation should be the evidence you've heard about exactly what Mr. Morant's current situation is. It has to start there. And like I say, I'm not talking to you about limits, I'm not trying to get away with a wrist slap. I'm telling you there's no evidence why the City should pay or where the award should be entered against the City under any of these theories. There's no evidence of that. But I want you to understand --

MR. BRUSTIN: Objection again.

THE COURT: Overruled.

MR. GERARDE: There's -- what I'm telling you is don't be swayed by what you heard on opening argument.

Now, we know, Mr. Morant and his wife, they live in the New Haven area. We know that from examination. We know they're both full-time employed and they work for the City of New Haven. Yes, they work for City of New Haven. We are very happy about that. We appreciate their service. They're able to -- they're full-time employed, they travel to North Carolina to see family, et cetera. That's a fair starting point. Move up from there. All

right.

There's all kinds of things you can consider when you consider damages, I don't deny that. But what's a logical way to think about that instead of with your heart or with your gut, anger, sympathy? Take your calculators out. Do the math. What if someone were to say, all right, $100 a day for all the days that he was incarcerated. You can punch that in, times 365, times 21 years, it's $757,000, something like that. Someone else can say $250 a day. You know, what does that add up to? That will get you to like $1.9 million. And so on and so forth. But for them to say we're not going to be talking about dollars when I ask you how much something's worth, we're going to talk to you about millions, they've now changed the language. We're not talking about how many dollars, we're talking about how many millions. So if I can make the conversation go there, I'm really off to the races. And all I'm saying is this is a very difficult time for you guys because you now have to make this decision. And we live with whatever you say. Whatever you decide is fair, just, and reasonable, we live with it.

And I want you to know this has been my one chance to speak to you. After I'm done, the others behind me will go, and plaintiff will have a chance for rebuttal argument. I don't get a chance to stand up again and say,

remember, don't base this on anger, don't base this on sympathy. Be cool, calm, and collected. It's a very difficult task you have ahead. And I would encourage you to support each other, keep each other on track. And I want you to know that I wish you the best, and it's been my distinct privilege as the City of New Haven's lawyer to stand before you and talk to you about this case for the last hour. And I thank you very much.

THE COURT: Thank you, Attorney Gerarde.

Members of the jury, we'll do Mr. Raucci's closing argument, he has 30 minutes. And then we'll take our afternoon break, to be followed by Mr. Sweeney's closing argument and Mr. Maher and Lawlor's closing argument.

MR. TALLBERG: Your Honor, I think Attorney Gerarde went less than his hour. May we consider that he ceded a few minutes to me if I go just past 30 minutes? Or I'm at 30 minutes?

THE COURT: Please try to stick to your 30, but if you go a couple minutes over, I won't interrupt you.

MR. TALLBERG: Very well. Starting at 2:01 to 2:31, thank you.

May it please the Court, counsel, ladies and gentlemen of the jury.

Almost everyone lies to the police. You may

recall those were among the first words I said to you when I stood here four weeks ago in opening statement. And that, in fact, is what you heard these officers testify to during this trial. In fact, that quote "almost everyone lies to the police," especially in serious matters, was a quote from testimony of Mr. Michael Sweeney.

I also told you that the police officers' job in that scenario is to navigate through those lies and try to determine how to solve a murder case. And what happened here, as I told you in the opening, is that the evidence was presented to a prosecutor, Assistant State's Attorney Cecilia Wiederhold, who signed off on an arrest warrant application regarding Mr. Morant which was then presented to a judge who made a specific finding of probable cause, and then the case was tried to a jury. It was not the police or the prosecutor who decided whether Mr. Morant was guilty; it was the jury of Mr. Morant's peers in New Haven.

So with that backdrop, let's start with a few words about what is at issue in this case and what is not at issue and what you are to decide as the jury.

You may recall from my opening statement on behalf of Detective Raucci, we did not take on the burden of proof to establish guilt or innocence of Mr. Morant. I am not a prosecutor. This is not a criminal case. A

finding of guilty or not guilty can only occur in a criminal action. It's not on the verdict form. Your verdict will not determine that issue. Your verdict will only decide the civil liability, as you have just been instructed by Judge Nagala.

So let's talk about innocence for a moment, nonetheless.

You heard during this trial that it was a sentence modification in 2015 to which Mr. Morant agreed, through his counsel. You heard there was a pardon in 2021. But as the Court just instructed you and you may still have it in your hands or you will in the jury room, the instructions at page 16 specifically instruct you, and you must follow this, that a sentence modification does not overturn a conviction and it does not establish a person is innocent. A pardon is also not a finding of innocence. And thus, as we sit here, there has not been a finding of innocence and the issue again is not before you. Instead, the verdict form, which you were just showed part of, and the instructions from the Court are that you are to determine as to Mr. Raucci whether he is liable for engaging in malicious prosecution or fabrication of evidence, coercion of witness statements, withholding exculpatory evidence, or having engaged in a conspiracy with Mr. Frank Parisi or others. And on those

issues, Mr. Raucci has been consistent for the past 35 years at least, and going back to 1991, that he did not engage in any of that misconduct.

So let me give you a quick road map. What I'm going to, I hope, do over the next 25 minutes, we're going to touch upon not all the evidence, you heard from more than 30 witnesses, many live, some by designation. I'm going to go through perhaps some of the more important witnesses, touch on the verdict form. And at the end, I'll ask you to please return a defendant's verdict for Mr. Raucci.

Let's start with the big one, Ovil Ruiz, a/k/a Agustin Castro, known as Junior, Junito, Blockhead, George Melendez, pick your name. He was arrested by Detective Raucci for having shot a man, Javier Torres. That arrest warrant, it's Plaintiff's Exhibit 130 -- I think we might need a toggle on the screen, Ms. Denault.

That arrest warrant dated January 10, 1991, for Ovil Ruiz was also signed by Cecilia Wiederhold, prepared by Detective Raucci, who brought Mr. Ruiz to justice for having shot a man.

Now, Ruiz claimed before you that Mr. Raucci was some kind of father figure, that he knew him, that cannot be reconciled. That insane story cannot be reconciled with this undisputed fact that Raucci had him arrested for

shooting a guy. And you have the undisputed testimony from Mr. Ruiz he went to prison for seven years for shooting the guy, Mr. Torres.

Ruiz also admitted that he was part of the drug operation at 149 Clay Street just around the corner from his house, he could walk to work.

He testified to you, unlike some of the witnesses who wanted to minimize the involvement in the drug activity or how extensive it was, Mr. Ruiz laid bear the harsh reality that that drug house at 149 Clay was a 24/7 operation. And when he was asked that open-ended question, he turned to you like reliving his glory high school days to tell you, oh, yeah, there was a graveyard shift, 11 to 7, midnights, and then a day shift and an afternoon shift, with a walk-up window like a Dunkin' Donuts selling cocaine through the window.

He also testified that while he was in prison for that offense of shooting a guy, he received a letter dated July 18, 1991. This is just seven months after the arrest, you have it in evidence. It is Exhibit 530. And in this letter, which Mr. Lewis admitted sending, he refers to Block and he says, Be smart. Further down the page, Me and my moms are getting some money together to get you a real lawyer. Further down, he is told -- this is Mr. Lewis writing in the name of Mike Love, Nobody's

saying anything or knows anything. Next page, it's signed Mike Love and Mack Tonight, who you may recall, if you can keep the aliases together, that was I believe José Roque. And the letter ends with, Don't incriminate yourself for nothing. If you do, you're through. Signed, the Exchange Street Posse.

Now, Mr. Lewis testified he was just being helpful, thought that this would be helpful to Mr. Ruiz. But you can reasonably infer that because Mr. Ruiz was the key witness testifying against Mr. Lewis and Mr. Morant in two trials, that he would understandably be concerned about retaliation for having served as a prosecution witness. And you also know that Mr. Ruiz/Castro was consistent in his reporting of the January 1991 statement and the May 1991 statement all the way through the two trials in '94 and '95. And it wasn't until 1995, '96 that the FBI gets involved, that he attempts to recant his story.

But we have Exhibit 528, you have it in the jury room with you, or will, it's on the screen now, dated February 16, 1997. Mr. Ruiz told the FBI that he was recanting his recantation, that actually he claimed he had been pressured to lie to the FBI by Mr. Lewis and that the testimony he had given at the trials was the truth. So you'll have to consider all of that.

Moving on, you had Mike Sweeney. He was asked a series of leading questions by counsel, and the Judge has instructed you that those leading questions are not evidence. I would submit that most of the testimony you heard from law enforcement was basically rapid-fire questions from plaintiff's counsel set in such a forceful manner and with such speed the court reporters were having trouble keeping up, that it was designed to elicit the answer "yes" with false premises built into the question. But let me compare that to when Mr. Sweeney was asked an open-ended question in 2013 in court in a habeas proceeding under oath, the question which I read to you, he was impeached with it, question was: "And what did you see Mr. Raucci doing? Answer: But he didn't threaten him in any way. He just matter of factually" -- and then the answer continued.

The point is, ladies and gentlemen, when Mr. Sweeney was not being peppered with the leading questions, when he was handed a where, what, why, how question about what he saw Raucci do in 2013, Sweeney's testimony was he didn't threaten him in any way. Mr. Sweeney was impeached right before your very eyes because when he was confronted with that 2013 testimony, he tried to deny it, and I had to ask him again, and he finally said that is what it says on the page. And so the

Court's instruction regarding what it means for a witness to be impeached you will find at page 13 of the jury instruction, it means a witness testified falsely on a material matter. Somehow after many years of Mr. Sweeney meeting with Mr. Morant's lawyers and investigators, his testimony morphed from Raucci didn't threaten Ruiz in any way to something other than that. And despite the fact that Mr. Sweeney is seated over on the defense side of the table and is in fact a defendant in this case, you heard testimony that he has been in contact with Mr. Morant's lawyers for many years going back to at least 1999 up to the present. Make of that odd situation what you will. But please don't forget the fact that Mr. Sweeney was impeached.

You heard from Brett Dignam. She was the law professor from Columbia who had 40 students from Yale and Columbia who sought to overturn 14 decisions from state court judges, the Connecticut Appellate Court, the Connecticut Supreme Court. Through Ms. Dignam, that's when you first heard the name of the investigator Melanie Carr, a private investigator hired by the Lewis team.

Ms. Carr, you heard, had been engaged as early as 2009. And you heard Ms. Dignam testify she and her team got the boxes of evidence regarding the Morant trial from the State's Attorney's Office, not from the New Haven

Police Department, because it was the State's Attorney's Office that prosecuted the case which corroborates Mr. Raucci's testimony that he was working with the State's Attorney's Office with regard to the charging decisions. It was the State's Attorney's Office, obviously, that prosecuted the case. That's why they're called prosecutors.

You heard from Vaughn Maher a fair amount. He testified that Mr. Raucci didn't engage in any misconduct.

Now, again, the device of leading questions after many days of being peppered with leading questions, he got bullied into some leading questions and gave some answers that didn't quite make sense that the "yes" answers to leading questions barked at him. But most importantly, Mr. Maher's March 27, 1991, report, part of Plaintiff's Exhibit 1, Bates pages labeled 451 to 452, which we have on the screen, this is an important part of the chronology. In this report, Mr. Maher documented in paragraph B on page 1 with regard to Michael Cardwell that "this sergeant did observe Cardwell in the area of Congress Avenue either by himself or with another party with the informant" -- that was Frank Graham -- "nowhere in sight, although he" -- Graham -- "stated that he was with Cardwell at the time." Now, that was just one of four multiple facts, Paragraphs A through D, documenting

that Maher and the New Haven police were actually surveilling Cardwell, they had concluded the informant's lying to them, that he was taking money, probably using it to buy drugs, was no longer reliable, and that is why he was ruled out at that point.

Now, again, the timing is crucial. March 27, 1991, is just two weeks before the April 12, 1991, arrest warrant affidavit -- this is Plaintiff's Exhibit 3, we have it on the screen -- for Scott Lewis. Again, signed by Cecilia Wiederhold and Raucci. And what this does is corroborates Mr. Raucci's testimony that as they got closer to an arrest warrant -- and put this in context. You have a double murder involving a former public official, an alderman. Do you think for a second that just a lone detective is going to be making these decisions and walking over to the prosecutor's office? Or is it more reasonable to conclude that at this critical juncture, the State's Attorney's Office is saying, well, this is what we're going to do, we're going to charge this person first, Lewis, as Mr. Raucci testified, and then it's not until ten months later, February 1992, that Mr. Morant is charged.

So moving on, then, you heard just a few words about Donna Desai, Mr. Raucci's obviously disgruntled ex-wife. Most importantly, she admitted she has not had

any contact with Mr. Raucci for 20 years, more than 20 years. She told you she didn't even wait for him to try to friend her on Facebook, or whatever the term is, she blocked him so she wouldn't ever hear from him. And she didn't.

Through Ms. Desai you heard the second reference to Melanie Carr, the private investigator, the one who had been hired seventeen years earlier in 2009. Fast-forward to present times and you heard that Ms. Carr, the investigator, is in the living room of Mr. Raucci's disgruntled ex-wife multiple times. And then she's driving Ms. Desai in a car to her deposition at the plaintiff's lawyer's office.

Now, that highlights the hypocrisy of the manner in which this litigation has been prosecuted. The police are faulted and they're accused of breaking a cardinal rule: How dare they talk to a witness before they go on the tape and start the tape recording? That's a no-no, they tell you. But this is exactly how this case was prosecuted. Witnesses were sought out by investigators, like Ms. Desai. The investigators went in and then delivered them. And we don't know what was said. But then they're finally put on the record and they give their testimony. I'm just pointing out the hypocrisy. Litigation can be rough, ladies and gentlemen. But I

would submit to you, respectfully, that dragging in the ex-wife of a detective is a low blow.

You heard from Joseph Petolla. He testified he didn't like Raucci. He had a lot of bad things to say about him, things he didn't care to document, but was all to too happy to come in and tell you. Here's the thing. Petolla was in the interview of Ovil Ruiz. Exhibit 401, you have it on the screen. This is, again, remember, plaintiff's theory of the case. This is the poison. This is the poisonous tree. Everything from this interview of Ovil Ruiz January 14, 1991, is flawed after this. But you see that Ovil Ruiz gave the following statement to Detectives Vincent Raucci and Joseph Petolla. Even though Petolla has obvious bias against Mr. Raucci, he didn't have anything bad to say about that interview. He didn't testify about alleged stopping, starting, overrecording, or any improprieties regarding the interview of Ovil Ruiz. And so Petolla didn't help them on that point.

Let's turn to Mr. Raucci. Okay. You heard from Mr. Raucci. And one of the things he has been consistent about, again from the beginning of time, is that he did not do these things that he's accused of.

Now, admittedly, the 1991 Vincent Raucci is a different man from the 1995 or 1996 or, even fast-forward to the 2026 version that you saw here today. Father Time

has not been kind. You could hear in 1991 Mr. Raucci's voice was firm and clear, crisp, enunciating his words, not threatening. And I would encourage you to listen to the recordings -- we're not going to do it again here, but in the jury room -- he's not threatening witnesses, he's speaking matter of fact like this asking open-ended questions and getting answers.

In 1994 by letter dated June 28, 1994, Assistant State's Attorney David Gold wrote this letter to Chief Pastore about Raucci, singing his praises. At that point he was still a decorated detective. And in the letter Mr. Gold wrote that Vin remained available to me and his availability to take in stride the last-minute nature of so many of my requests corroborates Mr. Raucci's testimony that at various points in this case, including that early juncture, March, April 1991, he was acting at the direction and taking requests from the State's Attorney's Office because they were making charging decisions about how to prosecute it.

By 1996, Mr. Raucci had gotten himself in some hot water. By 1995, '96, the FBI came in. Can you imagine the shock wave that must have sent through the New Haven Police Department? For 22 months, they're turning things upside down. Some colleagues still supported Raucci, including Mr. Maher and Robert Lawlor.

And then, like in any large organization, he had ruffled some feathers, he had some enemies, so in 1996 his career ended in a bad way with a disability retirement, but for reasons having nothing to do with this case, ladies and gentlemen.

Let's talk about that conspiracy theory.

The problem with plaintiff's conspiracy, the grandiose conspiracy theory, is the timeline, among other things. In January 1991, Mr. Ruiz came into Raucci's orbit because Raucci had him arrested. That's undisputed. And Raucci had him brought to justice for the shooting. He didn't cut him a break. And it makes sense then that Ruiz, facing criminal liability for having shot a guy, says to Raucci, hey, I got some information. I work in this drug house and I heard about a murder. You could see how that would happen. He doesn't spill his guts, Mr. Ruiz/Castro, all at once. That's not how snitches and cooperating witnesses operate. He does it a little bit at a time. In fact, that's how most humans do it. He initially minimizes his involvement.

It also makes sense that Mr. Ruiz, being in the game out there selling drugs, is not going to open up to Mr. Sweeney who is a more straight-laced supervisor. He's the senior guy, he's the boss. Raucci is the more hardened, rough-around-the-edges street detective. You

can imagine why Ruiz would clam up when Sweeney comes in the room and spends an hour and tries to extract information. Sweeney can't get it. But Raucci can.

And respectfully, even Mr. Sweeney I think in this court admitted to you that he could have been wrong, Ruiz may have had some useful information about the murders, which is why Mr. Sweeney allowed Detective Raucci to continue the interview and why Mr. Sweeney signed off as you just saw on the statement.

Moving on, Scott Lewis. Let's face it. He is smooth. He testified he rented 149 Clay Street because he was going to put his wife there as they were going through a separation. She takes one look at it and says no way. So he decided to turn it into a drug house. His testimony. He told you this. That one that was open seven days a week, 24 hours a day, with a walk-up window.

You can reasonably infer from all of this evidence, ladies and gentlemen, that 179 Clay Street was the headquarters of that Exchange Street Posse referenced in Mr. Lewis' letter with Mr. Lewis at the top of the organizational chart supervising Ovil Ruiz, José Roque, and others.

For you to -- well, Mr. Morant and Mr. Lewis both tried to minimize some of that stuff, Mr. Morant indicating he only worked for Lewis for a couple of weeks.

It's for you to decide whether that is plausible or believable. They want you to believe that Scott Lewis had an epiphany and he decided he didn't want to be a drug dealer anymore, and when he had an opportunity to get more involved in Mr. Parisi's operation, he declined and that upset Mr. Parisi and that's what put these wheels in motion for the alleged conspiracy. In reality, you heard the testimony that Mr. Lewis owed a large debt to Mr. Parisi for cocaine, 18,000 I think it was. And they would have you believe that selling cocaine was not a dangerous or violent business. But all you'd have to do is look at those crime statistics that were just showed to you. In New Haven in 1990, there were 31 murders. In 1991, there were 34 murders. We can take that down.

MR. BRUSTIN: Motion in limine.

MR. TALLBERG: We can take that down.

THE COURT: Overruled.

MR. TALLBERG: You heard testimony a majority of those murders were drug-related. And you could tell from your own experience that was a cash operation that they were running. There were rival drug dealers on corners. You heard all over New Haven were drug areas, related violence. And don't lose sight of the fact that two men were murdered, Lamont Fields and Ricardo Turner, who apparently were involved in the drug trade.

Getting near the end here.

Lisa Bull, she was working the phone line at the FBI, taking random calls from prison, so probably low on the order chart. She goes to prison, interviews Mr. Lewis, and then writes a memo wanting to open a file and assign the file to herself. She apparently never considered, until I asked her, whether her on again/off again romantic relationship with New Haven Detective Anthony DiLullo might present a conflict of interest. You've heard that name DiLullo. It just came through on the City's argument. He's also referenced in the January 16, 1991, interview of Mr. Lewis. Detective DiLullo was in the room questioning Mr. Lewis. But Ms. Bull talked about 302 reports.

Again, just a little point on hypocrisy, unlike the tape-recorded statements that the New Haven police took where you can hear the questions and answers and you have a transcript to know what was asked, the FBI you heard only puts in the 302 reports what the FBI agents decide to put in. So you have to take them at their word, trust them. But what you see in the 302 reports that went into evidence are information from anonymous sources, confidential informants, names blocked out, hearsay. Probably you can reasonably infer these are the drug users, dealers, confidential information, snitches. That,

ladies and gentlemen, is rank hearsay and rumors. And they even admitted it, I believe.

You heard from Brian Donnelly, whose 22-month investigation ended without them even trying to seek an indictment. He told you they could have convened a grand jury, they could have done wiretaps. The FBI was laser focused on Frank Parisi. And one of the stipulations or instructions from the Court was Mr. Parisi being prosecuted and getting a long prison sentence. If Mr. Raucci had done any of the things he's accused of, you can rest assured he would have been indicted. And he was not indicted because he didn't conspire with Mr. Parisi or anybody else. And he certainly didn't frame Mr. Morant.

Robert Lawlor, that was hard to watch, just cruel. You saw the video of his deposition. He was having a hard time through medical issues, blinking, in obvious distress. He passed between the deposition and us being here. But he testified Raucci didn't engage in any misconduct and Sweeney never said anything to him about Raucci engaging in any misconduct.

You heard from Dr. Akinsulure. I would put her in the same bucket with all of plaintiff's experts. Koenig, Drago, they were all hired guns. And by that, I mean they were paid to do their work on an hourly basis, each paid tens of thousands of dollars to give opinions.

You could tell by some of the pushback on cross that they were here for one purpose: to try to advance plaintiff's claims. But the doctor had one important fact. It was the admission that Mr. Morant made to her that he probably wouldn't be here if he hadn't gone to prison.

Now, contrary to plaintiff's suggestion, we weren't suggesting he was better off in prison. We were highlighting the fact that the lifestyle he was living in 1990 and '91 put him on a dangerous path that could have easily resulted in death or worse.

Finally, Mr. Morant. Everyone deserves a second chance in life. And it's an understatement to say that in late 1990 he was making bad life choices which were dangerous and placed him in jeopardy. He gained his freedom 11 years ago and he was given his second chance. And it appears he's made the most of that opportunity. You heard he's surrounded by a loving family, he's employed by the City. Any reasonable observer should be happy for him about that.

That's all I have on the witnesses. I have about two, three minutes left.

I ordinarily wouldn't talk about damages because your deliberations should never reach damages. We respectfully request you answer "no" on all of the boxes that pertain to Mr. Raucci, Questions 1, 4, 6, 8, and 10.

And if you find him not liable, you wouldn't reach damages. But because the plaintiff has made this shocking request for an award of damages in an amount that I won't repeat, I would be remiss if I didn't comment on it.

You've been instructed by the Court any award of damages must not be based on speculation or sympathy. So rather than grab a number out of the air, if you reach that part of the verdict form, speaking only on behalf of Detective Raucci, I would suggest this. What amount of money can possibly make Mr. Morant whole if you find that he's proved his case? You could do a yearly calculation. $100,000 per year is a lot of money. Times 21 years is $2,100,000. $250,000 a year is a lot of money. Times 21 years, that's $5,250,000. Or even $500,000 is an enormous sum on an annual basis. Times 21, that would be 10,000 -- rather, $10,500,000. I would respectfully submit, ladies and gentlemen, if you conclude plaintiff has proved his case, those are, rounding those numbers off, a range of 2 million to 10 million would be a more realistic range. It's for you to decide.

You may sense I'm about to conclude because I am. We sincerely appreciate your patience and careful attention. We came before you without hesitation because, despite all the name calling and mud thrown at Mr. Raucci, he did not engage in the misconduct of which he has been

accused. It would be easy from the calm, quiet of this courtroom 35 years later to second-guess and say Mr. Raucci should have done something different, he shouldn't have chased that one lead or he should have gone in another direction. But that is not the law, nor the reality of how murders are solved or prosecuted. Hindsight is always 20/20, but that is not the applicable standard.

So for all of these reasons, I respectfully request that you please return a defendant's verdict on all counts for Mr. Raucci. Thank you.

THE COURT: Thank you, Attorney Tallberg.

Members of the jury, we'll take our afternoon break. During your break, don't research or read about the case and don't discuss it amongst yourselves yet. Back in 15.

(Whereupon the jury left the courtroom.)

THE COURT: You may be seated. Anything I need to take up before the break?

MS. HOFFMANN: We would ask the Court give a corrective instruction because of -- it may have been accidental, but three times I believe the City of New Haven said the City of New Haven would be paying for a damages award which is expressly prohibited by the instructions.

MR. GERARDE: Judge, the very first time I said should not be made to pay, I then said there should be no award against the City of New Haven every other time.

THE COURT: I think the second time you started to say should not pay, you corrected yourself, but it was said, the word came out. I will find the place in the instructions where I've said this, I think it's on page 39. I'll repeat that before the next set of closing arguments.

MS. HOFFMANN: Thank you.

MR. BRUSTIN: Your Honor, one more thing. Would it be possible, even though you don't typically take a second break, to get at least five minutes in between the last defendant argument and rebuttal?

THE COURT: That's fine. The jury has been sitting for a while. I'm sure they'd appreciate the break.

MR. BRUSTIN: Thank you.

THE COURT: We'll come back at 2:45. Thank you.

(Whereupon, a recess followed.)

THE COURT: Ready for the jury?

MR. RYAN: Yes.

THE COURT: Okay.

(Whereupon, the jury entered the courtroom.)

THE COURT: You may be seated.

Members of the jury, before we turn to Attorney Ryan's closing argument on behalf of Mr. Sweeney, I want to remind you of an instruction from the jury instructions on page 39, specifically the source of payment of any damages you may award if you find for Mr. Morant is not an appropriate matter of concern for you. You are not to speculate about the source of payment of any damages you may find it appropriate to award.

With that, Attorney Ryan, you may begin whenever you're ready.

MR. RYAN: Thank you, Your Honor.

Good afternoon, ladies and gentlemen. I have a strict time limit this afternoon and a lot to cover. So I apologize, but I'm going to speak a little quickly. I'll try to keep it loud and clear so everyone can hear.

It's been my privilege here to represent Michael Sweeney in this case. On behalf of myself and Mr. Sweeney, I would like to thank each and every one of you sincerely for your time and your service over the last four weeks. This case is important. It's important to the plaintiff. And it's also important to all the parties, including Mr. Sweeney, but we all know that you all have your own concerns and your own important issues, so we appreciate your time. Thank you, again, for your

service.

Let's get to the case. So, first of all, with respect to Mr. Sweeney, you heard the Court's instructions and understand that Mr. Morant is making only one claim against Mr. Sweeney, the claim in Count Three of the complaint which alleges failure to disclose exculpatory evidence, also known as the *Brady* claim.

The Judge has instructed you that as a matter of law that the first four elements of the *Brady* claim have been established at this point. However, there are five elements. And they have to prove all of these elements in order to recover under that claim. Three isn't enough, four isn't even enough. They have to prove them all, including, as Judge Nagala has told you, that as to Mr. Sweeney, the only issue for you to decide is causation at this point in time. And has the plaintiff, the issue is, proven by a preponderance of the evidence that Mr. Sweeney's conduct was a but for and a proximate cause of Mr. Morant's deprivation of liberty — in other words, his imprisonment? And if the plaintiff hasn't proved this to you, you may not award any damages against Mr. Sweeney. And I believe the evidence will show that Michael Sweeney's conduct was not a but for cause or even a proximate cause of Mr. Morant's incarceration.

Now, to answer this question, you have to start

with examining the evidence that was not disclosed to the prosecutor. And your recollection controls. You've heard that over the last couple of weeks. But in broad strokes, the evidence was: (1) that in discussions Mr. Sweeney had with Mr. Ruiz before the recorded statement was taken, Ruiz said he knew nothing about the murders; (2) Sweeney felt, based on his interview of Mr. Ruiz, that Ruiz had no information about the homicides; (3) that when Mr. Raucci interviewed Mr. Ruiz in Mr. Sweeney's presence, Mr. Sweeney observed Raucci feed information to Mr. Ruiz, and Ruiz parroted the information back to Raucci so he could go home; (4) that Sweeney observed Mr. Raucci tell Ruiz that if he didn't give information, Ruiz would take the whole weight of the crime; (5) that Mr. Ruiz said three different things during the interviews that were all outlined by plaintiff's counsel; (6) that Mr. Sweeney told him to stop, to knock it off, to not detail the case for Mr. Ruiz and have him parrot back what Raucci told him and that we're not taking a statement like that; (7) that Raucci wanted to go on continuing to interview Ruiz, that Sweeney got pulled away on another matter at this point and let Raucci go back in and continue his discussions, but you recall, as a safeguard, he told Joe Petolla to go in with Raucci and sit with him and don't let him pull this stuff, don't leave the room, he wants to interview

him further; (8) that Petolla came in and Raucci took a statement from Mr. Ruiz that night, that was in January of 1991; (9) that the next day Sweeney reported to Sergeant Lawlor, who was handling the case, that Raucci was telling Ruiz what to say and he should pull him off the case; and (10) that when the arrest warrant was issued, Mr. Sweeney learned that it was based on information Ruiz gave, and he spoke to Lawlor again and told him he had to report the information to the State's Attorney Dearington, and that Lawlor said Ruiz had passed the polygraph, which led Mr. Sweeney to believe he might have been mistaken about what Ruiz had told him.

So those are the facts. So let's apply the law regarding causation to those particular facts.

And as the Court has instructed you, causation has two elements. The first is known as but for cause. And the second is proximate cause. The plaintiff has to prove both types of causation by a preponderance of the evidence to recover damages against Mr. Sweeney. Mr. Sweeney doesn't have to disprove anything.

And again, all your decisions have to be based on the evidence and reasonable inferences drawn from the evidence. But the important thing is that your decisions may not be based on speculation or conjecture or guessing.

So let's look at the two parts of causation one

at a time. The first is but for causation.

The judge gave you a little formula in her instructions to decide if there is but for causation, but what we're really trying to get to here is this: To hold Mr. Sweeney liable, Mr. Morant has to prove that his deprivation of liberty -- in other words, his incarceration -- would not have occurred but for, in other words, except for Mr. Sweeney's withholding of that evidence.

If the plaintiff would have been imprisoned even if Mr. Sweeney had not withheld anything -- in other words, if Mr. Sweeney went to the prosecutor, told him everything he told us in court about Raucci feeding facts and Raucci parroting back and the rest of it -- and Mr. Morant still got convicted at his criminal trial, then there's no but for causation. And my point, ladies and gentlemen, is that you cannot find that Mr. Sweeney's conduct was a but for causation of Mr. Morant's conviction without speculating or guessing because we don't know what would have happened if the information had been disclosed.

And I say this because, you'll recall in 1999, Mr. Sweeney called Mr. Morant's attorney, Michael Fitzpatrick, told him everything he knew, met with him many times, and eventually in 1999 testified at a hearing in court before Judge Blue on Mr. Morant's petition for a

new trial. He gave extensive testimony in which he told Judge Blue everything he knew about everything that happened between Raucci and Ruiz that night in 1991, which made Mr. Morant, you'll recall, very hopeful that he would finally be freed. But Judge Blue, notwithstanding Mr. Sweeney's extensive cooperation and testimony, still denied the petition for a new trial. Sweeney's testimony did not change the outcome there.

And while we have the transcript from the criminal trial in evidence, we don't know what evidence that jury found persuasive and what they did not. We don't know what the deciding factor was that led to the criminal trial jury convicting Mr. Morant. So it is impossible to know if anything Mr. Sweeney knew would have changed the outcome if it had been disclosed. And for that reason, I submit there's no but for cause.

And when you get to Question 3 on the verdict form, this is the question that asks has the plaintiff Stefon Morant proved by a preponderance of the evidence that Defendant Michael Sweeney caused Mr. Morant to suffer a deprivation of liberty as a result of Mr. Sweeney's withholding of material favorable information from the prosecutor, your answer to that question should be "no." And if your answer to that question is "no," Mr. Morant has failed to prove causation. And, in turn, he would not

be entitled to damages against Mr. Sweeney because, again, Mr. Morant has to prove both parts of causation, but for causation as well as proximate cause.

And I understand that Mr. Brustin has an answer for my argument. He's told you in his PowerPoint that if Mr. Sweeney had disclosed the information, a defense lawyer would have a very easy time impeaching Ruiz and it would have devastated the state's criminal case or that, based on Maher's testimony, that Morant would not have been arrested in the first place, or that the prosecution would have nolle'd the case like they did in the Ham case. And I say maybe so, maybe not; we don't know. But it would have been up to the prosecutor to decide that, not Maher. He might have called or decided to call or disclose the evidence to the defense and still call Ruiz and let Mr. Morant's defense lawyer bring out any inconsistencies on cross-examination at trial.

Remember, in May 1991 Ruiz hired Attorney Michael Moscowitz and gave a second recorded statement at the State's Attorney's Office containing much of the information Mr. Sweeney heard. Why did Ruiz have an attorney? To make sure that nothing improper happened, to make sure there was no coercion, to make sure there were no threats and no lies, and presumably to make sure the statement was the truth. And Mr. Brustin emphasized over

and over again throughout this trial that this statement was taken properly. There was no starting and stopping and no hanky-panky with it.

And you all saw the May 28, 1991, statement, it's Exhibit 2 in evidence, you heard it, Exhibit 34 in evidence, and you have to decide whether it sounds credible or whether it sounds like it came from information that was fed to him some four months earlier.

Now, I know some of you may be thinking, Mr. Ryan, you can't have it both ways here. You've told us the whole time how honest Mr. Sweeney is and how he testified that he thought Ruiz was lying. But you will also recall that Mr. Sweeney testified that this was not his case, that he had many serious cases that night, and he got pulled away. And for that reason, he asked Joe Petolla to go into the room and to baby-sit, in Mr. Brustin words, to baby-sit Mr. Raucci. But Sweeney also candidly admitted that maybe he was wrong about Mr. Ruiz. And Mr. Tallberg pointed this out a moment ago. In Sweeney's own words, he said, I allowed Raucci to stay with the man (Ruiz) because maybe I was wrong, maybe I wasn't sure that this man (Ruiz) didn't know, but so I let him continue the interview. And you'll recall that when Mr. Tallberg refreshed Mr. Sweeney's recollection of this testimony at trial, Mr. Sweeney again said at trial, this

trial, I could have been wrong, absolutely.

Remember, Mr. Sweeney's only interaction with Mr. Ruiz was this interview of Mr. Ruiz at the police station on January 14, 1991, so the determinations he made about what Ruiz knew or didn't know were based on what Ruiz told him in those limited discussions that evening in January.

Now, PowerPoints are great. Mr. Morant's testimony team did a wonderful job of making this production that you've seen earlier today. But the one thing you'll notice is that they contain a lot of excerpts and a lot of snippets. And snippets are fine, too, but they don't tell the whole story. They only tell part of the story.

What Mr. Sweeney was trying to explain in another snippet is that these investigations about murders, they're not static, they develop over time, you rarely get to the bottom of a murder investigation with the first witness statement because, as I have learned, you all have learned, if you have children or if you work with people at work, you've all learned that there are two sides to every story and usually more than two sides to every story. So you have to hear all of the sides. The police have to hear all of the sides before they get to the bottom of it.

And the job of the police is to try to find out the truth. It usually takes several discussions with witnesses and murder investigations to get to the truth. So they keep talking. They let things develop, they see what they can learn. What might have seemed right at the beginning may change, or the witness may give up further information as they keep talking, so they keep asking questions. They're trying to sift through all of it and get to the truth.

Mr. Sweeney explained this process in one of the video snippets that you saw that plaintiff's counsel showed, it was Exhibit 68. It was showed to you at the trial where he explained why he believed he did not need to document everything a witness said. His testimony was the following, quote: They do not have to be documented. I worked maybe three or four hundred homicides in my career, they are all fluid. People will lie. We take statements. We go and get further information. Then they give a second statement, half-truths. And then a third statement. Sometimes you take four statements from people. That doesn't mean we're going to call up the State's Attorney's Office between Statements One, Two, and Three.

And by the way, by "statements," Mr. Sweeney's referring to oral statements from witnesses or perhaps, to

use a better term, interviews, not written or recorded statements.

MR. BRUSTIN: Your Honor, objection. This contradicts your ruling. This is not causation.

MR. RYAN: It is causation, Your Honor. I'm trying to explain the change.

THE COURT: Overruled.

MR. RYAN: So the point, ladies and gentlemen, is, as the interviews go along and the information develops, things can change. And by the way, even at the start of the trial, Mr. Sweeney admitted that after speaking to Sergeant Lawlor the second time, he was having second thoughts about Ruiz.

So getting back to the question of whether Mr. Ruiz would have been easily impeached if the information had been disclosed to the prosecutors, keep in mind that Ruiz testified at the criminal trial in 1994 and never said his statement was coerced.

Remember, too, that Ruiz later told Brian Donnelly, as Mr. Tallberg pointed out earlier, in the presence of his own attorney and several others, that his testimony at the criminal trial was true.

So my point is that it would have been up to the prosecutor whether to call Ruiz at trial or whether to arrest Morant or whether to nolle the charges if the

information Sweeney possessed had been disclosed to the prosecutor.

But you'll recall that the prosecutor was actually a witness in this case. And he never said that he would have done any of those things.

We heard from David Gold, who testified early on, he was the Assistant State's Attorney who prosecuted the criminal trial against Mr. Morant in 1994. He testified that he was not aware of any information Sweeney described regarding Raucci's interview of Ruiz in January of 1991. But while he agreed that had he been aware of it, he would have disclosed it to the defense as *Brady* material, he further explained that he could not say for sure how he would have reacted.

Gold was not asked, nor did he offer any testimony, whether, had the prosecution been aware of this information, it would have continued to prosecute the case, nor was he asked to offer any opinion as to whether the outcome of the criminal trial would have been different had the criminal jury received this evidence. And we can't speculate or guess about it. And in fact, if you review the transcript from Mr. Morant's criminal trial, it doesn't support an argument that without Ruiz's testimony, Morant would not have been convicted.

The transcript from that trial is in evidence.

And you will have it to look at. It's Exhibit 15.

When Mr. Gold argued the case to the jury, like we're doing here today, his argument was that the case was not based solely on Ovil Ruiz's testimony. And I will quote Mr. Gold at page 1106, he told the jury in his closing argument, "This case is not based on Ovil Ruiz, this case is based as much on the words of the defendant himself." And at page 1120 again of Exhibit 15, Mr. Gold argued to the jury, "the defendant's words himself, or themselves, this is the key evidence in the case, this is it, it's not what Ruiz says, the defendant himself's words are the crucial words."

So, as you can see, the evidence doesn't support an argument that without Ruiz's testimony, Mr. Morant would not have been convicted. And for those reasons, ladies and gentlemen, I submit that the plaintiff hasn't established but for causation as to Mr. Sweeney.

And if you agree with me, that would mean that Mr. Morant cannot establish the but for causation and you need not move on to the issue of proximate cause. But if you disagree with me and find that Mr. Sweeney's conduct was a but for cause, then you need to move on to the second part of causation, which is proximate cause.

So let's discuss proximate cause for a minute.

Judge Nagala has instructed you that an act is a

proximate cause if it was a substantial factor in bringing about an injury and if the injury was a reasonably foreseeable consequence of the particular defendant's actions — in this case, Mr. Sweeney's actions.

To constitute a substantial factor, the law is that Mr. Morant must prove that Mr. Sweeney's actions contributed materially and not just in a trivial or inconsequential manner to his conviction. In this case, nothing Sweeney did or didn't do was a substantial factor in Mr. Morant's conviction and the conviction was not a reasonably foreseeable consequence of Mr. Sweeney's conduct. At best, Mr. Sweeney's conduct contributed in a trivial and inconsequential matter to the conviction. But trivial and inconsequential is not sufficient to constitute proximate cause.

There's only one claim in the whole case against Mr. Sweeney and it relates to a chance encounter with Mr. Ruiz one night towards the end of his shift in a case that was not his. Mr. Sweeney had two discussions with Ruiz that night. He heard comments by Raucci that were improper. He admonished Raucci to stop two times. He brought Sergeant Petolla, admittedly a good cop, in to baby-sit Raucci so he wouldn't do anything improper, and left for the night. The next day he notarized Ruiz's statement. He also notarized José Roque's statement on

January 15 and gave Raucci the constitutional waiver form for Mr. Morant's recorded statement. He did initial a change to Ruiz's statement, as Mr. Gerarde pointed out. It's one sentence, but there's no evidence who made the change or when it was placed on there, so it means nothing. But in terms of the evidence, that's all there is.

Sweeney was not present for Ruiz's first recorded statement. He wasn't present for Mr. Ruiz's second recorded statement. He didn't arrange the second statement, didn't notarize the transcription of it, he didn't even know it was being taken. He was not present for the interviews or the recorded statements of any other witnesses, including Morant or Roque or Ortiz or Lewis or Millie Martinez or anybody else. He didn't start and stop any tapes or do any overrecordings. He never spoke to the FBI about the investigation into Raucci. And this was simply not his file. It was not his investigation. The file was not assigned to him at any time by that form I showed you on the first day of evidence. It was never reassigned to him. He prepared no reports, no memos, made no assignment of tasks to be conducted in the entire investigation except for giving Raucci the waiver form to have Morant sign. But Mr. Sweeney did not sign or notarize the arrest warrant for Scott Lewis or Mr. Morant,

and he didn't draft, contribute, or participate in the arrest warrants for either gentlemen.

So you have the entire police file. That's in evidence. It's Exhibit 1, I believe. It was the big blue file that you saw. I've gone through this cover to cover on a number of occasions looking for Mr. Sweeney's name or involvement. And you can do the same thing, if you'd like. If you do that, though, have a cup of coffee because it's very large. It's 500 pages. But I can tell you that Mr. Sweeney's name is in two times and his initials once.

Something else you should consider. Mr. Morant made an alibi defense in his criminal trial, presented witnesses regarding his alibi, but he was convicted anyway. Mr. Sweeney had nothing to do with that investigation of the alibi or the jury's rejection of it at the criminal trial.

So the long and short of this is all to say that Mr. Sweeney's conduct cannot be said to have been a substantial factor in Mr. Morant's conviction. At best, it was trivial and inconsequential, especially when you consider all of the other claims that you've heard in this case against all of the other defendants.

Mr. Brustin told you right at the start of his opening statement at the start of this case and today as

well and several times in testimony that Mr. Raucci framed Scott Lewis and, coincidentally, Mr. Morant because he owed Frank Parisi money. Sweeney had nothing to do with that.

Plaintiff offered testimony that Raucci took an inconsequential recorded statement of Michael Cardwell, who was initially the main suspect in the case, as a cover-up and then dropped him from the investigation. Mr. Sweeney had nothing to do with that. And if you believe the plaintiff that Raucci framed Scott Lewis and dropped Cardwell as the main suspect in the case, committed such horrendous, heinous actions, I would submit to you anything Mr. Sweeney did was inconsequential and trivial and remote.

And furthermore, Mr. Morant's conviction was not a reasonably foreseeable consequence of Mr. Sweeney not preparing a report of his observations of Raucci and Ruiz in a case that was not his where he left while discussions with Witness Ruiz were ongoing and continuing under the observation of Joe Petolla who, by all counts, was a good and honest cop.

For those reasons, ladies and gentlemen, I submit that Mr. Sweeney's conduct was not a proximate cause of Mr. Morant's conviction and that when you get to that question about causation on the verdict form,

Question Number 3, that you answer "no" as to Mr. Sweeney.

And finally, I just want to mention that when you consider Mr. Sweeney's credibility, keep in mind that, according to Sergeant Petolla, Michael Sweeney was a good cop, one of the best, he said. According to Mr. Ruiz, he was a liar. But according to Ruiz, everyone was a liar. Maher said he was honest. And Scott Lewis certainly appreciated Mr. Sweeney, giving him an unsolicited hug in the hallway. And when asked if he knew Mr. Sweeney came forward to Mr. Morant's lawyer in 1999, he said "thankfully" and broke down in tears. And even Mr. Brustin, our opposing counsel, describes Mr. Sweeney repeatedly as honest, decent and well-intentioned. Now, I'm not saying that Michael Sweeney is the White Knight, but he certainly is not constrained by any code of silence. And he was a good cop.

In deciding the claims in this case, however, the bottom line is that his actions were not a cause, either a but for cause or a proximate cause, of Mr. Morant's imprisonment. Thank you very much.

THE COURT: Thank you, Attorney Ryan.

Attorney Melley.

MR. MELLEY: Thank you, Your Honor. If it please the Court, I'm going to use the ELMO --

THE COURT: Okay.

MR. MELLEY: -- at some stage.

Good afternoon. I must say I was surprised at the opening when, after referring to the finding about Mr. Sweeney, you were told that the codefendants -- and I'm specifically referring to Lawlor and Maher -- are more culpable. I take exception to that.

You heard at the beginning of the case I represented Mr. Petolla. I have had three defendants in the case: Petolla, Lawlor, and Maher. Petolla was voluntarily dismissed. I submit to you the other two should have been as well. And that's what I'm asking you to do, and that's what I said in the opening.

The whole idea of Lawlor being responsible is that he was a supervisor. And you heard him in that video which Mr. Tallberg commented in terms of his overall ability to respond to questions. He reviewed his testimony, and he was never a supervisor on this file. He said he was head of detectives during the day where there might be 15 to 20 different detectives doing various things. But he was never in charge on this file.

I find it amazing that, you know -- you've seen this, this is --

THE COURT: Could you turn on the camera on the document. There you go. Thank you.

MR. MELLEY: Thank you, Your Honor.

You saw this a couple times, page 495, the case preparation form. Sergeant McCoy, he's in charge. And he was in charge from the inception of the file through his leaving in December. And you'll also recall that most of the work certainly done by Detective Maher was done until December. Then there's that hiatus. And then we have what happened in January.

McCoy is in charge. So here's another page, 280 of the police report. This is Exhibit 1 where the reference is that Sergeant Ortiz and his informant, Mr. Graham, met with Sergeant McCoy and this detective. And this detective is Maher. So here you have hands-on involvement of McCoy.

We have page 187 of the police report. In October, Sergeants McCoy, Lillis, and Maher and Smith go and they interview Doreen Murdock, who you'll recall was asked and did give a couple statements. It's all McCoy. It's not Lawlor. Lawlor is in charge of that shift, but this is not his file. The amazing thing is that, as was suggested to you in the way the questions are asked, it's reinforced Lawlor's file, Lawlor's file. It wasn't his file. And he was emphatic on that score.

He's accused of being told that this was going on in the interview with Ovil Ruiz as far as the feeding by Detective Raucci. And he has consistently denied it

from 1999 when he testified, 2007, 2013, he always denied it. And what's interesting and what you heard in this case was when the question was put to him -- and this is his testimony from the deposition, page 92 of 144. If he had been told, that word "troublesome" would be a very light word to use. It would have been dramatic, but it would be catastrophic. In other words, from his point of view, this is not something he would ever ignore. He took it very seriously. And then he says, "It's not something I would forget. As bad as my memory is today, I would recall that." Because it flew in the face of what he stood for.

You have the stipulation as to who he is. Growing up in New Haven, serving in the Army, going to Vietnam, getting an award, putting in his time with the New Haven Police Department, then going on to the State's Attorney's Office. He's a man of principle. And when he says this, he's being pretty confident about where he stands.

Now, one of the interesting things that came out was Mr. Sweeney said before you that when he told this to Mr. Lawlor, Mr. Lawlor said, okay, Mike. And if you recall, I pointed out Mr. Sweeney never before reported an acknowledgment by Mr. Lawlor in his prior testimony in 1999 or in the different hearings, including the hearing

in 2015, he never said anything. But all of a sudden 35 years later, we have him saying that Lawlor acknowledged it. That doesn't make sense.

Now, on that whole score, you have conflicting testimony as to who to believe. But the question is twofold. Number one: Did the plaintiff -- they're the one putting this forward -- satisfy you concerning the burden of proof? Because they have to show it's more probable than not. You have to accept that that fact was proven. If it's not, if it's in equipoise, or whatever, they failed and you can't find it.

Now, one of the interesting things about that word "troublesome" was again in his statement, he denies -- he didn't deny that he may have said that to Lisa Bull because he liked her and he believed her, but he had no idea of the context. Lisa Bull essentially said the same thing, she has no idea of the context.

Now, keep in mind when this occurred. This is after the different criminal trials. When you go back to the instructions with regard to Lawlor, the question is whether he was negligent before that verdict of guilty as to Mr. Morant. So it's at some point later that this word shows up after that. And the allegation is, oh, he used it then, it must relate to what his thought process was going back to 1991. And there's no evidence of that.

So, again, you heard this idea of the Ovil Ruiz statement. But keep in mind, it was highly unusual to have an informant give a statement and then, for whatever reason, go to the State's Attorney's Office with his lawyer and give another statement. That indicates to anybody that's just even a casual observer in the police department something's going on. But what it is, there's no basis to infer that Mr. Lawlor was aware of any of that. There's no basis. It's not there.

With regard to Mr. Vaughn, who is here, I want to start by going back to the questions to Mr. Petolla. Now, when -- this is on his redirect, it's on page 64 where the reference was made that he was a prior defendant and he was represented by me and I'm still representing him today. And then what happened was your only involvement was in the case regarding the taped statement of Ovil Ruiz where they assessed and they voluntarily dismissed the case against Detective Petolla after he testified with regard to that. And then the comment is made, it became clear that there was no allegations of misconduct or reasonable allegations of misconduct against you, we decided to dismiss it.

So put that in perspective. Okay. So this is Ovil Ruiz who is really the linchpin of this prosecution. So you have everything that occurred before and you have

Mr. Maher doing whatever he's doing. And it stops in December when he, Maher, essentially he interviews Anthony Cardwell and then he gets the letter regarding a sergeant, and there's nothing that happens until Ovil Ruiz.

Ovil Ruiz gives the statement. You have it, you've heard it, 20-odd pages where he goes through in detail. And Petolla, Petolla gets dismissed from the case because nothing happened in that statement that would give rise to any questions as to what was going on.

Now, put in perspective what happens next.

First of all, with regard to the Ovil Ruiz statement, it occurred at night. Sweeney is the sergeant at night. Not Lawlor. It's Sweeney. And what happens the next day, Sweeney is there and he doesn't know who, but Maher testified he gets called in. He gets called in to sit on a statement of José Roque. He knows nothing about this. As he testified, as Mr. Raucci testified, all this was developed by Mr. Raucci. He has no information. And he goes in and he sits on an interview.

And you'll recall from listening to it, and you can listen to it again, Mr. Raucci is the primary questioner. Mr. Maher is seated in the back. He's there. He's at the table, but he's not right over the microphone. He's not right over the thing. He's not the one asking all the questions.

Now, Mr. Raucci agreed that he's directing it, but it's based upon what Ovil Ruiz had said as a foundation for that. So under what basis is Maher supposed to realize something's off?

Now, we did have Mr. Koenig testify. Originally you heard -- and I'm going to get to this -- that Mr. Maher said there was one stop for soda that he recalled, that's in 1994. And then '99 after the FBI report comes out, he says, well, maybe we did stop it more than that because we had to discuss information and where we're going. Again, he says he has no idea where it's going. And keep in mind what Mr. Koenig said, which is that there's no way to know. Okay, there are stops, that's what he says, there's no way to know how much information, if any, is deleted, if there was any, we don't know. But Maher, to the best of his knowledge, tells you didn't happen in my presence; I don't recall that at all.

So you have all that testimony. Then the next day we have the plaintiff come in. And it's the same story in terms of Mr. Maher being called in.

Now you have Mr. Raucci testifying that it was Sergeant Sweeney who was with him when he brought him to the station. Mr. Morant doesn't remember who was in the car, but he does remember it was another officer.

So just put that into perspective where Mr. Maher has been told about this Ovil Ruiz, sees this next step, and then comes in and sees that Sergeant Sweeney is there. And there's been some sort of preinterview.

Again, I have Raucci's testimony where he said -- he says on page 22 -- this is just reviewing all that testimony, if I may.

(Reading:) When Detective Maher showed up after the advisement? Mr. Roque: I believe he showed up after. He was not involved at all in the preparation? Yes, that's correct. With regard to the statement of Mr. Morant, Sergeant Lawlor's not involved and Sweeney was there and it's fair to say that Vaughn was not involved in the preinterview? That's correct. (End reading.)

Again, he's coming in. So you have to ask the question, to what extent is he supposed to have knowledge about things that allegedly occurred with no involvement from him? It's not there. And when that fails, the claims against Mr. Maher fail.

Now, 1991 there's claims with regard to Mr. Raucci. But to the extent there's more that developed in 1995 or '6, there's no evidence that it was public information even within the department where somebody like Detective Maher would know. There's no evidence that he

was aware of any misconduct. Joe Petolla, yeah, he had that incident. But in terms of knowledge as to any improper conduct by Mr. Raucci, it did not occur. And it wasn't of notice to Mr. Maher. There's nothing to put him on notice. He's instructed by a supervisor to come in for that statement with José Roque.

Now, when you analyze what happens -- I want to show, if I may, you saw this as well. This is the letter recording his promotion, okay. And the timing here is crucial because a lot of things happen. December is when he last interviews Anthony Cardwell who, you have it there in the file, excludes his brother, yeah, okay, that's understandable. But nothing else occurs before Ovil Ruiz.

So we heard that he's going to get promoted in February, effective January 22nd. The next sentence, "In the interim, ensure that all outstanding matters have either be closed or transferred to others within your unit."

Okay, he had been the lead detective on this file and he gets this notice to get this in other people's hands. He doesn't remember what he does, but he does get called back in to the station for January 15.
January 15th is a week before his removal date. So a lot of things are going on in terms of what he's doing in his job and he's getting for the next step where he is out of

his whole division.

Now, he said he should have done the memo that was done in March at that time. That's in his testimony. That's on him. I should have done it. Somebody tells him in March, hey, what's the story with the informant and this other Mr. Cardwell. You know, nobody is suggesting that there was enough of a basis to bring Mr. Cardwell in a application for an arrest warrant. Nobody says that. At best, he is a lead suspect. But nobody said he should have done it. Yeah, could have been developed, but not by Mr. Maher because he's gone. He's out of there.

So one of the things that's interesting is, in terms of the actual trial, you saw this letter, State of Connecticut, Division of Criminal Justice signed by David Gold, extolling the virtues of Mr. Raucci in terms of the trial and putting everything on. What he says is that Detective Raucci was not initially the primary investigator, he assumed responsibilities in the investigation when Maher was promoted and reassigned to the patrol division. David Gold doesn't even give Maher a pat on the back and say nice job for what you did. He's insignificant in terms of the prosecution. It's not there. He doesn't -- he doesn't hold it in any regard because it has nothing to do with the arrest or the conviction. There's nothing submitted by Maher to the

prosecutors for the arrest warrant.

I'm doing all right.

I want to point out there was mention made of experts. And this was done -- this is Mr. Drago. And if you recall, there were questions by me and then a follow-up regarding his report and his whole focus on the case.

So Ms. Hoffman read this. "All the while, the record reveals that on certain occasions, such as Ovil Ruiz, Sweeney and Maher respectively were present while, according to Sweeney and the interviewees, the misconduct discussed above and below" -- and then it goes on.

Maher was not present for Ovil Ruiz. But this is part of the narrative that is fed to the expert who doesn't bother reading the file to appreciate that, but yet he's free to throw a stone where it doesn't belong. Just like he said that Lawlor was the supervisor in the file. Where did you get that? Well, I think I read that Sweeney said that. As opposed to he never heard of who McCoy was. So, really, he's an independent expert who is coming here to tell you what's going on when he hasn't even read the file? I submit that you have to consider the source.

Just like the doctor who gave her report. I am not discussing damages, but I do want to discuss the fact

that she comes to you to give her opinion about what's going on, but there's a failure to relate to you that she saw Mr. Morant for 20-odd hours in the lawyer's office. There's no physician/patient relationship. It's all part of this case. She didn't refer in her testimony to you that she had a number of different recommendations for treatment that she thought would resolve in a favorable outcome. That's pretty significant.

So when you hear that, you say, well, is she being objective? Did she tell me things objectively? Or is she part of a process to paint things in a picture just to make it, what, more sympathetic? You can do with that as you will.

Mr. Gerarde referred to the way questions were asked. And one of the points that I had pointed out, when my client's on the stand, he made several mistakes. There was this barrage of questions they're asked yes or no. And he, Mr. Maher, acknowledged, yes, Detective Raucci's the one that told me to file that report in May. And I'm listening to it. And I get back up and I say, well, wait a minute. Let's go back to your prior testimony, not the testimony from 35 years later, let's go back to the time. And looking at it, he said, no, no, it wasn't Raucci. I've clearly testified in the past it was some supervisor, he doesn't know who, but it was not Raucci.

So, you know, that's an example where, all right, a lot of time has passed. A lot of time. And a lot of things have gone on in the various lives of people. And certain things stick out. But this is where -- wait a minute. I got it. Hold on. I want to -- here we are.

I want to review, this is testimony from Mr. Maher. And this gives you an example of what it was to be on the stand for this length of time. And this is the morning, I think it's May 7.

(Reading:) Question: Your position is that Mr. Sweeney -- withdrawn. Your position is that, just as Mr. Sweeney described, Vincent Raucci coerced and threatened and fed information to Ovil Ruiz. (End reading.)

I'm sorry, I'll slow down.

(Reading:) He just didn't do it with José Roque or Mr. Morant; correct?

Not while I was in the room.

Okay. I wanted to show you -- I asked you a lot of similar questions to what I asked at your deposition. Do you remember that?

Yes.

All right. I want to play you -- and we had the exhibit.

That was you under oath admitting -- and then

there's a pause and we go to the next.

That's you under oath after many hours of questioning admitting that it's possible that what Mr. Morant claimed exactly what Mr. Sweeney saw with Mr. Ruiz actually happened; correct? (End reading.)

So, a couple things. It's not the clearest question in the world, first of all. But note the reference to oath after many hours where something like this is done repeatedly over a period of time.

(Reading:) Mr. Maher: I said it's possible. That was my answer. I mean, how could I say it's absolutely not possible? I couldn't say that.

Question: Because you were there.

Answer: Well, that was my answer, and I stand by it as well.

You stand by it's possible?

Yes, I do.

Let me ask you, do you think that that is a sufficient answer for Mr. Morant?

That was my answer. That's -- I was asked the question, and at the present time I felt that was the answer that I should give.

Okay.

And the way I felt. And it was the truth.

By the way you felt at your deposition was that

it was possible, you feel that way today it is absolutely never happened?

It was a long time ago. I'm trying to recollect. That's what I said. I will stand by it.

Which one do you stand by? (End reading.)

So back to an argument.

(Reading:) I wasn't trying to deceive anybody, if that's the point you're making. I don't know what the point is that you're making.

So do you stand by it's possible it happened or do you stand by what you said today, that it never happened? Which one do you stand by?

It never happened. I will you assure you of that. It never happened. I did not see him coerce Mr. Morant at any time that I was in the room. That, I stand by.

You haven't mentioned feeding information. Is there a reason for that?

No, I include all of it. Coercion, feeding information, all of that is included in my answer.

Sir, we're going to move on. Your position is the interview of Mr. Morant was Mr. Morant, without any threats or coercion whatsoever, volunteered inculpatory information about his good friend, Mr. Lewis?

When I was in the room, that is the truth. (End

reading.)

He's been very consistent, what he saw, what he did.

And just this idea of using questioning, go to back a second to this word "troublesome." Do you recall questioning as to Brian Sullivan, who had no involvement in this file at all, but at his deposition he's asked 20 times about what he thinks Lawlor meant by troublesome, even though he never talked to him about it? Twenty times to ask somebody that has no knowledge takes up a lot of time.

All right. I'm just about done, if I may.

One of the things you did not hear anything about in the first argument is the alibi. So what we do know is that when Mr. Maher is taking this statement of Mr. Morant that Mr. Raucci is leading, there's no mention of North or South Carolina. That's not part of it at all.

And what we also know is that, as was stated, that argument was presented to a jury that rejected it. Okay. And there was evidence.

So just think of this. Put it in perspective as to what he was doing down there. His brother's in jail in New Jersey. He's trying to get money to get bond to get him out. We're going to go down and see our aunt to get a possible loan that she's going to sign off. We go down.

She doesn't get it. We go to a notary. Can't get that. We go back and forth. There is no documentation anywhere. How do you get from New Haven down there? Train? There's no train tickets, there's nothing. Bus? Car? There's nothing. Gas receipt? Nothing.

Either way, we do have -- this is part of Exhibit 84. This is a trial exhibit where on the date that we're talking about, there's two phone calls. And the allegation is that there was a phone call to New Haven from Fayettefield, North Carolina. Now, the context is we can't get money from aunt, so we're going to have to find it somewhere else. Mom, we're going to have to do something to get brother out of jail on bond in New Jersey.

So look at that and you say, wow, you put all of that together in two minutes. And then you call back a minute later and that's it? There's no other evidence anywhere that would fall into the category of satisfying a record that this was there.

So, last thing. Mr. Maher. Malicious prosecution. He had nothing to do with the preparation or signing of the arrest warrant. He had no role in the prosecution of the file.

Failure to disclose. He disclosed everything that he did. He wasn't involved. He denies anything

happening in his presence that would give rise to his duty to disclose.

Fabrication. He didn't fabricate anything. The statements are what they are. He didn't fabricate it. It wasn't done -- if it was done, it wasn't done in his presence. You recall Mr. Morant doesn't even recall Mr. Maher. He doesn't say he did anything like that.

Same thing, fabrication and then coercion, involuntary statement. There's no evidence of that. He comes in, it's time to take the statement, go. He's not involved in any type of allegation of that. In fact, there's no conspiracy. There's no evidence that he and Raucci ever had a discussion, put this together because whatever reason. He comes in after Ovil Ruiz. So how is he conspiring?

And then failure to intercede. If he doesn't have knowledge, he doesn't have a duty to intercede. If something was going on, he didn't have the knowledge.

And in order to prove those allegations, the plaintiff has the burden to show that he did it intentionally, with a reckless disregard for the rights of Mr. Morant. And it's not there, I submit.

So therefore, at the end of the day, I ask that you return a verdict for both Lawlor and Maher. Yes, somebody else said this, the hardest thing is to sit down

and I can't respond again. I ask you to respond in your verdict. There's been a lot of information. The most significant part of this whole trial, people have different views, cross-examine, direct, whatever. I submit it was when you stood up and you took an oath and you said, yeah, I'll pay attention, I'll be fair. I'm not going to be guided by sympathy or a leaning one way or another. I'm going to do what's right based on the evidence and based upon the law that the Judge gave. Thank you very much.

THE COURT: Thank you, Attorney Melley.

Members of the jury, we're going to take a five-minute break.

MR. BRUSTIN: I don't need to if you don't want to, Your Honor. I'm happy to go right now.

THE COURT: Let's take a short restroom break. We'll come back at 4:00 for plaintiff's rebuttal.

(Whereupon, a recess was taken.)

THE COURT: All right. Ready?

MR. BRUSTIN: Yes, Your Honor.

THE COURT: We'll get the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT: You may be seated.

Members of the jury, I appreciate your

willingness to stay past your normal 4:00 time so we can finish our closing arguments. We'll proceed with the rebuttal argument for Mr. Morant, and then I have just a few more instructions, and then we'll be done for the day.

Mr. Brustin, you may proceed.

MR. BRUSTIN: Thank you, Your Honor.

Mr. Morant and his legal team want nothing more but for you to decide this case based on the evidence, the mountains of evidence that we provided to you. But there's something that they said, a number of things they said, but something Mr. Gerarde said, counsel for the City, that we disagree with: that you are not allowed to be angry. In fact, there's nothing in the charge that says you can't be angry. You should be angry. You should be absolutely furious. You should be furious at what the defendants did in this case. You should be furious about the systemic misconduct you saw. And there is nothing wrong with that. You should also be furious about the arguments they made in this courtroom throughout the trial and today. So let's talk about that more specifically.

So let's talk about what you didn't hear about in their closing arguments.

All of a sudden, Mr. Morant committing this crime is gone. No more accusations that Mr. Morant committed this crime. Remember the first thing they said

in opening statement? He's guilty. He did this. That's gone. Not even they can stand up and stay that after what happened in this courtroom.

They have a new tact now. The new tact is let's pretend that the law is so strict that you can't possibly find for Mr. Morant in any claim because you just can't meet those standards. And let's talk more specifically about what that means.

So, first of all, on the City's claims, we prove our pattern and practice claim of *Brady* violations just based on the unconverted admissions from Petolla and Sullivan and Sweeney all testifying to the pattern and practice of misconduct. No mention of any of those things. Just disappeared. Pastore has nothing to do with those claims. The pattern could not have been clearer. They admitted. And you heard Drago, unrebutted, saying he's never heard those kinds of admissions before about such a widespread practice. Just completely ignored. Nothing to do with Pastore. Nothing in the charge suggesting that Pastore has to be involved in that. The pattern and practice here couldn't be clearer. It couldn't be clearer from those admissions, multiple admissions from all of those men, from all of the other cases we showed you which are obviously just the tip of the iceberg. Could not be clearer.

And instead, what they've told you is that you should -- you should ignore the law. The same with Sweeney, you should ignore the law as to what but for causation actually means. As you heard in the instructions, there could be more than one but for causation. Mr. Sweeney's lawyer got up here and said that, according to Sweeney's testimony, he doesn't meet the standard. I don't think Mr. Sweeney would agree with that. Mr. Sweeney told you had he understood that every single thing in both of the statements was fed by Raucci to Ruiz that first night. He talked to you about the coercion, not just when I was questioning him but in 1999 and in 2013, he described coercion and feeding. And he said on his own that every single inculpatory fact in that statement was fed to Ruiz by Raucci. There is no question in the world that if that came out, of course they can't go forward with the prosecution, it's impossible. And nobody ever said anything differently. Not Gold. Gold said he knew nothing about it. Of course, he couldn't go forward. It's not even a close call. What they're trying to suggest to you is that you should ignore what the law says and that the standard just can't possibly be met. But of course that's not true.

And none of this is a result of some special questioning by lawyers on our team. That has nothing to

do with it. And it's a little bit rich that they are concerned about how we questioned. You saw how we questioned them. We were cross-examining long-time detectives with their lawyers present in a courtroom or in a deposition. They were coercing and feeding information to vulnerable 15- and 16-year-olds in a small room in 1991.

And you heard nothing in any of their closings about Bruce Koenig other than a random comment that he was somehow associated with us? He was an FBI analyst who conducted forensic testing at the time he was at the FBI on the Roque tape and then later on the Morant tape. And he found, which nobody suggests is wrong, 11 stops and starts and nine overrecordings that nobody has attempted to explain.

It's not that they were -- it's not that we were unfair in our questioning. They didn't ask any questions. They didn't put on a case. They didn't ask these people to explain. They didn't ask Maher to explain, how is it possible that there were nine overrecordings and 11 stops and starts on the tape, what's your explanation? There is none. It's inconceivable. Of course he was there. Of course he saw it. That's what happened. There is absolutely no argument against it. And they can't even suggest otherwise.

The same is true with the City's ratification theory. The only reason that there wasn't a federal indictment against Raucci and the only reason that there wasn't a state indictment against Raucci is because the NHPD, who had the same evidence against him, tipped him off and told them they didn't have enough for the sting operation. They had a sting operation all set to go to catch Raucci in the act. The only reason it didn't happen is because the NHPD objected and then Raucci was magically tipped off in the exact same way Pastore had tipped him off just before. So to the extent that there was any reason why he wasn't prosecuted, it's the fault of the NHPD.

And obviously once there is a conviction, it is far more difficult to overturn it. There is no question that if simply the evidence that Sweeney saw that all that information was fed and that all that information was coerced from Ruiz, none of this could happen. It's inconceivable. Raucci -- I'm sorry, Morant and Roque didn't just guess the same exact story that they heard from Ruiz. It's impossible. Everything falls apart if you believe Sweeney. And nobody could honestly suggest otherwise. We all respect what he's done since 1991. But of course he's responsible and of course everything falls apart.

You heard about Donna Desai had only one contact with Raucci over -- had no contacts with Raucci over 20 years except when just before this trial Raucci committed a crime of witness tampering to get her not to testify. Exactly what we're accusing him of doing in this case. No mention of it.

So you heard nothing about Bruce Koenig because there's absolutely nothing they can say. They call no witnesses. They don't bring their expert in to dispute any of it. They don't bring their forensic expert in. They're now suggesting that our psychiatrist/psychologist was somehow biased? No psychologist came in. No questions of her. They didn't question a single alibi witness. They didn't question anybody because there was nothing they could say.

And when you go back into the jury room, you need to very carefully look at the jury instructions. They're nothing like what they suggest. We meet the standards of all the claims readily in multiple different ways, based on the admissions of the defendants, based on the admissions of other officers in every conceivable way. And there can be more than one but for cause, as you'll see in the instruction.

You heard from both Koenig and Drago, unrebutted, this is the worst they have ever seen in their

careers. No questions about it. No response. If the City was right that the standard wasn't met in this case, it would literally be impossible to ever meet the standard. They're simply trying to suggest that -- and that's what they're telling you, that nobody can meet the standard. If this case doesn't meet the standard, it simply can't be met.

And Mr. Gold said nothing to the contrary. All he told you was he knew none of this misconduct at the time, which is true. He didn't know any of it. It was reported that all of the interviews that were conducted by Raucci and Maher were conducted with open-ended questions just to get information, no coercion, no feeding whatsoever. That's all he knew. And we know now, as a matter of scientific fact, that that couldn't have happened. Twenty stops and starts and overrecordings. Sweeney credibly describing that the only reason for Ruiz's statement was feeding him coercion. None of it could have possibly -- could have -- none of it could have been rebutted, and they didn't even try.

You heard about Lawlor and the Bull meeting. I'm not exactly sure what the point was, but here's what we know. Lawlor met with Bull in 1996. He testified in 1999, three years later. So Lawlor has this meeting with Bull where he tells her, as she reports, that the

investigation had been troublesome at the time. Then, as you heard, he testifies just three years later, three or three and a half years later that not only did he not know anything about misconduct in the case, he had no knowledge about the case whatsoever. He had just met with Bull three years before and told her the case had been troublesome at the time. Unfortunately, nobody knew about the Bull memo at the time.

There is nothing but overwhelming evidence that, of course, Lawlor knew. Everything fits together. That's what Sweeney told you. He told it not just here under questioning from me. He told it in '99, he told it in 2013, repeatedly, the same story over and over.

So you also heard Defendant Raucci's lawyer stand up and tell you after what his client did -- and by the way, nobody here -- another thing to be angry about is nobody here except for Sweeney has taken an ounce of accountability. Zero. Never. Not here. Not ever.

And despite that, what his lawyer told you is that he criticized Mr. Morant for mistakes he made as a young man, mistakes that he owned up to. And statements that Dr. Akinsulure-Smith told you are reflective of diminished self-esteem as a result of his wrongful conviction. And you saw that's not who Mr. Morant was and that's not who he is. You saw that even when he was in

his twenties before he went to prison, he went back and he got his high school diploma. He was getting his life together. He was on the right track to doing good things, making a living and supporting his kids and looking for new job opportunities. They took all that from him.

You saw a man who did everything in his power to try to overcome what the defendants have done to him. Everything he has done, from prison, to parent his kids, to create a strong marriage. And he even parented his three bonus kids, as he calls them, Kim's children, including Kim's daughter who you heard after losing her father never thought she could see her mother with another man and now sees Stefon as a father.

You saw a man who relied on incredible faith to get him through unimaginable trauma, a man who somehow never lost hope despite everything he had to endure. They didn't care about him in 1991 and they don't care about him today. But you can only imagine what might his life had become given how resilient he is and what he's accomplished despite everything he went through.

They didn't talk about the impact on Stefon at all. They didn't talk about him at all. They just want you to devalue what he went through, just like we told you they would.

Do not dignify that argument. Hold them

accountable for every single penny of the undisputable damages that they caused. Hold each of the defendants accountable. Hold the City accountable. Not because of sympathy, but because of the overwhelming evidence that we've presented to you over this trial and the utter lack of a defense.

Now, as you've heard, Mr. Morant is a man of great faith. And it's been tested much more than most. And now Mr. Morant puts his faith in you. Thank you.

THE COURT: Thank you, Attorney Brustin.

Members of the jury, I'll return to Section VIII of my instructions, beginning on page 41.

Section VIII. Instructions for Deliberations (After Closing Arguments).

You have just heard closing arguments of counsel. I want to remind you that what the lawyers have just said is not evidence, even if it seemed at times as if they were testifying. The lawyers merely presented their arguments about what the evidence presented to you over the course of the trial has shown. Their credibility is not an issue that should enter into your decision in this case.

I must add a few general instructions concerning your deliberations. You were permitted to take notes during the course of the trial. Any notes you have taken

should be used only as memory aids; do not give your notes more importance than your independent recollection of the evidence. If you did not take notes, you should rely on your own memory of the proceedings and should not be unduly influenced by the notes of other jurors. The fact that a particular juror has taken notes entitles that juror's opinions to no greater weight than those of any other juror, and your notes are not to be shown to any other juror during the course of deliberations.

Your verdict must be based solely upon the evidence, or lack thereof, developed at this trial. Please bear in mind that all litigants are equal before the law. You should not, therefore, consider any personal feelings you may have about the race, religion, national origin, sex, age, wealth, lifestyle, or other features of the parties. Similarly, it would be wrong for you to allow feelings you might have about the nature of the claims to influence you in any way.

You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence presented here. If you let sympathy or prejudice interfere with your clear thinking about the facts, there is a risk that you will not arrive at a just verdict.

In reaching your verdict, you are not to be affected by sympathy for, or prejudice against, any of the

parties. You are not to be affected by what the reaction of the parties or the public to your verdict may be, whether it will please or displease anyone, be popular or unpopular or, indeed, any consideration outside the case as it has been presented to you in this courtroom. Finally, each of the parties to this case must be regarded as equals by you.

Your verdict must be unanimous and represent the considered judgment of each juror. Each of you must make your own decision, but you must consider impartially all of the evidence and the views of your fellow jurors. It is your duty to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so consistent with the individual judgment of each juror. Until a verdict is agreed to by each juror, it is not a unanimous verdict.

In the course of your discussion, do not hesitate to reexamine your own individual views, or to change your opinions, if the deliberations and the views of your fellow jurors convince you to do so. But you should not surrender your honest convictions about the facts or about the weight or effect of the evidence solely because of the opinions of your fellow jurors or merely to bring an end to deliberations.

Remember at all times that you must do

everything possible to avoid any bias. You are the judges of the facts and your sole interest is to seek the truth from the evidence in this case.

When you return to the jury room tomorrow, you should first elect one person to act as your foreperson who will preside over your deliberations and be your spokesperson.

A verdict form has been prepared for your convenience. Focusing on the questions set forth in the jury verdict form will assist you in your deliberations. You must complete and return the verdict form in court when you have reached your decision. You will be asked to answer the questions in the order in which they appear on the form, and each answer must be unanimous. When you have reached unanimous agreement as to your verdict, you will have your foreperson fill in your answers, and date and sign the verdict form. You will then inform the court security officer or courtroom deputy that you have reached a verdict. The verdict form must be used only in connection with the charge I have just given to you. The terms used in the verdict form are discussed in my instructions, and these instructions must govern your deliberations.

I want to caution you now to take your time when completing the verdict form. As you will see when you

retire to the jury room, the form consists of several questions. Each question calls for either a "yes" or "no" answer or a monetary amount. Answer each question as it appears and only those questions. As you review the form, you will see that there are instructions printed in italics after each question. Please read these instructions and follow them carefully. Depending on your answer to a particular question, it may not be necessary to answer a later question. The italicized instructions will guide you through the verdict form. Finally, be consistent in your responses.

When you go into the jury room to begin your deliberations tomorrow, you will be able to review the exhibits, but you will not have a transcript of the testimony. If you want any of the testimony read to you, that can be done and will occur in open court. I encourage you to limit the recitation of testimony. It is not easy to locate specific portions of the testimony, and reading the testimony is a time-consuming process, so please be as specific as possible if you decide to request a reading of portions of the testimony.

Requests that testimony be read back, as well as any other communication with the Court, should be made in writing, signed by your foreperson, and given to the courtroom deputy, Ms. Denault, or to a court security

officer. I will respond to your request as promptly as possible either in writing or by having you return to the courtroom so that I can address you orally.

I also must warn you that in your communications with the Court you should never reveal your numerical division at any time. In other words, you should not indicate how many jurors are in favor of returning a verdict in favor of one party or the other.

It is proper to add a final caution. Nothing that I have said in these instructions and nothing that I have said or done during the trial has been said or done to suggest to you what I think your verdict should be. What the verdict shall be is your exclusive duty and responsibility.

Tomorrow, you may proceed to your deliberations in the jury room. You will not be called into the courtroom in the morning, but you may begin deliberating in the jury room when you have all arrived. Throughout your deliberations, deliberate only when all of you are present. No deliberations may take place without all jurors being present. If you bring your cell phones into the jury room, you must turn them off during deliberations. You must not research any issue nor communicate with each other or with anyone about the case through the Internet, email, your smartphone, text

messaging, through any blog or website, through any internet chat room, or by way of any applications, including Facebook, Instagram, Twitter/X, TikTok, LinkedIn, and YouTube. Furthermore, if at any time a juror is using the restroom facilities or on a cell phone, the other jurors must cease deliberations immediately and may not begin deliberations again until all jurors are present and all cell phones are off. After you begin your deliberations, you are not to leave the jury room without first notifying the court security officer.

As you deliberate, determine the facts on the basis of the evidence as you have heard it and apply the law as I have outlined it for you. Render your verdict fairly, uprightly, and without a scintilla of prejudice. Take as long as you think is necessary to fairly and impartially reach your verdict.

The Court operates on your schedule while you are deliberating. Thus, if you wish to stay past 4:00 p.m. on any deliberation day and you are all able to do so, the Court and the parties are able to stay until 5:00 p.m. Likewise, if you wish to modify your time of arrival in the morning on any deliberation day and you are all able to do so, please just let Ms. Denault know, and we will be happy to accommodate your schedule. I understand that you already have decided for tomorrow to come at your

normal time of 8:30 and depart at 4:00. If you wish to change that schedule for any further days of deliberation, please just let Ms. Denault know.

I'd like to thank you again for your attention today and throughout the trial. And when you return tomorrow, you will begin your deliberations. Please leave your copies of the jury instructions and your verdict form in the jury room instead of taking them home tonight, and you'll have them with you, along with your notes, tomorrow when you start deliberating. Overnight, do not research or do any reading about the case and do not speak about it with anyone. You'll have plenty of time to discuss the case amongst yourselves beginning tomorrow.

Thank you very much for your time and attention. We'll see you tomorrow.

(Whereupon the jury left the courtroom.)

THE COURT: You may be seated.

Attorney Gerarde?

MR. GERARDE: Just while I'm thinking about it, we have that New Haven Police file in the safe. Can we now have that?

THE COURT: I think we were going to hold it until there was a verdict, so we can keep it for the time being.

A couple of things. First, for plaintiff's

PowerPoint, if you could just bring a marked copy tomorrow, we'll mark that for identification only.

MS. HOFFMANN: A hard copy?

THE COURT: Yes, please.

Second, we have the outstanding issue of qualified immunity special interrogatories. I think it's worth holding an argument about that tomorrow while the jury is deliberating. So let's plan on doing that at 11:00 tomorrow. I have read the submissions, but I do have some questions about the necessity and the phrasing of any questions, if we get to that point.

After Ms. Denault returns to the courtroom, we want you to give one final look to the exhibit binders just to make sure everything is fully in order.

I did have a question harkening back to last week about whether the pardon document was going to be redacted by plaintiff. Have you decided on that?

MS. HOFFMANN: No need to redact it.

THE COURT: Okay. And then Ms. Denault had one question about Plaintiff's Exhibit 65, which is a deposition transcript. Our records did not show that 65 as a main document had come in, but 65A through -F had come in as video exhibits. Please just keep that in mind.

We do have a form for you all to sign after you take a look at the paper exhibits just to make sure that

everybody believes that they adequately and accurately represent what would go back to the jury tomorrow.

Those are my to-do list issues. Anything from the parties?

MS. HOFFMANN: I just want to confirm, so the jury is coming in from 8:30 to 4:00 tomorrow, so we should be within five minutes of the courthouse from 8:30 to 4:00, but here for 11:00 for the argument?

THE COURT: Exactly right, yes.

MR. GERARDE: Does Your Honor have a full calendar so we need to make the tables available?

THE COURT: Tomorrow I have a 4:15 proceeding, but nothing until then.

MR. GERARDE: Very well. Thank you.

THE COURT: And that's a multidefendant -- I'm sorry, that's not on until Thursday. Tomorrow, the courtroom is open and yours to hang out in if you wish.

MR. MELLEY: May I designate Ms. Stone to review the exhibits?

THE COURT: She doesn't work for you.

MR. MELLEY: No, she doesn't, but I have complete faith.

THE COURT: If she agrees and if Attorney Gerarde agrees, you can work that out on your own.

MR. GERARDE: We'll work that out, Judge.

THE COURT: Okay. Anything else from the parties?

MR. BRUSTIN: No, Your Honor.

MR. TALLBERG: No, Your Honor.

THE COURT: I know we're all waiting for the verdict, obviously. In the meantime, I want to commend all counsel and support staff for the extraordinary efforts that you put into preparing this case for trial and presenting it. It has been my privilege to preside over it, and you're all welcome back in my courtroom any time. I know we're not at the end, but we're closer to it than we were before. The Court will stand in recess. Thank you.

(Proceedings adjourned at 4:35 p.m.)

# C E R T I F I C A T E

RE: STEFON MORANT v. CITY OF NEW HAVEN, ET AL.
No. 3:22-CV-630(SVN)

I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 3365 through 3588 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/

DIANA HUNTINGTON, RDR, CRR
Official Court Reporter
United States District Court
141 Church Street, Room 147
New Haven, Connecticut 06510
(860) 463-3180