UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

STEFON MORANT,
Plaintiff(s), NO. 3:22-CV-630-SVN
v. JURY TRIAL DAY 19
CITY OF NEW HAVEN, et al, HARTFORD, CONNECTICUT
Defendant(s). May 27, 2026

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff(s):
Anna Benvenutti Hoffmann
Nick Brustin
Emma Freudenberger
Amelia Green
Elsa Mota
Grace Paras
Katherine Cion
Syeda Ali
Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP
200 Varick Street, Ste. 800
New York, NY 10014

Kenneth Rosenthal
Law Office of Kenneth Rosenthal
One Audubon Street, Third Floor
New Haven, CT 06511

For the Defendant(s):
Thomas R. Gerarde
Amanda Stone
Lidia M. Michols
Abigail R. Willauer

Howd & Ludorf, LLC
100 Great Meadow Road, Ste. 201
Wethersfield, CT 06109
(Representing City of New Haven)

James Newhall Tallberg
Kimberly A. Bosse
Karsten & Tallberg, LLC
500 Enterprise Drive, Ste. 4B
Rocky Hill, CT 06067
(Representing Vincent Raucci)

William J. Melley, III
Law Offices of William J. Melley, III
250 Hudson Street
Hartford, CT 06106
(Representing Robert Lawlor and Vaughn Maher)

Michael T. Ryan
Jonathan Zellner
Ryan Ryan Deluca, LLP
1000 Lafayette Blvd., Ste. 800
Bridgeport, CT 06604
(Representing Michael Sweeney)

Reported by: Denae Hovland, RPR, RMR, CRR
Federal Court Reporter
701.840.9786
denae_hovland@ctd.uscourts.gov

THE COURT: Good morning. We're on the record in 22-CV-630. Let's just take appearances of counsel first.

MS. HOFFMANN: Anna Benvenutti Hoffmann, Nick Brustin, Grace Paras, and Katie Cion here for the plaintiff, along with the plaintiff, Stefon Morant.

THE COURT: Good morning to all of you.

MR. GERARDE: Good morning, Your Honor, Tom Gerarde and Amanda Stone for the City of New Haven.

MR. TALLBERG: Good morning, Your Honor, Jim Tallberg and Attorney Bosse with Ms. Oliveira for Mr. Raucci.

MR. RYAN: Good morning, Your Honor, Michael Ryan for the defendant, Mr. Sweeney. Mr. Sweeney was here. He will probably be stepping in shortly.

THE COURT: Okay.

MR. MELLEY: And good morning, Your Honor, Jay Melley on behalf of Lawlor and Maher, and Mr. Maher is also here. I sent him a text that we're coming on the record.

THE COURT: Okay. So as counsel is aware, I think, we've received a note from the jury. The note reads as follows: "For each subsection under each count, will each subsection require a 'yes' verdict to conclude an overall 'yes' for the count? For example, under Count

Number I, do we need a 'yes' for all subsections, or would one 'no' in a subsection give an automatic 'no' for the count?"

I think this is a relatively easy answer, which is that they do need a "yes" for each of the elements of each of the claims, but let me hear counsel's views on this.

MS. HOFFMANN: I think it's ambiguous. I agree it's an easy answer, but I think it's ambiguous whether they are asking they need a "yes" on all elements or they need a "yes" on the verdict sheet where under the count it says separately the consideration for each defendant.

So I would suggest we give both answers, that you have to find all elements "yes" for each individual defendant, but the consideration for each defendant is independent.

So, for example, on the verdict sheet under Count I where there is one question about Mr. Raucci and one question about Mr. Maher, those are independent and you don't have to answer them together.

THE COURT: But you have to answer all six elements for Mr. Raucci --

MS. HOFFMANN: Right.

THE COURT: -- in the affirmative to say yes, and likewise for Mr. Maher to say yes.

MS. HOFFMANN: Right, yes.

MR. GERARDE: That's agreed. I think that makes sense, Judge.

MR. TALLBERG: Same here, Your Honor. We agree.

MR. RYAN: Yes, Your Honor, but I'm just trying to understand the second question. "Do we need a 'yes' for all subsections?" I think we don't need a "yes" if they just want to find for one -- you know, against one defendant for all the questions. So I agree it is a little bit ambiguous, but if they are saying do they need a "yes" for all questions --

THE COURT: I think I see what you're getting at. You're saying they could answer "yes" as to one defendant, but no as to another defendant under the same count. Is that --

MR. RYAN: Exactly. So there could be a finding of liability on one count, but only against one defendant, so it depends who they -- or if they want to do that.

MR. MELLEY: It would seem to me, Your Honor, that each -- perhaps there is confusion. Each question, 1 to 19, has to be answered independently. I think that's in essence what it is.

MR. RYAN: Yeah, but they are trying to figure out whether if they answer for one particular count, how they should do it.

MS. HOFFMANN: They are not all independent. The instructions on the verdict sheet indicate which ones are predicates for other claims, but it does seem to make sense to make sure the jury understands that if, for example, they answered "yes" for one defendant on one count and "no" for another defendant on that count, there would still be liability against the defendant they answered "yes" for.

MR. MELLEY: I agree with that, but each question is independent until we get to number ten. That refers to the other subcategories.

MS. HOFFMANN: I think that's right.

MR. TALLBERG: One last comment, if I may, Your Honor, on behalf of Raucci. I think Your Honor just referred to Raucci just by way of example among us in the courtroom here, but I assume we'll just make it generic as to a defendant, or something like that, in the response to the jury.

THE COURT: Yes.

MR. TALLBERG: Thank you.

MR. GERARDE: And since I haven't said anything, the only thing I would say is it should be clear to them that before any one of them can become a "yes" on the verdict form, you have to go six-for-six for that one person in Count I.

THE COURT: Right. When they said subsection, I guess I had interpreted that as the elements of each claim, but I think we can instruct them that they both have to find all of the elements as to a particular defendant, and they have to consider each defendant's conduct individually, but they are permitted to answer "yes" as to one defendant and "no" as to another defendant.

MS. HOFFMANN: And clarifying that if they answer "yes" on the verdict sheet as to one defendant, that is liability, and they go to damages.

THE COURT: Now, I think just jumping ahead, this instruction may be a little different for Count VII, because there we're not -- first, there is only one defendant, and they have to answer "yes" to either 13, 14, or 15 before they reach 16. I think I'll say nothing about it unless they express confusion.

MR. GERARDE: Yes. There is so many predicates. If you answered "yes" to this, before you reach -- we should let them mush on. I wouldn't actually say you get to damages if you've answered "yes." On the verdict form it says go to question three if you've answered "yes" or, you know, regardless, I guess, but they don't need to know necessarily implications right now.

MS. HOFFMANN: Well, I think that may be what

their question is.

MR. GERARDE: Well --

THE COURT: I can clarify just the italics under 20, which says if you answered "yes" to any of those questions, you can proceed to answering question 20.

MS. HOFFMANN: I do think it makes sense if we're giving instruction that may be different that relates to the different defendants, to flag that under Count VII, that's a different situation, because otherwise I think that may be suggesting to them something that's not accurate in an abundance of caution. So the separate consideration for the individual defendants applies to all of Counts I through VI.

THE COURT: Yeah.

MS. HOFFMANN: And then when you get to Count VII, the instruction says as given that you have to answer 13, 14 and 15 independently. If you answer "yes" to any of those, then you proceed to 16.

MR. GERARDE: Yeah, however Your Honor wants to do that will be fine.

THE COURT: For now I'm just going to tell them to follow the instructions on Count VII, and if they have questions if and when they reach it, then we'll take them up at that time.

MR. TALLBERG: Just for purposes of the record,

Your Honor, is this note one or two at this point?

THE COURT: It will be Court Exhibit 21.

MR. TALLBERG: Very well. And so that would be -- we don't need to read it into the record, but there is one comment I would like to make. The last part of this note, which came out May 27 at 10:40 a.m., reads "or would one 'no' in a subsection give an automatic no for the count?" The answer to that is correct; right? So looking at Count I, malicious prosecution, if they found "no" on one of the elements, that is a "no" on that count, I believe.

MS. HOFFMANN: So it depends on whether subsection means element or subsection means a sub-question on the verdict sheet, which is exactly what we've been discussing instructing the jury on both parts, that they have to find all elements against any individual defendant to find a liability on any particular claim. They have to consider the claims independently as to each defendant. That's what everybody has been saying.

MR. RYAN: But they can find, for example, in Count I one defendant without finding both liable.

MS. HOFFMANN: Yes.

THE COURT: Correct.

MR. RYAN: Right. So they don't have to answer both questions "yes" to have found someone liable of

malicious prosecution.

MS. HOFFMANN: Yes, exactly.

THE COURT: It really does turn on what they mean by subsection, so I think what I will say is that -- I'll ask them to bring their instructions with them. I'll point out that, for instance, on Count I, there are six what we call elements to that claim. For each defendant, you have to find that Mr. Morant has established all six of those elements by a preponderance of the evidence to answer yes for that defendant. But you can -- you should assess each defendant independently, and you can reach different conclusions for each defendant under each count in the verdict form.

MS. HOFFMANN: But I think in addition to that, because it seems to be their question, that if you have found liability against any defendant, that is liability regardless of what you find for any other defendant on that same count, that is a liability finding, because that seems to be one of the questions that may be -- depending on what subsection means, that may be one of the questions the jury is asking.

MR. GERARDE: I think that's going too far and we should stop where Your Honor said.

MR. MELLEY: I don't see the word "liability" in the question.

THE COURT: I don't, either. So it's a four-part instruction.

First, you have to find all elements of each claim as to each defendant.

Second, each question on the verdict form has to be answered independently for each defendant, thus, you have to find all six elements of Count I, for instance, as to Mr. Raucci and Mr. Maher for Count I by way of example.

If you say "yes" to any of the questions in Counts I through VI, you move to question 20. And I'll repeat the instruction for question 20.

Count VII is treated slightly differently. Follow the instructions for Count VII.

MS. HOFFMANN: Okay. Thank you.

MR. GERARDE: If the message is if you find "yes" to someone in Count I, you move to question 20, they are going to turn to the back page.

THE COURT: You eventually --

MS. HOFFMANN: You eventually, yes.

MR. GERARDE: All right. I think we should just let them read "proceed to question two."

MR. MELLEY: I think Your Honor's instruction on the damages is that it's one figure, so they shouldn't get to number 20 until they are done with one through 19.

MS. HOFFMANN: That's what she said. She said

eventually you get to question 20.

THE COURT: I think it is fairer for them -- we want them to proceed in order through the verdict form. That's how we designed this. So if after they answer a question, they read the italics and proceed to the next question, eventually if they have answered "yes" to any of questions one through 12, 13 through 15 and 16, 17 and 18 or 19, they can proceed to answering question 20, so I'll tell them to proceed in order, and then what the instruction is on when they reach 20.

MS. HOFFMANN: Thank you.

THE COURT: All right. Can we call in the jury, please. Please ask them to bring their copy of the instructions, too.

(The following proceedings were held in the presence of the jury.)

THE COURT: You may be seated. Good morning, members of the jury. We received your note, which I will read for the record so that we're all on the same page. It says: "For each subsection under each count, will each subsection require a yes verdict to conclude an overall yes for the count? For example, under Count No. I, do we need a yes for all subsections, or would one no in a subsection give an automatic no for the count?" And it's signed by your foreperson and dated today at 10:40 a.m.

So I want to give you some instructions to answer your question.

First, as to each claim, you must find that Mr. Morant proved by a preponderance of the evidence each of the elements of that claim against each individual defendant. So by way of example, if you have your instructions, turn to page 21. And right in the middle of the page under Count I, it says to succeed on his malicious prosecution claim, Mr. Morant must prove by a preponderance of the evidence that, and then there are six elements. So for each defendant as to whom you need to make a decision for Count I, you need to find all six of those elements in order to answer yes on the verdict form.

Now, in addition, each defendant needs to be treated independently, so you must evaluate those elements for each defendant who is named in a particular count.

The answers do not need to be the same for each defendant. You may find that Mr. Morant has proven the elements of the claim by a preponderance of the evidence as to one defendant, but not as to another defendant. So you can permissibly answer yes for one defendant and no for another defendant under the same claim on the verdict form.

Now, if you answer -- no matter what you answer, you want to follow the italics instructions on the verdict

form. So if you answer -- however you answer question one, you will move on to question two. However you answer question two, you will move on to question three, and so forth.

Question 20 instructs you that if you answer yes to any of the following questions, questions one through 12, 13 through 15, and 16, 17 and 18 or 19, you may proceed to answering question 20.

Now, Count VII, I want to just draw your attention to, is treated slightly differently. There is only one defendant in that count, and you should just follow the instructions about which questions you need to answer in that section.

I hope that that answers your question. If it doesn't, you may write us another note and we can try to clarify it further.

Just by way of terminology, which may help us understand your questions better, those six things that I listed under malicious prosecution, we call those the elements of the claim. So if you have a question about the elements of the claim, that's what we all understand when you use the word elements.

If you use a word like "subsection" in the future, it may be helpful for you to explain to us what you mean by subsection so we can provide you with the

answer that will help you proceed in your deliberations. All right?

So, I hope that that answered it. You may proceed back to your deliberations. Thank you.

(The following proceedings were held outside the presence of the jury.)

THE COURT: All right. You may be seated. So the other issue we need to take up this morning is the question of special interrogatories for qualified immunity if the jury returns a verdict in favor of Mr. Morant on any of Counts I through VI, I think, although I do have a question about the conspiracy count.

So just this morning, Mr. Sweeney filed a joinder to Mr. Raucci's original motion and suggested three special interrogatories. I want to make sure plaintiff has seen that filing.

MS. HOFFMANN: I don't have a copy. I'm going to see if I can pull it up.

THE COURT: We'll get a paper copy for you printed.

MS. HOFFMANN: Thank you.

THE COURT: More generally, though, my first question is for each individual defendant, and really for each claim, I need to know what your qualified immunity argument is.

I haven't seen in your briefing thus far any indication that this is about the clearly established prong of a qualified immunity analysis, so let's start there and with you, Attorney Tallberg. Are you planning to argue that any of these rights were not clearly established by the time of the relevant events?

MR. TALLBERG: Yes, Your Honor, and I can try to narrow the argument that we have on this.

If I may first, may I respond to the filing that was made by plaintiff yesterday, I guess it was, citing to a case *Alla v. Verkay*. So that opinion we think is inapplicable for a variety of reasons. In that case, the court did not use special verdict interrogatories. It was a use-of-force case and the court did not send the jury those special interrogatories for two reasons.

One, the defendant didn't raise qualified immunity in their Rule 50 motion, so they hadn't preserved the issue, and then there were two very narrow questions that the defendant offered that were undisputed, that plaintiff I think had conceded the answer would be yes to that. So we don't think that provides any guidance.

We have found one decision, Ms. Bosse found this morning, in a wrongful conviction case, none in the District of Connecticut or Second Circuit, where there was a verdict for a plaintiff on a wrongful conviction

fabrication-type claim like we have here. There is a case out of the Eastern District of North Carolina, Western Division. We can share the cite or a copy. *Tarlton v. Sealey*. This was a plaintiff's verdict in 2021, and following the plaintiff's verdict, the judge did send a special verdict form into the jury that had I think like ten questions with regard to -- let's see now -- these were -- it involved fabrication of an alleged confession, suppression of exculpatory material. And so in that case there were these multiple questions sent to the verdict -- to the jury, rather.

Having gone through the five counts against Mr. Raucci, I have concluded that the counts -- if there is a verdict against him, I think the counts that would be most susceptible to a qualified immunity argument were, I think you picked up on this early on, Your Honor, the malicious prosecution, arguable probable cause, so it would be Count I, and the argument goes like this.

There are six elements laid out that ironically we were just looking at on page 21 of the jury instructions. Two of those, the jury has been instructed, they have already been established, the second and fifth elements, favorable termination as a result of the pardon, and post-arraignment deprivation of liberty.

There are four elements under the malicious

prosecution claim in Count I where the evidence was hotly contested.

One, did Raucci initiate a criminal prosecution?

The evidence was that he was working at the direction of the prosecutor.

THE COURT: So, Mr. Tallberg, I need to ask you a question. You ligated *Washington v. Napolitano*; correct?

MR. TALLBERG: I did, yes.

THE COURT: You lost on the question of whether the police officer's actions were -- in the investigative phase of a case could get prosecutorial immunity. I consider that a binding Second Circuit case to which counsel should have alerted the court, but I have not seen it anywhere in your filings.

MR. TALLBERG: Your Honor, I quite frankly didn't think it was relevant. We don't have the same facts that we have here.

THE COURT: You're advancing an argument in your Rule 50 motion that Mr. Raucci is entitled to prosecutorial immunity for his actions during the investigative phase of the case because he was doing so at the direction of Ms. Wiederhold. By my reading of *Washington*, it squarely forecloses that argument, and I question why you didn't bring it to the court's attention

given that it was your case.

MR. TALLBERG: I apologize, Your Honor. That was hotly contested. There was at the Second Circuit quite a strong dissent.

THE COURT: But the majority opinion held against you; right? Right?

MR. TALLBERG: It did, Your Honor, but we have not stressed that extensively, the prosecutorial --

THE COURT: Did you or did you not make the argument in your Rule 50 motion?

MR. TALLBERG: We did. It's one at the very end, buried in with the qualified immunity. It was not a prominent argument, Your Honor. It was not intentional, certainly, to exclude that.

THE COURT: So it sounds like you're making an argument that the jury -- that the question of whether Mr. Raucci initiated or continued the criminal proceeding depends on whether he was acting at the direction of Ms. Wiederhold.

MR. TALLBERG: Well, if I may finish my thought, Your Honor, that was one element. The stronger element, I think, the plaintiff's whole theory of the case is that Mr. Raucci was acting at the behest of Frank Parise, and so I think that is a factual finding.

THE COURT: Why does -- I mean, Mr. Raucci is

the police officer. Mr. Parise has no power to initiate or continue a criminal proceeding. Why would his acting -- which you're now sort of shifting arguments, and now you're saying he's acting at the direction of a non-governmental actor?

MR. TALLBERG: It's the converse of that, Your Honor, and that really has been the theme of our defense. The prosecutorial immunity -- I apologize for that, Your Honor. We're not -- I was not stressing that. The theme of the defense has been this idea that there is a conspiracy with Frank Parise is ludicrous, and so I think it would be helpful to the analysis if we had a finding that Mr. Raucci established he was not working at the direction of Mr. Parise, in which case that is more consistent with it's the prosecutor's office that initiated the charge. Yes, Mr. Raucci was the affiant on that. Again, it's a qualified immunity argument I'm making, not so much as the prosecutorial immunity.

THE COURT: Which of your questions specifically addresses that?

MR. TALLBERG: Right. So what we would have to do is -- and if I can just finish my thought, Your Honor. The malicious prosecution claim I think is the most susceptible, and that would mean, quite frankly, I think that the first one through 17 questions are not going to

be applicable. Questions 17 through 20, I think it is, are the ones that we could possibly refine.

THE COURT: Okay. So let me get you on record. You're withdrawing your request to have the jury decide questions one through 16 from your filing of last Friday?

MR. TALLBERG: Well, if I could finish my thought, Your Honor. So I do think the malicious prosecution claim in Count I is the most susceptible.

I think on the other counts, Count III, failure to disclose, if there is a finding against Mr. Raucci, I think that probably establishes the facts such that qualified immunity wouldn't be applicable. And, yes, Your Honor, I think that applies to Count IV, fabrication, as well, because if they find the elements that he fabricated knowingly false statements, I don't think we need additional factual findings.

The other one that I pause on is the conspiracy claim. The coercion I think falls in that same element. If they find that he caused Mr. Morant to give a false statement, additional factual findings are not going to help.

But when we get to Count II, the conspiracy, the five elements, one is met, the fourth on deprivation. But the others, it might be useful to know whether the jury found -- and this probably pertains more to Mr. Maher. If

they find a conspiracy, I think a factual finding as to who Mr. Raucci allegedly conspired with would be relevant to the qualified immunity analysis, maybe not so much for Raucci, but for -- I don't mean to speak for Mr. Maher, but those are the two counts I think are most susceptible.

So, yes, to answer you candidly, Your Honor, I think the first 17, one through 17 questions are probably not going to fly. And the whole intent of this, contrary to the plaintiff's argument that, you know, we never contended all 18 of these would be asked. What we're trying to do is preserve the record so that if we find ourself in a position where there is a finding against Mr. Raucci now on Count I or Count II, we have some questions that we can massage, in particular the questions we posed, 18 through 20 in document 546-1, which was filed May 22nd.

THE COURT: I am interpreting your remarks as withdrawing your request to ask the jury to decide questions one through 17, although you're being ambivalent about it.

MR. TALLBERG: Yes. No, I'll be candid with Your Honor. We withdraw those, one through 17.

THE COURT: Okay. Thank you.

So let me turn to Sweeney's counsel and Maher's counsel, because you each joined Mr. Raucci's filing, and

I need to know whether you all also withdraw your requests to have the jury answer questions one through 17.

MR. RYAN: On Raucci's submission?

THE COURT: You joined that filing.

MR. RYAN: Yes, I join in that.

THE COURT: Okay, you join the withdrawal of questions one through 17?

MR. RYAN: Right.

THE COURT: Attorney Melley?

MR. MELLEY: Likewise, Your Honor.

THE COURT: Okay. So I'm not going to address those. We'll focus our attention on 18 through 20.

Now, there are ways in which I think the malicious prosecution claim, particularly the question of arguable probable cause may depend in part on what evidence the jury might conclude was fabricated, and here's why. My review of Mr. Morant's arrest warrant shows that it was three pieces of evidence that established the foundation for the judge signing off on it.

First, there is Ovil Ruiz's statements. Second, there is Jose Roque's statements. And, third, there is Mr. Morant's own statement.

I think that the jury's determination on Count V, the coercion claim, will answer the question of whether

Mr. Morant's statement was an adequate basis on which to base a probable cause finding for the arrest, because if the jury says that statement was coerced, no reasonable officer could have concluded that it was a foundation for arguable probable cause.

But the fabrication claim, as I understand it, relates to many pieces of evidence, including Mr. Ruiz's statements, which were relied upon in the arrest warrant, and Mr. Roque's statements, which were also relied upon in the arrest warrant. So even if the jury returns a verdict against Mr. Raucci on fabrication, we won't know what piece of evidence they found to be fabricated unless they are asked the question. And if they find that only one of those two pieces of evidence was fabricated, my task will be in a qualified immunity analysis whether the remaining statements in the affidavit would have established arguable probable cause. That's how I'm thinking through it. But you tell me, you know, if I'm making any analytical errors here.

MS. HOFFMANN: So I think the issue is you only have to do that type of analysis if the facts as tried and presented would -- are susceptible to that sort of compartmentalization, and I think the uniform evidence is that they are not.

So, for example, you know, we presented wildly

different views of what happened. Mr. Raucci's version is he was a by-the-book detective, nothing ever went wrong, all these people just volunteered their statements.

Obviously, our evidence is that every single piece is fabricated.

I don't think there is any suggestion that you would find one versus the other based on the case as it was tried.

And even for Mr. Maher, if he's even aware of the fabrication with Mr. Morant or Mr. Roque's statements for which he was both present, he himself admitted -- in the converse, it was Mr. Ruiz -- but if you saw that by Raucci taking a statement in this very investigation, you could not trust any other statements that Mr. Raucci took, which would include the other statements like the Ruiz statement.

So I think on the facts here, there is no version which is susceptible to -- and this is just like -- there is at least one case we cited in our filing on special interrogatories that says if the trial evidence isn't really susceptible to that interpretation, there is no need to give a special interrogatory on it, because if the jury finds, yes, there was fabrication, yes, there was coercion, there isn't really a reasonable view of the evidence given what the both sides have argued that would

harmonize those things such that there could possibly be arguable probable cause.

THE COURT: So you're saying that because it's kind of all or nothing as a defense, either he fabricated every piece of evidence or he fabricated none, a finding for Mr. Morant on Count V means as to the Ruiz and Roque statements relied upon in the original arrest warrant, those get wiped out, and so if the jury also finds for Mr. Morant on the coercion claim, the entire foundation for the arrest warrant is eliminated and there would be no arguable probable cause to proceed.

MS. HOFFMANN: There is no -- it's -- they are not independent. I mean, this is the same investigation. And that's what everyone has testified to is if you know that Raucci has coerced one of these statements, you cannot trust anything that he obtained in the entire investigation, so you would not reasonably believe that there was probable cause.

And Mr. Maher specifically testified if you knew what Sweeney was saying about the Ruiz statement, you couldn't make an arrest. In general, you could not make an arrest, and that it's because the entire -- you then know that the entire investigation is tainted and you can't rely on it.

So this is not a case where there are, you know,

an independent eye witness identification that comes from somewhere else that could be a separate basis for probable cause. This is everything is coming from Raucci.

So certainly Mr. Raucci, there is no basis to believe if he did everything that -- you know, even some of what it is we're alleging, but again, I don't think that there is a reasonable view of the evidence that -- way to harmonize it based on the way that the evidence came in that he -- you know, Ruiz came forward to him independently, that he later fabricated the other statements. Like, that's just not consistent with anyone's version of what happened. So either you believe he fabricated all of these things, or you believe, you know, his version that everyone just happened to give him this information against Mr. Morant.

And I would also say, I mean, I think that -- I appreciate the court is trying to be very careful and look to anything that could possibly be a question but, really, it is on the defense to identify some actual arguable basis for probable cause or basis for qualified immunity, which there is a specific question which they are asking for which would -- and is supportable based on the evidence as it came in and as it was argued and which would actually be relevant to a determination of qualified immunity in this case, and I don't think they've come

close to doing that.

But I do think based on the evidence there isn't a need to give -- and they have now conceded, finally, there is no question for fabrication, for *Brady*, for any of these -- for coercion. If you find what -- you know, find the elements, there is no qualified immunity.

And I think on the facts again here, if you find what it is we have said, there is no qualified immunity for the malicious prosecution, either.

Like, this is a case where our versions are worlds apart, and no one has ever suggested that if they did any of what we're saying, that they were acting in good faith and such that there wouldn't be -- such that a reasonable officer could have done that.

THE COURT: So, Attorney Tallberg, just returning back to element one, you said that some version of a question about whether Mr. Raucci initiated or continued the criminal proceeding would be appropriate because of allegations that he, in your view, acted at the direction of Frank Parise. None of your questions in 18 through 20 seem to get at that.

MR. TALLBERG: Your Honor, these -- you know, it -- these are intended to be drafts that we modify. It's a moving target based on the evidence that came in at trial and, you know, I'd like an opportunity to try to

refine them now that we have narrowed the list.

THE COURT: By the time of this submission, evidence had closed. I mean, we can't have a continually changing set of potential questions while the jury is deliberating. For all we know, they could reach a verdict in the next 15 minutes.

MR. TALLBERG: It is an awkward process. What I would say to you is this, Your Honor. There is not an example in the District of Connecticut or Second Circuit that we can follow. Ms. Bosse just pointed out to me that the case I gave you out of North Carolina, the actual cite I guess is *McCollum v. Robeson County*. I think I gave the docket number, 5:15-CV-00451-BO. And in that case the court did give special verdict interrogatories.

A question, for example, did the defendants coerce or fabricate Henry McCollum's written confession? Did they act jointly in concert to deprive him of his constitutional rights? For whatever reason, the court in that case gave these special verdict interrogatories to the jury after they returned a verdict.

THE COURT: So but, you know, it's a new case. I haven't read it. Why wouldn't the verdict form itself answer questions like that in our case?

MR. TALLBERG: On some of the counts, like I've conceded, they necessarily do, but on others, I don't

think they do. Just like Your Honor pointed out. Is it the Ovil Ruiz statement? Is it the Roque statement? Is it the Morant? And I think we could use some additional factual findings that would aid the court.

THE COURT: If your position is that Mr. Raucci fabricated nothing and plaintiff's position is that he fabricated everything, why do I need to know further which potential statements he fabricated, because in the jury's mind they have the options that are black and white. They don't have a gray area based on how the case was argued.

MR. TALLBERG: Yeah, I mean, I've conceded on the fabrication. I should be focused on the malicious prosecution, Your Honor.

THE COURT: Okay, so which -- so I guess I was focussing on arguable probable cause for malicious prosecution, but you tell me which element of malicious prosecution would you base your qualified immunity argument on and what factual questions remain open.

MR. TALLBERG: Yeah, I think it would begin with initiated or continued the proceeding.

THE COURT: And what is the fact -- again, given that Mr. Raucci was the police officer, Frank Parise at some point in the duration of this case became a convicted felon, how is it possible that Mr. Parise could have initiated or continued this prosecution?

MR. TALLBERG: Well, that is the plaintiff's theory of the case, Your Honor, and --

THE COURT: It's not. It is that that was the motivation in part for Mr. Raucci to act in the way he acted, but it is not that Mr. Parise said, you know, go out and find these guys and write an arrest warrant. I didn't hear evidence of that.

MR. TALLBERG: I thought that could be inferred from the alleged statements that Mr. Raucci said to Mr. Lewis, you shouldn't have stopped dealing drugs in Fair Haven and Vinnie wants his money.

THE COURT: I don't think it goes as far as suggesting Mr. Parise had any ability to initiate or continue a criminal proceeding, though. Does it?

MR. TALLBERG: I think plaintiff's counsel argued that in the opening. I think that was the case they put on, Your Honor.

THE COURT: But it would be legally impossible for Mr. Parise to initiate or continue a criminal proceeding. He was not a police officer.

MR. TALLBERG: No, I think if the jury were to come back with an answer that Mr. Raucci established he did not initiate this proceeding or continue it at the behest of Frank Parise, I think that goes to the arguable probable cause argument and qualified immunity.

THE COURT: Those are different elements, though. So if the jury finds against Mr. Raucci on malicious prosecution, they will have found that Mr. Raucci initiated or continued the criminal proceeding. Why do I need to know whether Mr. Parise directed him? Their jury verdict will answer the question that you're getting at, I think.

MR. TALLBERG: I would respectfully submit because that is what the plaintiff put into issue, that that's the whole theory of the case, that it was a frame -- that Mr. Raucci framed Mr. Lewis and Mr. Morant as a result of Raucci, and our defense was we did not. Our defense was Ovil Ruiz provided this information, and I think that would be the key important fact that would be part of a special verdict interrogatory.

THE COURT: Okay. I'm denying that request.

MR. TALLBERG: Okay.

THE COURT: What other elements of this claim do you think require special verdict forms?

MR. TALLBERG: Well, it goes to acting without probable cause and for acting for -- that's the third element. It goes to whether Mr. Raucci acted maliciously or for a purpose other than bringing Mr. Morant to justice. I think it relates to all of those elements.

THE COURT: Again, why wouldn't the jury

verdict, and in this world we're contemplating a verdict against Mr. Raucci. Now that I've twice instructed them they have to find all of these elements in order to answer yes for that claim, what factual issue is actually in dispute and how does it relate to qualified immunity?

MR. TALLBERG: I'm beating a dead horse, but I think it is the central issue in the case posited by the plaintiff and rebutted by Raucci about Frank Parise and whether Mr. Raucci was part of the criminal conspiracy, the drug operation. That's really the heart of the case.

THE COURT: So I think -- We haven't touched on conspiracy. I think you're making conspiracy types of arguments for count --

MR. TALLBERG: That was the other count I thought might be susceptible.

THE COURT: So let me just articulate. I guess based on what you've argued so far, first, qualified immunity is an affirmative defense that must be pleaded and proven by any defendant who is attempting to raise it.

I find that you have not articulated as to Mr. Raucci any need for any special interrogatories as to Count I, malicious prosecution, because, first, a jury verdict for Mr. Morant on this count against Mr. Raucci will fully answer the question of whether these six elements were met.

The question of whether Mr. Raucci was acting at the direction of Mr. Parise in some manner is highly confusing to the court because he had no ability to initiate or continue the criminal proceeding given that he was not a police officer. And if the jury returns a verdict against Mr. Raucci on this count, they will have found that Mr. Raucci initiated or continued the criminal proceeding.

Likewise, as to element four, if they return a verdict for Mr. Morant on this count against Mr. Raucci, they will have found that one of the various examples we have given them for how to establish malice has been proven by a preponderance of the evidence. I see no need for them to specify what specific type of malice Mr. Raucci demonstrated.

So I think that answers the questions on malicious prosecution.

I will also say again that we can't have a moving target with respect to these special interrogatories. The version of questions that you submitted on Friday, May 22nd, was submitted after the close of evidence and so thought should have been given at that time to what specific questions would be necessary for the jury to resolve on factual disputes so as to enable the court to eventually decide the questions of

qualified immunity.

Let's move to your conspiracy argument.

MR. TALLBERG: Yes, Your Honor. I think I've already summarized this in that the element -- the first element is whether there was an agreement between a defendant and one or more others. And here, the instruction to the jury included Frank Parise specifically, Ovil Ruiz, Agustin Castro, Hector Ortiz, and I thought it would be important to know, if they come back on this, whether the jury found that Mr. Raucci conspired with one of these non-parties, especially Mr. Parise given my argument that Your Honor has rejected about the plaintiff's theory of the case.

But, also, it might be important to know as to whether the jury concluded it was Raucci conspiring with Maher. That's the allegation, that the two of them conspired. It just seems that that would be a relevant fact that might be useful to know with regard to the qualified immunity.

THE COURT: How?

MR. TALLBERG: I won't belabor it.

THE COURT: But how is it relevant to any finding the court would need to make down the road?

MR. TALLBERG: Well, again, if the jury were to answer a special verdict interrogatory -- and we did put

in our proposed draft we understand it's Mr. Raucci's burden to prove. If Mr. Raucci proved that he did not conspire with Mr. Parise, then we would know it's just an alleged conspiracy with someone else.

THE COURT: So it's not -- show me where it is in your draft.

MR. TALLBERG: Oh, it's not. In the drafts, they are not. And, Your Honor, I understand, I hear your frustration. I can tell you that the two examples we submitted with what we filed last Friday in the *Gibbs* case, which was a shooting case in front of Judge Meyer, and the *Drew v. Connelly* that was a due process claim in front of Judge Arterton, it was the same process, Your Honor. We were literally -- we had submitted a draft. And then once we had an argument like this, it crystalized, and the court said, I hear your argument. Here's the question we are going to use. That is how this unfolds.

I'm sorry, Your Honor. It seems -- I know you want everything to be very neat and tidy, and you've done a marvelous job managing this massive information. But that's been my experience with these special jury interrogatories on qualified immunity.

THE COURT: I appreciate that point. I know it's something that can't really be decided until first

the jury has a case and we're in this position, but that's a little bit different from I had a deadline for submissions. None of the questions you're now seeking to ask are in that, and so it's hard for the court to shoot in the dark.

MR. TALLBERG: We have to preserve the record, Your Honor, so we put in what we think is going to cover it, and then we refine and we adjust, just like we've done throughout this trial.

And the last thing I would say on this, Your Honor, and then I'll stop. With regard to *Washington*, just to put it in context, what happened was that was last -- it was like the last day of evidence. We made an oral Rule 50 motion, and Your Honor said that's fine. I tried to do belt and suspenders, so we put in a written product.

We've never briefed prosecutorial immunity. It was never a summary judgment issue. But on behalf of Mr. Raucci, as a zealous advocate, when at the tail end of evidence in week four this information about Wiederhold comes in, I felt an obligation to press the argument.

Now, it never occurred to me, *Washington*. That was a summary judgment case that we lost, and the case was settled after that. It was not a case that was tried like this, so I'm just trying to put it in context. I was not

trying to withhold adverse authority by any means, Your Honor. So I apologize.

THE COURT: Okay. I'll tell you after you raised that argument, we dug into it and that's how we stumbled upon *Washington*, which we shouldn't have had to stumble upon. I'm sure plaintiff would have brought it to our attention at the relevant time.

MS. HOFFMANN: Honestly, we haven't even read their Rule 50 --

MR. TALLBERG: I forgot about it, Your Honor. There is a blur of cases that we've litigated. I'm sorry.

MS. HOFFMANN: I'm sure we would have found it if we started researching, but we didn't even read it.

THE COURT: That's an issue for another day, but the submission of a written Rule 50 motion on an issue you litigated and lost that is in my view squarely on point, let it be a lesson to raise things like that.

At the same time, I acknowledge counsel is juggling a thousand balls at a time keeping up with the court's demands and the demands of the case, so I forgive you. But if this comes up again, you're going to need to tell me about it.

MR. TALLBERG: It's been a particularly tough case for the seat I'm in, Your Honor.

THE COURT: Fair enough.

MS. HOFFMANN: But going to that point -- well, not that point, but the point the court just made about, you know, filing things, it's certainly not our experience that you just file something as a place holder and then expect that you can change at the last minute what it is you're requesting. Obviously, we're all working around the clock. We certainly were all weekend. But that also means what we're responding to is whatever it is that they have filed.

Again, to be entitled to any special interrogatories going to qualified immunity, you would have to at the very least identify some specific factual question that you think is supported by the record that it could be a reasonable difference among the jury's decision and that would actually be determinative of whether qualified immunity applies, and they still haven't done that. They haven't come close to doing that.

And they certainly -- as the court said, we could get a verdict at any point -- should not be given another opportunity at this point to try. I don't think, frankly, there is anything they can come up with, but, you know, we're -- but if you were doing that, you'd have to look at the case law and say here's some difference as to why this wouldn't -- you know, a reasonable officer could have thought this was okay but not this.

Again, this is not a case -- this is not a case where there is a question about whether this force was slightly excessive or not excessive. What we're alleging is incredibly serious intentional misconduct, so there is -- it's difficult to imagine any way they could articulate how, if you find in our favor, there could be qualified immunity. I don't think there is a basis, but they certainly haven't done it now, and we would be prejudiced if they are given another opportunity to try to come up with something now when we have no time to even research it.

THE COURT: That's all fair. But let me hear your response on the conspiracy point. I didn't really hear an articulation of why identification of the co-conspirator matters.

MS. HOFFMANN: It doesn't. I mean, the idea that -- first, there is -- it's not the typical case when you're talking about a police officer conspiring as part of a drug conspiracy with a soon-to-be convicted felon. It is certainly not required to find that it is a constitutional violation that the conspiracy be with a person convicted of serious drug crimes. That's, I would say, a plus, but it's not something that not having that would take it out of, you know, clearly unlawful such that there is not -- such that you're not entitled to qualified

immunity, and none of that is relevant in any way to whether there would be qualified immunity for conspiring to frame someone as a police officer. There is just no question that if you join a conspiracy to fabricate evidence, to withhold exculpatory evidence, which is what, you know, any of the constitutional violations we're talking about, there is no qualified immunity.

And, again, they have not pointed to a single case, nor can they. I mean, these are not close questions. This is the most fundamental things the Constitution prevents against. You cannot create false evidence and use it to put someone in prison for a crime they did not commit. This is going back to the '40's Supreme Court case law. So this is just not a qualified immunity case, and they have not come close to articulating any basis why we would need special interrogatories here.

THE COURT: What is the relationship between qualified immunity as to one of the substantive underlying predicate constitutional violations and qualified immunity for conspiracy? I mean, is there even qualified immunity for conspiracy given that it's not a stand-alone Section 1983 violation?

MS. HOFFMANN: That's a good question, and that's something that, again, if it had been articulated,

maybe we could have researched and prepared something, but I would say it would have to -- again, the basic question is could an officer reasonably have believed that this was lawful; right? And so if you're looking at conspiring to fabricate or conspiring to withhold exculpatory evidence, there is no -- they have not articulated, nor can I think of a basis to say that an officer, if you find that they did what we're alleging, that they could have believed that that was lawful, and I'm certainly not aware of any authority that says that there could be a close question on that.

THE COURT: Okay. I find that no special interrogatories are necessary for the conspiracy claim for largely the reasons articulated by plaintiff's counsel.

First, none of the questions proposed in Mr. Raucci's filing from last Friday addressed this issue.

Second, I have not heard a reason why a finding about who Mr. Raucci or Mr. Maher may have conspired with is relevant to any determination I may ultimately need to make on qualified immunity. And so I'm not going to put forward special interrogatories on that point.

I think we should turn to Mr. Maher. My summary judgment ruling, which I went back and read yesterday, did identify some factual disputes about Mr. Maher's participation in and/or presence for some of the

pre-interviews, for instance, I think for Mr. Morant's pre-interview.

I did not have a chance to go back through the trial transcript to identify if that remains a factual dispute whether he was there or not.

Given that the allegation and the evidence at trial was that the coercive comments, million dollar bond, you're going to go to the electric chair, et cetera, were made during the pre-interview, is there an open factual question about whether Mr. Maher was present during the pre-interview that wouldn't be answered by a jury verdict against Mr. Maher on coercion?

MS. HOFFMANN: I don't think there is a question that wouldn't be answered by a jury verdict on coercion, and I do think there -- what did become clear, I believe, at trial is that, even just from listening to the tapes, is that Mr. Maher was present for the entire taped interview, and of course the taped interview includes multiple over-recordings, stop, rewind, over-record and, you know --

THE COURT: Which goes to fabrication.

MS. HOFFMANN: And also coercion. It's telling them to -- but in any event, I think if the court -- if the jury finds that Mr. Maher participated in the coercion, then that answers that question and there is no

need -- nothing is added by an additional question to the jury.

And in addition to it obviously imposing more on the jury and it's time, there is a cost to asking questions that are not actually necessary, because it's requiring the jury to reach unanimity on something they don't otherwise need to reach unanimity on. There is always a risk any time you have more questions, that there is something that's going to somehow be inconsistent or create a problem in some other way. So I think we should only be posing special interrogatories if they are strictly necessary to a determination of qualified immunity, if they get at something that could reasonably be supported by the evidence, that the defendants have articulated some basis why that would be necessary to a determination of qualified immunity and something that is not otherwise answered by the many questions they are already answering in terms of liability on the various counts, and so I don't think there is anything on that question that would not already be answered by the answers on the verdict sheet.

MR. MELLEY: I think counsel did not answer your question, Your Honor. With regard to Mr. Maher's presence at the pre-interview, there is no evidence for either Morant or Roque. He's not there in the pre-interview.

And the assessment of their ability to testify, whether they are drunk or whatever, there is no evidence that he's involved in that at all. It's an entirely separate thing.

And this idea that the taping is enough to get to that point, I submit it's not. That's why I do think the issue of coercion is one that's appropriate for Maher, and those are the questions that I had submitted that are more or less directed to coercion and fabrication only, because I saw the other ones as more black and white.

And on that point, I think Your Honor is correct that the essence of the case revolves around the three statements. And I disagree falsus in uno, falsus in toto does not necessarily apply, because everyday credibility, which is essentially the charge that was given to the jury, means that you can believe or disbelieve somebody on some stuff, but that doesn't mean everything they have said is not true. That's everyday credibility. So there are these distinctions in the case in the three statements. Are two of them good? Are one of them good?

The whole idea is when we get to the issue of qualified immunity, Your Honor has to ultimately answer the question because it is a question of law, and I would submit that as much information as necessary would be appropriate.

To a certain extent, I understand we're all

dancing on the head of a pin as to, you know, especially on the issue of coercion and fabrication in this instance where there is so many different factors that go into it.

And it just seems to me -- I was on the unfortunate end of that *Hartford v. Outlaw* and, you know, there I got chastised because they weren't submitted, and, you know, I had gone through that exercise in my head at the time as to whether or not they were -- they were very free to discuss that, because I said, oh, no, waive it, and then the Second Circuit said no, no, no, you should have submitted it. So my position is to -- in this situation to error if there is one on the side of let's get more information to help define exactly what's going on.

MS. HOFFMANN: I just want to speak to the one factual question to clarify. So there is -- there is disputed evidence as to whether Mr. Maher was present for the pre-interview. It is definitely not the case --

THE COURT: For Mr. Morant.

MS. HOFFMANN: For Mr. Morant. Certainly, for Mr. Morant. I mean, what we played to the jury in closing yesterday, Mr. Raucci saying two totally opposite things. First that Maher conducted the pre-interview entirely by himself, and then that Raucci was the one who conducted the pre-interview.

So I think -- and then we also have Mr. Maher saying that nothing happened during the taping, which we know to a matter of scientific fact, he even admitted, is not true, and there is no possible way he's present for the entirety of the tape, as even the tape demonstrates, he identified his voice on it, that he's not aware of the stop, rewind, over-record, retakes, which again he denied.

So I think, to be fair, Mr. Morant does not remember whether Mr. Maher was present for the pre-interview. But there is evidence in the record that he is, or he isn't, in both directions, and but again, the jury's verdict on that claim will answer that question, so I don't see any need for any additional factual interrogatory going to that.

THE COURT: And that's because the coercive -- allegedly coercive statements took place during that pre-interview, so if they find against Mr. Morant on that claim, it must mean they found he was there; right? Or am I --

MS. HOFFMANN: Or whenever the statements took place, and I don't know that it's clear that they were only during the pre-interview, but whenever the threats took place, either they find Mr. Maher is present for them and they find yes on the coercion, or they don't find that he's implicated in them and they find no on the coercion.

So I think that there is no -- there is no need to identify, you know, was he present for the pre-interview or was the pre-interview when the threats were made. The only question is, is he a party to the threats or -- in which case you find, yes, he's liable for the coercion, or not.

THE COURT: Okay. And I think I follow. You're saying that it's possible some of those allegedly threatening statements occurred when the tape was stopped or --

MS. HOFFMANN: Exactly. They don't appear on the tape, but also, the tape has been rewound and over-recorded, so when exactly in that period all of the threats were made -- I believe my memory of Mr. Morant's testimony was he was threatened repeatedly. He asked to go home repeatedly. He was told repeatedly he's not going to be able to go home until he gives the statement that Mr. Raucci wanted him to give. So I think -- I don't remember offhand whether he said that all happened before. I think he said it happened throughout, but -- and throughout, definitely that's a period when Mr. Maher would have been present. But in any event, that's something that the jury's verdict will answer.

THE COURT: All right. I'm making the same holding as to Mr. Maher's request for special

interrogatories as I did for Mr. Raucci's. Based on what was proposed, I don't find that there is a need for the jury to answer any of these questions in order for me to eventually address any qualified immunity argument that Mr. Maher may raise.

The jury's verdict, if it is against Mr. Maher on the various claims against him, will effectively answer all of the proposed questions. And my only outstanding one was the question of presence, but I think that will also be answered by the jury's verdict, so I will not be asking the jury to answer any of Mr. Maher's proposed questions.

That brings us to Mr. Sweeney's proposed questions, which were filed an hour and a half ago instead of on Friday when these questions were due. So first address the timing.

MR. RYAN: Yes, I apologize. Understanding that Your Honor had moved that determination until after the jury got the case, and then I went back and looked at the summary judgment decision and realized that, you know, obviously you had decided that issue in the light most favorable to the plaintiff. You know, and now we've been at trial and there has been testimony, so I thought it would be appropriate to raise it again. I didn't think it was foreclosed. I still don't. I think that the jury has

heard evidence and that, you know, the question is whether it was a clearly established right to document the information or to put it in writing. And the evidence would be that, you know, there was a statement in January that was witnessed by Mr. Pettola, that he sat in on it to make sure it was done correctly, that he testified he didn't observe anything improper about it. Maher said the same thing.

There had been a second statement in May of 1991, and furthermore that it had been reported to Lawlor the next day, according to the testimony, and finally that later on it was reported to Lawlor after the arrest warrant was issued and Mr. Sweeney's testimony at that time that he had told him to report it to Dearington.

So -- and as well, the trial testimony by Mr. Sweeney that absolutely he may have been mistaken and so forth. So I thought the question ought to be put whether a reasonable police officer in Mr. Sweeney's position could reasonably believe that he was not required to document the interviews, and that would be the issue. Based on that evidence --

THE COURT: But it's not about documenting the interviews. It's about documenting the exculpatory information provided in the interviews, and that was a right clearly established going back to *Brady* and before.

So tell me why your first two proposed questions here about documenting his interviews and documenting the entire pre-interview, including the interview tactics, why a reasonable officer's perspective on that would be relevant.

MR. RYAN: Well, *Brady*, it's a trial rule. It's not, you know, before the arrest warrant is issued. So all of this --

THE COURT: And this case isn't about him documenting it. That's only a part. He had an obligation to disclose it to the prosecutor. He could have done that without writing it down. He could have walked over to the State's Attorney's Office and said here's what I know; right?

MR. RYAN: But his testimony was that he did speak to Lawlor when the arrest warrant was issued, told him to report it to Dearington, and that was the --

THE COURT: Is that accurate? I am not sure I remember testimony where he said he told Lawlor to report it to the State's Attorney's Office.

MR. RYAN: I believe so.

THE COURT: Maybe you're right. Let's assume you're right. But the holding of the summary judgment ruling was that Mr. Sweeney's efforts, although commendable, did not satisfy his obligation because word

never reached the prosecutor from him directly.

MR. RYAN: Well, part of the claim, though, is that it should have been documented. If it had been documented, it would have made its way into the larger police report, and that file, that when the prosecutor went and reviewed the arrest warrant, Ms. Cecilia --

THE COURT: Wiederhold.

MR. RYAN: Wiederhold. Thank you, Your Honor. When Ms. Wiederhold reviewed the police file, she would have also seen this report, which would have complied with the *Brady* obligation, so I think that is an issue.

THE COURT: But it's not the only way in which the obligation could have been satisfied.

MR. RYAN: Well, there was testimony --

THE COURT: It's certainly the most traditional way; right?

MR. RYAN: The rest of it was satisfied by reporting to Mr. Lawlor at the time the arrest warrant was issued if I'm not mistaken on the facts, and I believe that was the testimony.

THE COURT: But the partial summary judgment finding is to the contrary. The obligation is to get it to the prosecutor, and it's undisputed that never happened; right?

MS. HOFFMANN: Yes, and it's also undisputed and

it was Mr. Sweeney's testimony that that was intentional that he not write down the prior inconsistent statements or the evidence of the misconduct again because that was the practice in the NHPD at the time. But that's his testimony: Why would I ever give it to the defense attorney? That's not my obligation or job. That would devastate the case.

And that was all presented to the court at summary judgment. That was the basis for the summary judgment finding. That was also the basis for the finding that Mr. Sweeney was not entitled to qualified immunity. Nothing that happened at trial changes that record or those facts.

And not only is this, you know, late past the court's deadline. Suggesting now that the jury should be answering specific questions about Mr. Sweeney after we've even closed, not just closed the evidence, but closed our arguments, that now that they are going to have specific questions to answer -- I mean, there isn't any basis for them legally, but also, that's not an issue that was even specifically litigated because there had already been a finding as to this. The only question that was live for Mr. Sweeney was causation.

THE COURT: So let me hear your response on question three, which is a causation-related question,

then.

MS. HOFFMANN: So I think the only question -- first of all, I think that there isn't any -- factually, there isn't any question about this based on Mr. Sweeney's own testimony and admissions.

But second, I think the obligation he has is if it's exculpatory evidence that could make a difference, he has to report it, not the specific causation question. That's not -- that doesn't go to the qualified immunity issue, which is the only thing that would theoretically be a basis for a special interrogatory, so the jury is specifically answering a causation question, which is was this a cause.

But there is no reason that -- the obligation is to provide the information to the prosecutor, and your -- there is no way to know in advance whether that is or is not actually ultimately going to be a cause at the trial; right? You can know that it's -- but you know that the other elements, which is that it's reasonably whatever the element is, you know, likely to --

THE COURT: Material.

MS. HOFFMANN: Material, right, so exactly however that's articulated. And so the materiality has already been found and that is answered by this question.

The ultimate causation question does not go to

qualified immunity and in any event is being answered by the jury.

THE COURT: Attorney Ryan?

MR. RYAN: Well, I don't know if the -- you know, we did argue the materiality has to come up twice because of the *Drumgold* decision, that it should be put again in terms of, you know, they have to be -- the plaintiff has the duty by a preponderance of the evidence to essentially answer the same question, and I know Your Honor ruled --

THE COURT: But *Drumgold* didn't have a partial summary judgment finding. I mean, effectively I've done already what *Drumgold* says the jury, if they had to consider all of the elements of a *Brady* claim, needs to do; right?

MR. RYAN: Well, I don't think -- I think the *Drumgold* is adding, you know, another element. There is the -- you know, the first three, including materiality, but they say to go further, that it requires more, so you have to answer that question again by a preponderance of the evidence considering the whole criminal trial.

THE COURT: In the context of that claim as going to the jury, though; right? *Drumgold* is not a partial summary judgment case.

MR. RYAN: No.

THE COURT: So our case is in a different procedural posture where I had previously found that no reasonable jury could find that this evidence wasn't withheld, that it wasn't favorable, and that it wasn't material, so -- and I think that door is closed.

The only question remaining is causation, and this question kind of mixes causation and materiality, but I think the jury's verdict will effectively answer this question, or at least it will answer the question of whether there was causation, and I'm not sure on qualified immunity, the elements of which are a constitutional violation of a clearly established right; right? So I've found a constitutional violation through the partial summary judgment, and the right is clearly established, so which of those pieces of a qualified immunity analysis would this question relate to?

MR. RYAN: The right being clearly established as to the duty to put it in writing.

THE COURT: Question three doesn't deal with duty to put it in writing, though. I think we're past one and two.

MR. RYAN: Well, I guess it's as to whether or not there was reasonable probability of a different outcome, and I think it factors in whether -- if -- if the -- if the information had been put into writing.

THE COURT: Okay. I'm going to reach the same conclusion on these proposed special interrogatories as I have for Mr. Raucci and Mr. Maher.

First, I find that the timing of this submission is unfair to plaintiff given that I had set a May 22nd deadline for submission of proposed special interrogatories. At that time it was only Attorney Tallberg who raised the possibility of it. I didn't hear anything from Attorney Ryan for Mr. Sweeney about these possible options and, frankly, I was proceeding until this morning on the assumption that there were no special interrogatories for Mr. Sweeney.

Springing three proposed special interrogatories on plaintiff's counsel after evidence has closed, after closing arguments have been made, so there is no further opportunity for plaintiff to argue these potential points to the jury is improper.

Second, as to the first two questions about being required to document the interviews of Ovil Ruiz and the pre-interview conduct, I can't see how those are relevant to any potential qualified immunity analysis given that we have a partial summary judgment finding on the three primary elements of a *Brady* claim already.

I think *Drumgold* is distinguishable for the reasons I expressed in my questions to Attorney Ryan in

that it was not a partial summary judgment posture. Here, those questions have already been decided, and I don't find that proposed questions one and two have any bearing on the two qualified immunity prongs, a constitutional violation of a clearly established right.

As to question three, I also find that that question will not help the court assess any potential qualified immunity argument, especially given that there has been a finding of again the three primary elements of a *Brady* violation already and the jury will answer the causation question in the main verdict form.

So where that leaves us is that the verdict form is the verdict form and when we get a verdict, that will be the end.

MR. RYAN: Very good, Your Honor. If I may, I'd just like to say I apologize for that. As you say, there have been many balls in the air. Plaintiff withdrew a punitive damage claim while I was in -- had written my final argument so, you know, I understand it's happened, but I do apologize.

THE COURT: Apology accepted.

Anything further from plaintiff's counsel?

MS. HOFFMANN: One question given that we obviously have no idea when we'll get a verdict, but it could be at any point soon. Would the court permit if the

jury is willing after they are released for us to speak to the jurors?

THE COURT: Let me think about that. I speak to them, and if you have specific questions you want to ask them, I'm happy to collect their answers. I don't know that it's a practice in our district to do that, to allow the attorneys to speak to the jury.

MS. HOFFMANN: I don't know about the District of Connecticut. I do know in other courts we have. Again, obviously it's completely up to the jury themselves whether -- they have no obligation, but we have found that sometimes people are interested in -- and obviously as lawyers, it's very useful to us to get any information we can from them about, you know, their thoughts.

So our request would be if the court is open to it, to just let them know that that is an option, that of course they have no obligation and we wouldn't, you know, bother anybody who is not interested, but just to give them an option if they do want to speak to any of the lawyers.

THE COURT: And would you ask questions about feedback generally or about the specific proof in the case, or what would you be asking them?

MR. BRUSTIN: Questions like, you know, what did you find compelling, what did we do that you didn't like,

you know, it's just questions that help us as trial lawyers.

THE COURT: Attorney Gerarde?

MR. GERARDE: My opinion, very, very bad idea. The one time this has ever happened in my career where we had people talk to jurors, they asked questions like Attorney Brustin said, you know, he was going to ask what was important. Something will come out. It will be said a certain way, especially if the verdict is not one that they love, and then all of a sudden motion in arrest of judgment. It looks like two jurors talked about the case at lunchtime and the others weren't present, and so, therefore, a problem, problem, and now we have -- we had like five months of post-trial hearings, and so it's just not a good idea.

I think the only thing I've ever seen in this district is the court has spoken to the jurors and come back -- and came back and told the defendants -- I'm sorry, the attorneys what the court learned.

The one thing I have seen, I remember Judge Arterton once, she had a questionnaire that she submitted to jurors about the lawyers. What did you think of this, what did you think of that, and this and that, and she said I want you lawyers to know what the jurors thought of how you did, and you'll modify your actions, and that was

kind of scary, but it was fun to go through, but you can't have -- this has to be over when it's over, and one-on-one conversations that can be misinterpreted as to who said what and what they meant by it is just a bad idea.

MR. TALLBERG: If I may, Your Honor, I've never seen it done in the District of Connecticut. It was my understanding that it was specifically prohibited for lawyers to speak with jurors after a verdict.

I had been a recipient of one of Judge Arterton's surveys to the jury. It was a scale of one to five. It was fascinating, and that's all I'll say on that.

MR. MELLEY: I can echo that.

THE COURT: You've also been on the receiving end?

MR. MELLEY: Yes, and I don't have a problem foregoing the experience again.

THE COURT: You know there is also a judicial survey that you all will fill out if you wish at the end of this case, so I'll be subject to the same exercise.

Attorney Ryan?

MR. RYAN: I agree with Judge -- or Attorney Gerarde's position, Your Honor.

THE COURT: Okay. Let me give some thought to it and query my colleagues.

The other thing I wanted to flag for you all is that when I do go back to speak to the jurors, which I plan to do, my understanding of their rights and obligations with respect to any media comments they wish to make is the following:

First, that it is completely their choice whether or not to speak to any media outlet.

Second, if they do choose to speak to a media outlet, they are to express only their views and not the views of either any other juror or anything that was said in deliberations.

Are there any other cautions that you all are aware of or have had experience with that I ought to be informing them of again if they choose to avail themselves of that potential opportunity?

MS. HOFFMANN: Nothing I can think of. That all sounds right.

And just to go back to the last point, it is certainly not our intention to do anything to undermine or disturb the verdict. We just want to get feedback, basically.

MR. TALLBERG: I have no comments on the last point about the press, Your Honor.

THE COURT: Okay.

MR. RYAN: No comment.

THE COURT: All right. Let me find out sort of where my colleagues are. I'll call Judge Arterton and see if I can get that questionnaire, and we will all wait.

Court will stand in recess.

THE CLERK: All rise. The Honorable United States District Court for the District of Connecticut is now in recess.

(Whereupon, a recess was taken.)

(Proceedings ended at 4:00 p.m.)

C E R T I F I C A T E

I, Denae L. Hovland, RPR, CRR, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the proceedings of a hearing which was held in the above-entitled action on May 27, 2026 were recorded by Denae L. Hovland by stenograph; that thereafter I transcribed in typewriting the foregoing transcript to the best of my ability; that the foregoing transcript constitutes a true and accurate transcription of the proceedings of such hearing.

/s/ Denae L. Hovland
Denae L. Hovland, RPR, CRR, RMR
Official Court Reporter
United States District Court
450 Main Street
Hartford, CT 06103