UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEFON MORANT | : | NO.: 3:22-CV-00630 (SVN) |
| | : | |
| v. | : | |
| | : | |
| CITY OF NEW HAVEN, ET AL | : | JUNE 26, 2026 |

**DEFENDANT CITY OF NEW HAVEN'S MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR JUDGMENT PURSUANT TO FED.R.CIV.P. 50(b)**

Defendant, City of New Haven, pursuant to Fed. R. Civ. P. 50(b), hereby submits its Memorandum of Law in support of its Renewed Motion for Judgment.[1]

## I. INTRODUCTION

The jury found liability against the City of New Haven based on a single *Monell* theory: that the City had a widespread practice or custom of suppressing evidence favorable to criminal defendants. Yet the jury also found that only one defendant, Vincent Raucci, was liable for suppressing exculpatory evidence in plaintiff's criminal case. In order for the jury's verdict to be sustained, then, there must have been sufficient evidence presented at trial to establish: 1) the practice of suppressing evidence favorable to criminal defendants was so widespread as to have the force of law; and 2) such a practice was the moving force behind defendant Raucci's decision to do so in plaintiff's criminal case. There was insufficient evidence to support either conclusion. Plaintiff's own theory of the case—that Raucci intentionally framed plaintiff

---

[1] Defendant City of New Haven preserves all legal arguments advanced in its Motion for Summary Judgment that do not depend on the factual record developed at trial. This motion addresses only those issues governed by the trial record and should not be construed as abandoning or waiving any previously asserted legal arguments resolved or reserved prior to trial.

and his co-defendant, Scott Lewis, to benefit his own corrupt interest in the drug trade—is completely divorced from any custom or practice of the New Haven Police Department ("NHPD").

Additionally, read in its totality, the jury's verdict leaves a vanishingly small amount of exculpatory information that could have caused plaintiff's deprivation of liberty—a conclusion that could only have been reached through rank speculation. This is because the jury also found that defendant Michael Sweeney did not cause plaintiff to suffer a deprivation of liberty as a result of his withholding of material, favorable information from the prosecutor, and found defendant Vaughn Maher not liable for failing to disclose exculpatory evidence to the prosecutor. To reconcile those verdicts with the verdict as to defendant Raucci, the jury must have found that plaintiff's incarceration was caused by some exculpatory information which Raucci withheld but Sweeney and Maher did not. What is interesting about this finding is that plaintiff's evidence at trial established that both Sweeney and Raucci knew that Raucci had essentially fabricated Ruiz's statement inculpating plaintiff, and that Ruiz had made multiple prior inconsistent statements. Similarly, both Raucci and Maher were present for the entire interview of Jose Roque. The withheld material that justifies the jury's verdict as to the Brady claim against Raucci must therefore be something outside the withholding of impeachment material as to Ruiz and Roque. The only such evidence in the record would be that Raucci took Ruiz for a ride in his vehicle prior to his arrival at the NHPD where he ultimately gave a statement implicating plaintiff. And to conclude that it is reasonably probable that the withholding of that relatively minor detail would have prevented plaintiff's conviction, despite all the other evidence in his criminal case,

is a leap that cannot be justified based on the evidence at trial. Judgment should therefore enter for the City of New Haven on the *Monell* claim in Count VII.

Furthermore, judgment should enter for the City of New Haven on Count Nine of the Complaint, which seeks, pursuant to C.G.S. § 7-465, an assumption of liability by the City for the civil rights violations found to have been committed by defendants Raucci and Maher in Counts One through Six. Section 7-465 specifically exempts municipalities from assumption of liability for willful or wanton acts, and the jury's verdict specifically found the actions of defendants Raucci and Maher to have been willful, wanton, malicious or reckless, which all are treated under Connecticut law as meaning the same thing.

## II. LEGAL STANDARD

Under FRCP 50, judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue...." Fed. R. Civ. P. 50(a)(1); see *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013). "[A] court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)).

## III. THE FACTS ADDUCED AT TRIAL WITH RESPECT TO MONELL

First, the NHPD's policy directly prohibited the withholding of evidence of any kind. (See NHPD Rules 15 & 16, attached as **Ex. 1**.) That policy was widely known

within the NHPD. Every former NHPD officer who testified at trial (Sweeney, Pettola, Raucci, Maher, Sullivan) was aware the NHPD forbade withholding of evidence favorable to criminal defendants. (5-1-26 Sweeney Testimony, attached as **Ex. 2** at pp. 450:9-451:2; 5-6-26 Maher Testimony, attached as **Ex 3**, at pp. 1041:16-1042:1; 5-7-26 Pettola Testimony, attached as **Ex 4**, at pp. 1438:11-18; 1438:25-1439:7; 5-11-26 Raucci Testimony, attached as **Ex 5**, at pp. 1907:17-1908:5; 5-14-26 Sullivan Testimony, attached as **Ex 6**, at p. 2622:12-18.) The testimony at trial uniformly confirmed that NHPD officers understood fabrication of evidence, coercion of witness testimony, and suppression of exculpatory evidence to be prohibited. Every NHPD witness who testified acknowledged that fabrication of evidence, coercion of witness testimony, and withholding exculpatory evidence were prohibited by the NHPD's Code of Conduct. Even defendant Sweeney testified that Rule 15 prohibited fabrication of evidence, withholding evidence, and destruction of evidence, and confirmed that every New Haven police officer was bound by those rules throughout his or her career. **Ex. 2**, pp. 450:9–451:2. Detective Pettola likewise testified that Rule 15 prohibited fabrication of evidence, coercion of witness testimony, and withholding exculpatory evidence. **Ex. 4**, pp. 1438:11-18; 1438:25-1439:7. Detective Maher testified that fabrication of evidence, coercion of witnesses, and withholding exculpatory evidence were not permitted under the Department's Code of Conduct. **Ex. 3**, pp. 1041:16-1042:1. Detective Raucci gave the same testimony. **Ex. 5**, pp. 1907:17-1908:5. Lieutenant Sullivan likewise confirmed that withholding exculpatory evidence violated the Department's Code of Conduct. **Ex. 6**, p. 2622:12-18. Lieutenant Sullivan further testified that he received training concerning exculpatory evidence directly from State's

Attorney Michael Dearington, who came to the NHPD and provided instruction regarding officers' Brady obligations. **Ex. 6**, p. 2618:3-8.

Most importantly, the evidence established that that policy was enforced. Every former NHPD officer who testified at trial confirmed that no supervisor ever communicated to him in words or substance that he could withhold exculpatory evidence, coerce witness testimony, or fabricate evidence and the Department/City would look the other way (**Ex. 2**, p. 480:9-22; **Ex. 3**, p. 1043:3-15; **Ex. 4**, p. 1426:9-19; **Ex. 5**, p. 1908:6-20; **Ex. 6**, pp. 2622:2-11; 2623:12-15). All NHPD officers who testified at trial confirmed they never witnessed former Chief Nicholas Pastore condone the withholding of exculpatory evidence, coercing witness testimony or fabricate evidence. (**Ex. 2**, p. 482:4-7; 482:12-23; **Ex. 3**, p. 1044:3-13; **Ex. 4,** pp. 1426:20-1427:12;**Ex. 5**, p. 1909:7-17; **Ex. 6**, pp. 2623:24-2624:10.) The jury did not find that Chief Pastore ratified unconstitutional conduct, nor that the City decisionmakers, including Chief Pastore, reacted to repeated instances of unconstitutional conduct with deliberate indifference. (Verdict Form, Rogs 14, 15, attached as **Ex. 7**.) Even Sergeant Sweeney testified that none of his supervisors, including Chiefs Farrel, Pastore and Wearing, ever indicated that it would be acceptable to withhold or hide exculpatory evidence. (**Ex. 2**, pp. 479:23–480:22.) Detective Pettola testified to the names he could recall of every supervisor he ever worked for and testified that no supervisor ever communicated to him in words or substance that withholding exculpatory evidence was an acceptable practice, or that there would be no consequence if he committed such an unconstitutional act. (**Ex. 4**, pp. 1424:14–1426:19.) Detective Maher testified that no supervisor ever communicated that withholding exculpatory evidence would be acceptable. (**Ex. 3**, p. 1043:12–15.)

Detective Raucci testified that no supervisor ever stated, in words or substance, that officers could withhold exculpatory evidence without consequence. (**Ex. 5**, p. 1908:16–20.) Lieutenant. Sullivan likewise testified that he never witnessed any supervisor withhold exculpatory evidence or condone such conduct. (**Ex. 6**, p. 2622:2–11.) The testimony was equally uniform regarding Department leadership. (**Ex. 2**, p. 480:9-22; **Ex. 3**, p. 1043:3-15; **Ex. 4**, 1426:9-19; **Ex. 5**, p. 1908:6-20; **Ex. 6**, pp. 2622:2-11; 2623:12-15.) The same was true with respect to the Police Commission and Internal Affairs. Each officer who testified denied ever observing the Police Commission or Internal Affairs condone withholding exculpatory evidence. (*See* **Ex. 2**, p. 483:9-12; **Ex. 3**, pp. 1044:14-1045:4; **Ex. 4**, pp. 1427:13-1428:3; **Ex. 6**, p. 2624:11-23 (regarding the Police Commission); *see also* **Ex. 5**, p. 483:13-23; **Ex. 3**, p. 1045:5-16; **Ex. 4**, p. 1428:4-16; **Ex. 6**, pp. 2624:24-2625:8 (regarding Internal Affairs).)

In the face of that policy, plaintiff put forth only a few examples of misconduct which, even accepted as true, could not reasonably and legally allow the jury to infer the existence of a widespread practice to suppress exculpatory evidence. This is because the evidence also established that at the time of the misconduct alleged in plaintiff's criminal case, the City of New Haven's police department was fully staffed by approximately 400 police officers, with approximately sixty in the Detective division. (*See* **Ex. 2**, p. 484:4-9.) Statistics kept by the State of Connecticut demonstrate there were approximately 21,000 crimes committed in a given year in the 1980s and 1990s in the City of New Haven and roughly 2000–3000 would be referred to the NHPD Detective Division (Uniform Crime Reports, attached as **Ex. 8**). Out of that set of only approximately 60 detectives and thousands of crimes per year, plaintiff introduced

evidence that approximately four or five NHPD detectives withheld or suppressed evidence (including defendant Sweeney) a total of approximately six times over the course of 10 years, without any evidence presented that those officers had permission to do so, even tacitly, from their commanding officers.

## IV. ARGUMENT

### A. The Evidence Presented at Trial Was Insufficient to Establish that there was a Widespread Pattern or Practice of Withholding Evidence

The jury found the City liable only under the "widespread practice or custom" theory submitted in Question 13 of the Verdict Form. (*See* **Ex. 7**.) Accordingly, the verdict against the City can stand only if the evidence was sufficient to permit a reasonable jury to find that, as of January 1991, the NHPD maintained a widespread and persistent practice of suppressing favorable evidence in criminal cases, that was so widespread as to have the force of law; and was the moving force behind defendant Raucci's decision to withhold evidence.

The Second Circuit's decision in *Jones v. Town of East Haven*, 691 F.3d 72 (2d Cir. 2012), provides the appropriate framework for this Court's analysis. In *Jones*, a jury returned a *Monell* verdict against the Town of East Haven on the ground that the killing of Malik Jones resulted from an unconstitutional custom, policy, or usage of the Town. *Id.* at 79. Using a similar tactic to the one used in this case, plaintiff in *Jones* introduced evidence of six prior incidents involving alleged misconduct by East Haven police officers. *Id.* at 82. The Second Circuit concluded that such evidence was legally insufficient to establish a municipal custom, policy, or usage and reversed the judgment entered against the municipality. *Id.* at 83. The Court explained that a handful of

incidents involving a small number of officers over a period of years fell "far short of showing a policy, custom, or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities." *Id.* at 85.

The same is true here. The evidence was undisputed that the NHPD maintained written policies prohibiting the fabrication of evidence and suppression of evidence. Rule 15, Section 23 of the Department's Code of Conduct expressly provided: "employees of the Department shall not fabricate, withhold or destroy any evidence of any kind." (**Ex. 1**.) Thus, plaintiff's burden was not merely to prove that misconduct occurred in isolated cases. Plaintiff was required to prove that, notwithstanding the City's written prohibition, suppression of favorable evidence had become so widespread and accepted that it effectively supplanted the NHPD's official policy.

To do so, plaintiff relied on a handful of incidents over a long period of time involving different officers, different investigations, and different factual circumstances, and the testimony of Sergeant Sweeney, a single, mid-level officer who himself had been found liable for a seven-figure civil rights verdict for withholding evidence that the conduct he himself had been guilty of committing was commonplace.

As for the other incidents, plaintiff relied principally upon evidence relating to Golino, Fleming, Ham, Gould/Taylor, Streater and allegations concerning Detective DiLullo. Even assuming all of that evidence is viewed in the light most favorable to plaintiff, it does not establish a widespread practice existing within the NHPD as of January 1991 when the misconduct by defendants Raucci and Maher was found to have occurred.

Plaintiff relied on a number of decisions in other cases, none of which support the existence of a widespread pattern or practice. In *Golino v. New Haven,* raised by plaintiff as *Monell* evidence, the trial court actually *granted* the City's summary judgment motion on the *Monell* claim, finding that plaintiff had no evidence of unconstitutional policies or practices. (*See* Court's Judicially Noticed Facts, attached as **Ex. 9**.)[2] The Court of Appeals noted that Detective DiLullo testified that it was his practice to exclude exculpatory information from his warrant applications, but made no finding that this practice violated the constitution. (*See* **Ex. 9**.) Accordingly, in *Golino*, the federal court rejected the *Monell* claim against the City as a matter of law; and although the Court of Appeals discussed allegations concerning Detective DiLullo's practices, the plaintiff presented no evidence that defendants Raucci or Maher knew of Detective DiLullo's alleged practices, much less that such practices had become so widespread throughout the NHPD that they carried the force of municipal policy.

*State v. Flemming*, also cited by plaintiff as *Monell* evidence, involved a witness who recanted claiming he was coerced into making a false statement by a NHPD Detective--despite the recant, defendant Fleming was convicted of a conspiracy to commit robbery charge, which was affirmed on appeal. (*See* **Ex. 9**.) Plaintiff presented no evidence that the practices described in Fleming had become so widespread throughout the NHPD that they carried the force of municipal policy, and, moreover, the jury did not find that the City had a practice of coercing false statements, it found only a policy of suppressing exculpatory evidence.

---

[2] Attached as **Ex. 9** is the draft filed on the docket because it is the version contained in the Court's record. Although marked "Draft," it reflects the judicially noticed facts ultimately approved by the Court and read and provided to the jury.

Plaintiff also presented evidence about George Gould and Ronald Taylor, who were convicted on the testimony of Doreen Styles, who gave a statement in 1992 but recanted in 2010, claiming she was coerced to provide a false statement because she was in heroin withdrawal and was willing to say anything to get out of the police station and buy heroin. (**Ex. 9**.) Again, coercing a witness to testify falsely is different from withholding exculpatory evidence, the practice found to exist here. A habeas court vacated their convictions, but the Connecticut Supreme Court reinstated them. In 2024 a second habeas court vacated the convictions.

Maceo Troy Streater was convicted in 1993, lost all appeals and post-conviction habeas petitions, but was pardoned in 2022. (**Ex. 9**.) There was no evidence presented to the jury about specific misconduct in that case, and therefore no basis from which it could have inferred a practice of withholding exculpatory evidence.

Plaintiff also obtained judicial notice that Daryl Valentine was convicted of murder in 1994, his conviction was reversed in 1997, he was retried and convicted in 1998, served his sentence and received a commutation in 2022. (**Ex. 9**.) The above facts have no probative value on the *Monell* issue.

The plaintiff also obtained judicial notice of the fact that Adam Carmon was convicted of murder in 1995 and in 2023 his conviction was vacated. (**Ex. 9**.) The above facts have no probative value on the *Monell* issue, as there was nothing from which the jury could have inferred police misconduct in the Carmon case.

To the extent any of this evidence has any probative value at all regarding the existence of a pattern or practice, it must be viewed in the context of the NHPD's overall operations. The crime statistics admitted at trial demonstrate that New Haven reported

between approximately 15,000 and 20,000 crimes annually during the relevant period, with thousands of cases being handled by the Detective Division. (*See* **Ex. 8**.) The evidence further established that the NHPD consisted of approximately 400 officers, including approximately sixty detectives. Against that backdrop, a small number of disputed incidents spread across many years cannot reasonably support a finding that suppression of favorable evidence had become a widespread and accepted municipal practice. Under *Jones*, a handful of allegations involving a small number of officers falls far short of the showing required to establish municipal liability.

Plaintiff's reliance on defendant Sweeney to establish a department-wide practice is also misplaced. Defendant Sweeney testified he himself did not put exculpatory evidence into warrants, but also testified he knew the rules, and never got a “message” that it would be acceptable in the NHPD to withhold exculpatory evidence from the prosecutor during a criminal case. Furthermore, Sweeney's testimony, favorable to and relied on by plaintiff, was that he interceded to stop defendant Raucci from feeding facts to Ruiz and took measures to safeguard the Ruiz interview process by having Detective Pettola sit in on the taped interview. Raucci did not testify he took any cue from Sweeney that violation of civil rights was acceptable when he interviewed Ruiz. There is no connection to be made between Sweeney's practice regarding warrants and Raucci's conduct in a witness interview without resort to rank speculation. Thus, no reasonable jury could find that conduct by Sweeney was a moving force behind Raucci's unconstitutional conduct.

Furthermore, there was no evidence Sweeney's conduct in *Ham v. Greene*, where he withheld exculpatory evidence could have been the moving force behind

Raucci's conduct as Sweeney's withholding occurred after Raucci's withholding of exculpatory evidence. It bears emphasis that Raucci was found to have maliciously prosecuted plaintiff. Malicious conduct is intentional on the part of Raucci, not something done pursuant to an unwritten widespread practice.

The undisputed evidence established that the NHPD's written policies prohibited suppression of evidence, officers were trained regarding their obligation to disclose exculpatory evidence, officers understood those obligations, supervisors never communicated that suppression was acceptable, and no witness observed NHPD leadership, the Police Commission or Internal Affairs condone such conduct. *Monell* does not permit municipal liability based upon isolated examples of alleged misconduct by individual officers. Nor does it permit a jury to infer a department-wide custom merely because constitutional violations occurred in a handful of cases. Under *Jones*, the evidence presented by plaintiff falls well short of the showing necessary to establish a widespread municipal practice. Because no reasonable jury could conclude otherwise, judgment should enter for the City on Count Seven.

### B. Even if a Widespread Practice Existed, Plaintiff Presented No Evidence that it was the Moving Force Behind Defendant Raucci's Conduct

As the Court instructed the jury, in addition to proving the existence of an unconstitutional practice, plaintiff must also prove that the policy or custom caused the deprivation of his constitutional rights, meaning that the policy was the 'moving force' behind the Constitutional violation. (Corrected Jury Instructions, attached as **Ex. 10**, at pp. 30, 31, 33.) The “identified deficiency” on the part of the City “must be closely related to the ultimate injury.” *City of Canton v. Harris*, 489 U.S. 378, 379 (1989). Here,

when looking solely at Raucci's conduct, as he was the only defendant found to have committed a constitutional violation by withholding exculpatory evidence—which was the only unconstitutional practice the jury found to exist—plaintiff fails to meet that burden.

### 1. Any Inference by the Jury that Raucci was Motivated to Withhold Evidence by the NHPD's Practice Instead of by his Interest in Assisting Frank Parese Frame Scott Lewis Would be Speculative

The specific findings by the jury that, 1) only Raucci withheld exculpatory evidence and 2) the only basis for *Monell* liability was that the City had an unconstitutional practice of withholding exculpatory evidence place the entire burden of causation squarely on the question of **why** Raucci in particular withheld exculpatory information from prosecutors in this case. Was it because that's just how they did things in the NHPD in 1991? Or was it because, as plaintiff argued, he had a specific ulterior motive to assist narcotics kingpin Frank Parese in framing Scott Lewis because he himself had a corrupt interest in the drug trade. *See Connick v. Thompson*, 563 U.S. 51, 76 (2011) (Scalia, J., concurring) ("the withholding of evidence in his case was almost certainly not caused by a failure to give prosecutors specific training, but by miscreant prosecutor Gerry Deegan's willful suppression of evidence he believed to be exculpatory, in an effort to railroad Thompson" which, if true, would mean "the 'moving force' behind the suppression of evidence was Deegan, not a failure of continuing legal education.").

Granted, the jury's verdict indicates that the jury found that the NHPD's practice was the moving force behind Raucci's decision to withhold that evidence. But there was simply an insufficient evidentiary basis from which a reasonable jury could have drawn

that conclusion. There was no evidence that Raucci acted in reliance on such a practice, understood such conduct to be authorized by the NHPD, believed such conduct was routinely accepted by supervisors, or expected to avoid discipline because of any departmental custom. In fact, as discussed above, every NHPD witness testified that they knew withholding evidence violated NHPD policy and that they understood that the policy was enforced. There was no evidence presented that Raucci was aware of any of the other incidents on which plaintiff relied on establishing the existence of the practice or custom prior to January 1991. Raucci denied the conduct entirely, so he provided no motivation of his own. The only way for the jury to have concluded that the NHPD's practice of withholding prior inconsistent witness statements was the moving force behind Raucci's decision to do so is to speculate that it musst have been because there was no other reason. And while that may be sufficient in a case where it is true, here there *was* another reason given to the jury—Raucci's corrupt connection to the drug trade. The jury was given no basis whatsoever to choose one of those theories of motives over the other, and to do so they necessarily would have had to speculate and draw a conclusion not supported by the evidence. (**Ex. 10**, at 12.) ("An inference is not a suspicion or a guess. It is a reasoned, logical conclusion that a disputed fact exists because another fact has been shown to exist… The process of drawing inferences from facts in evidence is not a matter of guesswork or speculation").

### 2. The Jury's Finding that Raucci's Decision to Withhold Information About the Car Ride in Particular Altered the Outcome of Morant's Trial Was Not Supported by the Evidence

In addition to Raucci, defendant Sweeney was also charged with a Brady violation, in Count Two. Because of the Court's summary judgment ruling, at trial, the

Court directed the jury to find: (1) that defendant Sweeney was aware of favorable information to plaintiff Morant; (2) that he deliberately withheld it from the prosecutor; (3) that the withheld information was material to the criminal trial, meaning it was reasonably probable that if it had been disclosed, the outcome would have been different; and (4) that plaintiff Morant suffered a deprivation of liberty. The Court reserved for the jury only the determination of whether it was more likely than not that had the information been disclosed to the prosecutor the outcome of the trial would have been different, recognizing that “reasonably probably” is a lower standard of proof that “more likely than not.” This element required proof by plaintiff that, more likely than not, defendant Sweeney's conduct was both a but-for and proximate cause of plaintiff Morant's conviction.

The jury found for defendant Sweeney on this claim. By finding in favor of defendant Sweeney, the jury necessarily found plaintiff did not prove that it was more likely than not that but for the non-disclosure to the prosecution of the information defendant Sweeney had concerning Ruiz's prior statements that were inconsistent with his statement inculpating plaintiff, plaintiff would have been acquitted at his criminal trial. The jury could and did find that even if defendant Sweeney had disclosed what he knew about the defendant Raucci feeding facts to Ruiz the criminal trial outcome would not have been different. This means, necessarily, that if Raucci had disclosed everything Sweeney knew about the Ruiz interview, the outcome would not have been different either.

Similarly, the jury found for defendant Maher on the Brady claim. This means that to the extent Raucci and Maher shared knowledge of certain information, for example,

they were both present for the interview of Jose Roque, the jury found either that such information was not exculpatory, or that even if disclosed, it would not have changed the outcome of plaintiff's criminal case.

The only information that the jury could have concluded ***would*** reasonably probably have altered the outcome of plaintiff's criminal case then is information that only Raucci, and not Sweeney or Maher, knew. The only such information in the record was that Raucci took Ruiz for a ride, prior to his being brought to the NHPD, and the speculation that he may have begun shaping Ruiz's future testimony at that point. At the time of Morant's trial in 1994, this was the only piece of exculpatory information that was known to Raucci but not to Maher or Sweeney, and therefore is the only piece of exculpatory information that could support the jury's verdict.

While this jury in this case may have concluded as much, that conclusion is entirely unsupported by the evidence at trial. If the highly-valuable impeachment material regarding the likely falsity of the statements by Ruiz and Roque would not have prevented plaintiff's conviction, there is no basis from which the jury could reasonably have concluded that the fact that Raucci had Ruiz in his vehicle prior to his statement would have done so.

Plaintiff did not present evidence from which a jury could reasonably and legally conclude that a widespread practice or custom existed to suppress evidence favorable to criminal defendants that was so pervasive as to have the force of law; and such practice was the moving force behind the civil rights violations committed by defendant Raucci.

### C. The City of New Haven is Not Required to Assume the Liability of Defendants Raucci or Maher Pursuant to Conn. Gen. Stat. § 7-465

Count Nine of the Amended Complaint seeks to impose liability upon defendant City of New Haven pursuant to Conn. Gen. Stat. § 7-465 for any damages assessed against defendants, Vincent Raucci and Vaughn Maher. The Court reserved Count Nine for its determination following trial, with the agreement of all parties. Based upon the jury's verdict and the instructions given by the Court, judgment should enter in favor of the City of New Haven on Count Nine because the conduct the jury found Raucci and Maher committed falls squarely within the statutory exception for willful and wanton conduct.

Section 7-465 is an assumption of liability statute. Conn. Gen. Stat. § 7-465 provides in relevant part that a municipality:

> shall pay on behalf of any employee of such municipality…all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damage to person or property, **except as set forth in this section if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any willful or wanton act of such employee in the discharge of such duty.**

That is, a municipality's obligation to indemnify arises only where the employee's conduct does not fall within the statute's exception for willful and wanton acts. *Myers v. City of Hartford*, 84 Conn. App. 395, 400 (2004).

Since 1928, Connecticut courts have consistently held that reckless misconduct and wanton misconduct are treated as equivalent under Connecticut law. *Menzie v. Kalmonowitz*, 107 Conn. 197, 199 (1928) ("Wanton misconduct is more than

negligence, more than gross negligence. It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of action. Wilful misconduct is intentional misconduct, and wanton misconduct is reckless misconduct, which is the equivalent of wilful misconduct."); *Doe v. Boy Scouts of America Corp.*, 323 Conn. 303, 330 (2016) ("Wanton misconduct is reckless misconduct.... It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.").

The Connecticut Supreme Court has further held that "[t]he plain and unambiguous language of § 7-465 provides that a municipality is not obligated to pay damages if the employee was acting in a willful or wanton manner." *City of West Haven v. Hartford Ins. Co.*, 221 Conn. 149, 156, 602 A.2d 988 (1992). Moreover, the Court has recognized that, as a matter of law, "[w]illful" conduct is synonymous with intentional conduct. *Pane v. City of Danbury*, 267 Conn. 669, 685 (2004). Accordingly, where a jury's verdict necessarily requires findings of intentional misconduct, § 7-465 does not obligate a municipality to indemnify the employee.

In determining whether § 7-465 applies, the Court must examine the nature of the conduct found by the jury, rather than the type of damages awarded. Thus, the fact that the jury awarded compensatory damages rather than punitive damages is immaterial. The relevant inquiry is whether the conduct underlying the verdict constitutes intentional, willful, or wanton misconduct. *See City of Hartford v. Edwards*, 946 F.3d 631 (2d Cir. 2020) (focusing on the nature of conduct giving rise to liability).

Here, the jury found Raucci and Maher liable for various intentional torts, including malicious prosecution, fabrication of evidence, coercion of statements,

conspiracy and, with respect to Raucci, Brady violations. (*See* **Ex. 7**.) The elements of each of these claims submitted to the jury required findings of intentional misconduct.

As to the Brady claim, the Court instructed the jury that plaintiff was required to prove that "the relevant defendant **deliberately** withheld" favorable information from the prosecutor and that plaintiff "must prove that the defendant intentionally did not disclose" such favorable information. (*See* **Ex. 10** at 24.) A person cannot knowingly fabricate evidence accidentally. The jury therefore could not have returned a verdict against Raucci or Maher on Count Three without finding intentional conduct.

Similarly, as to the fabrication claim, the Court instructed the jury that plaintiff was required to prove that the defendant "fabricated information, such as by **knowingly** making false statements or material omissions." *Id*. at 26. A finding that a defendant knowingly fabricated evidence necessarily constitutes intentional misconduct.

As to the coercion claim, plaintiff's theory at trial was that Raucci intentionally manipulated the interrogation process and recordings in order to obtain an incriminating statement from plaintiff. In opening statement, counsel argued that Raucci "coerced witnesses, fed them false stories," and "manipulated tape recordings until they got the statements they wanted." (*See* **Ex. 11**, pp. 40: 25-41:2.) Plaintiff separately alleged that Maher either joined those efforts through conspiracy or consciously chose not to stop them despite having a realistic opportunity to intervene. Plaintiff's own theory portrayed Raucci and Maher as intentional actors exercising independent judgment. Plaintiff argued that Raucci personally threatened witnesses, fed them facts, manipulated recordings and sought to obtain statements he knew were false. Never did plaintiff suggest that Raucci inadvertently obtained a voluntary statement, nor that there was a

negligent interrogation. The jury's verdict on Count Five necessarily reflects a finding that the conduct was purposeful and intentional rather than negligent.

The same is true of the conspiracy claim. The Court instructed the jury that, before considering conspiracy liability, it first had to find that plaintiff had established at least one of the underlying constitutional violations alleged in Counts One, Three, Four or Five. (*See* **Ex. 10**, at 27-28.) The Court further instructed that plaintiff had to prove an agreement among the defendants "to act in concert to deprive Mr. Morant of his civil rights." *Id*. at 28. Such a finding necessarily requires intentional conduct.

Finally, the jury found Raucci liable for malicious prosecution. As to that claim, the Court instructed the jury that plaintiff was required to prove that Raucci acted "maliciously, or for a purpose other than bringing Mr. Morant to justice." *Id*. at 21. By definition, that finding required the jury to conclude that Raucci acted with an improper purpose and not through mistake, carelessness, or negligence. A finding that a defendant acted "primarily for a purpose other than bringing the plaintiff to justice" is the antithesis of negligent conduct and necessarily reflects intentional misconduct. Under Connecticut law, intentional misconduct is synonymous with willful misconduct. *Pane*, 267 Conn. at 685.

Accordingly, the verdicts returned by the jury necessarily required findings that Raucci and Maher engaged in intentional, willful misconduct. Because C.G.S. § 7-465 expressly excludes from indemnification damages resulting from "willful or wanton" acts of municipal employees, the City of New Haven has no statutory obligation to assume liability for the verdict entered against Raucci or Maher.

The Court need not independently determine whether Raucci's and Maher's conduct was willful. The jury has already done so. By returning verdicts in favor of plaintiff on claims requiring findings that defendants acted maliciously, deliberately, intentionally, knowingly, and in concert with others to deprive plaintiff of constitutional rights, the jury necessarily found intentional misconduct. (*See* **Ex. 7**, generally; *City of West Haven v. Hartford Ins. Co.*, 221 Conn. 149, 602 A.2d 988 (1992).) Under Connecticut law, intentional misconduct constitutes willful misconduct. *Pane*, 267 Conn. at 685. Because § 7-465 expressly excludes liability resulting from "willful or wanton" conduct, judgment must enter for the City on Count Nine.

## V. CONCLUSION

For the foregoing reasons, defendant, City of New Haven, respectfully requests that the Court grant its Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) and enter judgment in its favor on Counts Seven and Nine of the Amended Complaint. The City further requests such other relief as the Court deems just and proper.

DEFENDANT,
CITY OF NEW HAVEN

By *_/s/ Thomas R. Gerarde_*

Thomas R. Gerarde (ct05640)
Alan R. Dembiczak (ct25755)
Amanda E. Stone (ct31531)
Lidia M. Michols (ct31789)
Abigail R. Willauer (ct31834)
Howd & Ludorf, LLC
100 Great Meadow Road
Suite 201
Wethersfield, CT 06109
Ph: (860) 249-1361
Fax: (860) 249-7665
E-mail: tgerarde@hl-law.com
E-mail: adembiczak@hl-law.com
E-mail: astone@hl-law.com
E-mail: lmichols@hl-law.com
E-mail: awillauer@hl-law.com