# Exhibit 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

---

STEFON MORANT,

Plaintiff(s), NO. 3:22-CV-630-SVN

v. JURY TRIAL DAY 3 - MORNING

CITY OF NEW HAVEN, et al, HARTFORD, CONNECTICUT

Defendant(s). May 1, 2026

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff(s):
Anna Benvenutti Hoffmann
Nick Brustin
Emma Freudenberger
Amelia Green
Elsa Mota
Grace Paras
Katherine Cion
Syeda Ali
Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP
200 Varick Street, Ste. 800
New York, NY 10014

Kenneth Rosenthal
Law Office of Kenneth Rosenthal
One Audubon Street, Third Floor
New Haven, CT 06511

For the Defendant(s):
Thomas R. Gerarde
Amanda Stone
Lidia M. Michols
Abigail R. Willauer

**Exhibit 2**

you were interviewing that what you were telling them was the truth when, in fact, it was a lie?

A. That's correct, sir.

Q. And so another way of looking at it is, homicide detectives like Mr. Raucci through their job had a lot of practice becoming good liars? You know what, that's really not a fair question.

A. It's not.

Q. Let me change it for you.

A. Yes.

Q. Lying to suspects and doing it effectively was actually part of the job of a homicide detective?

A. If necessary, yes, sir.

Q. Okay. That's now really all I have. Thank you very much for your time, sir.

A. You're welcome, sir.

THE COURT: Thank you. We will proceed with cross-examination in any order that the defense wishes.

And given that we started a little bit late, we'll take our break at 10:45 instead of 10:30.

EXAMINATION

BY MR. GERARDE:

Q. Good morning, Mr. Sweeney.

A. Good morning.

Q. Could you tell the ladies and gentlemen of the jury

**Exhibit 2**

when you joined the New Haven Police Department?
A. I joined the New Haven Police Department in 1968, sir.
Q. And when did you retire?
A. 1998, sir.
Q. And when did you become sergeant at the New Haven Police Department?
A. I believe 1985, sir.
Q. So you retired in '98; is that what you said? I'm sorry.
A. Yes, sir.
Q. Were you in Bosnia when you retired?
A. Actually, I was, sir. I left quickly New Haven and my retirement papers were filled out there.
Q. Can you explain how that happened? How was it that you --
A. The State Department sent a teletype to all police departments in our country and they asked for lieutenants and above, if we would go -- if they would go to Bosnia to -- there was a number of international police officers going there for the United States, lieutenants and above, to supervise the stations, so it was on the 4:00 to 12:00 shift, so I put in an application and -- I was working evenings that night, and I put an application in. At 9:00 in the morning they called me and said they were sending

**Exhibit 2**

me tickets to go to Bosnia, so I notified the department I was going to retire.
Q. All right. The fact that you were in Bosnia, you were still on the job technically because you were on loan to Bosnia?
A. It was not a loan. I had the time in service, so I told them verbally. I may have filled out paperwork that day, but I left very shortly thereafter.
Q. Now, the New Haven Police Department had rules and regulations that all of its officers had to follow; right?
A. That's correct, sir.
Q. And you recall the Code of Conduct Rule 15?
A. You'd have to tell me what it is, sir.
Q. In other words, that no employee of the department shall make a false official report, falsify anything?
A. I do understand that, sir.
Q. And no employee shall fabricate evidence?
A. That's correct, sir.
Q. No employee shall withhold evidence of any kind?
A. That's correct, sir.
Q. And no employee shall destroy evidence of any kind?
A. That's correct.
Q. So you and every other New Haven police officer was bound by those -- that code that I just referenced from the moment you were sworn all the way until the day you

retired. Am I right?
A. That's correct, sir.
Q. And you received recertification training throughout your career, continuing -- what we call continuing education when we're not police officers, but you call it recertification; right?
A. Yes, sir.
Q. That would be 60 hours every three years minimum; right?
A. I'm not sure the number of hours, but every few years we would be trained.
Q. And you and all of your fellow officers received that training to keep their certifications current throughout their careers?
THE COURT: Hold on. There is an objection.
MR. BRUSTIN: 611 Your Honor.
MR. GERARDE: I'll rephrase.
BY MR. GERARDE:
Q. You, just talking about you, you attended recertification training throughout your career from the day you were hired and certified all the way until your retirement?
MR. BRUSTIN: Same objection, Your Honor, scope. This is not cross.
THE COURT: Given the way that we said we were

**Exhibit 2**

going to set this out, I'll sustain the objection.

MR. GERARDE: I'm happy to rephrase.

THE COURT: Well, I think the objection is that it's beyond the scope of --

MR. GERARDE: Understood. Well, I could ask it as a direct exam question.

THE COURT: You can.

BY MR. GERARDE:

Q. Did you receive recertification training throughout your career at the level of 60 hours every three years?

MR. BRUSTIN: Your Honor, objection. My understanding was that we were going to do cross and then direct.

MR. GERARDE: We had a discussion about that and and that just doesn't make sense.

THE COURT: That is what the court's understanding was, you would cross-examine first, and then there would be sort of a clean break and we would move to direct examination. But I'll allow this question as to background and because it is within the scope of some of the questions about policies at the City.

BY MR. GERARDE:

Q. Do you have the question in mind, sir?

A. Yes, sir, I do.

Q. And what is your answer about receiving

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 59 of 169


recertification?
A. I don't recall sixty hours. That would entail more than a week. I recall attending classes, a 40-hour week every couple of years.
Q. All right. Throughout your career?
A. Yes, sir.
Q. Now, am I correct that you understood as a general matter that you had an absolute obligation as a detective and a detective supervisor to disclose any exculpatory evidence that you received? Correct?
A. Correct, sir.
Q. And you understood that you were required to do that in writing; correct?
A. No, not correct.
Q. Do you have the binder that is binder one in front of you?
A. Yes, sir.
Q. That would be your first deposition volume. Do you see that? It was January of -- January 31st of 2023?
A. That's the whole binder, sir?
Q. I'm sorry?
A. That's the whole binder you're talking about?
Q. Yes.
A. Yes, sir.
Q. And would you open to page 48 in that transcript in

**Exhibit 2**

your hand, please? Directing your attention, bottom of page 48, line 22, do you admit that I asked you the -- sorry. You were asked the following questions and you gave the following answers as your sworn deposition. Line 22.

A. Yes, sir.

Q. "First of all, you understood as a general matter, and you've testified to this before, that you had an absolute obligation as a detective and a detective supervisor to disclose any exculpatory evidence you received. Correct?"

Answer: "Yes."

Question: "And you understood that you were required to do that in writing; correct?"

Answer: "Yes."

That was your answer under oath that day, wasn't it, sir?

A. That's correct, sir.

Q. And the oath that you took when you swore this deposition is the same oath you took when you took the witness stand in this trial; am I right?

A. You are.

MR. BRUSTIN: Objection, Your Honor, completeness, page 49, lines six through nine.

THE COURT: You can explore on redirect.

**Exhibit 2**

MR. GERARDE: I'm sorry?
THE COURT: Plaintiff's counsel can explore those lines on redirect.
MR. GERARDE: Yes. Thank you.
BY MR. GERARDE:
Q. And you understood, Mr. Sweeney, generally exculpatory evidence can be evidence that tends to show a suspect is innocent; correct?
A. Repeat that question, sir.
Q. Yes. You understood in terms of what is exculpatory evidence, the word "exculpatory," exculpatory evidence is evidence that tends to show a suspect is innocent; correct?
A. I would answer correct to that, yes.
Q. Speak up a little, please.
A. I will answer correct to that, yes.
Q. All right. And exculpatory evidence could also be what's called impeachment evidence, meaning evidence that questions the reliability of a witness; correct?
A. Correct.
Q. Or even the reliability of a police officer?
A. Correct.
Q. All right. You knew and understood all of that; am I correct?
A. Yes, you are.

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 62 of 169


Q. All right. Now, you didn't know Ovil Ruiz in January 1991, am I right?
A. You are right, sir.
Q. Up until that day he showed up in the department and you spoke to him; correct?
A. That's correct, sir.
Q. And Vincent Raucci in 1991 was a relatively new detective, January, '91, wasn't he?
A. He may have been, yes, sir.
Q. Are you aware that he came from the Street Crime Unit before he became a detective?
A. Yes, I am, sir.
Q. Did you dislike Detective Raucci's style?
A. When he was working for me, yes, I did.
Q. He was a little too rough around the edges for you; is that a fair statement?
A. No, it is not, sir.
Q. As of the day that you met Ovil Ruiz, which is January 13th of 1991, you didn't know that Detective Raucci had a meeting with him and encounter before you met him at the police department; am I right?
A. No, sir, I did not.
Q. And just in general, if Detective Raucci is told by a witness named Ovil Ruiz that he has information on a pending homicide, a double homicide involving an alderman

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 83 of 169


and he wants to give him information about it, it makes sense for Raucci to hear the information, doesn't it?

A. I would answer yes to that.

Q. And it would make sense that if the witness was willing to do so, to have the witness show the detective here is the house where it happened, for example?

A. I can't answer that question, sir.

Q. You heard testimony that Ovil Ruiz showed the house where the drugs were being sold from on Clay Street before coming to see -- coming in and when you met him; am I right?

MR. BRUSTIN: Objection, 901.

A. No, you are not, sir.

THE COURT: Just a second. If there is an objection, I just need to --

MR. GERARDE: Withdrawn.

THE COURT: Okay. The jury shall disregard the question and the answer, but I'll ask everyone to please pause if there is an objection so that I can rule on it before answering the question.

THE WITNESS: Sorry.

BY MR. GERARDE:

Q. When you met Ovil Ruiz, he was a complete stranger to you; is that right?

A. Yes, sir, he was.

Q. And you were not aware that he had a preexisting contact with Detective Raucci; am I right?
A. You are right, sir.
Q. All right. And so as far as Ovil Ruiz is concerned, you were a complete stranger and there was no prior relationship between the two of you?
A. That's correct, sir.
Q. So when he spoke to you, he was in the police department, right, at 1 Union?
A. Yes, sir.
Q. All right. And he was in the Detective Division; is that right?
A. Yes, he was.
Q. And he was talking to a stranger, meaning you; correct?
A. Yes.
Q. And it was clear you were a sergeant, you were a boss?
A. Yes.
Q. All right. And that's when he said I know nothing to you?
A. In a subsequent conversation he did say that, yes.
Q. And you said to him, I heard this on your direct examination in this case, that we only want truth, and if you have truth, we are going to take a statement. Do you

remember that?
A. No, I do not.
Q. You didn't say that to Ruiz?
A. Those words I did not, sir. If I refer back to the statement, I may have, but I don't recall saying that to him.
Q. In this courtroom just the other day, didn't you say in response to one of Attorney Brustin's questions that you told Ruiz we are only interested in truth, and if you have any truth, we're going to take a statement?
A. I'm sure I asked him that we only wanted the truth, and I don't know if I followed it with a statement. That's not the way I work.
Q. Well, Ruiz did give a statement that day, didn't he?
A. He did, sir.
Q. And isn't it true that the fact that he gave that statement, when you learned that he was going to go forward with that statement and you learned when you came in the next day that he had given a statement, it had been typed up, you took that to mean he did have some truth to tell; am I right?
A. No, you are not.
Q. You had a trusted detective sit in on that statement, Detective Pettola, didn't you?
A. Yes, I did, sir.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 86 of 165


Q. And he reported no problems to you; am I right?
A. You're right, sir.
Q. Ruiz came in the next day, the next morning to sign the typed-out version; right?
A. I don't remember -- I don't know if he did. I met him that day later in the day.
Q. All right. It was the next day when Ruiz came in to sign and you witnessed his signature; right?
A. That's correct, sir.
Q. All right. So when you saw him the next day, if you thought that Ruiz was about to sign something that was a complete fabrication, you certainly had the opportunity to ask some questions and make sure that this was on the up and up; right?
A. No, it's not right, sir.
Q. You certainly knew who he was when he came in the next day, didn't you?
A. That's correct, I did.
Q. You recognized this is the person who I was speaking with the day before, and when I left, I had my trusted detective sitting in the interview room with him. That's the last thing you knew from the night before; right?
A. That's correct, sir.

THE COURT: Hold it.

MR. BRUSTIN: Objection 403, asked and answered.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 87 of 169


THE COURT: Overruled.

BY MR. GERARDE:

Q. And you knew --

THE COURT: The jury can consider the answer.

BY MR. GERARDE:

Q. And you -- so when he came in, he wasn't a stranger to you, am I right?

A. Yes, you are.

Q. And if you thought that he had provided false information, you were a sergeant in the Detective Division. You could have intervened, couldn't you?

A. At what point, sir?

Q. At the time when he's come back and you realized there is now 20 pages typed of information this witness has given. If you felt that there was fabricated evidence and this person is about to sign off on it, and you're about to sign off as the person who put him under oath, as the sergeant, you could have intervened if you wanted to; right?

A. That's not right.

Q. Why can a detective-sergeant not intervene in any situation where he thinks a witness has just given fabricated testimony?

A. My obligation that day, my duties that day included I witnessed his signature. I had him swear to the oath that

**Exhibit 2**

he told the truth. He signed the statement in my presence. I did not question him about the statement. That was not my obligation that day. I only witnessed that he said it was a true statement to the best of his knowledge, and he said yes.

Q. The reason why you did nothing more than that is because you had no reason to question the truthfulness of what he provided to Detective Raucci with Detective Pettola in the room; isn't that true?

A. No, it is not.

Q. How many years have you been with the department as of 1991? Twenty-three?

A. Yes, sir.

Q. All right. So a 23-year veteran of the police department, detective-sergeant. Detective-sergeant means you're the sergeant of the detectives; right?

A. That's correct, sir.

Q. All right. So there is the detectives and then there is a boss, a sergeant who is in charge of the detectives?

A. Yes, sir.

Q. And so you're saying that if you had the mindset that this -- this person has just given 20 pages of false testimony, but, hey, my job is just to tell him to raise his hand, and so I don't care, and you let it happen, you're saying you're able to do that?

**Exhibit 2**

A. You're saying I don't care? Of course I care. My obligation that day was not my investigation. I did not read the report. I merely -- by Connecticut state statute, it was my job as a sergeant to notarize his signature, and that's exactly what I did, sir.
Q. You asked him to raise his hand and swear that what was -- that what was true, and he did so and he swore what he was -- that what he had provided was true; right?
A. Yes, sir, he did.
Q. All right. And you had no reason to doubt that; right?
A. It was not my job to check and see whether the information was correct. My job that day was as a sergeant. I notarized his statement by state statute.
Q. All right. This was a lot different than, hey, sarge, you got a minute, we need a notary over here and some complete stranger signs. You were a lot more familiar with the case than that; right?
A. Of course I was, sir.
Q. And you knew that the very last thing that happened on your shift was that you had a detective, a trusted detective sit in to make sure that everything was on the up and up during that statement-taking; right?
A. I would say that is not right.
Q. Why is that?

**Exhibit 2**

A. I told the detective to go in, make sure he doesn't tell this man what to say in his statement. I merely said keep an eye on him and keep him straight, basically, and it was not -- because he had further information, which I was unaware of, the person being interviewed, and I said if that's the case, let him continue. I told him not to let him -- I told the detective you're not going to put that down on paper what you are telling the man to say.

Q. And did you know that three months later Mr. Ruiz gave a statement in the State's Attorney's Office? Did you know then as --

A. I didn't know then, sir, no, but I know now.

Q. Because of this case, you now know that that happened?

A. Yes, sir.

Q. But in 1991, in May of 1991, you have no idea?

A. That's correct, sir.

Q. And when -- you know now that when Mr. Ruiz went into the State's Attorney's Office and gave his statement in May of 1991, he had his lawyer with him; right?

A. I've read the statement and there was a lawyer, that he also signed.

Q. So if a witness has his lawyer present during questioning by the police, that's a pretty good safeguard against mistreatment, isn't it?

**Exhibit 2**

A. Absolutely, sir.
Q. And do you have any reason -- did you hear any challenge to the way that statement, that second statement was taken that caused you any concern?
A. How could I answer that, sir? I wasn't present in the statement.
Q. All right. Fair enough. Now, did you know that three years after these two statements were given, 1994, that Mr. Ruiz went and testified at trial? Did you know that?
A. No, I do not.
Q. When it was happening you didn't know, but you know now?
A. How would I know now?
Q. Throughout the case did you know?
A. Pardon me?
Q. Just because you've been involved in this litigation, did it come to your attention that Mr. Ruiz testified at the trial of Mr. Morant?
A. No, I have no independent information about him testifying at all.
Q. Am I the first person telling you that Ovil Ruiz testified at the trial of Stefon Morant?
A. Yes, you are, sir.
Q. All right. So you did nothing to familiarize

**Exhibit 2**

yourself with what the evidence was against Mr. Morant at his trial? Am I right?
A. That's correct, sir.
Q. All right. So you couldn't name one witness who testified because you didn't even know Ruiz testified; right?
A. That's correct, sir.
Q. So the entirety of your knowledge about this case is your interaction with Ovil Ruiz that happened on that day? That's your personal knowledge? That's the extent; right?
A. Repeat the question, sir.
Q. The entirety of your knowledge about this case is this one interaction you had with Ovil Ruiz in January of 1991; right?
A. I would have difficulty answering that question, sir.
Q. You have difficulty answering?
A. That's correct.
Q. All right. So, in other words, you weren't part of the investigation?
A. No, I was not.
Q. It was not your case; correct?
A. That's correct, sir.
Q. All right. And you told us of the interaction you had with Ruiz that night?
A. That's correct, sir.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 73 of 169


Q. And then the following day when he signed under oath his statement?
A. That's correct.
Q. And you don't know anything about his second statement; right?
A. That's correct, sir.
Q. You don't even know what happened at the trial; right?
A. No, I do not.
Q. The prosecutor who prosecuted Mr. Ruiz is David Gold. Did you know David Gold well?
A. Yes, sir, I did.
Q. How many years had you been working on cases where David Gold was prosecutor as of 1991?
A. Many, sir, many years. I can't tell you the exact number.
Q. Many years?
A. Most of my time in the Detective Division.
Q. All right. So you're a New Haven police detective and he is a State's Attorney who works in the New Haven judicial district, so your arrests go to his court?
A. That's correct.
Q. He's one of the few prosecutors or whatever who would get the cases?
A. Correct, sir.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 74 of 169


Q. Did you ever see David Gold either coerce or threaten a witness?

MR. BRUSTIN: Objection, 403.

THE COURT: Overruled.

BY MR. GERARDE:

Q. You can answer, sir.

A. I've never seen David Gold interview a witness in a case.

Q. Did you ever see David Gold fabricate any testimony?

A. He's a State's Attorney. I would have no knowledge of that.

Q. If you wanted to on any case, you can call up the prosecutor on a case you have information on and say, hey, I want to tell you something, something I've just learned; right?

A. Yes, sir, that's right.

Q. And if you wanted to, you could have contacted David Gold and spoken to him about your encounter with Ovil Ruiz; am I right?

A. I could have if I was aware of the importance of the information that I had, yes, sir.

Q. But you didn't?

A. No, I did not.

Q. And Mr. Morant was convicted in 1994 by his jury. You don't even know that. That's something you learned

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 75 of 169


later; right?
A. I learned later, sir.
Q. And you didn't -- Mr. Morant -- I'm sorry. Mr. Lewis was convicted in 1995, but you didn't know that in real time. That's something you found out later?
A. Yes, sir, it is.
Q. There is -- in this case there is a five hundred, roughly five-hundred page Exhibit 1, which is all of the investigation that happened by New Haven police officers that led to Mr. Morant's arrest. Have you looked at any of that?
A. Yes, I have, sir.
Q. In connection with this case?
A. Yes, sir.
Q. All right. Did you look at any of that in connection with -- in real time in connection with the investigation that lead to Mr. Morant's arrest?
A. Repeat the question, sir.
Q. As that investigation was developing that eventually led to Mr. Morant's arrest, did you look at any of the investigation during that time?
A. Yes, sir, I did.
Q. What did you look at?
A. Basically the police reports, statements.
Q. When did you look at that?

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 76 of 169


A. Well, I can't -- I can't answer that. At the time of the crime.
Q. And was that -- and was that in connection with your speaking with Ovil Ruiz?
A. No.
Q. Well, if the interview that you're telling us about you participated in was January of '91, and you accept that Mr. Morant was arrested in early '92, when during that time did you look at the investigation?
A. Oh, I misunderstood your question. It was well after that, sir.
Q. It was well after that?
A. Yes.
Q. Was it before the trial in '94, or was it well after that as well?
A. It was recently, sir.
Q. All right. I'm sorry for not making my question clear. Just recently you have looked at all of the investigation that was developed and is now our Exhibit 1 in this case, the five hundred pages of investigation that led to Mr. Morant's arrest. That is -- you've just recently looked at that; right?
A. That's correct.
Q. All right. There is a trial transcript that is another exhibit before our jury. It's many, many, many

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 77 of 165


pages. Have you read any of the trial transcript?
A. Some of it, yes, sir.
Q. What parts have you read?
A. The trial transcript? No, sir, I have not.
Q. You haven't read any part of the trial -- meaning when Mr. Morant was tried in 1994, everything that was said by every witness got written down just like we're having happen here, and it gets typed up and you can read it later, like a long story. You didn't read any of that at all?
A. I read none of that, sir.
Q. All right. And just to be clear, there is about 140 pages of that trial transcript that's in evidence. There is testimony by Ovil Ruiz. You haven't ever read any of that; am I right?
A. No, sir, I have not.
Q. All right. And have you been in contact with someone from either the Morant legal team or the Lewis legal team from the late 1990s all the way through today?
A. Repeat the question, sir.
Q. Sure. Have you been in contact with someone -- well, let me phrase it this way. Your contact with the Morant legal team or the Lewis legal team began in the late '90s; am I right?
A. That's correct, sir.

**Exhibit 2**

Q. And then you're still in contact with them now?
A. Yes, sir, I am.
Q. Let me ask you about the time when Mr. Morant came into the -- well, strike that. I want to show you a couple of exhibits, and then I'll roll into this. I'm calling up Exhibit 501. 501 is admitted already?
THE COURT: 501 is an excerpt of Plaintiff's Exhibit 1; correct?
MR. GERARDE: Yes.
THE COURT: 501 is admitted as a full exhibit.
BY MR. GERARDE:
Q. All right. So I have Exhibit 501 on the screen, and I will state for the record that this is the typed-out version of the statement that Ovil Ruiz provided in January of 1991. This is part of that very large New Haven Police Department five-hundred page file that is Exhibit 1, but it's been pulled out for ease of reference, and it now has its own number, 501. As you can see at the bottom of the page, you have signed Ovil Ruiz. Do you see where I'm toggling?
A. Yes, sir, I do.
Q. All right. And witnessed by Detective Raucci; correct?
A. That's correct.
Q. Witnessed by Detective Maher; correct?

**Exhibit 2**

A. That's correct, sir.

Q. And subscribed and sworn to before me the 15th day of January, notary public. That's Sergeant Michael Sweeney at the bottom; right?

A. That's correct, sir.

Q. All right. So this means that you, Raucci, Maher and Ruiz were all together when this happened. Am I right?

A. I know I was with Ovil Ruiz that day notarizing his statement. I don't remember the two detectives were present.

Q. Well, you're the responsibility -- you're the notary, so you have the responsibility to make sure that the person who you're asking to swear has actually raised their hand and sworn; right?

A. That's correct, sir.

Q. No question you did that; correct?

A. No question about that.

Q. No question that Ovil Ruiz raised his hand and swore?

A. No question, sir.

Q. He didn't say to you, hey, sergeant, remember I told you last night I know nothing? He didn't say that; right?

A. No, sir, he did not.

Q. He signed, and are you saying that even though there is two blocks here for witness, Maher and Raucci, that you're not sure if they were there, or you just don't

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 80 of 169


remember?

A. I just don't remember, sir.

Q. All right. Let's take that down, and I'm now going to call up 540.

MR. BRUSTIN: What's the exhibit?

MR. GERARDE: It's the waiver.

THE COURT: And is this also a portion of Plaintiff's Exhibit 1? I'm seeing co-counsel nod her head. So defense Exhibit 540 is admitted as a full exhibit.

MR. BRUSTIN: Can I see the number just to make sure?

MR. GERARDE: Yep. It's at the very bottom. Do you see that, 540?

MR. BRUSTIN: It's fine. It just has a different Bates stamp.

THE COURT: Okay. 540 is a full exhibit.

MR. GERARDE: Okay. Lost it. Sorry.

BY MR. GERARDE:

Q. Now, Mr. Sweeney, you were in the department when -- you were on duty and in the department when Stefon Morant came in to sign -- to give his statement, am I right?

A. Yes, sir, you're right.

Q. All right. And so I know you didn't participate in his statement, and I know you actually didn't take the

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 81 of 169


oath, but you were there when Mr. Morant was read his rights, the waiver was discussed, and you were there when he signed, even though you're not on this document; is that fair?

A. I don't remember that, sir.

Q. Do you have the deposition -- the binder of your second deposition? Do you have in front of you, sir, the June 7, 2023 deposition?

MR. BRUSTIN: It's all in one binder.

MR. GERARDE: I am not sure about that. You need to get to page 456. It's from the second session.

THE COURT: It's all in the one marked binder one.

BY MR. GERARDE:

Q. Would you turn to page 456, please? Do you agree that when I asked the following question, you provided the following answer? Line four. "Now you also testified that you witnessed Stefon Morant come to the New Haven Police Department and waive his rights prior to him giving a statement. I know you weren't part of that statement-taking process, but did you witness him waiving his rights prior to giving his statement? Am I right?" Your answer was "Yes." Correct?

A. That's correct, sir.

Q. And now I'm asking you a question. I'm not reading

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 82 of 169


from the transcript. Did Mr. Morant ever indicate to you during that waiver process, the part you witnessed, that he was not there of his own free will or that he was not willing to give a statement? Did he ever indicate that to you?

A. No, sir, he did not.

Q. So Exhibit 540 is on the screen in front of you. Do you see it?

A. Yes, I do.

Q. It reads at the top Department of Police Services, New Haven, Connecticut. This is a standard form that you have persons review and sign before they -- before they give a statement; right?

A. Yes, sir, it is.

Q. All right. And we don't need to read all of this. It's in evidence. But at the top there is a warning. It's basically the Miranda warning, you have a right to remain silent, et cetera; right?

A. Yes, sir.

Q. And then there's below that an acknowledgment that you have the person initial demonstrating that they understand what the rights are that they have just been read; right?

A. Yes, sir.

Q. And so they go through, kind of like break it down,

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 83 of 169


and I won't read all of it, but the first block is I have been advised I have the right to remain silent, and there is an SM there, and were you present when Mr. Morant put pen to this paper?

A. I do not know if I was present. I was present before.

Q. All right. But in any event, the practice is to have the person who's waiving their rights initial in each of these six spots where it's broken down as to what rights they are waiving; right?

A. That's correct.

Q. And then there is a concluding paragraph where the person indicates I am willing to answer questions and make this statement knowing that I have and fully understand these rights. I don't want a lawyer at this time. I do make the following statements without fear, threats, or promises of favor, knowing that the statement can be used against me in a court of law. That's standard for this form; is that right?

A. Yes, sir, it is.

Q. And you've actually been part of being a witness to many of these, haven't you, in your career?

A. Many, sir.

Q. And the lower left-hand corner is where the person who is waiving signs. Do you see that?

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 84 of 169


A. Yes, sir.
Q. And then in front of witnesses?
A. That's correct, sir.
Q. And it appears that the witnesses are Vaughn Maher and Vincent Raucci, Jr.; right?
A. That's correct, sir.
Q. Okay. We can take that down now. All right. So I want to get back to some of the questions that I was talking about earlier about your experience in the New Haven Police Department. Tell me about who were your supervisors. And I am now on direct exam, Judge.
THE COURT: Okay. Go ahead.
BY MR. GERARDE:
Q. Who were your supervisors in the 1980s and 1990s?
A. In the Detective Division?
Q. Yes, but I'll -- in the Detective Division, but then if you can go higher, lieutenants, captains, assistant chief, chief.
A. Yes.
Q. Go ahead, tell me.
A. Initially as a supervisor when I was asked to go to the Detective Division, Captain Peter Gill was my supervisor. He's the one who asked me to go there.
Q. Peter who?
A. Peter Gill, G-i-l-l.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 85 of 169


Q. Yep.
A. I worked for him for a number of years. I worked for Lieutenant Beausejour. I worked for Sergeant Thomas Richitelli. I worked for Sergeant Larry Celso. I worked for Sergeant Robert Lillis.
Q. Say that last name again.
A. Lillis, L-i-l-l-i-s. And that's all. I worked for -- I think that's the only ones I can remember.
Q. Was there a Sergeant Kikase?
A. Yes, also Sergeant Kikase I worked for, Ralph Kikase.
Q. How about Captain John O'Connor?
A. He was one rank above the person that was being -- Investigative Services Unit that was supervising me.
Q. He was?
A. Yeah, I believe he was a captain, and so I didn't work directly for him.
Q. How about Commander Montanari?
A. Commander Montanari was a commander in the patrol division, so I did not work directly under him.
Q. How about Major Muller?
A. He was one of the three or four people in charge of the department. I never worked for him directly.
Q. And was Chief Farrel your chief in the 1980s?
A. Chief Farrel was a lieutenant I worked for, and then he became Chief of Police.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 86 of 169


Q. And he was succeeded by Chief Pastore in the '90s?
A. Yes, sir, he was.
Q. And Pastore was succeeded by Chief Melvin Wearing in the late '90s?
A. Correct, sir.
Q. And so when you retired, you retired under Chief Wearing?
A. That's correct, sir.
Q. All right. Now, did any of these supervisors ever state to you in words or substance that it was accepted practice in the New Haven Police Department to secure false witness testimony through coercion or unfair promises?
A. No, they didn't.
Q. Did any of these supervisors ever state to you in words or substance that it would be acceptable to falsify a police report?
A. I never had discussion with them about that, no, sir.
Q. Did any of these supervisors ever state to you in words or substance that it would be acceptable to withhold or hide exculpatory evidence?
A. No, sir, they did not.
Q. Is there any other supervisor you can think of who you worked for in the '80s or '90s other than the names that we have just put on the record?

**Exhibit 2**

A. I worked for Sergeant Robert Lawlor. We were both sergeants in ISU, but he was like second-in-command of the Detective Division, so I worked under him also.
Q. All right. And so same question as to Lawlor. Did Sergeant Lawlor ever state to you in words or substance that it would be acceptable in the New Haven Police Department to coerce witness testimony?
A. We never had a conversation about that, no.
Q. Did you ever witness -- I'm talking about your police chiefs now. I am going to start with Farrel. What was Farrel's first name?
A. William Farrel.
Q. Did you ever witness William Farrel condoning police officer misconduct in the form of fabricating a witness statement?
MR. BRUSTIN: Objection, 901, foundation.
MR. GERARDE: I'm asking for his personal knowledge.
MR. BRUSTIN: How would he ever see that?
THE COURT: The objection is overruled.
THE WITNESS: No, sir, I did not.
BY MR. GERARDE:
Q. Did you ever witness Chief Farrel condone any police officers lying in a police report?
A. No, sir, I did not.

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 88 of 169


Q. Did you ever witness Chief Farrel condone a police officer's hiding or withholding exculpatory evidence?
A. No, sir, I did not.
Q. Did you ever witness Chief Nicholas Pastore condone withholding of exculpatory evidence by a New Haven police officer?
A. No, sir, I did not.
Q. Did you ever witness Chief Melvin Wearing condone a New Haven police officers withholding of exculpatory evidence?
A. No, sir, I did not.
Q. Did you ever see any of your -- anyone in the command staff, chief, assistant chief, anyone from that office, did you ever see anyone condone fabricating witness testimony through coercion?
A. No, sir, I did not.
Q. Did you ever see anyone in the command staff, assistant chief, chiefs condone lying in a police report?
A. No, sir, I did not.
Q. Coercing witnesses?
A. No, sir.
Q. Withholding exculpatory evidence?
A. No, sir.
Q. All right. How about any member of the police commission? Did you ever have contact with the police

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 89 of 169


commission?
A. Only one commissioner. I was a shift commander. He rode with me for an evening.
Q. You have to speak up.
A. Just one shift commander and he rode with me for an evening shift.
Q. One member of the police commission?
A. That was my only contact with a police commissioner.
Q. So you certainly don't have any evidence to report to this jury that members of the police commission condoned any police misconduct?
A. No, sir.
Q. Same question for New Haven PD's Internal Affairs department. Do you have any personal knowledge that the Internal Affairs department condoned police withholding of exculpatory evidence?
A. No, sir.
Q. Do you have any evidence that the Internal Affairs department for the New Haven Police condoned securing false testimony through coercing witnesses?
A. No, sir, I do not.
Q. Or lying in police reports?
A. No, sir, I do not.
THE COURT: We're at our break time, Attorney Gerarde, but if you want to finish this line --

**Exhibit 2**

MR. GERARDE: I'm very close. If I could?
THE COURT: Okay.
BY MR. GERARDE:
Q. How many sworn police officers, say, in the early 1990s, sir?
A. There was probably somewhere around 380.
Q. And then same question about Detective Division. Do you have a thought, how many sworn detectives?
A. There was approximately 60, sir.
Q. And the Detective Division gets cases, the serious cases, homicide, sexual assault, armed robbery, et cetera?
A. That's correct, sir.
Q. What would be a good estimate of the number of cases that came into the division in a given year, like over a year's time? Do you have a thought about that?
A. Yes, I do.
Q. How many?
A. Homicides, it averaged 15 to 25; shootings, well over a hundred; stabbings, well over a hundred; sexual assaults, maybe fifty or so, approximate numbers.
Q. All right. Have you ever seen any of the statistics that are reported -- that are kept by the state of types of cases per year in a given police department?
A. Repeat that, sir.
Q. Have you ever seen the statistics that are kept by

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 91 of 169


the State of Connecticut regarding the amount -- the number given of different kind of cases that happen in each town in the --

A. No, sir, I have not.

Q. If you were to -- if I were to put the number, say, 1500 in a given year on average of homicide, sexual assault, armed robbery, aggravated assault, does that sound about right to you?

MR. BRUSTIN: Objection, 901.

THE COURT: Overruled.

THE WITNESS: Yes, it does.

BY MR. GERARDE:

Q. You can answer, sir.

A. Yes, sir, it was.

Q. Yes, it does?

A. Yes.

Q. All right. Thank you. I don't have any other questions.

THE COURT: All right. Thank you. Members of the jury, we'll take our morning break at this time. I understand that some of you may have questions about the objection numbers that counsel are using when they are making objections. I'll remind you from my preliminary instructions that objections are not evidence, and that's the reason that we're using the numbers of the Federal

**Exhibit 2**

Case 3:22-cv-00630-SVN Document 583 Filed 06/11/26 Page 92 of 169


Rules of Evidence, and I am just ruling on them through those numbers. Those objections should not influence you in any way. You should just take whatever happens from the objection, meaning if I allow the witness to answer the question, you can consider the answer, and if I tell you to strike or disregard any of the testimony, you shall follow that instruction as well.

We will plan to come back at 11:05, and I think we'll go until 12:45, so if you want to eat a small snack because your lunch break will be a little bit later, you're welcome to do so. Please don't speak about the case during the break.

(The following proceedings were held outside the presence of the jury.)

THE COURT: All right, Mr. Sweeney, you may step down. The same instruction applies, don't speak to your attorney about the nature of your testimony.

Anything I need to take up from counsel?

MR. GERARDE: No, Your Honor.

MR. BRUSTIN: No.

THE COURT: Okay. The court will stand in recess.

(Whereupon, a recess was taken.)

THE COURT: Ready for the jury?

MR. BRUSTIN: Yes, Your Honor.

**Exhibit 2**

C E R T I F I C A T E

I, Denae L. Hovland, RPR, CRR, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the proceedings of a hearing which was held in the above-entitled action on May 1, 2026 were recorded by Denae L. Hovland by stenograph; that thereafter I transcribed in typewriting the foregoing transcript to the best of my ability; that the foregoing transcript constitutes a true and accurate transcription of the proceedings of such hearing.

/s/ Denae L. Hovland
Denae L. Hovland, RPR, CRR, RMR
Official Court Reporter
United States District Court
450 Main Street
Hartford, CT 06103

**Exhibit 2**