# Exhibit 4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEFON MORANT, Plaintiff, | ) | No: 3:22-cv-00630-SVN |
| v. | ) | May 7, 2026 |
| CITY OF NEW HAVEN, ET AL., Defendants. | ) | 1:02 p.m. |

Abraham A. Ribicoff Federal Courthouse
450 Main Street
Hartford, CT 06103

JURY TRIAL DAY 7 - AFTERNOON SESSION

B E F O R E:
THE HONORABLE SARALA V. NAGALA, U.S.D.J.
{and a jury}

Courtroom Deputy:
Sam Denault

Official Court Reporter:
Tracy L. Gow, RPR

**Exhibit 4**

wanted the story to be; correct?
A. Yes.
Q. And you said that this happened regularly?
A. Yes.
Q. And so, in those instances, the failure to announce and document the starting and stopping time was to ensure that the fixing of the testimony would not be on the record?
A. Yes.
MR. BRUSTIN: Thank you, sir. I may have some follow-ups after these attorneys question you, but that's all I have for now. Thank you.
THE COURT: Thank you. We can proceed with cross-examination, in any order.

CROSS-EXAMINATION

BY MR. GERARDE:
Q. Good afternoon, Mr. Pettola.
A. Good afternoon.
Q. Let me just stay with that last point that you stated on the record.
Can you tell me the first and last name of one person in the New Haven Police Department who stopped, rewound, and fixed testimony on a tape-recorded statement because it didn't come out right the first time?
A. I can't.
Q. In your entire career?

**Exhibit 4**

A. My entire career.

Q. I'll come back to that in a minute. I want to first talk to you about the issue regarding the white powder, and you made a comment about probable cause to arrest.

Police officers always have discretion whether to make an arrest, even in the presence of probable cause; am I right?

A. That's right. Correct.

Q. And in the case of that one instance that you described about the white powder in Raucci's possession, you didn't test that powder; right?

A. No.

Q. So you don't know what it was; correct?

A. No.

Q. All right. And until you test a suspected substance, you don't have probable cause to arrest for possession of narcotics, for example; right?

A. That's correct.

Q. And whatever that substance was, it was discarded; right?

A. Discarded.

Q. It was never able to be tested; you literally have no way of knowing if that was baby powder or rosin or narcotics; right?

A. No way, no.

**Exhibit 4**

Q. And you never -- so you never had probable cause to arrest Raucci in that instance because you didn't know what the powder was?
A. Didn't know what it was, no.
Q. And you never reported any misconduct by Raucci to any of your superiors; am I right?
A. No.
Q. And that's for any misconduct? I'm getting beyond the white powder now.
A. No.
Q. How many years were you a police officer at the same time Raucci was?
A. Maybe a year.
Q. I'm talking about in the Department. You were both in the Department in the '80s; right?
A. Yes.
Q. All of the '80s.
A. I don't know what year he came on the job. I have no clue.
Q. All right. So in the ten -- let's say it's ten years, let's say it's 15 years. Whatever the years is, in all of those years, the one thing that you know negative about Detective Raucci is what happened with that white powder you told us about; right?
A. Yes.

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 591 Filed 06/11/26 Page 35 of 38



Q. And certainly the -- the code of conduct for the New Haven Police Department absolutely prohibited any type of misconduct along the lines of officer fabrication, officer coercion of witnesses; correct?

A. Correct.

Q. And you knew that? You didn't need to be told that by any superior; you knew that from your conduct and your training -- your code of conduct and your training?

A. I knew that, yes.

Q. And regarding the interview that you sat in on Ovil Ruiz, we aren't asking you to speak about anything except about what you know. But what you know is you sat in that interview and nothing improper happened; right?

A. Nothing.

Q. No stopping of the tape, no threatening of the witness, no --

A. I didn't see him stop the tape, no.

Q. And you were there?

A. Well, I was out of the room a couple of times and he was in the room alone.

Q. You were there while the tape was running and the testimony is being taken?

A. And Sgt. Sweeney opened the door, called me out in the hall and asked me if he's taking a good statement, and he stopped the tape-recording.

**Exhibit 4**

Q. Okay. And when you were -- when Sgt. Sweeney asked you how things were going, did you report that they were going fine?

A. I told him he -- yeah, he's doing a good job, yeah.

Q. Said Raucci was doing a good job?

A. Yes.

Q. All right. Now, you were asked a number of questions about what -- what was happening in the police department and -- in terms of this was accepted in the police department, this is what everybody -- you know, everybody was thinking, this is what the officers were thinking and doing (indicating).

I want to ask you about specific names. All right? I want to talk to you about people -- human beings with first and last names.

You worked for Chief William Farrell; right?

A. Yes.

Q. And you worked for Chief Nicholas Pastore?

A. Yes.

Q. Did you work for Chief Melvin Wearing?

A. Yes.

Q. And you said Francisco Ortiz, as well?

A. Yes.

Q. Do you remember working for Major Tom Muller?

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 591 Filed 06/11/26 Page 37 of 88



A. Yes.
Q. Do you remember working for Major Doug Dortenzio?
A. Yes.
Q. Do you remember working for Major O'Connor?
A. Yes.
Q. Well, how about Commander Jim O'Neill?
A. Yes.
Q. Commander Lenny Gallo?
A. Yes.
Q. Captain John O'Connor?
A. Yes.
Q. Lieutenant Louis Loukides?
A. Yes.
Q. Lieutenant Danny McNulty?
A. Yes.
Q. Sergeant Timmy Binkoski?
A. Yes.
Q. And you know Mike Sweeney and Bobby Lawlor, as well; right?
A. Yes.
Q. All right. Do you remember the names of any other supervisor, sergeant or above, than the names I just mentioned that you worked for at any time in your career?
A. Sgt. McCarthy.
Q. McCarthy?

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 591 Filed 06/11/26 Page 38 of 88



A. Yeah, Bobby McCarthy.
Q. Okay. Who else?
A. Oh boy. Brian Sullivan.
Q. Brian Sullivan?
A. Yes.
Q. Anyone else?
A. Oh, boy. Not offhand. I got to think some more. Others, but right now I can't think of their names.
Q. All right. Well, those that you did think of, did any of those supervisors ever communicate to you, in words or substance, that it was acceptable in the New Haven Police Department to falsify or fabricate evidence?
A. No.
Q. Did they ever indicate to you that it was acceptable to coerce witness testimony?
A. No.
Q. Did they ever indicate to you that it was acceptable to withhold exculpatory evidence?
A. No.
Q. These are directed at your chiefs, the four chiefs you mentioned -- Farrell, Pastore, Wearing, Ortiz: Did you ever see any of those chiefs ever condone a New Haven Police officer's fabrication of evidence?
A. No.
Q. Did you ever see any of those four chiefs or their

**Exhibit 4**

command staff -- assistant chiefs, anyone in that level -- ever condone coercion of witness testimony by any New Haven police officer?

A. No.

Q. In other words, brought to their attention and they said, "Sweep it under the rug" or "we'll," you know, "circle the wagons"? Nothing like that?

A. No.

Q. Did you ever see any of those chiefs ever condone any New Haven Police officer's withholding of exculpatory evidence?

A. No.

Q. Same questions regarding the police commission. I'm not sure what contact you had with the police commission, but you know there's a New Haven Police Commission; right?

A. Yes.

Q. And did you ever see the New Haven Police Commission ever condone a New Haven police officer's fabrication of evidence?

A. No.

Q. Did you ever see the New Haven Police Commission condone any New Haven Police officer's coercion of witness testimony?

A. No.

Q. Did you ever see the New Haven Police Commission

Exhibit 4

ever condone a New Haven Police officer's withholding of exculpatory evidence?

A. No.

Q. Same questions for Internal Affairs. Did you ever see the Internal Affairs Department of the New Haven Police Department ever condone a New Haven Police officer's fabrication of evidence?

A. No.

Q. Did you ever see the Internal Affairs Department ever condone a New Haven Police officer's coercion of witness testimony?

A. No.

Q. Did you ever see the New Haven Police Department's Internal Affairs Division ever condone a New Haven Police officer's withholding of exculpatory evidence?

A. No.

Q. Now, you worked with a lot of detectives, fellow detectives; right?

A. Yes.

Q. You had a long career?

A. Yes.

Q. Do you remember working with a Detective John Flynn?

A. Yes.

Q. How about Richie Rosa?

**Exhibit 4**

A. Yes.
Q. Everett Nichols?
A. Yes.
Q. Brian Donnelly?
A. Yes.
Q. Lenny Pastore?
A. Yes.
Q. Vaughn Maher?
A. Yes.
Q. Chris Grice?
A. Yes.
Q. Mary Fish?
A. Yes.
Q. Joyce O'Neill?
A. Yes.
Q. John Bashta?
A. Yes.
Q. Holly Tritoni (phonetic)?
A. Yes.
Q. Joe Greene?
A. Yes.
Q. Melvin Daniels?
A. Yes.
Q. Fred Hurley?
A. Yes.

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 391 Filed 06/14/26 Page 42 of 88



Q. Eddie Kendall?
A. Yes.
Q. Dean Runlett?
A. Yes.
Q. And you've mentioned Vincent Raucci already.
Do you remember any other detectives you worked with than those that I've named.
A. George Hill. Leo Bombalicki.
THE COURT: Could you spell the last one?
THE WITNESS: Bombalicki.
THE COURT: Okay.
BY MR. GERARDE:
Q. Anyone else?
A. Offhand, I can't remember all the names right now. I don't remember. A lot of these detectives I can't remember all their names.
Q. Okay. Of every one of those names, those human beings, those first names and last names, those people, did you ever see any one of those persons ever coerce witness testimony?
A. No.
Q. Did you ever see any one of those persons ever fabricate evidence?
A. No.
Q. Did you ever see any one of those persons withhold

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 331 Filed 06/14/26 Page 43 of 88



exculpatory evidence?

A. No.

Q. I want to ask you a few more questions in this same area, because there were questions about the "thin blue line" or the "blue wall of silence."

I'm going to ask you this, starting with Chief Farrell: Is it true that you only had one interaction ever with Chief Farrell?

A. A couple.

Q. Had to do with a commendation that you got on a job well done in a homicide case?

A. Didn't receive a commendation. A special award from the Board of Police Commissioners.

Q. Okay. What I'd like you to do is to open the binder that you have, on Tab 1, and it's -- if you would open to page 237. If you can find your way there. This is your testimony in the deposition in -- that we took.

MR. TALLBERG: What page? Sorry, Tom.

MR. GERARDE: 237.

THE WITNESS: I have it.

BY MR. GERARDE:

Q. All right. Towards the bottom of the page, line 22. Do you agree with, that when you were asked the following question you gave the following answer:

QUESTION: So let's talk about -- did you have any

**Exhibit 4**

interaction with Chief Farrell?

ANSWER: Only one time.

QUESTION: In your entire life?

ANSWER: Only that one time, a homicide.

Right, that was your answer under oath?

Was it -- did I read that right?

A. Yeah. Homicide, yes.

Q. All right.

A. The Dorothy --

Q. So one time with Farrell is your --

A. -- Caccioppoli homicide.

THE COURT: Hold on. Just say that again, Mr. Pettola.

THE WITNESS: Dorothy Caccioppoli homicide.

BY MR. GERARDE:

Q. So you remember the name of the victim of the homicide?

A. Yes.

Q. It was one time you had an interaction with Chief Farrell. It's the one time you spoke to him. I didn't mean to speak to him, but a police-related interaction.

A. I -- when I was a patrol officer I solved a homicide, Dorothy Caccioppoli. And she was, I believe, at the time, if I remember correctly, Chief Farrell's Goddaughter. And she was shot and killed and put into the

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 391 Filed 06/14/26 Page 45 of 83


river, in Quinnipiac River.

Q. You solved it and the Chief was happy about that?

A. Yes.

Q. Okay. Gave you an "attaboy"?

A. More than that.

Q. Got it. All right. Chief Pastore. Am I correct that Chief Pastore never said to you "We have a blue wall here and cops don't ever say anything bad about cops"?

He never said that to you; did he?

A. No.

Q. How about Major Dortenzio; did he ever say to you that you should suppress evidence in order to make the conviction stick?

A. No.

Q. Did he ever say to you that "police officers don't complain about police officers here, there's a blue wall"?

A. No.

Q. How about Major Muller; did he ever say either of those things to you?

A. No.

Q. How about Major O'Connor; did he ever say "We have a blue wall here, police don't rat on police"?

A. No.

Q. Did Major O'Connor ever say to you, you need to suppress evidence -- exculpatory evidence or impeachment

Exhibit 4

Case 3:22-cv-00639-SVN Document 591 Filed 06/11/26 Page 16 of 38



evidence, in order to make our arrests stick and result in convictions?

A. No.

Q. Did Commander Jim O'Neill ever say to you "We have a blue wall here in New Haven, you are not to say anything negative about cops"?

A. No.

Q. Did Commander Jim O'Neil ever say to you, you should suppress evidence, whether it's impeachment or exculpatory, in order to make the convictions stick?

A. No.

Q. Did Lieutenant Louis Loukides ever say to you, "There's a blue wall in the city of New Haven, cops don't talk about cops"?

Say it out loud.

A. No.

Q. Did he ever say to you, you should suppress exculpatory evidence or impeachment evidence in order to make the arrests become convictions?

A. No.

Q. Lieutenant Danny McNulty. He was a training lieutenant; wasn't he?

A. Correct.

Q. And did Danny McNulty ever say to you, in words or substance, We have a blue wall in New Haven, Cops don't talk

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 591 Filed 06/11/26 Page 47 of 83



about cops?

A. No.

Q. Did he ever say to you, We should suppress exculpatory evidence so that we'll make sure our arrests become convictions?

A. No.

Q. And he was the training lieutenant; correct?

A. That's correct.

Q. Yeah. And he never trained you that New Haven Police officers should suppress impeachment evidence so the arrests will become convictions; right?

A. Right.

Q. What about your sergeants? Do you remember Timmy Binkoski?

A. Of course, yes.

Q. Mike Sweeney?

A. Yes.

Q. Bobby Lawlor?

A. Yes.

Q. All right. Did any of them ever say to you, There's a blue wall in the City of New Haven Police Department, Cops don't rat on cops?

A. No.

Q. Did Sweeney, Lawlor or Binkoski ever say to you, We need to suppress exculpatory evidence to make sure our

**Exhibit 4**

Case 3:22-cv-00630-SVN Document 591 Filed 06/14/26 Page 48 of 88



arrests will become convictions?
A. No.
Q. Did Binkoski, Sweeney or Lawlor ever say to you that, We, as police, need to suppress impeachment evidence so that our arrests will become convictions?
A. No.
Q. So, I take it, no one in the New Haven Police Department ever said to you, We need to suppress exculpatory evidence; right?
A. No.
Q. Am I right about that?
A. You're right, yeah.
Q. That's how you were trained -- no one ever said anything differently, by way of supervisors -- that, We do not suppress impeachment or exculpatory evidence in the New Haven Police Department; is that right?
A. Right.
MR. GERARDE: All right. So I'm on Direct Examination now, Your Honor.
THE COURT: Okay.

DIRECT EXAMINATION

BY MR. GERARDE:
Q. Tell me again, please. When did you join the Department?
A. June of 1976.

**Exhibit 4**

Q. All right. And you went to the police academy; is that right?

A. Yes.

Q. You graduated the academy and you became what position; patrol?

A. Patrol officer, yes.

Q. Did you receive recertification training throughout your career?

A. Yes.

Q. Do you remember what that recertification requirement was, in terms of how many hours per year -- per three years, et cetera?

A. I think it was 40 hours, I believe.

Q. Does 60 hours every three years sound right?

A. Yes. Yes.

Q. All right. And there was a training division that would send you to training?

A. We have our own training division, yes.

Q. Yeah. And they kept track of what you needed to keep your certification intact?

A. Yes.

Q. They would say, "Pettola, you need to go to training this week, make your plans," and they would get you the hours and the mandated courses?

A. Correct.

**Exhibit 4**

Q. All right. And do you remember being trained on all kinds of topics, including the constitutional rights of persons who you encountered and make arrests?

A. Yes.

Q. And do you remember there was a code of conduct in the New Haven Police Department regulations?

A. Yes.

Q. Was it Rule 15? Do you remember Rule 15?

A. Yeah, Rule 15. Yes.

Q. All right. Everyone knows Rule 15 generically.

Am I correct that it was against the police department's code of conduct for any police officer to fabricate evidence?

A. Yes.

Q. And am I correct that it was against the police department's code of conduct for any police officer to coerce witness testimony?

A. Yes.

MR. BRUSTIN: Objection. 611(c) now.

MR. GERARDE: It's my last question, Your Honor.

THE COURT: That's sustained. You're on Direct, so it's -- form of the question.

MR. GERARDE: True.

BY MR. GERARDE

Q. Did the code of conduct allow New Haven Police

**Exhibit 4**

officers to coerce witness testimony in the course of their investigations?

A. No.

Q. Did the code of conduct allow New Haven Police officers to withhold exculpatory evidence or evidence of any kind in connection with investigations?

A. No.

MR. GERARDE: All right. I don't have any other questions, sir. Thank you very much.

THE COURT: Thank you, Attorney Gerarde.

Next up from the Defense.

MR. TALLBERG: May I go next, Your Honor?

THE COURT: Yes, you may.

CROSS-EXAMINATION

BY MR. TALLBERG:

Q. Good afternoon, sir. My name is Jim Tallberg, and I represent Detective Raucci. How are you?

A. Good afternoon. I'm doing fine.

Q. Let's jump right into the white bag. You can't pinpoint a date when this occurred with any more precision than it was somewhere in the early '80s, between 1984 and 1988, roughly; is that correct?

A. Middle '80s, but no, more like 1985/1986.

Q. Roughly 40 years ago; right?

A. About 40 years ago, correct.

**Exhibit 4**

C E R T I F I C A T E

RE: *MORANT v. CITY OF NEW HAVEN, ET AL.*
Civil No. 3:22-cv-00630-SVN

Jury Trial Day 7 - Afternoon Session
May 7, 2026

I, Tracy L. Gow, RPR, Official Court Reporter for the United States District Court, District of Connecticut, do hereby certify that the foregoing pages, 1389 through 1475, are a true and accurate transcription of my shorthand notes taken in the aforementioned matter, to the best of my skill and ability.

/s/ TRACY L. GOW
Official Court Reporter
U.S. District Court
915 Lafayette Boulevard, Room 216
Bridgeport, Connecticut 06604
(203) 910-0323

**Exhibit 4**