# Exhibit 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

---

STEFON MORANT,

Plaintiff, Case No. 3:22-CV-630

v. JURY TRIAL, DAY 9 AFTERNOON

CITY OF NEW HAVEN, et al, HARTFORD, CONNECTICUT

Defendants. May 11, 2026

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:

Anna Benvenutti Hoffmann
Nick Brustin
Emma Freudenberger
Amelia Green
Elsa Mota
Grace Paras
Katherine Cion
Neufeld Scheck Brustin Hoffman & Freudenberger, LLP
200 Varick Street, Ste. 800
New York, NY 10014

Kenneth Rosenthal
Law Office of Kenneth Rosenthal
One Audubon Street, Third Floor
New Haven, CT 06511

For the Defendants:

Thomas R. Gerarde
Amanda Stone
Lidia M. Michols
Abigail R. Willauer
Alan R. Dembiczak

**Exhibit 5**

Howd & Ludorf, LLC
100 Great Meadow Road, Ste. 201
Wethersfield, CT 06109
(Representing City of New Haven)

James Newhall Tallberg
Kimberly A. Bosse
Karsten & Tallberg, LLC
500 Enterprise Drive, Ste. 4B
Rocky Hill, CT 06067
(Representing Vincent Raucci)

William J. Melley, III
Law Offices of William J. Melley, III
250 Hudson Street
Hartford, CT 06106
(Representing Robert Lawlor and Vaughn Maher)

Michael T. Ryan
Jonathan Zellner
Ryan Ryan Deluca, LLP
1000 Lafayette Blvd., Ste. 800
Bridgeport, CT 06604
(Representing Michael Sweeney)

Norman A. Pattis
Pattis & Paz, LLC
171 Orange Street, 2nd Floor
New Haven, CT 06510
(Representing Michael Sweeney)

Reported by: Catherine Cullen
Federal Court Reporter
914.552-3201
Catherine_Cullen@ctd.uscourts.gov

**Exhibit 5**

E X A M I N A T I O N


| EXAMINATION OF VINCENT RAUCCI: | PAGE |
|---|---|
| CONTINUED CROSS-EXAMINATION BY ATTORNEY TALLBERG | 9 |
| CROSS-EXAMINATION BY ATTORNEY GERARDE | 16 |
| CROSS-EXAMINATION BY ATTORNEY MELLEY | 20 |
| REDIRECT EXAMINATION BY ATTORNEY BRUSTIN | 23 |

| EXAMINATION OF SCOTT LEWIS | PAGE |
|---|---|
| DIRECT EXAMINATION BY ATTORNEY GREEN | 42 |
| CROSS-EXAMINATION OF ATTORNEY GERARDE | 88 |


**Exhibit 5**

COURTROOM DEPUTY: (Opens the courtroom).

THE COURT: I think before we reconvene with the jury, let's take up the issue of the State Appellate Court opinion dealing with Mr. Raucci.

I read the opinion and what is says. Let me understand from plaintiff's counsel the basis for relevance of the accusation from that case.

MR. BRUSTIN: Initially we were going to introduce this case on Monell. So the allegation, what the witness claimed, is that he had had sex with the rape victim while he was investigating the case the night after and never disclosed it. It became public through the trial and then this subsequent decision.

So relevant to notice and failure to act for Monell. We decided we were not going to do it because it's a little far afield until he volunteered in connection with his bravery that it was a rape case that he got an accommodation for. And that's the only reason we think it's now - we had mixed feelings for doing it. But now that he raised it, we think it's relevant.

THE COURT: To Monell or to impugn his reputation?

MR. BRUSTIN: Now both. It's independently relevant for Monell on notice and failure to act. And now it's also relevant given his testimony to his character,

404(b).

THE COURT: Attorney Tallberg.

MR. TALLBERG: I must object in the strongest terms possible. I've read State v. Horrocks and refreshed my recollection about that.

In that case the criminal defendant charged with sexual assault tried to use this consensual encounter between the detective and the victim to set aside the verdict. This, under 403, risks confusing the jury - looking at a potential trial within a trial - what happened in that unrelated trial that has no bearing on the facts of this case. There are no claims in this case that would make that sexual encounter relevant. And I just think it's also cumulative. There's been a mountain of character evidence against Mr. Raucci and I just think Your Honor has the discretion to draw a line somewhere. And this is one of those instances where it's too far afield, it is going to be unduly prejudicial to Mr. Raucci, and ought not to be allowed.

THE COURT: So I understand, did Mr. Raucci admit at this point that he had actually had a sexual relationship with the victim in that case?

MR. BRUSTIN: Yes, Your Honor. At his deposition.

THE COURT: All right. What is the City's

position given it's now being articulated as Monell evidence?

MR. GERARDE: There was good reason it was not included in the Monell; this is a 2000 decision.

THE COURT: Well, the conduct occurred in 1995. I think the night of the alleged sexual assault described in the Connecticut Appellate Court opinion was October 4th, 1995.

MR. GERARDE: Right. It wasn't public. It's not as if they can claim constructive notice of that happening in the motel or wherever that happened. The only time this has been raised is in this reported decision.

THE COURT: The reported decision says the defense was made aware of it because the State's Attorney's Office disclosed it, and then the defense wanted to use this information during the trial. So somebody was aware of it at the time of the trial at the very least.

MR. GERARDE: So we back up a few years before the Appellate Court decision, it's the late 1990s that there was - Raucci had a disability retirement in 1996. So he had been gone for two years. So I was supposed to be monitoring trials for constructive notice so we can do what? He's not a policeman anymore.

**Exhibit 5**

So at some point the probative value disappears and Your Honor even said that. They are talking about, this is evidence of something that can translate back to a moving force in 1991.

THE COURT: Does plaintiff know when the trial occurred?

MR. BRUSTIN: Looks like April '97.

THE COURT: Okay. So given that it is after Mr. Raucci retired from the police department and that it is allegations of a nature that are different from what is being alleged in this case, I think that it has relatively low probative value in the Monell case and has the risk of confusing the issues and unfairly prejudicing the City as to its use in the Monell claim.

As to its use against Defendant Raucci to show his character or lack thereof, I find it isn't unfairly prejudicial. He himself volunteered somewhat gratuitously that that medal of commendation was given in the context from a rescue of a fire. And it wasn't really necessary to have mentioned it was a rape victim or a rape case. He has thus opened the door to this allegation in investigating another sexual assault case, he actually himself engaged in sexual relations with the victim of that assault.

So it will be admissible as against Mr. Raucci,

**Exhibit 5**

but not against the City for Monell purposes. All right. I don't find that it's cumulative. It's on a different issue as well.

MR. TALLBERG: Understood.

THE COURT: Are we ready for the jury?

MR. TALLBERG: Yes. Shall Mr. Raucci resume the stand?

THE COURT: Yes.

MR. GERARDE: Would Your Honor give an instruction as to limited use of that testimony?

THE COURT: Yes. Did the parties look at the claims list with the addition of the statements about the defenses?

MS. HOFFMANN: Yes. It's acceptable to the plaintiff. Thank you.

THE COURT: Is it acceptable to the defendants?

MR. TALLBERG: Yes, Your Honor.

MR. GERARDE: Yes, Your Honor.

THE COURT: So, we can get that distributed on their chairs.

(Whereupon, the jury enters the courtroom).

THE COURT: You may be seated. Members of the jury, we have left on your chairs the list of plaintiff's claims on this case and a note at the bottom of that, that all defendants deny that they are liable on these claims,

**Exhibit 5**

and there may be defenses you are instructed on at the time of the final instructions. That's marked as Court's Exhibit 4 and that's for you to keep.

We will resume with the examination of Mr. Raucci by Attorney Tallberg. Mr. Raucci, I just remind you, you remain under oath.

CONTINUED CROSS-EXAMINATION BY ATTORNEY TALLBERG

BY MR. TALLBERG

Q. Okay, Mr. Raucci, just a reminder to please speak up into the mic. We have a new court reporter and she is expecting me to go slow and you to answer very crisply. Okay?

A. Yes, sir.

Q. When we ended before the break, we talked about the Ovil Ruiz arrest warrant. Do you recall that?

A. Yes, sir.

Q. There's been a lot of testimony about the statement of Mr. Ruiz and Mr. Morant and others, so I'm going to move forward in the chronology to the March 27, 1991 report prepared by Vaughn Maher. And I would ask, that's part of the police file, pages 451 and 452 of Plaintiff's Exhibit 1, could we pull that up, please. This is already admitted.

So you are seeing that on your screen?

A. Yes, sir.

**Exhibit 5**

Q. So in this report it actually says a couple of times, 'this sergeant'. See that on the second paragraph?
A. Yes, sir.
Q. Referring to Mr. Maher?
A. Yes.
Q. And so at that point he was a senior officer to you; is that right?
A. Yes, sir.
Q. So there was some testimony that you may have directed or asked him to prepare this report; is that the case?
A. No, sir.
Q. Would you as a junior officer have any authority to ask Mr. Maher to prepare this report?
A. No, sir.
Q. Moving on, just two last exhibits. Plaintiff's Exhibit 3, the April 12, 1991 arrest warrant affidavit for Scott Lewis.
MR. TALLBERG: I don't know if this has been offered.
MR. BRUSTIN: There's no objection.
MR. TALLBERG: We would offer that, Plaintiff's Exhibit 3, the April 12, 1991 arrest warrant.
THE COURT: Plaintiff's Exhibit 3 is admitted as a full exhibit.

**Exhibit 5**

BY MR. TALLBERG
Q. You are familiar with and recognize this arrest warrant affidavit for Mr. Lewis?
A. Yes, sir.
Q. What's the date?
A. 4-12-91.
Q. It's just a couple weeks after Mr. Maher's report we just looked at?
A. Yes.
Q. And if we can scroll down to the bottom of page one, whose signatures appear on this arrest warrant affidavit?
A. April 12, '91, my signature.
Q. And who else signed below you?
A. I can't read the writing.
Q. But the final signature on the bottom, 4-12-91, do you recognize that?
A. That's when the judge signs it. I can't recognize the judge's signature.
Q. Do you think that could be Judge Haddon?
A. Yes.
Q. And who - if we can scroll back up - do you have a recollection of this arrest warrant affidavit being prepared?
A. Yes, I do.
Q. You were the affiant, so you were swearing to the

**Exhibit 5**

truth of these statements, correct?
A. Yes, sir.
Q. Who actually prepared, and by that I mean typed up, this arrest warrant affidavit?
A. Cecilia Wiederhold in her office.
Q. That's a separate question. Were you there when this was typed up and this was prepared?
A. Yes.
Q. Where was that?
A. That was in the State's Attorney's Office.
Q. Why was it that you were in the State's Attorney's Office regarding the preparation of this arrest warrant affidavit and not at the police department?
A. Because I was doing some of my work at that office.
Q. Who made the decision with regard to whether Mr. Lewis or Mr. Morant would be charged first?
A. The State's Attorney.
Q. Not you?
A. No.
Q. We have one last exhibit and that is the arrest warrant affidavit for Mr. Morant. This is part of the police file, Plaintiff's Exhibit 1, pages 478 to 483. Could you pull that up, please.
You recognize and are familiar with this arrest warrant affidavit for Mr. Morant?

A. Yes, sir.
Q. And can you explain why was this - first of all, the date on this is what?
A. February 26, 1992.
Q. And can you explain why this warrant came roughly 10 months after the arrest warrant for Mr. Lewis?
A. I don't recall.
Q. Who made the charging decisions concerning which defendants would be charged and in what order?
A. I believe it was Cecilia Wiederhold.
Q. All right. Those are all my questions. Just a few final to conclude here. Sir, you understand that plaintiff's claims against you which have just been circulated in summary form to the jury include a claim that you engaged in malicious prosecution?
A. Yes.
Q. And how do you respond to that?
A. False accusations, sir.
Q. They claim you failed to disclose exculpatory evidence; is that true?
A. No, sir.
Q. Did you ever hide or fail to disclose exculpatory evidence regarding the Turner-Fields homicide?
A. Not to my knowledge, no, sir.
Q. Mr. Raucci, you understand the plaintiff has alleged

**Exhibit 5**

that you fabricated evidence. Did you fabricate any evidence regarding those prosecutions?

A. No, sir, I did not.

Q. You understand you are accused of coercing statements or threatening; did you ever coerce or threaten any of these witnesses?

A. I never coerced or threatened any witness, no.

Q. You understand you are accused of engaging in a civil rights conspiracy with your fellow officers; is that true?

A. No, that's not true.

Q. You understand more globally the claim against you in this case is that you framed Mr. Lewis and Mr. Morant in retaliation for Mr. Lewis having refused an offer from Frank Parise to take over Frank Parise's drug dealing operation because he was going to prison? You understand that's the claim against you?

A. Yes.

Q. How do you respond to that?

A. It never happened.

Q. All right. Finally, you testified that prior to the Turner-Fields homicide investigations you had received these accommodations we heard about, correct?

A. Yes.

Q. Is it also true that in 1995, 1996, after these murder trials were over, you went through what could be

**Exhibit 5**

called a messy divorce with your ex-wife, Donna?
A. Yes, I did.
Q. And it was around that time that the FBI started showing up and interviewing witnesses and people were pointing the finger at you?
A. Yes, they did.
Q. Would it be fair to say that colleagues you worked with your entire career who you thought were friends turned on you?
A. Yes, they did.
Q. And you became the subject of an investigation that resulted in no charges against you, correct?
A. Yes. Yes, no charges.
Q. And then ultimately we have heard, in 1996 rather than continue to fight the false claims against you, you elected to retire with a disability retirement?
A. Yes, I did.
Q. And when in relation to that did you retire to New Mexico?
A. Stayed here about a year. I worked for All Seasons Fence Company. Sometime after that, I left.
Q. You have been gone from the state for 30 years or more?
A. Yes, sir.
Q. Give me one second. These lawyers will have more

**Exhibit 5**

questions, but I don't have any for you, sir. Thank you.
A. Thank you for your time.
THE COURT: Thank you, Attorney Tallberg.
CROSS-EXAMINATION BY ATTORNEY GERARDE
BY MR. GERARDE
Q. Good afternoon, Mr. Raucci.
A. Good afternoon.
Q. I have just a few follow-up questions for you. You indicated that you joined the police department in 1980; is that right?
A. Yes, sir.
Q. And you completed the policed academy?
A. Yes, sir.
Q. Did you attend all training necessary to keep your certification current throughout your career?
A. Yes, sir.
Q. You recall that the New Haven Police Department had a Code of Conduct, Rule 15--
A. Yes.
Q. -- in the regulations?
A. Yes, sir.
Q. And was coercing witness testimony allowed under the New Haven Police Department's Code of Conduct?
A. No, it was not allowed.
Q. Was fabricating evidence allowed under the New Haven

**Exhibit 5**

Police Department's Code of Conduct?
A. No, it was not.
Q. Was withholding exculpatory evidence allowed under the New Haven Police Department's Code of Conduct?
A. No, it was not.
Q. Did any of your supervisors, all the way up to the chief of police, ever state to you in words or substance that if you coerced a witness, don't worry, nothing would happen to you?
A. No, sir. Never.
Q. Did any of your supervisors, all the way up to the chief, state to you in words or substance that you could fabricate evidence, don't worry, nothing will happen to you?
A. No, sir.
Q. Did any of your supervisors, all the way up to the Chief of Police, ever state to you in words or substance that you can withhold exculpatory evidence, don't worry, nothing will happen to you?
A. No, sir.
Q. Do you remember Chief Farrell?
A. Yes, sir.
Q. Did you ever see Chief Farrell condone a New Haven Police officer fabricating evidence?
A. No, sir, I did not.

**Exhibit 5**

Q. Did you ever see Chief Farrell condoning New Haven Police officers coercing a witness's testimony?
A. No, sir.
Q. Did you ever see Chief Farrell condone a New Haven Police officer withholding of exculpatory evidence?
A. No, sir.
Q. And you remember Chief Pastore?
A. Yes.
Q. Did you ever see Chief Pastore ever condone a New Haven Police officer's fabrication of evidence?
A. No, I did not.
Q. Did you ever see Chief Pastore condone a New Haven Police officer's coercion of witness's testimony?
A. No, sir.
Q. Did you ever see Chief Pastore condone a New Haven Police officer's withholding of exculpatory evidence?
A. No, sir.
Q. All right. The final area is, there was some discussion on direct examination that there was a time when Chief Pastore brought you up on charges?
A. Yes, sir.
MR. GERARDE: And I have Exhibit 564. I move it into evidence, Your Honor.
MR. BRUSTIN: No objection.
THE COURT: City's Exhibit 564 is admitted as a

**Exhibit 5**

full exhibit.

BY MR. GERARDE

Q. If we can have the screen up. This is a 16-page exhibit and the jury will have it. I just want to ask you a couple of questions about it. There's a date of January 31, 1996 on this letter that starts the charges from Chief Pastore. Do you see that in the upper left-hand corner?

A. Yes, sir.

Q. In June of 1996, that's when you received your disability retirement; is that right?

A. Yes, sir.

Q. And was disability retirement something that was allowed under your Police Union's Collective Bargaining Agreement?

A. Yes, it was.

Q. So you had a right to that; you qualified?

A. Yes, I did.

Q. And I'll skip to the bottom because I want to ask you a question about that. The jury has the entire document. The last two pages of this exhibit is a letter, December 20, 1996. So this is six months after you retired and it indicates that the Police Commission met and whereas charges were lodged against you and whereas you have a disability retirement. The Police Commission

**Exhibit 5**

elected to take this action, that suspending the investigation that was involved, that was Nicolas Pastore versus Vincent Raucci, but appends and makes a permanent part of your personnel file the charge sheet and all related documents, and that was signed by the Vice President of the Board of Police Commissioners. Have I read that right?
A. Yes, sir.
MR. GERARDE: I don't have any other questions. Thank you very much.
THE COURT: Thank you, Attorney Gerarde. Attorney Melley.
MR. MELLEY: Thank you, Your Honor.
CROSS-EXAMINATION BY ATTORNEY MELLEY
BY MR. MELLEY
Q. Good afternoon, Mr. Raucci. I have a couple of questions. In essence, the crux of this investigation that led to the arrest warrants occurred over three days when the statements were taken of Mr. Ruiz, Mr. Roque, and Mr. Morant; is that right?
A. Yes, sir.
Q. With regard to that first day, Mr. Ovil Ruiz, Sgt. Lawlor was not at all involved in the processing of any information; isn't that right?
A. No, sir. I don't recall.

**Exhibit 5**

Q. And likewise, Det. Maher was not involved at all in the development of the testimony of Ovil Ruiz; is that right?
A. That's correct. Yes.
Q. The next day when Mr. Roque testified, is it fair to say Sgt. Lawlor was not at all involved in the processing of anything that occurred with Mr. Roque?
MR. BRUSTIN: Objection to testimony. I think he misspoke.
THE COURT: You mentioned the testimony of Mr. Roque.
MR. MELLEY: Statement. I'm sorry, I can rephrase.
THE COURT: Thank you.
BY MR. MELLEY
Q. Is it fair to say that Sgt. Lawlor was not at all involved in the statement that was given by Mr. Roque?
A. No, he wasn't.
Q. And just to back up, Mr. Ruiz with regard to that statement, Joseph Pettola was present with you when that occurred; is that right?
A. That's correct.
Q. And is it fair to say on this day in January 1991, you and Joe Pettola didn't necessarily have a warm and fuzzy relationship?

**Exhibit 5**

A. No. No.

Q. You didn't send each other Christmas cards?

A. No, sir.

Q. But Mr. Pettola never complained about anything that occurred in that interview; isn't that right?

A. That's correct.

Q. Is it fair to say that Det. Maher showed up after the advisement of the rights of Mr. Roque at the beginning of the statement of Mr. Roque?

A. I believe he did, yes.

Q. So in other words, he was not involved at all with the preparation for that statement; is that right?

A. That's correct.

Q. And the last statement with regard to Mr. Morant, Sgt. Lawlor was not involved at all in that statement; is that right?

A. That's correct. He was not.

Q. And I think you testified, correct me if I'm wrong, Sgt. Sweeney was with you when you picked up Mr. Morant?

A. Yes, he was.

Q. So with regard to the actual taking of the statement in terms of the preinterview, is it fair to say Vaughn Maher was not involved?

A. That's correct.

Q. He was there for the actual giving of the statement;

**Exhibit 5**

is that right?
A. Yes.
Q. But not the ride to the police station, nor in the pre-statement interview?
A. That's correct.
MR. MELLEY: Thank you.
THE COURT: Thank you, Attorney Melley. Attorney Ryan.
MR. RYAN: I have no questions, Your Honor.
THE COURT: We will proceed with redirect examination.
REDIRECT EXAMINATION BY ATTORNEY BRUSTIN
BY MR. BRUSTIN
Q. Mr. Raucci, I won't be too long. I'll jump around a little. I'll start where we left off. You were asked questions by Mr. Maher and Mr. Lawlor's attorney, and you were specifically asked about whether or not Mr. Maher was present for the preinterview for Mr. Morant. And you said that he was not. You understand, sir, that we played testimony where you indicated he did that interview alone. Do you recall that, right?
A. I missed the last part of that. I'm sorry.
Q. You testified at your deposition that not only was he present for the preinterview, you claimed he did it alone?
A. I don't recall that. I don't remember a

**Exhibit 5**

preinterview, that's the problem.

Q. In any case, what we can all agree on is that Mr. Maher was present when you took the tape-recorded statement of Mr. Morant where there were nine or more times when the tape was stopped and rewound and over-recorded, correct?

A. No. Mr. Maher was present. I did not touch the tape recorder. I don't have an answer for the starts or stops about the tape recorder. I didn't do it and Det. Maher didn't do it.

Q. Okay. We have gone over that and I just want to make it clear that that's when he was there. And again, you have told us different things under oath over the years about whether or not Mr. Maher was present for the preinterview of Mr. Roque. But what we know for sure is that he was present when we know as a matter of scientific fact that tape recorder was stopped 11 different times, correct?

A. No, it's not correct. It wasn't stopped--

THE COURT: Hold on.

MR. TALLBERG: Objection. 701. 602.

THE COURT: So the question embedded there was, we know for sure he was present while the tape was stopped 11 different times. As to that question, I'll overrule both objections and you can answer.

**Exhibit 5**

A. No.
Q. Okay. Moving on. Let's turn to questions from the City's attorney. You were asked some questions about the charges that were brought against you before you retired. Do you recall those questions?
A. Yes.
Q. And you deny, you deny, that anybody in the chain of command, including Chief Pastore, told you that if you simply retired, those charges and the investigation into your other illicit activity would go away. You deny that happening, correct?
A. No one ever told me that, no.
Q. Let's talk about the code of conduct. Was snorting cocaine permissible in the code of conduct?
A. Snorting cocaine was what?
Q. Is that permissible under the code of contact?
A. No, it wasn't.
Q. How about stealing cocaine from drug dealers, was that permissible?
A. No, it's not permissible.
Q. How about selling cocaine, was that permissible?
A. No, it's not.
Q. How about threatening drug dealers, was that permissible?
A. No, it's not.

**Exhibit 5**

Q. How about covering up for other officers when they engaged in criminal misconduct, was that permissible?
A. No, it's not.
Q. And in terms of training, you were asked questions by both your attorney and by Mr. Gerarde about the training you were involved in as a cadet and then your in-service training. Do you remember those questions?
A. Yes.
Q. Fair to say, as we've heard in this courtroom, the most important training you received as a police officer and as a detective is on-the-job training; what do your supervisors expect of you, what are other detectives doing? That's the most important training for any officer; fair to say?
A. That's fair to say, yes.
Q. You were asked some questions about whether or not the chief ever told you to fabricate evidence or coerce statements and to whether or not you ever saw any of the chiefs withhold exculpatory evidence. Do you remember those questions?
A. Yes.
Q. And so let's be clear how the chain of command works. Chiefs of Police, even the department the size of the New Haven, don't sit in on witness interviews; fair to say?
A. Yes.

**Exhibit 5**

Q. So there would be no reason for Chief Pastore to ever be in the room with you when you were, as we claim, coercing a witness; right?
A. As you claim, yes. He was never in there.
Q. He would never see that because he would never be there, right?
A. He wasn't in any of mine, no.
Q. The way the chiefs of police supervise, as we will hear tomorrow when our expert testifies, is they do it through the chain of command; they set expectations for what sergeants should do and what lieutenants should do. That's how they supervise; fair to say?
A. Fair to say.
Q. Now, you talked about some of the accommodations you received over the years. Do you remember that?
A. Yes.
Q. And you volunteered that one of the acts of bravery you engaged in was a fire when you investigated a rape case. And you were commended for it by the chain of command, right?
A. Yes.
Q. I want to ask you about another rape case that you investigated in 1995. In 1995, you were the lead investigator in the Horrocks case, which was a rape case, and as you admitted in your deposition, during your time

**Exhibit 5**

as lead investigator you had sex with the rape victim?

MR. TALLBERG: Objection. 401. 403.

THE COURT: Overruled. You may answer.

A. The timeframe is a little off. It was sometime after the investigation was completed.

Q. Other than to say you understand that there was an upstairs neighbor who testified that you had sex with the rape victim the night of the crime; you understand that?

A. That's not true.

Q. The difference in your version of events is that you did have sex with the rape victim, but it was days later?

A. The upstairs victim was the rape victim. But people down below (indiscernible)--

COURT REPORTER: I'm sorry. But the person down below?

A. The person that did the rape lived on the first floor. She lived on the second floor.

COURT REPORTER: I'm sorry, I'm having a hard time. Can you please slow down. The upstairs victim was the rape victim but the person that was down below--

A. -- down below. The rape victim lived on the second floor.

BY MR. BRUSTIN

Q. The timing of this was approximately October of 1995 when you admitted that you slept with the rape victim in a

case where you were the lead investigator, and that it was only four months later when the other charges were brought against you that we have been talking about today; is that correct, sir?

A. I don't know the correlation between time frames.

Q. You have no basis to dispute that the charges that we just looked at were February of 1996, approximately four months later?

A. Which charge were you referring to?

Q. That you hit someone in the face with a butt of a gun.

A. Yes. You are right.

Q. Okay. And by the way, I didn't make this clear--

THE COURT: Is this an appropriate time for the limiting instruction?

MR. BRUSTIN: Sure.

THE COURT: So members of the jury, you have just heard testimony about another case, Horrocks, which is spelled H-O-R-R-O-C-K-S. The testimony that you have received about that case, you may consider with respect to the claims against Mr. Raucci as an individual but you may not consider that for evidence as to the claims against the City of New Haven or as to the claims of any other individual defendants.

BY MR. BRUSTIN

**Exhibit 5**

Q. Okay. A couple of more questions. So charges are brought about hitting someone in the face with a butt of a rifle, shotgun, and then forging your time records. Those two charges, that is what I'm talking about. Are you with me?
A. Yes.
Q. So during the process of those charges which were dismissed, at no time was the Horrocks issued raised, correct?
A. Was what?
Q. The allegations--
MR. TALLBERG: If I may?
MR. BRUSTIN: I'll withdraw it.
BY MR. BRUSTIN
Q. At no time during the time when the charges were brought against you for hitting someone in the face with the butt of a gun and the time charges, at no time were there any charges brought against you that in any way were related to drug activity, correct?
A. Correct.
Q. That was never mentioned in any of those charges, correct?
A. Correct.
Q. And then they were all dismissed and you retired?
A. I don't know what happened after I retired. I really

**Exhibit 5**

don't.
Q. You told us you retired in good standing and then left?
A. Yes.
Q. You never heard another thing about those charges?
A. No.
Q. Next. I think I heard you right, but you correct me if I'm wrong. I think I heard what you said, which is you never coerced any witness ever. Did I hear you right?
A. That's correct.
Q. Up to today?
A. In my career, period.
Q. Now, you were asked some questions about affidavits that you signed in the State's Attorney's Office with Cecilia Wiederhold. Do you remember those questions?
A. Yes.
Q. Affidavit for Scott Lewis, affidavit for Stefon Morant, correct?
A. Yes.
Q. Now, in the New Haven Police Department, like any police department in the country, when you swear out an arrest affidavit, you provide the information to the State's Attorney that she or he has to rely on your good faith reporting in making an arrest; fair to say?
A. Fair to say.

**Exhibit 5**

Q. In other words, the State's Attorney doesn't do any investigation; they are relying on you to be honest about what happened during the investigation, correct?

MR. TALLBERG: Objection. 602.

THE COURT: Overruled. You may answer.

A. They have inspectors they send out to help with their investigations.

Q. So there was no inspector ever sent out by the State's Attorney in this case on any of the witnesses we have been talking about, correct?

A. I don't know.

Q. We know there's no inspector for Roque or Ruiz or Morant, right?

A. I don't know.

Q. Is that really your testimony?

A. I don't know if an inspector went out. I didn't work in that office every single day. I don't know.

Q. Was there any inspector in the room when you were interviewing Mr. Morant?

A. Could have been - not in that room, but in the office, yeah, it could have been.

Q. In any case, you understood that the DA's, the State's Attorneys in the case, were absolutely reliant on you to give them a good faith reporting of what evidence you gathered and how you gathered it, correct?

**Exhibit 5**

A. Correct. Yes.
Q. All right. You were asked some questions about your age and your head injury. Just to be crystal clear, when you testified in 1994 and 1999 that there were no stops and starts or rewinds on the tape, you didn't have any head injuries or age issues then, correct?
A. I don't believe so.
Q. Now, one of the - so the jury was read information I think already or there will be, about information about an arrest of Mr. Parise in 1995. Did you hear that?
A. Yes.
Q. And you had nothing to do with that arrest, correct?
A. No, I did not.
Q. And his trial was after you retired, correct?
A. I believe so, yes.
Q. And you certainly didn't conduct an investigation in that case, correct?
A. No, I did not. No.
Q. By the way, you know from experience that often times when you arrest drug dealers sometimes they will give up information on other people and sometimes they won't; you never know, right?
A. True.
Q. There's really no rhyme or reason?
A. Correct.

**Exhibit 5**

Q. Which brings me to Diane Basilicato and your efforts there. So first of all, one of the things I heard you asked about was her description, her various descriptions of people she saw and heard.
A. Yes.
Q. One of the things you know from your experience doing many, many investigations is that often times witnesses are not very good at describing race, particularly when it's when they are listening to people as opposed to seeing people.
COURT REPORTER: Listening?
MR. BRUSTIN: I'll withdraw the question.
THE COURT: It was listening.
MR. BRUSTIN: It was listening.
BY MR. BRUSTIN
Q. In your experience, often times lay witnesses, people who are hearing things especially under stressful circumstances, are not particularly good at determining from listening to someone whether they are black or Hispanic or Caucasian? Those aren't things people are good at; fair to say?
A. I can't answer that. I don't know.
Q. Sometimes they are; sometimes they are not?
A. I can't answer that.
Q. But you are much more interested when you are

**Exhibit 5**

interviewing witnesses in details; what were the words you heard, can you describe the person you saw? Those are the details you are interested in; fair to say?

A. Yes.

Q. Far more important, right? Do you agree?

A. You are taking it out of context according to my investigation. What's going on in the city? What's going on in the world? What?

Q. Fair enough. I'm talking about investigating what is far more important are the details they provide you, right?

A. Yes.

Q. Not their characterization or conclusions; the details are what matter?

A. Yes.

Q. The other thing that is significant about the Diane Basilicato interview we heard and saw is, it's an example of you doing things exactly the right way when you want to; isn't that true, sir?

A. When I want to? I want to do it all the right way. Sometimes circumstances - it's not often that way.

Q. In other words, it's an example of you putting the start and stop time and immediately getting a signature?

A. Last time: I never stopped a tape. I don't know, maybe you should check the recorders, because that's the

**Exhibit 5**

only thing I can tell you. That's the only thing you didn't do.
Q. We did check the tape.
A. Oh, is that right? Not the tape, the recorder itself. Maybe it's the recorder.
Q. Did you hear in court Mr. Koenig from the FBI testify?
A. Yeah, he testified to the tape; not to the recorder.
Q. Let me ask it again. Were you sitting in court when Mr. Koenig testified about how he was able to tell from the tape as a matter of scientific fact that the stops and starts and over-recordings came from the original? Did you hear him say that?
A. I did, yes. But he's still wrong. I'm sorry. I don't know how he's wrong, but maybe you should check the recorder.
Q. And you know the recorder obviously no longer exists, correct?
A. The name brand does.
Q. All right. Back to Diane Basilicato. It's an example of you putting the start time, the stop time, and getting a signature, and you can even hear you announcing that on the tape as if it's second nature. Did you hear that?
A. Yes. There were times it sounded like I stopped the

**Exhibit 5**

tape, but I didn't stop that tape either. On that tape today, I heard it. It sounds like I stopped the tape, but I didn't touch the tape.
Q. You understand we don't have to rely on how the tape sounds because we had the FBI Crime Lab analyze that?
A. I understand that completely.
Q. And we also have your testimony in three different proceedings, maybe 20 different times, that you never, almost never stop and start the tape, and you never rewind, correct?
A. That's correct.
Q. Let's talk about confidential informants for a minute. So you were talking about your confidential informant, Paul Carrera?
A. Yes.
Q. And you mention that he was registered?
A. Yes, he was.
Q. Can you explain why no one has ever seen a registration for Paul Carrera? Is it possible that Paul Carrera was a confidential informant for you in the same way that Hector Ortiz was and in the same way that Bobby Wilson was? Is that possible?
A. No. Absolutely not.
Q. No. Okay. And they were confidential informants too, just not registered; right?

**Exhibit 5**

A. Hector Ortiz was registered. Bobby Wilson, he was not my informant.
Q. Hector Ortiz was registered; you just neglected to mention that anywhere in your reports?
A. I wouldn't have to mention it, that he was a registered informant. Why would I do that?
Q. Because of how important it is, as you told us, for the State's Attorney and for the defense to know that.
A. He's a registered informant. I used him for one job. That's all I can remember.
Q. Getting back to Paul Carrera, I want to understand what you are suggesting. Are you suggesting that you were working with Paul Carrera and so people may have made a mistake and thought that you were stealing and dealing and snorting cocaine because you were actually just working in the unit? Is that what you are claiming?
A. I'm not claiming anything. I don't understand the question.
Q. I didn't understand it either, that's why I'm asking.
A. Paul Carrera was an informant that was registered. You can talk to Capt. Garcia, he was there when we registered him, so that's all I can tell you.
Q. By the way, you and Paul Carrera, it sounds like, as your confidential informant, had a good relationship?
A. We had a decent one, yes.

**Exhibit 5**

Q. Never had a falling out, right?
A. No. I got him a job.
Q. In fact, no reason why he would ever make up these terrible lies about you?
A. They would say anything for cocaine. You know that.
Q. Another thing you said is that, and I also was confused but I want to make sure I understand, that you were very careful not to mention operations, drug operations in the police station, because there were too many eyes and ears. Did you say that?
A. We changed our location so nobody would look over our door and see what location we were working at and tell their family members about it.
Q. But it was at the police station you were talking about?
A. Yes.
Q. Is that because you understood that there was a problem with police officers tipping off drug dealers?
A. Yes.
Q. Okay. Also, I just noticed, I had not noticed before, that Diane Basilicato volunteered the name, Reggie Manafee, which the jury heard about in connection with Michael Cardwell. Did you notice the connection when you were investigating?
A. Not during the initial statement, no.

**Exhibit 5**

Q. How about when you went back and reviewed the Michael Cardwell documents, did you think to yourself Reggie Manafee might be a good person to talk to and see if he ever saw Scott Lewis or Stefon Morant?
A. I don't recall that.
Q. Last thing. You mentioned that you were upset or it was uncomfortable for you to be questioned aggressively by me on many topics that I've questioned you about. Is that in part because nobody has ever questioned your conduct in criminal investigations before?
A. No.
Q. That's all I have.

THE COURT: Thank you. Any further examination by any defense counsel?

MR. TALLBERG: Nothing here, Your Honor.

MR. GERARDE: Nothing, Your Honor.

MR. RYAN: No, Your Honor.

MR. MELLEY: No, Your Honor.

THE COURT: Mr. Raucci, you may step down.

MR. TALLBERG: Your Honor, I'm now relieved, the rule is lifted, and I may confer with my client again?

THE COURT: Yes, you may.

MR. TALLBERG: Thank you.

THE COURT: Plaintiff may call his next witness.

MS. GREEN: Plaintiff calls its next witness,

**Exhibit 5**

Scott Lewis.

COURTROOM DEPUTY: Please, raise your right hand.

Scott Lewis, having been duly sworn, testified as follows:

COURTROOM DEPUTY: You may be seated. Please state your name and spell your last name for the record.

THE WITNESS: Scott Lewis. L-E-W-I-S.

COURTROOM DEPUTY: Please state the city and state of your business.

THE WITNESS: West Hartford, Connecticut.

THE COURT: Mr. Lewis, let me give you a few logistics about your testimony before we begin. First, the attorneys will be asking you questions from the podium. Please wait until the attorney finishes their question before you begin answering. And likewise, the attorneys have been instructed to wait for you to finish your answer before they move onto the next question.

Second, if at any time the court reporter says stop, she is merely asking you to repeat what you just said so she can get it down accurately. She is not asking you to put it in any other words.

Third, if you see any of the attorneys standing up as a question is being asked or after, or if they say objection, please stop until I rule on the objection. And

**Exhibit 5**

then if I tell you to answer the question, you can proceed with answering.

THE WITNESS: Understood.

THE COURT: Attorney Green, you may proceed.

DIRECT EXAMINATION BY ATTORNEY GREEN

BY MS. GREEN

Q. Good afternoon, Mr. Lewis.

A. Good afternoon.

Q. How old are you today?

A. Sixty.

Q. And are you currently employed?

A. I am.

Q. What do you do for a living?

A. I'm a real estate broker, entrepreneur, and real estate investor.

Q. I'll ask you more questions about your background, but first I want to start by asking you about the crimes underlying this wrongful conviction case. Okay?

A. Okay.

Q. First of all, did you have anything to do with the October 11, 1990 murders of Ricardo Turner and Lamont Fields?

A. Absolutely nothing.

Q. Back in 1990 when these crimes took place, did you know either of these men?

**Exhibit 5**

A. I did not know either of the men.
Q. Have you ever met them before?
A. I have not.
Q. Have you ever told anyone in the world you committed these crimes?
A. I have not.
Q. Now, the jury has heard evidence that these murders took place in the early morning hours of October 11, 1990. Where were you in the early morning hours?
A. I was working at Minute Man Press.
Q. And what is Minute Man Press?
A. It's a printing franchise.
Q. And you were working there. What was your title at that organization?
A. I was the press operator.
Q. And you were working the overnight shift?
A. Yes.
Q. And in 1990, did you know Stefon Morant?
A. I do.
Q. Do you have any knowledge of Mr. Morant having any involvement whatsoever in the murders of Ricardo Turner and Lamont Fields?
A. I have no knowledge.
Q. Now, were you ultimately arrested for these murders?
A. I was.

Q. And can you tell us the month and year you were first arrested?
A. I believe it was April 15th, 1991.
Q. And were you ultimately convicted of these murders?
A. I was.
Q. What year was your criminal trial?
A. It was May of 1995.
Q. Did you testify at your criminal trial?
A. I did.
Q. When you testified, what was your response to the allegations that you were involved in these murders?
A. That I was innocent.
Q. At your sentencing, did you give a statement?
A. I did.
Q. At your sentencing what was your position as to whether or not you were involved with these murders?
A. That they had convicted a wrongful - I was wrongfully - I was being wrongfully convicted and I was an innocent man.
Q. After your sentencing, when you were incarcerated, did you continue to maintain your innocence?
A. I did.
Q. Was your conviction ultimately vacated?
A. Yes.
Q. And when were all the charges ultimately dismissed

against you?
A. I believe it was August 15, 2015.
Q. In total, how long did you spend wrongfully incarcerated, in jail and prison, for these crimes you did not commit?
A. I believe it was somewhere around 20 years, but it felt like a lifetime.
Q. I want to take a step back and talk about your life before your wrongful conviction.
A. Yes.
Q. Where did you grow up?
A. I grew up in the City of New Haven.
Q. And you told us you were first arrested for these murders in April 1991. So let's take a step back and talk about the time period of 1990 and 1991.
A. Yes.
Q. So back in late 1990, early 1991, how old would you have been?
A. I had to be 25, somewhere around there.
Q. And at that time, what was your education?
A. I finished high school. I was doing a couple of college courses. I was doing a couple of real estate courses.
Q. Okay.
A. Things of that nature.

Case 3:22-cv-00630-SVN Document 59-6 Filed 06/12/26 Page 46 of 138



Q. And where were you living in 1990?
A. I was living in 675 Townsend Avenue, New Haven, Connecticut.
Q. Were you married?
A. I was.
Q. Do you have any children?
A. I do.
Q. How many kids did you have back in 1991?
A. I believe it was four.
Q. And how old were they?
A. I had my first two - my first son was born in 1988, July 4th. Then I had a daughter August 13th that same year. Then my other two were born in 1990.
Q. And you told us earlier that in October 1990 you were working at Minute Man Press. How long had you been working at that specific organization?
A. Minute Man Press franchise, we first went to school January of 1990. We did a few months of training and the business officially opened on July of 1990.
Q. Okay. And had you studied printing in school?
A. I did.
Q. And you also told us you knew Mr. Morant in the early 1990s?
A. Yes.
Q. Do you recall how old you were or approximately your

**Exhibit 5**

age when you first met Mr. Morant?
A. I moved to Fair Haven sometime in 1978, so it had to be around 1978 at the earliest.
Q. Sounds like you don't recall the exact date you met?
A. It's been a long time. We have known each other for a long time.
Q. And how did you come to meet Mr. Morant?
A. We lived in the same neighborhood.
Q. Were you and Mr. Morant the same age?
A. No.
Q. Can you tell me a little about what your recollection is of the age difference?
A. I believe I'm a few years older than Stefon.
Q. In 1991, what was your relationship like with Mr. Morant?
A. We were great friends. Neighborhood friends.
Q. Now, we already covered you were working a printing job in 1990. Around that time period, did you also have involvement selling drugs?
A. I did.
Q. When did you start selling drugs?
A. I believe it was probably around when my first son was born, sometime in 1988.
Q. Approximately, how long a period were you selling drugs?

**Exhibit 5**

A. Probably late 1990.
Q. And are you proud of that?
A. I am not.
Q. What type of drugs did you sell?
A. It was cocaine.
Q. Now, the jury has already heard a lot of evidence about Frank Parise, a major drug dealer in New Haven, and his illicit relationship with Defendant Raucci. But I want to ask you about your knowledge of that.
So at the time you were selling drugs, did you know Mr. Parise?
A. I did.
Q. Who was Frank Parise?
A. Frank Parise was my drug supplier.
Q. Back in 1990, what was your relationship with him?
A. He would front me cocaine to sell.
Q. And in your dealings with Mr. Parise, did you come to learn the names of some of his associates in his drug operation?
A. I did.
Q. And around that time had you heard of a cop named Raucci working in connection with Mr. Parise?
A. I did.
Q. Now, at the time when you were working with Mr. Parise in 1990, what was your understanding of

**Exhibit 5**

Mr. Raucci's role in Parise's drug operation?
A. He would give Frank information that told us, be careful, the narcs are in the area.
Q. And when that information was received, what would you all do?
A. We would pretty much close shop.
Q. And what was Mr. Raucci's reputation in the New Haven community at that time?
A. He was known as a dirty cop.
Q. Now, back in 1990, did you know Mr. Raucci's first name?
A. I did not.
Q. Did you ever see Mr. Raucci with Mr. Parise directly?
A. I did not.
Q. Okay. So you had only heard about him?
A. Yes.
Q. Now, the jury has also heard a lot of evidence about an apartment on Clay Street, so I want to ask you about that apartment.
A. Yes.
Q. Did there come a time when you sold drugs out of an apartment on Clay Street?
A. Yes.
Q. What time period was that?
A. I believe it was sometime in mid-December we started

**Exhibit 5**

selling drugs out of Clay Street, but I leased the apartment sometime in November, I believe.
Q. And of what year?
A. 1990.
Q. And what was the specific address of that apartment?
A. 149 Clay Street.
Q. And who at that time had provided you with the drugs that you sold out of that apartment?
A. I had gotten my drugs from Frank Parise.
Q. I want to be clear about this. Were you personally selling drugs to individual people out of that Clay Street apartment, 149 Clay Street?
A. Not personally, but I would supply the individuals that I had working under my organization the drugs to be sold.
Q. And do you recall the names of some of those people that worked for you out of that house?
A. I do.
Q. Can you give us some of those names?
A. An individual by the name of Jose Roque, Troy Clark, and there was another individual by the name of Dewayne Cunningham.
Q. Today, over 35 years later, do you recall the names of everyone who was selling drugs out of that house?
A. I have no idea who everyone is. I do know that some

**Exhibit 5**

of these guys would have their friends there and they would also do the same thing.
Q. And those people would not necessarily be people working for you?
A. Correct.
Q. Now, you mentioned Mr. Roque. How did you originally meet Mr. Roque?
A. Roque is a younger kid from the area as well. I had a good friend by the name of Michael Rivera, and Jose Roque used to work under Michael Rivera.
Q. Did Roque live in the neighborhood?
A. He did. Yeah, all the kids kind of lived in the neighborhood.
Q. Did you also know him from playing sports in the neighborhood?
A. Yeah. Automatically, you know, sports was a big thing. Obviously, neighborhood basketball games, we would go to the park. We would play football games against different communities. You would have younger kids and older kids both playing in those sports leagues, but unofficially. They were just neighborhood pick-up games.
Q. Giving this set up you described, having people work for you out of that house, did you personally spend a lot of time at that Clay Street apartment, 149 Clay Street, when drugs were being sold out of that house?

**Exhibit 5**

A. I hate to admit, but my whole purpose was to drop off drugs and pick up money, that was it. I was never hanging out with the individuals that were actually selling the drugs.
Q. You told us you rented the apartment on November 30, 1990; is that right?
A. Yes.
Q. And at the time that you were originally renting that apartment, what was the purpose for renting that apartment?
A. My wife and I had separated sometime that summer. I had her living at 675 Townsend Avenue. I started seeing another girl and I was like okay, I have to find her an apartment. And I think I came across that apartment, I'm not exactly sure, but it was less expensive than having her stay in the condo where we were. So I rented the place for her initially.
When I showed it to her, she was like I'm not moving there. So that's where I had to figure out - I already paid the rent - so I had to figure out what was, not the next best thing, but it was already paid for and that's when my brain just said okay, you know what, I'll use it as a drug operation. That's what happened.
Q. When you first rented the apartment, did you have any intention of using it to sell drugs?

A. Not at all.
Q. So I want to put on the screen for the witness, Exhibit 202. Do you remember this document?
A. I do.
Q. What is it?
A. It's the rental application for the 149 Clay Street.
Q. And did you complete this application?
A. I did.
MS. GREEN: At this time I would seek to move it into evidence.
MR. GERARDE: No objection.
THE COURT: It's admitted as a full exhibit, Plaintiff's Exhibit 202.
BY MS. GREEN
Q. All right. It says application for apartment rental at the top right. Why don't we scroll down to the bottom. The bottom right corner, whose signature is that?
A. That's my signature.
Q. What's the date on the application?
A. November 30, 1990.
Q. And is this the application you completed in order to rent the 149 Clay Street apartment?
A. It is.
Q. And so I want to be very clear, before November 30, 1990, when you completed this rental application, were you

**Exhibit 5**

or anyone working for you selling drugs out of 149 Clay Street?
A. Not at all. If you look at the top of the application, you'll notice it has my wife and my two kids names on it. That was the purpose of this application, to have them move into that apartment.
Q. And so before November 30, 1990, you were not even in possession of this apartment?
A. No, I was not.
Q. And so you told us you didn't have the apartment before November 30, 1990, and started using it to sell drugs sometime in December. When did you stop using 149 Clay Street?
A. I think there was a police raid on January 5th, 1991.
Q. And what happened after that police raid?
A. The operation was shut down so.
Q. Now, you told us you were friends with Mr. Morant during this time period. Did Mr. Morant purchase drugs from you to sell at times?
A. At times he did purchase drugs for me to sell, yes.
Q. And what time period specifically would that have been?
A. That was definitely sometime in December, late December, early January of 1990.
Q. So that same time period you were using the Clay

**Exhibit 5**

Street house?
A. Yes.
Q. Now, you told us you and Mr. Morant were close friends. Did Mr. Morant have any major involvement in your drug dealing operation?
A. Not at all.
Q. How would you describe his involvement during that time period?
A. I mean, we were all friends in the neighborhood. I used to get - like I said, Frank Parise fronted me a lot of cocaine. When I say a lot of cocaine, I'm talking about, you know, half of kilos. And a lot of individuals from the area knew that, so sometimes I would sell half ounces, ounces to individuals that were in the area. Stefon Morant at one time was one of those individuals, but he was not part of the operation that I was actually running.
Q. Now, you understand that the crimes you were wrongfully convicted of took place in October 1990?
A. I do.
Q. And you also understand there were allegations that you had involvement with a drug house on Clay Street in October of 1990?
A. I do.
Q. Did you have any involvement in a drug house on Clay

**Exhibit 5**

Street in October of 1990?

A. I did not.

THE COURT: Attorney Green, I know we started a little late, but we will take our afternoon break at 2:15 to stay back on schedule. By my clock, you have two more minutes.

MS. GREEN: Okay. I think this might be a good place to stop.

THE COURT: Okay. Members of the jury, you can take your afternoon break. Same instructions apply, don't research or talk about the case among yourselves. Thank you.

(Whereupon, the jury exits the courtroom).

THE COURT: You may be seated. And, Mr. Lewis, you may step down. During the break don't speak with plaintiff's counsel about the substance of your testimony. All right.

Is there anything I should take up before our break?

MR. GERARDE: No, Your Honor.

MS. CION: Looking ahead to when Mr. Lewis needs to cease his testimony for the day at 3:30, we were trying to pick a read-in that could be published in half an hour, and we think the testimony of Diane Basilicato fits the bill. But the parties have come to what I believe is an

**Exhibit 5**

Case 3:22-cv-00630-SVN Document 159-6 Filed 06/16/26 Page 57 of 138



agreed upon stipulation that goes with the Diane Basilicato testimony, so can we send it to chambers over the break for review?

THE COURT: Sure. What does it pertain to?

MS. CION: Regarding Attorney Richard Emanuel, and this will come out in the designations, but he was present for Diane Basilicato's 2005 identification at the East Haven Police Department. And the stipulation is regarding what Richard Emanuel would testify to if he were called. And, essentially, it's that he would note that the person Diane Basilicato identified with 60 percent surety is Michael Cardwell.

THE COURT: Is that correct, there's a stipulation?

MR. GERARDE: That's fine.

MR. TALLBERG: That's fine.

THE COURT: I'll look over it at the break.

MR. GERARDE: I have an issue. I'm not sure if there's an objection, but we will be utilizing the July 18 letter, Defendant's Exhibit 530. Is there any objection to that?

MR. BRUSTIN: No.

MR. GERARDE: Thank you.

THE COURT: No objection to that?

MR. BRUSTIN: No, Your Honor.

**Exhibit 5**

THE COURT: All right. We will take our break and come back at 2:30.

(Recess).

COURTROOM DEPUTY: The United States District Court is open after recess. You may be seated.

THE COURT: All right. Are we ready for the jury?

MS. GREEN: Yes.

THE COURT: Mr. Lewis, you can return to the stand. I received the stipulation, so I'll read it at the appropriate time.

(Whereupon, the jury enters the courtroom).

THE COURT: You may be seated. Attorney Green, you can proceed with the examination of Mr. Lewis. Mr. Lewis, I'll remind you that you remain under oath.

THE WITNESS: Thank you.

BY MS. GREEN

Q. Mr. Lewis, I want to talk to you about drug supplier Frank Parise. Did there come a time in late 1990 when you had a face-to-face meeting with Mr. Parise?

A. I did.

Q. How did this meeting come about?

A. Frank called me into the restaurant and he wanted to speak to me.

Q. What are you referring to when you say the

**Exhibit 5**

restaurant?
A. So there was a restaurant that Frank owned. I believe it was on Grand and E Street.
Q. Okay. And did you meet with him?
A. I did.
Q. When did that meeting take place to the best of your recollection?
A. It was sometime early December or maybe mid-December 1990.
Q. What happened in that meeting?
A. Frank asked me to take over his drug operation because he had got busted by the federal government on a gun charge and he would be going away for some time, and he asked me to take over the operation on a bigger level.
Q. And what was your response when Mr. Parise asked you to take over his operation on a bigger level?
A. I told him I was not interested in dealing with narcotics on that level. I was pretty much happy with where I was, but at the same time I was in the process of being done with selling drugs.
Q. When you say you were in the process of being done with selling drugs, why was that?
A. Around that time my cousin, Daryl Snyder...
Q. Take your time.
A. So my cousin got hooked on drugs and it pretty much

**Exhibit 5**

made me reevaluate what I was doing, so I decided not to, I wanted to give it up. I saw how it affected him and it made me realize the things I was doing to make a living and how it was affecting other people, and it just wasn't for me anymore.

Q. And other than the discussion and your rejection of his request to take over his drug operation, did you talk about anything else in that meeting?

A. I had owed him money at that particular time and when I denied to take it over, he said that he wants his money.

MR. TALLBERG: Objection. 801.

THE COURT: Do you claim it?

MS. GREEN: This is not being offered for the truth. It's being offered for the fact that it was said, and also in furtherance of the conspiracy by Det. Raucci.

THE COURT: I'm going to allow it for its truth based on the proffer that it's being offered for the - well, first - Sorry. Give me one moment.

I'm going allow it for its truth under 801(d)(2)(E) as a statement of a coconspirator. So the jury can consider that remark and testimony for its truth.

BY MS. GREEN

Q. And so when Parise told you Vinny wants his money, did you know what Vinny, who Vinny was, or who he was referring to?

**Exhibit 5**

A. At that time I did not.
Q. So at that time had you put together that Vinny was in fact the dirty cop Raucci that you had been hearing about?
A. I did not.
Q. And with respect to the money, you said you owed Parise a debt?
A. Yes.
Q. What was that debt owed for?
A. The supply of cocaine. Like I said, he used to front me cocaine. So it was paid on consignment.
Q. Do you recall approximately how much money you owed to Parise back in December of 1990?
A. I believe it was anywhere between that 10 to $15,000.
Q. You mentioned that the apartment on Clay Street got raided on January 5th, 1991. Did the drugs Mr. Parise fronted you get seized in that raid?
A. Yes, they did.
Q. Did you ever pay the money you owed Parise back?
A. I wasn't able to.
Q. Now, I want to talk to you about how you came to first learn that you were being accused of the Turner-Fields murder. Okay?
A. Yes.
Q. So when did you first learn that your name had come

**Exhibit 5**

up in reference to a murder?
A. I believe it was January 17, 1991.
Q. And how did you first come to learn that your name was being tossed around in relation to a murder?
A. Stefon came to me and said hey, you know they had me at the police department the night before and they were saying a lot of stuff, and you know, implicating you in the murder, said you had something to do with this. And I was like what are you talking about. And he just kept rambling. And at that time I decided to call the police department myself to see what was going on.
Q. After you learned from Mr. Morant that the police were trying to put your name into a murder - first of all, did Mr. Morant mention the cop he had spoken with?
A. Yes.
Q. Who did he identify him as?
A. Det. Raucci.
Q. And after you learned this information from Mr. Morant, what did you do?
A. I went down to the police department and confronted the police and asked why my name was being mentioned in a double homicide.
Q. Did you meet with any detectives?
A. I did.
Q. Who did you meet with?

**Exhibit 5**

A. I believe Det. Raucci was one of them, and maybe Det. DiLullo, and there may have been another one but I can't remember.
Q. I want to get this straight. So you learn that your name has come up in some sort of murder investigation and you voluntarily go down to the department and ask to speak to the police yourself; is that right?
A. I went down to the police department, yes.
Q. And why did you go down there?
A. Well, I wanted to clear that up. I just kind of figured out why my name is being implicated in something that shouldn't be, and it was concerning to me.
Q. And when you got there and you met with Det. Raucci, did you voluntarily give a statement?
A. I was interviewed by the police, yes.
Q. Did they ask you questions about a murder?
A. They did.
Q. What did you tell them?
A. I didn't know anything about it. I didn't know the individuals involved, nor did I know the victims.
Q. Now, during the course of this interview with Det. Raucci and DiLullo, and possibly another detective you described, did these detectives ever threaten you?
A. No, I was not threatened.
Q. Did they try and tell you what to say?

**Exhibit 5**

A. No.

Q. Have you ever in the history of the last 35 years of this case, including when you were fighting to prove your innocence, made a claim or allegation that Raucci coerced you in that interview when you voluntarily went down to the department to clear your name?

A. No, I never made a claim of coercion.

Q. Now, in the interview with Det. Raucci, did he ask you questions about drug dealing, your involvement in that?

A. I believe so.

Q. Did you tell him the truth about the full extent of your involvement of selling drugs?

A. I did not.

Q. Did you have any reasons to be suspicious of Det. Raucci at that point?

A. I did. First, I knew Det. Raucci was a dirty cop. Second, he had told me - I said to these guys, I said hey, my friend Stefon Morant said you were implicating me or trying to implicate me in a murder. And he said I don't know what you are talking about, we never talked to Mr. Morant. He didn't know that I actually dropped Stefon off the night before to meet him because his mother called him and said that Det. Raucci wanted to speak to you about something.

**Exhibit 5**

Q. And when you dropped Stefon off, did you have any idea why he was going down there?
A. I did not.
Q. Now, when you were voluntarily giving a statement to Det. Raucci and the other officer in this case, did they ever ask you if you had an alibi for the murders?
A. They did not.
Q. Did they ever even bother to tell you the date of the crime that you were being wrongfully accused of?
A. They did not.
Q. So what happened after you gave that interview?
A. I gave the interview. I was under the impression that it would be over and done with. I kind of knew that they were lying to me about talking to Stefon, and I just went about my life.
Q. You went home?
A. Yeah.
Q. Now, you told us earlier you were arrested on April 15, 1991?
A. Yes.
Q. About three months later?
A. Yes.
Q. At the time of your arrest, were you told you were being arrested for murder?
A. I was pulled over on a traffic ticket by the Milford

Police Department. I knew I was going to get a ticket because I made a left on red instead of a right on red, so I was just prepared to give the officer my driver's license, take a ticket, and keep moving. But then when I looked at my rearview mirror, I saw the police approaching the car with their guns drawn. So they basically put the guns to my head and told me to get out of the car and I was being arrested for murder. And that's how it happened.

Q. And when you learned you were being arrested for murder, what was your reaction?

A. I didn't know - I said, what? It was, I don't mean to cuss, but I was like what the hell, what are you talking about. And the officer that arrested me, I guess he felt it was a little strange because I wasn't trying to flee or run from the police or anything. And when he put me in the car he said New Haven had a warrant out for your arrest for a double homicide. And I asked him who was the arresting officer and he said Det. Raucci. And then I started putting things together that I was being framed.

Q. And on the date of that arrest, did you ultimately have any interactions and speak with Det. Raucci himself?

A. Yes. Det. Raucci picked me up from the Milford Police Department and then drove me down to New Haven Police Department. And as we got out of the police car,

all the media was there. And then he brought me into the elevator to take me up to the detective division, and then he told me I should have never stopped selling drugs in Fair Haven.

Q. When Det. Raucci told you, you never should have stopped selling drugs in Fair Haven, do you know what he was referring to?

A. That's when I tied Frank Parise into it, because Frank Parise is the only one that knew that I was not going to be selling drugs any more.

Q. And did you ultimately come to learn after your arrest Det. Raucci's first name?

A. I did.

Q. And how was that significant to you, if at all?

A. Because Frank had told me back in December that Vinny wanted his money. I only knew Det. Raucci by Det. Raucci. And when I saw the arrest warrant it said Vinny Raucci, and then that's when I put it together, that they were the same person.

Q. Now, after your arrest, did you come to understand the details of how the murder took place that you were being accused of being involved in?

A. I don't know what you mean by that.

Q. I'll ask a better question. How did you start to learn the details of this crime you had nothing to do with

**Exhibit 5**

after you were arrested?
A. Oh, so after the arrest it was a big media case. So they started reporting some of the stuff in the newspaper, and that's when I started finding out the dates of the actual murder, what they were alleging happened in the actual murder, who the players were that was allegedly saying that I was involved in the murder. So that's how I kind of started piecing things together.
Q. Did you get your arrest warrant as well, a copy of that?
A. I think the arrest warrant came after the arraignment, but I did, yeah.
Q. Did you learn that a person called Ovil Ruiz had implicated you in the crime?
A. By way of the newspaper, yes, but I didn't know who that was.
Q. You didn't know the name Ovil Ruiz?
A. I did not.
Q. Did you come to learn that it was a person that you actually did know who it was?
A. Ovil Ruiz, to me, was known by the name of Blockhead. That was his neighborhood name. And I just happened to be in the bullpen with somebody that knew him and he said that's the name that his cousin used but his real name is Agustin Castro. So that's when I started putting those

**Exhibit 5**

things together.
Q. So you didn't know an Ovil Ruiz, but you did know a Blockhead?
A. Yes.
Q. Where did you know Blockhead from?
A. Blockhead was a friend of Jose Roque who we called Mac Tonight.
Q. And do you recall Blockhead being involved in the house on Clay Street today?
A. I don't recall Blockhead being there, but I do know that there were friends of individuals that were part of my organization that visited that house.
Q. And so it's possible he was there?
A. It's definitely possible.
Q. Now, over the course of your criminal proceedings, did you ultimately receive the statements the New Haven Police Department, and specifically Raucci, claiming he took from Mr. Ruiz?
A. I did.
Q. And did you come to learn about other statements taken by the New Haven Police Department, specifically Raucci, implicating you in the Turner-Fields murders over the course of your proceedings?
A. I did.
Q. You have already made clear you had nothing to do

with these murders, but I want to ask you specifically some specific questions about some of the allegations in these statements. Okay.

First of all, were you ever in a car with Ovil Ruiz or Stefon Morant on the morning of October 11, 1990?

A. I was not.

Q. Did you ever in front of Ovil Ruiz, Stefon Morant, Jose Roque, or anyone, tell anyone that you had something to do with this crime that you had nothing to do with?

A. That conversation never happened.

Q. Before the crime took place, did you make any admissions about the crime?

A. I did not.

Q. After the crime took place, did you make admissions about the crime?

A. I did not.

Q. You told us you never met the victim, Mr. Turner, one of the victims, Mr. Turner. Do you ever have a relationship with Mr. Turner of any kind?

A. I didn't know Mr. Turner so there could be no relationship.

Q. Have you ever been to the home of Mr. Turner, this man you never met, at 634 Howard Avenue?

A. I have not.

Q. Having never been there, had you ever been there with

**Exhibit 5**

Ovil Ruiz or Stefon Morant?
A. I have not.
Q. Did you ever keep any guns in a bag at this place you have never been?
A. I don't own guns.
Q. Did you ever throw a gun into the Mill River?
A. I did not.
Q. Have you ever owned a gun in your life?
A. I did not.
Q. Let's talk about something different. Let's talk about the time period between your arrest in April 1991 and your criminal trial in 1995. Were you incarcerated for the entire period between your initial arrest in April 1991 and your 1995 criminal trial?
A. I was arrested in April 1991. I was released on bail in August of 1991.
Q. Okay. And how did you come to be released on bail?
A. The state was not able to proceed with a probable cause hearing and I refused based on my lawyer's advice to wait. My lawyer wanted me to waive my probable cause hearing, and I said under no uncertain terms am I waiving anything. And they were not able to proceed with probable cause and as a result of that they had to reduce the charges. And as a result of them reducing the charges, I was able to make bond.

**Exhibit 5**

Q. And so what were the murder charges reduced to before you made bond?
A. I believe it was manslaughter or something along those lines.
Q. What was your understanding of why the state couldn't proceed with the probable cause hearing back when you were first arrested?
A. I was under the impression they were trying to get Morant to try to testify falsely and Morant refused and therefore they couldn't go forward.
Q. How long were you out on bond; a period of weeks, months?
A. I was on bond through September 19 - actually, I was on bond until they rearrested me on new information in September of 1994, and then the probable cause proceeded sometime in May of 1995, so I was out on bond that whole time.
Q. Literally years?
A. All four years, yeah.
Q. And what was the supposed new information you were arrested on, your understanding of it?
A. It was crazy. First, I think in the first warrant I think they had Ruiz saying that he drove me to the car. But no, first warrant he said - I forget. There were so many stories, it was crazy.

**Exhibit 5**

I think the first time it was based on Ovil Ruiz just overheard a conversation and I think Stefon drove the car and I was supposed to go up.

And then when Stefon didn't cooperate with them, now it was Ruiz drove the car and Stefon and I both went upstairs. It has changed so many times, I couldn't keep up with it.

Q. A brand-new statement from Ruiz?

A. Yeah.

Q. And when that supposedly new information came out, were your murder charges reinstated?

A. Yes.

Q. Let's talk about your criminal trial in 1995. What was your expectation of going into that trial?

A. My expectation was to win.

Q. You told us you testified at your trial. What's your position before the jury regarding allegations against you?

A. That they were all false and fabricated.

Q. Did you present your alibi at the trial?

A. I did.

Q. Did you present alibi witnesses?

A. I did.

Q. Who?

A. Jeffrey Rochler, Chris Corcoran, and it may have been

one or two others, but they were with me at Minute Man Press the night we were working.
Q. Colleagues you were working with that night?
A. Yes.
Q. Let's talk about what you did to prove your innocence after your wrongful conviction. After you were wrongfully convicted, did you reach out to any law enforcement authorities?
A. I did.
Q. Who did you reach out to?
A. Well, I figured that the best shot I had, given that I had no money, was call the FBI. That's what I did.
Q. And when did you call the FBI in relation to the time period of your trial?
A. I believe it was the day after the jury found me guilty.
Q. And what month was your trial in, do you recall, in 1995?
A. Actually, I believe the conviction came down May 10, 1995.
Q. Now, did you ultimately have a meeting with the FBI?
A. I did.
Q. When was the first meeting, do you recall?
A. I don't. But they did meet with me and I gave them the story.

**Exhibit 5**

Q. Okay. I'm going to show you a document and see if it refreshes your recollection on that date. Okay?
A. Sure.
Q. I would like to put on the screen Plaintiff's Exhibit 4, just for the witness, the FBI report. And page nine, please.
Mr. Lewis, could you read the first paragraph to yourself so you can orient yourself to what the report is and then I'll direct you to the date at the bottom.
A. Okay.
Q. Let's take a look at the bottom.
A. Okay.
Q. Do you see the bottom left?
A. Yes.
Q. Does this refresh your recollection on the date of your first meeting with the FBI, in-person meeting?
A. Yes.
Q. When was that?
A. May 16, 1995.
Q. Who did you meet with in that first meeting?
A. I believe it was Lisa Bull.
Q. And did you ultimately have a series of meetings with the FBI?
A. I did.
Q. Do you remember the names of the other agents you met

**Exhibit 5**

with?
A. Brian Donnelly.
Q. And what did you report to the FBI in those meetings?
A. I reported to the FBI that I was framed by Det. Raucci and Vincent - Detective Vincent Raucci and Frank Parise over a drug debt.
Q. And did you explain to the FBI your knowledge of Raucci's involvement and Parise's drug operation?
A. I did.
Q. Did you report to the FBI the statement Parise made to you that Vinny wants his money?
A. I did.
Q. Did you report to the FBI the statement that Raucci made to you, that on the date of your arrest, that you should have never stopped selling drugs in Fair Haven?
A. I did.
Q. Did you do your best to report the information you knew about Raucci's corruption?
A. I think at that point, you know, I was facing 240 years, and I needed somebody to look at the investigation. So when I called them I was like, I'm throwing myself at the mercy of whatever happens, you know. I was a drug dealer, I can admit being in jail, for being convicted for selling drugs. But I was not a murderer and I couldn't tolerate that, so I told the FBI everything, including my

drug involvement.
Q. Now, after your first interview with the FBI in May of 1995, that year did anyone contact you from the New Haven Police Department?
A. Yes.
Q. Who was that?
A. Chief Pastore. Nicolas Pastore.
Q. Chief of Police Pastore contacted you after your conviction?
A. Yes, he did.
Q. And where did that contact take place?
A. He actually came to visit me on my birthday, July 10th, at the New Haven Correctional Facility.
Q. And that was in 1995?
A. Yes.
Q. Now, have you ever met Chief Pastore before?
A. I have not.
Q. Did you know he was coming to visit you in jail?
A. I did not.
Q. He didn't give you any notice he was coming to see you?
A. Not at all.
Q. So tell me about that visit. What happened, how did you come to learn he was there to see you, and what happened in the conversation?

**Exhibit 5**

A. When you are in jail, they call you, "Inmate Lewis, you have a visit." I was not expecting a visit. I got there, it was Chief Pastore. And he started talking with me saying that he had come to learn that I was making allegations that he had a crooked cop on the force. And I told him the same story I told the FBI.
Q. Was it your understanding he had learned that from the FBI?
A. At that time, yes, that's the only place he could have learned it from.
Q. And what did Pastore ask you and what did you tell him?
A. He asked me who it was. I told him Det. Raucci. And he basically walked around, walked away, saying I don't believe you, I don't have a dirty cop on my force. And that was it.
Q. Did you tell Pastore about your innocence?
A. I did.
Q. Did you tell Pastore, you said the information, you told him the same information you reported to the FBI?
A. I did.
Q. Including Raucci's involvement and Parise's drug operation?
A. I believe so, yes.
Q. And what was Pastore's response?

A. That he didn't have a dirty cop on the force.
Q. Is that how the conversation ended?
A. Pretty much.
Q. Were you shy about telling Chief Pastore that you had been framed and that he had a dirty cop involved in drug dealing on the force?
A. I've never been shy to say anything to anybody about anything.
Q. Were you trying to hold anything back sitting wrongfully incarcerated in jail?
A. At that time I had nothing to lose, no reason to hold anything back; I was looking for help.
Q. Now, after Chief Pastore told you he didn't believe you and left, after that meeting did anyone from the New Haven Police Department ever contact you again to learn about your knowledge of Det. Raucci's criminal activity?
A. I don't know what you mean by that question.
Q. Did anyone, after Pastore dismissed you and left, from the New Haven Police Department try to contact you again to learn more?
A. No.
Q. Did they try to contact you to learn more about how you had been set up by Raucci? Did anyone try to contact you?
A. No.

**Exhibit 5**

Q. Now, the City in their opening statements in this case claimed that you were rightfully convicted and you were on a supposed pressure campaign to get the FBI to reverse a rightful conviction. Did you pressure the FBI into investigating Raucci?
A. I simply called the FBI to report it, what I told them, and they came voluntarily. I don't think I got that kind of power.
Q. Did you trick the FBI into conducting a year's long investigation into this detective?
A. Actually, the FBI gave me three or four polygraph examinations, so there was no tricking.
Q. Do you have an understanding of the results of those polygraphs?
A. That I passed. I think that's the reason why they looked into the case.
Q. Now, over the history of this case have you ever threatened anyone or any witness in connection with this case?
A. I have not.
Q. I want to talk about the contacts, any contacts you have had with Ovil Ruiz after you were first arrested in April 1991. Did you have any contact or try to make contact with Ovil Ruiz when you were first arrested and before your trial, before you were out on bond?

**Exhibit 5**

A. I believe so. I think at this point, and I'm not sure, but I think Stefon went to trial first, because for some reason they kind of reversed course and they went after Stefon because he wouldn't testify against me. And then they convicted him. And then he still wouldn't testify against me, and then they brought me to trial.

I thought, in my mind I thought they thought I was going to run, because I was living in Atlanta at that time. So I came to trial because I had nothing to run from. And I saw that an innocent person can be convicted based on lies.

So my efforts to Ruiz was to try to get him to tell the truth, because I didn't want to see myself in the situation that Stefon was in a year prior to me going to trial.
Q. It sounds like you don't recall the first date you tried to contact Ovil Ruiz?
A. I don't know the exact date.
Q. But in any event, did you send a letter to him?
A. I did.
Q. Did you sign that letter in your own name?
A. I did not.
Q. Whose name did you sign it in?
A. I believe it was either Mike Love or Jose Roque.
Q. And why did you sign it in someone else's name?

A. I didn't know Ovil Ruiz.
Q. And to be clear, did you know Ovil Ruiz to know Mike Love and Jose Roque?
A. I did.
Q. And what was your intent in sending a letter to Mr. Ruiz before your trial?
A. I already saw what they did to Stefon. They forced him to give a false statement, then they used it against him to convict him. And I was pretty much advising him, pretty much don't fall for their tricks, they can't charge you with a crime if you don't know anything.
Q. And did that letter work?
A. Not at all.
Q. And after you were convicted and incarcerated, did you have an occasion to see Ruiz in person?
A. I believe we were in the bullpen together at some point, yes.
Q. And did you have a conversation with him?
A. Yes, I believe so.
Q. Did you report that conversation to the FBI?
A. I reported everything to the FBI.
Q. Okay. And as you sit here today, do you recall the substance of that conversation?
A. I don't.
Q. In these contacts with Mr. Ruiz, did you ever try to

**Exhibit 5**

get him to do anything other than tell the truth in your case?

A. The only thing I tried to get everybody to do is tell the truth. I never tried to get anyone to lie about anything.

Q. Let's talk about efforts you made beyond contacting the FBI while you were incarcerated to prove your innocence.

So other than contacting the FBI when you were in prison, did you make other efforts to try and get your conviction overturned and prove your innocence?

A. I did.

Q. So the jury has heard from Professor Dignam regarding your representation of you and the evidentiary hearing that led to your release. Before you were represented by the professor and the law clinic, did you seek to challenge your conviction and post-conviction proceedings?

A. Yes.

Q. Who represented you in the vast majority of those proceedings?

A. I represented myself pro se.

Q. Can you talk to us about your pro se efforts to represent yourself?

A. Well, again, this is just my perception of what was going on. I realized that, obviously I didn't have the

**Exhibit 5**

money and they were giving me court appointed attorneys, public defenders, and at that time they were just trying to get me to waive everything. Just waive your probable cause haring, waive this and waive that. I didn't think they were fighting to establish my innocence. I think they were saying the state had the burden of proving you guilty, and I was like that's pretty much not my position, I'm trying to prove my innocence, I don't care what the state burden is.

And then the appellate process was a little different, because the appellate process they can only go on what the Trial Court record had established. So I said to myself I'm not going to allow that to happen again, that I wanted to take control, and to take control of my life or the legal proceedings. So at the end of the day if it didn't work, I was the one in prison; it wasn't the lawyers because they were trying to take me this way and I was trying to go this way.

Q. Did you represent yourself in any evidentiary hearings?

A. I did.

Q. Did you file motions on your own behalf?

A. I did.

Q. Did you seek to uncover new evidence from your prison cell?

**Exhibit 5**

A. I did.
Q. Did you take any course work to better represent yourself?
A. I did.
Q. What was that?
A. I took a paralegal course. I took an Associate's Degree in Paralegal Studies. I just studied a lot of case law. And I just applied the truth to what the law allowed me to do and that's what I did.
Q. So let's fast forward now. I want to talk to you about your life since you were released from prison and those charges were dismissed in 2015. After you were released, did you start working?
A. I did.
Q. What's the first job you took?
A. Good question. I pretty much took any job that came up. But I think I was selling vacuum cleaners.
Q. Door-to-door?
A. I was. Yes.
Q. Did you go back to school?
A. I did.
Q. What type of school?
A. I finished my real estate course. I testified earlier that I was transitioning out of the drug game because of what was going on with my cousin and I just

**Exhibit 5**

kind of had to re-examine what I was doing with my life and how it was affecting other people's lives. So at the time I started the real estate course and I was about to finish and pass the test right before I got arrested, so I picked it up when I came home.

Q. And did you get your real estate license?

A. I did.

Q. Did you get your broker's license?

A. I did.

Q. And have you done everything in your power to try to rebuild your life?

A. I have.

Q. And never the less, does your wrongful incarceration and conviction still impact you today?

A. Definitely.

Q. Can you tell us a little bit how?

A. I have four grown kids that I - some connections you can't get back. That's the only way to say it.

Q. And since the charges were dismissed in 2015, has anyone from the New Haven Police Department contacted you to apologize for what this department did to you and Mr. Morant?

A. Det. Sweeney is the only one. He's the only one that reached out and said that he was sorry.

Q. And since all the charges were finally dismissed

**Exhibit 5**

against you in 2015, has anyone in the New Haven Police Department contacted you to investigate what went wrong here and what they could have done differently to print your and Mr. Morant's wrongful conviction?

A. The only thing the City of New Haven is doing is just making shit worse. Excuse my language. No. The answer is no.

Q. I want to talk about your relationship with Mr. Morant today. Have you been in touch with Mr. Morant since you both have been released from prison?

A. Oh, yeah. Yes. Stefon is more than a good friend. He's sacrificed his life just because he stood up for the truth. And the only reason they took him down was because he wouldn't testify against me. That's the only reason.

Q. What does that mean to you?

A. People just don't do that. I think what people need to realize is when people fall for the lies that the police tell, nine times out of 10 it ends in violence. And for Stefon to sacrifice his life, to stand on the truth, he didn't have to do that. It cost him 20 years just to stand by me.

Q. Thank you, Mr. Lewis. I don't have any further questions. I think the other attorneys do.

THE COURT: Thank you, Attorney Green. Mr. Lewis, the defense cross-examination will be next, but

**Exhibit 5**

Case 3:22-cv-00630-SVN Document 159-6 Filed 06/12/26 Page 88 of 138



we are aware of the 3:30.

THE WITNESS: Thank you.

CROSS-EXAMINATION BY ATTORNEY GERARDE

BY MR. GERARDE

Q. Good afternoon, Mr. Lewis.

A. Good afternoon.

Q. I have on the screen Exhibit 202. It's the one marked today. It's what you are calling your apartment rental application. Do you remember that?

A. Yes, sir.

Q. This is a document you had and you were able to provide to the Morant team?

A. Yes, sir.

Q. Is all the writing your writing on this?

A. I believe so. I don't have any reason to believe it's not.

Q. So the upper right-hand corner doesn't say a number on Clay Street. It just says Clay Street, right?

A. Yes.

Q. How come it doesn't say 149 Clay Street?

A. I can't answer that right now. I have no idea.

Q. As we look at it, this has got your signature in the lower right-hand corner?

A. Yes, sir.

Q. And a date of 11-30-90 just to the left?

**Exhibit 5**

Case 3:22-cv-00630-SVN Document 59-6 Filed 06/12/26 Page 89 of 138


A. Yes, sir.
Q. Was something erased? Was there some kind of white-out that was a different date before then?
A. I couldn't tell you that. I doubt it. If it was, it wasn't by me, I can tell you that much.
Q. There's no signature of a landlord on here, is there?
A. Not that I see. I think the landlord notes are on the side. So those would be the writing of the landlord, I think. I think what this document shows based on what I'm seeing, I told him it was going to be for my wife. So he wrote my wife and my kids names down and then his notes would be on the side.
Q. So this isn't a lease?
A. It is whatever he made me fill out for the apartment. It says application. So the notes from him are on the side of the application.
Q. In your real estate business, the leases look a lot different than this, don't they?
A. It depends on the landlord, sir.
Q. So you were arrested for the Turner-Fields homicide, you said April 1991?
A. Yes.
Q. And you realized shortly thereafter that there was a statement that had been made against you by this person, Ovil Ruiz, who you knew as Blockhead?

**Exhibit 5**

A. Yes.
Q. Do you know he had a birth name, Agustin Castro?
A. I learned that, yes.
Q. And am I correct that you and allies immediately began to communicate to Ruiz in an effort to try to get him not say you were involved in the homicide?
A. What do you mean, allies?
Q. Friends, either you or someone on your behalf?
A. I reached out to Ovil Ruiz. I didn't say for him not to say that I was in a homicide. I was trying to protect him from them arresting him. I was already arrested, sir.
Q. But you were arrested and you knew that he was the person who identified you as going into the house?
A. No. I knew at that time that he said he overheard conversations. And then there was a second arrest warrant saying that Stefon and I had went upstairs, yes.
Q. You just said a second arrest warrant. Do you mean a second statement by Ruiz?
A. No. There was literally a second arrest warrant.
Q. For you?
A. Yes.
Q. And the basis for the second arrest warrant was the information based on Ruiz's May 1991 statement, right?
A. I believe so, yes.
Q. And I'll call up Exhibit 730. There's no objection

to that. I'm sorry, 530. I have on the screen Exhibit 530. This is a communication from you to Ruiz, right?
A. Yes, sir.
Q. I'm going to spend a minute on this, but we will come back to it. July 18, 1991, is the summer after you're arrested, right?
A. Yes, sir.
Q. And it begins, "Yo, Block, what's up in there". And that's you saying hello to Blockhead, right?
A. Yes, sir.
Q. And I'm mindful of the time, so I'll roll down for now and talk to you about this at the next session. But this letter is signed Mike Love and Mac Tonight. Do you see that?
A. Yes, sir.
Q. Who is Mike Love?
A. Mike Love was a friend of mine. And Mac Tonight was a guy that Mike Love - Mac Tonight worked under Mike Love. I testified to that earlier on direct.
Q. So Mike Love is Mike Rivera?
A. Yes, sir.
Q. One of your lieutenants in the operation?
A. No, sir, he was not a lieutenant. We were neighborhood friends. He was not a lieutenant.
Q. So he wasn't involved in any of the cocaine dealing?

**Exhibit 5**

A. I'm not saying he wasn't involved in cocaine dealing. He was not involved in cocaine dealing for me.
Q. And Mac Tonight is Jose Roque?
A. Yes, sir.
Q. Is it Roque(ROE-KAY) or Roque(ROKE)?
A. You will have to ask him.
Q. All right. So this letter is signed Mike Love and Mac Tonight. And would you explain why the name Scott Lewis is not on this letter?
A. Yes. Because I did not personally know Blockhead or Ovil Ruiz or Agustin Castro.
Q. So you figured that if you - but you knew that Castro slash Blockhead knew Mike Love and Mac Tonight?
A. I knew that, yes, sir.
Q. So you thought it would be a more effective communication if it came from someone he was friends or familiar with?
A. Well, if you go back to the beginning of the letter, I started the letter in the way that was helping him. I never said it was helping me.
The first paragraph simply says it was helping him. Although I knew they were trying to get him to lie on me, it was for him to wake up, because I already saw what they were doing.
Q. I'm at the bottom of the first page it reads, be

**Exhibit 5**

strong and stay quiet. This is your writing, right?
A. Yes, sir.
Q. Asterisk, you know nothing, they got nothing.
A. Yes, sir.
Q. I might come to court on August 14, 1991?
A. Yes, sir.
Q. But remember, don't incriminate yourself for nothing.
A. Yes, sir.
Q. And then you wrote, if you do, you are through?
A. Yes, sir.
Q. And then you write, Exchange Street Posse?
A. Yes, sir.
Q. What's the point of that?
A. We play neighborhood football games. Exchange Street was a popular street in Fair Haven. So if we played other areas from The Hill, they would have their street names and we had our street names. And that is what he was familiar with. So like I said, I was trying to be his friend. And the letter was stupid; I can admit that to this day.
Q. All right. And just to finish the letter off, you wrote Exchange Street Posse a second time?
A. Yes, sir.
Q. Is that to warn him to watch out for the posse if he didn't cooperate?

**Exhibit 5**

A. No, sir.
Q. I'm going to pull this down for a minute and --
THE COURT: Do you want to move that into evidence?
MR. GERARDE: Yes.
THE COURT: Defense Exhibit 530 is admitted as a full exhibit.
MR. GERARDE: Thank you.
BY MR. GERARDE
Q. Now the jury can see it. And I think I will bring you back so the jury can see this.
This letter is written, and on the second page or so you will see it says, Mike Love and Mac Tonight. That's the signature part, right?
A. I believe so.
Q. And then there's a P.S.?
A. Yeah.
Q. Okay. I think what we will do since this letter is up is we will go through this, because we only have six more minutes before you have an issue.
It reads on top, hold on, help is coming. What did you mean by that?
A. Because I knew the police were trying to coerce him into giving a false statement.
Q. By this time, July 18, 1991, did you know he had

**Exhibit 5**

given that May 28, 1991, statement?
A. I'm not sure if I knew that or not. I do know they were not able to go to a probable cause hearing because Morant wouldn't testify. I do know what they did to Morant and obviously they were trying to do the same thing to him.
Q. Are you aware that when Ruiz gave his May 1991 statement, that he had his lawyer sitting with him?
A. If you call Mike Moskowitz his lawyer, then yes.
Q. Well, he called him his lawyer. You don't dispute that, do you?
A. Hey, I'm not - I'm just saying that he was not representing the kid good enough.
Q. Well, you were not there, were you?
A. I wasn't. But I do know you don't let at 16-year-old incriminate himself in a murder case that he had nothing to do with. I do know that much.
Q. So you write, Yo Block, what's up in there. Word is all over town that you are going to get charged with that murder and they are going to give you a deal.
So you are saying to him what there?
A. Don't fall for it. It says it. It says, don't fall for it; they are setting you up.
Q. Don't believe that shit. They are setting you up big time to take the fall.

**Exhibit 5**

Case 3:22-cv-00630-SVN Document 59-6 Filed 06/12/26 Page 96 of 138


So you are essentially saying to him, if he continues with his cooperation and giving statements, it's going to get bad for him because he's going to take the weight?

A. Well, usually when people confess or give statements to the police that implicate themselves, they usually end up getting charged for the very crimes.

So that was the intention of that letter. I'm not going to say that it was a smart thing to do, but at that time I was facing a double murder charge for a crime I didn't do and I needed to establish my innocence, and I knew that they were using a troubled kid to try to get to me.

Q. Did you know him at all in terms of like, knowing him to say, hello Blockhead, and he will say, hello Scott?

A. I knew who he was. I didn't know him. I didn't have a personal relationship with him or anything like that. I knew who he was through Mike Love, Mac Tonight. I knew he was a friend of theirs. That was the extent, which is why I didn't sign my name and why it wasn't coming directly from me.

Q. Leaving aside the time the 149 Clay Street was under your control, occupation, or rights to enter, whatever you want to call it, leaving aside the time of when that happened, did Blockhead ever deal cocaine from that house for you?

**Exhibit 5**

A. No, he did not.
Q. You are certain of that?
A. I'm positive of that.
Q. And what about Jose Roque, Mac Tonight?
A. No, he did not.
Q. Mike Rivera?
A. No, he did not.
Q. Did anyone deal cocaine for you out of 149 Clay Street at any time?
A. Prior to December or post?
Q. Any time. I'm leaving aside the fact that you say I didn't even get there until November.
A. So with that understanding, I would say there were three people that sold drugs for me at that location. Mac Tonight, Troy Clark, and Dewayne Cunningham.
Q. Dewayne Cunningham, is that Cutty(ph)?
A. Yes, sir.
Q. But you also said sometimes those guys had their friends over there helping out?
A. Yes, sir.
Q. And that was permitted?
A. It wasn't permitted. It wasn't authorized by me, but I can't control people. You are talking about the drug business, sir.
Q. How did the people who dealt the cocaine out of that

**Exhibit 5**

house get the supply from you?
A. Are you talking about the people that worked for me? The three individuals that worked for me would get it directly from me.
Q. Would you bring it to the house?
A. I would deliver it and pick up cash, yes.
Q. And would you deliver it, was it in the form ready for sale? So if it's small $10 bags, it was already in bags and bundled up?
A. Most likely, yes.
Q. Where did you keep your stash, the large amounts that became small packages?
A. They could have been in different locations, yes.
Q. How about over at Rick Turner's house?
A. No, sir.
Q. You are certain of that?
A. I'm positive of that.
MR. GERARDE: I'm at a point where I'm about to switch to something else.
THE COURT: Okay. Mr. Lewis, we will pick up with your testimony tomorrow.
THE WITNESS: Thank you.
THE COURT: You are excused for the day. Overnight, don't speak to plaintiff's counsel about your testimony.

**Exhibit 5**

Case 3:22-cv-00663-SVN Document 156 Filed 06/16/26 Page 190 of 139



THE WITNESS: All right. Thank you.

THE COURT: Members of the jury, just to accommodate a scheduling conflict, we are going to pick up with some read-in deposition testimony for the remainder of the day.

MS. HOFFMANN: This is from a prior proceeding and it's Diane Basilicato.

THE COURT: Let me correct myself.

MS. HOFFMANN: Two prior proceedings, testimony from Diane Basilicato.

THE COURT: So the first testimony that will be read in is the testimony of Diane Basilicato given at the trial of Mr. Morant on May 27, 1994. Direct examination was originally conducted by Mr. Gold and cross-examination was conducted by Mr. Morant's attorney.

MR. RYAN: Is that Exhibit 24, Your Honor?

MS. HOFFMANN: This is a portion of the trial transcript which is in evidence, I think. I believe it's Exhibit 15.

MS. CION: Yes, the trial transcript.

MS. HOFFMANN: This is from when it was filed, but this is a portion of the trial transcript. The one from May 27, 1994, is the first. And from January 25, 2007, will be the next.

THE COURT: Okay. Attorney Cion, you may begin

**Exhibit 5**

your reading the part of Mr. Gold.

MS. CION: Yes.

(Reading the transcript).

THE COURT: Now we are proceeding with cross-examination originally conducted by Mr. Morant's attorney.

(Reading the transcript).

THE COURT: We are going to mark that transcript as Court Exhibit 5.

Next, we will proceed with the testimony given by Diane Basilicato on January 25th, 2007, in Morant versus Commissioner of Correction. The direct examination was done by Mr. Morant's attorney, Attorney Fitzpatrick, and the cross-examination was conducted by a lawyer for the State, Attorney Godialis(ph). We will mark this as Court Exhibit 6.

(Reading transcript).

MS. CION: Before I read this next portion, would the Court read the stipulation?

THE COURT: Yes. Members of the jury, the parties have stipulated to the following fact:

If Attorney Richard Emanuel were called to testify at this trial, he would recount that Diane Basilicato indicated she was 60 percent sure that the person depicted in photo number two of the photo array

Case 3:22-cv-00630-SVN Document 61-6 Filed 06/16/26 Page 101 of 138



shown to her at the East Haven Police Department in 2005 was the individual she saw on the night of the Turner-Fields homicide. Photo number two of that photo array depicted Michael Cardwell.

MS. OLIVEIRA: Would Your Honor like us to continue given the time?

THE COURT: Let's go a few more minutes.

(Reading transcript).

THE COURT: Members of the jury, we are at the end of our trial day. We will see you back here tomorrow. Please report at 8:30 for the 9:00 start time. And my same instructions apply, don't talk about the case or do any research about it in the overnight break. Thank you and I hope you have a pleasant evening.

(Whereupon, the jury exits the courtroom).

THE COURT: I forgot to tell them who we have tomorrow, but we will finish up with Diane Basilicato's read-in and then Mr. Lewis. And then do we have Mr. Drago?

MS. HOFFMANN: Mr. Drago is testifying after that. We had lined up Ms. Bull and Mr. Donnelly, we won't get through that, and anything else will get pushed to Wednesday.

MR. GERARDE: Scott is off till Wednesday.

MS. HOFFMANN: No. Diane Basilicato, finish

**Exhibit 5**

Scott Lewis. Then we should definitely finish Mr. Drago tomorrow. I don't know if we will start Ms. Bull. We will see how far we get.

THE COURT: We have read-in testimony to fill the day if we need.

MS. HOFFMANN: Yes. We have plenty of read-in testimony for better or worse.

THE COURT: Okay. Then we have the exhibits from this morning we need to talk about and I think constructive notice issues, right?

Has the defense had a chance to look at the portions of Plaintiff's Exhibits 439 and 45 that plaintiff is seeking admission of?

MR. GERARDE: As long as the hearsay is the issue, as long as they have a path around the hearsay, the objection goes away.

THE COURT: Okay. So let me hear what the articulation is of the path around the hearsay for each of these documents. Let's start with Plaintiff's Exhibit 4, which is the FBI report, pages nine to 11, which is the report written by Lisa Bull concerning an interview of Scott Lewis on May 16th of 1995.

MS. HOFFMANN: Ms. Bull will testify the information she received in this interview is what she communicated to Mr. Lawlor and Mr. Sullivan in her meeting

**Exhibit 5**

with them. So this summarizes what she communicated to them, which is admissible for notice.

Ms. Bull will testify what she communicated to, she had a phone call with Mr. Lawlor, immediately after the initial outreach by Mr. Lewis.

Then she had a meeting with Mr. Lewis, which is summarized in this report. Then she had a meeting with Mr. Lawlor and Mr. Sullivan after her meeting with Mr. Lewis. And in the meeting with Mr. Lawlor and Mr. Sullivan, she conveyed the information she had gotten from Mr. Lewis, which is summarized here.

So this is a report of what it is that she conveyed to the New Haven Police Department, so it's admissible for notice.

THE COURT: Defense.

MR. GERARDE: Non-hearsay then. Then that's it. As long as it's not offered for the truth.

THE COURT: So pages nine to 11 of Plaintiff's Exhibit 4 are admitted, but not for the truth. Only for the purpose of notice to various people in the police department.

MS. HOFFMANN: Page 52 is actually a New Haven Police Department document that was provided to the FBI. It's written by Sgt. Lanza of the New Haven Police Department and it summarizes to Mr. Sullivan, and

**Exhibit 5**

summarizes NHPD's surveillance of Mr. Raucci and observation of him engaged in what appears to be drug activity.

THE COURT: What is former Special Agent Bull going to testify about with respect to this document?

MS. HOFFMANN: She won't. Ms. Bull was only involved in the beginning of the investigation. So really just the initial interview of Mr. Lewis, and the bulk was conducted by Mr. Donnelly. We identified the documents together, but most would go to Mr. Donnelly, not Ms. Bull. So this is in the FBI file, so this was provided to the FBI. But it also would be relevant whether it was the FBI or not, because it's something the NHPD knew because it's their document.

THE COURT: Again, seeking to admit it only for notice purposes?

MS. HOFFMANN: I think it's a party admission. It's a document created by the New Haven Police Department and it's a New Haven Police Department memo about their observations, a business record, and their observations of Mr. Raucci. It's also admissible for notice, but I think it should be admissible for the truth.

THE COURT: You are saying that Sgt. Lanza was a representative of the City of New Haven at the time then or an agent acting on behalf of the City?

**Exhibit 5**

MR. GERARDE: We disagree with that. He's a sergeant. He's nowhere near the equivalent of a representative of the City. He's an employee of the City, but certainly not authorized by anyone. There's a lot of shade around this memo. No one knows when it was created or - I know what it says, but that's Lanza to Sullivan, for whatever it's worth.

MS. HOFFMANN: It's an internal memo created by an employee of the New Haven Police Department to the high-ranking employee of the New Haven Police Department about the surveillance or observations they had made about Det. Raucci engaging in apparent drug activity. And it references discussions that were had between these parties at the New Haven Police Department, again, about Det. Raucci's drug activity.

THE COURT: It's undated. So do we have any information about the provenance of it, other than it's from Sgt. Lanza to Mr. Sullivan?

MR. BRUSTIN: So Sullivan testifies that it should have been dated. There's no excuse for it not being dated. My best recollection is he believes this was all before he met with Lisa Bull in '96.

THE COURT: So he knew of this, and then how did the FBI ultimately get it?

MR. BRUSTIN: It was sent - nobody knows. But

Exhibit 5

Sullivan agreed it was an NHPD document. It somehow made its way to Donnelly.

THE COURT: And what is the argument? That it was - to be an opposing party statement, it has to be made by the party in an individual or representative capacity, it is one the party manifested that it adopted or believed to be true, and it has to have been made by a person whom the party authorized to make a statement on the subject.

MR. BRUSTIN: I will represent that Let. Sullivan testified there's two memos that fall in this category. There's another one from Badger. But Sullivan testified to these memos at his deposition, that they were consistent with what he was learning and what he saw on his own when he did surveillance. And this was all during this time period when Raucci is being looked at, and so at the time he is second in command in the ISU unit.

MS. HOFFMANN: There's no question they are admissible for notice, because NHPD had these documents. But they were written by an NHPD employee as part of their job to record things, so it would be a business record also. But I think it's a document of the New Haven Police Department that was created in the scope of their business to record activities they had observed during their employment, so I believe for multiple reasons this is

Case 3:22-cv-00639-SVN Document 159-6 Filed 06/16/25 Page 107 of 138



admissible, not just for notice, but also for the truth.

THE COURT: What about what the subject relates? I mean, there's multiple levels of hearsay in the document. There's the form of the document, so I think that's addressed by the fact that it's a public or business record.

Then there's the fact it's Sgt. Lanza's words. But Sgt. Lanza is in turn relating what a subject that is well-known to him said.

MS. HOFFMANN: Fair enough. That level of hearsay, it would be for what it is that is reported at the time, not the truth of what a third party not working for the police department had said, that Lanza observed this and is reporting accurately what it is he observed or was told to him, could come in for the truth. The truth of what an external person is reporting, we are not claiming would come in for the truth of that.

MR. TALLBERG: I would just note an objection on behalf of Raucci. You made my point; it's an undated memo loaded with hearsay from a subject who we don't even know who that person is. So I think it's highly prejudicial to Raucci. I realize it's for notice, but I would object to that.

MR. GERARDE: Even if it's a party opponent that somehow Lanza becomes that, it's hearsay within hearsay.

**Exhibit 5**

He's reporting hearsay.

THE COURT: So I think the first two levels of hearsay are addressed by the fact that it is a business record, and then that Sgt. Lanza would have been a party authorized to make a statement on this subject given that it appears on police service letterhead and it's addressed from Sgt. Lanza to Let. Sullivan.

But the third layer of hearsay, which is what the subject is reported to Lanza, could only come in for the fact that these words were on paper and it was noticed to the City, or rather, to the police department, not for the truth of any of the allegations reported by this unidentified person.

MS. HOFFMANN: Yes.

THE COURT: With respect to the 403 objection made by Mr. Raucci, it's no more prejudicial than the other evidence that has been admitted with respect to Mr. Raucci's involvement in cocaine trafficking and use.

The only potential issue I see is there's a line that says that Raucci told a black male that if he caused any further problems, Raucci would, quote, deal with him.

If that's a statement from Mr. Raucci, it's a party admission. But again we have, this is, sort of layer four of hearsay, and I think that's suggestive of potential violence or other actions being taken by Raucci.

**Exhibit 5**

So I need to know the response to the 403 objection there.

MS. HOFFMANN: I think, obviously for evidence of notice to the City, the same reasons that it might be prejudicial to Mr. Raucci are the reasons why this is additional evidence the City should have taken notice of way back at the time this was raised. And so I think it is relevant.

The fact it is linked to the allegations to some extent here is what makes it particularly probative when we talk about what notice the City had about the potential validity of the claims raised repeatedly, that the evidence, all of the evidence against Mr. Lewis and Mr. Morant was fabricated.

THE COURT: So you are not seeking to introduce this as to the claims against Mr. Raucci as an individual defendant?

MS. HOFFMANN: All of this is being introduced for the Monell claim. I should have made that clear. This is all used for the Monell claim.

THE COURT: Okay. So given that, I'm going to be informing the jury that the statements from this unidentified subject are not being admitted for their truth, and that this would come in with a limiting instruction saying it's only to be considered by the jury for purposes of the municipal liability claim against the

City and not against Mr. Raucci. I'm going to overrule the Rule 403 objection and admit this document for those purposes and with those caveats.

Next, is the memo of Mr. Roque's interview.

MS. HOFFMANN: I think this one we have now reached agreement, I believe, on reading in Mr. Roque's testimony, and that's on the same subject so we don't need to offer this document.

THE COURT: Eighty-five, page 85, will not be offered. Pages 131 to 134 are another interview of Mr. Lewis.

MS. HOFFMANN: If we were to offer this through Mr. Donnelly, it would be for what he heard from Mr. Lewis. I'm not sure whether there's going to be a basis that makes that particularly relevant. Obviously, the jury heard from Mr. Lewis generally of what it is he told Mr. Donnelly. So I think not offering this one right now, either unless something in the examination of Mr. Lewis or Mr. Donnelly makes this relevant in some way.

THE COURT: Okay. Then I won't rule on it. The next is, there were a couple pages from an interview with Mr. Ruiz, but not the full Ruiz interview reports.

MS. HOFFMANN: Which page is this?

THE COURT: 138 and 139.

MS. HOFFMANN: So these statements from

**Exhibit 5**

Mr. Ruiz, so the level, that is the FBI report, is a business record, and the statement from Mr. Ruiz, none are being offered for the truth. This is further examples of Mr. Ruiz giving a number of inconsistent statements along the lines of what the defendants introduced about the series of false statements of Mr. Gold. All of this is the fact that he gave a series of inconsistent fantastical statements, is one of the things that precipitated the end of the FBI investigation. So they are offered not for the truth. In fact, I think everyone recognized that they were false. Of course, our contention is this is consistent with an unmedicated schizophrenic who suffers from delusions. But we are offering the fact he said them and not for the truth of anything he said.

THE COURT: Defense.

MR. GERARDE: Non-hearsay.

THE COURT: There's no objection given they are offered for the purpose articulated by plaintiff's counsel, simply for the fact that they were related to the FBI by Mr. Ruiz. So those are admissible for that purpose.

Then next, Plaintiff's Exhibit 39. There were two sets of pages from this document. The second set we can dispense with easily because it's duplicative of Defendant's Exhibit 53, the internal affairs summary of

**Exhibit 5**

investigation for Mr. Raucci.

MS. HOFFMANN: I think that's right. Yes.

THE COURT: 1454 to 1457.

MS. HOFFMANN: So this is to be used with Ms. Bull. This is her contemporaneous memos of her communication with Mr. Lewis and her communications with Mr. Lawlor and Mr. Sullivan. So it's relaying what information she got, which she then gave to the NHPD, relaying what the NHPD reported back to her, and all of those things.

THE COURT: Not being offered for the truth, just the fact that she recorded them in this document?

MS. HOFFMANN: Offered for what was said in these - her level of recording it as a business record, and then it's what was said to her and what she said to them, so the fact of what was said.

THE COURT: Non-hearsay purpose.

MR. GERARDE: Agreed, Judge.

MR. MELLEY: To Lawlor, it is post-conviction.

MS. HOFFMANN: That's separately being addressed in the jury instructions as to it's an admission he made post-conviction. But the admission he is making is about the investigation being troublesome at the time, which is preconviction.

MR. MELLEY: That confuses the testimony from

**Exhibit 5**

Ms. Bull and Mr. Lawlor, because both of them cannot put that comment, whatever it is, in any context of time. And we can get - that will come up when her testimony is presented. But if she says that statement stands for what it is, she has no understanding what he meant by it, and he has no recollection, so it's just something that is there.

MS. HOFFMANN: That would go to whatever argument you are going to make about the significance, and I don't agree with the factual representation. But what she will testify that she accurately reported is that when she had a conversation with Mr. Lawlor, who is a defendant, initially when she said there had been a complaint about a New Haven Police Department officer and they didn't know who it was, Lawlor on his own volunteered the name Vincent Raucci, let me know if it's about him. Then after she spoke to Mr. Lewis, got the full report and reported back to them, Mr. Lawlor admitted that the investigation had been troublesome at the time. That is what she recorded.

So they can make arguments about what that means. Mr. Lawlor was asked about what that means, but she is clear she would not have written that down if that's not what he said. And that because she is reporting a party opponent, anything Mr. Lawlor said would

**Exhibit 5**

be admissible as a party admission.

THE COURT: The jury instructions will instruct the jury that as to the negligence claim against Defendant Lawlor, they can only consider evidence that is dated up to the date of Mr. Morant's conviction. But this document and her conversations with Mr. Lawlor are admissible and overcome the hearsay issues, first, because it's being offered for what the City knew and what she recorded. And as to Mr. Lawlor's comments as recorded here, those are actually party admissions. So non-hearsay in the first place.

There's some handwritten notation on this document. Is there any information about the provenance of that?

MS. HOFFMANN: Nobody knows what that is or where that's from.

THE COURT: Okay.

MS. HOFFMANN: The last page is an internal memo that she wrote, which is just a business record reporting steps she intends to take. So there's no hearsay.

THE COURT: It's not being offered for its truth, so that will be...

MS. HOFFMANN: And another page describing, again a business record, about who was being assigned to handle the investigation and that it's Mr. Donnelly.

THE COURT: I should disclose to the parties, I see two names I recognize on page three, former colleagues of mine, AUSA Gordon Hall and Peter Markle.

MS. HOFFMANN: I don't think those names have any significance in what we are eliciting.

THE COURT: There was a reference to Len Boyle who I worked with, but I don't think that has anything to do with anything of relevance here.

MS. HOFFMANN: Okay.

THE COURT: Those three pages of PX39 are admissible for the purposes articulated.

MS. PARAS: To clarify, it's four pages; 54, 55, 56 and 57.

THE COURT: They are all in. Then we move onto 45.

MS. HOFFMANN: This is a handwritten record from the initial phone call, page one from Ms. Bull. So same analysis. But it's just the initial handwritten report from the initial phone call. These are all business records and I think it's just describing that same meeting. It's another business record reiterating the same information.

THE COURT: So there are a lot of pages of this document. I think in the interest of time and given that we might not even get to either Bull or Donnelly tomorrow,

**Exhibit 5**

let's let defense counsel digest the pages of this exhibit and report back to me tomorrow whether you maintain any objections.

MR. GERARDE: Okay.

MS. HOFFMANN: Makes sense.

THE COURT: Anything else we should take up today? Constructive notice.

MR. GERARDE: Judge, I'll say a few more words about it. Constructive notice is, it was kind of brought into the case over the weekend, and we are talking about what someone would learn through diligence, classic constructive notice.

We are being charged with knowing what people are saying at trial and what Court of Appeals are saying. If we are now getting criticized for 1999, not doing anything to reopen the case or to say or do anything about Raucci or whatever, then everything that a reasonable decision maker would know through diligence about that topic is fair game. It's all part of the constructive notice universe.

So if we are going to be criticized, well, you knew Raucci did this because of when you disciplined him in '95 and '96, why didn't you do anything in 1999, and he was back there, you could have interviewed him.

Well, in 1999 I also knew the Connecticut

**Exhibit 5**

Appellate relinquished the conviction and Judge Blue's petition for new trial that was in progress and was denied. He testified in that, so it's a little bit of a cart before the horse, but it would justify, just like Mike Dearington told our police chief in a letter that there's a full trial going on, Sweeney is testifying about the Ovil Ruiz interview, Mr. Morant's testifying about being coerced, why don't you wait and see what Judge Blue does.

So that should all come in, is my point. And I think there's a really good argument, it goes beyond judicial notice that this petition for new trial was denied. If they are going to call constructive notice and pull snippets out of an Appellate Court of opinion or what one witness said while on the stand, it's like the whole event is fair, including everything Judge Blue found, because that's what a decision maker would know through diligence.

MS. HOFFMANN: I think he's confusing different theories of liability and the basis on which constructive notice in particular is relevant and what we have been offering it for. Specifically what we are offering is things that happened before the conviction that were evidence, that it goes to our failure to supervise discipline theory of Monell liability and saying that the

department was on notice of issues that they should have at least investigated, that what you have to show is a deliberate indifference to the risk of a constitutional violation, right.

And so we are saying if you have front page newspaper articles about these allegations, that's a suggestion this is going on. And then if you don't do anything to look into it, particularly in conjunction with all the other evidence we put on about the systemic problems in the department before the wrongful conviction, that all goes together to the policy maker, should have known there was a problem and taken steps to intervene, all again, before the conviction.

We are not saying that anything in the world is suddenly relevant on a constructive notice theory. We are saying these particular - and this is what the case law says - you can have actual or constructive notice of the risk of constitutional violations. And if it's an individual supervisory liability claim, you need actual notice and you need subjective deliberate indifference. But if it's a Monell claim for failure to supervise or discipline, you can have constructive notice and it's an objective deliberate indifference.

So it's a different standard. But this all relates to the failure to supervise, discipline, which is

**Exhibit 5**

about the broader tolerance for misconduct within the police department before the time of the wrongful conviction.

THE COURT: The City has always emphasized the moving force kind of element to the Monell claim and I just want to make sure I'm understanding this correctly.

If they have to show or if you have to show rather that the deliberate indifference was a moving force behind the constitutional violation of Mr. Morant's rights, then would there be any relevance to what happened post-conviction?

MS. HOFFMANN: The only relevance, and I believe this is what the Court held in summary judgment, and a lot of the evidence of the direct notice about issues with Mr. Raucci happens after the convictions, but it's circumstantial evidence of what the culture was, what the mindset was in the department beforehand. So we can't prove moving force without proving that before the wrongful conviction there was notice, there was deliberate indifference, and that was the moving force behind the violation here.

But the actions of Chief Pastore himself shortly thereafter when confronted with specific evidence of what happened in this case is highly relevant, circumstantial evidence, as to what his state of mind was before. And

**Exhibit 5**

again, the jury will have to find that he, for this claim it's doesn't have to be, it's the policy maker. So either he did or should have while it was available to him, be aware of the risk of a constitutional violation in the future, and then been deliberately indifferent, like failed to take the obviously necessary actions to protect against that constitutional violation. But all of that has to happen before the wrongful conviction, so it could be the cause of the wrongful conviction.

THE COURT: So then why wouldn't the outcome of the post-conviction proceedings also potentially be relevant to questions of what they - maybe I'm answering my own question.

Why isn't Attorney Gerarde's articulated theory of relevance the correct one? Tell me concisely in your view.

MS. HOFFMANN: First of all, any of the actual things he's talking about are fairly remote. From the key actions, what we are pointing to is, these issues are raised directly to the police department and in the timeframe of '95 to early '96. Everything he's talking about is happening well after that. It's not even Pastore who is running the department at that point. He left by early '97. So that's one issue.

There's also - it's confusing, because there's

the constructive notice. I think for the ratification theory we need to show actual notice of the issues. So the two related theories, but that's the one that goes to Pastore more directly. And so Pastore is obviously aware of the things happening in '95. He goes to meet with Scott Lewis on his own and doesn't make a record of it. And there's other testimony that will come in that he was directly following what was happening in this investigation. And other testimony that came in already about his direct interest in this investigation. But 1999, 2007, all of these are completely removed from what he personally would know. So I think those are, there's no evidence that, I don't believe there's evidence that anyone will say they were looking at these and that was part of their determination as to what to do. And it's not even the same decision maker as what is relevant for the ratification theory.

Again, at some level --

THE COURT: But on failure to discipline and supervise, if there's now a theory of constructive notice of all of these other accusations, then is there relevance to what the relevant people at the City later learned about the results of Mr. Morant's post-conviction proceedings as to their failure to supervise and discipline the officers at any of the relevant times here?

Because I think your failure to supervise and discipline claim time period is broader than the individual violation of Mr. Morant's rights.

MS. HOFFMANN: In order to prove our claim for failure to supervise and discipline, it has to have happened before the conviction. Because our claim is that a failure to supervise and discipline officers was deliberately indifferent to the risks it would cause a wrongful conviction, and that indeed was the moving force and did cause it. So that has to happen by whenever it is, in 1994, that Mr. Morant is wrongly convicted.

THE COURT: Okay. With that articulation in mind, Attorney Gerarde.

MR. GERARDE: We might have two different categories based on what I've just heard. The Fleming argument is not exactly the same as these other arguments. I'm now, when they say how come no one spoke to you in 1999 or no one apologized to you in 2016, that opens the door to judicial notice of every one of the reported decisions because it bears on that. It's actually the reason why you wouldn't expect anyone to apologize if there's an affirmance and four denials before a pardon is issued.

So I realize that's a different argument than what we just spent the last five minutes on, but I think

**Exhibit 5**

they are both out there, and I feel like there's more of this coming, this post, you know, they said we are limiting negligence just up to the conviction. But now we are being criticized for being negligent, really, or callous, in not apologizing and not reopening and everything else. So at some point those decisions are relevant, and I'm thinking that is now, at least judicial notice of what happened.

MS. HOFFMANN: None of that is appropriate basis for judicial notice or constructive relevance. If there were a witness who were testifying, of course I didn't apologize because I believe he was guilty and there was nothing to apologize, that would go to their own personal state of mind. But there's no witness who will say no policy, none of these people are saying the reason we didn't do x, y, z. There may be some of that in Wearing(ph). That might be the designated testimony of Chief Wearing.

MR. GERARDE: He was instructed by Dearington to hold off.

MS. HOFFMANN: So that's the point you are trying to get in.

MR. GERARDE: But now that we are in constructive notice, this is like the actual notice and explanation for it. We don't need to have a live witness

**Exhibit 5**

say I was thinking about apologizing, but here are the three reasons why I didn't when we are accused of, did anyone from that City apologize. Well, anyone is now on the table, so if there's an objective reason you wouldn't apologize, that's fair.

THE COURT: So I think you were correct to recognize that the argument you are making now is different. It's not really tethered to constructive notice on the deliberate indifference claim.

What you are saying, I think, is plaintiff has opened the door to questions about why more investigation was not done or apologies were not issued. And the reason would be that these decisions had all the way along upheld the conviction. But I think how are you planning to elicit that, through which witness? Would you ask Mr. Lewis did you go through these various steps and was it upheld by the courts at every step?

MR. GERARDE: You were asked, did anyone apologize. Would you expect an apology when your first habeas was denied? Or first petition for new trial was denied? Or, et cetera.

THE COURT: So that's not judicial notice. You are asking to be able to ask questions about those prior judicial decisions.

MR. GERARDE: Your Honor asked how would I

**Exhibit 5**

elicit that. If I get judicial notice, I'll argue to the jury that we are criticized through a witness for not apologizing when were we supposed to apologize. And then all of those are out there. I mean, these are judicially determined facts.

THE COURT: I think we left this morning that you were going to confer on adding procedural history to the judicially noticed facts for Mr. Lewis and Mr. Morant. I take that that hasn't happened yet.

MS. HOFFMANN: We can confer and see if we reach an agreement on that.

THE COURT: Why don't you do that overnight and see if you can work that in. There's been evidence of the failure of post-conviction proceedings so it won't be new to the jury, but it could be incorporated into the snippet that I read of the procedural history of Mr. Morant and Mr. Lewis' cases.

MS. GREEN: I don't want the record to be confused. Mr. Lewis was asked if anyone apologized to him after his conviction was vacated and all charges dismissed in 2015. You will recall that was a time that it was determined there was a Brady violation in his case after the Second Circuit credited Sweeney's testimony that Ovil Ruiz had been coerced. So there were no further proceedings. They were done. So we didn't ask anything

**Exhibit 5**

about getting an apology while the proceedings were ongoing. So I just wanted to make that clear, factually.

THE COURT: You all will have the transcript soon enough. So confer on that issue and check back with me tomorrow.

I want to try to keep on time in the morning, so is there anything I can take up now or preview for me for tomorrow morning?

MR. BRUSTIN: One housekeeping issue. We are working on the closing. Does the Court prefer that we take testimony directly from the transcript or do we need to write out on our Power Point ourselves the testimony? Can we take it from the transcript?

THE COURT: You can screech out the transcript.

MS. HOFFMANN: Do we have an agreement on the Golino stipulation or should we ask for judicial notice?

MR. GERARDE: We should be heard on that.

MS. HOFFMANN: One issue we want tomorrow, and I believe a lot of things have been going on, this was addressed and I believe the Court suggested you would take judicial notice of the court decision. This is a Second Circuit decision, '91 or '92, before the wrongful conviction. And all we want is, there was a Second Circuit decision issued and it included one line, which is essentially describing Mr. DiLullo's testimony that he

Case 3:22-cv-00630-SVN Document 165-6 Filed 06/16/26 Page 128 of 139



never reported exculpatory information in affidavits. The purpose is notice.

We have designated with agreement the actual testimony from the underlying proceedings which was in a case which the City of New Haven was a party. But this is, again, if they didn't learn being a party to this lawsuit, it's broadcast in a Second Circuit decision that this officer had said that he never reports exculpatory information in affidavits submitted in support of applications for warrants. And again, this links up to there's notice of a problem and then the City fails to take any action to address the issue. So that's the purpose.

We don't want to introduce an irrelevant legal decision from 30 years ago. We only want that part in. We tried to reach a stipulation that the Second Circuit issued this decision and included this line. We were unable to reach an agreement. So at this point we just request the Court to take judicial notice. Again, we can submit the two lines, but we want to use this with Mr. Drago who is testifying tomorrow.

THE COURT: If Mr. DiLullo's testimony is coming in on this same issue, why wouldn't the Second Circuit's adoption of his testimony be cumulative?

MR. GERARDE: I think what I'm thinking is that

based on Your Honor's rulings this is now admissible that the District Court decision and the Court of Appeals decision should be both coming in.

THE COURT: Which ruling are you talking about?

MR. GERARDE: Golino. The Golino Court of Appeals that--

THE COURT: I had not made a ruling yet, unless I missed it.

MR. GERARDE: I'm thinking that based on what has happened in Fleming, I think Golino will get the same treatment because it's all preconviction, and it's kind of they are the same in that regard. But if we were going to talk about the demonstrative board, I don't think it has a place on there.

THE COURT: Plaintiff is not using a demonstrative until closing.

MR. GERARDE: I know that. But I was just ready on that. The Golino District Court decision is, police, two individuals, you don't get qualified immunity because there's an issue of fact for trial. But City, you do get summary judgment on the Monell claim, there's no evidence your policies are bad. Court of Appeals now says they got it right, there's an issue of fact, go back and try it.

So that's what actually happened. So if they are going to run with there's evidence that one person

**Exhibit 5**

said he doesn't do this and that's all they get out of Golino with a police practices expert coming on tomorrow, I think the whole decision of both levels, District Court and Court of Appeals, should come in as a full exhibit and let them make what they can out of it.

MS. HOFFMANN: As we discussed, there's many reasons why court decisions are not admissible generally and also it would be confusing. It has the discussion of legal standards which will be different than the instruction the Court is going to give.

We are not seeking to introduce specific evidence about the prosecution or misconduct during the Golino individual case, which as Mr. Gerarde said, they ultimately lost at trial. The only thing we are seeking to introduce is during these proceedings it became public that one of these detectives said he as a matter of practice never included exculpatory information in arrest affidavits, which as our police practices expert will testify, if you learn that you have a detective who is not complying with what the obligations are supposed to be, you should be taking steps to intervene with him to make sure he changes his practices and making them compliant with the constitutional obligations. And the failure to do so is an indication of exactly what our claim is, which is deliberate indifference.

**Exhibit 5**

Case 3:22-cv-00630-SVN Document 186 Filed 06/12/26 Page 130 of 138


This goes to the first Monell claim, which is about the tolerance of the failure to disclose exculpatory evidence, a practice of failing to disclose exculpatory evidence. So again, we have to show that there's notice of the problem and then acquiescence in the pattern. So this is part of our evidence that there's notice that there's a broad problem with the NHPD of failing to disclose exculpatory evidence. It's consistent with the evidence we put on with the Ham memo and it's consistent with the live testimony we put on describing the broader practices within the NHPD from Mr. Sweeney, Mr. Pettola, anticipated testimony from Mr. Sullivan who hasn't testified yet. But this in particular is something that demonstrates why the City would have been aware of this issue independently from its own internal supervision and knowledge of the widespread practice within the department.

THE COURT: Okay. So if the Second Circuit is simply quoting or amplifying something from the underlying record in that case, and you correct me if I'm wrong, but it sounds like you are going to introduce evidence of Mr. DiLullo's own statements to that effect, why wouldn't the Second Circuit decision be cumulative?

MS. HOFFMANN: Because Mr. Gerarde keeps saying how would we ever know that this was said in a deposition

**Exhibit 5**

Case 3:22-cv-00630-SVN Document 161-6 Filed 06/16/26 Page 132 of 139



in which we were a party.

The fact it's highlighted in a published Second Circuit decision, just like when things are published in the newspaper, and these are reasons why someone at the NHPD certainly should have known about this testimony. And the fact that this sentence is highlighted in a published Second Circuit decision in a case they are litigating is reason why someone at the NHPD should have definitely been alerted about this specific issue. So that's why.

THE COURT: What's the decision citation?

MS. HOFFMANN: Hold on one second. We don't have it in the stipulation. We can pull it up. It was on our exhibit list, but we didn't want to introduce the actual decision. It's Exhibit 110 and the cite is 950 F.2nd 864. It was decided December 3rd, 1991.

THE COURT: And the specific line you want to use?

MS. HOFFMANN: Third page of the printed decision. We quoted it in post-stipulation, which was, DiLullo testified at his deposition in the present case that it was his general practice to omit exculpatory information from affidavits submitted in support of applications for warrants.

So that's what we seek to introduce, that there

**Exhibit 5**

was a published Second Circuit decision in a case involving the City of New Haven and it included this line. It's 867 on the third page of the printed exhibit which is included.

THE COURT: Why do you think, Attorney Gerarde, this one mention of this sentence opens the door to, not this opinion, but the District Court's opinion?

MR. GERARDE: Because the theory behind the sentence is that this puts us on notice that we have a problem, and we don't have any of the context. This is a denial of summary judgment interlocutory appeal. So a detective testified to whatever, but that case is going back to trial, who knows what will happen.

So maybe they will say, so what, he said it so that's all you need to know. Well, I think I have a right to say that I think I should have the right to say this case is going back to trial, this was not a finding, this was a comment, an observation, as they said, interlocutory appeal denied, go try your case and then see what the jury decides the truth is.

And then you say, what about the Golino decision? The district said your policy is fine, you won summary judgment. All right. Now here's is why we have not done anything yet. Let the case try out and see what happens. And we know we don't have a systemic problem; we

might have a problem with one guy. Okay.

But that's the thing, it's almost like the way -- if we just get the little snippet in, it's you had a rock-solid directive from the Court of Appeals and did nothing. So we want to explain why we did nothing.

THE COURT: So I think then if that's the case then some sort of proportional counterpoint to it would be more appropriate than admitting two district courts and Second Circuit opinions that have a lot of extraneous information and legal standards and other things that would raise 403 concerns.

So I know you couldn't reach a stipulation on this. I'm inclined to allow plaintiff to admit this, but through what format would it come in?

MS. HOFFMANN: That's what we are trying to figure out. We tried to reach a stipulation. I was proposing judicial notice that the Second Circuit issued this decision and in this decision they included this line. So you can take judicial notice this was the published decision and it included this line.

I don't think it makes sense to have a heavily redacted document, so we are trying to avoid that.

The other thing we can do is, like we did from the 2015 statement from Mr. Dearington and read it into the record, we want to be able to put forward some way

this happened, and whichever way is easier.

MR. GERARDE: Sounds like a stipulation that includes balance might be the way.

THE COURT: Either that way or a judicially noticed fact with language that is agreed upon by the parties describing this line and the procedural history that followed thereafter.

MR. GERARDE: Okay. I agree.

THE COURT: That's on your "to do" list to come back tomorrow.

MR. GERARDE: Yes.

MS. HOFFMANN: Mr. Brustin is reminding me where we left on the Fleming stipulation.

THE COURT: You still need to confer on more details about Fleming, because as currently phrased, I think it's incomplete.

MS. HOFFMANN: So we have to figure that out tonight.

MR. GERARDE: Sure.

MS. HOFFMANN: I think that's everything. Again, I can't remember whether we told you or it was just among ourselves, I think we have reached agreement on the Roque designation so there shouldn't need to be a ruling from the Court on that. There may be a dispute about what if any instruction would be appropriate for the Court to

give--

MR. GERARDE: -- he took the Fifth Amendment.

MS. HOFFMANN: My memory is that there's a different standard that applies in terms of what type of instruction would be appropriate when you talk about a witness versus a party. I don't know what it is the defendants are proposing. But I suggested--

MR. GERARDE: We want the same thing that Raucci got.

MS. HOFFMANN: I don't think there's a--

MR. GERARDE: -- about an adverse inference.

MS. HOFFMANN: I have not researched this in the Second Circuit. My memory when we researched this in other circuits dealing with, for example the real perpetrator of the crime who takes the Fifth, is that it's more difficult to justify an adverse inference instruction when you talk about a nonparty than a party.

I have not seen any case law supplied by the defense, so I'm raising that. We are happy to respond. My sense is that that same instruction is probably not appropriate, but some instruction would be appropriate. We don't have any control over Mr. Roque, so nothing should be adverse to us or our interest, for sure. We don't have control over Mr. Roque. We tried to get him to testify and it didn't work.

**Exhibit 5**

THE COURT: Are you planning to admit Mr. Roque's trial testimony? That's already in as part of Exhibit 15, right?

MR. GERARDE: We have a deposition too.

THE COURT: What you agreed upon is the designations from the deposition?

MR. GERARDE: And trial. There's two sources.

MS. HOFFMANN: We made designations with both the trial and the deposition and I think we reached agreement on the designations. But the dispute is about any instruction, and there's no way we would get to this tomorrow, so this is probably for Wednesday or Thursday.

THE COURT: What was the hearing at which John Williams was adamant about Mr. Roque being allowed to consult with an attorney? Was that a petition for a habeas hearing for Mr. Lewis?

MS. HOFFMANN: Mr. Lewis' trial. And we didn't designate from that. We designated from Mr. Morant's trial and the deposition in this case. It's basically the same. He says the same things in all of these different proceedings.

THE COURT: In the deposition he invokes his Fifth Amendment, right?

MR. GERARDE: Right.

THE COURT: Whatever you are able to provide me

**Exhibit 5**

on research whether an adverse inference instruction needs to be different in this context would be helpful.

MR. GERARDE: Okay.

THE COURT: So the homework list is Plaintiff's Exhibit 45, for the defense to look through those pages and let me know in the morning. Stipulations for Fleming, judicially notice fact for Fleming, rather. And some resolution of the Golino Second Circuit issues and procedural history there.

And then sometime over the next couple of days before the Roque testimony, we would need some briefing on what type of adverse inference instruction would be appropriate.

Okay. Anything else we should take up for the day?

MS. HOFFMANN: Not from us.

MR. GERARDE: Nothing, Your Honor.

MR. TALLBERG: No, Your Honor.

MR. RYAN: No, Your Honor.

MR. MELLEY: No, your Honor.

THE COURT: The Court will stand in recess.

COURTROOM DEPUTY: The Honorable United States District Court for the District of Connecticut is now in recess.

(Adjourned at 4:58 p.m.)

**Exhibit 5**

C E R T I F I C A T E

I, Catherine Cullen, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ CATHERINE CULLEN

_________________________

Catherine Cullen
Official Court Reporter
450 Main Street
Hartford, CT 06103
(914) 552-3201

**Exhibit 5**