# Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---

STEFON MORANT,

Plaintiff, Case No. 3:22-CV-630

v. JURY TRIAL, DAY 12 AFTERNOON

CITY OF NEW HAVEN, et al, HARTFORD, CONNECTICUT

Defendants. May 14, 2026

---

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE SARALA NAGALA
UNITED STATES DISTRICT JUDGE

---

APPEARANCES:

For the Plaintiff:
Anna Benvenutti Hoffmann
Nick Brustin
Emma Freudenberger
Amelia Green
Elsa Mota
Grace Paras
Katherine Cion
Neufeld Scheck Brustin Hoffman & Freudenberger, LLP
200 Varick Street, Ste. 800
New York, NY 10014

Kenneth Rosenthal
Law Office of Kenneth Rosenthal
One Audubon Street, Third Floor
New Haven, CT 06511

For the Defendants:
Thomas R. Gerarde
Amanda Stone
Lidia M. Michols
Abigail R. Willauer
Alan R. Dembiczak

**Exhibit 6**

Case 3:22-cv-00630-SWN Document 601 Filed 06/11/26 Page 112 of 161


Q. Thank you, sir. That's all I have.

THE COURT: Defense examination.

CROSS-EXAMINATION BY ATTORNEY GERARDE

BY MR. GERARDE

Q. Good afternoon, Mr. Sullivan.

A. Good afternoon.

Q. You had nothing to do with the Turner-Fields investigation in 1991; am I right?

A. Correct.

Q. And the first event asked about on direct examination was the Gould-Taylor investigation where you interviewed that witness Doreen Styles; do you remember that?

A. Yes.

Q. That happened in 1993?

A. Yes.

Q. And you were Sergeant Sullivan then; is that right?

A. Yes.

Q. So you had not become I1 or I2 as of then?

A. No.

Q. And nothing that happened in 1993, the Turner-Fields homicide, that investigation was underway, both arrests were made and they were awaiting trial as of that time; is that right?

A. Yes.

Q. Now, the witness in Gould-Taylor is a woman named

**Exhibit 6**

Doreen Styles, right?
A. Yes.
Q. And she made a photo identification of the two men?
A. Yes.
Q. Gould and Taylor. And she testified at trial; you are aware of that?
A. Yes.
Q. She was cross-examined?
A. Yes.
Q. And there were two convictions, right, in 1995?
A. Yes.
Q. And are you aware that the first time she ever recanted was 14 years later in 2009?
A. Yes, that's what I heard.
Q. And did you know that she later recanted her recantation?
A. Yes.
Q. Do you believe that when you made that initial interview and made that arrest that you had obtained false information from her, that you then proceeded with a prosecution?
A. No.
Q. Now, you spoke to - there was questions about speaking to Chief Pastore about the observations of Det. Raucci in bad areas of town, high crime, high drugs,

that kind of thing, right?

A. Yes.

Q. Do you have any personal knowledge as to why Chief Pastore told Det. Raucci to stay out of those neighborhoods?

A. No. Other than he wanted him to stop doing - committing that behavior.

Q. Did Chief Pastore say to you, "we need to protect Raucci from an FBI investigation that's about to happen so let's give him a tip"?

A. No.

Q. You are aware that Chief Pastore started an internal affairs investigation against Raucci in late 1996? Or are you?

A. I'm not.

Q. Are you aware that Chief Pastore proffered charges against Raucci to the police commission in January of '96?

A. I read that, but I don't recall it.

Q. The time sequence was, Raucci is brought up on charges by the chief in 1996, January, and then he retires with a non-service related disability in June of 1996. Does that timeline ring a bell to you?

A. Yes.

Q. And under your collective bargaining agreement, if someone has a right to retire and receive a pension, they

**Exhibit 6**

can elect that; am I right?

A. Yes.

Q. You can't stop that?

A. No.

Q. And are you aware that rather than just dropping what was the charges that were proffered, the investigation of those charges was suspended by the police commission and made a permanent part of his file; did you know that?

A. No.

Q. Are you aware of any training instructing officers, that they can retaliate against other officers who report misconduct?

A. No.

Q. And in regard to what has been called a Blue Wall of Silence, Sgt. Lanza had nothing happen to him in connection with his writing that memo about his observations of Raucci; am I right?

A. Correct.

Q. He was not disciplined? Harmed in any way?

A. No.

Q. In your experience, officers who raise concerns are not automatically disciplined or terminated simply because they reported another officer, right?

A. Correct.

Q. You personally never witnessed a supervisor instruct

Case 3:22-cv-00630-SVN Document 601 Filed 06/11/26 Page 116 of 161


officers not to report misconduct; did you?
A. No.
Q. And you are not aware of any official department policy encouraging a code of silence; are you?
A. No.
Q. And you can't identify any instance where the department formerly disciplined an officer for merely truthfully reporting misconduct by a fellow officer?
A. No.
Q. In fact, there were other occasions where officers reported concerns and they continued their employment and advanced through the ranks without any consequence at all, right?
A. Correct.
Q. And regarding the Badger memo, regarding surveillance, is an example - Badger was a sergeant?
A. Yes.
Q. So he took that on his own to take a look at detectives and see if there was anything worth pursuing, right?
A. Correct.
Q. And he didn't get in any trouble for that?
A. No.
Q. Did you tell him to knock it off or did anyone else say that?

**Exhibit 6**

Case 3:22-cv-00630-SVN Document 601 Filed 06/11/26 Page 117 of 161


A. No.
Q. When did you start with the New Haven Police Department?
A. June 6th of 1976.
Q. And you went to the police academy; is that right?
A. Yes.
Q. Did you receive all of your required training from the police academy so that you graduated?
A. Yes.
Q. And did you have periodic training throughout your career, recertification training?
A. Yes.
Q. Did you receive all of your recertification training necessary to keep your certification as a Connecticut Police Officer current?
A. Yes.
Q. And in terms of your receiving training, am I correct that you understood that detectives in your chain of command in the '80s and '90s had an obligation to provide, to document and provide, exculpatory and impeachment evidence to the prosecutor?
A. Yes.
Q. In other words, they have an equal obligation to document evidence that might suggest they had the wrong person as they did to document evidence supporting

impeachment; am I right?
A. Yes.
Q. And do you recall receiving training on exculpatory evidence, what we call Brady material, from the State's Attorney, Michael Dearington?
A. Yes.
Q. He came over and gave classes?
A. Yes.
Q. What about a private attorney, Elliot Spector, do you remember receiving that training as well?
A. I remember the name. I think he was an instructing attorney.
Q. Do you want to open up your deposition to page 226, please. That would be your January 18, 2024. Is it in that notebook? The first tab, page 226. You can see lines 10, 11, 12?
A. Okay. Yeah.
Q. Do you recall you received training from Attorney Elliot Spector on the Brady and exculpatory evidence topics?
A. Yeah, that would be in the police academy. I think he taught up there.
Q. So in the police academy when you started in 1970?
A. No.
Q. You are saying that you received some of your

recertification training at the academy?
A. Yeah, which was located in the building and headquarters.
Q. Sorry for speaking over you.
A. It would be in the police academy, as I recall, but he did not come to the bureau to do it.
Q. Understood. But in the police academy, you would get your recertification training; some of it would happen at the academy, right?
A. Correct.
Q. And Attorney Spector was one of the teachers at the academy?
A. Correct.
Q. On Brady?
A. Yes.
Q. And exculpatory evidence?
A. Yes.
Q. Now, do you remember when we spoke at your deposition, I asked you to recall your supervisors, a number of your supervisors through the years?
A. Yes.
Q. You recalled you worked for - did you work for Chief William Farrell?
A. Yes.
Q. And for Chief Nicholas Pastore?

**Exhibit 6**

A. Yes.
Q. Melvin Wearing?
A. Yes.
Q. What about Assistant Chief Doug McDonald?
A. Yes.
Q. What about Assistant Chief Herman Badger? When you were working with Badger, what was his highest rank?
A. Sergeant.
Q. Major Tommy Muller?
A. Yes.
Q. Major Doug Tortenzio(ph)?
A. Yes.
Q. Commander Jimmy O'Neil?
A. Yes.
Q. Commander Lenny Gallo?
A. Yes.
Q. Captain John O'Connor.
A. Yes.
Q. Capital Art Lee?
A. Yes.
Q. Captain Louie Loukitez(ph)?
A. Yes.
Q. Lieutenant Danny McNulty.
A. Yes.
Q. Let. Willy Tinker?

**Exhibit 6**

A. Yes.
Q. So I've given you a lot of names. I am not going to ask you a hundred questions, just a few general questions, and we will get specific if we need to. Of all these names of former New Haven Police Department supervisors, did you ever witness them coerce witness testimony?
A. No.
Q. Fabricate evidence?
A. No.
Q. Withhold exculpatory evidence?
A. No.
Q. It was against your code of conduct to fabricate evidence; wasn't it?
A. Yes.
Q. And it was against your code of conduct to withhold evidence of any kind, including exculpatory evidence; wasn't it?
A. Correct.
Q. And did you ever witness any of those persons, those persons I just mentioned, stop a tape recording and tell a witness what they wanted the witness to say and start up the tape again?
A. No.
Q. Did you ever witness any of those persons stop a tape recording, rewind it, tell the witness what they need to

**Exhibit 6**

say the next time it starts up, and then go forward again with a new over-recording?
A. No.
Q. Did you ever witness any of those persons falsify a police report?
A. No.
Q. Did any of those supervisors ever communicate to you in words or substance that you can coerce witness testimony in the New Haven Police Department and don't worry, we will look the other way?
A. No.
Q. Did any of those supervisors ever communicate to you in words or substance that you could withhold exculpatory evidence and don't worry, nothing bad will happen?
A. No.
Q. Same question for fabricating testimony. Did any of those supervisors ever communicate to you wink, wink, nod, nod, you can do this, don't worry, nothing bad will happen?
A. No.
Q. And I'm talking about all the way up to the chief of police?
A. Correct.
Q. And did you ever witness any of your chiefs, you named three chiefs for me, Farrell, Pastore, Wearing, did

**Exhibit 6**

Case 3:22-cv-00630-SVN Document 601 Filed 06/11/26 Page 123 of 161


you ever witness any of your chiefs condone another New Haven Police Officer's coercing witness testimony?
A. No.
Q. Did you ever witness any of your three chiefs ever condone a New Haven Police Officer fabricating testimony?
A. No.
Q. Did you ever witness any of your three police chiefs condone a New Haven Police Officer's withholding of exculpatory evidence?
A. No.
Q. Same questions for the New Haven Police Commission. Did you ever witness the New Haven Police Commission ever condone a New Haven Police Officer's coercing witness testimony?
A. No.
Q. Did you ever witness the New Haven Police Commission condoning a New Haven Police Officer's fabrication of evidence?
A. No.
Q. Did you ever witness the New Haven Police Commission condoning a New Haven Police Officer's withholding of exculpatory evidence?
A. No.
Q. The Internal Affairs Department, did you ever witness the New Haven Police Department's Internal Affairs

**Exhibit 6**

Department ever condoning a New Haven Police Officer's fabrication of witness testimony?
A. No.
Q. Same question for coercing of a witness's testimony?
A. No.
Q. Same question for a New Haven Police Officer withholding exculpatory evidence?
A. No.
Q. There was testimony about the responsibilities of I1, to pay attention to what is happening in the courts so that if there's a problem that is identified regarding a police officer you can take some action. Do you remember that?
A. Yes.
Q. My question for you is, if there's a court case going on and a witness says, "yeah, I told them I didn't know anything in the beginning but they told me what to say so I just said that", and the case goes on and it's in the middle of the trial that the witness just happens to say that, how is it that I1 who in the New Haven Police Department Building with all of I1's responsibilities, how does he find out that happened over in some Superior Court?
A. No, he wouldn't find out.
Q. Thank you.

**Exhibit 6**

MR. GERARDE: I don't have any further questions.

THE COURT: All right.

MR. TALLBERG: I have no questions for this witness.

MR. RYAN: No questions, Your Honor.

THE COURT: Attorney Melley does.

MR. MELLEY: I do.

THE COURT: Just before we get there, I misspoke; all of those exhibits have been previously discussed, so Plaintiff's Exhibits 155, 156, 158, 159, 164, and 165 are all admitted, not for the truth of the matters asserted within them, but instead for the fact that the document exists and the statements were made.

MS. PARAS: Thank you, Your Honor. I believe we discussed this morning 134 and 157, and if so, we would move to admit those as well. 134 was the one I erroneously labeled in the motion.

THE COURT: Yes. And 157 was already admitted through Mr. Brustin. But 134 is admitted subject to the same limiting instruction. Okay. Sorry about that, Attorney Melley. Now you can proceed.

MR. MELLEY: Thank you, Your Honor. If the Court pleases, I'm going to use the elmo.

THE COURT: Okay.

C E R T I F I C A T E

I, Catherine Cullen, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/ CATHERINE CULLEN
_________________________
Catherine Cullen
Official Court Reporter
450 Main Street
Hartford, CT 06103
(914) 552-3201

**Exhibit 6**