# Exhibit 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -

STEFON MORANT, No.: 3:22-cv-00630-SVN

Plaintiff

v.

CITY OF NEW HAVEN, et al,

Defendants

Hartford, Connecticut
APRIL 29, 2026

- - - - - - - - - - - - - - - -

JURY TRIAL - DAY 1

B E F O R E:

THE HONORABLE SARALA V. NAGALA, U.S.D.J.

and a JURY OF TEN

Alicia A. Cayode Kyles, RMR
Official Court Reporter

**Exhibit 11**

final instructions and then you would retire to deliberate on your verdict.

We will start at 9:00 a.m. each day. Although you should report to the courthouse by 8:30 a.m. You will get a 15-minute break at 10:30 and a 45-minute lunch break at 12:15. We will start again at 1:00, take a 15-minute break at 2:15 and then end the day at 4:00.

This will be the schedule for all days that we are in session. I will do my very best to adhere to this timeline, but I do ask for your patience if any testimony runs slightly over.

Thank you for your attention.

We will now proceed with the opening statements of the parties. Each side will have one hour for it's opening statement. Defendants may divide their collective hour as they see fit.

Plaintiff.

MS. HOFFMAN: Thank you, Your Honor.

**OPENING STATEMENT BY MR. BRUSTIN**

MR. BRUSTIN: Good afternoon.

THE COURT: Go ahead.

MR. BRUSTIN: Almost exactly 32 years ago Stefon Morant was wrongfully convicted for a New Haven double homicide he had nothing to do with and knew nothing about.

He spent more than 21 years in jail, in prison

**Exhibit 11**

for this crime as an innocent man. Twenty-one years locked in a cage, torn away from his children, his family, his life, from age 26 to 47 when other people were figuring out careers and life partners and parenting.

How could this happen? Here's how. We will prove the New Haven Police Department, the NHPD, violated the most basic and important rules of policing. You can't fabricate or make up evidence; you can't coerce witnesses; you can't hide evidence of innocence -- rules that protect all of us, victims, suspects, citizens.

First, we will show that even though our Constitution requires officers to report all evidence that could help a suspect, the practice in the NHPD was the opposite. Officers would not report anything that could hurt the prosecution's case. And following that practice, powerful evidence of Mr. Morant's innocence was hidden.

And, second, we will show there was what's known a blue wall of silence, a rule to cover up misconduct of brother officers. That was uniquely strong in the NHPD. So, even when an officer committed the most egregious misconduct, fabricating evidence and coercing witnesses, the department would brush it under the rug rather than intervene to stop it.

Now, before I get into the story of what we intend to prove in this case, let me just say you are

going to hear a lot of details -- names, dates, all of which will be presented later as evidence. The intent now is just to give you a preview of some of what you will hear to make it easier to follow how it fits together when you hear the actual evidence.

The story of this case begins in the early morning of October 11th, 1990, when former New Haven Alderman Ricardo Turner and his boyfriend Lamont Fields are shot and killed in their New Haven apartment.

Stefon Morant has nothing to do with the crime and knows nothing about it. At the time Mr. Morant is in North Carolina, almost 1,000 miles away, visiting his large network of family and friends.

Defendant Maher, a homicide investigator with the NHPD, is assigned the case. And at first Maher conducts a standard homicide investigation. He quickly uncovers likely suspects, a man named Michael Cardwell also known as "Bullet" and his brother.

Maher learns that Cardwell had recently had a falling out with the victims over drugs and relationship issues, that Cardwell had suspiciously left town right after the murder and most significantly that he admitted to committing the crimes to others.

Three months later, after dozens of witness interviews Cardwell and his brother remain the primary

suspect. Stefon Morant has no connection to the crime. His name never comes up in Maher's investigation because he is completely innocent, but then another NHPD detective Vincent Raucci gets reassigned the case and that changes the course of Stefon Morant's life.

Raucci drops any investigation into Cardwell and instead he takes the opportunity to frame a man named Scott Lewis. Why? Well, Mr. Lewis, like Mr. Morant, has nothing to do with the crime, but Mr. Lewis has gotten in the way of Raucci's side job working with drug dealers.

You heard me correctly. In addition to being an NHPD homicide detective, you will hear evidence that Detective Raucci deals drugs, protects drug dealers, and uses drugs himself. And Raucci uses his position, as a homicide detective, to punish Mr. Lewis by framing him for murder.

The police believe the shooter was assisted by a second person. And so Mr. Morant, who is a friend of Mr. Lewis, becomes targeted as the second person. He is simply collateral damage.

And here is how Detective Raucci does it. Raucci brings in a 17 year old who is -- who goes by the name at the time of Ovil Ruiz. Ruiz, who suffers from mental illness and who also knows Raucci from the illegal drug trade in New Haven is brought in.

Ruiz knows nothing about the murders, but over the course of hours, Raucci threatens Ruiz to make him give a statement and tells him what to say. He feeds Ruiz details about the murders and a false story that Scott Lewis did it with the help of Stefon Morant. Raucci coerces and feeds this statement from Ruiz in front of his supervisor Defendant Sweeney.

Remember Sweeney's name as you'll see he's important.

Ruiz tells Sweeney he doesn't know anything about the murders and is just repeating what Raucci is telling him to say so he can go home.

Sweeney repeatedly tells Raucci to cut it out because the statement he is trying to get from Ruiz is clearly false. But then Sweeney gets busy and he leaves Raucci alone with Ruiz to continue interviewing him. Ultimately Raucci tape records a rehearsed-fabricated statement from Ruiz that includes multiple made-up details.

For example, in it Ruiz falsely claims that he overheard conversations between Lewis and Morant in which Lewis confessed to committing the murders and also states that later, while playing basketball, Ruiz saw Lewis throw a gun into the river. It is all made up.

Sweeney tells another supervisor, Defendant

Lawlor, what Raucci did. In other words, Sweeney tries to do the right thing, but neither Sweeney nor Lawlor actually stop Raucci. And consistent with the NHPD policy and practice, Sweeney does not write down or report to the prosecutor that Ruiz's statement is false, or that Sweeney witnessed Raucci coercing and fabricating the statement, or that Ruiz said that he was just repeating Raucci's false story so he could go home.

It will be many years until Mr. Sweeney fully admits this misconduct, but more on that a little later.

Left alone by his supervisors, Raucci continues on. The next day Raucci brings in a second vulnerable teenager, Jose Roque. Roque, like Ruiz, has no actual knowledge about the murder. Raucci threatens Roque that he will pin the murder on him if he doesn't say what Raucci wants him to say and then he feeds him the same story that he fed to Ruiz. Raucci does this in front of Defendant Maher who does nothing to stop the misconduct or report it.

And after a number of hours, Raucci and Maher take an audio-taped statement which matches the one that Raucci took from Ruiz, but Roque can't remember the made-up story that Raucci has fed to him. So Raucci and Maher repeatedly stop and start the tape to coach him.

The next day Raucci tracks down Lewis's friend

Stefon Morant and brings him in. And at that time Mr. Morant is 22 years old. And on that night, Mr. Morant has been drinking and smoking marijuana with friends and is under the influence.

Raucci and Maher interrogate Mr. Morant for hours, threatening him to implicate Mr. Lewis. They say he'll get the electric chair if he doesn't tell them what they want to hear. They tell him he can leave if he does. Mr. Morant has never been interrogated by the police before and after hours of threats and feeding him the same story they fed to Ruiz and to Roque, Mr. Morant succumbs and he falsely implicates Mr. Lewis, claiming he was in the car with Lewis and saw Mr. Lewis run up to the victim's apartment the night of the crime.

Raucci again, with Maher, repeatedly starts and stops and even rewinds and records over the tape to get a clean take from Mr. Morant. They let Mr. Morant go. As soon as he is freed, Mr. Morant tries to set the record straight. Within days he returns to the station with his mother to tell them his statement was fabricated and coerced, but the detectives and the supervisors refused to even see him. Then Raucci takes yet another false statement implicating Lewis, this time from an informant that Raucci uses cocaine with.

Raucci again starts and stops and rewinds and

over-records the tape to coach the witness. Raucci has now fabricated four matching statements falsely implicating Mr. Lewis and Mr. Morant, but there's still the problem of the overwhelming evidence that the crime was actually committed by the initial suspect Cardwell, not Lewis or Morant.

So Maher writes a police report that Cardwell was ruled out. He wasn't. That was a lie. And because Lewis and Morant are innocent, there is no physical evidence whatsoever tying them to the crimes. Nevertheless, based on the false statements, Lewis is arrested first and charged with murder. And then Defendant Sweeney, who had seen Raucci coercing 17-year-old Ovil Ruiz he reenters the picture.

When Sweeney learns that Lewis has been arrested based upon the fabricated statement he, again, confronts Lawlor about Raucci. Sweeney tells Lawlor again the statement is all lies, that Raucci simply fed it to Ruiz, but Lawlor, again, does nothing and Sweeney takes no steps to report this information to the prosecutor even after Lawlor's inaction becomes clear.

But the case against Lewis hits a speed bump. Almost immediately after their release from Raucci's control, both Morant and Roque report that their statements were coerced and fabricated, so they refuse to

testify against Lewis.

With the fabricated case falling apart, Raucci goes back to Ruiz and he coerces him to give a different false statement which now puts Ruiz at the scene of the crime directly implicating Morant and Lewis.

Raucci then arrests Mr. Morant. Raucci tells him again that it is Lewis he is after. But, again, Morant refuses to testify against Mr. Lewis, so Raucci's case against Mr. Morant goes forward.

The case is based upon the false taped statements. At trial, Mr. Ruiz lies and he gives Raucci's made-up story. Roque testifies truthfully that his statement had been coerced and fabricated. He describes how Raucci and Maher repeatedly stopped and started the tape to tell him what to say.

Raucci and Maher lie to the prosecutor and then to the jury saying the taped statements were volunteered without any coercion or feeding whatsoever and also saying they never stopped, started, or rewound and re-recorded the tapes to fix answers. And neither Lawlor, nor Sweeney, nor anybody in the NHPD do anything to fix these lies. They follow the widespread NHPD practice of not reporting evidence that suggests innocence or officer misconduct.

So, the prosecutor argues that Roque just got

Exhibit 11

cold feet and that his taped statement is the truth. And even after Mr. Morant puts on the evidence of his truthful alibi, corroborated by multiple witnesses, that he was in North Carolina at the time of the crime visiting family for weeks, the jury believes the detective. And, as a result, Mr. Morant is wrongly convicted of felony murder as an accomplice.

The jury's verdict shatters him. He is sentenced. He is offered another deal if he will testify against Lewis but, again, he refuses. He is sentenced to 70 years in prison, essentially a life sentence. And in May of 1995 Lewis too is wrongfully convicted.

Mr. Morant and Mr. Lewis both continue to fight to prove their innocence. Within days of his wrongful conviction Lewis reaches out to the FBI to report that he and Morant were framed by Raucci and that Raucci is a dirty cop. And after interviewing Lewis in jail, the FBI opens a formal investigation. The FBI interviews numerous witnesses who all describe Raucci's criminal involvement in drugs. They also interview the teenagers that Raucci coerced in this case and all of them describe how Raucci coerced them into offering false statements against Lewis and Morant. Even Ruiz, the 17-year-old who succumbed to Raucci's pressure and continued to lie at the trial, he too admitted to the FBI that it was all a lie that was fed

to him by Raucci.

Based upon the evidence gathered, the FBI gets permission for a high-level sting operation on Raucci to prove his corruption. They plan to catch him using his police authority to seize drugs and then steal it for himself. But the NHPD objects to the sting and soon thereafter Raucci is tipped off that he is being watched, ruining any possibility of catching him in the act. The only people who know about the sting operation are the FBI and the highest levels in the NHPD. And without the type of hard evidence the sting could provide, the FBI has to close the investigation.

The Chief of Police Nicholas Pastore was aware of the FBI investigation shortly after it began and he personally -- he personally visits Scott Lewis in jail. He interviews him alone to find out what information Lewis has against Raucci, but Chief Pastore buries the information Lewis provides about Raucci and he covers up his visit.

The NHPD takes no action to investigate Raucci's conduct or the murder investigation that put Mr. Morant and Mr. Lewis in prison and Raucci is allowed to retire with a full pension.

Still, Mr. Morant and Mr. Lewis continue to fight to prove their innocence the best they can from their

prison cells.

Now, remember Sweeney. I asked you to remember that name. He's the supervisor who was physically in the room with Ruiz when Raucci coerced and fabricated that very first statement.

Finally, Sweeney comes forward and he testifies publicly that the Ruiz statement, which started the case against Morant and Lewis and was the basis for the conviction, was coerced and fed by Raucci. But Raucci and Maher continue to lie and the department let them.

So, Sweeney's testimony isn't enough to win Mr. Morant his release at that time. For Mr. Morant these defeats are almost incomprehensible, but Mr. Morant is a man of great faith and he never loses hope and he never stops fighting. He wills himself to remain strong, to be a strong presence in the life of his family, the best he possibly can and finally his prayer are answered.

Scott Lewis is successful in getting a Yale law professor to take on his case. She and her students work tirelessly. Eventually they uncover that the FBI had sent the Roque tape to the FBI crime lab for analysis. That analysis showed that the Roque tape had been stopped and started at least 11 times, corroborating Roque's trial testimony that Raucci and Maher stopped the tape to feed him information and contradicting Raucci and Maher's claim

that they did not.

Mr. Lewis' conviction is overturned by a federal judge in this District and in Mr. Morant's case, the prosecutor candidly informs the judge that Ruiz testified falsely and that Raucci put him up to contriving the story.

Mr. Morant's sentence is modified and he is immediately released after more than 21 years in prison.

His kids who were six and under now are in their 20s. And after six more years, Mr. Morant is granted a full and unconditional pardon.

Now, as you know from jury selection, my name is Nick Brustin and together with my law partners Anna Benvenutti Hoffman and Amelia Green who will by here later in the trial, as well as Attorneys Grace Paras, Katie Cion, Elsa Mota, Ken Rosenthal, and our paralegals Jackie Ochoa Acevedo and Priya Anand and James Smith our trial consultant, it is our great honor to represent the plaintiff in this case, Stefon Morant.

And in this case, we are suing former NHPD Officers Vincent Raucci, Vaughn Maher, Michael Sweeney and the late Robert Lawlor. We are suing the City of New Haven itself and here's why.

First, we will prove that the defendant officers fabricated evidence. More specifically, they coerced

**Exhibit 11**

witnesses, fed them false stories, manipulated tape recordings until they got the statements they wanted and then lied and said the witnesses had volunteered all of the information on their own.

Second and relatedly, they hid the truth about how they got these statements from the prosecutor.

And third, and most important, the evidence will show that the NHPD knowingly allowed a culture that protected officers at all costs, even when they engaged in the most egregious misconduct.

We will prove that the breadth and scope of misconduct in this case could only occur in a police department that failed to hold its officers responsible and that all of these violations of the most basic rules of policing caused Mr. Morant's wrongful conviction.

So, let's start with the evidence that Raucci and Maher coerced and fabricated multiple witness statement and that Raucci, Maher, and their supervisor Defendant Sweeney, failed to document and disclose any of this evidence and provide it to the prosecutor.

So let me describe some of the examples of the evidence you are going to hear on this issue.

First, you will hear the testimony of Defendant Sweeney. He will be our first witness and here's why. Sweeney will admit that he was present with Raucci when

Raucci first interviewed Ruiz, that he repeatedly heard Ruiz say he knew nothing about the crime. That Raucci repeatedly threatened Ruiz and that the inculpatory information on the taped statements all came from Raucci who fed it to Ruiz. And that although Sweeney verbally reported it to Lawlor, his failure to stop Raucci, or to report any of the exculpatory evidence he saw and heard was entirely consistent with the practice of the NHPD in 1991.

And as you will see, there will be no evidence of any reason why Sweeney would make these damning statements about himself and his fellow officers if they weren't completely true.

And as you will also hear, the misconduct that Sweeney witnessed with Raucci and Ruiz shows that the entire case against Morant and Lewis was made up out of whole cloth.

Sweeney was only present for the Ruiz interview so he could only directly say that the Ruiz statement was made up and fed to Ruiz, but Ruiz went first and then the statements Raucci obtained from Roque and Morant matched the statement he made up and fed to Ruiz.

We will prove that Roque and Morant didn't just happen to volunteer the identical made-up story Raucci coerced and fed it to them. And, of course, that will

also be proved by the audiotapes, but we'll get to that in a minute.

So Sweeney, by his own admission, witnessed and enabled the fabrication of evidence and failed to document or disclose exculpatory evidence that would have proven Mr. Morant's innocence.

But as you will also see, Sweeney is the least culpable of all the defendants. Sweeney is the only defendant who admitted his misconduct, albeit too late. You will also hear the testimony of each of the witnesses from whom Raucci and Maher fabricated statements either live or through their prior sworn testimony.

You will hear each testify that they knew nothing about the murders and each will provide a consistent account of threats and feeding and stopping and starting the tape to create false statements.

You will hear that each of them was vulnerable as a result of age or other factors. They will describe how they are still afraid of the New Haven Police Department. For example, Mr. Ruiz who now uses his given name Castro. He suffered from and continues to suffer from schizophrenia, but at least by the time of his deposition he was medicated. He will describe the same misconduct by Ruiz, same misconduct by Raucci, that Sweeney describes as best he can.

**Exhibit 11**

You will also hear from Jose Roque, both from his sworn deposition in this case and even more importantly from his testimony in the 1994 criminal trial. During the 1994 trial, Mr. Roque testified that he didn't know anything about the crime, that he only gave the taped statements because Raucci and Maher threatened him and told him what to say, exactly tracking what Sweeney says happened with Ruiz.

And at the 1994 trial, Mr. Roque further describes Raucci and Maher starting and stopping the tape to coach him, but in 1994 the forensic analysis showing the stops and starts on the tape hadn't yet been done. And without Sweeney's testimony and without the forensic evidence, the jury believe Raucci and Maher who swear they never stopped the tape, which brings us to forensic scientist Bruce Koenig. As you will hear, Mr. Koenig is the nation's foremost expert on forensic audio analysis.

For many years Mr. Koenig led the FBI audio lab. He holds multiple science degrees. You will hear that the FBI lab was the gold standard for forensic analysis of tape recordings in the 1990s.

He was tasked with some of the most important audio investigation in our nation's history, including analyzing the Nixon Watergate tapes. And in 1996, FBI agents sent the Roque tape to the FBI crime lab for

analysis. Mr. Koenig's forensic analysis, on behalf of the federal government, revealed 11 instances in which the Roque tape was stopped and started just as Mr. Roque had always claimed.

And after Mr. Koenig retired from the FBI crime lab and went into private practice, Mr. Morant's legal team hired Mr. Koenig to evaluate additional tapes, including the tape of Mr. Morant's statement. In both Mr. Koenig found the tape recorder was stopped, rewound and over-recorded many times.

There is much more, but this is a preview of some of the evidence we will present that the defendants coerced and fabricated witness statements and hid it all from the prosecutor.

Admissions from Defendant Sweeney, combined with multiple witness statements, all describing the same misconduct and all bolstered by forensics.

And we still haven't talked about Defendants Raucci and Maher. We will be calling them in our case. We will be questioning them extensively and you will judge their credibility.

On the issue of taping, for example, you will hear Defendant Maher, his evolving attempts to explain why there are multiple starts and stops and over-recordings on the tape. As you will hear even Raucci admit, when police

have a legitimate reason to stop a recording, like a bathroom break, they announce what they're doing on the tape. They announce the time the tape is stopped and they announce the time the tape is restarted on the tape. As you will hear, that never happened here.

Prior to the forensic testing in 1994, Maher swore that they only stopped the Morant tape once when Mr. Morant allegedly asked for a soda.

Many years later, after the forensic analysis contradicted Maher's claim, Maher claimed to remember for the first time and new, as the evidence will show, implausible explanations for why they would have stopped the tape at least nine times without ever noting that they were doing so on the tape.

Which bring us to Defendant Raucci. Raucci will swear that the story Ruiz gave on tape was completely voluntary with no coercion or feeding whatsoever and that Ruiz gave the same story before the tape was turned on while Sweeney was still in the room. In other words, he will tell you that both Sweeney and Ruiz are lying.

In fact, you will hear Raucci testify that more than a dozen people lied about his conduct in this case and about his criminal conduct and his drug use including all of the taped witnesses, multiple detectives, other high-ranking police officials and many others. He will

deny ever using drugs, let alone dealing drugs or working with drug dealers.

In short, what we believe you will see, when he testifies, is a man that is completely untethered from truth and we will prove that a person so comfortable lying can only become a police officer investigating homicides in a department that is indifferent to truth and accountability.

Which brings us to the evidence of what we believe is the most important failure here, the failures by the City.

First, the evidence that the City allowed a custom and practice of suppressing evidence that was favorable to criminal defendants.

Second, the evidence that the City made a deliberate choice not to provide adequate supervision and discipline to its officers.

And, third, that the NHPD's policymaker Chief of Police Nicholas Pastore was on notice of defendants investigative misconduct in Mr. Morant's case and failed to take appropriate action.

So, what's the evidence you will hear on those claims?

Here is a preview of just some of it.

First and most importantly you will hear

admissions from officers at all different levels in the chain of command, that there was a custom and practice of hiding evidence that could help a suspect and that nothing was done about it.

All will admit that by 1991 NHPD officers were obligated, under the law, to document and disclose to the prosecutor evidence tending to show innocence or what's known as exculpatory evidence and any evidence that could be used to impeach or call into question the reliability of a prosecution witness called impeachment evidence.

But despite understanding these most basic obligations, you will hear detectives, sergeants and the eventual captain in charge of a unit investigating homicides all admit that the practice of an NHPD detectives was not to include this exculpatory evidence in their police reports.

Defendant Sweeney, for example, we'll admit that, in general, in the NHPD you only put in police reports evidence that helped you win. Not evidence that suggested somebody might be innocent, just as he admitted was done in this case.

Other officers will echo his admissions.

One officer who will testify is one former detective Joseph Pettola and he is not a defendant in this case. As others will testify, Pettola had a reputation for honesty

in the department. Detective Pettola will admit that during the 80s and 90s NHPD officers felt a great deal of pressure coming all the way from the top not to report officers who engaged in misconduct. He will describe that this blue wall of silence was particularly strong in the NHPD and that the pressure not to report a bad cop exceeded the instincts of a good cop to do the right thing.

That it was understood that even reporting criminal misconduct by another police officer could effectively end your own career. And he will describe how the blue wall of silence worked in this case. Pettola will testify that in the mid 80s, he observed Raucci attempt to plant cocaine on a criminal suspect. During a traffic stop of a suspected drug dealer that turned up empty, Raucci pulled a packet of white powder from his pocket, told Pettola and Pettola's partner it was cocaine and said they should plant it on the suspect and arrest him.

And although Pettola stopped Raucci from doing it and made him pour the cocaine in the gutter, he will tell you that he and his partner failed to report this misconduct to anybody, specifically because of the code of silence.

This incident remained buried for about a decade until the FBI investigation following Mr. Morant's trial.

**Exhibit 11**

In fact, we will prove that Raucci's misconduct, his criminal misconduct and drug use was an open secret in the NHPD and that the highest-ranking officers in the department covered it up rather than investigate and address it.

You will hear the testimony of former Chief Pastore and Defendant Lawlor who eventually led the unit, as well as another former head of the unit Brian Sullivan. Pastore and Lawlor are both deceased, but their prior under oath sworn testimony will be played for you during this trial. And although Chief Pastore is not an individual defendant, he is the key policymaker for the City's responsibility.

All will describe the NHPD's knowledge of Raucci's drug-related misconduct, including in this case and the NHPD's failure to address it.

Raucci was allowed to simply retire without repercussion, but as we will prove, the misconduct in the NHPD was not limited to Detective Raucci. In addition to testimony about the broad practices of suppressing exculpatory evidence and covering for officer misconduct you will hear examples of other homicide investigations where NHPD detectives did exactly the same thing that was done in this case, pressuring witnesses to give statements, doctoring tapes, feeding facts.

**Exhibit 11**

You will also hear evidence that the City was on notice of these unconstitutional practices before Mr. Morant's criminal trial and that they failed to take any action whatsoever to remedy it.

And you will hear evidence that when NHPD and in particular, the Chief of Police, were warned specifically about Raucci and the investigation into Lewis and Morant, their only priority was covering up the misconduct.

Again, you're going to hear more evidence of systemic failures but this is a preview of some of the evidence you will hear during this case.

So, what will the defendant officers say in response?

Well, we don't know for sure, but we have some ideas. One thing you may hear is that there was no written or official NHPD policy to fabricate evidence or withhold exculpatory evidence. And as you will hear, of course that is true. That is not how things work.

One of the witnesses you will hear on this point is a man named Chuck Drago. He is a police practices expert that we hired to evaluate the evidence in this case. Mr. Drago is an experienced supervisor of investigators. He was Assistant Chief of Police in the Ft. Lauderdale Police Department. He has supervised detectives at all levels and he is an expert in

**Exhibit 11**

investigating officer misconduct and internal affairs.

Mr. Drago will explain how a basic risk that police departments face is that officers will ignore their constitutional obligation such as not to hide exculpatory evidence because they are worried that obeying the Constitution will make it harder to prosecute the people they arrest. And Mr. Drago will explain how because of this risk, there are minimally accepted standard among departments about how to ensure all relevant evidence reaches the prosecutors. And you will hear that the evidence shows that the NHPD completely failed to follow these minimally accepted practices.

Mr. Drago will also explain how the code of silence is another well-known risk in policing where officers prioritize loyalty to fellow officers over integrity. And Mr. Drago will explain how allowing a code of silence culture protects corrupt officers and puts well-intentioned officers in impossible position.

Again, you will hear evidence that that is exactly what happened in the NHPD during this time.

What else will they say? Well, Defendant Raucci may try to show that there is insufficient evidence to prove that he conspired with a known drug dealer to frame Scott Lewis and by default Stefon Morant.

To be clear, you will hear, when the Judge

instructs you on the law, it doesn't matter what motivated Raucci's misconduct, only that the misconduct occurred and that it caused his wrongful conviction.

But you will hear evidence that Raucci was involved in the drug trade and in particular with a drug dealer named Frank Parise because it is part of the story of what happened in this case and we contend further evidence of systemic misconduct.

When Scott Lewis, who will testify in this case, reported to the FBI in 1995 that Raucci framed him, he also reported his suspicion that Raucci was motivated to do so because of Raucci's connection to Frank Parise.

Mr. Lewis will testify that in the 1990s, in late 1990, he had decided to stop dealing drugs but he still owed Mr. Parise a substantial amount of money. He also had reason to believe that Raucci was involved with Parise and that this could be Raucci's motivation for framing him.

And you will also hear that the FBI was trying to develop more such evidence including through surveillance and a sting that could catch him in the act stealing drugs but the NHPD objected and then Raucci was tipped off.

We will prove that if there was insufficient evidence to catch Raucci committing crimes and to connect him with Parise it was the fault of the NHPD.

**Exhibit 11**

One thing, we know that at least some of the defendants will say despite the mountains of evidence of Mr. Morant's innocence and all the evidence of misconduct is that the criminal jury in 1994 got it right. They will claim that Mr. Morant and Mr. Lewis actually committed this crime. One thing you won't hear is any actual evidence that they did this.

We ask you to consider how could these defendants and the City still be arguing that they are guilty as you hear the evidence. We will prove it's the same reason why Mr. Morant was arrested and prosecuted in the first place. To admit Mr. Morant's innocence is to admit the police engaged in misconduct and with the exception of Mr. Sweeney none of these men will ever do that.

You will see that the defendants and City did not value Mr. Morant as a human being in 1990 and they don't value him as a human being today, which brings us to Mr. Morant and the end of my opening statement.

Mr. Morant will testify in this trial. Mr. Morant will explain where he was and what he was doing at, down south at the time this horrible crime occurred. How he came to make the taped statement you will hear and most importantly how these events impacted his life.

Mr. Morant will candidly admit the shame and regret he still feels today for having succumbed to

defendants' coercion and threats and making the false statements on tape that were fed to him by Raucci and Maher and the shame and regret he feels that for a few years before his arrest he was dealing drugs to make extra money, including for a short period of time with Mr. Lewis.

This made Stefon an easy target for Raucci to frame as an accomplice, but even then Mr. Morant was always working one or more jobs and by the time of his wrongful conviction he had gone back to school, completed his high school degree and had gotten his life back on track.

What we will show you in this trial is that Mr. Morant is a big man in every sense of the word. Enormous strength of body and spirit, enormous resilience, enormous faith, enormous grace, enormous love for family and friends, and those less fortunate than himself, not perfect by any means, none of us are, but for all of those years stuck in a cage surrounded by violence and despair, he never lost hope. He never stopped fighting. In fact, in so many important ways, he was able to rise above all of it.

Under the most challenging circumstances he tried everything to find ways to be a committed father and husband and son. He became an informal counselor to other

prisoners and even prison guards. And since his release from prison in 2015 he has devoted all of himself to work and to family and to helping others.

He has counseled other men who were wrongfully convicted like himself, but also men who were guilty but needed counseling and help nonetheless. He has tried not to waste a second feeling sorry for himself. You're going to hear from a variety of people about who Mr. Morant is. For a man like Mr. Morant falsely labeled a murderer, the constant indignities of prison were intolerable.

But, as we will prove, all that was happening inside the prison walls paled in comparison to what Mr. Morant was missing on the outside. The loss of time with his family, the inability to be physically present, the actual loss of family, the loss of his brother in prison, and his son soon after he was released from prison. For Mr. Morant, the grief was magnified tenfold. And as you will hear, the pain and the anguish didn't end when he was released from prison.

Until his pardon in 2021 he had to live with his wrongful conviction and all the difficulties and indignities that it caused in his daily life.

He still lives with the pain and trauma and will for the rest of his life and it is still very difficult for him to process and talk about it. He would prefer to

**Exhibit 11**

just plow forward and to take care of business, to take care of family, to be a rock for so many.

One of the witnesses you will also hear from is a woman named Dr. Akinsulure-Smith. She is a forensic psychologist we retained to evaluate Mr. Morant's psychological trauma from his wrongful conviction. She will explain how despite his unique resilience he suffers from PTSD, depression, anxiety, and an overwhelming sense of loss.

Family and friends will describe the same. To be clear, you will hear about everything Mr. Morant endured, not because Mr. Morant is seeking sympathy. You will hear about everything Mr. Morant endured, everything he went through in prison and after his release because at the end of this trial, if you find liability against any of the defendants, you will have the responsibility of awarding money damages for all that he endured.

We have to put on evidence of all that Mr. Morant went through because as the Judge will instruct you, it will be your job to put a money value on all of the harm and all of the losses Mr. Morant suffered. And to be frank, it is a daunting task because when you dispassionately follow the law, your common sense and the evidence will tell you that the value of what Mr. Morant went through is an astronomically high number, but that is

the only way our system has to balance the harm.

So, as you listen to the evidence in this case, I ask you to pay attention to everything that Mr. Morant went through for the last 35 years. Every second of every day that he lost locked in a cage, labeled a murderer, every second away from his family, every second away from his dreams and his hopes, every second he had to live with the stigma of his wrongful conviction between his release in 2015 and his pardon in 2021, every second that he has had to and will continue to live with the trauma and loss for the rest of his life every pain, every in dignity, every separation, every loss.

So that when it comes time to assess Mr. Morant's damages you can measure each and every one of these harms and fully and appropriately put a dollar value on all that he has endured, to fully value the man and his loss.

As you will see and hear, Mr. Morant is a proud man and he doesn't talk openly and easily about his feelings, but they're all there. You will feel them in the air around him when he speaks. Even as he continues to work every day to rebuild his life, he remains overwhelmed by loss. This trial will be an important step forward.

Thank you.

THE COURT: Thank you. We're just going to take

**Exhibit 11**

C E R T I F I C A T E

I, Alicia A. Cayode Kyles, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/s/________________________________________

ALICIA A. CAYODE KYLES, RMR
Official Court Reporter
United States District Court
450 Main Street, Room 320
Hartford, Connecticut 06103
(860) 509-8743

Dated: 4/30/26

**Exhibit 11**