UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEFON MORANT                    :        NO.: 3:22-CV-00630 (SVN)
                                 :
v.                               :
                                 :
CITY OF NEW HAVEN, ET AL         :        JUNE 26, 2026

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, CITY OF NEW HAVEN'S MOTION FOR NEW TRIAL

The City of New Haven submits this memorandum in support of its motion under Federal Rules of Civil Procedure 59 for a new trial—either without qualification or conditioned on plaintiff refusing to accept a remittitur—and to alter any final judgment to offset the damages plaintiff has already been awarded under Conn. Gen. Stat. § 54-102uu(i)[1]. A new trial is warranted pursuant to Rule 59(a) because: (1) the jury's verdict with respect to the City is against the weight of the evidence; (2) the City was prejudiced by certain erroneous decisions, including the Court's refusal to bifurcate trial and instruct the jury that plaintiff had, as a matter of law, proved that defendant Sweeney violated his *Brady* rights; and (3) the jury's damages award was excessive, and evidently the product of passion or prejudice incited in part by improper statements during plaintiff's summation.

Should the Court decline to order a new trial without qualification, it should at least remit the jury's excessive damages award and order a new trial conditioned on

---

[1]     Defendant City of New Haven preserves all legal arguments advanced in its Motion for Summary Judgment and any other legal motion made prior to commencement of trial that do not depend on the factual record developed at trial. This motion addresses only those issues governed by the trial record and should not be construed as abandoning or waiving any previously asserted legal arguments resolved or reserved prior to trial.

plaintiff's refusal to accept the remittitur. Finally, once a final award has been determined, the judgment must be amended under Rule 59(e) to offset the amount plaintiff has already been awarded by the Connecticut Claims Commissioner, pursuant to Conn. Gen. Stat. § 54-102uu(i).

## I.    LEGAL STANDARD

A district judge has the discretion to order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Newton v. City of New York*, 171 F. Supp. 3d. 156, 164 (S.D.N.Y. 2016). Whether to grant a motion for new, trial is within the discretion of the trial court. *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 143 (2d Cir. 1998).

## II.    ARGUMENT

### A.    A NEW TRIAL IS WARRANTED BECAUSE THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE

"It is well established that the trial judge enjoys 'discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence.'" *Lore v. City of Syracuse*, 670 F.3d 127, 176-77 (2d Cir. 2012) (quoting *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). In considering the weight of evidence to support a verdict, the district court may "examine the evidence through its own eyes," *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001), and "need not view [the evidence] in the light most favorable to the verdict winner." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002). Indeed, the Court may find that a new trial is

warranted "even if there is substantial evidence supporting the jury's verdict." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003).

As set forth in the City's Renewed Motion for Judgment under Rule 50(b), there was insufficient evidence to support the jury's verdict on Count Seven. [Doc. #618.] However, to the extent the Court concludes that there was *some* evidence supporting the jury's finding (1) that the City fostered a widespread practice or custom of suppressing exculpatory evidence and (2) that this custom was the moving force behind the constitutional violations the jury found, the Court should nevertheless grant a new trial because these findings are manifestly against the weight of the evidence.[2]

**B.    A NEW TRIAL IS WARRANTED BECAUSE THE CITY WAS PREJUDICED BY THE COURT'S REFUSAL TO BIFURCATE TRIAL AND INSTRUCTION THAT PLAINTIFF PROVED MOST ELEMENTS OF HIS *BRADY* CLAIMS**

1.    Prior to trial, the City moved to bifurcate the trial of plaintiff's claims. [Doc. #233.] As the City explained in support of that motion, *Monell* claims are uniquely suitable for bifurcation since a municipality can only be found liable under *Monell* if the plaintiff has proved a constitutional violation by the individual defendants involved, and there is a substantial risk of prejudice to the defendants from the introduction of evidence to support both the individual and *Monell* claims. *See generally Bonilla v. Jaronczyk*, 354 F. App'x 579, 582 (2d Cir. 2009); *Amato v. Town of Saratoga Springs*, 170 F.3d 311, 320-21 (2d Cir. 1999). For these reasons, "[c]ourts in the Second Circuit are generally in favor of bifurcating *Monell* claims." *Mineo v. City of New York*, 2013 WL 1334322, at *1 (E.D.N.Y. 2013); *see also, e.g.*, *Morales v. Irizarry*, 1996 WL 609416, at *! (S.D.N.Y. 1996) ("The overwhelming weight of authority holds that since the Town's

---

[2]    The City incorporates the sufficiency arguments in its Rule 50(b) motion in support of this alternative motion for a new trial.

liability is derivative of the individual defendant's liability … the most prudent course is to try the *Monell* claims separately … until the liability of the individual defendants is established.").

The Court denied the City's motion for two reasons. First, the Court rejected the City's argument that it may not be necessary to reach the *Monell* claim if the jury finds no individual defendant liable for a constitutional violation, because the Court had already found defendant Sweeney liable on plaintiff's *Brady* claim. [*See* Doc. #263.] "Thus," the Court reasoned, "regardless of the jury's' determination as to liability of any other individual defendant, reaching the *Monell* claim will be necessary here at least as to Defendant Sweeney." *Id.* But that wasn't true. While the Court had granted *partial* summary judgment on plaintiff's *Brady* claim against Sweeney, it had not found defendant Sweeney liable, as plaintiff still needed to prove at trial that Sweeney's violation of plaintiff's *Brady* rights caused his deprivation of liberty. [*See* Doc. #210 at 33-35; Trial Tr. 3404:23-3405:6 (instructing jury that "your only task as to Mr. Sweeney is to consider the fifth element of causation").] This error turned out to be consequential, for the jury ultimately found that plaintiff *did not* prove the element of causation with respect to Mr. Sweeney.[3]

Second, the Court reasoned that the risk of prejudice *to the individual defendants* was minimal, as evidenced by the fact that "the individual Defendants themselves

---

[3]     As noted in the City's Rule 50(b) motion, the jury's answers to the interrogatories on the verdict form undermine confidence in its verdict. The only *Monell* theory that the jury found proved was that the City "had a widespread practice or custom of suppressing evidence that was favorable to criminal defendants." [Doc. #569 at 4.] Yet, the only defendant found liable for withholding favorable information was Raucci, who (plaintiff contends) had a personal motivation to frame Scott Lewis (and, in turn, plaintiff). It is difficult to reconcile the jury's findings that Raucci's *Brady* violation caused a deprivation of plaintiff's rights, while Sweeney's nearly identical violation did not.

4

notably have not moved for bifurcation." [Doc. #263; *see also id.* ("[T]he Court believes that it could mitigate the risk of prejudice *to the individual Defendants* with carefully-crafted jury instructions.") (emphasis added).] But this ignored the risk of prejudice to *the City* from being tainted by evidence of Raucci's bad character.

To be sure, as the Court noted, the City did not, in its motion, "articulate any separate prejudice it may suffer from a non-bifurcated trial." *Id.* But it does not require hindsight to see how clear that risk of prejudice was. Plaintiff characterized defendant Raucci as not just a "bad apple," but one that is rotten to the core, and built his case against the City around the inference that someone so corrupt—a drug dealer who would frame innocent men as retribution for one of them leaving the drug trade—could only serve in a police department that was equally corrupt. *See, e.g.*, Trial Tr. at 40:11-15 (Opening Argument) ("We will prove that the breadth and scope of misconduct *in this case* could only occur in a police department that failed to hold its officers responsible….") (emphasis added); *id.* at 46:4-8 (describing Raucci as "a man that is completely untethered from truth" and promising to "prove that a person so comfortable lying can only become a police officer investigating homicides in a department that is indifferent to truth and accountability"); *id.* at 3433:20-23 (Closing Argument ("They would rather align themselves with one of the least truthful and reliable witnesses imaginable than take any responsibility for what they have done.").

Had the Court followed "the most prudent course" and tried the *Monell* claim only if necessary following plaintiff's trial against the individual defendants, the City would have been better able to defend itself from the allegation that it fostered a widespread practice or custom of suppressing favorable evidence and that this unspoken policy was

5

the moving cause behind the deprivation of plaintiff's rights. While courts have broad discretion over whether to bifurcate trials, "[a] district court 'abuses' or 'exceeds' the discretion accorded to it when … its decision rests on an error of law … or a clearly erroneous factual finding." *Zervos v. Verizon N.Y.*, 252 F.3d 163, 169 (2d Cir. 2001). Here, the Court's decision rested on the clearly erroneous finding that it would be necessary to reach the *Monell* question because it had already found Sweeney liable as a matter of law and its one-directional assessment of potential prejudice. While the City should have done more to alert the Court to these errors before trial, they nevertheless warrant a new trial.

2.      The Court's partial summary judgment on plaintiff's *Brady* claim against Sweeney caused a second prejudicial error in the jury instructions. In its charge, the Court gave the following instruction with respect to that claim:

> You are to consider all elements of the *Brady* claim with respect to Mr. Raucci and Mr. Maher.
>
> With respect to Mr. Sweeney, I instruct you that, as a matter of law, Mr. Morant has proven elements one through four of his *Brady* claim against Mr. Sweeney. As a result, your only task as to Mr. Sweeney is to consider the fifth element of causation—that is, whether Mr. Morant has proven by a preponderance of the evidence that Mr. Sweeney's withholding of information that was favorable to Mr. Morant was a but-for and proximate cause of Mr. Morant's deprivation of liberty.

Trial Tr. at 3404:21-3405:6. While it was true that the Court had already concluded, as a matter of law, that Sweeney deliberately withheld material, favorable information from the prosecutor, it was nevertheless erroneous to instruct the jury that "Mr. Morant has proven elements one through four of his *Brady* claim against Mr. Sweeney," when the jury was required to find if those same elements had been proven against Raucci. The Court's instruction necessarily telegraphed a view of the evidence that the jury alone

6

was meant to assess in its deliberations. *See generally Quercia v. United States*, 289 U.S. 466, 470 (1993) ("The influence of the trial judge on the jury is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.") (internal quotation marks omitted).

Plaintiff seized upon this instruction in his closing argument, noting that "[y]ou've just been instructed that Sweeney has been found liable for violating Mr. Morant's constitutional rights because he failed to report to the prosecutor that he observed Raucci coercing Ruiz and feeding him his statement, and he failed to report that Ruiz admitted he knew nothing about the crime and was only repeating the story that Raucci had fed to him." Trial Tr. at 3434:22-3435:4. Needless to say, if Sweeney was found liable for failing to report what Raucci was doing, the jury would feel compelled to make the same finding with respect to Raucci. While this error may have been most directly prejudicial to Raucci, it also harmed the City[4]. As discussed in the City's Rule 50(b) motion, the only *Monell* policy that the jury found was a practice or custom of suppressing favorable evidence, and the only defendant that the jury found liable for suppressing favorable evidence was Raucci. [Doc. #618.] It is highly likely that the jury's

---

[4]     This prejudice could have been avoided had the Court granted the City's Motion in Limine to Preclude, Based on Collateral Estoppel, Testimony or Evidence that Detective Sweeney Withheld Exculpatory Evidence in Violation of *Brady* and for Relief Pursuant to Federal Rule of Civil Procedure 60(b)(6). [Doc. #291.] In that motion, the City argued that J. DeMayo's habeas decision, which followed a full evidentiary hearing and was later affirmed on appeal, established that no *Brady* materiality existed. *See Morant v. Comm'r of Correction*, No. CV 02 0485200S, 2007 WL 1893329, at *9 (Conn. Super. Ct. June 12, 2007), aff'd, 117 Conn. App. 279, 979 A.2d 507 (2009). At a minimum, those findings created a genuine issue of material fact as to Brady materiality, making summary judgment against Detective Sweeney inappropriate. Because the City's liability depended upon the jury's finding against Detective Sweeney, the denial of the City's 60(b)(6) prevented jury consideration of all Brady elements as to Sweeney, resulting in the harm described in this paragraph.

finding in that regard was influenced by the Court's instruction that a nearly identical claim against Sweeney had already been proved as a matter of law.

### C. A NEW TRIAL IS WARRANTED BECAUSE THE JURY'S EXCESSIVE DAMAGES AWARD WAS THE RESULT OF PASSION OR PREJUDICE INFLAMED BY PLAINTIFF'S COUNSEL

Even if the evidence supported the jury's determination that a municipal policy or custom caused the deprivation of plaintiff's constitutional rights, it plainly does not support the jury's decision to award plaintiff $38 million in non-economic damages to compensate him for his injuries. As explained further below, compensatory damages for wrongful convictions tend to range from around $200,000 per year of incarceration to an upper limit of $1 million per year. Connecticut's legislature, meanwhile, has determined that the appropriate compensation for an individual who was wrongfully convicted is 200% of the annual median family income in the state, subject to certain adjustments. *See* Conn. Gen. Stat. § 54-102uu(d)(2)(A). The jury's award here—equating to approximately $1.8 million per year of incarceration—dwarfs these accepted measures of damages. Inasmuch as plaintiff did not adduce evidence that his injuries were especially severe relative to other wrongfully convicted plaintiffs, the only explanation for the jury's astronomical award is that it was unduly influenced by passion or prejudice.

It is easy to trace this influence. Throughout the trial, plaintiff's counsel sought to channel the jury's reasonable anger at the actions of defendant Raucci toward the City, despite the dramatically different degrees of culpability of each defendant. Most notably, after opposing the City's motion to bifurcate—and after devoting considerable energy at trial to proving that Raucci was a drug dealer connected to organized crime who set out deliberately to frame Scott Lewis (and, in turn, plaintiff) for murder as revenge for

8

Lewis's decision to exit the drug trade, *see, e.g.*, Trial Tr. at 52:4-8, 1905:8-19, 1552:1-25, 3346:2-5, 3444:12-3445:13—plaintiff unilaterally and without explanation dropped his claim for punitive damages against Raucci. [*See* Doc. #554.] In other words, plaintiff presented evidence to support a punitive damages verdict against Raucci and then removed that potential outlet for the jury to express the anger that plaintiff provoked, leaving only the general compensatory damages line.

Indeed, during summations plaintiff's counsel, Attorney Brustin, directly exhorted the jury send a message to the City through its verdict. Trial Tr. at 3463:7-12 ("Say it loud and clear with your verdict. …. Say it loud enough and clearly enough that even the City of New Haven can finally hear it."). Notably, Attorney Brustin urged the jury to "[s]ay it loud and clear with [its] verdict" immediately before turning to the topic of damages and recommending, without invoking any particular evidence, that the jury award plaintiff anywhere from $60 million to $90 million to compensate him for 21 years of incarceration and future pain and suffering. *See id.* at 109. As courts have recognized, these types of "[s]end-a-message arguments are improper because they constitute an implicit request for punitive damages, and this request is inappropriate at the compensatory liability/damages stage." *Gaddy v. Terex Corp.*, 2018 WL 11350558, at *2 (N.D. Ga. Dec. 18, 2018); *see also, e.g.*, *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1033 (N.D. Ill. 2011) ("Given that compensatory damages are limited to actual losses, this court agrees that Betts' argument that the jury should "send a message" is a punitive damages argument.")).

9

The City's counsel, Attorney Gerarde, attempted to mitigate this concern in his own summation, by correctly reminding the jury that it must "put [sympathy and anger] aside" when deliberating:

> If you're in there and you're deliberating and someone senses that there's anger going on that's driving some of the conversation, raise your hand and say, hey, let's not let anger decide this, all right? Let's just stay cool, calm, and collected and get back to what we were talking about. If it starts to be grounded in sympathy, raise your hand and say let's not base this on sympathy. Let's be cool, calm, and collected and let common sense and logic drive what we're doing. If one of the lawyers gets you riled up—that happens, all right—don't let each other make a decision based on sympathy or anger.

Trial Tr. at 3505:11-22. Attorney Gerarde's statements aligned with the Court's instructions that the jury may not "permit sympathy or emotion to influence [its] verdict" and that it "should draw no inference against any defendant simply for their decision to defend against Mr. Morant's claims." *Id.* at 3375:24-3376:1.

But in rebuttal, Attorney Brustin doubled down, explicitly *encouraging* the jury to let anger guide its deliberations and falsely assuring them that doing so was permissible under the Court's instructions:

> [T]here's … something Mr. Gerarde said, counsel for the City, that we disagree with: that you are not allowed to be angry. In fact, there's nothing in the charge that says you can't be angry. You should be angry. You should be absolutely furious. You should be furious at what the defendants did in this case. You should be furious about the systemic misconduct you saw. And there is nothing wrong with that. You should also be furious about the arguments they made in this courtroom throughout the trial and today.

*Id.* at 3568:10-20. These statements were plainly improper. *See, e.g.*, *United States v. Anaya*, 727 F.3d 1043, 1059 (10th Cir. 2013) (statement in summation that defendant's conduct "should make you angry" was improper, but harmless in light of other evidence and trial court's curative instruction).

10

As the Second Circuit has long held, "when the conduct of counsel in argument causes prejudice to the opposing party and unfairly influences a jury's verdict, a new trial should be granted." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992); *see also, e.g., Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) ("Quite plainly, a party is entitled to a new trial when opposing counsel's conduct causes prejudice to that party by appealing to a jury's possible biases, thereby unfairly influencing its verdict."). Here, there can be little doubt that Attorney Brustin's comments were intended to inflame the jury's passions—both sympathy for plaintiff and antipathy toward defendants.

With respect to the City, in particular, Attorney Brustin's comments were especially improper, as they sought to stir up anger on the basis of its decision to defend itself at trial. *See* Trial Tr. at 3568:18-19 ("You should … be furious about the arguments they made in this courtroom throughout the trial and today."). "To imply or argue that the mere act of defending oneself, or the mere act of bringing suit, is reprehensible serves no proper purpose and for time out of mind it has been the basis for appellate courts ordering new trials." *Whittenburg v. Werner Enterprises Inc.*, 561 F.3d 1122, 1130 (10th Cir. 2009) (Gorsuch, J.) (citing, *inter alia*, *New York Cent. R. Co. v. Johnson,* 279 U.S. 310, 318 (1929) (Stone, J.) (reversing and mandating new trial in light of "bitter and passionate attack on petitioner's conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the jury")).

While no defendant objected to these statements in real time, their impropriety is plain and obvious, particularly given that they were accompanied by a mischaracterization of the Court's instructions—the false assurance that "there is

11

nothing wrong with" being "furious" with defendants while deliberating.[5] Likewise, the prejudicial nature of these comments is made plain by the jury's response: a $38 million verdict well in excess of any amount reasonably supported by the evidence.

Because the verdict was excessive and evidently influenced by a direct appeal to passion and prejudice, "a new trial should be granted" without qualification. *Pappas*, 963 F.2d at 540.

### D. ALTERNATIVELY, THE COURT SHOULD REMIT PLAINTIFF'S DAMAGES AND ORDER A NEW TRIAL IF PLAINTIFF REFUSES THE REMITTITUR

While the foregoing arguments independently warrant an unqualified new trial, the Court should, at a minimum, reduce the shockingly high damages award and condition the denial of a new trial on plaintiff's acceptance of the remitted amount. *See generally*, *e.g.*, *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) ("Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014) ("Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high.").

Remittitur is appropriate "in at least two circumstances: (1) where the Court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error."

---

[5]    That Attorney Brustin was encouraging the jury to allow anger to guide its deliberations is evident from the fact that he was explicitly "disagree[ing]" with Attorney Gerarde's statement that they should "not let anger decide this." *Compare* Trial Tr. at 3505:13-16 *with id.* 3568:12-20.

*Newton v. City of New York*, 171 F. Supp. 3d 156, 165 (S.D.N.Y. 2016). An award is intrinsically excessive "if it is so high as to shock the judicial conscience and constitute a denial of justice." *Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017). In making this determination, "courts canvass the amounts awarded in 'comparable cases' and determine whether the award falls within the 'reasonable range'". *Newton*, 171 F. Supp. 3d at 165; *see also Jennings v. Yurkiw*, 18 F.4th 383, 394 (2d Cir. 2021) (affirming remittitur of damages award after comparison with similar cases). Whether an award "surpasses an upper limit" is "not a question of fact with respect to which reasonable persons may differ, but a question of law." *Newton*, 171 F. Supp. 3d at 165.

**1.    An Award of $1 Million Per Year of Incarceration is the "Upper Limit" for Compensatory Damages in Wrongful Conviction Cases**

Plaintiff's $38 million award, spread across 21 years of incarceration, equals roughly $1.8 million per year. That figure is nearly double the amount that courts in this circuit and elsewhere have cited as the upper limit for wrongful-conviction cases.

In *Restivo*, the Second Circuit sustained an award of $1 million per year of wrongful incarceration, holding that the district court "did not abuse its discretion in holding that the amount awarded, $1 million per year of wrongful incarceration per plaintiff, neither shocks the conscience nor materially deviates from reasonable compensation." 846 F.3d at 588. In so holding, the Second Circuit relied on a First Circuit decision that likewise approved of $1 million per year for "wrongful incarcerations of between eighteen and thirty-three years, but not[ed] that this was at the high end of what would be permissible." *Restivo*, 846 F.3d at 588 (citing *Limone v. United States*, 579 F.3d 79, 103–07 (1st Cir. 2009)). The Second Circuit reiterated this ceiling in *Ortiz*

13

*v. Stambach*, 137 F.4th 48 (2d Cir. 2025), where (in sustaining an award of $5 million in compensatory damages for approximately ten years of wrongful imprisonment) it observed that "this Court and other courts have upheld awards of compensatory damages of approximately $1 million for each year of incarceration." *Id.* at 73 (citing *Restivo*, 846 F.3d at 588); *see also, e.g.*, *Alston v. City of New York*, 2023 WL 11956309, at *6 (E.D.N.Y. 2023) (observing that a "review of case law in this Circuit" suggests that "an award in the range of $500,000 to $1 million for each year of incarceration is typically considered reasonable" and recommending an award of $750,000 for 15 months of incarceration, a rate of $600,000 per year); *Burton v. City of New York*, 630 F. Supp. 3d 586, 596 (S.D.N.Y. 2022) (awarding $19 million for nearly 20 years of incarceration where plaintiff was a juvenile at the time of the alleged crime and was physically abused during part of his incarceration); *Gilliam v. Allen*, 62 F.4th 829, 850 (4th Cir. 2023) (affirming award of $62 million to two plaintiffs who served 31 years, i.e. $1 million per year, but describing the award as "unprecedented in size.").

Where compensatory damages awards exceed $1 million per year of wrongful incarceration, courts have not hesitated to order remittitur. In *Newton*, for example, the Court remitted an $18 million award to $12 million, reasoning that compensatory damages for the plaintiff's wrongful incarceration "should not have exceeded one million dollars per year of imprisonment." 171 F. Supp. 3d at 177. While the plaintiff in *Newton* had cited some higher awards, the Court distinguished those cases as involving either short periods of incarceration or exceptional circumstances such as being placed in an adult prison as a juvenile or sustaining physical abuse while in prison. *Id.* at 175–76. Courts in other circuits have applied a similar benchmark. *See, e.g.*, *Wallace v. Powell*,

14

2022 WL 3447197, at *14–15 (M.D. Pa. Aug. 16, 2022) (recognizing that "$1 million per year of wrongful imprisonment in an adult prison may reasonably compensate a plaintiff's injuries" and citing *Newton* for the proposition that $1 million per year "is the 'upper boundary' for similar cases.").

While $1 million per year of incarceration is the "upper boundary" for compensatory damages, the sustained per-year awards in analogous wrongful incarceration cases—including a recent verdict in this district—tend to cluster closer to $500,000 per year. *See, e.g., Birch v. Town of New Milford*, 2025 WL 1603217 (D. Conn. June 6, 2025) ($5.7 million for more than thirty years of wrongful incarceration, i.e. $190,000 per year); *Ortiz v. Stambach*, 137 F.4th 48 (2d Cir. 2025) ($5 million for approximately 10 years of incarceration, or $500,000 per year); *Kelley v. Reyes*, No. 2:19-cv-17911 (D.N.J. Mar. 25, 2026) ($12 million for approximately 24 years of wrongful incarceration, or $500,000 per year); *Earley v. Annucci*, 2018 WL 5993683, *reversed and remanded on other grounds*, 810 F. App'x 60 (2d Cir. 2020) ($150,000 for 202 days of imprisonment, or $271,000 per year); *Wallace v. Powell*, 2022 WL 3447197 (M.D. Pa. Aug. 16, 2022) ($1,000 per day, or $365,000 per year, with individualized adjustments); *Waters v. Town of Ayer*, 2009 WL 3489372 (D. Mass. Sept. 17, 2009) ($10,729,000 for just under 18.5 years, or approximately $580,000 per year); *Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) ($13,300,000 for 21 years, or $630,000 per year).

Plainly, plaintiff's award of approximately $1.8 million per year falls well outside the "reasonable range" of awards in "comparable cases." *Newton*, 171 F. Supp. 3d at 165. Most saliently, it is nearly 10 times the rate that a jury in this district awarded to a

15

similarly situated plaintiff who was incarcerated for an even longer period, *see Birch*, 2025 WL 1603217, and four times the rate sustained by the Second Circuit in its most recent decision addressing wrongful-conviction damages, *see Ortiz*, 137 F.4th 48, and nearly double the $1 million per year rate that decisions like *Restivo*, *Newton* and *Limone* have described as the upper limit of permissible compensation. This case does not, moreover, involve the sort of aggravating factors that accompany outlier awards, such as juvenile status, persistent physical abuse, or significant illness suffered in prison. *See Newton*, 171 F. Supp. 3d at 175-76.

### 2. An Award of $1.8 Million Per Year Vastly Exceeds the Rate Deemed to be Reasonable Compensation by the Connecticut Legislature

The $38 million award in this case is rendered even more excessive in light of the fact that plaintiff has already recovered nearly $6 million from the State through the wrongful-incarceration claim he pursued in the Claims Commissioner's Officer pursuant to Conn. Gen. Stat. § 54-102uu. Following an evidentiary hearing at which plaintiff and his family members were able to present evidence of both his wrongful conviction and the injuries he and they suffered as a result, the Claims Commissioner concluded that $5,817,237.00 was appropriate compensation for *both* economic and non-economic damages. (*See* Jan. 2, 2025, Decision at 6-8, attached as **Ex. A**.) [6]

To be sure, the Claims Commissioner's award was dictated in part by a statutory formula that does not bind the jury or the Court in this case. *See* Conn. Gen. Stat. § 54-102uu(d)(2)(A) ("In determining the amount of such compensation, the Claims Commissioner shall award an amount that is two hundred per cent of the median family

---

[6]     As explained below, this amount must be offset from the final (remitted) award of damages in this case. *See* Conn. Gen. Stat. 53-102uu(i).

income for the state for each year the claimant was incarcerated, as determined by the United State Department of Housing and Urban Development, adjusted for inflation using the consumer price index for urban consumers, provided the amount for any partial year shall be prorated in order to compensate only for the portion of such year in which such claimant was incarcerated. The Claims Commissioner may decrease or increase the award amount by twenty-five per cent based on an assessment of relevant factors including, but not limited to, the evidence presented by the claimant under subdivisions (1) to (6), inclusive, of subsection (c) of this section."). But the fact that the legislature has determined that a rate 200% of the average median family income for the state is an appropriate baseline measure of compensation for wrongful incarceration simply underscores that the jury's award of approximately *ten times* that amount per year is unreasonable.

***

By any measure, the award of $38 million in noneconomic damages in this case is well outside the range supported by the evidence and comparable cases. The Court should remit the damages award to a total "within the reasonable range," *Newton*, 171 F. Supp.3d at 165, which is approximately $500,000 to $1,000,000 per year of incarceration, or $10,500,000 to $21,000,000 in total damages.

### E.    THE FINAL AWARD IN THIS CASE MUST BE FURTHER REDUCED PURSUANT TO CONN. GEN. STAT. § 54-102UU(I)

As noted above, plaintiff secured a verdict in this civil suit after receiving $5,817,237.00 in compensation from the Claims Commissioner under Conn. Gen. Stat. § 54-102uu. That statute establishes a system of compensation for individuals who have served all or part of a sentence based on a conviction that has been vacated or

17

reversed on "grounds of innocence or grounds consistent with innocence" or "a ground citing an act or omission that constitutes malfeasance or other serious misconduct." *Id.* § 54-102uu(a)(1), (2). As a condition of receiving compensation under § 54-102uu, a claimant must release any claims against the State arising out of his wrongful conviction and incarceration, but (following an amendment of the original statute) may pursue related claims against other parties, including municipalities and municipal officials. *See id.* at § 54-102uu(h).

In order to avoid a double recovery, however, the statute provides that "any damages awarded after an award pursuant to this section to the claimant resulting from an action by the claimant against any other unit of government within this state by reason of the same subject of the claim *shall be offset* by the amount of the compensation award received under this section." *Id.* § 54-102uu(i) (emphasis added). Here, the jury's damages award was "awarded after an award pursuant to" § 54-102uu based on the same underlying claim. Thus, by the plain language of § 54-102uu(i), whatever amount of damages is ultimately awarded to plaintiff in this case must be offset by $5,817,237.00.

This language clearly and unambiguously requires an offset.[7]

---

[7]  In *Birch v. Town of New Milford*, the court, citing a prior version of Conn. Gen. Stat. § 54-102uu, held that the statutory offset provision did not apply because the plaintiff's recovery arose from a settlement agreement with the State and pursuant to Conn. Gen. Stat. § 3-125a, and the provisions of § 54-102uu "shall not apply to any agreement or stipulation pursuant to the provisions of section 3-125a." 2025 WL 1603217 (D. Conn. June 6, 2025) (citing former § 54-102uu(*l*)). Needless to say, that reasoning does not apply here, where plaintiff's prior award was obtained pursuant to § 54-102uu, not § 3-125a. In any event, even if it was not mandated by § 54-102uu(i), an offset would still be required in order to prevent a double recovery. *See generally Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989) (applying "the one satisfaction rule, which provides that a plaintiff is entitled to only one satisfaction for each injury"); *accord Belanger v. Vill. Pub I, Inc.*, 26 Conn. App. 509, 516 (1992).

## III.    CONCLUSION

For the foregoing reasons, the Court should (if it denies the City's renewed motion for judgment) order a new trial without qualification, or alternatively a new trial conditioned on plaintiff's refusal to accept a substantially reduced damages award. Once the Court has determined a final damages award, it must be offset by $5,817,237.00 pursuant to General Statutes § 54-102uu.

DEFENDANT,
CITY OF NEW HAVEN


By_____/s/ Thomas R. Gerarde_____
   Thomas R. Gerarde (ct05640)
   Alan R. Dembiczak (ct25755)
   Amanda E. Stone (ct31531)
   Lidia M. Michols (ct31789)
   Abigail R. Willauer (ct31834)
   Howd & Ludorf, LLC
   100 Great Meadow Road
   Suite 201
   Wethersfield, CT  06109
   Ph:  (860) 249-1361
   Fax:  (860) 249-7665
   E-mail: tgerarde@hl-law.com
   E-mail: adembiczak@hl-law.com
   E-mail: astone@hl-law.com
   E-mail: lmichols@hl-law.com
   E-mail: awillauer@hl-law.com