# Exhibit A

**STATE OF CONNECTICUT**
**CLAIMS COMMISSIONER'S OFFICE**
**450 COLUMBUS BLVD, SUITE 203**
**HARTFORD, CT 06103**

**STEFON MORANT**                                              **CLAIM NO. 26501**

     **v.**

**STATE OF CONNECTICUT**                                  **JANUARY 2, 2025**


### DECISION PURSUANT TO CONNECTICUT GENERAL STATUTES SECTION 54-102uu – COMPENSATION FOR WRONGFUL INCARCERATION


On November 30, 2021, the claimant, Stefon Morant, filed a wrongful incarceration claim with the Claims Commissioner's Office pursuant to Connecticut General Statutes section 54-102uu.  The Claims Commissioner's Office notes that the Connecticut General Assembly recently amended section 54-102uu under Public Act 24-106, signed into law by Governor Lamont on June 4, 2024.  This new law applies to claims pending before the Claims Commissioner's Office, including Mr. Morant's claim.  The new amendments to the law are reflected in this decision.

### I.    BACKGROUND

This claim arises from the murders of Ricardo Turner and Lamont Fields in the Hill section of New Haven in the early morning hours of October 11, 1990. Both victims were shot repeatedly at point blank range inside Turner's apartment, with signs that the perpetrator(s) had been known to the victims (there was no sign of forced entry). Despite a lengthy investigation in which over 25 witnesses were interviewed and more than 30 police reports filed, the case remained unsolved for more than three months.

In early January 1991, the original lead detective was transferred to another division, and Detective Vincent Raucci took over. Without filing a single additional report or any further street work, Raucci took the investigation in an abruptly different direction.

Raucci did so by strong-arming two vulnerable teenagers – 17-year-old Ovil Ruiz, an inner-city youngster who Raucci had under arrest in another shooting and who suffered from severe mental problems, and Jose Roque, likewise an inner-city New Haven teenager (16 years old) – to implicate Scott Lewis, and Lewis's friend, Stefon Morant.

1

**Exhibit A**

Although Ruiz repeatedly insisted he knew nothing about the murders, Raucci ultimately obtained a taped statement from him, feeding Ruiz information about the crime and promising to release him on the charges for which he was already under arrest if he provided the statement against Lewis and Morant that Raucci was seeking.

Likewise with Roque, from whom Raucci obtained a similar statement the following night, Raucci fed him the information he was to provide on the taped statement, and threatened to charge him with the murders if he did not comply. Further, as Roque later reported to the FBI, Raucci would repeatedly stop and restart the tape in the course of the taping session to tell Roque how to answer. In January 1997, as part of an FBI investigation into Raucci and his conduct of the Turner-Fields case described below, the FBI issued a report of its forensic examination of the NHPD tape of the statement taken by Raucci from Roque, corroborating Roque's account (which Raucci had falsely denied at trial), that the tape had been stopped and restarted at least 11 times and that there were four instances of over-recordings erasing underlying information. That FBI lab report was entered as an exhibit at the hearing in this case.

Neither Lewis nor Morant had ever been mentioned by any of the witnesses interviewed or the 30+ police reports filed during the first three months of the investigation before Raucci took over.  They were not among the numerous individuals with whom Turner dealt in the drug trade in the Hill, including several with whom he had recent conflicts, and there was no physical or forensic evidence tying either Lewis or Morant to the crime.  Nevertheless, based almost entirely on the testimony of Ruiz, tracking his taped police statements to Raucci, both Morant and Lewis were convicted and sentenced to lengthy prison terms – 70 and 120 years, respectively..

Following the convictions, Lewis contacted the FBI, which proceeded to conduct an 18-month investigation. The 187-page report of that investigation, released in January 1997, documented Raucci's ties to the New Haven drug underworld and the misconduct through which Raucci had fabricated a case against Lewis and Morant.

Every one of the witnesses from whom Raucci had procured inculpatory statements renounced those statements, in sworn accounts to the FBI, independently confirming the manner in which Raucci had planted evidence with each of them and used threats and manipulation of the tapes – once again confirmed by subsequent forensic testing.

The FBI findings, and the renunciations of the statements Raucci had coerced, were further confirmed by Raucci's direct supervisor, retired Lieutenant Michael Sweeney, who testified in post-conviction proceedings in 1999 to first-hand observations of Raucci feeding Ruiz "the whole story", despite Sweeney's admonitions to Raucci not to do so, and notwithstanding Ruiz's repeated indications he knew nothing about the

2

**Exhibit A**

murders.

Yale Clinical Professor Brett Dignam, with some forty years practicing as an attorney, stated, in an exhibit at the hearing, that she was "not aware of another instance of a federal law enforcement agency agreeing to investigate a wrongful conviction at an incarcerated person's request, and then uncovering significant evidence of corruption substantiating that person's claims of innocence."  Long-time criminal defense attorney Michael Fitzpatrick, who testified in person at the hearing and was intimately familiar with Mr. Morant's case, stated that "a case like Stefon Morant's only comes along once every 50 years . . . where you have this level of corruption."

In June 2015, after Mr. Morant had served more than 21 years, New Haven State's Attorney Michael Dearington himself stated in open court, in agreeing to Mr. Morant's release, that the State's "key witness" [Ruiz] "was not honest in his testimony with respect to both trials, and it's public information that a certain police officer [Raucci] had put him up to contriving a story."

Mr. Morant was subsequently granted an "absolute and unconditional pardon," following an application to the Board of Pardons and Paroles documenting his innocence, including portions of the FBI investigative report, the forensic findings of the FBI lab documenting Raucci's the manipulation of the Roque tape, and the transcript of Lieutenant Sweeney's post-conviction testimony.

The Claims Commissioner's Office held a full-day in-person evidentiary hearing on October 19, 2024. Mr. Morant and members of his family were present throughout the hearing. In all there was testimony from eight witnesses and there were more than 50 exhibits entered, including a number of expert reports. The witnesses included: (1) Attorney Fitzpatrick, who testified concerning the FBI report, the evidence he had obtained from Lt. Sweeney, and the overall evidence of innocence; (2) Mr. Morant's wife and mother, who testified concerning the impact of Mr. Morant's wrongful incarceration on him, his children and his extended family, and the challenges he has faced since his release;  (3) his son, Julian, who testified concerning the impact of the case on both him and his now-deceased twin brother; (4) Mr. Morant himself, who testified to the thirty-year ordeal he suffered from the time of his first meeting with Raucci in January 1991 through the ultimate expungement of his felony murder conviction in July 2021, the challenges he faced even after his release from prison in 2015, his continued maintenance of full-time employment notwithstanding those challenges, his involvement in church and religious affairs, and his support for those around him; (5) Karen Wolff, the retired head of social work for the national Innocence Project, who testified concerning Mr. Morant's extraordinary leadership in the innocence movement; and (6) Dr. Steven Shapiro, a PhD economist, who testified concerning Mr. Morant's lost earnings and the calculation of statutory compensation

# Exhibit A

for his 21 years of wrongful incarceration.

The exhibits entered at the hearing included: (1) evidence concerning Mr. Morant's eligibility for compensation, including excerpts from the FBI report relating to Detective Raucci's illicit drug-dealing and the renunciations to the FBI by numerous witnesses concerning the statements Raucci had coerced from them; (2) the transcript of the testimony of Lt. Sweeney; (3) the transcript of State's Attorney Dearington's in-court representations concerning the "dishonest" trial testimony of Ruiz and Raucci's role in "contriving" it; (4) photographic and documentary evidence concerning Mr. Morant's children and parenting efforts and challenges -- both during incarceration and subsequent to his release; (5) letters and other documents relating to damages to familial relations; (6) letters attesting to Mr. Morant's religious devotion and community service both during incarceration and subsequent to release; (7) the PTSD report of his therapist, Danielle Marinucci; (8) employer references and other documentation of his work ethic and employment record since release; and (9) the expert reports of Dr, Shapiro (economist) and Dr. Joy (vocational and rehabilitation expert) concerning Mr. Morant's economic damages.

The decision in this claim is based upon the testimony presented during the hearing, as well as the exhibits that were made part of the record.

## II.    DECISION

### A. <u>The Claims Commissioner's Office concludes that Mr. Morant is eligible to receive compensation under section 54-102uu.</u>

The first question for the Claims Commissioner's Office is to decide whether Mr. Morant is eligible to receive compensation under section 54-102uu for wrongful incarceration.

Section 54-102uu sets forth the eligibility to receive compensation as follows:

> (a) A person is eligible to receive compensation for wrongful incarceration if:
> (1) Such person has been convicted by this state of one or more crimes and has been sentenced to a term of imprisonment for such crime or crimes and has served all or part of such sentence; and
> (2) Such person's conviction was (A) vacated or reversed, and (B) the complaint or information dismissed on (i) grounds of innocence or grounds consistent with innocence, or (ii) a ground citing an act or omission that constitutes malfeasance or other serious misconduct by any officer, agent, employee or official of the state that contributed to such person's arrest, prosecution, conviction or incarceration.

4

# Exhibit A

Mr. Morant is claiming eligibility for compensation under subdivision (a)(2)(i), which requires that his conviction was vacated on "grounds of innocence or grounds consistent with innocence."

Subdivision (a)(3) defines "grounds consistent with innocence" as follows:

> "for purposes of this subsection, "grounds consistent with innocence" includes, but is not limited to, a situation in which a conviction was vacated or reversed and there is substantial evidence of innocence, whether such evidence was available at the time of the investigation or trial or is newly discovered."

The Claims Commissioner's Office concludes that Mr. Morant is eligible to receive compensation, because: (1) under subdivision (a)(l), Mr. Morant served a substantial part of the sentence of imprisonment imposed for his conviction in the Turner-Fields case; and (2) under subdivision (a)(2), such conviction was vacated and the information dismissed on grounds consistent with innocence, within the meaning of subdivisions 54-102uu(a)(2)(i) and (a)(3).

### B.  **Determination of the award of compensation.**

### 1.  *Statutory provisions*

<u>Connecticut General Statutes</u> subdivision 54-102uu(d)(2)(A) provides:

> "In determining the amount of such compensation, the Claims Commissioner shall award an amount that is two hundred per cent of the median family income for the state for each year the claimant was incarcerated, as determined by the United States Department of Housing and Urban Development, adjusted for inflation using the consumer price index for urban consumers, provided the amount for any partial year shall be prorated in order to compensate only for the portion of such year in which such claimant was incarcerated.  The Claims Commissioner may decrease or increase the award amount by twenty-five percent based upon an assessment of relevant factors including, but not limited to, the evidence presented by the claimant under subdivisions (1) to (6), inclusive, of subsection (c) of this section."

### 2.  ***Evidence relating to the calculation of the award of compensation in this claim***

Evidence relating to the calculation of the award includes:

# Exhibit A

**Period of wrongful incarceration**:

Mr. Morant was arrested on February 28, 1992, at age 23.  He was released on surety bond on April 27, 1992. He was reincarcerated upon conviction on June 8, 1994 and remained incarcerated until his release on June 17, 2015, at age 47.  In all, Mr. Morant was incarcerated for 21 years, two months and thirteen days.

**Calculation of the initial baseline award of compensation under Connecticut General Statutes subdivision 54-102uu(d)(2)(A):**

Mr. Morant presented expert evidence during the hearing that the initial baseline award amount under the subdivision 54-102uu(d)(2)(A) formula is as follows:

The award calculation for the 21 years, two months and thirteen days that Mr. Morant was wrongfully incarcerated -- from February 28, 1992 through April 27, 1992 and from June 8, 1994 through June 17, 2015 -- is **$5,168,166**.

The Claims Commissioner's Office accepts these calculations and hereby awards the baseline amount of **$5,168,166**.

**Calculation of the additional adjusted award of compensation under Connecticut General Statutes subdivision 54-102uu(d)(2)(A):**

In addition to the economic and financial evidence presented by Mr. Morant, he also presented significant evidence bearing on the discretionary adjustment that is referred to in subdivision 54-102uu(d)(2)(A).  This evidence included:

➢ Evidence relating to Mr. Morant's age, income and vocational training and level of education at the time of conviction, and the related reports and analysis of vocational expert Dr. Jeffrey Joy, the lost earnings and lost earning capacity analysis of economist Shapiro; the now more than 8-year track record of Mr. Morant's steady work history since release (often at menial and minimum wage jobs, particularly in the early years following his release); and attestations to his strong work ethic from his employers.

➢ The testimony of Mr. Morant's wife, son, mother and aunt, who described the damages to Mr. Morant's familial relations, supplemented by numerous exhibits.

➢ Mr. Morant's personal testimony concerning separation from his children and his extremely close-knit extended family; the losses of close family members for whom he could not be present either prior to their passing or with the family

# Exhibit A

while mourning their loss, including the death of his younger brother Julien at age 38 and of his own father while he was incarcerated (among others); and the struggles of his son Christian, who died at age 29 shortly after Mr. Morant's release.

➢ Mr. Morant's personal testimony and exhibits relating to the damage to his reputation, including during the five years following release while he remained under the cloud of felony-murder convictions despite his innocence.

➢ Evidence relating to the severity of the crimes for which he was wrongfully convicted and whether Mr. Morant was under a sentence of death (Mr. Morant was not under a sentence of death).

➢ Evidence relating to whether Mr. Morant had to register (Mr. Morant did not have to register).

➢ Evidence concerning Mr. Morant's community service and support for others, both during incarceration (six years of service as a prison Hospice aide and leadership in the prison religious community) and since his release. This evidence included attestations from practitioners with decades of experience in the criminal justice system –singling out Mr. Morant  as one of the most extraordinary persons they ever encountered: Darcy McGraw (38 years as both a prosecutor and then defense attorney; Lauren Weisfeld (41 years as trial and appellate public defender); Richard Emanuel (50 years as criminal defense attorney); and Karen Wolff (14 years as national IP lead social worker --"Stefon Morant is one of the most amazing people I have ever met, including [100s of] exonerees, staff at the IP and anyone else").

The Claims Commissioner's Office concludes that Mr. Morant should be awarded a 12.5**%** increase to the baseline award of **$5,168,166**.

This **12.5%** increase is **$ 646,021**.

**Calculation of the additional award for Training, Counseling and Education under Connecticut General Statutes section 54-102uu(e)**

Connecticut General Statutes subsection 54-102uu(e) provides:

"In addition to compensation paid under subsection (d) of this section, the Claims Commissioner may order payment for the expenses of employment training and counseling, tuition and fees at any constituent unit of the state system of higher education."

# Exhibit A

Mr. Morant testified to his commitment to obtain further training, counseling and education; and he submitted evidence that the expenses for employment and training and counseling, as well as tuition and fees at any constituent unit of the state system of higher education, would be as follows:

- ➢ Employment training and counseling:    $13,050

- ➢ Tuition & fees (community college)
  - $5,218 per year x 3 yrs (w/ inflation)    $16,698

  **Total**    **$29,748**

The Claims Commissioner's Office accepts these calculations and hereby awards the amount of **$29,748**.

Mr. Morant agrees that this amount of $29,748 will be transferred to the Connecticut Bar Foundation ("CBF").  Such funds to be applied, when and as eligible, for approved services rendered for the benefit of Mr. Morant, administered in accordance with the terms of the February 21, 2019 Memorandum of Understanding ("MOU") between the Connecticut Bar Foundation and Community Partners in Action Inc.  Payment of approved services to qualified third party service providers, subject to the approval and service provider payment procedures set forth in the MOU, and limited to the training and educational expenses specified above, up to the total amount of $29,748, shall be allowed for a period of five years from the date as of which such funds first become available for disbursement. Any unused funds remaining in the possession of the CBF at the expiration of that five-year period shall be returned to the Connecticut Treasury upon expiration of the 5-year period (unless otherwise extended under the provisions of the MOU).

3.  ***Total Amount of Compensation Award for Mr. Morant:***

Mr. Morant may have taken a loan of some sort against the potential award that the Claims Commissioner's Office is ordering in this claim.  The Claims Commissioner's Office was inclined to further investigate the nature of this loan and the amount that Mr. Morant will have to pay back in principal and interest; but Mr. Morant's legal counsel respectfully requested that the resolution of this claim not be furthered delayed (this claim was filed more than four years ago in 2021).   Accordingly, the Claims Commissioner's Office respectfully suggests to the General Assembly that it may make sense for the General Assembly to investigate the nature and the regulation of these "pre-award" loans.

# Exhibit A

The following is the final award:

    **A. Compensation (subsection d)**

Baseline Award:                                                                            $5,168,166

Additional 12.5% Adjusted Increased award:                        $   646,021

Reimbursement of the Filing fee to the Claims Commissioner's Office:      $           50

    **Total Compensation Award:**                                      **$ 5,814,237**


    **B. Training & Tuition allowance (subsection e):**       **$   29,748**


The compensation  award of **$ 5,814,237** shall be paid to Mr. Morant from the State Comptroller's Adjudicated Claims Fund.

The allowance for qualified expenses of **$29,748** shall be transferred to the Connecticut Bar Foundation from the State Comptroller's Adjudicated Claims Fund to be held and administered for the benefit of Mr. Morant in accordance with the terms of the aforesaid MOU.

Pursuant to Connecticut General Statutes subsection 54-102uu(g), Mr. Morant shall sign a release to be provided to the Connecticut Attorney General's Office which states that Mr. Morant voluntarily relinquishes any right to pursue any other action or remedy at law or in equity against the State that Mr. Morant may have arising out of such wrongful conviction and incarceration.


    BY ORDER OF THE CLAIMS COMMISSIONER'S OFFICE




_____
         *Robert F. Shea, Jr.*
         ROBERT F. SHEA, JR.

**Exhibit A**