**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

STEFON MORANT,

        Plaintiff,

    v.

CITY OF NEW HAVEN, et. al.,

        Defendants.

Civil Action No. 2:22-cv-00630 (SVN)

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CITY OF NEW HAVEN'S MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. P. 50(b)**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD ...................................................................................................... 4

FACTUAL RECORD ...................................................................................................... 5

ARGUMENT ................................................................................................................ 10

I.    The jury's finding that the City had a widespread practice or custom of suppressing

      evidence favorable to criminal defendants was well supported............................................ 10

II.   The jury's finding that the City was the moving force behind the violations of Plaintiff's

      constitutional rights was well supported.................................................................. 13

CONCLUSION............................................................................................................... 18

## INTRODUCTION

After a month of trial and three days of careful deliberation, the jury found former New Haven Police Department Detectives Vincent Raucci and Vaughn Maher engaged in unconstitutional misconduct that caused Plaintiff Stefon Morant's wrongful conviction, and that the City of New Haven was directly responsible for causing those constitutional violations. In particular, the jury found the City had a "widespread practice or custom of suppressing evidence that was favorable to criminal defendants" and that "the City of New Haven's actions were the moving force behind the constitutional violations, such that the City is responsible for the violation of Mr. Morant's constitutional rights." ECF No. 577 at 4–5.

That verdict was based on overwhelming supporting record evidence, including consistent admissions from multiple high-ranking NHPD officers about the widespread practice, admissions by the City's own Rule 30(b)(6) representative corroborating that testimony, and proven specific examples of improper suppression which the City knew about at the time and admittedly took no steps to address. It was supported by unrebutted opinions from a well-qualified police practices expert that the practices fell well below minimally acceptable policing standards; indeed, he said he had never seen such extensive violations in his entire 40-year career. And the proof interlocked with the extensive evidence supporting the related theories of *Monell* liability, including the particularly strong "code of silence" coming all the way from the top putting pressure on officers to hide fellow officer misconduct and the powerful evidence of Chief Pastore's deliberate indifference to officer misconduct and ratification of the misconduct in this case.

The City's motion for judgment as a matter of law is predicated on a tortured interpretation of the jury's verdict that has no basis in either law or the trial record. The City

1

conjures up a hypothesized explanation for the jury's verdict out of thin air, then uses that as a premise for its challenges to the sufficiency of the evidence. The argument fails at every step. As but a few examples of the fatal legal, factual, and logical flaws:

- The City presupposes that in evaluating the sufficiency of the support for the verdict against the City on its Rule 50 motion, the Court must take into account the individual claims on which the jury did not find liability and ignore any evidence supporting those claims. That is incorrect. The jury's findings are not relevant at all to the evaluation of a Rule 50 motion, which considers whether any reasonable jury could find in Plaintiff's favor based on the evidence in the record. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 249 n.15 (2d Cir. 2016). In addition, any challenge based on such an alleged inconsistency in the verdicts is waived for the City's failure to raise it before the jury is dismissed, *see Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46–50 (2d Cir. 2015), and in any event there is no legal requirement to reconcile general verdicts; rather, the Court evaluates the sufficiency of the evidence supporting the verdict on each claim independently, *see Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52–53 (2d Cir. 2014).

- The City seeks judgment as a matter of law on the premise that Plaintiff's proof must be limited to his first theory of *Monell* liability (based on the widespread custom of *Brady* violations). ECF No. 618-1 at 1. But the jury never found against Plaintiff on either of the other *Monell* theories, it simply didn't reach them because the first theory was sufficient to prove the City's liability. Even if there were any flaw in the sufficiency of the evidence supporting the verdict based on the first theory (and there is not), given these unanswered questions the remedy could only be a new trial on the

2

other two theories, not judgment as a matter of law. *See Iacurci v. Lummus Co.*, 387 U.S. 86, 87–88 (1967).

- The City presumes that the City's liability under *Monell* could be based solely on causing *Raucci* to suppress exculpatory evidence, because he was the only defendant found personally liable for a *Brady* violation. But while the City cannot be held liable without an underlying constitutional violation, there is no requirement that it be caused by one person, let alone that that person is individually liable. For example, the City could cause the actions of a number of people to come together to cause a constitutional violation, such that City is liable even if no individual officer is. *See, e.g.*, *Barrett v. Orange Cnty. Hum. Rts. Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999).

- The City posits if the verdicts on the *Brady* claims against Raucci, Maher, and Sweeney were to be reconciled (which, again, they shouldn't be) that would mean the jury had to find that Raucci is liable for suppressing exculpatory evidence that was unknown to Sweeney or Maher. That does not logically follow. The jury could find Sweeney's suppression or Maher's suppression were not *alone* but-for causes of the conviction (precluding individual liability for them on those claims), but that the suppression of the totality of exculpatory evidence known to Raucci (which includes some evidence known also to Sweeney, some evidence known also to Maher, and some evidence known only to Raucci) was. *See, e.g.*, *Outlaw v. City of Hartford*, 884 F.3d 351, 369–72 (2d Cir. 2018) (rejecting "factually, doctrinally, and logically flawed" argument jury verdict necessarily encompassed specific factual findings).

- The City just makes up that the only exculpatory evidence Raucci knew that Sweeney and Maher did not was that "Raucci took Ruiz for a ride in his vehicle prior to his

3

arrival at the NHPD." ECF No. 618-1 at 2. The record demonstrated abundant other exculpatory evidence Raucci was aware of which wasn't disclosed, including (1) his coercion and fabrication of the statement from Hector Ortiz; (2) his coercion and fabrication of the statement from Millie Martinez; and (3) Raucci's own extensive criminal and investigative misconduct.

On top of all this, the City also ignores ample evidence of systemic misconduct and interprets other evidence in its own favor, in stark violation of the governing standard. The City's motion should be denied.[1]

## LEGAL STANDARD

"A court may not grant judgment as a matter of law unless: (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025) (cleaned up). "The burden on [Defendants] is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict." *Perry v. City of New York*, 78 F.4th 502, 517 (2d Cir. 2023) (cleaned up).

"A court considering a Rule 50 motion may not weigh the credibility of witnesses or otherwise consider the weight of the evidence on its own. Instead, the court must consider the evidence in a light most favorable to [Plaintiff] and grant [him] every reasonable inference that the jury might have drawn in [his] favor [as well as] disregard all evidence favorable to

---

[1] Based on the jury's verdict, Plaintiff is not contesting dismissal of Count Nine.

4

[Defendants] that the jury is not required to believe." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 44 (2d Cir. 2025) (cleaned up). Nor may the Court consider the jury's verdicts on other claims when ruling on a Rule 50 motion: "When a court considers a motion for a judgment as a matter of law—even after the jury has rendered a verdict—only the sufficiency of the evidence matters. The jury's findings are irrelevant." *In re Vivendi*, 838 F.3d at 249 n.15 (cleaned up).

### FACTUAL RECORD

The jury heard overwhelming evidence that systemic failures at the New Haven Police Department caused Mr. Morant's wrongful conviction. Focusing on the first *Monell* theory, three separate high-ranking NHPD officers from the time period consistently described the pervasive failure to disclose exculpatory and impeachment evidence.

Sergeant Michael Sweeney, an NHPD homicide supervisor for years, testified that "there was an expectation that exculpatory and impeachment evidence would not be documented in police reports" and that "you don't put things in police reports that will hurt the case…in 1990 and 1991 in New Haven." Trial Tr., ECF No. 581 at 208:6–25; *see also* Trial Tr., ECF No. 584 at 584:10–16 (the manner in which he and his subordinates documented cases "was consistent with [his] understanding of what the department expected" of them). Sweeney testified based on his experience directly supervising homicide detectives for years, he didn't know "any detective during that time period that would put down information for the defense to attack the case." Trial Tr., ECF No. 581 at 212:10–14. And he explained how under NHPD practices neither he nor Raucci had any obligation to document the exculpatory information they heard from Ruiz— including that Ruiz knew nothing about the crime and the only reason he was giving a statement was because of Raucci's threats and promises to him—because that would hurt the prosecution

and "of course" they would not want to do that. Pl.'s Ex. 68-B (Sweeney Dep. 1, 1/31/2023 286:12–24).

Joseph Pettola, another longtime NHPD detective who the City's own 30(b)(6) witness testified had a particularly good reputation for truthfulness, Court Ex. 7, Dell Dep. at 69:23–71:6, agreed with Sweeney's description of the practice. Pettola testified the practice generally at the NHPD "was not to turn over exculpatory evidence from detective notes"; when asked about the exculpatory information Sweeney described observing from Ruiz, Pettola agreed that "although police officers were obligated to report that kind of information in their police reports, as a general matter, people in the Department…didn't document that type of information as a matter of practice." Trail Tr., ECF No. 591 at 1411:2–19. Pettola further described how in the NHPD in 1991 "even when sergeants observed such misconduct, there was pressure not to report it" and that as a result, "given the custom of not reporting, [he] would have expected that Sweeney would not have documented the misconduct that he described" witnessing with Raucci and Ruiz. *Id.* at 1412:2–1413:10. And Pettola described how "as a rule—even though police officers understood that they were supposed to write down in police reports inconsistent statements that witnesses might give…detectives typically didn't do that" and that "routinely officers would interview witnesses for long periods of time, get multiple versions of what happened, and only document" one of them. *Id.* at 1412:13–23. Pettola also testified that Sweeney was "absolutely" a "uniquely reliable source" and that Sweeney's testimony that officers in his chain of command did not document exculpatory evidence was "uniquely reliable evidence." *Id.* at 1461:9–15.

A third high-ranking NHPD officer, former Sergeant and later Lieutenant Brian Sullivan, confirmed this testimony. Sullivan described how in the Gould-Taylor investigation he had taken a key incriminating statement from a witness, Dorren Stiles, who he understood was going

6

through heroin withdrawal; Stiles initially said she knew nothing about the crime, but Sullivan interviewed her for six hours and told her she couldn't leave until she gave a statement, but if she told them what they wanted to hear they would take her to buy heroin, which Sullivan did (taking her to where she could buy heroin and giving her money to do so). Although Sullivan admitted he understood all these things were relevant to the reliability and credibility of Stiles's statement—and specifically could cause her to say things that were not true—in the NHPD in the early 1990s such information which was "not good for the case" would not be included in police reports. Trial Tr., ECF No. 601 at 2567:19–2568:19, 2641:20–2643:1, 2643:17–2644:7. And Sullivan described how what he did with Stiles was consistent with NHPD practices at the time: he would have been comfortable discussing all of it with Chief Pastore and "as far as [he] understood, Chief Pastore would have been fully on board with what [he] did." *Id.* at 2569:20–24; 2570:1–4.

This was consistent with the testimony from the City's own Rule 30(b)(6) designee, Rose Dell, who testified that it was the regular practice at the NHPD in 1991 to conduct long unrecorded interviews and only take a recorded statement at the end of the interview, and that there was no policy or training requiring detectives to take notes during those unrecorded interviews or, if they happened to take such notes, to turn them over to the prosecutor. Court Ex. 7, Dell Dep. at 42:8–43:5, 43:22–44:13, 45:5–22. She also admitted no NHPD rule or policy even mentioned the words "exculpatory" or "impeachment" until 2016. *Id.* at 49:15–50:21, 51:9–14, 54:1–24.

Plaintiff's police practices expert Charles Drago described how the practices these witnesses described at the NHPD for documenting and disclosing exculpatory and impeachment evidence were inconsistent with minimally accepted police practices which had been well known

in police departments for decades by 1990. *See* Trial Tr., ECF No. 598 at 2160:8–2161:19; 2165:12–2166:10. And Drago testified in his 40 plus years of law enforcement experience, that he had never seen such admissions of a widespread practice across a department of not disclosing exculpatory or impeachment evidence: "I never have. And as I said, I've been policing for many, many years and as an expert witness across the country for many, many years and I have never seen it to that extent, no." *Id.* at 2165:12–2166:10. The City's police practices expert Jerry Rodriguez, who testified by stipulation, did not comment on any of this testimony about what NHPD practices were at the time but agreed "It was not accepted practice…to suppress exculpatory information learned from any person." Trial Tr., ECF No. 606 at 3125:13–3128:11.

In addition, the jury heard several examples confirming this was the practice and that the NHPD had public notice of it at the time. First, in December 1991, in a published opinion in the *Golino v. City of New Haven*, 950 F.2d 864 (1991), the Second Circuit noted the deposition testimony of Officer Anthony DiLullo "that it was his general practice to omit exculpatory information from affidavits submitted in support of applications for warrants." Court Ex. 15 (Judicially Noticed Facts) at ¶ 3; Trial Tr., ECF No. 603 at 2707:15–2708:3 (also part of judicially noticed facts if we want to cite that instead and/or in addition). Similarly, the jury heard about the *Ham* case, where prosecutor Gold wrote a memo warning about the "debacle" of NHPD detectives (including Sweeney) failing to report exculpatory evidence which led to the dismissal of charges, and Ham filed a civil rights lawsuit which ultimately led to jury findings against Sweeney and another NHPD detective and a $1.4 million verdict. *See* Court Ex. 15 (Judicially Noticed Facts) at ¶ 1; ECF No. 533 at ¶ 1; Pl.'s Ex. 27 (Gold Memo); Trial Tr., ECF

No. 581 at 225:22–226:1.[2] Drago described how as a matter of practice the Chief of Police would be aware of information from both the Golino and Ham cases, and how pursuant to minimally accepted police practices "he's got to investigate that and look into that and make sure he determines if in fact the allegations are correct, if this is actually happening, and then he has to fix it. He has to take the measures to fix it so it doesn't continue going on. But he can't ignore it at all. He has to make sure he investigates it." Trial Tr., ECF No. at 598 2168:18–2173:11, 2239:18–2241:24.

But the undisputed evidence was the NHPD (including Chief Pastore) *did* ignore it. Sweeney testified no one at the NHPD ever questioned him about his conduct in the Ham case or suggested his manner of documenting information was in any way improper, including *after* the civil rights verdict against him. Trial Tr., ECF No. 581 at 223:2–249:15; Trial Tr., ECF No. 584 at 585:9–20. The City's 30(b)(6) designee, Rose Dell, admitted that, based on her review, she is not aware of anything the NHPD did in response to the allegations raised in Ham: no investigation, no revision of policies, no additional training. Court Ex. 7, Dell Dep. at 75:8–76:13, 82:1–83:1, 177:4–10, 177:25–178:6, 183:17–184:9. As Drago testified, by failing to investigate or take any action despite this notice of constitutional violations:

> [t]he police chief is really giving tacit approval to all the officers that this type of behavior is okay, it's condoned and you won't get in trouble; there's no problem, we don't have any issues with you committing these types of offenses. It sends that

---

[2] The jury also heard evidence of other examples of either similar misconduct or credible allegations of similar misconduct, which were never investigated or disciplined by the NHPD, including in Fleming, Streater, Valentine, Gould/Taylor, and Carmon. *See, e.g.*, Court Ex. 15, Judicially Noticed Facts at ¶¶ 2, 4–6; Trial Tr., ECF No. 595 at 1817:5–1836:22 (Fleming); Trial Tr., ECF No. 587 at 972:5–975:19 (Streater); Trial Tr., ECF No. 582 at 357:15–362:13 (Carmon); Trial Tr., ECF No. 583 at 433:4–446:23 (Carmon); Trial Tr., ECF No. 601 at 2609:12–1612:15 (Valentine); Trial Tr., ECF No. 601 at 2546:3–2558:24, 2567:19–2570:4 (Gould/Taylor).

message very clearly, in my mind. As a police officer, that would be a clear message to the organization.

Trial Tr., ECF No. at 2171:3–2173:23.

This was consistent with the evidence the jury heard about the code of silence. For example, Pettola testified that the NHPD had a "particularly strong" code of silence, including "a great deal of pressure" which "came all the way from the top" not to report officer misconduct. Trial Tr., ECF No. 590 at 1363:18–1369:14. And he gave a vivid example of how this worked in practice: he had observed Raucci attempt to plant cocaine during a traffic stop in the 1980s, but solely due to the code of silence he didn't report it at the time. *Id.* at 1348:6-–1363:2. This was also consistent with the evidence the jury heard about policymaker Chief Pastore, both from before and shortly after the constitutional violations in this case, which demonstrated he interfered even to the extent of criminal obstruction of the FBI to cover up for officer misconduct, because his interest was "damage control." Court Ex. 17, Robert Lawlor Dep. at 81:4–82:13, 83:16–84:9; Trial Tr., ECF No. 599 at 2546:3–2558:24, 2567:19–2570:4 (Donnelly testimony); Trial Tr., ECF No. 601 at 2584:5–2588:13 (Sullivan testimony).

## ARGUMENT

I.    **The jury's finding that the City had a widespread practice or custom of suppressing evidence favorable to criminal defendants was well supported.**

Overwhelming evidence supported the jury's verdict that the City had a widespread practice or custom of suppressing evidence that was favorable to criminal defendants. *See* ECF No. 557 at 31; ECF No. 569 at 4–5 (Jury Verdict Form, questions 13, 17). As described above, *three separate* high-ranking NHPD officers from the time period testified to this widespread practice; any one of them would be sufficient alone to support the jury's finding that this was the practice. *See, e.g.*, *Bradshaw v. City of New York*, 855 F. App'x 6, 9 (2d Cir. 2021) ("A single witness's sworn testimony, if believed by a jury, can support a verdict."); *Edelman*, 141 F.4th at

10

52–53 (holding court erred in granting Rule 50 motion where jury could have believed one witness whose testimony supported the claim). Together, this evidence is abundantly sufficient to support the jury's verdict that the NHPD had a custom or practice of violating *Brady*. *See, e.g.*, *Jeffes v. Barnes*, 208 F.3d 49, 62 (2d Cir. 2000) (highlighting testimony of one officer responsible for day-to-day operations at jail about "constant adherence to the code of silence," along with one example, as supporting jury finding "that the code of silence was a practice or custom that constituted the municipality's standard operating procedure.").

And the NHPD's undisputed failure to take action after public notice of unconstitutional behavior is a separate way to prove that the suppression of exculpatory and impeachment evidence was the custom and practice of the NHPD. *See, e.g.*, *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 306–08 (2d Cir. 2020) (holding inaction of high-ranking officials after notice of unconstitutional conduct demonstrates that conduct reflects the accepted custom and practice); *Matusick*, 757 F.3d at 63 (same).

The City completely ignores almost all of Plaintiff's evidence on this point, including the testimony of Sweeney, Pettola, and Sullivan describing the widespread practice; the testimony of Drago that the NHPD practices were inconsistent with minimally accepted practices; and the admissions by its own Rule 30(b)(6) designee that the City took no action after notice of officers suppressing exculpatory evidence. Instead, the City points to some evidence that at best *could* be interpreted as supporting its argument that there was no widespread practice of violating *Brady*. But such evidence certainly "does not compel a jury finding, nor does it in itself refute the countervailing evidence" Plaintiff presented. *See Perry*, 78 F.4th at 519. In other words, nothing the City points to comes close to meeting the "particularly heavy" burden of showing how it could be entitled to judgment as a matter of law despite the jury verdict. *Id.* at 517.

11

And the specific arguments the City makes are deeply flawed both factually and legally. For example, the City claims it had a written policy prohibiting the suppression of favorable evidence. ECF No. 618-1 at 8. In reality, the policy the City points do does not even mention the words "exculpatory" or "impeachment"; Drago testified this written policy was "totally inadequate" and inconsistent with widespread practice in police departments by 1990. Trial Tr., ECF No. 598 at 2164:8–24; Trial Tr., ECF No. 599 at 2325:4–2326:7. The City's 30(b)(6) designee admitted the City did not have a policy explicitly mentioning obligations to disclose exculpatory evidence until 2016, when she amended them after looking at what was standard in other police policies. *See* Court Ex. 7, Dell Dep. at 49:15–50:21; 51:9–14; 54:1–24. And in any event, it is undisputed an actionable "policy or custom need not be memorialized in a specific rule or regulation" for the City to be liable. *See Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996); ECF No. 557 at 31.

Similarly, the City points to testimony it elicited that officers denied any supervisor ever "communicat[ing] in words or substance that he could withhold exculpatory evidence." ECF No. 618-1 at 5. But as both Pettola and Drago explained, that's not how it works at all in practice; supervisors don't send a memo telling officers they can engage in misconduct, but their actions can still send that message clearly. *See* Trial Tr., ECF No. 591 at 1458:8–1460:16 (Pettola testimony); Trial Tr., ECF No. 598 at 2212:8–2215:8 (Drago testimony). Nor did the jury have to credit this testimony declining to implicate any specific supervisor; as Pettola candidly explained when asked about that testimony, given the extremely strong code of silence in effect at the NHPD, even today and under oath he would not identify any officers who had engaged in misconduct unless the questioner already knew the specifics of the misconduct to inquire about. Trial Tr., ECF No. 590 at 1365:8–22, 1366:12–18, 1367:22–1368:14, 1369:2–1370:18; Trial Tr.,

12

ECF No. 591 at 1452:13–1453:22, 1453:23–1454:11, 1455:10–1460:16. Given that the jury was not required to believe the testimony the City highlights, the Court must disregard it on the City's motion for judgment as a matter of law. *Edelman*, 141 F.4th at 44.

In support of its argument that Plaintiff's proof of custom was insufficient the City cites a single case, *Jones v. Town of East Haven*, 691 F.3d 72 (2d Cir. 2012), which just makes the opposite point. The *Jones* court reaffirmed that a plaintiff may prove *Monell* liability through evidence of "a sufficiently widespread practice among police officers" of constitutional violations "to support reasonably the conclusion that such abuse was the custom of the officers of the Department and that supervisory personnel must have been aware of it but took no adequate corrective or preventative measures (or some combination of the two)." *Id.* at 82. As recounted above, that's exactly what Plaintiff's evidence demonstrated—not by inference from a number of discrete examples, but from direct evidence of widespread NHPD practices. By contrast, Jones lost because his only evidence was of a small number of examples from which he sought to demonstrate a pattern: "two instances, or at the most three, over a period of several years" of abuse, as well as "one incident in which an officer indicated a disposition to abuse" rights, but "no instances in which supervisors were aware of abuse, or of a high probability of abuse, but failed to take corrective or preventative action." *Id.* at 85. In other words, Jones had *none* of the compelling evidence Plaintiff has here: no witnesses describing the custom, no police practices expert explaining why their practices were problematic, no evidence of supervisory failure to respond appropriately to notice of constitutional violations.

II.    **The jury's finding that the City was the moving force behind the violations of Plaintiff's constitutional rights was well supported.**

"The issue of causation is for the jury." *Chislett v. New York City Dep't of Educ.*, 157 F.4th 172, 184 (2d Cir. 2025); *Jeffes*, 208 F.3d at 61 (holding in *Monell* case causation "is a

13

question of fact for the jury"). Here the jury expressly found the NHPD's custom was the moving force behind the violation of Plaintiff's constitutional rights. ECF No. 569 at 5. And that finding was well-supported by the record evidence. First, it naturally follows that where there is a widespread custom in a department of suppressing evidence favorable to criminal defendants, officers who do so do it pursuant to that custom. And specific record evidence supported that conclusion. For example, Drago testified how the custom of suppressing exculpatory evidence leads individual officers to suppress evidence, whether they are well-intentioned or not. Trial Tr., ECF No. 598 at 2173:4–2177:9. While well-intentioned officers may be more directly swayed by the direction they get from their supervisors, corrupt officers are given the opportunity because they understand: "nobody is going to turn him in, there's no protocols against it. He feels like he can do whatever he wants to do without any discipline." *Id.* at 2175:5–2176:18. The City presented no countervailing evidence; their own police practices expert never disputed this causal link, and expressly admitted that "[p]roper supervision, proper reporting of violations, and proper discipline for violations are all critical to constitutional policing." Trial Tr., ECF No. 606 at 3128:8–10; *see also* Court Ex. 7, Dell Dep. at 116:19–117:4. Particularly given the circumstances in this case, in which Raucci's investigative misconduct was committed flagrantly in front of supervisors and other officers but never reported, the jury's conclusion that the custom of suppressing favorable evidence was the moving force behind the constitutional violations is well supported.

The City's contrary argument, made largely without legal authority or citations to the record, incorporates numerous fatal logical, legal, and factual flaws. The City starts with the premise that there were "specific findings by the jury that 1) only Raucci withheld exculpatory evidence and 2) the only basis for *Monell* liability was that the City had an unconstitutional

14

practice of withholding exculpatory evidence." ECF No. 618-1 at 13. But there are no such specific findings by the jury at all. *See, e.g.*, *Outlaw*, 884 F.3d at 369–72 (rejecting similar argument that jury's verdict must be interpreted to encompass a number of specific factual findings: "We cannot allow [defendant] to put words in the jury's mouth.…The jury made none of the factual findings he wishes to impute to it.").

The verdicts for the individual defendants, which asked whether that defendant was liable on a particular claim, were general verdicts. *See Lavoie v. Pac. Press & Shear Co., a Div. of Canron Corp.*, 975 F.2d 48, 54 (2d Cir. 1992); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002). Thus with respect to the individual defendants, the jury found only that Plaintiff had or had not proven all elements of specific claims by a preponderance; there are no more specific findings by the jury. On the *Monell* claim, the jury found that the City "had a widespread custom of suppressing evidence that was favorable to criminal defendants" and it found that "the City of New Haven's actions were the 'moving force' behind the constitutional violations, such that the City is responsible for the violation of Mr. Morant's constitutional rights." ECF No. 569 at 4–5. The jury did *not* enter any additional findings related to *Monell*. Specifically, while the jury did not reach the questions addressing the two alternate bases for *Monell* liability (because those questions were unnecessary to the liability finding) it certainly never found that those bases were *not* proven. Thus, it is legally wrong to treat the unanswered questions as if they were findings against Plaintiff; the law is clear that they are not. *See Iacurci v. Lummus Co.*, 387 U.S. 86, 87–88 (1967) (holding it was error to treat unanswered jury questions as if they were answered "no"); *California v. Altus Fin. S.A.*, 540 F.3d 992, 1007 (9th Cir. 2008) ("The cases are clear that no legal significance attached to the jury's failure to answer Form 7, and the district court should not have considered Form 7 when reconciling the answered verdict forms.").

15

Furthermore, the City's assumption that the verdicts must be harmonized at all is wrong. There is no legal requirement that general verdicts be consistent. *See Matusick,* 757 F.3d at 52–53 (2d Cir. 2014) ("We have long held the view that consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment.") (cleaned up); *Cash v. Cnty of Erie*, 654 F.3d 324, 343 (2d Cir. 2011). Thus, when evaluating the sufficiency of evidence in support of a general verdict, "the focus is not on any purported inconsistency between the jury's verdicts as to the separate claims, but rather on whether there was sufficient evidence to support a finding of liability on the claim as to which the plaintiff prevailed." *Hundley v. Frunzi*, No. 23-581, 2024 WL 3886996, at *2 (2d Cir. Aug. 21, 2024); *see In re Vivendi*, 838 F.3d at 249 n.15 ("When a court considers a motion for a judgment as a matter of law—even after the jury has rendered a verdict—only the sufficiency of the evidence matters. The jury's findings are irrelevant.") (cleaned up); *Matusick*, 757 F.3d at 52–53; *Cash*, 654 F.3d at 343.

What's more, any objection based on alleged inconsistencies in the verdict is waived because the City failed to raise it before the jury was dismissed. *Cash*, 654 F.3d at 342–43; *In re Vivendi*, 838 F.3d at 249 n.15; *Anderson Grp., LLC*, 805 F.3d at 46–50. "The requirement of a timely exception is not merely a technicality." *Kosmynka v. Polaris Indus., Inc.,* 462 F.3d 74, 83 (2d Cir. 2006) (cleaned up). "The waiver rule is in place to require counsel to seek clarification and cure when that is still possible without the duplication of the enormous resources just spent on a substantial trial." *Buchwald v. Renco Grp.*, No. 13-cv-7948, 2015 WL 925954, at *4 (S.D.N.Y. Mar. 4, 2015).

And even assuming for the sake of argument that the City hadn't waived this argument (it has) and that the verdicts had to be harmonized (which they don't), the City is also wrong about *how* they could reasonably be harmonized. In circumstances in which a reviewing court must

16

reconcile verdicts (i.e., where there are potentially inconsistent *special* verdicts), "the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency" and "make every attempt to reconcile the jury's findings, by exegesis if necessary." *Turley v. Police Dep't of City of New York*, 167 F.3d 757, 760 (2d Cir. 1999) (cleaned up). Thus, for example, the Second Circuit has held that concurrent findings that a Sheriff *was* deliberately indifferent and that he was *not* negligent could stand because "the jury rationally could have concluded that if, as it found, Gallivan was deliberately indifferent, he was not simply negligent. A failure to understand that the higher standard necessarily subsumes the lower may have inured to Gallivan's benefit on the negligence claim, but it did not produce irreconcilably inconsistent verdicts." *Cash*, 654 F.3d at 343–44; *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427–29 (2d Cir. 1995); *Ali v. Kipp*, 891 F.3d 59, 65–66 (2d Cir. 2018). In doing such harmonizing, "proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards any material jury finding. Thus, if there is no way in which the jury's answers may be harmonized, the court must order a new trial." *Le-Blanc-Sternberg*, 67 F.3d at 428 (cleaned up).

Contrary to the City's argument, the jury's findings can be easily reconciled in a manner wholly consistent with the City's liability. First, the jury could have found Sweeney, Maher, and Raucci all suppressed exculpatory evidence, but that what Sweeney and Maher each suppressed was insufficient on its own to be a but-for cause of Plaintiff's wrongful conviction.[3] The jury could also have found that the unconstitutional practice was the moving force behind all the suppressions by each of the NHPD officers, even ones who weren't individually found liable.

---

[3] Sweeney was involved in and aware of evidence solely related to the first Ruiz interview. Maher was present solely for the Roque and Morant interviews. Raucci was present for all interviews, including Ruiz, Roque, Morant, Ortiz, Martinez, as well as the rest of the investigation.

17

And it also could have found the unconstitutional practice of suppressing favorable evidence—including evidence of officer misconduct—was the moving force behind other constitutional violations it found by Raucci and Maher, including fabrication and coercion. The jury could reasonably have concluded that, absent this custom of suppression, Raucci and Maher would have been dissuaded from engaging in this misconduct in the first instance because they would expect to be caught. Or that even if they hadn't been dissuaded, their misconduct would have been uncovered at the outset of the prosecution and the case would have been dismissed before the right to a fair trial was violated—just as the jury heard happened in the *Ham* case.

### CONCLUSION

When it denied the City's motion for summary judgment, this Court held that a reasonable jury reviewing the record could find that the violations of Plaintiff's constitutional rights were caused by an unconstitutional custom by the NHPD. A reasonable jury heard the evidence at trial and found the City was indeed responsible for causing the violations of Plaintiff's constitutional rights. There is no basis whatsoever to disturb that verdict. The City's motion should be denied.

Dated: July 17, 2026                                         Respectfully Submitted,

                                                            */s/ Anna Benvenutti Hoffmann*
                                                            Anna Benvenutti Hoffmann,
                                                            phv208203
                                                            Nick Brustin, phv08609
                                                            Emma Freudenberger, phv08602
                                                            Amelia Green, phv208992
                                                            Grace Paras, phv208762
                                                            Elsa Mota, phv208184
                                                            Katie Cion, phv20899
                                                            Neufeld Scheck Brustin
                                                            Hoffmann & Freudenberger, LLP
                                                            200 Varick Street, Suite 800
                                                            New York, NY 10014
                                                            Tel: (212) 965-9081

18

Fax: (212) 965-9084
nick@nsbhf.com
anna@nsbhf.com
emma@nsbhf.com
amelia@nsbhf.com
grace@nsbhf.com
elsa@nsbhf.com
kcion@nsbhf.com

Kenneth Rosenthal, ct05944
Law Office of Kenneth Rosenthal
One Audubon Street, 3d Fl.
New Haven, CT 06511
(203) 915-4235
krosenthal@gs-lawfirm.com

*Attorneys for Plaintiff Stefon Morant*

19

## **CERTIFICATE OF SERVICE**

  I hereby certify that on July 17, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<em>/s/ Anna Benvenutti Hoffmann</em>   