**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| STEFON MORANT,<br><br>       Plaintiff,<br><br>  v.<br><br>CITY OF NEW HAVEN, et. al.,<br><br>       Defendants. | Civil Action No. 2:22-cv-00630 (SVN) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS RAUCCI'S AND
MAHER'S RULES 50(b) AND 59 MOTIONS, ECF NOS. 615, 617**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL RECORD ......................................................................................................... 2

ARGUMENT ................................................................................................................... 9

I.    There is no basis to grant Raucci or Maher judgment as a matter of law. .......................... 9

   A.  Legal Standard .................................................................................................... 9

   B.  The jury's findings against Raucci and Maher were well-supported. ............................ 10

   C.  Maher's argument against the sufficiency of the evidence improperly relies on
       assumed findings the jury did not make. ........................................................ 15

   D.  Neither Raucci nor Maher are entitled to qualified immunity. ..................................... 17

II.   There is no basis for a new trial ............................................................................. 19

   A.  Legal standard ................................................................................................ 19

   B.  Neither Raucci nor Maher were prejudiced by Plaintiff's presentation of *Monell*
       evidence or other evidence of their own misconduct....................................................... 20

   C.  There is no legal basis for remittitur................................................................. 23

CONCLUSION................................................................................................................. 30

**INTRODUCTION**

After a month of trial and three days of careful deliberation, the jury found former New Haven Police Department detectives Vincent Raucci and Vaughn Maher engaged in unconstitutional misconduct that caused Plaintiff Stefon Morant's wrongful conviction, and that the City of New Haven was directly responsible for causing those constitutional violations. In particular, the jury found Defendant Raucci liable for malicious prosecution, the failure to disclose exculpatory evidence, fabrication of evidence, coercion, and civil rights conspiracy and Defendant Maher liable for fabrication of evidence, coercion, and civil rights conspiracy. *See* ECF No. 569.

That verdict is overwhelmingly supported by the record evidence. The record demonstrated that both Plaintiff and his co-defendant Scott Lewis were actually innocent of the Turner-Fields murders, and that every piece of evidence implicating them was fabricated by Raucci, assisted at times by Maher. All five witnesses from whom Raucci took statements implicating Plaintiff (Ovil Ruiz, Jose Roque, Stefon Morant, Hector Ortiz, and Milly Martinez) testified that they were coerced into giving false statements and that Raucci told them what to say. NHPD Sergeant Sweeney described how he observed Raucci threatening Ruiz and feeding information to him in real time, and that he told Raucci to stop but observed Raucci continue anyway. Unrebutted scientific analysis of the tapes of the Roque, Morant, and Ortiz interviews demonstrated substantial manipulation of the tapes including stops, starts, and rewinds; there was no dispute any such manipulation was improper, and neither Raucci nor Maher could offer any innocent explanation. Indeed, Maher essentially conceded Raucci engaged in impermissible misconduct, but claimed he didn't notice or know about it, even though the taped interviews played for the jury made clear he was present for the whole taped statements of Morant and

1

Roque. And the evidence demonstrated Maher's own initial investigation pointed powerfully to a different suspect, Michael "Bullet" Cardwell, and that to aid the prosecution of Morant and Lewis Maher drafted a report falsely claiming Cardwell had been eliminated. The one qualified immunity argument Raucci makes, with respect to the *Brady* claim, is also meritless—as the Court has already ruled.[1] In short, Raucci and Maher's liability is proven several times over; their perfunctory motions for judgment as a matter of law border on frivolous.

Nor is there any basis for either a new trial or for any reduction in the verdict. As the Court properly ruled, evidence of Raucci's other misconduct was properly admissible, either because it was intrinsic to the claims in this case or as Rule 404(b) evidence. Evidence of other specific *Monell* incidents was minimal and was all subject to limiting instructions, which the jury is assumed to follow. The jury's damages award is comparable to other jury findings in similar cases and is amply supported by extensive, almost entirely unrebutted evidence of Plaintiff's extraordinary damages.

Raucci's and Maher's Rule 50(b) and Rule 59 motions should be denied in full.

### FACTUAL RECORD

The jury heard overwhelming direct evidence that Raucci and Maher committed the constitutional violations the jury found, including fabricating and coercing witness statements. *All five* witnesses from whom Raucci took statements implicating Morant and Lewis testified that the statements were fabricated and coerced. *See* Trial Tr., ECF No. 589, 1178:6–8 (Ovil Ruiz, "Q: …What caused you to give that false testimony? A. Det. Raucci coerced me to lie."); Court Ex. 14, Jose Roque Dep. at 13:12–24 (testifying that Raucci threatened that he would be

---

[1] Puzzlingly, Maher "joins" this qualified immunity argument, ECF No. 617 at 5, even though it relates solely to the *Brady* claim on which he was not found liable by the jury.

2

charged for the murders and have a $1 million bond if he did not testify); Court Ex. 13, Jose Roque Crim. Tr. at 658:19–27 (same); Court Ex. 8, Hector Ortiz Pet. for New Tr. at 168 (testifying that Raucci "stopped the tape," "pointed to the picture," then "turned the tape back on" and made him "say the names…on the bottom of the picture"); *id.* at 195 ("Q: … [W]hat would you say today about this audio tape and the answers you gave? A: I sent an innocent to jail" because the answers "were false"); Court Ex. 2, Millie Martinez Dep. at 41:15–22 (testifying that the information in her statement was not true and that it came from Raucci); *id.* at 25:25–26:2 (testifying that Raucci offered her money for her statement).

Similarly, Plaintiff himself testified at trial that Raucci would not accept his truthful statements that he knew nothing about the crime and repeatedly threatened he would "get the electric chair" or "a million dollar bond" unless he gave a statement against Lewis. Trial Tr., ECF No. 604 at 2855:5–23, 2857:2–2858:2. Plaintiff testified that Raucci was "giving [him] the information, just feeding it to [him], telling [him] exactly about the crime," as well as reading him information from statements and telling him details over the course of two to three hours. *Id.* at 2855:24–2856:20. During that time, Raucci acknowledged that he knew Plaintiff didn't "have anything to do with the crime," and that he wanted to pin it on Scott Lewis. *Id.* at 2856:21–2857:1. Plaintiff also described how Raucci would stop, start, and rewind the tape to feed him information and get a take he thought sounded sufficiently convincing. *Id.* at 2859:3–2860:5.

In addition, NHPD Sergeant Sweeney provided incredibly compelling testimony that he had observed Raucci attempting to coerce and fabricate the statement from Ruiz in real time. Sweeney described how he had confirmed that Ruiz actually knew nothing about the crime and was only parroting information Raucci had fed to him because Raucci had threatened him and he believed if he gave the story Raucci wanted he would be permitted to go home, and that Sweeney

3

repeatedly warned Raucci what he was doing was improper and that Ruiz's statement was false and Raucci continued to engage in the same misconduct in front of him. *See, e.g.*, Trial Tr., ECF No. 580 at 102:25–108:23, 109:18–117:20, 122:17–123:20, 124:2–125:10, 127:11–18; Trial Tr., ECF No. 581 at 171:7–175:13 ("Q. And Mr. Ruiz made it crystal clear to you those were not his words. They were Raucci's words, and he knew nothing again about this crime? A. That's correct."), 177:24–179:9, 188:17–194:3.

The jury also heard unrebutted scientific testimony by Bruce Koenig, former head of the FBI audio lab, which demonstrated Raucci and Maher tampered with the tape recordings during their interviews of Jose Roque and Plaintiff, and that Raucci tampered with the recording of his interview of Hector Ortiz. *See generally* Trial Tr., ECF No. 582 at 260:1–336:20. Koenig described how he had found at least nine over-recordings on the tape recording of Raucci and Maher's interrogation of Plaintiff, at least eleven stops and starts on the tape recording of Raucci and Maher's interrogation of Jose Roque, and at least seven stops and starts and three over-recordings on the tape recording of Hector Ortiz's interrogation by Raucci. *Id.* at 284:16–285:1, 289:4–290:10, 291:18–292:16, 294:22–295:8, 299:25–300:9. The unrebutted evidence was that over-recordings—where the tape is stopped, rewound, and recorded over—are never permissible, and that it would never be permissible to stop and start a tape to feed information to a witness, as the witnesses testified happened. *See* Trial Tr., ECF No. 606 at 3127:8–16 (City's expert, Jerry Rodriguez, testifying via stipulation that "[i]t was not an accepted practice to stop a recording and rewind over spoken words" and that "[i]t was also not an accepted practice to coerce or fabricate witness testimony while a recording is stopped"); Trial Tr., ECF No. 598 at 2230:13–2233:15 (explaining it is "illegal" to "feed untrue facts to a witness then require them to state

those facts on the tape" and to "stop a tape, rewind it and say you didn't say it right the first time and here is what you're going to say or else, and then start it back up again").

Koenig, the undisputed leader in the field who the evidence demonstrated in his over 50 years of practice had conducted more audio analyses than anyone else, explained this was the worst instance of manipulation he had ever seen: "Q: In the thousands of cases you reviewed, have you ever seen this many stops and starts or over-recordings on separate tapes in the same investigation? A. No." *See* ECF No. 582 at 300; *see also id.* at 260:24–2 (began practicing forensic audio analysis in 1964), 272:20–22 (explaining he has done more forensic audio exams than anyone in the world), 293:3–22 (explaining that of the 1,000 allegedly altered tapes he examined over the course of his career, maybe 30–40 had any alterations at all, usually only 1–2 stop and start events a piece).

Raucci and Maher provided incredible and mutually inconsistent explanations for this evidence. Raucci denied that he ever stopped, started, or rewound and over-recorded the tapes; he agreed that a jury would have to choose whether to believe his "word versus Bruce Koenig's scientific testing." Trial Tr., ECF No. 594 at 1674:22–24. Maher admitted on the stand that Koenig's analysis was powerful circumstantial evidence supporting Plaintiff's and Roque's testimony about the stops and starts on the tape. Trial Tr., ECF No. 586 at 855:1–8. Maher also admitted that his own explanation for the stops and starts on the tapes changed drastically over time, and that it would be fair for the jury to consider such inconsistencies in evaluating whether he was lying. *Id.* at 842:13–845:18, 867:19–868:13; *see also* Pl.'s Ex. 65-C (Maher Dep.); Pl.'s Ex. 65-D (Maher Dep.). Maher first claimed he and Raucci stopped the tape only once when he said Plaintiff asked for a soda, but Plaintiff testified he never asked for a soda, and the taped statement itself does not include such a request. *Id.* at 858:24–863:5 (Maher testimony); Trial Tr.,

5

ECF No. 604 at 2861:6–8 (Plaintiff's testimony); Pl.'s Ex. 31 (Plaintiff's audio statement). After

Maher first learned of audio analysis demonstrating multiple stops and starts on the Roque tape,

Maher claimed to remember that they had stopped the Morant tape multiple times to discuss the

case, and the reason this was not indicated on the tape itself was that Maher and Raucci had used

silent hand signals to indicate they wished to speak in the hallway outside of Plaintiff's presence.

*See* Trial Tr., ECF No. 586 at 863:22–867:18, 875:10–876:21.[2] Both Plaintiff and Raucci deny

this; Raucci agreed that Maher's explanation was ridiculous and never happened. *See* Trial Tr.,

ECF No. 605 at 3005:6–14 (Plaintiff's testimony); Trial Tr., ECF No. 594 at 1669:8–15. Maher

ultimately acknowledged that it was possible Raucci had coerced and fabricated the statements,

but claimed none of it happened in his presence and he didn't know about it, even though he had

vouched during the criminal prosecution that he was present the whole time and Raucci engaged

in no misconduct, and the audio tapes themselves demonstrate Maher was present for the entire

taped interviews of Roque and Morant. *See* Trial Tr., ECF No. 586 at 870:13–875:18, 877:10–

881:22.

The jury also heard that Maher's own comprehensive investigation had produced

abundant evidence pointing to Michael Cardwell as the perpetrator. Trial Tr., ECF No. 586 at

792:18–809:20; Trial Tr., ECF No. 589 at 1137:7–1138:15. And it heard that in an indication of

his bad faith, Raucci failed to conduct any of the follow-up investigation into Cardwell once he

took over the investigation. Nevertheless, despite there not actually being any evidence to rule

out Cardwell as a suspect, to help tie up the prosecution of Lewis and Morant, Maher wrote a

---

[2] Maher acknowledged that officers were supposed to indicate when and whether they were stopping a tape, and that they never did so in on either the Morant or Roque tapes. *See* Trial Tr., ECF No. 586 at 882:22–883:17, 886:12–23.

false report stating that Cardwell had been ruled out. Trial Tr., ECF No. 587, at 945:20–954:17, 968:3–10.

In the face of all this evidence and more of Raucci and Maher's misconduct, essentially the only evidence that they *didn't* engage in this investigative misconduct is their own mutually inconsistent denials. But there was ample basis for the jury to discredit their testimony. As described above, Maher agreed three good ways to tell if someone is lying are if their statements change over time, if they are contradicted by circumstantial evidence, and if they don't make common sense; he agreed it would be fair for the jury to use that test to evaluate his own testimony. And the undisputed evidence showed Maher failed on all three tests: his explanation of the stops and starts in the interrogations had changed over time; his explanation was contradicted by both direct and circumstantial evidence including from Koenig, Roque, and Morant; and his story did not make any common sense. In particular, Maher admitted he believed Sweeney's account of Raucci fabricating Ruiz's earlier statement, but it made no sense if Raucci was comfortable engaging in such misconduct in front of his supervisor who told him repeatedly to stop he would *not* have also done so in front of Maher. *See* Trial Tr. at ECF No. 586 at 854:5–7, 879:3–8; Trial Tr., ECF No. 589 at 1150:9–19, 1151:2–10. And Maher claimed Roque and Morant volunteered stories which matched each other and the earlier account from Ruiz, but that made no sense given that Morant is innocent, none of what they said was true, and they could not just coincidentally volunteer the same made-up story Raucci had fed to Ruiz. *See* Trial Tr., ECF No. 589 at 1149:14–1154:7.

As for Raucci, he was perhaps the least credible witness ever to testify. He claimed he was an honest, rule-following, by-the-book detective and that everyone else at trial—about a dozen separate people—were all telling terrible lies about him, for reasons including that they

were allegedly jealous of his prowess in slow-pitch softball. Tr. Transcript, ECF No. 593 at 1515:18–1517:20, 1541:17–1542:8. He claimed he had never and would never coerce or threaten anyone ever, yet the jury saw evidence he had coerced and threatened his ex-wife not to testify about his involvement in illegal narcotics just before opening statements in this very case. *See* Pl.'s Ex. 199 (Facebook message); Trial Tr., ECF No. 587 at 902:16–908:11 (Desai testimony). He provided inconsistent and implausible explanations for different failures in his investigation; at one point, after being confronted about five inconsistent explanations for why he never investigated Cardwell as the perpetrator, and asked which was true, he responded, "which one would you pick?" Trial Tr., ECF No. 593 at 1556:3–1573:15. Raucci also offered directly contradictory testimony about whether he pre-interviewed Plaintiff before he began recording the coerced statement. Pl.'s Tr. Ex. 79-B (stating he never asked Plaintiff a single question before he began recording); Pl.'s Tr. Ex. 80-A (stating that of course he conducted a pre-interview with Plaintiff). Raucci also testified as to numerous new versions of events that he never shared over the course of the three days of his depositions. *See, e.g.*, Trial Tr., ECF No. 593 at 1586:18–1593:10, 1595:2–22 (testifying for the first time that he chose not to pursue Cardwell as the true perp because a hotel clerk remembered Cardwell was there six months prior); Trial Tr., ECF No. 594 at 1713:7–1716:16 (testifying that Ms. Martinez's mother was present and doing dishes during Raucci's coerced interview with her).

Finally, Plaintiff even presented evidence, though he was not required to do so in order to win on his legal claims, that Raucci was motivated to frame Plaintiff and his co-defendant Lewis due to his ties in the New Haven drug-dealing scene. Plaintiff presented credible testimony that Raucci was a business associate of Frank Parise, a high-powered drug dealer who wanted Lewis to take over his business, and that when Lewis refused, Parise threatened that Raucci wanted to

8

be paid for his drug debt. *See* Trial Tr., ECF No. 596 at 1939:6–1940:6, 1949:18–1959:20 (Lewis testifying that Parise told him "Vinny wants his money"), 1956:23–1958:19 (Lewis testifying that upon arresting him, Raucci said, Lewis "should have never stopped selling drugs in Fair Haven"); *see also* Trial Tr., ECF No. 587 at 928:20–929:6, 929:23–930:14 (Desai testifying that Raucci and Parise were drug associates).

**ARGUMENT**

**I.      There is no basis to grant Raucci or Maher judgment as a matter of law.**

**A.  Legal Standard**

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 may not be granted unless a Court determines: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025) (cleaned up). "The burden on [Defendants] is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict." *Perry v. City of New York*, 78 F.4th 502, 517 (2d Cir. 2023) (cleaned up). "A court considering a Rule 50 motion may not weigh the credibility of witnesses or otherwise consider the weight of the evidence on its own. Instead, the court must consider the evidence in a light most favorable to [Plaintiff] and grant [him] every reasonable inference that the jury might have drawn in [his] favor [as well as] disregard all evidence favorable to [Defendants] that the jury is not required to believe." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 44 (2d Cir. 2025) (cleaned up).

A motion made under subsection (b) of Rule 50 is, by its terms, a renewed motion, and "can be granted *only on grounds advanced in the preverdict motion*." *Lore v. City of Syracuse*,

9

670 F.3d 127, 153 (2d Cir. 2012) (emphasis in original). "This procedural requirement may not be waived as a mere technicality." *Modise v. Osagie*, No. 20-cv-765, 2024 WL 4170979, at *4 (D. Conn. Sept. 12, 2024) (cleaned up). "Thus, if an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required to prevent manifest injustice." *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (cleaned up).

### B. The jury's findings against Raucci and Maher were well-supported.

Plaintiff presented copious amounts of direct, circumstantial, and scientific evidence proving each of the claims for which the jury found Raucci and Maher liable. The evidence was so overwhelmingly in favor of liability that it is difficult to imagine how any reasonable jury viewing this record could have come to a different conclusion. Certainly there is no basis for judgment as a matter of law for Raucci or Maher. Raucci and Maher utterly fail to engage with the abundant evidence offered against them, instead raising only cursory argument divorced from the trial record.[3] For example, they assert without explication that "Plaintiff's theory" of the case against them "required the jury to make a series of speculative inferential leaps." ECF No. 615 at 3. That is completely false. Even though, as the Second Circuit has recently reiterated, like claims can be proven through circumstantial evidence alone, *see Ortiz*, 137 F.4th at 62; *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir. 1992), Plaintiff presented a mountain of direct evidence here. This included testimony from five witnesses who said Raucci fed them

---

[3] As cursory as the briefed arguments are, the arguments in support of Rule 50(a) motions were even more spare, particularly for Maher, who never filed any supporting brief or even joined in the one filed by Raucci. *See* Trial. Tr., ECF No. 606 at 3141:10–3145:15 (Maher). Maher's failure to properly articulate any argument in his Rule 50(a) motion provides an independent basis to deny his Rule 50(b) motion. *See Broadnax*, 415 F.3d at 268.

facts, obtained statements incorporating these fed facts through threats and coercion, and then presented these statements as if they were unadulterated witness accounts; testimony from Sweeney that he observed Raucci fabricate the Ruiz statement (which Maher agreed was credible); and unrebutted scientific testimony proving the manipulation of the Roque, Morant, and Ortiz tapes. Defendants do not even attempt an argument for why this direct evidence could be disregarded on their Rule 50 motion—which would be futile in any event. *See Zellner v. Summerlin*, 494 F.3d 344, 370–74 (2d Cir. 2007) (in ruling on a Rule 50 motion, the court is not permitted to disregard testimony supporting the verdict that the jury could credit).

*Fabrication.* Plaintiff presented abundant evidence that both Raucci and Maher fabricated evidence. While "[a] *single* witness's sworn testimony, if believed by a jury, can support a verdict," *Wills v. Microgenics Corp.*, No. 20-cv-4432, 2025 WL 2208291, at *7 (E.D.N.Y. Aug. 4, 2025) (emphasis added), Plaintiff presented evidence from *four* separate third-party witnesses—Ruiz, Roque, Ortiz, and Martinez—and Plaintiff himself, that Raucci coerced them to make statements that included false information he fed to them, with Maher joining in for Roque and Plaintiff. Plaintiff presented testimony from Sweeney that he witnessed Raucci actively feeding Ruiz information and coercing him to incorporate the fed information in his statement.

Furthermore, Plaintiff presented unrebutted scientific evidence that three of these tapes—the ones recording Ruiz's, Ortiz's, and Plaintiff's statements—were stopped and started a number of times, and in some instances, over-recorded. Neither Raucci nor Maher could provide an innocent explanation for the scientific evidence, and their explanations were evolving and internally inconsistent. And Plaintiff presented evidence that Maher fabricated his report eliminating Cardwell as a suspect, even though he admitted his own investigation had pointed

11

consistently to Cardwell, and no new information regarding Cardwell had been developed to rule him out. Raucci and Maher's cursory arguments that insufficient evidence supports the fabrication verdicts can be easily rejected. *See* ECF No. 615 at 5; ECF No. 617 at 2–3.

*Coercion.* Raucci and Maher do not clearly make any argument challenging the sufficiency of the evidence on Plaintiff's coercion claim. Raucci restates the legal standard for a coercion claim, without discussing the evidence presented or making any argument that the evidence Plaintiff presented was insufficient (or, if it was, how it was). ECF No. 615 at 4. Maher merely says, "To the extent that the defendant Raucci makes claims with regard to the coerced statement, the defendant Maher joins that argument." ECF No. 617 at 2. Any assertion of error with respect to the coercion claim is so entirely undeveloped as to be waived. *See, e.g., Lewis v. Berryhill*, No. 16-cv-01091, 2018 WL 1377303, at *9 (D. Conn. Mar. 19, 2018) ("Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.") (cleaned up).

In any event, the evidence was plainly sufficient to support a reasonable finding that Raucci and Maher coerced Plaintiff's statement. Plaintiff testified that he was innocent and that he knew nothing about the Turner-Fields murders. He testified that he was under the influence of alcohol and marijuana when he was brought in, that he was interrogated for hours, that Raucci and Maher refused to accept his truthful denials of knowledge and told him he had to give a statement implicating Scott Lewis, and that he could only leave once he gave such a statement and if he did not do so he would get the electric chair and be put on a million-dollar bond. *See* Trial Tr., ECF 604 at 2850:15–2858:7. And Plaintiff testified how he was told what to say, and how Raucci stopped, rewound and over-recorded the tape to get a version of the statement he liked. *See* Trial Tr., ECF No. 604 at 2859:3–2860:5. This amply supports the jury's finding that

Plaintiff's will was overborne. As relevant here, the Second Circuit has upheld a plaintiff's coercion claims against a defendant's Rule 50 motion based on purely circumstantial evidence that there was no evidence linking the plaintiff to the crime scene, and yet his statement contained nonpublic details about the crime that the officer would have known. *See Ortiz*, 137 F.4th at 62–66, 68 (denying Defendants' Rule 50 motion on coercion claim even where, unlike Mr. Morant, the plaintiff was unable to testify to the events surrounding the coerced confession).

*Conspiracy.* To the extent any specific argument about the sufficiency of the evidence in support of the conspiracy claim can be discerned, it appears to amount to that Raucci and Maher denied being in a conspiracy, and no one else with direct knowledge of it testified to it. But "conspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence." *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994). "Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and intent may be established through circumstantial evidence." *In re Dana Corp.*, 574 F.3d 129, 153–54 (2d Cir. 2009) (cleaned up) (reversing summary-judgment dismissal of conspiracy claim where, despite the "self-serving" denials of participation by all defendants, circumstantial evidence supported the claim). "The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan." *United States v. Rea*, 958 F.2d 1206, 1214 (2d Cir. 1992). And conspiratorial agreement includes a "tacit understanding"; "[t]here need not be any written statement or even a speaking of words which expressly communicates agreement." *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996).

As described above, Raucci and Maher were jointly engaging in unconstitutional misconduct during the taped interrogations of Morant and Roque and jointly lying to hide their misconduct after the fact. This amply supports the jury's conclusion that they conspired together

to deprive Mr. Morant of his constitutional rights. *See United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) ("The mere fact that Panek participated with Henry in the suspicious transactions at issue suggests an agreement.").[4]

*Malicious Prosecution.* Raucci's one-line argument as to why there is insufficient evidence to support the malicious prosecution verdict is similarly baseless. Without specifying what if any evidence he is referencing, Raucci asserts various "information and statements gathered" as well as "the elimination of other potential suspects, and Plaintiff's own admission of his presence at the scene of the homicide" gave him arguable probable cause. *See* ECF No. 615 at 5. But as Plaintiff has explained at length above, all of the inculpatory evidence was coerced and fabricated. This included Plaintiff's own statement. Such fabricated evidence obviously could not provide probable cause. Raucci's argument that the elimination of "other potential suspects" supports that he had arguable probable cause is as just silly. *See id.* Plaintiff presented evidence, including Maher's own testimony, that there was no indication that Cardwell

---

[4] It is unclear if Raucci is suggesting that Plaintiff's proof failed for failure to introduce sufficient evidence of Frank Parise's participation in the conspiracy. *See* ECF No. 615 at 4. To the extent Raucci raises such an argument, it has no merit. There was no need to prove the identity of all participants in the conspiracy. *See, e.g.*, *Richardson v. United States*, 526 U.S. 813, 817 (1999) ("A federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element.") (cleaned up); *United States v. Dove*, 884 F.3d 138, 147–48 (2d Cir. 2018) (holding that removing the names of participants in a conspiracy from the jury instructions did not affect "the jury's ability to determine" the defendant's role in the conspiracy, as there was no burden "to demonstrate the precise details…of the conspiracy"). And in any event, Plaintiff presented ample evidence that Raucci did conspire with Parise. *See* Trial Tr., ECF No. 596 at 1939:6–1940:6, 1949:18–1959:20 (Lewis testifying that Parise told him "Vinny wants his money"), 1956:23–1958:19 (Lewis testifying that upon arresting him, Raucci said, Lewis "should have never stopped selling drugs in Fair Haven"); *see also* Trial Tr., ECF No. 587 at 928:20–929:6, 929:23–930:14 (Desai testifying that Raucci and Parise were drug associates); Trial Tr., ECF No. 599 at 2418:8–25 (Brian Donnelly testifying that there was enough evidence that Parise and Raucci were associating such that the FBI planned an integrity sting to "prove they were collaborating with one another in drug operation activities"), 2420:18–24 (Donnelly testifying about witnesses who provided the FBI with information on "Raucci's…connection to Parise").

was no longer a viable suspect. In fact, Plaintiff presented evidence that Raucci tried to cover up for the fact that all evidence indicated Cardwell as the true perpetrator. Trial Tr., ECF No. 593 at 1556:3–1573:15, 1583:3–1595:22.[5] Finally, there was evidence presented from multiple witnesses that Raucci admitted that he understood Morant was innocent; that alone is sufficient to support a finding that Raucci lacked probable cause. *See* Court Ex. 8, Hector Ortiz Pet. for New Tr. at 151; Court Ex. 13, Jose Roque Crim. Tr. at 662:22–25; Trial Tr., ECF No. 604 at 2856:21–2857:1 (Plaintiff's testimony).

**C. Maher's argument against the sufficiency of the evidence improperly relies on assumed findings the jury did not make.**

Maher makes a separate Rule 50 argument that, although difficult to follow, appears to rely on an interpretation of his assumed findings by the jury based on an apparent attempt to harmonize the various general liability verdicts for and against Maher on separate claims. *See* ECF No. 617 at 3–4. Plaintiff understands Maher's argument to be that, because the jury found Raucci liable for malicious prosecution, failure to disclose exculpatory evidence, fabrication, coercion, and conspiracy, but that it didn't find Maher liable for failure to intervene in Raucci's misconduct, the liable verdicts against Maher for fabrication of evidence and coercion cannot have been properly reached. This argument is factually, legally, and logically flawed. Indeed, Maher's argument repeats some of the very same legal and logical flaws as an argument Maher's counsel made in a prior case, which was specifically derided by the Second Circuit. *See Outlaw*

---

[5] While, in introducing his arguments on insufficiency of the evidence, Raucci argues that "[t]he record on which the verdict was rendered does not provide a legally sufficient basis to find that Mr. Raucci…suppressed favorable material from prosecutors," he makes no arguments regarding Plaintiff's *Brady* claim other than a qualified immunity defense, which Plaintiff will address in the next section. ECF No. 615 at 3–4.

15

*v. City of Hartford*, 884 F.3d 351, 369–72 (2d Cir. 2018) (rejecting "factually, doctrinally, and logically flawed" argument jury verdict necessarily encompassed specific factual findings).

First, "when a court considers a motion for a judgment as a matter of law—even after the jury has rendered a verdict—only the sufficiency of the evidence matters. The jury's findings are irrelevant." *In re Vivendi*, 838 F.3d at 249 n.15 (cleaned up). Thus, when evaluating the sufficiency of evidence in support of a general verdict, "the focus is not on any purported inconsistency between the jury's verdicts as to the separate claims, but rather on whether there was sufficient evidence to support a finding of liability on the claim as to which the plaintiff prevailed." *Hundley v. Frunzi*, No. 23-581, 2024 WL 3886996, at *2 (2d Cir. Aug. 21, 2024); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52–53 (2d Cir. 2014); *Cash v. Cnty of Erie*, 654 F.3d 324, 343 (2d Cir. 2011).

In addition, these are general verdicts, and there is no legal requirement that general verdicts be consistent. *See Matusick*, 757 F.3d at 52–53 ("We have long held the view that consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment.") (cleaned up); *Cash*, 654 F.3d at 343.

Further, any objection based on alleged inconsistencies in the verdict is waived because Maher failed to raise it before the jury was dismissed. *Cash*, 654 F.3d at 342–43; *In re Vivendi*, 838 F.3d at 249 n.15; *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46–50 (2d Cir. 2015). "The requirement of a timely exception is not merely a technicality." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006) (cleaned up). "The waiver rule is in place to require counsel to seek clarification and cure when that is still possible without the duplication of the enormous resources just spent on a substantial trial." *Buchwald v. Renco Grp.*, No. 13-cv-7948, 2015 WL 925954, at *4 (S.D.N.Y. Mar. 4, 2015).

16

Finally, assuming *arguendo* that Maher hadn't waived this argument and that the verdicts against he and Raucci must be harmonized, Maher's argument that the verdicts cannot be harmonized is incorrect. In circumstances in which a reviewing court must reconcile verdicts (i.e., where there are potentially inconsistent *special* verdicts), "the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency" and "make every attempt to reconcile the jury's findings, by exegesis if necessary." *Turley v. Police Dep't of City of New York*, 167 F.3d 757, 760 (2d Cir. 1999) (cleaned up); *see also Cash*, 654 F.3d at 343–44; *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427–29 (2d Cir. 1995); *Ali v. Kipp*, 891 F.3d 59, 65–66 (2d Cir. 2018). Here, the jury could have reasonably found that Maher was not liable for failing "to intercede to prevent Defendant Raucci's violation of Mr. Morant's constitutional rights," ECF No. 569 at 4, because he actually violated Plaintiff's rights as a direct participant. *See Ekukpe v. Santiago*, No. 16-cv-5412, 2019 WL 13544670, at *7 (S.D.N.Y. Mar. 8, 2019) (holding that a defendant was entitled to a judgment as a matter of law on the plaintiff's failure to intervene claim because he was found to be a direct participant in excessive force, false arrest, and malicious prosecution); *see also Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 622 (D. Conn. 2016), *as amended* (Aug. 9, 2016) (holding that a plaintiff may proceed on civil rights claims "under the alternate theories of direct participation and failure to intervene").

### D.  Neither Raucci nor Maher are entitled to qualified immunity.

The only argument Raucci advances with respect to qualified immunity relates to the *Brady* claim. While it is difficult to parse, Raucci appears to make two arguments. First, he argues that, to the extent the *Brady* claim is based on suppression of the Bobby Wilson tape, it cannot succeed because that tape was provided to the prosecutor. But Plaintiff never argued his *Brady* claim was based on suppression of that Bobby Wilson tape, as opposed to the abundant other exculpatory and impeachment evidence Raucci suppressed (including evidence regarding

17

his fabrication of the Ruiz, Roque, Ortiz, and Martinez statements). So this argument is irrelevant.

Second, Raucci claims that the *Brady* obligation was not clear until the *Walker* decision in September 1992, and so "at the time Mr. Raucci performed the subject investigation, clearly established law did not require him, in the specific factual circumstances presented here, to do more than provide the underlying material to the prosecuting authority." ECF No. 615 at 9. Raucci is admitting it was clear he had to provide exculpatory information to the prosecutor, which the evidence established he did not do. To the extent Raucci is claiming the relevant time period is solely when he was conducting the investigation, that is incorrect. Plaintiff's trial was not until May and June 1994, well after the *Walker* decision, and Raucci's obligation to disclose exculpatory and impeachment evidence continued at least through the time of that trial. And in any event, Raucci is wrong that *Walker* first clearly established his *Brady* obligation; as the Second Circuit has repeatedly recognized, the obligation was clearly established well before this case. *See Horn v. Stephenson*, 11 F.4th 163, 170–73 (2d Cir. 2021) (denying qualified immunity on *Brady* claim, tracing obligation not to deliberately suppress exculpatory evidence back to *Brady v. Maryland*, 373 U.S. 83, 86–87 (1963), *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (recognizing a cause of action against police for suppressing exculpatory evidence from the prosecution in 1971). The Second Circuit has routinely held officers liable for misconduct including *Brady* violations arising out of prosecutions at or before the time of the conduct in this case. *Bermudez v. City of New York*, 790 F.3d 368, 376 n.3 (2d Cir. 2015) (denying qualified immunity on fabrication and Brady claims based on 1991 misconduct);

18

*Restivo v. Hessemann*, 846 F.3d 547, 552 (2d Cir. 2017) (upholding jury verdict finding officer liable for fabrication, *Brady* violations and malicious prosecution based on 1984 misconduct).

Maher's qualified immunity argument is even more baffling. Maher cites no legal authority in support of his argument, and "joins the statement of defendant Raucci" on qualified immunity. ECF No. 617 at 5. But Raucci's argument relates only to the *Brady* claim, and Maher was not found liable on the *Brady* claim. Any other argument Maher attempts to make is merely a regurgitation of his factual arguments, which fail for the reasons given above.

## II. There is no basis for a new trial

### A. Legal standard

A motion for a new trial under Federal Rule of Civil Procedure 59 "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ortiz*, 137 F.4th at 71–72 (cleaned up); *see also Modise*, 2024 WL 4170979, at *4. Although when considering a new trial motion "the trial judge may weigh the evidence and the credibility of witnesses" itself, Second Circuit "cases teach…the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

"It is well-settled that a court should only award a new trial based on an evidentiary error if the admission of evidence was both a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that the Court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Icon Int'l, Inc. v. Elevation Health LLC*, 812 F. Supp. 3d 288, 316–17 (S.D.N.Y. 2025) (cleaned up); *Parker v. Reda*, 327 F.3d 211, 213 (2d Cir. 2003); *see also Restivo v. Hessemann*, 846 F.3d at 573 (noting it would "only hold

19

that the district court abused its discretion in making an evidentiary ruling where the ruling was arbitrary and irrational" (cleaned up)).

### B. Neither Raucci nor Maher were prejudiced by Plaintiff's presentation of *Monell* evidence or other evidence of their own misconduct.

Raucci and Maher's arguments that they were prejudiced by the Court's evidentiary decisions are completely baseless. They do not identify the high standard they would have to meet to merit a new trial—that any decision was a "clear abuse of discretion" and that it was "so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," *Parker*, 327 F.3d at 213—let alone attempt to meet it. They obviously could not. The Court carefully considered the admissibility of all this evidence in the context of motions in limine and properly ruled all evidence admitted at trial was admissible. For example, all admitted evidence of Raucci's misconduct the Court found was either intrinsic to the claims being tried or admissible under Rule 404(b). *See* ECF No. 393 at 44–46. Defendants do not discuss a single one of those decisions, let alone point to any flaw in the Court's analysis at all. There was none, and certainly no "clear abuse of discretion."

First, with respect to the *Monell* evidence of other cases, neither defendant moved to bifurcate the trials, nor did they join the City's motion to bifurcate. *See* ECF No. 263 (Order Denying the City's Motion to Bifurcate) (highlighting that "the Individual Defendants themselves notably have not moved for bifurcation"). Further, Raucci and Maher moved *in limine* before the trial that *either* the Court preclude Plaintiff from introducing evidence of *Monell* case examples *or*, in the alternative, issue a limiting instruction; the Court issued said limiting instructions throughout the trial and at its close. *See* ECF No. 277-1; ECF No. 287; ECF No. 393 at 44 ("The Court will instruct the jury that examples of other NHPD investigations not

20

involving the individual Defendants should be considered only as evidence against the City on Plaintiff's *Monell* claims.")

Only two of the *Monell* case examples presented by Plaintiff during trial concerned an investigation in which Raucci participated. Raucci was questioned only on one, the Fleming investigation. Raucci denied any recollection of the details of that investigation, testifying only that no one from NHPD ever investigated him for any misconduct following Fleming's acquittal—evidence that goes directly to the *City's* failure to supervise and discipline and its acquiescence to a custom of misconduct without Raucci having testified to any details of his own misconduct. *See* Trial Tr., ECF No. 595 at 1817:5–1821:9, 1836:12–22. Maher was questioned about the Streater investigation, to which he replied he had no reason to dispute that Raucci participated in the investigation, that he had no knowledge of any misconduct in the investigation, and that he remembered only that no one at NHPD ever interviewed him about the investigation. *See* Trial Tr., ECF No. 587 at 973:7–14, 974:5–975:19. The presentation of *Monell* case examples, when made with a proper limiting instruction, are perfectly permissible, and here the lines of questioning on the Fleming and Streater cases (the only two involving Raucci) were so abbreviated that they could not have caused any undue prejudice by the jury.

Second, the Court already held that much of the evidence Raucci takes issue with regarding his drug use—in particular, Desai's testimony and "Pettola's anecdote concerning alleged cocaine-planting"—was properly admissible and did not unduly prejudice him. *See* ECF No. 615 at 11 n.2, 12. This Court already held in its Omnibus Order on Motions *in Limine* of April 23, 2026, that Raucci's drug use was relevant to his "motive to frame Plaintiff" and "his alleged ability to engage in brazen illegal conduct as a NHPD officer with no apparent fears of repercussion"; plus, such evidence was also relevant to his credibility when Raucci denied using

21

drugs during his testimony. ECF No. 393 at 33–34 (discussing Desai's prospective testimony about Raucci's drug use).[6] Raucci argues that Plaintiff presented no credible testimony about Raucci's drug use. *See* ECF No. 615 at 12–13. That contention is belied by the record. *See, e.g.*, Trial Tr., ECF No. 589 at 1200:3–6 (Ruiz testifying that he "got high" and "did drugs with" Raucci); Court Ex. 8, Hector Ortiz Pet. for New Tr. at 196 (stating that he was with Raucci when "Raucci was getting high"); Trial Tr., ECF No. 587 at 909:3–910:20, 912:6–12, 914:6–11 (Desai testifying that she had observed Raucci using drugs).

That Raucci was not permitted to question Ms. Desai was not prejudicial; the Court already found that while "Raucci's involvement with drugs is a central issue in this trial," given Ms. Desai did not indicate she had any drug-affected memory problems, questioning her about her past drug use would amount to "nothing more than his desire to sling mud at [her]" and to "discredit her testimony." ECF No. 448 at 10. The Court similarly had already ruled that the drug-planting incident described by Pettola was "relevant to Plaintiff's individual liability claims against Raucci, as it tends to show that (a) Raucci had access to suspected cocaine…and (b) he may have had a belief that he could fabricate evidence without fear of repercussion or even a report to supervisors"; plus it was "relevant to his credibility." ECF 393 at 37–40.[7]

In terms of the admission of evidence of Raucci's sexual misconduct in the *Horrocks* case, in which he had sexual relations with a rape victim on the night of her rape, the Court

---

[6] Maher cursorily argues that a new trial is warranted because the "allegations against him" were "decided in the same award" in which evidence had been submitted against the City and Raucci. *See* ECF No. 617 at 6. Maher does not enumerate which evidence was prejudicial to him nor why the limiting instructions presented in tandem with evidence against the City did not alleviate any potential prejudice, nor why evidence about another officer's conduct would prejudice him. Plaintiff does not attempt to guess.

[7] Ms. Desai's testimony regarding Raucci's domestic violence was stricken from the record. The jury is presumed to follow instructions about what evidence to disregard.

carefully ruled on the record after argument. *See* Trial Tr., ECF No. 596 at 1898:8–1899:3. Raucci himself put this evidence at issue after "[h]e himself volunteered somewhat gratuitously that the medal of commendation was given in the context from a rescue of a fire" and unnecessarily mentioned it was a rape case. *Id.* at 1898:17–20. The Court then held that because Raucci himself "opened the door" to Plaintiff's presentation of the *Horrocks* case as "admissible as against Mr. Raucci" to "show his character or lack thereof." *Id.* at 1898:15–1899:3. Raucci argues that this was improperly admitted in part because it was uncorroborated, *see* ECF No. 615 at 13, but Raucci himself admitted to having sex with the victim of the rape victim in that case (for which he was lead investigator) sometime shortly after the rape occurred, *see* Trial Tr., ECF No. 596 at 1918:22–1919:5.

In short, the Court's evidentiary rulings were all correct. Defendants have not come close to demonstrating any error, let alone an evidentiary error serious enough to merit a new trial. *See Parker*, 327 F.3d at 213.

## C. There is no legal basis for remittitur.

"A jury's damages award may not be set aside unless the award is so high as to shock the judicial conscience and constitute a denial of justice." *Manganiello v. City of New York*, 612 F.3d 149, 168 (2d Cir. 2010) (cleaned up). Plaintiff presented fulsome evidence of the extraordinary damages he suffered. The Second Circuit has "long held that, when damages are awarded, calculation of damages is the province of the jury." *Restivo*, 846 F.3d at 587 (cleaned up). Accordingly, "in reviewing damages awards," courts "accord considerable deference to the factual findings of both judge and jury." *Id.*

Raucci and Maher move for remittitur of the damages award, but neither defendant articulates a reason why the verdict is so high as to "shock the conscience"—nor could they. Instead, they recognize that "Plaintiff undoubtedly claimed a serious injury." ECF No. 615 at 14.

They state that, despite this serious injury, "the damages must still be *supported by the evidence*" but then make no argument as to why the evidence failed to support the jury's damages verdict. *Id.* (emphasis in original).[8]

While Raucci and Maher make no factual or evidentiary arguments, they make a cursory legal argument centered around the appropriate award to compensate only Plaintiff's wrongful incarceration award and reduce it to a per-year calculation. *See* ECF No. 615 at 14–15. But the jury was properly instructed to compensate for four separate categories of damages: loss of liberty, emotional pain and suffering, physical harm, and loss of a normal life. See ECF No. 557 at 40. These categories of damages were not limited in time to just those years Plaintiff spent wrongfully incarcerated; instead, they included harms stemming from the time of his wrongful arrest through today and into the future. Plaintiff demonstrated ample evidence of each of these types of damages. Multiple witnesses, including Plaintiff himself and psychological expert Dr. Adeyinka Akinsulure-Smith, testified in detail about how Plaintiff suffered from the time of his wrongful arrest and conviction, throughout his incarceration, to after he was released but before he was granted a pardon in 2015, through today, and also how he will continue to suffer for the rest of his life.

Plaintiff presented extensive testimony about his loss of liberty, or in his words, being locked in a "cage" for twenty-one years. *See, e.g.*, Trial Tr., ECF No. 604 at 2902:11–19. Mr. James Jeter described how each cell at a facility where Plaintiff was incarcerated for years "was a coffin." *Id.* at 2808:7–2809:15. Plaintiff testified about the traumatic effect of having his family

---

[8] In a footnote, Raucci states that "defendants also intend to pursue" statutory offset of the Claims Commission award. ECF No. 615 n.14. To the extent this can be considered to raise a request for setoff, any setoff is precluded under *Restivo*, 846 F.3d at 581–87, for reasons more fully explained in Plaintiff's opposition to the City's motion for a new trial.

visit him in prison due to his loss of liberty, and how he'd be strip searched after each visit. *See* Trial Tr., ECF No. 604 at 2915:4–25; *see also* Trial Tr., ECF No. 606 at 3083:17–3084:5 (Dr. Akinsulure-Smith testimony regarding the pain Plaintiff felt following family visits).

Plaintiff also amply demonstrated that he endured, and continues to endure, emotional pain and suffering. For example, Dr. Akinsulure-Smith testified that, due to his wrongful conviction and incarceration, Plaintiff currently suffers from chronic Post-Traumatic Stress Disorder, which she explained as akin to experiencing "a car accident every day of your life for 21 years." *Id.* at 3078:25–3079:13; *see also id.* at 3093:13–3094:6 (testifying that Mr. Morant's symptoms will continue for the rest of his life). As a result of being incarcerated, Plaintiff presented testimony that he continues to experience the symptoms of chronic PTSD including hypervigilance, intrusive thoughts, avoidance, and negative cognitions. *See id.* at 3082:25–3083:16, 3087:24–3088:1 (Dr. Akinsulure-Smith discussing Plaintiff's hypervigilance and hyperarousal); 3087:5–15, 3089:10–13, 3089:23–3091:9, 3092:16–3093:5 (Dr. Akinsulure-Smith discussing Plaintiff's intrusion symptoms including nightmares and flashbacks); 3115:7–11 (wife, Kimberly Morant, testifying to Plaintiff's frequent nightmares); 3087:16–19, 3088:7–12, 3093:13–21, 3102:22–3103:6 (Dr. Akinsulure-Smith discussing Plaintiff's avoidance); 3119:7–11 (wife, Kimberly Morant, testifying to Plaintiff's self-isolation); 3087:20–23 (Dr. Akinsulure-Smith discussing Plaintiff's negative cognitions).

Plaintiff also presented extensive testimony on all the family moments, both momentous and quotidian, that he missed out on as a result of his incarceration. *See, e.g.*, *id.* at 3063:23–3065:15 (son, Julian Sobin, testifying about all the occasions Plaintiff missed due to his incarceration; "anything you can think of, he's missed"); Trial Tr., ECF No. 603 at 2743:14–24 (daughter, Twyla Washington, testifying that Plaintiff "missed everything"); Trial Tr., ECF No.

25

604 at 2928:10–2931:8 (Plaintiff's testifying on the family milestones he missed); Trial Tr., ECF No. 603 at 2743:9–13 (daughter, Twyla Washington, testifying that when Plaintiff's younger brother died while he was still incarcerated, "[i]t broke him"); Trial Tr., ECF No. 605 at 3020:20–3021:25 (mother, Linda Morant, discussing Plaintiff's mourning the death of his younger brother "all alone"); Trial Tr., ECF No. 604 at 2936:13–2937:23 (Plaintiff testifying about mourning the loss of his brother alone and in shackles).

Additionally, the death of Plaintiff's son who struggled with substance abuse issues caused him extreme emotional pain and suffering, beyond what a normal grieving father would feel, because, due to his wrongful conviction, Plaintiff felt "enormous feelings of guilt as a result of his son's dying, death, and overdose." Trial Tr., ECF No. 606 at 3091:21–3092:15 (Dr. Akinsulure-Smith testimony).

Plaintiff also proved that he suffered physical harm as a result of his wrongful conviction and incarceration. Plaintiff testified about his chronic back and shoulder injuries as a result of the lack of an adequate mattress and medical care and losing five teeth as a result of a lack of adequate dental care. *See* Trial Tr., ECF No. 604 at 2887:17–2888:20.

Further, Plaintiff and Mr. Jeter described the unrelenting atmosphere of violence in prison. *See id.* at 2811:23–2812:12 (Jeter's testimony); *id.* at 2890:10–2891:14 (Plaintiff's testimony). Plaintiff presented a particularly vivid example of physical harm: enduring the extreme deprivations that accompanied his time in solitary confinement for eleven months for an infraction he did not commit. During that time, he was shackled whenever out of his cell, which was infrequent, and could only take three showers per week. See Trial Tr., ECF No. 606 at 3084:6–3086:8 (Dr. Akinsulure-Smith's testimony); Trial Tr., ECF No. 604 at 2900:25–2094:10 (Plaintiff's testimony). For approximately six months during that time period, Plaintiff was

exposed to light twenty-four hours a day, seven days a week. *See* Trial Tr., ECF 606 at 3084:19–3085:14 (Dr. Akinsulure-Smith's testimony).

Plaintiff presented evidence of his loss of a normal life as he continues to navigate the world post-wrongful incarceration. For example, Plaintiff's family testified to the difficulties of reestablishing their relationships with him as a result of his lengthy wrongful incarceration. *See id.* at 3114:12–23, 3116:2–18 (wife, Kimberly Morant, discussing the challenges of Plaintiff's ability to cope with everyday life post-incarceration and how it negatively affects their relationship); Trial Tr., ECF No. 603 at 2745:20–2746:3 (daughter, Twyla Washington, discussing the "ups and downs" of rebuilding her relationship with Plaintiff as an adult); Trial Tr., ECF No. 605 at 3018:21–3019:10 (mother, Linda Morant, discussing the difficulties of relating to her son post-wrongful incarceration); *see also* Trial Tr., ECF No. 606 at 3089:17–3091:20 (Dr. Akinsulure-Smith testifying on the negative effects of Plaintiff's wrongful incarceration on his family relationships). Plaintiff's wrongful incarceration has led to inabilities to display physical affection to his wife, causing them to sleep on separate mattresses. *See* Trial Tr., ECF No. 606 at 3116:19–3117:2 (wife, Kimberly Morant's, testimony); Trial Tr., ECF No. 604 at 2916:1–23 (Plaintiff's testimony).

Notably, this extensive damages testimony was essentially unrebutted. Defense counsel did not ask a single question of any of his non-expert, non-alibi damages witnesses, did not ask Mr. Morant any questions about the extent of his damages, did not question Dr. Akinsulure-Smith's diagnosis and did not present any contrary opinion from any expert. It was well within the jury's province to evaluate each of these harms and calculate the appropriate damage award. *See, e.g.*, *Restivo*, 846 F.3d at 587 ("Calculation of damages is the province of the jury.") (cleaned up).

27

Further, even were the award appropriate characterized by a per-year calculation for the number of years Plaintiff was wrongfully incarcerated, the jury's verdict did not come close to conscience-shocking or a denial of justice. Upon "a review of comparable cases," as Raucci and Maher suggest as the appropriate measure for the Court's determination, Courts "need not average the high and low awards" but instead "focus instead on whether the verdict lies within the reasonable range." *Restivo*, 846 F.3d at 587–88.[9]

First—and contrary to what Raucci and Maher's legal argument suggests—the *Restivo* court never said $1 million per year represented the "upper limit" of permissible compensation. Rather, the court suggested this was not at the upper limit, "easily reject[ing]" defendant's challenge to the size of the verdict, holding the district court "plainly" did not abuse its discretion in rejecting the excessiveness challenge, and noting "Plaintiffs and the district court cited scores of cases, federal and state, with awards in a similar range." 846 F.3d at 588 & n.29.

Indeed, verdicts representing much higher yearly amounts than $1.8 million have been awarded and approved as reasonable, particularly recently. *See Gillispie v. Miami Twp.,* No. 23-3999, 2025 WL 1276900, at *8–9 (6th Cir. May 2, 2025) (affirming reasonableness of $45 million award for 20 years of wrongful imprisonment, or nearly $2.5 million per year, despite no expert evidence of any mental health condition or any physical ailments); *Brown v. City of Chicago*, No. 19 CV 4082, 2025 WL 2785426, at *32 (N.D. Ill. Sept. 30, 2025) (rejecting excessiveness challenge to $50 million award for ten-year detention, or $5 million per year); *Fulton v. Bartik*, No. 20-CV-3118, 2026 WL 884774, at *21–22 (N.D. Ill. Mar. 31, 2026) (rejecting excessiveness challenge to $120 million award—$60 million per plaintiff incarcerated

---

[9] Raucci himself recognized that Plaintiff's claims have significant financial merit, arguing in closing that if the jury were to find that Plaintiff "proved his case" then he may be entitled to up to $10 million. Trial Tr., ECF No. 609 at 3528:5–20.

for 16 years each—or $3.75 million per year); *Lobato v. Las Vegas Metro. Police Dep't*, No. 19-CV-01273, 2026 WL 891887 (D. Nev. Mar. 31, 2026) (rejecting post-verdict challenges to $34 million damages award for 16 years' wrongful imprisonment, or approximately $2.125 million per year); Verdict Sheet at 3, *Weppner v. County of Erie*, No. 22-cv-00519 (W.D.N.Y. Nov. 25, 2025) (jury award of $80 million for 27 years' wrongful incarceration or nearly $3 million per year).

Further, when assessing comparator verdicts, the Court "must take into account inflation." *Gonzalez v. United States*, 80 F.4th 183, 199 (2d Cir. 2023). Particularly when adjusting for inflation, there are many more verdicts well above the $1.8 million per year metric that have been approved over the past 25 years. *See, e.g.*, *White v McKinley*, 605 F.3d 525, 534–36, 539 (8th Cir. 2010) (affirming 2008 verdict of $14 million for 5 ½ years' wrongful imprisonment, or over $4 million per year in 2026 dollars); *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (affirming 2008 verdict of $9 million award for 4 years' wrongful imprisonment, or over $3.5 million per year in 2026 dollars); *Jimenez v. City of Chicago*, 732 F.3d 710, 712 (7th Cir. 2013) (affirming 2012 verdict of $25 million for 16 years' wrongful imprisonment, or over $2.3 million per year in 2026 dollars); *Newsome v. McCabe*, 319 F.3d 301, 302 (7th Cir. 2003) (affirming 2001 verdict of $15 million award for 15 years' wrongful imprisonment, or over $1.9 million per year in 2026 dollars).[10] Even adjusting the 2014 *Restivo* verdict for inflation would increase the figure approved by the Second Circuit to over $1.4 million per year—not far off the award here. *See also Limone v. United States*, 579 F.3d 79, 103–

---

[10] All inflation adjustments are made with the CPI Inflation Calculator. *See* U.S. BUREAU OF LABOR STATISTICS, CPI INFLATION CALCULATOR, https://www.bls.gov/data/inflation_calculator.htm.

07 (1st Cir. 2009) (affirming 2007 award of $96 million based on baseline of $1 million per year of wrongful incarceration, or over $1.6 million in 2026 dollars).

**CONCLUSION**

For the foregoing reasons, Raucci's and Maher's requests for judgment as a matter of law, a new trial, and remittitur should be denied.

Dated: July 17, 2026

Respectfully Submitted,

*/s/Anna Benvenutti Hoffmann*
Anna Benvenutti Hoffmann,
phv208203
Nick Brustin, phv08609
Emma Freudenberger, phv08602
Amelia Green, phv208992
Grace Paras, phv208762
Elsa Mota, phv208184
Katie Cion, phv20899
Neufeld Scheck Brustin
Hoffmann & Freudenberger, LLP
200 Varick Street, Suite 800
New York, NY 10014
Tel: (212) 965-9081
Fax: (212) 965-9084
nick@nsbhf.com
anna@nsbhf.com
emma@nsbhf.com
amelia@nsbhf.com
grace@nsbhf.com
elsa@nsbhf.com
kcion@nsbhf.com

Kenneth Rosenthal, ct05944
Law Office of Kenneth Rosenthal
One Audubon Street, 3d Fl.
New Haven, CT 06511
(203) 915-4235
krosenthal@gs-lawfirm.com

*Attorneys for Plaintiff Stefon Morant*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Anna Benvenutti Hoffmann*
