UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEFON MORANT,

     *Plaintiff*,

v.

CITY OF NEW HAVEN, ET AL.,

     *Defendants*.

No. 22-cv-630 (SVN)

**DEFENDANT CITY OF NEW HAVEN'S REPLY MEMORANDUM IN SUPPORT OF
ITS MOTION FOR NEW TRIAL**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

ARGUMENT ............................................................................................................................... 1

   I.    Remittitur is warranted because the jury returned an excessive, and de facto punitive, verdict against the City ................................................................................................ 1

      A.   The award should be remitted because it is de facto punitive. ...................................... 1

      B.   The award should be remitted because it is intrinsically excessive. .............................. 4

   II.   The Claims Commission award must be offset. ................................................................ 7

CONCLUSION ........................................................................................................................... 10

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Chicago*,
    798 F.3d 539 (7th Cir. 2015) ...............................................................................................6

*Alston v. City of New York*,
    2023 WL 11956309 (E.D.N.Y. Nov. 9, 2023)......................................................................5

*Birch v. Town of New Milford*,
    2025 WL 1603217 (D. Conn. June 6, 2025)........................................................................7

*Brown v. City of Chicago*,
    2025 WL 2785426 (N.D. Ill. Sept. 30, 2025) .....................................................................6

*Burke v. Regalado*,
    935 F.3d 960 (10th Cir. 2019) .............................................................................................3

*Burton v. City of New York*,
    630 F. Supp. 3d at 586 (S.D.N.Y. 2022).............................................................................5

*Dominguez v. Hendley*,
    545 F.3d 585 (7th Cir. 2008) ...............................................................................................7

*Fulton v. Bartik*,
    2026 WL 884774 (N.D. Ill. Mar. 31, 2026)........................................................................6

*Gillespie v. Miami Township*,
    2025 WL 1276900 (6th Cir. May 2, 2025) .........................................................................6

*Limone v. United States*,
    579 F.3d 79 (1st Cir. 2009)..................................................................................................5

*Lobato v. Las Vegas Metro. Police Dep't*,
    2026 WL 891887 (D. Nev. Mar. 31, 2026) ........................................................................7

*Merrill Lynch Interfunding, Inc. v. Argenti*,
    155 F.3d 113 (2d Cir. 1998).................................................................................................8

*Newport v. Fact Concerts, Inc.*,
    453 U.S. 247 (1981).............................................................................................................1

*Newton v. City of New York*,
    171 F. Supp. 3d 156 (S.D.N.Y. 2016)..................................................................................5

ii

*Ortiz v. Stambach*,
    137 F.4th 48 (2d Cir. 2025) ........................................................................................5

*Payne v. Jones*,
    711 F.3d 85 (2d Cir. 2013)...................................................................................1, 4, 6

*Racher v. Westlake Nursing Home Ltd. P'ship*,
    871 F.3d 1152 (10th Cir. 2017) ..................................................................................3

*Ramirez v. NY City Off-Track Betting Corp.*,
    112 F.3d 38 (2d Cir. 1997)...........................................................................................3

*Restivo v. Hessemann*,
    846 F.3d 547 (2017)........................................................................................5, 6, 7, 8

*Stampf v. Long Island R. Co.*,
    761 F.3d 192 (2d Cir. 2014)..........................................................................................1

*Turley v. ISG Lackawanna, Inc.*,
    774 F.3d 140 (2d Cir. 2014)......................................................................................1, 4

*Weppner v. Cnty. Of Erie*,
    22-cv-00519 (W.D.N.Y. Nov. 25, 2025) .....................................................................7

*White v. McKinley*,
    605 F.3d 525 (8th Cir. 2010) .......................................................................................7

*Zervos v. Verizon N.Y.*,
    252 F.3d 163 (2d Cir. 2001)..........................................................................................2

**Statutes**

42 U.S.C. § 1983...................................................................................................1, 7, 8

Conn. Gen. Stat. § 54-102uu....................................................................................8, 9

Conn. Gen. Stat. § 54-102uu(a) ...................................................................................9

Conn. Gen. Stat. § 54-102uu(a)(2)...............................................................................9

Conn. Gen. Stat. § 54-102uu(c)....................................................................................9

Conn. Gen. Stat. § 54-102uu(i).....................................................................................7

General Obligations Law § 15-108(a) ..........................................................................8

New York's Unjust Conviction and Imprisonment Act, N.Y. Ct. Cl. Act § 8-b ...........7

Though a new trial is warranted for all the reasons stated in the City's Motion for New Trial, this page-limited reply principally addresses its remittitur arguments.

ARGUMENT

**I. Remittitur is warranted because the jury returned an excessive, and de facto punitive, verdict against the City.**

The Second Circuit has repeatedly expressed concern about the "size of awards rendered in the trial courts within our Circuit" and has "addressed at length the individual and social harms associated with excessive awards of compensatory and punitive damages," particularly those "based on intangibles such as emotional harm or the need for punishment." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 147 (2d Cir. 2014); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 205 (2d Cir. 2014) (among other "burdensome costs on society" imposed by excessive damages awards, "[m]unicipalities can be drained of essential public resources"). The $38 million noneconomic damages award here is based entirely on such "intangibles." It should be remitted, both because it resulted in part from discernible errors because it is "intrinsically excessive." *See generally Payne v. Jones*, 711 F.3d 85, 96 (2d Cir. 2013).

**A. The award should be remitted because it is de facto punitive.**

Punitive damages may not be awarded against a municipality under 42 U.S.C. § 1983. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). As the Supreme Court has observed, "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." *Id.* at 267.

Here, the City (and, ultimately, its "blameless and unknowing taxpayers") has been saddled with a $38 million verdict that, while compensatory in name, is punitive in fact. This de facto

1

punitive verdict resulted from a series of events leading up to and during trial, which allowed Plaintiff to present a case for punitive damages against Defendant Raucci before withdrawing that claim and urging the jury to channel its anger, and send a message, through compensatory damages.

**1.** First, the Court denied the City's motion to bifurcate on the ground that it would be necessary to reach the *Monell* claim regardless of how a trial against the individual defendants went because it had already granted summary judgment in Plaintiff's favor against Defendant Sweeney. D.E. 263. While the Court has considerable discretion over whether to grant a motion to bifurcate, it is necessarily an abuse of that discretion to base a decision on a clearly erroneous assessment of the relevant facts. *Zervos v. Verizon N.Y.*, 252 F.3d 163, 169 (2d Cir. 2001).

The City was undoubtedly prejudiced by the failure to bifurcate, as it was tainted by association with Defendant Raucci, and by evidence of his bad character. To take an obvious example, the evidence that Raucci improperly—and, it is alleged, criminally—sought to influence or intimidate his ex-wife immediately before she testified at trial would not have been admitted in a hypothetical *Monell* trial against the City alone. More generally, being associated with Raucci during trial made it inevitable that the jury would transfer that to the verdict form. Plaintiff's counsel exploited the opportunity to link Raucci with the City, repeatedly intimating that the very fact that a person of such low character served on the NHPD suggests that it was the sort of department that would have a practice of suppressing exculpatory evidence. *See, e.g.*, Trial Tr. at 30:11–15, 46:4–8, 3433:20–23. Even if a bifurcated trial would be conducted before a single jury, there is no doubt the *Monell* phase of that trial would have looked very different.

**2.** The prejudice to the City was made worse by the fact that Plaintiff advanced a punitive-damages claim against Raucci throughout the trial. During the final charge conference on May 21st, the City's counsel voiced a concern about Plaintiff's counsel making arguments in summation

that could lead to a de facto punitive damages award against the City, arguing that "there shouldn't be a deterrence argument at all against the City," because it "can never be made to pa[y] punitive damages under law," Trial Tr.  at 3313:5–9; *see also id.* at 3314:15–19 ("[W]hen you're talking about a party that cannot be held liable for punitives, it doesn't apply to them. So they shouldn't be saying you need to send a message to the City.").

Following that discussion, Plaintiff made the sudden (and unexplained, *see* Trial Tr. at 3369:10–11) decision to withdraw his punitive damages claim against Raucci. *See* D.E. 554. As a result, following a trial largely premised on evidence of Raucci's bad acts and bad character (including evidence that likely would not have been admissible in the absence of a punitive-damages claim), the jury was left with nowhere to express a deterrent or punitive sentiment apart from the compensatory damages line on the verdict form. Plaintiff's counsel then made sure to incite the jury's anger during summation, arguing that they need not set aside such feelings, but "should be absolutely furious" when deliberating over whether and how to "say it loud and clear with [their] verdict." Trial Tr. at 3568:10–20, 3463:7–12.

**3.** While certain steps along this sequence of events may themselves warrant a new trial, *see* D.E. 619-1 at 3–9, the Court must also vigilantly guard against the likelihood that the jury was led to award a verdict against the City that is impermissibly punitive. *See Ramirez v. NY City Off-Track Betting Corp.*, 112 F.3d 38, 41 (2d Cir. 1997) ("[T]he size of a jury's verdict may be so excessive as to be inherently indicative of passion or prejudice and to require a new trial").

While "references to deterrence and systemic correction are not necessarily improper when … the jury [is] instructed to consider whether to award punitive damages," such references are improper where "counsel appear[s] to ask the jury … to base its award of *compensatory* damages on deterrence." *Burke v. Regalado*, 935 F.3d 960, 1029 (10th Cir. 2019); *see also, e.g.*, *Racher v.*

3

*Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1169 (10th Cir. 2017) ("We recognize the potential prejudice posed by arguments that invite the jury to award damages based on punishment or deterrence when only compensatory damages are at issue."). Once Plaintiff withdrew his punitive damages claim, it was inappropriate for counsel to encourage the jury to consider deterrence through an award of compensatory damages. And it was especially improper to tell the jury that it "should be absolutely furious" while deciding what message to send. These factors render the noneconomic damages award ripe for remittitur. *See Turley*, 774 F.3d at 162.

## B.  The award should be remitted because it is intrinsically excessive.

Even in the absence of a specific error, courts "ha[ve] an obligation to ensure that … awards for intangibles be fair, reasonable, predictable, and proportionate." *Payne*, 711 F.3d at 93. Particularly with respect to "intangible[]" noneconomic damages awards, the Second Circuit has stressed that courts "must ensure proportionality, to control for the inherent randomness of jury decisions concerning appropriate compensation for intangible harm, and to reduce the burdensome costs on society of overextensive damages awards." *Turley*, 774 F.3d at 162. "Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high." *Payne,* 711 F.3d at 93. The Second Circuit has stressed that, in evaluating damages awards, "a degree of excessiveness less extreme than 'grossly excessive' will justify a finding that supports imposing a remittitur." *Id.* at 97.

In its new-trial motion, the City showed that the damages award—which amounts to roughly $1.8 million per year of incarceration—vastly exceeds the damages awarded in comparable cases in this Circuit and must be substantially reduced in order to be "fair, reasonable, predictable, and proportionate" and "to avoid extensive and burdensome social costs." *Turley*, 774 F3d at 164. Those comparable cases overwhelmingly establish that a reasonable damages award

4

in cases of long-term wrongful incarceration lies between $500,000 and $1,000,000 per year. *See, e.g.*, *Restivo v. Hessemann*, 846 F.3d 547, 588 (2017) (sustaining an award of $1 million per year and citing decision placing $1 million per year "at the outer edge of the universe of permissible awards") (quoting *Limone v. United States*, 579 F.3d 79, 102–03 (1st Cir. 2009)); *Ortiz v. Stambach*, 137 F.4th 48, 73 (2d Cir. 2025) (sustaining an award of roughly $500,000 per year and noting that courts have upheld awards of "approximately $1 million for each year of incarceration"); *Alston v. City of New York*, 2023 WL 11956309, at *6 (E.D.N.Y. Nov. 9, 2023) (stating that awards "in the range of $500,000 to $1 million for each year of incarceration [are] typically considered reasonable"); *Newton v. City of New York*, 171 F. Supp. 3d 156 (S.D.N.Y. 2016) (remitting award of $18 million for 12 years of incarceration because compensatory damages "should not have exceeded one million dollars per year of imprisonment"). No court in this Circuit has sustained an award of more than $1 million per year of incarceration, let alone an amount nearly two times that.

Plaintiff contends that $1.8 million per year is less of an outlier when other awards are adjusted for inflation. D.E. 638 at 19–20. While it may be appropriate to consider inflation when considering the sizes of awards in older cases, there is no requirement that comparator awards be mechanically adjusted to keep pace with consumer price index. After all, in most instances, these awards are for solely *noneconomic* damages, which are not tied to purchasing power. Thus, in *Ortiz*, the Second Circuit did not adjust *Restivo*'s discussion of damages for inflation. Similarly in *Burton v. City of New York*, meanwhile, the court acknowledged that $1 million in 2007 would be worth approximately $1.4 million in 2022, but still concluded that $1 million per year was reasonable. 630 F. Supp. 3d at 586, 596 (S.D.N.Y. 2022). Meanwhile, in *Limone*, the First Circuit stressed that the trial court's award of $1 million per year "should not be understood as a carob

5

seed for measuring the harm caused by wrongful incarceration generally. 579 F.3d at 107; *accord Payne*, 711 F.3d at 94 (cautioning that "an excessive verdict that is allowed to stand establishes a precedent for excessive awards in later cases.").[1]

Unable to identify comparable awards in the Second Circuit, Plaintiff cherry-picks the highest wrongful-conviction verdicts in the nation, but those marquee verdicts (to the extent they have been sustained by a court at all) have been sustained under standards meaningfully different from that applied in the Second Circuit. For example, both *Brown v. City of Chicago*, 2025 WL 2785426 (N.D. Ill. Sept. 30, 2025) (roughly $5 million per year), and *Fulton v. Bartik*, 2026 WL 884774 (N.D. Ill. Mar. 31, 2026) (roughly $3.75 million per year) employ the Seventh Circuit's remittitur standard, which asks whether an award is "monstruously excessive" and lacks any "rational connection" to the evidence. *See Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). That can hardly be squared with the Second Circuit's admonition that "excessiveness less extreme than 'grossly extreme' will justify … remittitur." *Payne*, 711 F.3d. at 97. Similarly, *Gillespie v. Miami Township*, 2025 WL 1276900 (6th Cir. May 2, 2025) (the only appellate decision Plaintiff cites, albeit unpublished), applied a Sixth Circuit standard that "sharply limit[s]" a courts "ability to remit a jury verdict," and strongly discourages review of comparator judgments. *Id.* at *8–9. Indeed, *Gillespie* expressly rejected the First Circuit's $1-million per year benchmark, while the Second Circuit has endorsed it. *Compare id. with Restivo*, 846 F.3d at 588.[2] Other decisions cited by Plaintiff are even less useful, as they involve jury verdicts that were not, or have not yet

---

[1]    Even adjusting for inflation, Plaintiff struggles to find awards in this circuit comparable to $1.8 million per year. By his own calculations, the damages award sustained in *Restivo* would be equivalent to roughly $1.4 million today; an equivalent reduction of his damages award would amount to $8,400,000.

[2]    Plaintiff argues that focusing on a per-year damages figure ignores various categories of harm that the jury intended to compensate. But Plaintiff himself suggested a per-year compensation formula in his closing argument. *See* Trial Tr. at 3472–3473.

been, reviewed for excessiveness. *See Lobato v. Las Vegas Metro. Police Dep't*, 2026 WL 891887 (D. Nev. Mar. 31, 2026); *Weppner v. Cnty. Of Erie*, 22-cv-00519 (W.D.N.Y. Nov. 25, 2025); *White v. McKinley*, 605 F.3d 525 (8th Cir. 2010); *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008).

Needless to say, none of these out-of-circuit decisions are binding on this Court. Under binding Second Circuit authority, courts are required to take a more active role in policing nonmonetary damages awards, and the comparators in this Circuit suggest that an award in excess of $1 million per year is excessive. Indeed, the closest comparator, *Birch v. Town of New Milford*, 2025 WL 1603217 (D. Conn. June 6, 2025), involved an award of less than $200,000 per year of incarceration. There is no reason why one former Connecticut prisoner should be compensated at a rate nine times greater than another. Because the jury's nonmonetary damages awards is far in excess of comparable verdicts in this circuit, it should be remitted to an amount under $1 million per year of incarceration.

## II. The Claims Commission award must be offset.

Plaintiff sought and accepted $5.8 million in state compensation for the same wrongful conviction, and same injuries, for which he seeks compensation here. He did so pursuant to a statute that expressly requires any subsequent award for the same injuries to be offset by the amount recovered from the State. *See* C.G.S. § 54-102uu(i). Plaintiff does not contest the operation of the statute, but insists that this Court can simply ignore it because it is somehow inconsistent with the deterrent goals of Section 1983. D.E. 638 at 21. The Court should reject this invitation.

Plaintiff's argument turns entirely on the Second Circuit's decision in *Restivo* in which the majority refused to deduct the amount of a settlement obtained under New York's Unjust Conviction and Imprisonment Act, N.Y. Ct. Cl. Act § 8-b. Unlike § 54-102uu(i), the New York statute contains no express setoff provision. Instead, the defendant in *Restivo* sought a setoff under

7

General Obligations Law § 15-108(a)—the generic joint-tortfeasor statute requiring claims against non-settling tortfeasors to be reduced by the amount of any settlement with a co-tortfeasor.

This distinction matters. In Connecticut, the very statute that *permits* Plaintiff to recover compensation from the State *conditions* that recovery on an offset of any future recovery for the same injury. By voluntarily pursuing and accepting this conditional relief, Plaintiff has necessarily agreed to be bound by the setoff provision. *See generally Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) ("[A] party seeking to avoid an agreement who accepts performance . . . either: (1) is estopped from denying the existence of the agreement because he accepted the benefit of the very agreement he is now seeking to avoid; or (2) that his conduct in accepting the tendered performance serves as an affirmative ratification of the existence of the agreement.").

Requiring a claimant who pursues and accepts payment under § 54-102uu to abide by its offset provision—in the same way he must abide by its release provision—in no way undermines the deterrent rationale of § 1983. While in *Restivo*, the Court was concerned that a non-settling tortfeasor might escape his equitable share of damages due to another tortfeasor's settlement, here the statute simply provides that, if a plaintiff elects to pursue relief through the Claims Commission, he must forego a double recovery. Plaintiff's proportional fault argument does not alter this analysis. Section 54-102uu compensation is not a settlement that calls for such apportionment in the first place. It simply credits a no-fault statutory payment that the Connecticut legislature expressly made conditional on avoiding duplicative recovery for the same wrongful incarceration—a condition Plaintiff voluntarily agreed to when he pursued and accepted his award.

Even if the Court were somehow precluded from applying the plain language of §54-102uu, it would still possess the independent authority to deduct the amount of Plaintiff's state

8

recovery from his final damages award in order to avoid a double recovery. Indeed, Plaintiff acknowledges the general operation of the one-satisfaction rule, D.E. 638 at 20 n.10, but argues that it doesn't apply here because the Claims Commission award represented economic damages while the jury's award is exclusively noneconomic. But that simply isn't accurate.

Section 54-102uu provides claimants like Plaintiff "compensation for wrongful incarceration.' Conn. Gen. Stat. 54-102uu(a). While the statute prescribes a formula for compensation that is based on the median family income for the state in each year of incarceration, the formula does not correspond to any particular claimant's actual economic damages. *Id.* § 54-102uu(a)(2). Plaintiff does not identify what portion of his award "includes damages for economic harms," but it is plain that the vast majority, if not all, of the funds he received was "compensation for wrongful incarceration," the same intangible harms that the noneconomic damages award is meant to compensate.[3] Having already recovered $5.8 million to compensate him for these injuries, that amount must be deducted from any final compensatory damages award to prevent a double recovery.

The Court should offset the Claims Commissioner's award against any damages awarded to Plaintiff in full under Section 54-102uu, or at minimum in the amount of duplicative non-economic compensation under the one-satisfaction rule.

---

[3]     Indeed, the discretionary portion of the award was based explicitly on  non-economic factors: damage to Plaintiff's family relationships, harm to his reputation, his community service, and the effects of his PTSD. *See* Mot., Ex. A at 7–8. *See also* C.G.S. § 54-102uu(c).

**CONCLUSION**

For the reasons set forth above, and in the City's opening brief, the Court should order a new trial, either unconditionally or conditioned on Plaintiff refusing a substantially reduced damages award, and the amount he received from the Claims Commission should be deducted from any final award.

Respectfully submitted,

/s/ *Tadhg Dooley*
Tadhg Dooley (ct29364)
Daniel Passeser (ct32099)
Armando Ghinaglia (ct31859)
Wiggin and Dana LLP
One Century Tower
265 Church Street
New Haven, CT 06510
(203) 498-4400
tdooley@wiggin.com

*Counsel for Defendant City of New Haven*

10