**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEFON MORANT,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NEW HAVEN, et al.,<br><br>Defendants. | Civil Action No. 3:22-cv-00630 (SVN) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR ATTORNEY'S FEES AND COSTS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 2

ARGUMENT ..... 10

I. As the prevailing party, Plaintiff is entitled to his attorney's fees and costs. ..... 10

II. The time spent by Plaintiff's counsel is reasonable and should be compensated. ..... 12

III. The hourly rates that Plaintiff's counsel request are reasonable. ..... 17

A. Plaintiff is entitled to hourly rates prevailing in the Southern District. ..... 19

B. The requested District of Connecticut rates are reasonable for the District of Connecticut. ..... 30

C. The relevant *Johnson* and *Blum* criteria support the rate requests. ..... 35

IV. Plaintiff is entitled to his reasonable costs. ..... 38

CONCLUSION ..... 39

## TABLE OF AUTHORITIES

### U.S. Supreme Court Cases

*Blum v. Stenson*, 465 U.S. 886 (1984) ........ 17, 25

*City of Riverside v. Rivera,* 477 U.S. 561 (1986) ........ 8, 14

*Fox v. Vice*, 563 U.S. 826 (2011) ........ 12

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ........ 11

*Missouri v. Jenkins*, 491 U.S. 274 (1989) ........ 19

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ........ 11, 35

### Federal Cases

*Abdell v. City of N.Y.*, No. 05 Civ. 8453, 2015 WL 898974 (S.D.N.Y. Mar. 2, 2015) ........ 37

*Al Thani v. Hanke*, No. 20 Civ. 4765, 2025 WL 1591379 (S.D.N.Y. June 5, 2025) ........ 26, 29

*Almond v. PJ Far Rockaway, Inc.*, No. 15 Civ. 6792, 2018 WL 922184 (E.D.N.Y. Feb. 15, 2018) ........ 28

*Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, No. 06 Civ. 6510, 2011 WL 2893087 (S.D.N.Y. July 14, 2011) ........ 39

*An v. Despins*, No. 22 Civ. 10062, 2024 WL 1157281 (S.D.N.Y. Mar. 18, 2024) ........ 26, 28, 29

*Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, No. 20 Misc. 23, 2021 WL 1353756 (S.D.N.Y. Apr. 12, 2021) ........ 27

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182 (2d Cir. 2008) ........ passim

*Barati v. Metro-N. R. Co.*, 939 F. Supp. 2d 153 (D. Conn. 2013) ........ 32, 33

*BD v. DeBuono*, 177 F. Supp. 2d 201 (S.D.N.Y. 2001) ........ 39

*Benihana, Inc. v. Benihana of Tokyo*, LLC, No. 15 Civ. 7428, 2017 WL 6551198

(S.D.N.Y. Dec. 22, 2017) .......... 38

*Bruce Kirby, Inc. v. LaserPerformance (Eur.) Ltd.*, No. 13 Civ. 297, 2020 WL 502653 (D. Conn. Jan. 31, 2020) .......... 34

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 342 F.R.D. 84 (S.D.N.Y. 2022) .......... 33

*C.K. through P.K. v. McDonald*, 816 F. Supp. 3d 284 (E.D.N.Y. 2026) .......... 22, 24

*Evans v. State of Connecticut*, 967 F. Supp. 673 (D. Conn 1997) .......... 31

*Serricchio v. Wachovia Sec., LLC*, 706 F. Supp. 2d 237 (D. Conn. 2010) .......... 31, 34

*Charles v. Seinfeld*, No. 18 Civ. 1196, 2022 WL 889162 (S.D.N.Y. Mar. 25, 2022) .......... 30

*Doe v. Darien Bd. of Educ.*, 2015 WL 8770003 (D. Conn. Dec. 14, 2015) .......... 34

*Fair Hous. Justice Ctr. v. Pelican Mgmt., Inc.*, No. 18 Civ. 1564, 2025 WL 965129 (S.D.N.Y. 2023) .......... 29, 30

*Farbotko v. Clinton Cnty.,* 433 F.3d 204 (2d Cir. 2005) .......... 19

*Fogle v. Sokol*, 957 F.3d 148 (3d Cir. 2020) .......... 36

*Gay Officers Action League v. Puerto Rico,* 247 F.3d 288 (1st Cir. 2001) .......... 14

*Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998) .......... 13

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) .......... 12

*Hasemann v. Gerber Prods. Co.*, No. 15 Civ. 2995, 2025 WL 2773748 (E.D.N.Y. Sept. 29, 2025) .......... 39

*HomeAway.com, Inc. v. City of New York*, No. 18 Civ. 7742, 2021 WL 791232 (S.D.N.Y. Mar. 1, 2021) .......... 38

*Horror Inc. v. Miller*, No. 16 Civ. 1442, 2022 WL 4473426 (D. Conn. Sept. 26, 2022) .......... 24

*House v. Wackenhut Servs., Inc.*, No. 10 Civ. 9476, 2012 WL 4473291 (S.D.N.Y. Sept. 27, 2012) .......... 28

*In re Whitehall Manor*, No. 25-15245 (E.D. Pa. Bankr. June 3, 2026) ........................................ 32

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)................................. 18

*Kassim v. City of Schenectady*, 415 F.3d 246 (2d Cir. 2005) ...................................................... 15

*LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748 (2d Cir. 1998)...................................................... 19

*Lego A/S v. Best-Lock Construction Toys, Inc.*, No. 11 Civ. 1586 (D. Conn. 2021)........ 32, 33, 34

*Lilly v. City of New York*, 934 F.3d 222 (2d Cir. 2019) ............................................................. 18

*Macquarie Mexico Real Estate Mgmt. S.A. de C.V. v. Hoiston Int'l Enters., Inc.*, No. 20 Civ. 8383, 2021 WL 4952693 (S.D.N.Y. Oct. 1, 2021) .......................................................... 26, 28

*Medina v. Buther*, No. 15 Civ. 1955, 2019 WL 4370239 (S.D.N.Y. Sept. 12, 2019) .................. 38

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ..................................................................... 20, 36

*Millea v. Metro-North R.R. Co.*, 658 F.3d 154 (2d Cir. 2011) .................................................... 11

*Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) .................................................... 13

*Muhammed v. Martoccio*, No. 06 Civ. 1147, 2010 WL 3718560 (D. Conn. Sept 13, 2010)....... 32

*Pappas v. Watson Wyatt & Co.*, No. 04 Civ. 304, 2008 WL 45385 (D. Conn. Jan. 2, 2008)........ 17

*Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060, 2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)................................................................................................... 27

*Perez v. Westchester Cnty. Dep't of Corr.*, 587 F.3d 143 (2d Cir. 2009) .................................... 12

*Planned Parenthood of Cent. New Jersey v. Attorney Gen. of New Jersey*, 297 F.3d 253 (3d Cir. 2002) ....................................................................................................................... 15

*Ravina v. Columbia Univ.*, No. 16 Civ. 2137, 2020 WL 1080780 (S.D.N.Y. Mar. 6, 2020)......... 39

*Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278 (2d Cir. 1987)....................... 38

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)........................................................... passim

*Restivo v. Nassau County*, No. 06 Civ. 6720, 2015 WL 7734100 (E.D.N.Y. Nov. 30, 2015) ........ passim

*Retained Realty, Inc. v. Spitzer*, 643 F. Supp. 2d 228 (D. Conn. 2009) ........ 34

*Roberts v. City of Fairbanks*, 947 F.3d 1191 (9th Cir. 2020) ........ 20, 36

*Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990) ........ 18, 35

*Rosario v. City of New York*, No. 18 Civ. 4023, 2023 WL 2523624 (S.D.N.Y. Mar. 15, 2023) ........ passim

*Rosenfeld v. City of New York*, No. 18 Civ. 6720 (E.D.N.Y. Sept. 20, 2021) ........ 32, 33, 34

*Rubin v. HSBC Bank USA, NA*, 763 F. Supp. 3d 233 (E.D.N.Y. 2025) ........ 28

*Rudman v. CHC Grp. Ltd.*, No. 15 Civ. 3773, 2018 WL 3594828 (S.D.N.Y. July 24, 2018) ........ 27

*Simmons v. New York City Transit Authority*, 575 F.3d 170 (2d Cir. 2009) ........ 19, 24

*Stanczyk v. City of New York*, 752 F.3d 273 (2d Cir. 2014) ........ 11

*Stinson v. City of New York*, 256 F. Supp. 3d 283 (S.D.N.Y. 2017) ........ 39

*StoneX Grp., Inc. v. Shipman*, No. 23 Civ. 613, 2025 WL 1212165 (S.D.N.Y. Apr. 25, 2025) . 26, 28, 29

*Themis Capital v. Democratic Republic of Congo*, No. 09 Civ. 1652, 2014 WL 4379100 (S.D.N.Y. Sept. 4, 2014) ........ 27

*Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41 (2d Cir. 2012) ........ 19

*Trulove v. D'Amico*, No. 16 Civ. 050 (N.D. Cal) ........ 20, 35

*Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516 (7th Cir. 1995) ........ 15

*Valley Disposal, Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 71 F.3d 1053 (2d Cir. 1995) .... 17

*Vista Outdoor Inc. v. Reeves Family Trust*, No. 16 Civ. 5766, 2018 WL 3104631 (S.D.N.Y. May 24, 2018) ........ 26, 29

*Wells Fargo Bank N.A. v. Konover*, No. 05 Civ. 1924 (D. Conn. February 19, 2013) ................ 33

**Statutes**

42 U.S. Code § 1988 (b) ........................................................................................................ 10

**Other Authorities**

House Report 1-3, U.S.Code Cong. & Admin.News 1976.......................................................... 11

Senate Report No. 1011, 94th Cong., 2d Sess., 5 U.S. Cong. & Admin News (1976) ................ 18

## INTRODUCTION

At trial, Plaintiff Stefon Morant won a resounding victory: findings that two separate New Haven Police Department officers had fabricated evidence against him and otherwise violated his constitutional rights, causing his wrongful conviction; a finding the City of New Haven was directly responsible for this wrongful conviction under *Monell v. Department of Social Services* due to its widespread practice of suppressing favorable evidence; and a damages award of $38 million for his 21 years of wrongful incarceration and other resulting injuries. To Plaintiff's knowledge, this is both the largest civil rights verdict ever in the history of Connecticut and the first successful wrongful conviction verdict on either § 1983 claims or *Monell* claims in the State. Ex. 7 (Hoffman Decl.) ¶ 33.

Several factors demanded particular time and skill to navigate the road to that eventual victory. First, the underlying record was extremely large, given the extensive prosecutions and then post-conviction proceedings for both Mr. Morant and his co-defendant, Scott Lewis. Second, the extent of misconduct was astonishingly vast: Defendant Vincent Raucci straight-up framed Mr. Morant and Mr. Lewis, fabricating every piece of evidence inculpating them. That required discovery into every aspect of the investigation. Third, Defendants put Plaintiff to his burden of proof on every point: his innocence, the defendants' individual misconduct, the City's responsibility to pay for any judgment against an individual officer, and the scope of Plaintiff's damages. While of course Defendants were entitled to mount a vigorous defense, this intransigence increased the time required for the litigation as a whole. That was particularly so with respect to the *Monell* claims, which required exploration into wide-ranging practices and a number of separate prosecutions to prove up the City's direct liability. Finally, fourth, as the verdict itself aptly reflects, this case concerned issues of grave importance and losses of massive proportion. Mr. Morant's case demanded the utmost time and care to prosecute.

As a successful § 1983 litigant, Mr. Morant is now entitled to an award of attorney fees. And the law is clear where, as here, the result is excellent, the plaintiff should receive a fully compensatory fee. Plaintiff seeks an award at rates and hours commensurate with those previously found reasonable by other district courts within this circuit and the Second Circuit itself. *Restivo v. Hessemann*, 846 F.3d 547, 588–92 (2d Cir. 2017); *Restivo v. Nassau County*, No. 06 Civ. 6720, 2015 WL 7734100, at *5–6 (E.D.N.Y. Nov. 30, 2015); *Rosario v. City of New York*, No. 18 Civ. 4023, 2023 WL 2523624, at *5–6 (S.D.N.Y. Mar. 15, 2023).

Because, as discussed below, a reasonable paying client would have hired out-of-district counsel to take on the specialized work of litigating a wrongful conviction matter, and Neufeld Scheck Brustin Hoffmann & Freudenberger, LLP ("NSBHF")'s expertise certainly led to Mr. Morant's resounding victory at trial, this motion seeks an award of fees at reasonable hourly rates in the New York City legal market: an award of $6,900,937.50 in attorney's fees on the merits, $85,181.25 in fees for travel, and an additional $51,742.50 for preparing the attorney's fees petition. This motion also seeks $419,746.60 in compensable expenses, for a total of $7,457,607.85

**STATEMENT OF THE CASE**

The genesis of this § 1983 action was the October 11, 1990, murder of Ricardo Turner and Lamont Fields, and the subsequent prosecution, conviction, and eventual exoneration of two innocent men for those crimes: Stefon Morant and Scott Lewis. Over the past 36 years, there has been a near constant stream of activity related to this case, beginning with the investigation and separate criminal prosecutions of Mr. Morant and Mr. Lewis, and then the extensive litigation by both men seeking to win their freedom. These were no run-of-the-mill post-conviction proceedings; they included an extensive 20-month FBI investigation substantiating Mr. Lewis's report that he and Mr. Morant had been framed by Vincent Raucci, who was working with drug dealer Frank Parise. And it included Mr. Morant's extensive evidentiary hearings on a petition for

a new trial in which Sergeant Michael Sweeney came forward to testify that he had personally observed Raucci fabricating key evidence used against both men. Ex. 7 (Hoffmann Decl.) ¶ 22.

In 2013, after a multi-day hearing, Mr. Lewis had his federal habeas petition granted; the grant was finalized after being upheld on appeal in 2015. But although Mr. Lewis's criminal case ended at that point, and he was able to bring and resolve through settlement a § 1983 wrongful conviction suit over the next two years, Mr. Morant's ordeal dragged on. Despite the logical necessities tying Mr. Lewis's case to Mr. Morant's, it was not until 2021 that Mr. Morant received a full and unconditional pardon, clearing the pathway for his own § 1983 wrongful conviction suit to move forward. In 2022, Mr. Morant filed this suit against Defendants Raucci, Maher, Sweeney, Lawlor, Pastore, and others, as well as the City of New Haven. And even though the City had earlier resolved Mr. Lewis's near-identical suit at the outset of the litigation—before a single deposition was taken—here it took an opposite tack.

In fact, at the outset of Mr. Morant's federal case, Plaintiff's counsel made a settlement demand of $9.5 million to the City of New Haven: the same amount Mr. Lewis's case had settled for years earlier. Despite Mr. Morant's additional *years* in prison, despite the better part of a decade with a murder conviction over his head after he got out, and despite even inflation from the years that had passed since Mr. Lewis was able to resolve his case without the added trauma of protracted litigation, Mr. Morant asked for only what the City had already given his friend and former co-defendant, based on identical police misconduct. The City rejected Mr. Morant's offer out of hand. *See* Ex. 8 (Brustin Decl) ¶ 20.

Instead, Defendants inexplicably took the polar opposite approach to this litigation, putting Mr. Morant to his burden of proof on every issue, disputing his innocence, the investigative misconduct that caused his conviction, the City's responsibility for that misconduct, and the scope

of Mr. Morant's damages. Given the extent of the underlying record and the number of contested issues, the four years of litigation that followed until Plaintiff's successful verdict at trial this past spring were complex.

The documentary record alone was massive, combining the underlying investigative files and files produced during two separate prosecutions and numerous post-conviction proceedings. Plaintiff also sought, received, reviewed, and employed many New Haven Police Department case files from other, facially unrelated cases, in order to prove up his *Monell* claim. The time required not just to review these documents but to come up to speed on entire police investigations in order to slot them into Plaintiff's *Monell* claims was substantial. There were also numerous third-party witnesses whose criminal histories and prior interactions with the New Haven Police Department were directly relevant to show why and how their statements were coerced in this case. That spawned even more, distinct document discovery. Ultimately, Mr. Morant produced over 95,000 pages to Defendants—most of which spanned voluminous files from *Monell* example cases and documents on some of the more complicated witnesses in this case, including Michael and Anthony Cardwell, Frank Parise, and Ovil Ruiz a/k/a Augustin Castro ("Castro")—Defendants produced over 9,000 pages themselves, and more than 7,000 pages of documents were produced via third-party subpoena. On top of this, more than 200 audio/visual files were exchanged in discovery. Ex. 7 (Hoffmann Decl.) ¶ 23.

The number of contested issues also greatly multiplied the number of relevant witnesses to investigate and interview. First, given the extensive scope of investigative misconduct (Raucci fabricated every piece of incriminating evidence) Plaintiff had to pursue the many witnesses Raucci falsely claimed implicated him. Indeed, Defendants so thoroughly denied any misconduct on Raucci's part—despite the FBI investigation to the contrary—Plaintiff could not avoid time-

consuming investigation, document discovery, and depositions to show otherwise. He also had to explore the extensive investigation Defendant Vaughn Maher had initially conducted pointing to Michael Cardwell as the shooter, which involved an entirely separate set of witnesses. Even though the State of Connecticut had already recognized Mr. Morant's innocence, Defendants contested it, requiring Plaintiff to explore the many alibi witnesses who had seen him in the Carolinas in the days around the time of the crime. And Plaintiff had to put on evidence of the damages he suffered during the 21 years of his wrongful imprisonment and additional decade post-release, which required developing yet another set of witnesses. Because the City disclaimed any responsibility to pay for constitutional violations by the individual officers, Plaintiff had to prove *Monell* liability as well; ultimately Plaintiff pursued three separate theories of municipal liability that all survived summary judgment, involving overlapping witnesses but separate types of proof. Plaintiff prepared and presented each of these theories at trial, and though the jury only needed to and so only did make a finding as to one to reach its verdict against the City, all were contested and Plaintiff could not know in advance which the jury would prefer. Notably, Plaintiff did not lose on any of the theories listed, the jury just did not need to reach them. Further, practically speaking, the City's refusal to commit to indemnification meant the individual Defendants hired multiple different sets of counsel, making the litigation more complicated and time consuming as a whole. Ex. 7 (Hoffmann Decl.) ¶¶ 24–27.

By the numbers, all told Plaintiff deposed 20 fact witnesses in this case across 28 deposition days, plus 3 additional fact depositions noticed by Defendants. This included taking discovery from a number of third-party witnesses whose locations in many cases were unknown and who were not under either side's control, many of whom did not testify in the underlying criminal trials, and some of whom were hostile. Further, many depositions, like Defendant Raucci's, covered

many separate topics and required an inordinate amount of time and effort to prepare and undertake. Ex. 7 (Hoffmann Decl.) ¶ 28.

Defendants continued to multiply the proceedings at the motions stage. Despite the overwhelming record of misconduct, plainly applicable law, and the clear disputes of fact, every Defendant moved for summary judgment on every single claim. Marshalling the extensive evidence in response to these motions was a heavy lift, requiring extensive time to both respond to five sets of facts, five opening briefs, and put together Plaintiff's own affirmative set of facts, distilling an immensely complicated story into a readable narrative that nonetheless spanned 353 paragraphs, 120 pages, and nearly 200 exhibits. This briefing also formed the basis of a day-long oral argument. Ex. 7 (Hoffmann Decl.) ¶ 29. In the end, Plaintiff was successful, both in his affirmative motion against Sweeney, where this Court found a *Brady* violation occurred, and in his defensive posture, with all of his key claims surviving to trial.

In the lead up to trial, Plaintiff spent many hours preparing to distill this complicated history into a presentation a jury could easily understand. This required staffing additional attorneys to account for the gargantuan task and more run-of-the-mill staff turnover. And this investment was reasonable given both the scope of the evidence and the stakes. Plaintiff had to meet the heavy burden of demonstrating intentional police misconduct, and that a custom or failure of the City of New Haven caused the wrongful conviction. And the sheer brazenness of the misconduct in this case was in some ways an obstacle; the truth of what Defendants did to frame Stefon Morant was almost too wild to believe, absent the corroborating evidence, some of it scientific, Plaintiff had to marshal in his favor. Even if Plaintiff won on individual liability and *Monell*, a sizeable damages award also could not be left to chance. Instead, Plaintiff spent considerable time parsing through thousands of pages of potential damages documents produced in discovery, vetting many potential

damages witnesses and prepping those set to testify, as well as the many hours spent prepping Plaintiff himself to speak about the most traumatic things that have ever happened to him. This required finesse, care, and time. Ex. 7 (Hoffmann Decl.) ¶ 30.

As this Court is well aware, there was also voluminous pre-trial briefing on all manner of subjects, much of which was necessitated either by Defendants' refusals to agree in advance to common-sense positions or to accept the clear dictates of this Court's prior rulings. Defendants filed 12 separate motions *in limine* on evidentiary issues alone, and Plaintiff himself filed 8, not counting additional pre-trial briefing from both sides. *Cf.* ECF No. 393 at 1 (Court's omnibus ruling on the same). On several fronts, Defendants did not do the expected pretrial work of specifying the evidence they intended to rely on at trial, requiring Plaintiff not just to file ultimately unnecessary motions *in limine*, but to do so aiming at the full universe of evidence in the case. *See, e.g.*, ECF No. 290 (motion regarding Defendants' designation of entire trial transcript); ECF No. 270 (motion to exclude 404 evidence made without clarification from Defendants on any specific 404 evidence sought to be included). This in addition to the multiple motions filed by Defendants that rested entirely or in substantial part on arguments the Court had already rejected earlier in the litigation. Most egregious were Defendants' multiple filings styled as motions *in limine* that in fact sought to relitigate Court's summary judgment decision. *See* ECF No. 291 (motion to preclude Sweeney *Brady* finding), 285 (motion to preclude Plaintiff's coercion claims with respect to his January 16, 1991 statement, despite no similar argument made at summary judgment). Plaintiff was almost uniformly successful at this stage as well.

Of course, there was also a month's long trial to litigate. At trial, Defendants made clear they were contesting every issue—indeed, the City opened on the assertion it would prove that Mr.

Morant was guilty of the Turner-Fields murders.[1] Although Defendants never had any evidence to substantiate these allegations, their litigation posture confirmed Plaintiff's need to put on compelling proof establishing every single component of his case. Indeed, although Defendants did put on some evidence through Plaintiff's case, it nonetheless bears noting that across more than four weeks of trial time, Plaintiff called every one of the 23 live witnesses and presented the vast majority of the evidence, including 108 of the 129 exhibits. ECF Nos. 571, 572.

Plaintiff was ultimately successful at each of these stages, culminating in the entry of the $38 million judgment in favor of Mr. Morant. *See* Ex. 7 (Hoffmann Decl.) ¶ 32. To state the obvious, this verdict exceeded many times any settlement offer made by Defendants in the course of litigation. But more than that, this eight-digit verdict comes after a lengthy, difficult litigation in which Defendants did not make a settlement offer, period, until weeks into the jury trial. Suffice it to say, this recalcitrance came as a surprise to Plaintiff, after the settlement reached so early on in Mr. Lewis's federal litigation—a settlement Plaintiff, in the interest of resolution, sought for himself at the beginning of the litigation, and a settlement that the City refused here. Ex. 8 (Brustin Decl.) ¶ 20. Whatever it is that motivated the different approach in this case, there is a road not taken in this litigation that would have mooted the need to expend the hours for which Plaintiff now seeks due compensation. *Cf. City of Riverside v. Rivera,* 477 U.S. 561, 580 n.11 (1986) (noting, in a case where counsel for the Petitioner made a settlement

---

[1] ECF No. 580 at 58–59 (wherein the first words of the City's opening argument were: "I'm sure that no one will be surprised to learn that the lawyers on this side of the room have a very different view of what the evidence will show than what the lawyer next to me just told you. So, let's get right into it. **The evidence will show, ladies and gentleman, that Stefon Morant was not in North Carolina on the date of the Turner-Fields homicide. He was not in South Carolina on the date of the Turner-Fields homicide. He was in New Haven, Connecticut, in a car with Scott Lewis. They entered Rick Turner's apartment, who was being visited by Lamont Fields. The homicides occurred[.]**" (emphasis added)).

offer only when the jury was deliberating, that "Petitioners could have avoided liability for the bulk of the attorney's fees for which they now find themselves liable by making a reasonable settlement offer in a timely manner").

In any event, now, years later, as the prevailing party in the litigation, Plaintiff seeks the following for merits hours spent on this litigation, applying New York City rates:

| **Name of Counsel** | **Grad Year** | **Hourly Rate** | **Hours** | **Total** |
|---|---|---|---|---|
| Nick Brustin | 1995 | $1050 | 2009.3 | $2,109,765.00 |
| Anna Benvenutti Hoffmann | 2004 | $950 | 1148.4 | $1,090,980.00 |
| Emma Freudenberger | 2007 | $950 | 158.0 | $150,100.00 |
| Amelia Green | 2015 | $700 | 233.4 | $163,380.00 |
| Kenneth Rosenthal[2] | 1978 | $450 | 1361.1 | $612,495.00 |
| Tony Balkisoon | 2010 | $650 | 248.7 | $161,655.00 |
| Christina Matthias | 2015 | $600 | 1442.8 | $865,680.00 |
| Elsa Mota | 2020 | $525 | 757.9 | $397,897.50 |
| Grace Paras | 2020 | $525 | 1001.4 | $525,735.00 |
| Katie Cion | 2021 | $500 | 790.6 | $395,300.00 |
| Paralegals/Law Clerks | N/A | $225 | 1902.0 | $427,950.00 |

On the other hand, if this Court applies Connecticut rates, Plaintiff seeks the following:

| **Name of Counsel** | **Grad Year** | **Hourly Rate** | **Hours** | **Total** |
|---|---|---|---|---|
| Nick Brustin | 1995 | $800 | 2009.3 | $1,607,440.00 |
| Anna Benvenutti Hoffmann | 2004 | $700 | 1148.4 | $803,880.00 |

[2] Mr. Rosenthal is seeking only one set of rates as local counsel based in Connecticut. As explained in his supporting declaration, as a matter of billing judgment he is seeking a rate of $450/hour. Ex. 6 (Rosenthal Decl.) ¶ 13.

| | | | | |
|---|---|---|---|---|
| Emma Freudenberger | 2007 | $700 | 158 | $110,600.00 |
| Amelia Green | 2015 | $550 | 233.4 | $128,370.00 |
| Kenneth Rosenthal[3] | 1978 | $450 | 1361.1 | $612,495.00 |
| Tony Balkisoon | 2010 | $500 | 248.7 | $124,350.00 |
| Christina Matthias | 2015 | $475 | 1442.8 | $685,330.00 |
| Elsa Mota | 2020 | $400 | 757.9 | $303,160.00 |
| Grace Paras | 2020 | $400 | 1001.4 | $400,560.00 |
| Katie Cion | 2021 | $375 | 790.6 | $296,475.00 |
| Paralegals/Law Clerks | N/A | $150 | 1902 | $285,300.00 |

In addition, Plaintiff requests $51,742.50 for preparation of the fee petition applying New York City rates, or $38,397.50 applying Connecticut rates. Plaintiff also requests $85,181.25 in travel applying New York City rates, or $64,655.00 applying Connecticut rates; travel is billed at half rate in either scenario.

Finally, Plaintiff requests $419,756.60 in compensable costs, *see* Ex. 7 (Hoffmann Decl) ¶ 53.

That makes the total request for fees and costs $7,457,607.85 applying New York rates, or $5,880,796.10 applying Connecticut rates.

**ARGUMENT**

**I. As the prevailing party, Plaintiff is entitled to his attorney's fees and costs.**

Congress passed the Civil Rights Attorney's Fees Awards Act (the "Act") in 1976, "which provided that prevailing parties could recoup 'reasonable attorney's fee[s].'" *Arbor Hill*

[3] Mr. Rosenthal is seeking only one set of rates as local counsel based in Connecticut. As explained in his supporting declaration, as a matter of billing judgment he is seeking a rate of $450/hour. Ex. 6 (Rosenthal Decl.) ¶ 13.

*Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 186 (2d Cir. 2008) (quoting 42 U.S.C. § 1988(b)). The purpose of the Act is to permit plaintiffs with valid claims to attract effective legal representation and thereby encourage private enforcement of civil rights statutes, to the benefit of the public as a whole. *See Hensley v. Eckerhart*, 461 U.S. 424, 444–45 (1983).[4] "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 435. Plaintiff certainly achieved "excellent results"—a judgment of $38 million against Defendants including the City of New Haven itself—and is entitled to a "fully compensatory fee." *Id.*

"Both [the Second Circuit] and the Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010) ("[T]he lodestar method yields a fee that is presumptively sufficient to achieve this objective [of securing attorneys to take on civil rights cases.]"); *see also Stanczyk v. City of New York*, 752 F.3d 273, 284 (2d Cir. 2014)

[4] The Supreme Court in *Hensley* quoted from the Senate Report on the Civil Rights Attorney Fees Award Act as follows:

> All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain. In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must recover what it costs them to vindicate these rights in court. Senate Report 2; *see* House Report 1-3, U.S.Code Cong. & Admin.News 1976, p. 5910.

*Hensley*, 461 U.S. at 445 (footnote omitted).

(reaffirming *Millea* holding).

The district court enjoys wide discretion in determining an appropriate fee award under § 1988. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[A]ppellate courts must give substantial deference to these determinations [regarding fee awards], in light of the district court's superior understanding of the litigation. We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it." (internal citations and quotation marks omitted)); *see also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) ("Indeed 'abuse of discretion'—already one of the most deferential standards of review—takes on special significance when reviewing fee decisions.").

Here, Plaintiff's fee request as a whole is reasonable. NSBHF brings decades of experience litigating high-profile wrongful-conviction cases like this one as one of the premier civil rights firms in the country. And NSBHF brought this experience to bear on this case, pursuing as efficiently as possible the final, excellent result. Still, all involved must admit this was an especially complex matter, requiring due time even for experienced counsel to litigate all the way through to a jury verdict. And up through trial, Defendants (excepting Sweeney) denied not only any misconduct, but also the very fact of Plaintiff's innocence, requiring Plaintiff's counsel to, "in effect [] relitigate a decades-old [murder] trial while fitting Plaintiff's claims into the complex and evolving legal doctrines governing this area of civil rights litigation." *Rosario*, 2023 WL 2523624, at *2. Having done so and done so effectively, Plaintiff's resultant fee request is reasonable.

## II. The time spent by Plaintiff's counsel is reasonable and should be compensated.

The first step in setting the lodestar is to determine the amount of time reasonably expended and therefore compensable. The number of hours reasonably expended is a "factual issue whose resolution is committed to the discretion of the district court." *Perez v. Westchester Cnty. Dep't of Corr.*, 587 F.3d 143, 156 (2d Cir. 2009) (internal citation and quotation omitted). In making this

factual determination, the Court may take into account both its own familiarity with the litigation and the attorneys, as well as the general circumstances that apply to contingency-fee civil rights cases. As the Ninth Circuit has noted:

> [L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in churning. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). If the Court does conclude that any hours for which compensation is sought should not be awarded, it must "state its reasons for excluding those hours as specifically as possible." *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998) (internal quotation omitted).

NSBHF has used their professional judgment in determining how much time to spend per task, and the nature of their caseload demands that they do so. The vast majority of NSBHF's cases settle for a global figure that includes attorney's fees; it is only the rare case in which NSBHF makes a fee application to a court. At the same time, NSBHF maintains a full docket of approximately 35 other complex civil rights cases at any given time. As a result, NSBHF's attorneys are kept busy with their caseloads, and have every incentive to work efficiently, spending only the time they judge necessary to the successful prosecution of each case. *See* Ex. 7 (Hoffmann Decl.) ¶ 20.

The total number of hours is reasonable given the scope of this litigation to date. As discussed above and as elaborated in the Declaration of Anna Benvenutti Hoffmann attached hereto as Exhibit 7, this case took a long path to the ultimate successful conclusion, encompassing representation spanning four years: a huge record relating just to the Turner-Fields homicide to be

both assembled and made sense of; more still related to the FBI investigation, and separate, example cases of similar misconduct within the New Haven Police Department, going to *Monell*; thorny third-party witnesses many of whom, like Castro, had complicated backgrounds to contend with, and were downright terrified of testifying exactly because of the misconduct and corruption Plaintiff alleged and proved against Defendant Raucci; complex, technical expert analysis going to the heart of Plaintiff's claims of misconduct; nearly 30 depositions all told, including multiple multi-day depositions; massive and iterative briefing on dispositive motions; and ultimately a 4-week trial including the presentation of 23 live witnesses, the pendency of which was studded with novel and important legal and/or practical issues, like Defendant Raucci's apparent witness tampering. *See* Ex. 7 (Hoffmann Decl.) ¶¶ 21–35.

Further, Defendants' opposition at each stage of the litigation increased the time Plaintiff's counsel spent. For example, Defendants filed five separate motions for summary judgment, together covering all of Plaintiff's claims. Although these motions were by and large unsuccessful, they necessitated substantial time by Plaintiff's counsel to address. While Defendants are entitled to put Plaintiff to his burden of proof, a party must be compensated for meeting the vigorous defense of the opposing party. *City of Riverside*, 477 U.S. at 580 n.11 (A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response "); *see also Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 298 (1st Cir. 2001) ("After setting such a militant tone and forcing the plaintiffs to respond in kind, it seems disingenuous for the [defendant] to castigate the plaintiffs for putting too many troops into the field.").

Still, throughout most of the litigation, Plaintiff's counsel staffed the case leanly, with local counsel and one NSBHF partner, associate, and paralegal billing the bulk of the hours throughout

discovery. This staffing was roughly commensurate with that employed by Defendants. At particularly active and work-intensive points in the litigation, most notably summary judgment and trial, Plaintiff did bring in additional attorneys to account for the sheer amount of work required in more condensed periods of time. Ex. 7 (Hoffmann Decl.) ¶¶ 36–37. All the same, Plaintiff's staffing levels here are of a piece with, or even less than, those that other courts in the Second Circuit have found reasonable with respect to NSBHF staffing of wrongful conviction cases in particular. *See Restivo*, 2015 WL 7734100, at *4–5 (approving fee award for 10 attorneys, including eight at one trial); *Rosario*, 2023 WL 2523624, at *5 (approving fee award for 14 attorneys across life of litigation); *see also Planned Parenthood of Cent. New Jersey v. Attorney Gen. of New Jersey*, 297 F.3d 253, 272 (3d Cir. 2002) (holding fee awards for multiple attorneys appropriate because "the magnitude of the case mandated the help of numerous attorneys for both parties" and because staffing was appropriate given "the complexity and specialized [] knowledge necessary for the proper presentation of this case"). Moreover, NSBHF's expertise in § 1983 wrongful conviction suits like this one made its work both more effective and more efficient.[5]

Although Plaintiff prevailed on almost every significant contention and claim, he is also entitled to be compensated for time spent on the motions, claims, and issues on which he did not prevail. So long as the suit as a whole involved a "common core of facts" and involved "related legal theories," all the time spent on the case—including time spent on losing motions—must be compensated. *See Kassim v. City of Schenectady*, 415 F.3d 246, 253 (2d Cir. 2005); *see also Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 526 (7th Cir. 1995) ("[The defendant] wishes to exclude fees incurred for any work performed by Uniroyal's attorneys on

[5] Further, where certain attorneys slotted in to complete discrete tasks or otherwise take a limited role in the litigation due to practical necessities or staff turnover, Plaintiff has omitted their hours from this petition, although they are technically compensable.

motions which were eventually denied.... Common sense, however, informs us that such a rule is inappropriate."). Here, all claims and discovery were related to either the NHPD investigation that caused Mr. Morant's wrongful conviction, Mr. Morant's innocence, which was directly relevant to both liability and damages, and/or the *Monell* claim against the City of New Haven. As just one example, although Plaintiff ended up dropping Joseph Pettola as a Defendant near the end of discovery, because of his presence the night of the first Castro interview, as well as his knowledge of other incidents of Raucci's misconduct that related to both Plaintiff's individual liability and *Monell* claims, Plaintiff still relied heavily on discovery taken regarding Pettola, and indeed still called him as a witness at trial. *See, e.g., Restivo*, 2015 WL 7734100 at *3–4 (holding "it cannot be legitimately argued that Plaintiffs' claims related to the conduct of the murder investigation do not contain 'a common core of facts' with" the fair trial and malicious prosecution theories on which Plaintiffs prevailed at trial); *see also Restivo*, 846 F.3d at 592 (affirming that decision); *Rosario*, 2023 WL 2523624, at *4–5 (declining to reduce fee award based on claimed "limited success" where not all claims made it to trial, defendants were voluntarily dismissed before trial, and at trial won against only one defendant).

As demonstrated by the declarations filed with this motion, all of the hours requested are carefully documented based on contemporaneous records. The attorneys seek compensation only for time reasonably expended, having carefully reviewed their hours and weeded out entries for non-compensable activities from the final request, and having exercised billing judgment, discounting or excluding time where otherwise appropriate. Indeed, in an exercise of billing judgment Plaintiff's counsel is not requesting compensation for any hours billed by interns and summer associates, although the approximately 600 hours billed by these categories of timekeepers

are compensable. Counsel has likewise excluded from their fee petition any paralegal timekeeper who billed fewer than 50 hours total on this case. Ex. 7 (Hoffmann Decl.) ¶¶ 40–42.[6]

In addition, time spent in preparing the fee application is also compensable. *See Valley Disposal, Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 71 F.3d 1053, 1060 (2d Cir. 1995) ("[A] successful applicant for § 1988 attorney's fees should be awarded the costs of bringing its § 1988 application."). Including the work on this motion, Plaintiff currently seeks a total of 75.7 attorney hours and 12.6 paralegal/law clerk hours for preparing the instant fee petition.[7]

## III. The hourly rates that Plaintiff's counsel request are reasonable.

The Supreme Court has declared that the reasonable hourly rate to be applied in awarding fees under statutory fee provisions is the "prevailing market rate," that is, the rate that lawyers of similar skill, reputation, and experience would charge in the legal market of that geographic area. That rate is determined, as the Supreme Court held in *Blum v. Stenson*, by examining the "prevailing market rates in the relevant community" for "similar services by lawyers of reasonably comparable skill, experience and reputation." 465 U.S. 886, 895–96 & n.11 (1984). Quoting from the Senate Report on the Civil Rights Attorneys Fees Act, the Supreme Court noted that: "It is intended that the amount of fees awarded under [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases." *Id.* at 893 (quoting Senate Report No. 1011, 94th Cong., 2d Sess., 5 U.S. Cong. & Admin News, p. 5908, 5913 (1976)).

---

[6] Note as well that it is counsel's standard billing practice, as reflected in his submissions, to bill "travel time" only for those hours spent in transit without working on this or other cases. *See* Ex. 7 (Hoffmann Decl.) ¶ 43; *Pappas v. Watson Wyatt & Co.*, No. 04 Civ. 304, 2008 WL 45385, at *7 (D. Conn. Jan. 2, 2008) (commenting favorably on this same exercise of billing judgment).

[7] Plaintiff made overtures to attempt to settle the fee litigation, or aspects thereof, without full briefing on the matter, but the City indicated it preferred to litigate this matter as well. Ex. 7 (Hoffmann Decl.) ¶ 35.

"[T]he district court, in exercising its considerable discretion, [should] bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." *Lilly v. City of New York*, 934 F.3d 222, 230 (2d Cir. 2019) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008))). A comprehensive list of case-specific variables was articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), to which the Second Circuit still refers favorably. *See, e.g.*, *Lilly*, 934 F.3d at 228. Those are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* (quoting *Arbor Hill*, 522 F.3d at 186 n.3).

A court may also determine what lawyers of comparable skill and experience, handling other complex litigation, charge their private clients, as "the rates charged in private representations may afford relevant comparisons." *Id.* at 895 n.11. *See, e.g.*, *Rosario*, 2023 WL 2523624, at *2 (setting rates for NSBHF in wrongful conviction case in part in reference to "top New York firms"). "[T]he court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). .

Indeed, the Second Circuit has noted: "[T]his Court has instructed that determination of a reasonable hourly rate 'contemplates a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel,' an inquiry that may 'include

judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district.'" *Townsend v. Benjamin Enters., Inc.,* 679 F.3d 41, 59 (2d Cir. 2012) (quoting *Farbotko v. Clinton Cnty.,* 433 F.3d 204, 209 (2d Cir. 2005)).

In addition, fee awards reflect the rate at the time fees are sought, not at the earlier time when work was performed, in order to compensate for the delay in payment. *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (citing *Missouri v. Jenkins*, 491 U.S. 274, 283–84 (1989)).

### A. Plaintiff is entitled to hourly rates prevailing in the Southern District.

#### *i. The* Simmons *and* Arbor Hill *test has been satisfied*

Although the hourly rates awarded in a fee petition are generally the rates charged in the forum where the case is litigated, that "forum rule" is far from absolute. In *Simmons v. New York City Transit Authority*, the Second Circuit held that to overcome the presumption of in-district rates, "a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." 575 F.3d 170, 175 (2d Cir. 2009); *see also Arbor Hill*, 522 F.3d at 184 n.2 ("[A]ttorneys—regardless of whether they are pursuing litigation on behalf of a paying client or a non-paying client—should receive out-of-district fees only if a reasonable, paying client would have retained out-of-district counsel."). "In determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors [such as] counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise." *Simmons*, 575 F.3d at 175–76. Further, "[a]mong the ways an applicant may make such a showing is by establishing that local counsel possessing requisite experience were unwilling or unable to take the case, or by establishing, in a case requiring special expertise, that no in-district counsel possessed such expertise." *Id.* at 176 (internal citation omitted).

That test is met here. NSBHF has particular expertise in litigating § 1983 wrongful conviction suits—a particularly difficult and complicated area of law. Indeed, the Second Circuit has recognized both NSBHF's particular expertise and the role it plays in justifying out-of-district rates in complex wrongful conviction cases like this one. *See Restivo*, 846 F.3d at 590–91 (affirming district court's application of out-of-district rates on basis that: "NSB has particular experience litigating wrongful conviction suits and has successfully litigated dozens of these cases nationwide, and that this experience was necessary given" complex nature of case (internal quotation marks omitted)). Though of course different in the particulars, this case, as with the *Restivo* litigation, was also exceedingly complex, even among wrongful conviction matters that are complex as a rule. Ex. 7 (Hoffmann Decl.) ¶ 21.

In addition to the Second Circuit's imprimatur, NSBHF's experience and past successes speak for themselves. Indeed, in the 9 years since the *Restivo* decision, NSBHF has successfully litigated dozens more wrongful conviction suits around the country. *See* Ex. 7 (Hoffmann Decl.) ¶¶ 6, 17–18. And NSBHF has had remarkable success while doing so, obtaining leading appellate decisions and groundbreaking verdicts and settlements for its clients. *See, e.g., Trulove v. D'Amico*, No. 16 Civ. 050 (N.D. Cal) (jury awarded $10 million in damages to plaintiff who spent six years in prison after being wrongfully convicted of murder); *Kelley v. Reyes*, No. 19 Civ. 17911 (D.N.J.) (jury found for Plaintiff on six separate liability claims against police officers based on 24-year wrongful conviction, awarded $12 million in damages to wrongful conviction Plaintiff); *Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018); *Roberts v. City of Fairbanks*, 947 F.3d 1191 (9th Cir. 2020); *Hastings v. Price*, No. 23 Civ. 9684 (C.D. Ca.) ($25 million settlement); *Kidd v. Kansas City*, No. 21 Civ. 578 (W.D. Mo.) ($14.5 million settlement).

The firm's wrongful conviction practice also includes noted experience in developing,

defending from dispositive motions, and proving to a jury *Monell* claims against municipalities for policies, customs, and/or failures that lead to wrongful convictions. Ex. 8 (Brustin Decl.) ¶ 9. This specific band of experience put into action has produced several successful jury verdicts and has encouraged many cases to settle for substantial sums. *Id.* (citing *Mayes v. City of Hammond*, 03 Civ. 0379 (N.D. Ind.) (*Monell* verdict); *Hicks v. City of Philadelphia*, 22 Civ. 977 (E.D. Pa.) (jury found for Plaintiff on two theories of *Monell* liability in what, to counsel's knowledge, was the first wrongful conviction *Monell* verdict against the City of Philadelphia).

NSBHF's expertise is particularly important in a field as complicated as this one, which requires an understanding of interlocking immunities, the effect on this suit of prior state judgments, and facility with an extensive body of case law unique to this area. *See* Ex. 7 (Hoffmann Decl.) ¶¶ 4–5. In addition, NSBHF already had familiarity with this particular case, as Scott Lewis, Mr. Morant's former co-defendant who was likewise exonerated, also made the rational decision to hire NSBHF to handle his federal and state wrongful conviction cases in 2015, both of which reached a favorable result. Ex. 4 (Dignam Decl.) ¶¶ 4–6; Ex. 3 (Emanuel Decl.) ¶¶ 7–8, 12. Further, Bobby Johnson, another man wrongfully convicted in Connecticut, previously chose to hire NSBHF to take the lead on his federal case as well. Ex. 6 (Rosenthal Decl.) ¶ 10. This made the decision to hire NSBHF in particular even more reasonable here. Confirming the reasonableness of this decision, the firm was subsequently engaged by two separate local counsel to handle the now-consolidated wrongful conviction suits of George Gould and the Estate of Ronald Taylor. *See* Ex. 3 (Emanuel Decl.) ¶ 10.

On the other hand, as demonstrated by the declarations of Ms. Hoffmann, Mr. Rosenthal, Mr. Maazel, Ms. Dignam, and Mr. Emanuel, although there are talented, sophisticated lawyers in Connecticut with experience in criminal matters or civil rights matters more broadly, to Plaintiff's

knowledge and on the understanding of the above-listed declarants who are all in a position to know, there simply are not lawyers in Connecticut with the type of knowledge and experience in wrongful conviction matters that NSBHF and other out-of-district counsel have to offer. Ex. 7 (Hoffmann Decl.) ¶¶ 17–18; Ex. 6 (Rosenthal Decl.) ¶¶ 5–8, 10–11; Ex. 1 (Maazel Decl.) ¶¶ 11–16; Ex. 4 (Dignam Decl.) ¶¶ 6–9; Ex. 3 (Emanuel Decl.) ¶¶ 7–13. Mr. Rosenthal, Mr. Emanuel, and Ms. Dignam have all practiced at length in Connecticut, and are intimately familiar with the civil rights bar in the state, existing in and among it as preeminent members. Ex. 6 (Rosenthal Decl.) ¶¶ 2–4; Ex. 4 (Dignam Decl.) ¶¶ 2–7, 9; Ex 3 (Emanuel Decl.) ¶¶ 2–5, 10. Yet all opine that given the lack of in-state experience in wrongful conviction matters in particular, it was eminently reasonable for Mr. Morant to select out-of-district counsel here, and that in fact NSBHF's experience and skill litigating federal wrongful conviction cases almost certainly produced the superior results actually reached here.

Case in point, to Plaintiff's knowledge, this case is the first wrongful conviction suit in Connecticut to prevail at trial on § 1983 claims or *Monell* claims. And, among other wrongful conviction matters resolved or still pending in Connecticut, the vast majority are litigated by out-of-district counsel either alone or as co-counsel. Ex. 4 (Dignam Decl.) ¶¶ 5, 7–8; Ex. 3 (Emanuel Decl.) ¶¶ 10–11; Ex. 1 (Maazel Decl.) ¶ 15. *Cf. C.K. through P.K. v. McDonald*, 816 F. Supp. 3d 284, 328 (E.D.N.Y. 2026) (awarding out-of-district rates despite in-district co-counsel where "[r]eliance on solely in-District counsel would not only have produced a substantially inferior result for the Classes, the record shows that this litigation could not have been pursued at all without the deep expertise that all Class Counsel, including out-of-District counsel, brought to bear" (cleaned up)).

In addition to a lack of specialization in wrongful conviction matters in particular, pragmatically speaking, many prominent lawyers in the Connecticut bar would have been conflicted out of contention to represent Mr. Morant in the first place. As noted above and as this Court knows by now, the procedural histories of Mr. Morant's and Mr. Lewis's cases feature dozens of lawyers, many of whom would be conflicted out for one reason or another. Ex. 4 (Dignam Decl.) ¶¶ 4, 7–8; Ex. 3 (Emanuel Decl.) ¶¶ 6–7.

Perhaps most telling, Mr. Rosenthal makes clear in his declaration that in this very case, despite his general experience in civil rights law, he sought out NSBHF to serve as lead counsel for Mr. Morant's federal civil rights case because NSBHF had specialized experience with wrongful conviction matters Mr. Rosenthal understood to be necessary to successfully litigate the case, and there was no law firm or solo practitioner with comparable experience in Connecticut. Ex. 6 (Rosenthal Decl.) ¶¶ 9–11.

At bottom, a reasonable fee-paying client would choose an attorney with sufficient experience to navigate the highly complicated field of § 1983 wrongful conviction law. Ex. 1 (Maazel Decl.) ¶ 15. For such an attorney, a reasonable fee-paying client would need to look outside of Connecticut.

What's more, is it virtually certain that NSBHF's special skill and expertise accumulated from collective decades of experience working on and winning exactly this kind of case led to the excellent result here: not only a liability win that includes a *Monell* finding against the City of New Haven, but also $38 million worth of damages (the payout of which is not dependent on state law or the City's decision regarding indemnification, given the *Monell* verdict). To Plaintiff's knowledge, and that of several declarants, this is the highest civil rights jury verdict in Connecticut history. Ex. 7 (Hoffmann Decl.) ¶ 33; Ex. 6 (Rosenthal Decl.) ¶ 11; *see also* Ex. 1 (Maazel

Decl.) ¶ 13. In assessing whether a reasonable paying client would have hired out-of-district counsel, the Court must ask whether out-of-district counsel was likely to lead to a substantially better result. *Simmons*, 575 F.3d at 175. The degree of the success here only further establishes a "yes" answer to the *Simmons* question. Ex. 6 (Rosenthal Decl.) ¶ 11; Ex. 3 (Emanuel Decl.) ¶ 12–13.

Put together, NSBHF's special expertise, experience, and practical ability to take this case on, the lack thereof in the Connecticut market, and the undeniably excellent results NSBHF in fact obtained, displace the forum rule in this case. *See, e.g.*, *Restivo*, 846 F.3d at 591; *McDonald,* 816 F. Supp. 3d at 328; *Horror Inc. v. Miller*, No. 16 Civ. 1442, 2022 WL 4473426, at *5 n.3 (D. Conn. Sept. 26, 2022) (granting out-of-district rates where counsel had experience litigating the same kinds of cases, a rare subspecialty; had successfully litigated such cases before; and the favorable outcome reflected the quality of counsel's performance). Southern District of New York rates should apply.

*ii. The Southern District rates sought here are reasonable.*

Applying out-of-district, New York City–based rates for NSBHF attorneys, Plaintiff is seeking reimbursement for time expended at the hourly rates of $1050 for Nick Brustin; $950 for Anna Benvenutti Hoffmann and Emma Freudenberger; $700 for Amelia Green; $650 for Tony Balkissoon; $600 for Christina Matthias; $525 for Elsa Mota and Grace Paras; $500 for Katie Cion; and $225 for paralegals and law clerks.

As attested to by two separate outside reviewers, counsel's proposed rates are reasonable compared with the market rates for similarly complex federal litigation in the Southern District of New York, NSBHF's home district. Ex. 2 (Loewenson Decl.) ¶¶ 5–11; Ex. 1 (Maazel Decl.) ¶¶ 6–14. Multiple district courts in this Circuit, and the Second Circuit itself, have likewise endorsed

New York rates for NSBHF attorneys litigating wrongful conviction matters that parallel those awarded to New York City attorneys litigating at the highest level. *See Rosario*, 2023 WL 2523624, at *3 (noting in fee decision for NSBHF that the "skills required to win a complex civil rights case like this one are comparable to…those required in a complex commercial case"); *Restivo*, 2015 WL 7734100, at *3 (finding NSBHF's requested rates were "in line with rates charged in similar complex federal work in the Southern District" and citing a fee award in commercial litigation case), *aff'd sub nom. Restivo v. Hesseman*, 846 F.3d at 591.

Still, rates typically charged for similarly complex litigation in the SDNY market dwarf the requested rates. For example, Mr. Loewenson notes that current hourly rates at Morrison & Foerster, where he was a partner, *start* at $895 for the newest associates and reach as high as $2600 for some partners. Ex. 2 (Loewenson Decl.) ¶ 9. And rates at big law firms, both in New York and nationwide, have risen precipitously in the past several years. *See, e.g.*, Ex 16 (Article Compilation) at 6–7 (describing a Wells Fargo survey documenting a 9.2% increase in billing rate growth during the first half of 2025); *id.* at 1–5 (documenting a trend at top law firms with rates approaching or surpassing $3,000 per hour for partners, and in any event "nearly doubling in the past decade"); *see also Rosario*, 2023 WL 2523624, at *3 (emphasizing need for hourly rates in civil right cases to "reflect [] evolving market realities" to "'attract competent counsel' to enforce civil rights law even in difficult cases" (quoting *Blum*, 465 U.S. at 897)).

Of course, as a mid-sized civil rights firm, NSBHF is differently situated from these large commercial comparators, with somewhat lower overhead and a different clientele. But the requested rates, certainly nowhere near these levels, already reflect that reality. *Id.* at *3 (noting rates at top law firms were a relevant point of comparison for NSBHF given the comparable complexity of federal litigation, and the "large gap" between NSBHF's requested rates and larger

firms' analogous rates "fully accounted" for "different cost structures" and "a different legal sub-market"). Emery Celli Brinckerhoff Abady Ward & Maazel, LLP ("ECBAWM"), a litigation boutique with both a complex civil-rights practice and a commercial practice—and therefore the best comparator for NSBHF—has customary billing rates comparable to or higher than what NSBHF requests, including senior-partner rates of $1,000–$1175, junior-partner rates of $775–$900, and associates rates of $550–$600. Ex. 1 (Maazel Decl.) ¶ 10.

In recent years, courts in the Southern District have found reasonable attorney's fees at rates as high as $1760 per hour for complex federal litigation. *See, e.g.*, *An v. Despins*, No. 22 Civ. 10062, 2024 WL 1157281, at *2–4 (S.D.N.Y. Mar. 18, 2024) (approving reasonableness of 2023 rates of $1760 for partner with 20 years' experience, $1440 for counselor with 10 years' experience, and $895 for associates with federal clerkship experience); *Macquarie Mexico Real Estate Mgmt. S.A. de C.V. v. Hoiston Int'l Enters., Inc.*, No. 20 Civ. 8383, 2021 WL 4952693, at *8 (S.D.N.Y. Oct. 1, 2021), *adopted by* 2021 WL 4951764 (S.D.N.Y. Oct. 25, 2021) (awarding a managing partner with more than 25 years' experience $1300/hour and a partner with more than 20 years $1250/hour in 2021, in a case the court described as "relatively straightforward"); *StoneX Grp., Inc. v. Shipman*, No. 23 Civ. 613, 2025 WL 1212165, at *3–4 (S.D.N.Y. Apr. 25, 2025) (approving as reasonable rates of $1285 for a partner with 30 years' experience and $800 for a senior associate); *Vista Outdoor Inc. v. Reeves Family Trust*, No. 16 Civ. 5766, 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018) (awarding $1260/hour to partner with over 20 years' experience in contract dispute); *Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2025 WL 1591379, at *5–7 (S.D.N.Y. June 5, 2025) (approving as reasonable 2021 rates of $1108 for partner with 30 years' experience, $768 for associate with 6 years' experience and $616 for associate with 3 years' experience); *Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060, 2022 WL 4554858, at *10 (S.D.N.Y.

Sept. 29, 2022) (finding reasonable hourly rates from $500 for associates to $1200 for senior partners).

In fact, as early as 2014, the Southern District routinely awarded partners hourly rates in excess of $1,000 an hour in complex commercial litigation. *Themis Capital v. Democratic Republic of Congo*, No. 09 Civ. 1652, 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) ("[P]artner billing rates in excess of $1,000 an hour[] are by now not uncommon in the context of complex commercial litigation."); *Rudman v. CHC Grp. Ltd.*, No. 15 Civ. 3773, 2018 WL 3594828 (S.D.N.Y. July 24, 2018) (finding an hourly rate of $985 per hour reasonable for lawyers at a financial litigation firm); *Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, No. 20 Misc. 23, 2021 WL 1353756, at *3 (S.D.N.Y. Apr. 12, 2021) (approving rates of $1175 and $1350 for partners in bankruptcy action).

NSBHF's requested New York rates here are also in line with its most recent fee award in the Southern District itself, taking into account inflation, staffing variations, and even putting to the side various differences in the two cases across relevant *Johnson* factors. *See Rosario*, 2023 WL 2523624, at *5. For example, even adjusting solely for inflation, Mr. Brustin's 2022 rate of $900 approved in *Rosario* would be nearly $1050 in 2026. That figure is based on the most recent Consumer Price Index data available from the Bureau of Labor Statistics, and is quite close to the

rate requested here.[8,9] *LeBlanc-Sternberg*, 143 F.3d at 764 (hourly rates must be set at the market rate at the time of the fee petition, to take into account delay in payment). His $1050 rate is right on target for senior-partner rates currently charged at ECBAWM, Ex. 1 (Maazel Decl.) ¶ 10 (senior-partner rates from $1000–$1150), and it is far below rates approved for comparably experienced partners even several years ago now. *See, e.g., An*, 2024 WL 1157281, at *2–4 ($1760 for partner with 20 years' experience); *Macquarie*, 2021 WL 4952693, at *8 ($1300 to managing partner with more than 25 years' experience); *StoneX Grp., Inc.*, 2025 WL 1212165, at *3–4 ($1285 for a partner with 30 years' experience).

So too for partners Anna Benvenutti Hoffmann and Emma Freudenberger, whose 2022 rates of $800 awarded in *Rosario* are roughly equivalent to $925 per hour in 2026. The $950 rate requested here for these two partners—each with approximately 20 years' experience—is well below comparable rates at ECBAWM, *see* Ex. 1 (Maazel Decl.) ¶ 10 (*junior*-partner rates rise to $900), and well below rates awarded to similarly situated partners in New York, *see, e.g., Macquarie*, 2021 WL 4952693, at *8 ($1250 to partner with more than 20 years' experience);

---

[8] All inflation calculations included in this brief are done using the Bureau of Labor Statistics' online CPI Inflation Calculator, available at https://www.bls.gov/data/inflation_calculator.htm. *See Rubin v._HSBC Bank USA, NA*, 763 F. Supp. 3d 233, 242 (E.D.N.Y. 2025) ("Attorneys fees, as with other goods and services, increase in cost with inflation." (quoting *Almond v. PJ Far Rockaway, Inc.*, No. 15 Civ. 6792, 2018 WL 922184, at *2 (E.D.N.Y. Feb. 15, 2018))). Given that rates are typically set yearly, inflation is calculated from January of the year a rate was billed to January 2026.

[9] Note, however, that Bureau of Labor statistics tracking increases in prices for legal services in particular show that these prices have increased at a higher rate than the CPI writ large over the past 25 years. Therefore, the CPI inflation calculation is, if anything, a conservative measure of the rise in legal services costs in particular. *See* Producer Price Index by Industry: Legal Services, available at https://fred.stlouisfed.org/series/PCU54115411; *House v. Wackenhut Servs., Inc.*, No. 10 Civ. 9476, 2012 WL 4473291, at *2 (S.D.N.Y. Sept. 27, 2012) ("An alternative form of the Laffey Matrix, used by certain courts to determine fees, adjusts the *Laffey* rates based on the higher rate of inflation in the legal services component of the CPI.").

*Vista Outdoor Inc*, 2018 WL 3104631, at *6 ($1260 to partner with over 20 years' experience).

Partner Amelia Green's requested New York rate of $700 per hour is, if anything, modest for complex cases in the Southern District. It is well below the rates reflected in ECBAWM's billing practices, which *start* junior-partner billing rates at $775, Ex. 1 (Maazel Decl.) ¶ 10, and is in line with past awards by courts in the jurisdiction, *see, e.g., Restivo*, 2015 WL 7734100, at *5 (approving $500 per hour for Ms. Hoffmann, then a junior partner, based on 2014 rates, equivalent to almost $700 when adjusted for inflation); *An*, 2024 WL 1157281, at *2–4 ($1440 to counselor with 10 years' experience; $895 for associates with federal clerkship experience); *StoneX Grp., Inc.*, 2025 WL 1212165, at *3–4 ($800 for senior associate).

Similarly, the rates requested for experienced counsel Tony Balkissoon ($650/hour, 16 years' experience) and former senior associate Christina Matthias ($600/hour, 11 years' experience) are also amply supported by the record evidence. Despite their impressive credentials and experience, their requested rates are far below the current $895 *starting* rate for big-firm associates, Ex. 2 (Loewenson Decl.) ¶ 9, in line with the $600 top rate for ECBAWM associates, Ex. 1 (Maazel Decl.) ¶ 10, and well below rates awarded to similarly qualified lawyers, *see, e.g., An*, 2024 WL 1157281, at *2–4 ($1440 to counselor with 10 years' experience, $895 for associates with federal clerkship experience); *Al Thani*, 2025 WL 1591379, at *5 ($768 for associate with 6 years' experience and $616 for associate with 3 years' experience).

The rates Plaintiff seeks for junior to mid-level associates ($500–$525) are likewise reasonable, consistent with prior awards in civil rights and other complex cases, and lower than corollary rates customarily charged at ECBAWM. Ex. 1 (Maazel Decl.) ¶ 10 (associate rates of $550–600); *Fair Hous. Justice Ctr. v. Pelican Mgmt., Inc.*, No. 18 Civ. 1564, 2025 WL 965129, at *3 (S.D.N.Y. 2023) (awarding $550 to a 2017 law graduate in an employment law matter). Rates

of approaching $500 or $525 per hour in today's dollars have also been approved for associates in civil rights cases with less experience than Elsa Mota and Grace Paras (6 years' experience, seeking $525), and Katie Cion (5 years' experience, seeking $500)—experience that includes prestigious federal judicial clerkships and time spent in civil rights practice during and after law school. *See, e.g.*, *Fair Hous. Justice Ctr.*, No. 18-cv-1564, Dkt. 195 at 11 (in 2023, requesting $475 for 2020 law graduate with two federal clerkships); *id.*, 2025 WL 965129, at *3 (finding $475 rate for associate with 3 years' experience reasonable and undisputed by defendants).

Lastly, the $225 per hour rate for paralegals and law clerks is reasonable; it is less than the 2022 rate of $200 approved in *Rosario* for NSBHF, adjusted for inflation. *See* 2023 WL 2523624, at *5; *see also Charles v. Seinfeld*, No. 18 Civ. 1196, 2022 WL 889162, at *5 (S.D.N.Y. Mar. 25, 2022) ("Courts in this district generally find that reasonable hourly rates for paralegal and litigation support staff range from $150 to $250.").

**B. The requested District of Connecticut rates are reasonable for the District of Connecticut.**

In the event this Court applies the forum rule and looks to prevailing rates in the Connecticut legal community, Plaintiff requests the following hourly rates: $800 for Nick Brustin; $700 for Anna Benvenutti Hoffmann and Emma Freudenberger; $550 for Amelia Green; $500 for Tony Balkissoon; $475 for Christina Matthias; $400 for Elsa Mota and Grace Paras; $375 for Katie Cion; and $140 for paralegals and law clerks.

Once again here, Plaintiff submits an outside Declaration, that of Brian Spears, a prominent white collar criminal defense attorney practicing in Connecticut, attesting to the fact that Plaintiff's proposed Connecticut rates are reasonable, in line with the prevailing market rate for comparably complex civil and/or criminal matters. Ex. 5 (Spears Decl.) ¶¶ 7–10. *Cf. Evans v. State of Connecticut*, 967 F. Supp. 673, 691 (D. Conn 1997) (looking to attorney's fees granted in cases in

the District of Connecticut where proponent of rates had failed to submit additional evidence beyond own affidavits showing that "the requested rates are in line with those prevailing in the community for similar services").

Indeed, multiple district court judges within this Circuit have held that experienced, skilled NSBHF attorneys and the complex wrongful conviction matters they litigate occasion rates at the high end of the spectrum for similarly complex federal work in a given district, civil rights or otherwise. *See Restivo*, 2015 WL 7734100, at *3 (awarding senior partners at NSBHF rates "in line with rates charged for similar complex federal work in the Southern District," even outside of § 1983 cases in particular where relevant comparators were out of date and involved simpler matters); *Rosario*, 2023 WL 2523624, at *2–3 (awarding rates at the high end of the civil rights market and rejecting the defense's citation to civil rights cases awarding lower rates, as "many of those [cases were] several years old, and many involve[d] more 'garden variety' civil rights cases. In order to attract competent counsel to enforce civil rights laws even in difficult cases, rates must reflect both evolving market realities and the challenges of particular cases." (cleaned up)); *Cf. Serricchio v. Wachovia Sec., LLC*, 706 F. Supp. 2d 237, 255 (D. Conn. 2010), *aff'd*, 658 F.3d 169 (2d Cir. 2011) (awarding an hourly rate above any reported hourly rate given attorney's "extensive experience, high reputation, and remarkably successfully results, and to reflect the reality of rate increases over time").

Looking at similar comparators in the District of Connecticut simply confirms that to which Brian Spears attests: the proposed Connecticut rates are reasonable. Start with Nick Brustin: courts in this District have awarded rates similar to his proposed $800/hour in other, apparently less complex civil rights cases, adjusting for inflation. *See, e.g.*, *Muhammed v. Martoccio*, No. 06 Civ. 1147, 2010 WL 3718560, at *3–4 (D. Conn. Sept 13, 2010) (awarding attorney with "substantial

experience in litigating criminal and civil cases" $500/hour in 2010, approximately $750 now adjusted for inflation, in straightforward § 1983 excessive force case); *Barati v. Metro-N. R. Co.*, 939 F. Supp. 2d 153, 156 (D. Conn. 2013) (awarding rate of $525/hour in 2013, now approximately $750 adjusted for inflation, to experienced lead attorney with specialization in railroad employee rights, after successful six-day jury trial, rate that was both reasonable and "fulfill[ed] the purpose of federal fee shifting statutes to incentivize capable attorneys to take on meritorious cases"). The same is true looking at rates awarded in comparably complex civil litigation. In fact, 2021 rates submitted by Wiggin and Dana in a class action lawsuit wherein ECBAWM served as co-counsel show a senior partner then charged $750/hour, what equates to over $900 in 2026 dollars. *Rosenfeld v. City of New York*, No. 18 Civ. 6720 (E.D.N.Y. Sept. 20, 2021), Dkt. 115. *See also Lego A/S v. Best-Lock Construction Toys, Inc.*, No. 11 Civ. 1586 (D. Conn. 2021), Dkt. 222-1 (Intellectual Property partner at Day Pitney based out of Hartford with more than 25 years of experience billed at $780/hour in 2021 on a complex matter, the equivalent of over $950/hour today). And, as with Mr. Brustin's New York rates, a benchmark for the reasonableness of his proposed Connecticut rates is the fact that rates charged by large law firms in Connecticut for corporate litigation are comparable but considerably higher. *See, e.g.*, *In re Whitehall Manor*, No. 25-15245 (E.D. Pa. Bankr. June 3, 2026), Dkt. 181 (Bankruptcy partner at Shipman and Goodwin based out of Hartford office billed at a rate of $1120/hour).

Both Ms. Hoffmann's and Ms. Freudenberger's requested rates ($700/hour) are also well within the range of rates awarded to senior partners with approximately 20 years of specialized experience in complex civil litigation in Connecticut. Indeed, a partner at Wiggin and Dana LLP with more than twenty years handling complex commercial litigation charged $675/hour in 2021, equal to well over $800 today. *Hallingby v. Gerber*, No. 17 Civ. 975 (D. Conn. May 13, 2021),

Dkt. 84. Counsel for the City in this matter, Mr. Dooley, also a partner at Wiggin and Dana LLP, commanded an hourly rate of $575/hour in 2021 with closer to 10 than 20 years of legal experience under his belt: a rate that, adjusted for inflation, equals out to over $700 today. *Rosenfeld v. City of New York*, 18 Civ. 6720 (E.D.N.Y. Sept. 20, 2021), Dkt. 115.[10] A December 2009 *National Law Journal* article reported that *in 2009*, the top rate for partners at McCarter & English was $700/hour; for Robinson & Cole $650/hour; and for Wiggin & Dana, $650/hour. *Wells Fargo Bank N.A. v. Konover*, No. 05 Civ. 1924 (D. Conn. February 19, 2013), Dkt. 1069-7. Those numbers all top $1000 today.

The rates requested by Ms. Green ($550), Mr. Balkissoon ($500), and Ms. Matthias ($475) are similarly shown to be reasonable by relevant comparators. These attorneys, a firm partner, counsel, and senior associate, respectively, all have over 10 years of specialized legal experience and all contributed substantively to the result in this case. Ex. 10 (Green Decl.) ¶¶ 3–8; Ex. 11 (Balkissoon Decl.) ¶¶ 3–8; Ex. 12 (Matthias Decl.) ¶¶ 3–6. Their rates, staggered slightly to reflect their differing roles at the firm and on this case, all fit within the mold of those awarded to similarly situated practitioners in Connecticut. *See, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 342 F.R.D. 84, 88 (S.D.N.Y. 2022) (Day Pitney partner Christopher Klimmek, who graduated law school in 2008 and is based out of Hartford office, awarded $475/hour for 2019 rate and $510/hour for 2020); *Lego A/S*, No. 11 Civ. 1586, Dkt. 222-1 (counsel at Day Pitney based out of Hartford office with more than 10 years of intellectual property experience charged a $515 rate in 2021); *Barati v. Metro-North R. Co.*, 939 F. Supp. 2d 153, 156 (D. Conn. 2013) (second-chair at 6-day trial with 12 years of experience and federal clerkship awarded hourly rate of $375, over $500

[10] Notably, ECBAWM served as co-counsel to Wiggin and Dana in that litigation.

adjusted for inflation); *Rosenfeld*, 18 Civ. 6720, Dkt. 115 (Mr. Dooley charged a rate of $575/hour in 2021).

For associates Elsa Mota, Grace Paras, and Katie Cion, all with 5-6 years of legal experience, Plaintiff requests rates between $375 and $400 per hour. These rates are well within the range awarded to associates with similar experience and sterling credentials. *See, e.g.*, *Bruce Kirby, Inc. v. LaserPerformance (Eur.) Ltd.*, No. 13 Civ. 297, 2020 WL 502653, at *5 (D. Conn. Jan. 31, 2020) (Awarding a rate of $300/hour, or over $350 adjusted for inflation, to a lawyer with five years of experience at time of award given complexity of case); *Lego A/S*, No. 11 Civ. 1586, Dkt. 222-1 (Day Pitney intellectual property associate based in Hartford office with more than five years of experience charged $410/hour in 2021, equivalent to approximately $500 in 2026); *Serrichio*, 706 F. Supp. 2d at 254 (awarding associate with 5 years of practice experience and a clerkship $300/hour in 2010, equivalent to about $450 today).

Separately, as laid out in his supporting Declaration, Ex. 6 (Rosenthal Decl.) ¶ 13, attorney Ken Rosenthal has most recently charged a rate of $550/hour for federal trial work in 2022. *See Arbor Hill*, 522 F.3d at 190 ("The reasonable hourly rate is the rate a paying client would be willing to pay."). As an exercise in billing judgment and in view of his particular role in this case, and despite inflation of rates in the interim, he is requesting a reduced rate of $450/hour, that is entirely reasonable given his experience and skill.

Finally, the requested rate for paralegals, $150/hour, is right down the middle for reasonable rates charged by and awarded to paralegals in this District. *See, e.g.*, *Retained Realty, Inc. v. Spitzer*, 643 F. Supp. 2d 228, 242 (D. Conn. 2009) ($140/hour for paralegal in 2009); *Doe v. Darien Bd. of Educ.*, No. 11 Civ. 1581 (JBA), 2015 WL 8770003, at *6 (D. Conn. Dec. 14, 2015) ("This Court recently found that $140/hour is a reasonable rate for paralegal work").

### C. The relevant *Johnson* and *Blum* criteria support the rate requests.

Several of the *Johnson/Blum* factors are particularly relevant here. Although NSBHF works on a contingency basis, the prior opinions canvassed above certainly go to the "customary fee" as well as "previous awards" category. But additional factors counsel in favor of the proposed rates at either the New York or Connecticut level. Again, the Court must bear these factors in mind when setting a reasonable hourly rate. *Arbor Hill*, 522 F.3d at 190.

*i. Experience, reputation, and ability of the attorneys*

Plaintiff's counsel's "skill, experience, and reputation," as well as the particular "services" provided in this complex litigation, fully justify the rates sought. *Perdue*, 559 U.S. at 553 (noting "the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate" (cleaned up)); *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

As discussed as it bears on displacing the forum rule, NSBHF is a recognized leader in wrongful conviction practice nationally, having successfully litigated dozens of wrongful conviction cases. *See, e.g.*, *Restivo*, No. 06-cv-6720 (E.D.N.Y.) (jury awarded $36 million, $18 million to each plaintiff amounting to $1 million for every year spent wrongfully incarcerated); *Trulove v. D'Amico*, No. 16-cv-050 (N.D. Cal) (jury awarded $10 million in damages to plaintiff who spent six years in prison after being wrongfully convicted of murder); *Deskovic v. City of Peekskill*, No. 07-cv-8150 (S.D.N.Y.) ($41.65 million jury verdict); *Gates v. District of Columbia*, No. 11-cv-040 (D.D.C.) (jury found that District of Columbia police officers had fabricated evidence and hid exculpatory evidence during plaintiff's trial for rape and murder, resulting in 28-year wrongful conviction, with the government subsequently settling claims for $16.65 million); *Kelley v. Reyes*, No. 19 Civ. 17911 (D.N.J.) (jury found for Plaintiff on six separate liability claims against police officers based on 24-year wrongful conviction, awarded $12 million in damages to

wrongful conviction Plaintiff). *See* Ex 7 (Hoffmann Decl.) ¶¶ 6–7, 17–18. And, once more, NSBHF has also achieved numerous appellate victories in this evolving area of the law. *See, e.g.*, *Restivo*, 846 F.3d 547; *Roberts*, 947 F.3d 1191; *Mellen*, 900 F.3d 1085; *Fogle v. Sokol*, 957 F.3d 148 (3d Cir. 2020). *See* Ex. 7 (Hoffmann Decl.) ¶ 9. Since the vast majority of NSBHF's cases settle, the firm has a much longer list of substantial settlements in § 1983 wrongful conviction cases around the country, many of which are the highest in their respective jurisdictions.[11]

And the firm's successes are due in no small part to the exceptional quality of the work done by the firm's respective leadership. Mr. Brustin, a named partner at NSBHF, has litigated over 75 wrongful conviction cases in the last two decades alone, and is responsible for several of the biggest verdicts nationally. Because of his expertise in this area, he is regularly consulted by other experienced civil rights lawyers on trial strategy. *See* Ex. 8 (Brustin Decl.). Ms. Hoffmann, also a named partner, in addition to trial successes in *Restivo, Trulove*, and *Rosario* is responsible for notable appellate decisions in this field, *see, e.g.*, *Restivo*, 846 F.3d 547; *Mellen*, 900 F.3d 1085, and is regularly consulted by other civil rights lawyers as a leading expert in § 1983 wrongful conviction law. *See* Ex. 7 (Hoffmann Decl.). Ms. Freudenberger, a named partner as well, has helped achieve trial and appellate victories, as well as substantial settlements, in dozens of other wrongful conviction cases. Earlier this year, she served as lead counsel representing Eric Kelley

[11] *E.g. Hastings v. Price* ($25 million); *Klene v. Los Angeles County* ($24 million); *Deskovic v. City of Peekskill* (over $23 million); *Saldaña v. Donovan* ($22.8 million); *Coley v. Simi Valley* ($21 million); *Register v. City of Los Angeles* ($16.7 million); *Gates v. District of Columbia* ($16.65 million); *Saunders v. City of Chicago* ($15.99 million); *Berry v. Las Vegas Metro. Police Dep't* ($14.5 million); *Kidd v. Kansas City* ($14 million); *Allen v. City of St. Louis* ($14 million); *Estate of Wilson v. City of New York* ($13 million); *Fogle v. Sokol* ($13 million); *McIntyre v. Unified Government of Wyandotte Cnty. & Kansas City* ($12.5 million); *Halsey v. Pfeiffer* ($12.5 million); *Rubalcava v. San Jose* ($12 million); *Jenkins v. City of Boston* ($12 million); *Tapp v. City of Idaho Falls* ($11.7 million); *Roberts v. City of Fairbanks* ($11.5 million). *See* Ex. 7 (Hoffmann Decl.) ¶ 18.

in *Kelley v. Reyes*, No. 19 Civ. 17911 (D.N.J.), where she led the team in securing a resounding victory at a jury trial, winning a panoply of liability claims and $12 million in damages. *See* Ex. 9 (Freudenberger Decl). Lastly, Ms. Green, partner, recognized by Bloomberg Law in 2024 as one of the top young lawyers in the country for her litigation practice, has achieved successful outcomes for clients nationwide, including securing favorable settlements or trial verdicts in more than twenty wrongful conviction cases. *See* Ex. 10 (Green Decl.). All four partners are consistently named as "Super Lawyers."

Further, as mentioned *supra*, NSBHF's counsel and associates are of the highest caliber, having graduated from top law schools, often, as in this case, with multiple federal clerkships and, for mid-level associates and beyond, years of relevant experience themselves. See Exs. 11–15.

As recognized by their peers, the attorneys involved in this case are at the pinnacle of their profession and are well deserving of the requested rates. Complete biographies are provided for each attorney in their supporting declarations. *See* Exs. 6–15. These qualifications and experiences were all brought to bear on the exceedingly complicated, difficult case at bar, to tremendous result. They warrant a higher hourly rate, just as they would on the open market.

*ii.* *The complexity of the litigation*

As described above and in Ms. Hoffmann's declaration, § 1983 wrongful conviction cases are incredibly complex, and this case was complex even for a § 1983 wrongful conviction case. *See* Ex 7 (Hoffman Decl.) ¶ 21. Higher attorney's fees are reasonable when a case is "particularly complex" or "hardly straightforward." *See Abdell v. City of N.Y.*, No. 05 Civ. 8453, 2015 WL 898974, at *3 (S.D.N.Y. Mar. 2, 2015) (in 2015, finding $650 per hour reasonable for lead counsel in a particularly complex civil rights action). Courts consider not only legal complexity but also "factual and historical complexity" of the controversy in assessing whether rates at the top of the

range are merited. *See Medina v. Buther*, No. 15 Civ. 1955, 2019 WL 4370239, at *10–11 (S.D.N.Y. Sept. 12, 2019) (finding 'factual and historical complexity' of having dealt with, among many other things, handwritten records that were difficult to obtain and decipher in support of higher rate); *Benihana, Inc. v. Benihana of Tokyo*, LLC, No. 15 Civ. 7428, 2017 WL 6551198, at*4 (S.D.N.Y. Dec. 22, 2017) (finding requested rates reasonable where there was "tangible evidence of the factual and historical complexity of the controversy").

Based on all these criteria, the rates requested are eminently reasonable.

**IV. Plaintiff is entitled to his reasonable costs.**

"[A]n award of costs under § 1988 normally includes those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged to fee-paying clients." *HomeAway.com, Inc. v. City of New York*, No. 18 Civ. 7742, 2021 WL 791232 (S.D.N.Y. Mar. 1, 2021) (citing *Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987). "Recoverable disbursements include such items as legal research, photocopying, postage, transportation, and filing fees." *Id.* (citing *Arbor Hill*, 369 F.3d at 97–98). Plaintiff is seeking reimbursement for $419,756.60 in costs under § 1988.[12] *See* Ex 7 (Hoffmann Decl.) ¶ 53. This includes $1400 for court fees; $56,047.98 for deposition and discovery expenses; $35,099.08 for printing, copying, and scanning; $707.70 for records requests; $732.74 for shipping costs; $100,552.56 in travel and meal costs; $113,851.48 in trial costs; $27,675.30 in trial transcript costs; $11,139.68 in Westlaw and research costs; and $258.92 in witness fees. *Id.* ¶¶ 53–69.

It also includes $72,291.16 for investigation, *see Stinson v. City of New York*, 256 F. Supp. 3d 283, 297 (S.D.N.Y. 2017), and line items in trial costs for jury consultant fees, *see, e.g.*, *Ravina*

[12] Although some of these categories of expenses are compensable under § 1920, for simplicity, Plaintiff seeks them all here.

*v. Columbia Univ.*, No. 16 Civ. 2137, 2020 WL 1080780, at *14 (S.D.N.Y. Mar. 6, 2020); (awarding costs for jury consulting); *BD v. DeBuono*, 177 F. Supp. 2d 201, 204 (S.D.N.Y. 2001) (same), and for a trial technician, *see Hasemann v. Gerber Prods. Co.*, No. 15 Civ. 2995, 2025 WL 2773748, at *11 (E.D.N.Y. Sept. 29, 2025) (listing "trial consultants" and "litigation and trial support services" as typical, compensable costs of complex litigation); *Altvater Gessler-J.A. Baczewski Int'l (USA) Inc. v. Sobieski Destylarnia S.A.*, No. 06 Civ. 6510, 2011 WL 2893087, at *7 (S.D.N.Y. July 14, 2011) (awarding costs for trial technology consultant).

All of these costs, which are normally billed to fee-paying clients under the standard billing practices in this district, were reasonably incurred during this litigation. And given that Plaintiff's counsel were carrying these costs for years—in addition to substantial other costs that are not compensable, such as over $110,000 in expert fees, and compensable costs Plaintiff nonetheless does not submit here as an exercise of billing judgment—they endeavored to minimize costs as much as possible. *See* Ex. 7 (Hoffmann Decl.) ¶ 53.

## CONCLUSION

For the reasons stated herein, Plaintiff's request for attorney's fees and costs in the amount stated should be granted.

Dated: New York, New York
October 15, 2026

Respectfully Submitted,

/s/ Anna Benvenutti Hoffmann
Nick Brustin, phv08609
Anna Benvenutti Hoffmann, phv208203
Emma Freudenberger, phv08602
Amelia Green, phv208992
Elsa Mota, phv208184
Grace Paras, phv208762
Katie Cion, phv20899
Neufeld Scheck Brustin
Hoffmann & Freudenberger, LLP

200 Varick Street, Suite 800
New York, NY 10014
Tel: (212) 965-9081
Fax: (212) 965-9084
anna@nsbhf.com
nick@nsbhf.com
emma@nsbhf.com
amelia@nsbhf.com
elsa@nsbhf.com
grace@nsbhf.com
kcion@nsbhf.com

Kenneth Rosenthal, ct05944
Law Office of Kenneth Rosenthal
One Audubon Street, 3d Fl.
New Haven, CT 06511
(203) 915-4235
krosenthal@gs-lawfirm.com

*Attorneys for Plaintiff Stefon Morant*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

*/s/ Jackie Ochoa Acevedo*
Jackie Ochoa Acevedo
Paralegal